UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE №: 9:25-cv-81197

DEFENSE DISTRIBUTED, a Texas
corporation; DD FOUNDATION, LLC, a
Texas limited liability company; and,
DEFCAD, INC., a Texas corporation,

*Plaintiffs,*

v.

JOHN ELIK; MATTHEW LAROSIERE;
ALEXANDER HOLLADAY; PETER
CELENTANO; JOSH KIEL STROKE; JOHN
LETTMAN; and ZACKARY CLARK,

*Defendants.*

_____/

JOHN ELIK; ALEXANDER HOLLADAY;
JOSH KIEL STROKE; and JOHN
LETTMAN,

*Counterplaintiffs,*

v.

DEFENSE DISTRIBUTED; DEFCAD, INC.;
DD FOUNDATION, LLC; CODY
RUTLEDGE WILSON; GARRET
WALLIMAN; THOMAS ODOM; FEDERICO
REYNAL; CHAD FLORES; and DAVID
GINGRAS,

*Counterdefendants.*

**DEFENDANTS' CONSOLIDATED ANSWER AND COUNTERCLAIMS TO
PLAINTIFFS' SECOND AMENDED COMPLAINT**

1

## TABLE OF CONTENTS

**ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT** ..................... 5

**AFFIRMATIVE DEFENSES** ........................................................................ 10

**COUNTERCLAIMS** .................................................................................... 13

**INTRODUCTION** ........................................................................................ 13

**JURISDICTION AND VENUE** ................................................................... 13

**PARTIES** .................................................................................................... 16

**BACKGROUND** .......................................................................................... 33

    **Wilson Stalks, Harasses, and "Doxxes" his Critics** ........................................ 35

    **The DDLegio blog** ........................................................................................ 44

    **The Black Flag White Paper** ........................................................................ 47

    **The Middle District Action's Counterclaims** .................................................. 49

    **Wilson uses Journalists to Weaponize his Counterclaims** ........................... 52

    **Wilson Pays Gary Flowers to Craft Narratives, Harass
    Counterplaintiffs** ........................................................................................... 56

**FIRST CAUSE OF ACTION COPYRIGHT INFRINGEMENT UNDER 17
U.S.C. § 501** ............................................................................................... 75

    **COUNT 1 – COPYRIGHT INFRINGEMENT** BY JOHN ELIK AGAINST
    DEFCAD, INC.; DD FOUNDATION; DEFENSE DISTRIBUTED; CODY
    RUTLEDGE WILSON; THOMAS ODOM; AND GARRET WALLIMAN ............. 75

    **COUNT 2 – COPYRIGHT INFRINGEMENT** BY ALEXANDER HOLLADAY
    AGAINST DEFCAD, INC.; DD FOUNDATION; DEFENSE DISTRIBUTED;
    CODY RUTLEDGE WILSON; THOMAS ODOM; AND GARRET WALLIMAN .. 79

**SECOND CAUSE OF ACTION FALSE DESIGNATION OF ORIGIN AND
UNFAIR COMPETITION UNDER 15 U.S.C. § 1125** ........................................... 84

    **COUNT 3 – FALSE DESIGNATION OF ORIGIN** BY JOHN ELIK AGAINST
    CODY RUTLEDGE WILSON AND THROUGH HIM DEFCAD, INC.; DD
    FOUNDATION; AND DEFENSE DISTRIBUTED ............................................... 84

    **COUNT 4 – FALSE DESIGNATION OF ORIGIN** BY ALEXANDER
    HOLLADAY AGAINST CODY RUTLEDGE WILSON AND THROUGH HIM
    DEFCAD, INC.; DD FOUNDATION; AND DEFENSE DISTRIBUTED ............. 88

    **COUNT 5 – FALSE DESIGNATION OF ORIGIN** BY JOSH KIEL STROKE
    AGAINST CODY RUTLEDGE WILSON AND THROUGH HIM DEFCAD, INC.;
    DD FOUNDATION; DEFENSE DISTRIBUTED; THOMAS ODOM; AND
    GARRET WALLIMAN ..................................................................................... 91

**THIRD CAUSE OF ACTION VIOLATION OF The Illinois Right of Publicity Act  UNDER 765 ILCS § 1075** ................................................................................ 96

    **COUNT 6 – ILLINOIS RIGHT OF PUBLICITY ACT VIOLATION** BY JOHN ELIK AGAINST DEFCAD, INC.; DD FOUNDATION; DEFENSE DISTRIBUTED; CODY RUTLEDGE WILSON; THOMAS ODOM; AND GARRET WALLIMAN .................................................................................................. 96

**FOURTH CAUSE OF ACTION PUBLIC DISCLOSURE OF PRIVATE FACTS UNDER ILLINOIS LAW OR, IN THE ALTERNATIVE, FLORIDA LAW** ...... 102

    **COUNT 7   PUBLIC DISCLOSURE OF PRIVATE FACTS** BY JOHN ELIK AGAINST CODY RUTLEDGE WILSON, AND THROUGH HIM, DEFCAD, INC.; DD FOUNDATION; AND DEFENSE DISTRIBUTED ...................................... 102

**FIFTH CAUSE OF ACTION UNAUTHORIZED PUBLICATION OF NAME OR LIKENESS IN VIOLATION OF §540.08, Fla. Stat.** ................................... 106

    **COUNT 8 – UNAUTHORIZED PUBLICATION OF NAME OR LIKENESS** BY ALEXANDER HOLLADAY AGAINST CODY RUTLEDGE WILSON, AND THROUGH HIM DEFCAD, INC. AND DEFENSE DISTRIBUTED .................. 106

**SIXTH CAUSE OF ACTION –VIOLATION OF TEXAS BUSINESS & COMMERCE CODE §§ 302.101 AND 302.303** ..................................................... 108

    **COUNT 9 –VIOLATION OF TEXAS BUSINESS & COMMERCE CODE §§ 302.101-.303, & CHAPTER 17 DECEPTIVE TRADE PRACTICES** BY COUNTERPLAINTIFFS ELIK, STROKE, LETTMAN, AND HOLLADAY, INDIVIDUALLY AND ON BEHALF OF THE PROPOSED CLASS, AGAINST COUNTERDEFENDANTS DEFENSE DISTRIBUTED AND DEFCAD, INC... 108

**SEVENTH CAUSE OF ACTION – WRONGFUL INSTITUTION OF CIVIL PROCEEDINGS UNDER ARIZONA LAW** ........................................................ 113

    **COUNT 10 – WRONGFUL INSTITUTION OF CIVIL PROCEEDINGS** BY JOSH KIEL STROKE AGAINST COUNTERDEFENDANTS DEFENSE DISTRIBUTED, DEFCAD, INC., CODY RUTLEDGE WILSON, FEDERICO A. REYNAL, CHAD C. FLORES, AND DAVID S. GINGRAS.................................. 114

**EIGHTH CAUSE OF ACTION – ABUSE OF PROCESS UNDER ARIZONA LAW** .......................................................................................................................... 121

    **COUNT 11 – ABUSE OF PROCESS** BY COUNTERPLAINTIFF STROKE AGAINST COUNTERDEFENDANTS DEFENSE DISTRIBUTED, DEFCAD, CODY RUTLEDGE WILSON, AND GARRET WALLIMAN............................... 121

**NINTH CAUSE OF ACTION – WRONGFUL INSTITUTION OF CIVIL PROCEEDINGS UNDER ARIZONA LAW** ........................................................ 126

**COUNT 12 – WRONGFUL INSTITUTION OF CIVIL PROCEEDINGS** BY JOSH KIEL STROKE AGAINST COUNTERDEFENDANTS DEFENSE DISTRIBUTED, DEFCAD, CODY RUTLEDGE WILSON, GARRET WALLIMAN, FEDERICO REYNAL, CHAD FLORES, and DAVID GINGRAS ........................ 126

**TENTH CAUSE OF ACTION – INTENTIONAL INFLUCTION OF EMOTIONAL DISTRESS UNDER ARIZONA LAW** ......................................... 135

**COUNT 13 – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** BY COUNTERPLAINTIFF STROKE AGAINST COUNTERDEFENDANTS DEFENSE DISTRIBUTED, DEFCAD, AND CODY RUTLEDGE WILSON ...... 135

**ELEVENTH CAUSE OF ACTION WRONGFUL USE OF CIVIL PROCEEDINGS IN VIOLATION OF 42 Pa.C.S. §§ 8351-8354 (DRAGONETTI ACT)** ............................................................................................... 141

**COUNT 14 – WRONGFUL USE OF CIVIL PROCEEDINGS** BY JOHN LETTMAN AGAINST COUNTERDEFENDANTS CODY RUTLEDGE WILSON, DEFENSE DISTRIBUTED, DEFCAD, FEDERICO REYNAL, CHAD FLORES, and DAVID GINGRAS ..................................................................... 141

In response to Plaintiffs' Second Amended Complaint, (Doc. 49), Defendants John Elik, Matthew Larosiere, Alexander Holladay, Josh Stroke, John Lettman, and Zackary Clark plead this answer. Defendants John Elik, Alexander Holladay, Josh Stroke, and John Lettman plead counterclaims and third-party claims.

## ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

Defendants Elik, Larosiere, Holladay, Stroke, Lettman, and Clark submit their consolidated answer to the allegations in the Second Amended Complaint as follows. To the extent any allegation is squarely admitted or denied without qualification, it is done so by all Defendants. To the extent any Defendant differs in responding to any allegation, it will be done so explicitly. The paragraph numbers below correspond to the paragraph numbers in the Second Amended Complaint.

1. Admit.

2. Denied. DEFCAD, Inc. forfeited its corporate existence/charter on February 27, 2026, and is no longer a Texas corporation with a principal place of business in Texas.

3. Admit.

4. Admit.

5. Admit.

6. Admit.

7. Denied for lack of knowledge.

8. Admit.

9. Admit.

10. Admit.

11. Admit.

12. Admit as to diversity, denied as to amount in controversy.

13. Denied.

14. Denied. Mr. Larosiere resides in the Middle District, and no conspiracy exists.

15. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in SAC ¶ 15 and therefore denies them. To the extent the allegations in SAC ¶ 15 purport to describe the corporate structure, ownership, or financial relationships among the Plaintiffs, they call for legal conclusions to which no response is required. Defendant further states that Plaintiffs (or related entities) previously denied substantially similar allegations regarding the sharing of income from DEFCAD's business in discovery in *Larosiere v. Wilson*, Case No. 6:24-cv-01629 (M.D. Fla.).

**DEFENDANT, DEFCAD, INC.'S, RESPONSE
TO PLAINTIFF'S REQUEST FOR ADMISSIONS**

Defendant, DEFCAD, INC., pursuant to Rule 33 of the Federal Rules of Civil Procedure, hereby responds to Plaintiff's Request for Admissions, and states as follows:

REQUEST NO. 1: Admit that Defcad shares some or all of the income it makes with other companies.

**RESPONSE: Denied.**

**DEFENDANT, DEFENSE DISTRIBUTED'S, RESPONSE
TO PLAINTIFF'S REQUEST FOR ADMISSIONS**

Defendant, DEFENSE DISTRIBUTED, pursuant to Rule 33 of the Federal Rules of Civil Procedure, hereby responds to Plaintiff, MATTHEW LAROSIERE's Request for Admissions, and states as follows:

REQUEST NO. 1: Admit that at least some of the income you have "shared" from Defcad was generated in part or in whole while Defcad made the works at issue available.

**RESPONSE: Denied.**

6

16. Denied.

17. Denied.

18. Mr. Elik admits, the remaining Defendants deny for lack of knowledge.

19. Mr. Elik denies, the remaining Defendants deny for lack of knowledge.

20. Denied for lack of knowledge.

21. Mr. Elik denies, the remaining Defendants deny for lack of knowledge.

22. Denied.

23. Denied.

24. Denied.

25. Denied. The image, literally right below this paragraph, simply does not say that.

26. Denied.

27. Denied. None of the answering Defendants ever paid or agreed with Mr. Celentano to do anything. Also, Defcad.com's own posting of the meme remains the top search result.

28. Denied.

29. Denied.

30. Denied.

31. Denied. Ms. Stroke has never been paid by either MAF or Larosiere, although Ms. Stroke did post the meme of her own volition.

32. Denied for lack of knowledge.

33. Denied.

34. Denied.

35. Denied.

36. Mr. Clark admits he posted the meme on Twitter, denies he joined any conspiracy, denies he acted with or sought the approval of Mr. Larosiere. The remaining Defendants Deny for lack of knowledge.

37. Denied.

38. Denied.

39. Mr. Clark denies that "the Gatalog" exists at all as Plaintiffs contend, and thus denies. The remaining Defendants deny for lack of knowledge.

40. Denied.

41. Denied.

42. Defendants incorporate their responses to paragraphs 1 through 41.

43. Denied.

44. Denied.

45. Defendants admit they are individuals capable of holding a legal or beneficial interest in property.

46. Defendants admit §1961(1) contains "wire fraud."

47. Denied.

48. Denied.

49. Denied.

50. Denied.

51. Denied.

8

52. Denied.

53. Denied.

54. Defendants reincorporate their answers to Paragraphs 1-41.

55. Denied.

56. Denied.

57. Denied.

58. Denied.

59. Denied.

60. Denied.

61. Defendants reincorporate their answers to Paragraphs 1-41.

62. Defendants admit Mr. Larosiere and Mr. Holladay are Florida residents, but deny that this claim is directed solely as to them, as is made manifest in Plaintiffs' filings.

63. Denied.

64. Denied.

65. Denied.

66. Denied.

67. Denied.

68. Denied for lack of knowledge.

69. Denied.

## AFFIRMATIVE DEFENSES

1. **First Affirmative Defense**. To the extent any claim in the Second Amended Complaint is founded upon allegedly false or defamatory publication or broadcast, Plaintiffs failed to satisfy a condition precedent to suit. Specifically, Plaintiffs did not serve, at least five days before filing suit, the written notice required by section 770.01, Florida Statutes, specifying the article, broadcast, or statements they contend were false and defamatory. Any such claim is therefore barred in whole or in part.

2. **Second Affirmative Defense**. To the extent any claim is founded upon a single publication, exhibition, or utterance, including but not limited to the alleged "FEDCAD" meme, such claim accrued, if at all, at the time of first publication and is barred in whole or in part by the applicable statute of limitations, including sections 770.07 and 95.11, Florida Statutes.

3. **Third Affirmative Defense**. To the extent Plaintiffs seek to recover under multiple legal theories for harm allegedly arising from the same publication, exhibition, or utterance, such claims are barred in whole or in part by Florida's single-action and single-publication rules, including section 770.05, Florida Statutes.

4. **Fourth Affirmative Defense**. To the extent any cause of action sued upon arose outside the State of Florida and would be time-barred under the law of the jurisdiction where it arose, such claim is barred by section 95.10, Florida Statutes.

5. **Fifth Affirmative Defense**. Plaintiffs' claims are barred, in whole or in part, by waiver, estoppel, acquiescence, consent, and/or ratification. By their own conduct, including publishing, republishing, distributing, advertising, linking to, and otherwise disseminating the same or materially similar "FEDCAD" meme and related materials through their own websites, blogs, downloadable files, and email communications, Plaintiffs waived any contrary position and are estopped from seeking relief based on the same or substantially similar publications.

6. **Sixth Affirmative Defense**. Plaintiffs' claims for equitable or discretionary relief are barred, in whole or in part, by the doctrine of unclean hands. Plaintiffs engaged in the same or closely related conduct of which they complain, including their own dissemination and commercial use of the challenged materials, including the "FEDCAD" meme, and related publications.

7. **Seventh Affirmative Defense**. Plaintiffs failed to mitigate their alleged damages. Among other things, Plaintiffs continued to publish, circulate, distribute, and promote the challenged meme and related materials, failed to take reasonable steps to limit any alleged injury, and thereby caused or materially increased the damages they now claim.

8. **Eighth Affirmative Defense**. Plaintiffs' claims are barred, in whole or in part, because the challenged statements and publications were true, substantially true, nonactionable opinion, rhetorical hyperbole, or otherwise

protected commentary. In addition, Defendants assert that statements concerning, among other things, alleged hacking, Iranian hosting, and doxxing were supported by facts, disclosures, or materials already known to Plaintiffs.

## COUNTERCLAIMS

## INTRODUCTION

Plaintiffs'/Counterdefendants' "file sharing business" is not "legal[.]" (Doc. 49 at 3). It sells, without permission, the copyrighted works of authors across the country, while committing various legal wrongs against those same people from whom it steals, and the public at large. These claims follow.

## JURISDICTION AND VENUE

1. This Court has original subject-matter jurisdiction over the federal counterclaims pursuant to 28 U.S.C. § 1331.

2. This Court has original subject-matter jurisdiction over the copyright claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

3. This Court has original subject-matter jurisdiction over the Lanham Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4. This Court has supplemental jurisdiction over the state-law counterclaims and third-party claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy under Article III of the United States Constitution. They arise from the same nucleus of operative fact as the federal claims, including Counterdefendants' operation of the Defense Distributed, Defcad, DDLegio, and Ghostguns business, their infringement and misattribution practices, their related retaliatory publications and

13

solicitations, and their use of litigation and associated conduct to target Counterplaintiffs.

5. This Court has personal jurisdiction over Counterdefendants Defense Distributed, Defcad, Inc., and DD Foundation LLC because they are Plaintiffs in this action, invoked this Court's jurisdiction by filing and maintaining this lawsuit in the Southern District of Florida, and thereby purposefully availed themselves of this forum.

6. This Court has personal jurisdiction over Counterdefendant Cody Rutledge Wilson because, among other things, he filed and maintains this action through his alter-ego entities, he exercises complete control over Defense Distributed, Defcad Inc., and DD Foundation, and personally directed, performed, authorized, or knowingly participated in the conduct giving rise to the counterclaims.

7. This Court has personal jurisdiction over Counterdefendants Defense Distributed, Defcad, DD Foundation, and Wilson for the additional reason that the counterclaims arise out of and relate to their purposeful commercial and tortious conduct directed into Florida, including the operation of highly interactive websites through which they advertise, sell, distribute, and promote digital files, memberships, merchandise, blog content, and related materials, as well as the publication of statements and materials which caused injury to Counterplaintiffs in Florida and elsewhere.

8. This Court has specific personal jurisdiction over Counterdefendant Garret Walliman because the claims against him arise out of and relate to his personal participation in reviewing, preparing, posting, maintaining, and continuing the challenged content on Defcad.com and related platforms, with knowledge that such content would be displayed, promoted, sold, and cause injury in Florida, including to Counterplaintiffs.

9. This Court has specific personal jurisdiction over Counterdefendant Thomas Odom because the claims against him arise out of and relate to his personal participation in reviewing, preparing, posting, maintaining, and continuing the challenged content on Defcad.com and related platforms, with knowledge that such content would be displayed, promoted, sold, and cause injury in Florida, including to Counterplaintiffs.

10. This Court has specific personal jurisdiction over Counterdefendants Federico A. Reynal, Chad C. Flores, and David S. Gingras as to the claims asserted against them because those claims arise directly out of their procurement, initiation, continuation, and prosecution of wrongful and retaliatory litigation in Florida federal courts, together with related conduct purposefully directed into Florida and at Counterplaintiffs.

11. Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiffs chose to file this action here, because a substantial part of the events or omissions giving rise to the claims and counterclaims occurred in or were directed to this

District, and because the counterclaims arise from and relate to the same controversy now pending before this Court.

12. Venue is also proper in this District because the claims against the Plaintiff-Counterdefendants arise in the same civil action they themselves commenced here, and the additional counterclaims arise from the same course of conduct, the related operation of the websites and commercial offerings at issue, and the ongoing publications, solicitations, and wrongful acts tied to this dispute.

13. To the extent any counterclaim is based in part on related conduct occurring outside this District, venue remains proper here because that conduct forms part of the same case or controversy as the claims already properly before this Court, and because the operative dispute has been purposefully brought and maintained in this forum by the Plaintiff-Counterdefendants and their agents.

## **PARTIES**

**Counterplaintiffs**

14. Counterplaintiff John Elik is a natural person, citizen and resident of the United States and state of Illinois, county of Madison. Elik is a mechanical engineer and author. Elik engages in the design and development of various mechanical technologies, and produces pictorial, written, and visual art works related to his work.

15. Counterplaintiff Alexander Holladay is a natural person, citizen and resident of the United States and the Great State of Florida, county of Orange. Holladay is a firearms industry advocate and author. Holladay engages in the design

and development of firearms technologies, and produces pictorial, written, and visual art works related to her advocacy.

16. Counterplaintiff Josh Stroke is a natural person, citizen and resident of the United States and the State of Arizona, county of Maricopa. Stroke is a trans woman. Stroke engages in Second Amendment advocacy, and produces pictorial, written, and visual art works related to her advocacy.

17. Counterplaintiff John Lettman is a natural person, citizen and resident of the United States and the State of Pennsylvania, county of McKean. Lettman is an Embedded Software Engineer and is engaged in Second Amendment advocacy.

**Counterdefendants, Generally & Alter Ego Allegations**

18. Counterdefendant Cody Rutledge Wilson (hereinafter "Mr. Wilson") established a web of corporations including DEFCAD. Inc., Defense Distributed, Inc., and DD Foundation LLC, (collectively, the "Business Entity Counterdefendants") each of which is an alter ego of Mr. Wilson

19. Mr. Wilson exerts complete control of the Business Entity Counterdefendants.

20. Mr. Wilson owns at least 80% of each Business Entity Counterdefendant.

21. The collective operations of the Business Entity Counterdefendants constitute a single business enterprise.

22. Facts underlying the alter ego relationship specific to each of the Business Entity Counterdefendants are pled below.

23. DEFCAD, Inc. and Defense Distributed have identical addresses, corporate directors, and owners, with the exception of DD Foundation LLC, which is identical to the other Business Entity Counterdefendants in all material respects save for the address.

24. According to information and belief, Counterdefendant Wilson and his alter-ego corporate co-counterdefendants are engaged in a corporate shell game designed to allow Mr. Wilson to dissipate assets and avoid judgments.

25. This shell game has allowed Counterdefendants to hide assets in multiple ways– including real estate holdings, cryptocurrencies, real monies, as well as tangible valuables. The shell game has diverted assets to the friends and family members of Counterdefendant Wilson, who are on-again, off-again agents of the Business Entity Counterdefendants, and also the owners of registered addresses that Counterdefendant Wilson's companies have used.

26. Counterdefendant Wilson has transferred the assets of the corporate co-Counterdefendants to third parties and to himself.

27. Counterdefendant Wilson has commingled his own assets with the assets of the corporate co-Counterdefendants, most frequently those of Counterdefendant Defense Distributed, to support an extravagant lifestyle.

28. On or about August 15, 2018, Counterdefendant Wilson used a vehicle and other assets belonging to Defense Distributed for strictly personal matters.

29. On or about August 16, 2018, Counterdefendant Wilson emptied every cryptocurrency account connected to himself and the then-extant Business

Entity Counterdefendants into a single cryptocurrency account. (the "consolidating transfer").

30. On or about August 31, 2018, Counterdefendant Wilson transferred the contents of the consolidating transfer to another cryptocurrency account accessible to him for his own personal use.

31. The 2018 consolidating transfer commingled all cryptocurrency assets of the then-existing Business Entity Counterdefendants together with Counterdefendant Wilson's personal assets.

32. Counterdefendant Wilson continues to commingle his own assets and money with that of the other assets from the Business Entity Counterdefendants, chiefly Defense Distributed.

33. On or about June 12, 2024, Counterdefendant Wilson sent or caused to be sent a package, through his company Counterdefendant Defense Distributed, to Counterplaintiff John Elik.

34. This package contained a death threat directed at Mr. Elik.

35. The intent behind this threat Counterdefendant Wilson sent or caused to be sent, through his company Counterdefendant Defense Distributed, is clear: to use his companies to send death threats in the hopes of harassing and intimidating people such that they wouldn't bring actions against his companies.

36. On or about October 1, 2024, Counterdefendant Wilson sent a typewritten letter to "Will Becker" ("the October 1 letter").

Cody R. Wilson
2320 Donley Drive
Ste. C
Austin, TX 78758

10/01/2024

Will Becker
8470 Selma Ln.
Flagstaff, AZ 86004

Re: Notice of Breach and Refund Demand

Dear William,

I write to formally demand the return of $5,570, which Defense Distributed paid to you from February 2023 to March 2024 for your "labor." Unfortunately, upon review of your work product, I find it deficient. I find it doesn't fulfill the terms of your contract with Defense Distributed. I write to notify you of your breach of Section 7 of that same contract, and the additional breaking of your NDA, which you signed and still remember.

Despite my attempts to resolve this matter professionally, you've provided no satisfactory explanation for your substandard work or the breaches of our agreements.

Let this letter serve as my demand that you refund the full amount of $5,570 within 14 days from the above date. If I do not receive the refund by 10/15/2024, I will add to my demand the value of the Ghost Gunner machine we sent to assist you in your work. And when I don't receive that larger refund, I'll not just pursue an amusing array of legal methods to collect, but I'll pursue all available legal remedies against your multiple breaches.

Sincerely Yours,

Cody R. Wilson

P.S. Matt isn't authorized to practice law in Arizona. I can remind him of this for you if you like.

37. In the October 1 letter, Counterdefendant Wilson wrote "to formally demand the return of $5,570, which Defense Distributed paid" for contract work.

20

38. The October 1 letter claims that "Will Becker" was a former contract employee of Defense Distributed, and that the repayment was owed due to unsatisfactory work performed as far back as 2023.

39. The October 1 letter did not use Defense Distributed letterhead, nor did it identify Counterdefendant Wilson as an agent of Defense Distributed, but instead was on Counterdefendant Wilson's personal letterhead.

40. The October 1 letter threatens "Will Becker" with "an amusing array of legal methods" in the event that "I [Counterdefendant Wilson] do not receive the refund".

41. The October 1 letter concludes "P.S. Matt isn't authorized to practice law in Arizona. I can remind him of this for you if you like."

42. According to information and belief, "Matt" is a reference to Elik's counsel, Matthew Larosiere.

43. On or about November 1, 2024, Counterdefendant Wilson sent another letter to "Will Becker" ("the second letter").

Cody R. Wilson
2320 Donley Drive
Ste. C
Austin, TX 78758

11/01/2024

Will Becker
8470 Selma Ln.
Flagstaff, AZ 86004

Re: Second Notice of Breach and Refund Demand

Dear William,

I write again to formally demand the return of $7,570, which represents the value of your Ghost Gunner machine plus the amount Defense Distributed paid to you from February 2023 to March 2024 for your "labor." Unfortunately, after review of your work product, I found it deficient. I found it didn't fulfill the terms of your contract with Defense Distributed. I write again to remind you of your breach of Section 7 of that same contract, and the additional breaking of your NDA, which you signed and still remember.

Aside from your bleating admissions on social media, and your sometimes abusive, sometimes apologetic private messages to my employees, you've provided no satisfactory explanation for your substandard work or the breaches of our agreements.

Let this letter serve as my second demand that you refund the full amount of $7,570 within 14 days from the above date. If I do not receive the refund by 11/14/2024, I'll have to send you to collections and begin the intrepid pursuit of every remedy against your multiple, and now additional breaches.

Sincerely Yours,

Cody R. Wilson

P.S. Calling your professional harassment of my employees "professional harassment" lacks art. It also tends to imperil your zoo animal friends.

44. This second letter demanded a payment of some $7,570 dollars to Mr. Wilson personally.

22

45. The second letter threatens Mr. Becker's "zoo animal friends," which is one of the myriad ways Mr. Wilson refers to Counterplaintiffs.

46. In this context, Mr. Wilson uses "zoo animal" to reference Counterplaintiff Stroke and "[]peril" to reference Mr. Walliman abusing Arizona process to file materially misrepresentative and fraudulent claims in an Injunction Against Workplace Harassment against Ms. Stroke.

47. This second letter did not use Defense Distributed letterhead, nor identify Mr. Wilson as an agent of Defense Distributed, but rather was sent and signed personally by Counterdefendant Wilson.

48. The improper use of the corporate forms on the part of Counterdefendant Wilson in his use of the Business Entity Counterdefendants have damaged and are designed to damage Counterplaintiff in numerous ways, including but not limited to lost revenue from infringing activities, enabling Counterdefendant Wilson to personally use the corporate forms to amplify his personal torts against Counterplaintiffs, to shield assets from Counterplaintiff's inevitable recovery, and to harass Counterplaintiffs and their personal friends.

**Counterdefendant Defcad**

49. Counterdefendant Defcad, Inc. ("Defcad") is a corporation organized and existing under the laws of the State of Delaware, with concomitant registrations in the states of Arkansas, and most recently, Texas.

50. Counterdefendant Defcad, Inc. "shares the income" produced by its "file sharing business" with the other Business Entity Counterdefendants. (Doc. 49 at 3).

51. Defcad is the alter ego of Counterdefendant Wilson, because Counterdefendant Wilson exerts complete control of it, and is its sole director and owner.

52. Defcad does not have a registered agent listed with the Delaware Secretary of State. Counterdefendant Defcad may be served by serving its alter ego, Counterdefendant Wilson.

53. Defcad's Arkansas registration lists a Principal Address of 2320 Donley Drive, Ste C, Austin, TX 78758. Its officers are Counterdefendant Wilson, as President, and Morgan Noble as Incorporator.

54. Defcad's Texas registration lists a mailing address of 2320 Donley Dr, Stc C, Austin TX 78758, and lists Counterdefendant DEFENSE DISTRIBUTED as Registered Agent, with the same Donley Dr. Address.

55. Defcad's Texas registration lists Counterdefendant Wilson as Director, listing Counterdefendant Wilson's address as 4610 Crestway Drive, Austin, TX 78731.

56. Counterdefendant Defcad is the owner and operator of the website Defcad.com. This website hosts and distributes downloadable three-dimensional models of various firearms and firearms accessories, plus documentation and photographs relating to the downloadable models.

57. To access the files, Defcad requires prospective downloaders to purchase a subscription through DDLegio.com—itself proclaiming to be "Defense Distributed's technical and legal support fraternity," owned by Counterdefendant Defense Distributed.

58. Defcad also publishes and maintains a blog at https://defcad.com/blog/. ("the Defcad blog").

59. Counterdefendant Wilson frequently posts updates or causes updates to be posted to the Defcad blog. Many of these blog posts advertise the copyright infringement that is carried out at Defcad.com, and make false claims about counterplaintiffs.

60. Counterdefendant Wilson is the only director, officer, or executive, of Defcad, Inc.

**Counterdefendant Defense Distributed**

61. Counterdefendant Defense Distributed is incorporated as a nonprofit in the State of Texas, with a mailing and registered address of 2320 Donley Dr, Ste C, Austin, TX 78758.

62. Counterdefendant Defense Distributed "shares the income" produced by the "file sharing business" with the other Business Entity Counterdefendants. (Doc. 49 at 3).

63. Defense Distributed is the alter ego of Counterdefendant Wilson, because Counterdefendant Wilson exerts complete control of it, and is its sole director and owner.

64. Counterdefendant Wilson is listed as Defense Distributed's registered agent, Director, and Governing Member.

65. Defense Distributed does business as "Ghostguns.com," "Legio," "DDLegio," and "Ghost Gunner."

66. Defense Distributed extracts revenues from Legio Memberships, which it markets as a way to gain access to downloads from Defcad.com. Among these downloads are the copyrighted works which belong to Counterplaintiffs.

67. Defense Distributed also publishes and maintains a blog at https://ddlegio.com/blog ("the DDLegio blog").

68. The posts on the DDLegio blog are written and/or curated by Counterdefendant Wilson.

69. Counterdefendant Wilson is the only director, officer, or executive, of Defense Distributed.

70. Defense Distributed has accepted payment by cryptocurrency since around 2013.

71. Counterdefendant Wilson has diverted many of the proceeds from these cryptocurrency payments to himself.

**Counterdefendant DD Foundation LLC**

72. Counterdefendant DD Foundation LLC is incorporated in the State of Texas, with a mailing address of 5900 Balcones Drive, STE. 100, Austin, TX, 78731, USA.

26

73. DD Foundation LLC's registered agent is listed as "Registered Agents, Inc," with a registered office street address of 5900 Balcones Drive, STE. 100, Austin, TX, 78731, USA.

74. DD Foundation LLC "shares the income" produced by the "file sharing business" with the other Business Entity Counterdefendants. (Doc. 49 at 3).

75. DD Foundation LLC is the alter ego of Counterdefendant Wilson, because Counterdefendant Wilson exerts complete control of it, and is its sole director and owner.

76. DD Foundation LLC previously listed Counterdefendant Wilson's father, Dennis K. Wilson, as an officer.

77. Following the 2024 filing of a copyright action against Wilson and his companies, Counterdefendant Wilson removed his father from DD Foundation LLC.

78. The purpose of removing his father from DD Foundation LLC was at least in part an attempt to shield assets that were diverted to his father from recovery.

79. Combined with DD Foundation LLC's admission that it shares profits with the other Business Entity Counterdefendants, the timing of the corporate restructuring suggests a transparent attempt to try and frustrate recovery and obfuscate aspects of Counterdefendants' conduct.

**Counterdefendant Cody Rutledge Wilson**

80. Counterdefendant Wilson is a natural person who resides in Austin, Texas.

81. Counterdefendant Wilson's residence address is unknown, and when his residence address was compelled in previous litigation, Mr. Wilson amended his drivers' license to reflect his Business address—a commercial warehouse with no bed or shower—after fraudulently claiming, under penalty of perjury, that the commercial warehouse with no bed or shower, was his "residence."

82. Counterdefendant Wilson refuses to identify his residence address, at least in part, to conceal the real estate assets he acquired from the proceeds of cryptocurrency and other property he diverted from the Business Entity Counterdefendants to himself.

83. Counterdefendant Wilson has primary control and command of Defense Distributed.

84. Counterdefendant Wilson is the director and governing member of Defense Distributed, and by extension Defense Distributed's subsidiaries.

85. Counterdefendant Wilson has primary control and command of Defcad, Inc.

86. Counterdefendant Wilson has primary control and command of DD Foundation LLC.

87. At all times material to this complaint, Counterdefendant Wilson either personally performed, directed, or was aware of the complained-of conduct.

88. In the alternative, Counterdefendant Wilson directed Counterdefendant Walliman to perform the complained-of conduct.

89. In the alternative, Counterdefendant Wilson directed Counterdefendant Odom to perform the complained-of conduct.

**A Note on Counterdefendants Walliman and Odom**

90. In prior litigation, Counterdefendants have attempted to obfuscate or confuse liability by vaguely alluding to the actions of employees of Counterdefendant Wilson.

91. It is Counterplaintiffs' firm belief that Counterdefendants Odom and Walliman were acting at Counterdefendant Wilson's direction and coercion. However, Counterdefendant Wilson has indicated that Counterdefendants Odom and Walliman were acting of their own volition, and that each had a knowing role to play in the complained-of conduct.

92. In light of this, in the alternative to the infringements pled herein being done at the specific direction of Counterdefendant Wilson, Counterplaintiff pleads liability alternatively as to Odom and Walliman specifically as follows.

**Counterdefendant Garret Walliman**

93. Counterdefendant Walliman is a natural person who resides in Apache Junction, Arizona.

94. Counterdefendant Walliman is an employee, contractor, or business partner of Counterdefendant Wilson through at least one of the Business Entity Counterdefendants.

95. Mr. Wilson has described Mr. Walliman as an "unpaid employee," but Mr. Walliman has described himself as "one of DEFCAD's top stakeholders."

96. In any event, Mr. Walliman serves as Mr. Wilson's assistant, doing any and all tasks directed by Mr. Wilson.

97. Mr. Walliman's duties include reviewing, analyzing, and preparing each work that is available for download on Defcad.com.

98. As a part of these duties, Mr. Walliman was responsible for ensuring that materials subject to copyright protection were not made available on Defcad.com.

99. Mr. Walliman maintained and kept up-to-date the website "Fedcad.com," which purported to track copyright registrations in firearms-related works of authorship.

100. Mr. Walliman was aware of the copyrights claimed in Counterplaintiffs' works, which are the subject of the instant action.

101. Despite this, Mr. Walliman proceeded to make these works available at Defcad.com, knowing that he would be infringing Counterplaintiffs' copyrights in doing so.

102. Mr. Walliman was aware what he was doing was, in fact, copyright infringement.

103. Mr. Walliman personally indicated on Defcad.com that the works he was copying and distributing were subject to copyright, with all rights reserved.

104. Mr. Walliman made the works available for download on Defcad.com anyway, abdicating his duty to prevent copyright infringement by Defcad.com.

105. Through the "Fedcad.com" website, Mr. Walliman makes it clear that he is aware of the infringement which he is responsible for stopping, yet he continues to perform.

30

106.    In private communications, Mr. Walliman has expressed frustration with the fact that Counterplaintiffs' works are subject to copyright protections.

107.    Mr. Walliman willfully infringed Counterplaintiffs' copyrights.

108.    Mr. Walliman infringed Counterplaintiffs' copyrights for his own pecuniary gain or to curry favor with Counterdefendant Wilson.

**Counterdefendant Thomas Christopher Odom**

109.    Mr. Odom is a natural person who resides in Kingsbury, Texas.

110.    Counterdefendant Odom is an employee, contractor, or business partner of Counterdefendant Wilson through at least one of the Business Entity Counterdefendants.

111.    Mr. Odom operated the account "punished_jackal" on The Business Entity Counterdefendants' systems.

112.    Mr. Odom's duties include reviewing, analyzing, and preparing each work available for download on Defcad.com.

113.    As a part of these duties, Mr. Odom was responsible for ensuring that materials subject to copyright protection were not made available on Defcad.com.

114.    Mr. Odom was personally aware that Counterplaintiffs' works were subject to copyright protection, which are the subject of the instant action.

115.    Mr. Odom proceeded to make these works available at Defcad.com despite knowing that he would be infringing Counterplaintiffs' copyrights in doing so.

116.    Mr. Odom was aware that what he was doing was, in fact, copyright infringement.

117.    Mr. Odom personally indicated on Defcad.com that the works he was copying were subject to copyright, with all rights reserved.

118.    Mr. Odom made the works available for download on Defcad.com anyway, abdicating his duty to prevent copyright infringement by Defcad.com.

119.    Mr. Odom willfully infringed Counterplaintiffs' copyrights.

120.    Mr. Odom infringed Counterplaintiffs' copyrights for his own pecuniary gain or to curry favor with Mr. Wilson.

## Counterdefendant Federico Reynal

121.    Mr. Reynal is a natural person who resides in Houston, Texas.

122.    Counterdefendant Reynal is an attorney and founder at The Reynal Law Firm, P.C.

## Counterdefendant Chad Flores

123.    Mr. Flores is a natural person who resides in Houston, Texas.

124.    Counterdefendant Flores is an attorney and principal at Flores Law.

## Counterdefendant David Gingras

125.    Mr. Gingras is a natural person who resides in Phoenix, Arizona.

126.    Counterdefendant Gingras is an attorney at Gingras Law Office, PLLC.

32

## BACKGROUND

127.    Mr. Wilson founded Defense Distributed in October of 2012.

128.    Defcad was founded in March of 2013.

129.    Around March of 2020, Defcad began to invite authors to upload their works to its site.

130.    In addition, Defcad began to download works it came across on the Internet and redistribute them on Defcad.com without authorization.

131.    Around March of 2020, Defcad began to require prospective downloaders to first purchase a membership from ddlegio.com. (a "Legio membership").

132.    The price of a Legio membership has varied, but typically costs about 60 Dollars per year.

133.    Counterdefendant Defcad posts announcements and news concerning their operations on its blog. It also sends announcements and news out through email blasts.

134.    Through these blog posts and email blasts, Counterdefendant Defcad has boasted about their unpermitted copying of Counterplaintiffs' copyrighted works

135.    Some of these posts have acknowledged that publishing the works counterplaintiffs own is an act subject to copyright law.

136.    These posts are authored in whole or in part by Counterdefendant Wilson.

137.   These posts are authored in whole or in part by Counterdefendant Walliman.

138.   These posts are authored in whole or in part by Counterdefendant Odom.

139.   Defcad operates by having Mr. Odom and/or Mr. Walliman make files available for download on Defcad.com only after Mr. Odom and/or Mr. Walliman completes a thorough initial review and preparation for each downloadable file, and after a final review by Odom, Walliman, or Wilson.

140.   Counterdefendant Defcad's final review process includes an administrator (usually Counterdefendant Odom or Counterdefendant Walliman, but sometimes Counterdefendant Wilson) updating the web pages hosting the works to associate a "creator" with the file  which gives the appearance of the files having been made available on Defcad.com by their putative "creator", when in reality these files were made available by Defcad's own personnel after Defcad personnel's independent review and preparation.

141.   Counterdefendant Wilson has the ability to remove files from download pages in order to stop copyright infringement.

142.   Counterdefendant Walliman has the ability to remove files from download pages in order to stop copyright infringement.

143.   Counterdefendant Odom has the ability to remove files from download pages in order to stop copyright infringement.

**Wilson Stalks, Harasses, and "Doxxes" his Critics**

144. From at least 2022 to the present, Counterdefendant Wilson has engaged in a persistent pattern of monitoring, targeting, harassing, and attempting to expose the identities and private information of persons he views as critics of himself or of the business entity Counterdefendants.

145. Upon information and belief, when Wilson identifies a person as critical of him or of the business entity Counterdefendants, he frequently seeks to identify, track, investigate, or otherwise gather personal information about that person, including using private investigators or similar third parties.

146. The persons Mr. Wilson targets commonly include individuals who have criticized, among other things:

    A. his prior criminal case involving injury to a child, where the allegation involved paid sexual interactions with a minor child;

    B. the copyright-infringement practices of his business entities; and

    C. his broader business practices;

147. The persons Mr. Wilson has targeted through that pattern of conduct substantially overlap with the persons he has attempted to accuse, implicate, or draw into his repeated civil RICO theories and related retaliatory pleadings – here, Counterplaintiffs.

148. This pattern reflects a broader course of retaliatory conduct in which Wilson seeks to punish, intimidate, discredit, or silence critics and perceived

adversaries by subjecting them to investigation, exposure, harassment, and litigation burden.

149.    From December 1, 2022, until, at least, May 21, 2023, Mr. Wilson, using his Defcad email address with a Defense Distributed signature block, sought to identify Peter Celentano using Valdes Investigation Group.



150.      On or about October 24, 2023, Mr. Wilson, using his Defcad email address, received a report from Jim Blackburn of Destin Investigations identifying Counterplaintiff Elik.



151.    On or about October 24, 2023, Mr. Wilson, using his Defcad email address, received a report from Jim Blackburn of Destin Investigations identifying Mr. Larosiere.



152.     On or about October 24, 2023, Mr. Wilson, using his Defcad email address, received a report from Jim Blackburn of Destin Investigations identifying Counterplaintiff Holladay.



153. On or about October 30, 2023, Mr. Wilson, using his Defcad email address, received a personal invoice for the services of Jim Blackburn of Destin Investigations for his reports on Counterplaintiffs Elik, Larosiere, and Holladay.



154. On or about October 30, 2023, Mr. Wilson, using his Defcad email address, received a report from Investigations National identifying Peter Celentano.



155.    3 days after the filing of Mr. Larosiere's copyright action, *Larosiere v. Wilson* 6:24-cv-01629 (M.D. Fl.), against Counterdefendants Wilson, Defcad, and Defense Distributed, on or about September 9, 2024, Mr. Wilson, using his Defcad email address, received a report from Jim Blackburn of Destin Investigations identifying Counterplaintiff Elik.



156.      10 days after the filing of Defendant Larosiere's copyright action, *Larosiere v. Wilson* 6:24-cv-01629 (M.D. Fl.), against Counterdefendants Wilson, Defcad, and Defense Distributed, on or about September 16, 2024, Mr. Wilson, using his Defcad email address, again received a personal invoice for the services of Jim Blackburn of Destin Investigations for his reports on Counterplaintiff Elik and the addresses of other Counterplaintiffs.



157. No Counterplaintiff maintained the kind of sustained, multi-year pattern of communications with private investigators focused on identifying, tracking, surveilling, harassing, stalking, or "doxxing" perceived adversaries that Mr. Wilson maintained.

158. Upon information and belief, Mr. Wilson then used, or caused his employees, agents, and aligned actors to use, that information for retaliatory purposes.

159. Those retaliatory purposes included, among other things, initiating or supporting abusive legal process in other jurisdictions (*See infra* 500-524), disclosing or leaking private information to members of the press (*See infra*

202-214), publicly referring to private personal information on websites he controlled, and publishing harassing or intimidating content about Counterplaintiffs on those websites.

160.   This behavior is part of a broader course of retaliation and intimidation directed at persons who criticized Mr. Wilson, his conduct, or the conduct of the business entity counterdefendants.

**The DDLegio blog**

161.   On March 2, 2024, Mr. Wilson published or caused to be published "Gatalogy" on the DDLegio blog[1].

162.   In "Gatalogy," Mr. Wilson intentionally published Counterplaintiff Elik's private banking details.

---

[1] https://ddlegio.com/gatalogy/, archived at:
https://web.archive.org/web/20251010035109/https://ddlegio.com/gatalogy/



*Black squares containing "(REDACTED)" are added for the purposes of protecting*

*Mr. Elik's private banking details.*

163.    Mr. Wilson, despite being on notice of the publication of those private banking details, never removed or modified the offending image, which is present to this day.

164.    On May 24, 2024, Mr. Wilson published or caused to be published "Memorial Day Weekend" on the DDLegio blog.[2]

---

[2] https://ddlegio.com/memorial-day-weekend/, archived at: https://web.archive.org/web/20250615053002/https://ddlegio.com/memorial-day-weekend/

165.    In "Memorial Day Weekend," Mr. Wilson shares the "Black Flag White Paper."

166.    Mr. Wilson further suggests Counterplaintiffs will not sue him to assert their copyrights on works Counterdefendants infringed, writing, "[t]he reason you don't sue is because you got the law wrong on copyright. That and because you're a huge pussy."

167.    Mr. Wilson ends the announcement with, "[a]nyway, I wrote a paper to commemorate the great pirates who lit our way. They pillaged so we could plunder."



**The Black Flag White Paper**

168.     On or about May 23, 2024, Counterdefendant Wilson posted a manifesto titled "Black Flag White Paper"[3] ("Wilson's manifesto").

169.     Counterdefendant Wilson and Counterdefendant Defcad's Defcad.com website cites Wilson's manifesto as "Wilson, Cody R. Black Flag White Paper, 2024."[4]

170.     Wilson's manifesto is available for sale on Amazon.com, with "Cody Wilson" listed as the author.[5]

171.     Wilson's manifesto is reproduced in textual form on a website dedicated to the content of Wilson's manifesto, "blackflagwhitepaper.com."[6]

172.     In Wilson's manifesto, Counterdefendant Wilson admits to personally removing or having caused the removal of one of the copyright disclaimers copyrighted works that were reproduced on Defcad.com.

173.     In Wilson's manifesto, Counterdefendant Wilson complains at length that individuals have asserted their copyright rights against him.

---

[3] https://defcad.com/blog/the-plastikov-v4-and-back-flag-white-paper/, archived at https://web.archive.org/web/20240830034042/https://defcad.com/blog/the-plastikov-v4-andback-flag-white-paper/

[4] https://defcad.com/opensource/, archived at:
https://web.archive.org/web/20240830033107/https://defcad.com/opensource/

[5] https://www.amazon.com/dp/B0D5VXPJJV, archived at:
https://web.archive.org/web/20240830033826/https://www.amazon.com/dp/B0D5VXPJJV

[6]  https://www.blackflagwhitepaper.com/, archived at:
https://web.archive.org/web/20250710221054/https://www.blackflagwhitepaper.com/

174.   In Wilson's manifesto, Counterdefendant Wilson recognizes that in December of 2023, Counterplaintiff Elik "registered their files with the U.S. Copyright Office."

175.   In Wilson's manifesto, Counterdefendant Wilson admits that Counterdefendant Elik's "build guide is copyrightable."

176.   In Wilson's manifesto, Counterdefendant Wilson admits to removing the affixed copyright notice to a registered 3D model, under the theory that "the only copyrightable part of the design is the copyright statement itself."

177.   In Wilson's manifesto, Counterdefendant Wilson identifies a website that he and Counterdefendant Walliman created or caused to be created which presents a mock version of the USCO's public records website[7] ("the FEDCAD website").

178.   The FEDCAD website references Counterplaintiffs' copyrighted works.

179.   The FEDCAD website acknowledges that the works that Counterdefendants Wilson and Walliman, through Counterdefendant Defcad, reproduced or caused to be reproduced, were reproduced in violation of the law.

180.   In Wilson's manifesto, the introduction contains the sentence, "[e]xactly one year into the Everytown litigation, the loudest and largest of Zarathustra's apes made dueling copyright statements to DEFCAD[.]"

---

[7] https://www.fedcad.com/database.html, archived at:
https://web.archive.org/web/20240830034655/https://www.fedcad.com/database.html

181. According to information and belief, "the loudest and largest of Zarathustra's apes" is a racist reference to Counterplaintiffs Holladay, who is an Asian-American, and Elik.

182. Further Wilson writes, "[s]uppose DEFCAD pursued reputational damages for the FEDCAD libel. Does that mean the right being vindicated is a property right? The traditional view of libel is a personal action, and personal actions at common law are not assignable."

183. Counterplaintiffs believe this was a threat to convert any impending copyright suits into his later RICO conspiracy to "assign" the "not assignable" "personal actions" of "libel" to Counterdefendant Defense Distributed.

184. In Wilson's manifesto, the epilogue contains the sentence, "[l]et it serve as a reminder that, in this movement, the only possible theft is property."

185. On May 24, 2024, Counterdefendant Wilson announced Wilson's manifesto on the DDLegio blog. (*See infra* 164-167).

## The Middle District Action's Counterclaims

186. In retaliation to a straightforward copyright action, *Larosiere v. Wilson* 6:24-cv-01629 (M.D. Fl.) (hereafter, the "Middle District Action"), and to execute on the promise alluded to in Wilson's manifesto (*See supra* 182-183), Counterdefendant Defense Distributed, acting for Counterdefendant Wilson and Defcad, Inc., filed  sprawling counterclaims on November 19, 2024 that sought to transform a narrow intellectual-property dispute into a sweeping

campaign of public criminal accusation against a wider circle of perceived adversaries. (Middle District Action, Doc. 29).

187. That first counterclaim drew in unrelated individuals, including Counterplaintiffs Elik, Stroke, Lettman, and Holladay, and it further named Peter Celentano, The Gatalog Foundation, and MAF Corp., thereby recasting the case as a sprawling conspiracy action rather than a conventional response to alleged copyright infringement.

188. As part of that effort, Defense Distributed attempted to drag non-Florida residents Mr. Elik, Mr. Lettman, Ms. Stroke, and Mr. Celentano into Florida federal court through bare jurisdictional conclusions unsupported by facts.

189. Defense Distributed used a stock allegation that the case arose from conduct by which Mr. Elik, Mr. Lettman, Ms. Stroke, and Mr. Celentano had purposefully availed themselves of Florida, while offering no meaningful jurisdictional analysis and no competent evidence that he had ever engaged in relevant conduct in Florida, maintained property there, conducted business there, or otherwise established suit-related contacts with the forum.

190. The purpose and effect of that pleading was retaliatory.

191. Rather than litigate the merits of the copyright dispute, Defense Distributed used the docket to portray its critics and their perceived associates as members of a criminal enterprise engaged in racketeering, export violations, wire fraud, money laundering, extortion, threats of murder, cyberattacks, and tortious interference.

192.     The last operative version of the counterclaims was filed on January 3, 2025 (Middle District Action Doc. 52; together with Docs. 29 and 49, hereinafter the "Middle District Action's Counterclaims").

193.     Defense Distributed alleged that a supposed entity called "The Gatalog" was an unincorporated Florida association and a criminal enterprise organized in opposition to federal export-control laws and devoted to giving the public unrestricted access to firearm-related files.

194.     Those allegations were designed to inflict maximum reputational and economic damage on the people Counterdefendants Wilson, Defense Distributed, and Defcad chose to target.

195.     The retaliatory nature of the pleading was further reflected in the way Mr. Wilson and his entities shifted factual characterizations when useful.

196.     In one context, Defcad was described as a subsidiary of Defense Distributed (Middle District Action's Counterclaims); in other contexts, it was treated as an independent business or otherwise as a distinct entity sharing profits with Mr. Wilson's other alter egos. (Instant Action Doc. 1).

197.     Those shifting characterizations were part of a broader pattern in which Mr. Wilson and his entities adapted factual and legal positions from pleading to pleading as needed to obtain tactical advantage, avoid copyright infringement damages, expand the case, and intensify pressure on the parties and nonparties they sought to punish.

198. On September 5, 2025, the Middle District Action's Counterclaims were voluntarily dismissed.

199. A mere twenty days later, on September 25, 2025, Counterdefendants filed different RICO claims again under a new action, advancing a different theory which abandoned the most absurd and damaging unsupported allegations and causes of action from the Middle District Action's Counterclaims.

**Wilson uses Journalists to Weaponize his Counterclaims**

200. Counterdefendant Wilson and the business entity Counterdefendants used the Middle District Action's Counterclaims as the foundation for a broader public narrative outside the courtroom, repeating and encouraging repetition of the same unsupported allegations through various media channels.

201. Although the counterclaims were ostensibly filed on behalf of Defense Distributed, upon information and belief Mr. Wilson repeatedly sought to publicize and amplify those allegations beyond the litigation itself, including by encouraging journalists and media figures to write about the counterclaims and to present their allegations as established fact.

202. On or about September 10, 2024, merely six days after the filing of the Middle District Action's Counterclaims, Rajan Basra of *Global Network on*

*Extremism & Technology* published an article titled, "Lawsuits, Rivalries, and Trolls: Examining the Behaviour of the 3D-Printed Gun Movement."[8]

203.    Mr. Wilson induced, encouraged, or facilitated that publication.

204.    In that article, Basra republished private banking information concerning Counterplaintiff Elik that had been lifted from Mr. Wilson's "Gatalogy" post on the DDLegio blog (*See infra* 161-163), together with other identifying imagery, for the purpose and effect of publicly identifying Elik.

205.    By republishing those materials, the article amplified the exposure of Mr. Elik's private information.

206.    Following that publication, Counterplaintiff Elik and members of his family were subjected to harassment related to Mr. Elik's Second Amendment advocacy.

207.    On or about September 10, 2024, the same day as the Basra article, *The New York Times* published an article titled, "He's Known as 'Ivan the Troll.' His 3D-Printed Guns Have Gone Viral[]" in the "Europe" section.[9]

208.    That article drew from, repeated, or amplified allegations and themes appearing in the Basra article and in Counterdefendants' counterclaims.

---

[8] Archived at: https://web.archive.org/web/20260201084816/https://gnet-research.org/2024/09/10/lawsuits-rivalries-and-trolls-examining-the-behaviour-of-the-3d-printed-gun-movement/

[9] https://www.nytimes.com/2024/09/10/world/europe/ivan-troll-3d-printed-homemade-guns-fgc9.html

209.    In that article, *The New York Times* repeatedly identified Counterplaintiff Elik by name and associated him with uses of works that were unconnected to him.

210.    The article also expressly identified members of Elik's family by name, thereby expanding the public exposure of Elik's private life and personal associations.

211.    The publication substantially broadened the reach of the campaign against Elik, extending it beyond the existing dispute and into a much larger public and international audience.

212.    As a result of that publication, Elik and members of his family were subjected to severe public harassment.

213.    Counterplaintiffs aver that the publication of such allegations in a widely read national newspaper foreseeably intensified the harassment, reputational harm, and personal distress already being directed at Elik and his family.

214.    Upon information and belief, Wilson induced, encouraged, or facilitated, that publication and the resulting amplification of the allegations against Elik.

215.    On or about January 3, 2025, journalist Dan Christensen of *Florida Bulldog* published an article titled, "Lawsuit: UnitedHealthcare CEO's killer

built gun, silencer from 3D-printing files supplied by Florida 'black-market operator.'"[10]

216.     Mr. Wilson induced, encouraged, or facilitated that publication.

217.     The article repeated and extended the narrative advanced in Counterdefendants' pleadings, thereby carrying the allegations beyond the courtroom and into public reporting.

218.     Journalist José Niño of *Headline USA* was and continues to be present in numerous channels within the corporate Slack instant-messaging workspace used by the business entity Counterdefendants.

219.     On or about April 1, 2025, José Niño published an article titled, "EXCLUSIVE: Inside the Fight over 3D-Printable Guns," bearing the subtitle, "'This is no run-of-the-mill Copyright Act dispute...,'"[11] which lifted language directly from the opening sentence of the Middle District Action's Counterclaims.

220.     Mr. Wilson induced, encouraged, or facilitated that publication.

---

[10] https://www.floridabulldog.org/2025/01/unitedhealthcare-ceo-killer-built-3d-gun-rint-files-florida-black-marketeer/, archived at:
https://web.archive.org/web/20260213174033/https://www.floridabulldog.org/2025/01/unitedhealthcare-ceo-killer-built-3d-gun-rint-files-florida-black-marketeer/
[11] https://headlineusa.com/exclusive-inside-the-fight-over-3d-printable-guns/, archived at:
https://web.archive.org/web/20260120000042/https://headlineusa.com/exclusive-inside-the-fight-over-3d-printable-guns/

221.    On or about July 20, 2025, José Niño published another article titled, "3D Gun Pioneer Taken Down in Landmark RICO Case," with the subtitle, "First-ever RICO case shakes 3D-printed gun world..."[12]

222.    Mr. Wilson induced, encouraged, or facilitated that publication.

223.    That article discussed the litigation in assertive factual terms from Counterdefendants' perspective and repeated allegations materially consistent with Counterdefendants' pleadings, including assertions concerning the supposed structure, leadership, and activities of "The Gatalog," the alleged role of Peter Celentano, and the claim that Defense Distributed operated through a regulated and compliant system while "The Gatalog" distributed files freely and without safeguards.

224.    In this way, Counterdefendants extended the reach of their accusations far beyond the court's docket, increasing their spread, their persistence, and the reputational harm they inflicted on Counterplaintiffs.

**Wilson Pays Gary Flowers to Craft Narratives, Harass Counterplaintiffs**

225.    Between 2024 and 2025, Wilson communicated through the encrypted messaging application Signal with Gary Flowers, also known as FDM Arms and/or Gary LaFluer.

---

[12] https://headlineusa.com/3d-gun-pioneer-taken-down-in-landmark-rico-case/, archived at: https://web.archive.org/web/20251119035853/https://headlineusa.com/3d-gun-pioneer-taken-down-in-landmark-rico-case/

56

226.     In those communications Wilson provided, or agreed to provide, Flowers with substantial payments totaling thousands of dollars.

227.     Those payments were made, at least in part, to induce or encourage Flowers to target Counterplaintiffs and other Wilson critics online.

228.     The conduct Wilson induced or encourage included harassing and intimidating Counterplaintiffs on the internet, amplifying narratives favorable to Counterdefendants, antagonizing Wilson's critics, and provoking or manipulating online interactions so that selected excerpts could later be repackaged or cited in support of additional RICO-style allegations.

229.     This conduct formed part of a broader pattern in which Wilson used third parties and paid intermediaries to manufacture, amplify, or curate material for retaliatory use against perceived adversaries.

230.     In the following screenshots of interactions between Mr. Wilson and Mr. Flowers, Mr. Wilson and Mr. Flowers converse with blue and grey chat bubbles, respectively.

231.     Flowers began by ingratiating himself with Wilson setting his smartwatch background to a picture of Wilson and expressing admiration for him, using the term "Primal Father," a self-aggrandizing phrase Wilson had coined for himself.



232.     On December 4, 2024, Wilson offered to "talk [money]" with Flowers.

233.     On December 5, 2024, the two agreed on an "influencer agreement" and a non-disclosure agreement. Mr. Wilson provided his Defcad email address in this interaction with Flowers.



234. On or about December 7, 2024, Flowers provided Wilson with banking information for the purpose of receiving payment. For purposes of this pleading, the account details have been redacted.

235. On that same date, Wilson acknowledged that Counterplaintiff Stroke had never been employed by Wilson or by any of the business-entity Counterdefendants.



236.     On that same date, Wilson admitted that, in 2022, Counterplaintiff Elik

gave him notice to remove some of Elik's copyrighted works from Defcad, and

that Wilson deliberately disregarded that notice instead of taking action to

remove the works.



237.     On or about December 17, 2024, after the RICO counterclaims had been

filed, Flowers asked Wilson whether he should continue "being provocative"

and "poking the bear" because, in Flowers's words, "it only helps." Wilson

agreed, suggesting Flowers direct that "provocative" and harassing conduct

toward Counterplaintiff Stroke.



238.     On or about December 18, 2024, Flowers asked Wilson whether he should file bar complaints against Counterplaintiff's counsel Matthew Larosiere. Wilson responded that he personally wanted to file additional complaints himself but did not want to appear to be taking a "cheap shot." Wilson instead encouraged Flowers to submit such complaints against Larosiere and suggested that they be framed around supposed "unprofessional" conduct. Flowers expressed disappointment that the bar-complaint process could not be used anonymously.



239.    On or about December 19, 2024, the Flowers harassment campaign began in earnest. Upon information and belief, Flowers and Wilson began coordinating a more deliberate campaign directed at Counterplaintiffs and their counsel.

240.    That campaign included the collection, discussion, and planned use of personal, inflammatory, or identifying material concerning Counterplaintiffs and related persons.

241.     The subjects discussed and used in that campaign included, among other things, references to Peter Celentano's brother and his employment with the FBI, Peter Celentano's mugshot, filings made in response to the Middle District Action's Counterclaims, and articles containing identifying information concerning Counterplaintiff Elik for the purpose and effect of exposing or "doxxing" him.

242.     Notably, this coordinated harassment campaign did not begin until after Wilson and Flowers had discussed an "influencer agreement" and payment terms.

243.     Only after payment and related terms were discussed did Flowers's conduct shift into a more deliberate campaign of provocation, harassment, narrative-shaping, and targeting of Counterplaintiffs and their counsel.

244.     That sequence evokes Counterdefendants' own RICO theory, in which they accused Counterplaintiffs of participating in a covert, paid conspiracy to disseminate supposedly libelous and defamatory material.

245.     Here, Mr. Wilson himself engaged in the very sort of paid coordination he publicly attributed to others: funding and encouraging a third party to amplify favorable narratives, antagonize critics, and generate material that could be repurposed against Counterplaintiffs.





65

246.     On or about December 30, 2024, Wilson and Flowers expressed concern that the broader internet had begun to notice that Defcad.com offered files that may have been used by the assassin of UnitedHealthcare CEO Brian Thompson, and that Wikipedia had already reflected that association.

247.     In response to that concern, Wilson stated, in substance, that he would say "Gatalog already took credit" in order to redirect or deflect that narrative.



248.   On or about April 1, 2025, Flowers stated that MAF Corp. was his "new target" for harassment. Unlike his earlier responses encouraging provocative conduct against Counterplaintiffs, Wilson advised Flowers against pursuing harassment of MAF Corp. at that time.

249.   Also on April 1, 2025, Flowers proposed that Wilson upload the work titled the "Rose and Thorn Version II," created by "Ruby G," the recently deceased romantic partner of Counterplaintiff Stroke, for the purpose of emotionally provoking Ms. Stroke and causing her to "lose it."



250.    In that conversation, Flowers proposed falsely attributing the work to "Nikolai Romanov" rather than to its actual creator, "Ruby G."

251.    Flowers acknowledged that "Nikolai Romanov" had told him that he had no role in the development of "Rose and Thorn Version II."

252.    Separately, "Nikolai Romanov" stated on Twitter/X that he had expressly told Flowers he did not want credit for the work and that he wanted the work credited to "Ruby G" instead.



253.    Despite that instruction, Flowers disregarded "Nikolai Romanov's" stated wishes and, in the conversation, favored Wilson using "Nikolai Romanov's" account to upload the work to cause Ms. Stroke to "lose it."

254.     By that point, Counterdefendant Defcad had already established a pattern of taking and uploading works created by "Ruby G," beginning with the "RBG Crescent."

255.     "Ruby G" released works under the Creative Commons Attribution-NonCommercial-ShareAlike 4.0 International License.

256.     Immediately following "Ruby G's" passing, Defcad uploaded and used the "RGB Crescent" despite her express prohibition on commercial use.

257.     In releasing her "RGB Crescent" days prior to her unfortunate passing, "Ruby G" specifically singled out Defcad, referring to it as "FedCad," and stated that others should tell Defcad to take the work down if used by them.



258.     Notwithstanding that express warning and prohibition, Counterdefendant Defcad uploaded and exploited the work anyway.[13]

---

[13] https://defcad.com/library/rgb-crescent/, archived at: https://web.archive.org/web/20250704221215/https://defcad.com/library/rgb-crescent/

259. In her grief after the loss, Ms. Stroke became a vocal advocate against this copyright infringement and a critic of Counterdefendants.

260. Consistent with that same pattern of harassment, Wilson had, on or about June 8, 2024, uploaded and falsely designated the work titled "Come and Press It 3D Printable Reloading Press" ("CAPI"), which was also created by "Ruby G," as though it had been created by Ms. Stroke herself.

261. Like the "RGB Crescent," "Ruby G" expressly prohibited commercial use for the "CAPI" and "Rose and Thorn Version II" works under the Creative Commons Attribution-NonCommercial-ShareAlike 4.0 International License.

262. Thus, Wilson and Flowers were not discussing a neutral or authorized publication of the "Rose and Thorn Version II." They were discussing use of the work in a manner that was both emotionally targeted at Stroke and contrary to the terms under which its creator had released it.

263. Wilson subsequently followed through on Mr. Flowers' proposal.[14]

264. Following the upload of the Rose and Thorn, the next day, on April 5, 2025, Flowers used his "@FDMArms" account on Twitter/X to directly contact Ms. Stroke and draw her attention to the work's availability on Defcad.com with an image containing a hand-drawn circle around the false designation to "Nikolai Romanov" and a hand-drawn smiley face within.

---

[14] https://defcad.com/library/rubygbs-rose-and-thorn-version-ii-okb69-release/, archived at: https://web.archive.org/web/20251108102757/https://defcad.com/library/rubygbs-rose-and-thorn-version-ii-okb69-release/

265.     After Ms. Stroke asked Flowers whether he wished to take credit for the upload, and following a reply from another Twitter/X user, Flowers responded, "Stay mad Troomers," substituting the letter "o" with a clown emoji.



266.     "Troomer" is a derogatory term directed at transgender adults.[15] It combines "transgender" with "groomer" and carries the defamatory implication that the person so labeled is associated with grooming children.

---

[15] https://www.urbandictionary.com/define.php?term=Troomer

267.    Flowers's use of that term was intended to insult, demean, and further harass Ms. Stroke on the basis of her transgender identity characteristics.

268.    The targeting of Ms. Stroke by Flowers and Wilson was not incidental. When discussing Ms. Stroke, both Flowers and Wilson expressed overtly hostile views toward persons with transgender identity characteristics.

269.    Wilson, for example, on January 15th, 2025, shares a video containing bigoted commentary about transgender-identifying individuals[16] to Flowers after he uses the "he" pronoun to refer to Ms. Stroke.

270.    Those views informed and intensified their treatment of Counterplaintiff Stroke and formed part of the motive for the harassment, provocation, and targeting directed at her.

271.    Counterplaintiffs aver that the conduct directed at Ms. Stroke was thus not merely personal or tactical but was also fueled by prejudice and animus.

---

[16] https://www.instagram.com/reels/DBasDCFRljl/

73



272. Ultimately, Flowers later used proceeds he received from Wilson, at least in part, on personal expenditures including casino visits, which he described as a way to "blow off some steam" from his activities directed against Counterplaintiffs before going "back on the clock."



**FIRST CAUSE OF ACTION**
**COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 501**

**COUNT 1 – COPYRIGHT INFRINGEMENT**
BY JOHN ELIK AGAINST DEFCAD, INC.; DD FOUNDATION; DEFENSE
DISTRIBUTED; CODY RUTLEDGE WILSON; THOMAS ODOM; AND GARRET
WALLIMAN

273. Each named infringement below, unless otherwise specified, consists of the unauthorized reproduction and distribution of one of Elik's owned and copyrighted works.

274. On or about November 1, 2021, Counterdefendants caused Elik's photographs to be uploaded to Defcad.com.[17] (the "3011 Infringement")

275. Defcad.com required a paid Legio membership to download the 3011 Infringement.

276. The 3011 Infringement contains an exact, unauthorized reproduction of one of Elik's registered photographic visual arts works that depict a firearm known as the 3011, and which has a United States Copyright Office (USCO) registration number of VA0002479454.

277. Elik became aware of the 3011 Infringement on or about April 8, 2026, after Counterdefendant's counsel in the Middle District Action notified him that that case had settled.

278. Curious about the terms of the settlement, Elik checked Counterdefendant's defcad.com website to see if any works had been taken down.

---

[17] https://defcad.com/library/3011-printable-1911-frame/

279. Elik was alarmed to discover a large number of his works being offered for sale through the Legio subscription scheme.

280. On or about April 10, 2026, from a computer located in Madison County, Illinois, Elik accessed Defendant's Defcad website and downloaded the 3011 Infringement.

281. Shortly thereafter, Elik filed as many copyright registrations as he could afford[18] for the litany of his works Counterdefendants are selling.[19]

282. On or about April 17, 2026, from a computer located in Orange County, Florida, Elik accessed Defendant's Defcad website and downloaded the 3011 Infringement once again.

283. Elik filed the works copied in the 3011 Infringement with the Copyright Office on October 27, 2025.

284. The effective date of registration for the works infringed in the 3011 Infringement is October 27, 2025.

285. Counterdefendants have continued to reproduce and distribute the 3011 Infringement, including the registered work therein, up to and including the present day.

---

[18] Elik is an individual with limited income with which to file registrations. Pursuing each and every single one of his works that Counterdefendants are infringing would quickly reach a sum in excess of $2,500 in registration fees.
[19] These registrations are pending, and Elik intends to amend this complaint as soon as the registrations are processed with the Copyright Office. As of filing this complaint, Elik is aware of at least 82 other works of his that Counterdefendants are infringing, but discovers more each day.

286. Archive records confirm that Counterdefendants have profited from the 3011 Infringement within the past three years, with approximately 100 downloads since January 1, 2025.

287. Archive records also show Counterdefendants have manually altered the total number of downloads displayed on their page offering the 3011 Infringement since it was posted, which indicates the true number of downloads is far greater than the number indicated on the site.

288. Counterdefendants have a history of deleting evidence of their infringement by altering view and download counts.

289. Counterdefendants have previously reached out to internet archive service providers to delete archived versions of their site that show evidence of their infringement.

290. At all times relevant hereto, Elik has been the owner of the works reproduced, distributed, sold, offered for sale, and publicly displayed by Counterdefendants. Elik published each work prior to Counterdefendants' infringing activity.

291. For each of the works cited in this cause of action, Elik holds a copyright registration certificate from the United States Copyright Office.

292. Without authorization, Counterdefendants, reproduced and distributed the following Elik-owned and copyrighted works:

A.  From at least November 1, 2021, and continuing to the present day, one photographic visual art works that depict a firearm known as the 3011, and which is registered under VA0002479454.

293.    Elik did not authorize Defendant's copying, display, or distribution of Elik's works.

294.    As a result of its wrongful conduct, Counterdefendants are liable to Elik for copyright infringement pursuant to 17 U.S.C. § 501. Elik has suffered, and will continue to suffer, substantial losses, including but not limited to damage to his business reputation and goodwill.

295.    Elik is entitled to recover damages including any and all profits Counterdefendants have made as a result of their wrongful conduct. 17 U.S.C. §504, and in the alternative, statutory damages pursuant to 17 U.S.C. § 504(c).

WHEREFORE, Counterplaintiff John Elik demands judgment against Counterdefendants DEFCAD, INC., DD FOUNDATION, LLC, DEFENSE DISTRIBUTED, CODY RUTLEDGE WILSON, THOMAS ODOM, and GARRET WALLIMAN, and requests that this Court award:

A.  actual damages and any additional profits of Counterdefendants attributable to the infringement pursuant to 17 U.S.C. § 504(b), or, to the extent available, statutory damages under 17 U.S.C. § 504(c);

B.  preliminary and permanent injunctive relief under 17 U.S.C. § 502 prohibiting further infringement of Elik's copyrighted works;

C.   impoundment and destruction, as appropriate, of infringing copies and materials under 17 U.S.C. § 503;

D.   costs and, to the extent recoverable, attorneys' fees under 17 U.S.C. § 505;

E.   pre-judgment and post-judgment interest as allowed by law; and

F.   such other and further relief as the Court deems just and proper.

### COUNT 2 – COPYRIGHT INFRINGEMENT
BY ALEXANDER HOLLADAY AGAINST DEFCAD, INC.; DD FOUNDATION; DEFENSE DISTRIBUTED; CODY RUTLEDGE WILSON; THOMAS ODOM; AND GARRET WALLIMAN

296.   Each named infringement below, unless otherwise specified, consists of the unauthorized reproduction and distribution of one of Holladay's owned and copyrighted works.

297.   On or about December 25, 2020, Counterdefendants caused the MacDaddy to be uploaded to Defcad.com.[20] (the "MacDaddy Infringement")

298.   Defcad.com required a paid Legio membership to download the MacDaddy Infringement.

299.   The MacDaddy Infringement contains an exact, unauthorized reproduction of one of Holladay's registered literary works, and which has a United States Copyright Office (USCO) registration number of TX0009457604.

300.   On or about April 28, 2021, Counterdefendants caused the Shush Puppy to be uploaded to Defcad.com.[21] (the "Shush Puppy Infringement")

---

[20] https://defcad.com/library/the-macdaddy-by-fmda/
[21] https://defcad.com/library/shush-puppy/

301. Defcad.com required a paid Legio membership to download the Shush Puppy Infringement.

302. The Shush Puppy Infringement contains an exact, unauthorized reproduction of one of Holladay's registered literary works, and which has a United States Copyright Office (USCO) registration number of TX0009457608.

303. On or about Augus 26, 2022, Counterdefendants caused the TacDaddy to be uploaded to Defcad.com.[22] (the "TacDaddy Infringement")

304. Defcad.com required a paid Legio membership to download the TacDaddy Infringement.

305. The TacDaddy Infringement contains an exact, unauthorized reproduction of one of Holladay's registered literary works, and which has a United States Copyright Office (USCO) registration number of TX0009457610.

306. Holladay became aware of the MacDaddy Infringement on or about December 19, 2024, after Counterdefendants named him in the Middle District Action's Counterclaims.

307. Holladay became aware of the Shush Puppy Infringement on or about December 19, 2024, after Counterdefendants named him in the Middle District Action's Counterclaims.

308. Holladay became aware of the TacDaddy Infringement on or about December 19, 2024, after Counterdefendants named him in the Middle District Action's Counterclaims.

---

[22] https://defcad.com/library/tacdaddy-release-package/

309. On or about December 19, 2024 from a computer located in Orange County, Florida, Holladay accessed Defendant's Defcad website and downloaded the MacDaddy Infringement.

310. On or about December 19, 2024, from a computer located in Orange County, Florida, Holladay accessed Defendant's Defcad website and downloaded the Shush Puppy Infringement.

311. On or about December 19, 2024, from a computer located in Orange County, Florida, Holladay accessed Defendant's Defcad website and downloaded the TacDaddy Infringement.

312. Shortly thereafter, Holladay filed copyright registrations for the textual works that Counterdefendants were infringing.

313. Holladay filed the works copied in the MacDaddy Infringement with the Copyright Office on December 19, 2024.

314. The effective date of registration for the works infringed in the MacDaddy Infringement is December 19, 2024.

315. Holladay filed the works copied in the Shush Puppy Infringement with the Copyright Office on December 19, 2024.

316. The effective date of registration for the works infringed in the Shush Puppy Infringement is December 19, 2024.

317. Holladay filed the works copied in the TacDaddy Infringement with the Copyright Office on December 19, 2024.

318.    The effective date of registration for the works infringed in the TacDaddy Infringement is December 19, 2024.

319.    Counterdefendants have continued to reproduce and distribute the MacDaddy Infringement, including the registered work therein, up to and including the present day.

320.    Archive records confirm that Counterdefendants have profited from the MacDaddy Infringement within the past three years, with approximately 100 downloads since March 1, 2025.

321.    Counterdefendants ceased reproducing and distributing the Shush Puppy Infringement, including the registered work therein, at some point after noticing Holladay's copyright registrations.

322.    Counterdefendants ceased reproducing and distributing the TacDaddy Infringement, including the registered work therein, at some point after noticing Holladay's copyright registrations.

323.    At all times relevant hereto, Holladay has been the owner of the works reproduced, distributed, sold, offered for sale, and publicly displayed by Counterdefendants. Holladay published each work prior to Counterdefendants' infringing activity.

324.    For each of the works cited in this cause of action, Holladay holds a copyright registration certificate from the United States Copyright Office.

325.    Without authorization, Counterdefendants, reproduced and distributed the following Holladay-owned and copyrighted works:

A. From at least December 25, 2020, and continuing to the present day, one textual work which is registered under TX0009457604.

B. From at least April 28, 2021, and ceasing within the past three years, one textual work which is registered under TX0009457608.

C. From at least August 26, 2022, and ceasing within the past three years, one textual work which is registered under TX0009457610.

326. Holladay did not authorize Defendant's copying, display, or distribution of Holladay's works.

327. As a result of its wrongful conduct, Counterdefendants are liable to Holladay for copyright infringement pursuant to 17 U.S.C. § 501. Holladay has suffered, and will continue to suffer, substantial losses, including but not limited to damage to his business reputation and goodwill.

328. Holladay is entitled to recover damages including any and all profits Counterdefendants have made as a result of their wrongful conduct. 17 U.S.C. §504, and in the alternative, statutory damages pursuant to 17 U.S.C. § 504(c).

WHEREFORE, Counterplaintiff Alexander Holladay demands judgment against Counterdefendants DEFCAD, INC., DD FOUNDATION, LLC, DEFENSE DISTRIBUTED, CODY RUTLEDGE WILSON, THOMAS ODOM, and GARRET WALLIMAN, and requests that this Court award:

A. actual damages and any additional profits of Counterdefendants attributable to the infringement pursuant to 17 U.S.C. § 504(b), or, to the extent available, statutory damages under 17 U.S.C. § 504(c);

B. preliminary and permanent injunctive relief under 17 U.S.C. § 502 prohibiting further infringement of Holladay's copyrighted works;

C. impoundment and destruction, as appropriate, of infringing copies and materials under 17 U.S.C. § 503;

D. costs and, to the extent recoverable, attorneys' fees under 17 U.S.C. § 505;

E. pre-judgment and post-judgment interest as allowed by law; and

F. such other and further relief as the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**FALSE DESIGNATION OF ORIGIN AND**
**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125**

329.    Counterplaintiff repeats and re-alleges paragraphs 56 through 59, 61 through 68, 80, 83 through 89, and 131 through 140 as if fully set forth herein.

330.    In violation of 15 U.S.C. §1125(a), Defendants have used in commerce a slogan, trade dress, word, name, symbol, device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which was and is likely to cause confusion or to cause mistake, or to deceive consumers as to an affiliation, connection, or association with Counterplaintiffs.

**COUNT 3 – FALSE DESIGNATION OF ORIGIN**
BY JOHN ELIK AGAINST CODY RUTLEDGE WILSON AND THROUGH HIM
DEFCAD, INC.; DD FOUNDATION; AND DEFENSE DISTRIBUTED

331.    Beginning at latest March 29th, 2026, and continuing until the present day, Counterdefendant Wilson changed or caused to be changed the description of "The Gatalog," a category present on his several websites, under which

Counterdefendant Wilson sells and distributes both digital works and physical goods. ("The Gatalog change").

332. As Part of The Gatalog change, Defendants referred to "The Gatalog" as "Owned and directed by Alexander Holladay and John Elik[.]"

333. Mr. Elik does not "own" or "direct" "The Gatalog."

334. Mr. Elik's name is used by him in commerce in his capacity as a mechanical engineer, as a firearms designer, as an author, and as an advocate.

335. The business entity Counterdefendants, by and through the direct actions of Counterdefendant Wilson, knew or should have known the information in The Gatalog change was misrepresentative.

336. DefCad.com, the website of Counterdefendant Defcad, contains over one-hundred separate pages purporting to be authored by "The Gatalog," and thus misattributed to and affiliated with Mr. Elik.

337. Each page purporting to be authored by "The Gatalog" is directly connected to the digital files Defcad sells commercially under its subscription model.

338. Most of the Defcad.com pages purporting to be authored by "The Gatalog" and thus misrepresented as being affiliated with Mr. Elik, advertise designs for purchase under Defcad's subscription model that Mr. Elik had no involvement in whatsoever.

339. According to information and belief, Defcad.com customers have purchased memberships and files at least in part because they believed those

items were designed, made, or approved by Mr. Elik as a result of The Gatalog change's misrepresentations.

340. Ghostguns.com, the website of Counterdefendant Defense Distributed, contained at least thirteen pages that explicitly misattribute and affiliate Plaintiff by identifying Plaintiff as owning and directing "The Gatalog."

341. Each of the pages Ghostguns.com attributes to being created by "The Gatalog" either directly sell or are connected to the commercial sale of a firearms-related product or merchandise.

342. Most of the Ghostguns.com pages purporting to be authored by "The Gatalog," and thus misrepresented as being affiliated with Mr. Elik, advertise designs and merchandise for direct commercial sale that Mr. Elik had no involvement in whatsoever.

343. According to information and belief, Ghostguns.com customers have purchased items at least in part because they believed those items were designed, made, or approved by Mr. Elik as a result of The Gatalog change's misrepresentations.

344. Counterdefendants have willfully infringed Mr. Elik's copyrights, have falsely designated their infringements as being approved by or in affiliation with Mr. Elik, and have made material misrepresentations and descriptions of fact and have falsely attributed numerous items as being those of Mr. Elik.

345.    As a direct and proximate result of Defendants' willful misconduct, Mr. Elik has suffered and continues to suffer irreparable harm to his reputation and business goodwill and associated common law rights.

346.    Unless Counterdefendants are enjoined from further infringement of Mr. Elik's works and from further false designations, Mr. Elik will continue to be irreparably harmed.

WHEREFORE, Counterplaintiff John Elik demands judgment against Counterdefendants CODY RUTLEDGE WILSON, DEFCAD, INC., DD FOUNDATION, LLC, and DEFENSE DISTRIBUTED, and requests that this Court award:

A. preliminary and permanent injunctive relief under 15 U.S.C. § 1116 prohibiting further false designation of origin, false affiliation, false association, and other false or misleading representations concerning Mr. Elik;

B. Counterdefendants' profits, any damages sustained by Mr. Elik, and the costs of this action pursuant to 15 U.S.C. § 1117(a);

C. to the extent permitted by law, enhanced damages and/or an accounting of profits;

D. an order requiring the delivery up and destruction of materials bearing the false designation or false attribution, as appropriate, pursuant to 15 U.S.C. § 1118;

E. pre-judgment and post-judgment interest as allowed by law;

F. attorneys' fees to the extent recoverable; and

G. such other and further relief as the Court deems just and proper.

### COUNT 4 – FALSE DESIGNATION OF ORIGIN
BY ALEXANDER HOLLADAY AGAINST CODY RUTLEDGE WILSON AND THROUGH HIM DEFCAD, INC.; DD FOUNDATION; AND DEFENSE DISTRIBUTED

347. Beginning at latest March 29th, 2026, and continuing until the present day, Counterdefendant Wilson changed or caused to be changed the description of "The Gatalog," a category present on his several websites, under which Counterdefendant Wilson sells and distributes both digital works and physical goods. ("The Gatalog change").

348. As Part of The Gatalog change, Defendants referred to "The Gatalog" as "Owned and directed by Alexander Holladay and John Elik[.]"

349. Mr. Holladay does not "own" or "direct" "The Gatalog."

350. Mr. Holladay's name is used by him in commerce in his capacity as a firearms designer, as an author, and as an advocate.

351. The business entity counterdefendants, by and through the direct actions of Counterdefendant Wilson, knew or should have known the information in The Gatalog change was misrepresentative.

352. DefCad.com, the website of Counterdefendant Defcad, contains over one-hundred separate pages purporting to be authored by "The Gatalog," and thus misattributed to and affiliated with Mr. Holladay.

353. Each page purporting to be authored by "The Gatalog" is directly connected to the digital files Defcad sells commercially under its subscription model.

354. Most of the Defcad.com pages purporting to be authored by "The Gatalog" and thus misrepresented as being affiliated with Mr. Holladay, advertise designs for purchase under Defcad's subscription model that Mr. Holladay had no involvement in whatsoever.

355. According to information and belief, Defcad.com customers have purchased memberships and files at least in part because they believed those items were designed, made, or approved by Mr. Holladay as a result of The Gatalog change's misrepresentations.

356. Ghostguns.com, the website of Counterdefendant Defense Distributed, contained at least thirteen pages that explicitly misattribute and affiliate Mr. Holladay by identifying Mr. Holladay as owning and directing "The Gatalog."

357. Each of the pages Ghostguns.com attributes to being created by "The Gatalog" either directly sell or are connected to the commercial sale of a firearms-related product or merchandise.

358. Most of the Ghostguns.com pages purporting to be authored by "The Gatalog," and thus misrepresented as being affiliated with Mr. Holladay, advertise designs and merchandise for direct commercial sale that Mr. Holladay had no involvement in whatsoever.

359.     According to information and belief, Ghostguns.com customers have purchased items at least in part because they believed those items were designed, made, or approved by Mr. Holladay as a result of The Gatalog change's misrepresentations.

360.     Counterdefendants have willfully infringed Mr. Holladay's copyrights, have falsely designated their infringements as being approved by or in affiliation with Mr. Holladay, and have made material misrepresentations and descriptions of fact and have falsely attributed numerous items as being those of Mr. Holladay.

361.     As a direct and proximate result of Defendants' willful misconduct, Mr. Holladay has suffered and continues to suffer irreparable harm to his reputation and business goodwill and associated common law rights.

362.     Unless Counterdefendants are enjoined from further infringement of Mr. Holladay's works and from further false designations, Mr. Holladay will continue to be irreparably harmed.

WHEREFORE, Counterplaintiff Alexander Holladay demands judgment against Counterdefendants CODY RUTLEDGE WILSON, DEFCAD, INC., DD FOUNDATION, LLC, and DEFENSE DISTRIBUTED, and requests that this Court award:

A. preliminary and permanent injunctive relief under 15 U.S.C. § 1116 prohibiting further false designation of origin, false affiliation, false

90

association, and other false or misleading representations concerning Mr. Holladay;

B. Counterdefendants' profits, any damages sustained by Mr. Holladay, and the costs of this action pursuant to 15 U.S.C. § 1117(a);

C. to the extent permitted by law, enhanced damages and/or an accounting of profits;

D. an order requiring the delivery up and destruction of materials bearing the false designation or false attribution, as appropriate, pursuant to 15 U.S.C. § 1118;

E. pre-judgment and post-judgment interest as allowed by law;

F. attorneys' fees to the extent recoverable; and

G. such other and further relief as the Court deems just and proper.

**COUNT 5 – FALSE DESIGNATION OF ORIGIN**
BY JOSH KIEL STROKE AGAINST CODY RUTLEDGE WILSON AND
THROUGH HIM DEFCAD, INC.; DD FOUNDATION; DEFENSE DISTRIBUTED;
THOMAS ODOM; AND GARRET WALLIMAN

363.    Beginning no later than June 8, 2024, and continuing thereafter, Counterdefendants Wilson, Walliman, and/or Odom published, displayed, advertised, promoted, and distributed a 3D model identified as the "Come and Press It 3D Printable Reloading Press" (the "CAPI") on one or more of their websites, including Defcad.com[23]. (*See supra* 250-253, 261-263).

---

[23] https://defcad.com/library/come-and-press-it-3d-printable-reloading-press/, archived at:
https://web.archive.org/web/20240809205356/https://defcad.com/library/come-and-press-it-3d-printable-reloading-press/

364. In connection with that publication, Counterdefendants identified "josh.kiel.stroke" as the "Creator" of the "Come and Press It 3D Printable Reloading Press."

365. That designation was false. (*See supra* 250-253).

366. Ms. Stroke did not create the CAPI. Rather, a recently deceased romantic partner of Ms. Stroke, "Ruby G," created the CAPI. (*See supra* 250-253).

367. The designation was a continuation of an ongoing pattern of intentional harassment involving Ms. Stroke's grief over the loss of "Ruby G." (*See supra* 250-253, 261-271).

368. Ms. Stroke did not upload the CAPI to Defcad.com.

369. Ms. Stroke never created an account on Defcad.com.

370. Upon information and belief, the Defcad.com account using the name "josh.kiel.stroke" was created not by Ms. Stroke, but by one or more of Counterdefendants Wilson, Walliman, Odom, and/or employees or agents of Counterdefendants Defcad, Defense Distributed, and/or DD Foundation.

371. Upon information and belief, that account was created and used to masquerade as Ms. Stroke and to falsely attribute the CAPI to Ms. Stroke.

372.     On or about July 31, 2024, Counterdefendant Wilson caused the DEFCAD email newsletter entitled "The Nutty-9 and McMaster Blaster" to be published through Counterdefendant Defcad.[24]

373.     That newsletter expressly referred readers to the "Come and Press It 3D Printable Reloading Press by josh.kiel.stroke" and linked readers to the corresponding page on Defcad.com.

374.     That newsletter was sponsored by Antelope Hill Publishing (or, "Antelope Hill"), "which specializes in translating historical works by Nazis, fascists and ultranationalists, and original works by contemporary white nationalists, neo-fascists and others on the far right" according to Hatewatch.[25] Their translations include "works by Adolf Hitler; Belgian fascist, Nazi collaborator, SS commander and convicted war criminal Leon Degrelle; and Wilfrid Bade, whose Conquering Berlin is a laudatory account of the campaign of political violence carried out by the Nazi paramilitary Sturmabteilung, or SA (also known as 'brownshirts'), in Weimar Republic-era Germany."

375.     In the advertisement for Antelope Hill, Counterdefendant Wilson wrote that they publish "research on the roots of transgenderism," a harassing reference to Ms. Stroke's transgender identity and a veiled threat in context of

---

[24] https://defcad.com/blog/nutty-9/, archived at:
https://web.archive.org/web/20250704221215/https://defcad.com/blog/nutty-9/
[25] https://www.splcenter.org/resources/hatewatch/white-nationalist-book-publishers-revealed/

the actions, practices, beliefs, ideologies, and positions of the typical authors published by Antelope Hill.

376. Ms. Stroke's name is used by her in commerce in her capacity as an advocate, artist, photographer, author, and as a tradesperson.

377. The business entity Counterdefendants, by and through the direct actions of Counterdefendants Wilson, Walliman, and Odom, knew or should have known that the information in the CAPI and newsletter was misrepresentative.

378. Defcad.com, the website of Counterdefendant Defcad, contains at least three separate pages purporting to be authored by "josh.kiel.stroke," and thus misattributed to and affiliated by Ms. Stroke.

379. Each page purporting to be authored by "josh.kiel.stroke" is directly connected to the digital files Defcad sells commercially under its subscription model.

380. Most of the Defcad.com pages purporting to be authored by "josh.kiel.stroke" and thus misrepresented as being affiliated with Ms. Stroke, advertise designs for purchase under Defcad's subscription model that Ms. Stroke had no involvement in whatsoever.

381. According to information and belief, Defcad.com customers have purchased memberships and files at least in part because they believed those items were designed, made, or approved by Ms. Stroke as a result of the CAPI's misrepresentations.

382. Counterdefendants have falsely designated their content as being approved by or in affiliation with Ms. Stroke and have made material misrepresentations and descriptions of fact and have falsely attributed the CAPI as being those of Ms. Stroke.

383. As a direct and proximate result of Counterdefendants' willful misconduct, Ms. Stroke has suffered and continues to suffer irreparable harm to her reputation and business goodwill and associated common law rights.

384. Unless Counterdefendants are enjoined from further false designations, Ms. Stroke will continue to be irreparably harmed.

WHEREFORE, Counterplaintiff Josh Kiel Stroke demands judgment against Counterdefendants CODY RUTLEDGE WILSON, DEFCAD, INC., DD FOUNDATION, LLC, DEFENSE DISTRIBUTED, THOMAS ODOM, and GARRET WALLIMAN, and requests that this Court award:

A. preliminary and permanent injunctive relief under 15 U.S.C. § 1116 prohibiting further false designation of origin, false affiliation, false association, false attribution, and other false or misleading representations concerning Ms. Stroke;

B. Counterdefendants' profits, any damages sustained by Ms. Stroke, and the costs of this action pursuant to 15 U.S.C. § 1117(a);

C. to the extent permitted by law, enhanced damages and/or an accounting of profits;

D.  an order requiring the delivery up and destruction of materials bearing the false designation or false attribution, as appropriate, pursuant to 15 U.S.C. § 1118;

E.  pre-judgment and post-judgment interest as allowed by law;

F.  attorneys' fees to the extent recoverable; and

G.  such other and further relief as the Court deems just and proper.

<strong>THIRD CAUSE OF ACTION<br>VIOLATION OF The Illinois Right of Publicity Act<br><u>UNDER 765 ILCS § 1075</u></strong>

<strong><u>COUNT 6 – ILLINOIS RIGHT OF PUBLICITY ACT VIOLATION</u></strong><br>BY JOHN ELIK AGAINST DEFCAD, INC.; DD FOUNDATION; DEFENSE DISTRIBUTED; CODY RUTLEDGE WILSON; THOMAS ODOM; AND GARRET WALLIMAN

385.  Counterplaintiff John Elik repeats and re-alleges paragraphs 14, 56 through 59, 61 through 68, 80, 83 through 89, and 133, and 136 through 138 as if fully set forth herein.

386.  The Illinois Right of Publicity Act recognizes an individual's right to control whether and how his identity is used for commercial purposes.

387.  Mr. Elik is a living natural person within the meaning of the Act.

388.  Mr. Elik's identity, as that term is used in the Act, includes without limitation his name, image, and likeness.

389.  Counterdefendants are "persons" within the meaning of the Act and are subject to its prohibitions and remedies.

390.  At no time did Mr. Elik ever provide written consent authorizing Counterdefendants to use his identity for commercial purposes.

391.     Beginning no later than March 29, 2026, and continuing thereafter, Counterdefendants, by and through Counterdefendant Wilson, changed or caused to be changed the description of "The Gatalog," a category used on Counterdefendants' websites in connection with the offering for sale and sale of digital files, merchandise, and other goods and services.

392.     As part of that change, Counterdefendants publicly represented that "The Gatalog" was "owned and directed by Alexander Holladay and John Elik."

393.     That representation was false.

394.     Mr. Elik does not own "The Gatalog."

395.     Mr. Elik does not direct "The Gatalog."

396.     Counterdefendants knew, or at a minimum should have known, that the foregoing representation was false when made and when maintained.

397.     Defcad.com contains more than one hundred pages purporting to be authored by "The Gatalog."

398.     Those pages are directly connected to the commercial offering and sale of digital files through Defcad's subscription model.

399.     By representing that "The Gatalog" was owned and directed by Mr. Elik, and by attributing those pages to "The Gatalog," Counterdefendants used and held out Mr. Elik's name and identity in connection with the sale, offering for sale, advertising, and promotion of products, merchandise, goods, and services.

400. Most of the Defcad.com pages attributed to "The Gatalog" advertise designs for purchase that Mr. Elik did not design, did not make, did not approve, and with which he had no involvement whatsoever.

401. Ghostguns.com likewise contained at least thirteen pages expressly attributing ownership and direction of "The Gatalog" to Mr. Elik.

402. Each of those pages either directly sold, advertised, promoted, or was connected to the sale of firearms-related products, merchandise, or services.

403. Most of the Ghostguns.com pages attributed to "The Gatalog" advertised designs, merchandise, or other items for direct commercial sale that Mr. Elik neither designed nor approved and with which he had no involvement whatsoever.

404. On information and belief, consumers purchased subscriptions, files, merchandise, and other items from Counterdefendants at least in part because they believed such items were designed by, made by, approved by, affiliated with, or otherwise connected to Mr. Elik.

405. In addition, on October 31, 2025, and again on March 5, 2026, Counterdefendants used an artificial-intelligence-generated image containing the likeness of Mr. Elik in blog and newsletter publications that included links to Counterdefendants' products and services.

406.     Defcad, Inc, did on March 5, 2026, posted "FULL-NULL and California Sues The Gatalog"[26] containing a section "California Sues The Gatalog" with a generative artificial intelligence derived image of Mr. Elik and Mr. Larosiere in front of a computer.



407.     Defcad, Inc, did on October 31, 2025, posted "PWC9 and Projectile Dysfunction for Halloween"[27] containing a section "A Very Scary Halloween Crashout" with a generative artificial intelligence derived image of Mr. Elik.

---

[26] https://defcad.com/blog/franken-lite-full-null/, archived at: https://web.archive.org/web/20260420190727/https://defcad.com/blog/franken-lite-full-null/

[27] https://defcad.com/blog/pwc9-projectile-dysfunction-halloween/, archived at: https://web.archive.org/web/20251105040158/https://defcad.com/blog/pwc9-projectile-dysfunction-halloween/



408.    By doing so, Counterdefendants used Mr. Elik's image and likeness to advertise, promote, and drive traffic to commercially offered products and services.

409.    The foregoing uses of Mr. Elik's identity were for commercial purposes.

410.    The foregoing uses of Mr. Elik's identity were made without his prior written consent.

411.    The uses described above were not truthful identifications of Mr. Elik as the author of the works or the performer in a performance, because Mr. Elik did not own or direct "The Gatalog," and did not author, create, approve, or participate in the works, files, merchandise, and promotions so attributed.

412.    Counterdefendants' conduct was knowing, intentional, and willful.

413.    As a direct and proximate result of Counterdefendants' unauthorized commercial use of his identity, Mr. Elik has suffered and continues to suffer damage to his reputation, business goodwill, commercial value, and associated rights.

414.    As a direct and proximate result of Counterdefendants' conduct, Counterdefendants have derived revenue, sales, subscription income, traffic, promotional value, and other commercial benefits from the unauthorized use of Mr. Elik's identity.

415.    Counterdefendants' continuing use of Mr. Elik's identity threatens ongoing and irreparable harm for which there is no adequate remedy at law.

WHEREFORE, Counterplaintiff John Elik demands judgment against Counterdefendants, jointly and severally where permitted, and requests:

A. a declaration that Counterdefendants violated the Illinois Right of Publicity Act;

B. temporary, preliminary, and permanent injunctive relief prohibiting Counterdefendants from using Mr. Elik's identity, including his name, image, and likeness, for commercial purposes without his written consent;

C. an order requiring Counterdefendants to remove from their websites, blogs, newsletters, advertisements, promotional materials, and other commercial channels all unauthorized uses of Mr. Elik's identity;

D.   actual damages, Counterdefendants' profits attributable to the unauthorized use, or both, in an amount to be proven at trial, or statutory damages as allowed by law;

E.  punitive damages based on the willful nature of Counterdefendants' misconduct;

F.  reasonable attorney's fees, costs, and expenses;

G.  pre- and post-judgment interest as allowed by law; and

H.  such other and further relief as the Court deems just and proper.

## FOURTH CAUSE OF ACTION
## PUBLIC DISCLOSURE OF PRIVATE FACTS
## UNDER ILLINOIS LAW OR, IN THE ALTERNATIVE, FLORIDA LAW

### COUNT 7 – PUBLIC DISCLOSURE OF PRIVATE FACTS
BY JOHN ELIK AGAINST CODY RUTLEDGE WILSON, AND THROUGH HIM,
DEFCAD, INC.; DD FOUNDATION; AND DEFENSE DISTRIBUTED

416.   Counterplaintiff John Elik repeats and re-alleges paragraphs 14, 67, 68, 80, 83 through 87, 161 through 163, and 202 through 205 as if fully set forth herein.

417.   At all relevant times, John Elik was and is a resident of Illinois.

418.   Counterdefendants, by and through Counterdefendant Cody Rutledge Wilson, gave publicity to private facts concerning Counterplaintiff Elik.

419.   On March 2, 2024, Counterdefendant Wilson published or caused to be published a post titled "Gatalogy" on the DDLegio blog.

102

420.     In "Gatalogy," Counterdefendant Wilson intentionally published Counterplaintiff Elik's private banking details, including his account and routing number.

421.     Those banking details were private facts, not matters of public record, and not matters Elik had voluntarily made public.

422.     Private banking details are the sort of intensely personal financial information that a reasonable person would expect to remain private.

423.     The DDLegio blog was a public-facing website operated and maintained by Counterdefendants and accessible to the public at large.

424.     By publishing Elik's private banking details on that public-facing blog, Counterdefendants gave publicity to private facts concerning Elik.

425.     The disclosure of Elik's private banking details would be highly offensive to a reasonable person.

426.     Elik's private banking details were not matters of legitimate public concern, and their disclosure was not reasonably necessary to comment on any public controversy, litigation, or political issue.

427.     Counterdefendant Wilson did not accidentally disclose that information. He intentionally selected, included, and published the offending material.

428.     Despite repeated notice through multiple actions that the post contained Elik's private banking details, Counterdefendant Wilson never removed or modified the offending image and allowed it to remain published.

103

429. On September 10, 2024, Rajan Basra published an article titled "Lawsuits, Rivalries, and Trolls: Examining the Behaviour of the 3D-Printed Gun Movement."

430. In that article, Basra republished private banking information concerning Counterplaintiff Elik that had been lifted from Wilson's "Gatalogy" post on the DDLegio blog, together with other identifying imagery, for the purpose and effect of publicly identifying Elik.

431. Mr. Wilson induced, encouraged, or facilitated that publication.

432. By republishing those materials, the Basra article further amplified the exposure of Elik's private financial information and intensified the publicity given to those private facts.

433. Counterdefendants' publication of Elik's private banking details served no legitimate informational purpose. Instead, it formed part of a broader retaliatory course of conduct directed at Elik and others whom Wilson viewed as critics or adversaries.

434. As a direct and proximate result of Counterdefendants' conduct, Elik suffered damages, including but not limited to humiliation, emotional distress, invasion of privacy, reputational harm, fear for his safety, and other general and special damages according to proof.

435. As a further direct and proximate result of that disclosure and its republication, Elik and members of his family were subjected to harassment related to Elik's Second Amendment advocacy.

436.    Counterdefendants' conduct was intentional, malicious, and in reckless disregard of Elik's privacy rights.

437.    Illinois has the most significant relationship to this claim because Elik resides in Illinois, the injury from the disclosure was suffered primarily in Illinois, and the effects of the disclosure were centered there.

438.    In the alternative, if the Court determines that Illinois law does not govern this claim, then the same conduct constitutes public disclosure of private facts under Florida law because Counterdefendants gave publicity in Florida to private facts concerning Elik that would be highly offensive to a reasonable person and were not matters of legitimate public concern.

WHEREFORE, Counterplaintiff John Elik demands judgment against Counterdefendants Defense Distributed, Defcad, Inc., DD Foundation LLC, and Cody Rutledge Wilson, and requests:

A. compensatory damages in an amount to be proven at trial;

B. punitive damages as permitted by law;

C. costs of suit;

D. pre- and post-judgment interest as allowed by law; and

E. such other and further relief as the Court deems just and proper.

## FIFTH CAUSE OF ACTION
## UNAUTHORIZED PUBLICATION OF NAME OR LIKENESS
## IN VIOLATION OF §540.08, Fla. Stat.

### COUNT 8 – UNAUTHORIZED PUBLICATION OF NAME OR LIKENESS
BY ALEXANDER HOLLADAY AGAINST CODY RUTLEDGE WILSON, AND
THROUGH HIM DEFCAD, INC. AND DEFENSE DISTRIBUTED

439.     Counterplaintiff Alexander Holladay repeats and re-alleges paragraphs 15, and 346 through 360 as if fully set forth herein.

440.     Defendant Wilson, and through him Defcad and Defense Distributed, in violation of § 540.08, Fla. Stat., did, for purposes of trade and for commercial and advertising purposes, publish, print, and display Mr. Holladay's name and identity without his prior consent.

441.     In particular, Defendants identified "The Gatalog" as "owned and directed by Alexander Holladay," and used that false identification on commercial pages connected to the sale of digital files, subscriptions, merchandise, and related goods and services, thereby falsely representing that such materials were created by, approved by, or affiliated with Mr. Holladay.

442.     Those uses were not truthful identifications of Mr. Holladay as the author, creator, or sponsor of the works, files, merchandise, and promotions so attributed, because Mr. Holladay does not own or direct "The Gatalog" and had no involvement in numerous items so marketed.

443.     Defendants' conduct was knowing, intentional, and willful.

444.     As a direct and proximate result of Defendants' unauthorized commercial use of Mr. Holladay's identity, Mr. Holladay has suffered and

106

continues to suffer damage to his reputation, business goodwill, commercial value, and associated rights.

445. As a direct and proximate result of that conduct, Defendants derived revenue, sales, subscription income, traffic, promotional value, and other commercial benefits from the unauthorized use of Mr. Holladay's identity.

446. Defendants' continuing use of Mr. Holladay's identity threatens ongoing and irreparable harm for which there is no adequate remedy at law.

WHEREFORE, Counterplaintiff Alexander Holladay demands judgment against Counterdefendants Cody Rutledge Wilson, and through him Defcad, Inc. and Defense Distributed, jointly and severally where permitted, and requests:

A. temporary, preliminary, and permanent injunctive relief prohibiting Counterdefendants from using Mr. Holladay's name and identity for trade, commercial, or advertising purposes without his written consent;

B. an order requiring Counterdefendants to remove from their websites, blogs, newsletters, advertisements, promotional materials, sales pages, and other commercial channels all unauthorized uses of Mr. Holladay's name and identity;

C. actual damages, including an amount equal to a reasonable royalty, Counterdefendants' profits attributable to the unauthorized use, or both, in an amount to be proven at trial;

D. punitive or exemplary damages based on the willful nature of Counterdefendants' misconduct;

E. reasonable attorneys' fees, costs, and expenses to the extent recoverable;

F. pre- and post-judgment interest as allowed by law; and

G. such other and further relief as the Court deems just and proper.

### SIXTH CAUSE OF ACTION –VIOLATION OF TEXAS BUSINESS & COMMERCE CODE §§ 302.101 AND 302.303

### COUNT 9 –VIOLATION OF TEXAS BUSINESS & COMMERCE CODE §§ 302.101-.303, & CHAPTER 17 DECEPTIVE TRADE PRACTICES
BY COUNTERPLAINTIFFS ELIK, STROKE, LETTMAN, AND HOLLADAY, INDIVIDUALLY AND ON BEHALF OF THE PROPOSED CLASS, AGAINST COUNTERDEFENDANTS DEFENSE DISTRIBUTED AND DEFCAD, INC.

447. Counterplaintiffs Elik, Stroke, Lettman, and Holladay repeat and re-allege Paragraphs 53 through 58, 49 through 69, and 131 through 133, inclusive, as if fully set forth herein.

448. Counterplaintiffs Elik, Stroke, Lettman, and Holladay bring this claim individually and on behalf of a proposed class under Federal Rule of Civil Procedure 23.

449. Counterplaintiffs seek to represent a class defined as follows: All natural persons in the United States who, on or after September 1, 2025, were sent one or more commercial email solicitations by Defense Distributed and/or Defcad, Inc. from a business location in Texas, where such solicitations were sent for the purpose of inducing the recipient to purchase, rent, claim, or receive Defendants' goods or services, and who were not former or current customers of the soliciting Counterdefendant at the time of the solicitation.

450. Excluded from the Class are Counterdefendants, their parents, subsidiaries, affiliates, officers, directors, employees, agents, successors, and

assigns; any entity in which any Counterdefendant has a controlling interest; and the judicial officers assigned to this action and their immediate families.

451. The Class is so numerous that joinder is impracticable. On information and belief, Defendants' solicitation list includes more than 150,000 individuals, and Defendants sent at least sixteen covered solicitations to each of the named Counterplaintiffs alone after September 1, 2025.

452. Common questions of law and fact exist and predominate over any questions affecting only individual class members, including but not limited to:

a. whether Defendants are "sellers" within the meaning of Chapter 302;

b. whether Defendants initiated and transmitted covered solicitations from a business location in Texas;

c. whether the email solicitations at issue were "telephone solicitations" within the meaning of Chapter 302;

d. whether recipients of those solicitations were "purchasers" within the meaning of Chapter 302;

e. whether Defendants held a registration certificate required by § 302.101 for the business location from which the solicitations were made;

f. whether Defendants' conduct violated Chapter 302;

g. whether Defendants' Chapter 302 violations constitute false, misleading, or deceptive acts or practices under § 302.303 and Chapter 17;

h. whether the named Counterplaintiffs and class members qualify as consumers to the extent required for Chapter 17 private remedies;

i. whether Plaintiffs and the Class are entitled to damages, injunctive relief, attorney's fees, costs, or other relief; and

j. the proper measure of such relief.

453. The claims of the named Counterplaintiffs are typical of the claims of the Class because they arise from the same course of conduct, the same solicitation program, the same Texas sending location, the same lack of registration, and the same inducements to purchase Defendants' goods and services.

454. The named Counterplaintiffs will fairly and adequately protect the interests of the Class. Their interests are aligned with those of the Class, and they have retained counsel competent to prosecute complex representative litigation.

455. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because Defendants' conduct was standardized and common across the proposed Class, and individual actions would be uneconomical and risk inconsistent adjudications.

456. At all relevant times, Counterdefendant Defense Distributed was, and Counterdefendant Defcad, Inc. was, a "seller" within the meaning of Texas Business & Commerce Code Chapter 302.

457. At all relevant times, Defense Distributed and Defcad, Inc. solicited purchases of goods and services from recipients, including through commercial emails promoting products, subscriptions, memberships, tools, files, and related offerings.

458. On information and belief, the commercial email solicitations at issue were initiated and transmitted from a business location in Texas.

459. On and after September 1, 2025, Defendants initiated and transmitted commercial solicitations to the named Counterplaintiffs and the proposed Class for the purpose of inducing them to purchase, rent, claim, or receive Defendants' goods or services.

460. Those solicitations were transmitted by electronic mail and consisted of commercial transmissions containing text, graphics, images, links, and calls to action promoting Defendants' goods and services.

461. Under Texas Business & Commerce Code § 302.001, those emails were "telephone solicitations" because they were transmissions, including transmissions of text, graphic messages, and images, initiated by sellers to induce persons to purchase, rent, claim, or receive items.

462. The named Counterplaintiffs and the proposed Class were "purchasers" within the meaning of Chapter 302 because they were solicited to become obligated for the purchase or rental of Counterdefendants' goods or services and/or were offered opportunities to claim or receive Counterdefendants' items.

463. At the time Defendants made those covered solicitations, Counterdefendants did not hold the registration certificate required by Texas Business & Commerce Code § 302.101 for the business location from which the solicitations were made.

464. By making covered solicitations from a business location in Texas without the required registration certificate, Defendants violated Texas Business & Commerce Code § 302.101.

465. By operation of Texas Business & Commerce Code § 302.303, Counterdefendants' violations of Chapter 302 constituted false, misleading, or deceptive acts or practices under Chapter 17.

466. To the extent Chapter 17 consumer status is required for the private remedies sought herein, each named Counterplaintiff qualifies as a consumer because each sought by purchase or lease goods or services that form the basis of this claim, including physical tools, subscriptions, memberships, and related goods or services promoted in Counterdefendants' solicitations.

467. Those goods and services form the basis of this complaint whether or not they were sought directly from the particular Counterdefendant sued.

468. Defendants' conduct was a producing cause of injury to the named Counterplaintiffs and the proposed Class.

469. As a direct and proximate result of Defendants' unlawful solicitations and related deceptive acts and practices, the named Counterplaintiffs and the proposed Class seek all damages and remedies permitted by Texas law,

including economic damages, statutory damages, declaratory and injunctive relief, attorney's fees, costs, and such other relief as the Court deems just and proper.

WHEREFORE, Counterplaintiffs Elik, Stroke, Lettman, and Holladay, individually and on behalf of the proposed Class, demand judgment against Counterdefendants Defense Distributed and Defcad, Inc. as follows:

A. certifying the proposed Class under Rule 23 and appointing the named Counterplaintiffs as class representatives and their counsel as class counsel;

B. declaring that Defendants violated Texas Business & Commerce Code § 302.101;

C. declaring that Defendants' violations of Chapter 302 constitute false, misleading, or deceptive acts or practices under § 302.303 and Chapter 17;

D. awarding all damages permitted by Texas law, including statutory damages of $5,000 per offending communication;

E. awarding injunctive relief prohibiting Defendants from making covered solicitations from Texas without the required registration certificate;

F. awarding attorney's fees, costs of court, and expenses as permitted by law; and

G. awarding such other and further relief as the Court deems just and proper.

### SEVENTH CAUSE OF ACTION – WRONGFUL INSTITUTION OF CIVIL PROCEEDINGS UNDER ARIZONA LAW

**COUNT 10 – WRONGFUL INSTITUTION OF CIVIL PROCEEDINGS**
BY JOSH KIEL STROKE AGAINST COUNTERDEFENDANTS DEFENSE
DISTRIBUTED, DEFCAD, INC., CODY RUTLEDGE WILSON, FEDERICO A.
REYNAL, CHAD C. FLORES, AND DAVID S. GINGRAS

470. Counterplaintiff Josh Kiel Stroke repeats and re-alleges paragraphs 16, 144 through 148, 186 through 199, and 200 through 271 as if fully set forth herein.

471. This Count arises from the wrongful institution and continuation of civil proceedings against Counterplaintiff Stroke in the Middle District Action's Counterclaims.

472. At all relevant times, Counterdefendant Defense Distributed filed, procured, and prosecuted the Middle District Action's Counterclaims on behalf of itself and Counterdefendant Defense Distributed and Defcad, Inc., and did so through its officers, agents, and counsel, including Counterdefendants Wilson, Reynal, Flores, and Gingras.

473. In the Middle District Action, Defense Distributed filed and maintained sprawling counterclaims and third-party claims against Ms. Stroke, including in Doc. 52, styled Defendants' Second Amended Answer with Counterclaims.

474. In those counterclaims, Counterdefendants alleged that Ms. Stroke was a principal of a supposed criminal enterprise called "The Gatalog," and that she was liable for a broad array of purportedly unlawful acts and claims. Specifically, Counterdefendants alleged, among other things, that:

  A. Ms. Stroke was responsible for "The Gatalog's" past and current publication, administration, and maintenance of content at

114

thegatalog.com, Odysee.com, chat.deterrencedispensed.com, the "Fuddbusters" Discord server, deterrencedispensed.com, gatalog.com, maf-arms.com, and ctrlpew.com;

B. Ms. Stroke served as an agent of MAF Corp.;

C. Ms. Stroke acted as "The Gatalog enterprise's 'Chief of Propaganda' since 2022";

D. Ms. Stroke promoted "The Gatalog" as an enterprise on social media;

E. Ms. Stroke promoted MAF and sites like thegatalog.com and ctrlpew.com in commerce according to a normal e-commerce calendar;

F. Ms. Stroke harassed DEFCAD and its employees;

G. Ms. Stroke was part of an enterprise that committed harassment and extortion;

H. Ms. Stroke was part of an enterprise that threatened murder;

I. Ms. Stroke was part of an enterprise that used cyberattacks; and

J. Ms. Stroke was jointly and severally liable for the supposed acts of the broader alleged enterprise, which Counterdefendants claimed gave rise to claims for civil RICO, Lanham Act violations, Computer Fraud and Abuse Act violations, tortious interference, trade libel, violations of FDUTPA, and spoliation.

475.    Counterdefendants further sought sweeping relief against Ms. Stroke based on those accusations, including compensatory damages, treble damages, punitive damages, disgorgement, injunctive relief, dissolution-type relief,

115

attorneys' fees, costs, interest, and spoliation sanctions up to and including default.

476. At the time Counterdefendants instituted and continued those proceedings against Ms. Stroke, they lacked probable cause to do so.

477. Counterdefendants did not possess competent pre-filing evidence that Ms. Stroke was responsible for the publication, administration, and maintenance of the websites, services, and platforms attributed to her.

478. Counterdefendants did not possess competent pre-filing evidence that Ms. Stroke was an agent of MAF Corp., a paid "Chief of Propaganda," or a person exercising the organizational or commercial authority they attributed to her.

479. Counterdefendants did not possess competent pre-filing evidence that Ms. Stroke harassed DEFCAD or its employees, committed extortion, threatened violence, threatened murder, or engaged in cyberattacks.

480. Counterdefendants did not possess competent pre-filing evidence that Ms. Stroke had committed acts sufficient to support civil RICO claims, Lanham Act claims, Computer Fraud and Abuse Act claims, tortious interference claims, trade libel claims, FDUTPA claims, or spoliation claims against her.

481. Counterdefendants likewise lacked competent evidentiary support to allege that Ms. Stroke was properly subject to personal jurisdiction in the Middle District of Florida based on the suit-related conduct they attributed to her.

482.    A reasonable pre-filing inquiry would have revealed that the allegations against Ms. Stroke were false, materially misleading, unsupported, or not reasonably likely to be proven.

483.    Discovery in the Middle District Action further exposed the lack of factual basis for Counterdefendants' accusations, yet Counterdefendants and their counsel continued to maintain the claims.

484.    Rather than discontinue the claims when it became apparent that the discoverable evidence would not support them, Counterdefendants continued to litigate them for months, engaged in abusive discovery tactics, forced Counterdefendants to respond to and disprove facially unsupported accusations, and maintained the claims until they were confronted with motion practice directed at the lack of factual support and bad-faith prosecution of those claims.

485.    Counterdefendants neither honestly nor reasonably believed that they had a good chance of prevailing on the Middle District claims against Ms. Stroke.

486.    Counterdefendants were motivated by malice in instituting and continuing those proceedings against Ms. Stroke.

487.    Counterdefendants' primary purpose in instituting and continuing the Middle District proceedings against Ms. Stroke was not to secure a proper adjudication of legitimate claims, but instead to retaliate against her for protected speech and association, to burden her with expensive federal

litigation in a distant forum, to intimidate and punish her, to publicly brand her as a criminal and violent actor, and to obtain leverage through harassment and reputational injury.

488.     That improper purpose is further shown by, among other things:

A. the facial implausibility and breadth of the allegations against Ms. Stroke;

B. the attempt to portray Internet criticism and advocacy as racketeering and cybercrime;

C. the persistence in maintaining those claims after discovery failed to substantiate them;

D. the use of sweeping spoliation theories without first obtaining basic factual information;

E. the maintenance of the claims until Counterdefendants were pressed to disclose their factual bases and respond to motion practice targeting the insufficiency and bad-faith nature of the claims; and

F. the retaliatory context already alleged herein, including the Arizona workplace-harassment filing used to "imperil" Ms. Stroke.

489.     The Middle District proceedings terminated in favor of Ms. Stroke when Counterdefendants voluntarily dismissed those counterclaims on or about September 5, 2025.

490.     Under the circumstances of that dismissal, including the prolonged maintenance of the claims, the failure of discovery to substantiate them, and

118

Counterdefendants' abandonment of the proceedings rather than adjudicating the claims on the merits, the termination was favorable to Ms. Stroke.

491.     As a direct and proximate result of Counterdefendants' wrongful institution and continuation of civil proceedings against her, Ms. Stroke has suffered damages, including but not limited to attorneys' fees and litigation expenses, emotional distress, humiliation, reputational harm, and financial losses.

492.     The accusations were especially damaging because they falsely portrayed Ms. Stroke as a violent, extortionate, dishonest, and criminal participant in racketeering and cybercrime-related misconduct.

493.     Counterdefendants have intentionally continued hosting copies of their abandoned claims on the DDLegio blog as part of an effort to maximize the reach and persistence of those allegations, including by causing them to surface in search-engine results for Ms. Stroke's name and thereby prolonging the reputational harm caused by the claims.



494.     The allegations remain readily accessible and continue to surface prominently in internet search results for Ms. Stroke's name.

495. *All* pages of Google search results for "Josh Kiel Stroke" include links to the docket, pleadings, or filings associated with the counterclaims.

496. Counterdefendant Wilson and the business entity Counterdefendants further amplified that harm by encouraging journalists and publications to repeat and publicize the allegations outside the judicial process.

497. As a result, internet searches for Ms. Stroke's name continue to return articles repeating or repackaging Counterdefendants' accusations, including a Florida Bulldog article bearing the headline, "UnitedHealthcare CEO's killer built gun, silencer from 3D-printing files supplied by Florida 'black-market operator[.]'"

498. In this way, Counterdefendants' allegations have remained persistently associated with Ms. Stroke's identity in public search results, thereby prolonging and compounding the reputational, professional, and personal harm caused by the counterclaims.

499. Counterdefendants' conduct was willful, malicious, and undertaken in conscious disregard of Ms. Stroke's rights, entitling her to compensatory and punitive damages in an amount to be proven at trial.

WHEREFORE, Counterplaintiff Josh Kiel Stroke demands judgment against Counterdefendants Defense Distributed, Defcad, Inc., Cody Rutledge Wilson, Garret Walliman, Federico A. Reynal, Chad C. Flores, and David S. Gingras, jointly and severally to the extent permitted by law, and requests:

A. Compensatory damages in an amount to be determined at trial;

120

B.  Damages for attorneys' fees and costs incurred in defending against the wrongful proceedings;

C.  Damages for emotional distress, humiliation, and reputational injury;

D.  Damages for economic and financial losses according to proof;

E.  Punitive damages;

F.  Prejudgment and postjudgment interest as allowed by law;

G.  Costs of suit; and

H.  Such other and further relief as the Court deems just and proper.

## EIGHTH CAUSE OF ACTION – ABUSE OF PROCESS UNDER ARIZONA LAW

### COUNT 11 – ABUSE OF PROCESS
BY COUNTERPLAINTIFF STROKE AGAINST COUNTERDEFENDANTS DEFENSE DISTRIBUTED, DEFCAD, CODY RUTLEDGE WILSON, AND GARRET WALLIMAN

500.    Counterplaintiff Stroke repeats and re-alleges paragraphs 16, 36 through 46, 144 through 148, and 235 as if fully set forth herein.

501.    Merely 17 days after the first "Will Becker" letter, on October 18, 2024, Counterdefendant Wilson utilized his "amusing array of legal methods" by inducing or conspiring with Counterdefendant Walliman to file, in the Superior Court of Arizona in Maricopa County, Case No. CV2024-029706, a verified Petition for Injunction Against Workplace Harassment pursuant to A.R.S. § 12-1810 against Stroke (hereafter, the "Workplace Harassment Injunction").

502.    In that filing, Mr. Walliman, as the "authorized agent" for Defcad falsely asserted that Ms. Stroke was a "Former Contractor" of Defcad.

503.    Ms. Stroke never worked for Defcad in any capacity, let alone as a "Contractor."

504.    Counterdefendants knew or should have known Ms. Stroke never worked for Defcad in any capacity.

505.    In fact, on December 8, 2024, Mr. Wilson admitted that he knew Ms. Stroke never worked for any business entity Counterdefendant to Gary Flowers in private Signal correspondence. (*See supra* 235).

506.    In the Workplace Harassment Injunction, Mr. Walliman further alleged, among other things, that Ms. Stroke:

    a.  received Mr. Walliman's address from a former Defcad contractor;

    b.  posted "sexually explicit images" and "messages that include sexually violent overtones" directed at Mr. Walliman, including an "image with semen;"

    c.  taunted knowing where Mr. Walliman resides;

    d.  threatened to "visit" Mr. Walliman's residence; and

    e.  posted a threat of physical and/or sexual violence.

507.    Ms. Stroke never met Mr. Walliman in person, nor did she visit or threaten to visit Mr. Walliman's residence.

508.    Ms. Stroke never received Mr. Walliman's residential address from anyone.

509.     Ms. Stroke never posted "sexually explicit images" and "messages that include sexually violent overtones," including an "image with semen," directed at Mr. Walliman.

510.     Ms. Stroke never visited or threatened to visit the Defcad workplace.

511.     In fact, Defcad has no workplace in Arizona.

512.     Ms. Stroke never made a threat of physical or sexual violence against Mr. Walliman.

513.     These allegations were material misstatements and fraudulent claims to enable Counterdefendants, from Texas, to reach into Arizona and retaliate against Ms. Stroke's protected speech – specifically, for opining on and joking about Counterdefendants' attempt to rebrand "Ghost Gunner" as "Coast Runner" in order to subvert a new California law regulating machines that manufacture firearms and firearms components.

514.     Counterdefendants Defense Distributed would use the Workplace Harassment Injunction to advance their first iteration of RICO claims against Ms. Stroke in the Middle District Action, a copyright suit filed 42 days prior.

515.     In their claims, Defense Distributed recast the Arizona injunction proceeding by asserting that Counterdefendant Defcad, rather than Mr. Walliman, sought the injunction against Ms. Stroke (Middle District Action's Counterclaims ¶ 120(e)) and that the injunction was required because of Ms. Stroke's supposed "commercial harassment." (Middle District Action's Counterclaims ¶ 120(g)).

123

516.     Defense Distributed further alleged that the injunction was necessitated by Ms. Stroke's purported "false advertising" and "public coercion" of "DEFCAD contributors," including a user identified as "Durbanpoisonpew." (Middle District Action's Counterclaims ¶ 120(g)).

517.     Those characterizations were not grounded in the injunction filing itself.

518.     Mr. Walliman's injunction papers did not state that he was seeking relief on behalf of Defense Distributed, did not describe Ms. Stroke's conduct as "commercial harassment," and did not assert that the injunction was sought to protect Defense Distributed, or unidentified platform users.

519.     Nor did Mr. Walliman's injunction filing state that relief was being sought because of alleged "false advertising," "public coercion," or conduct directed at supposed "DEFCAD contributors" such as "Durbanpoisonpew."

520.     Defense Distributed thus embellished and expanded the meaning of the injunction proceeding by attributing to it allegations, purposes, and protected parties that were not stated in the underlying filing.

521.     Mr. Walliman, for Defcad, abused Arizona process designed to shield a workplace for safety against real threats and transformed it into a tool to retaliate, intimidate, punish, and gain leverage against a critic joking about Counterdefendants unlawful gambit in California to curry favor with or on direction of Mr. Wilson and/or the business entity Counterdefendants.

522.     On November 1, 2024, following the first letter and 14 days after the filing, Mr. Wilson admitted the Workplace Harassment Injunction was a

retaliatory filing under his direction to "imperil" the "zoo animal" Ms. Stroke. (*See supra* 43).

523.     Counterdefendants knew or should have known their reckless misstatements and fraudulent claims regarding physical or sexual violence in the context of a workplace would cause extreme emotional and reputational damage to Ms. Stroke.

524.     As a direct and proximate result of Counterdefendants' abuse of process, Ms. Stroke has suffered and continues to suffer substantial damages, including severe emotional distress, irreparable harm to her reputation, and significant financial losses.

WHEREFORE, Counterplaintiff Josh Kiel Stroke demands judgment against Counterdefendants Defense Distributed, Defcad, Cody Rutledge Wilson, and Garret Walliman, jointly and severally to the extent permitted by law, and requests:

A. Compensatory damages in an amount to be determined at trial;

B. Damages for emotional distress, humiliation, and reputational injury;

C. Damages for economic and financial losses according to proof, including losses caused by the misuse of the Arizona workplace-harassment process;

D. Damages for attorneys' fees and costs incurred as a proximate result of the abuse of process, to the extent recoverable;

E. Punitive damages;

F. Prejudgment and postjudgment interest as allowed by law;

G. Costs of suit; and

H. Such other and further relief as the Court deems just and proper.

**NINTH CAUSE OF ACTION – WRONGFUL INSTITUTION OF CIVIL PROCEEDINGS UNDER ARIZONA LAW**

**COUNT 12 – WRONGFUL INSTITUTION OF CIVIL PROCEEDINGS**
BY JOSH KIEL STROKE AGAINST COUNTERDEFENDANTS DEFENSE DISTRIBUTED, DEFCAD, CODY RUTLEDGE WILSON, GARRET WALLIMAN, FEDERICO REYNAL, CHAD FLORES, and DAVID GINGRAS

525.     Counterplaintiff Josh Kiel Stroke repeats and re-alleges paragraphs 16, 144 through 148, 186 through 199, 225 through 245, 266 through 270, and 374 as if fully set forth herein.

526.     This Count arises from the wrongful institution and continuation of civil proceedings against Counterplaintiff Stroke in the Middle District Action's Counterclaims.

527.     At all relevant times, Counterdefendant Defense Distributed filed and prosecuted the Middle District Action's Counterclaims on behalf of itself, Counterdefendant Defcad, and through its officers, agents, and counsel, including Counterdefendant Wilson, Counterdefendant Walliman, Counterdefendant Reynal, Counterdefendant Flores, and Counterdefendant Gingras.

528.     In the Middle District Action, Defense Distributed filed Doc. 52, styled "Defendants' Second Amended Answer with Counterclaims," asserting numerous claims against Ms. Stroke, including claims premised on allegations that Ms. Stroke was a principal of "The Gatalog," an agent of MAF Corp., a

126

paid "Chief of Propaganda," a promoter of certain websites in commerce, a harasser of DEFCAD and its employees, an extortionist, and a threat of violence.

529.    Specifically, the counterclaims alleged, among other things, that:

A. Ms. Stroke was responsible for "The Gatalog's" past and current publication, administration, and maintenance of content at thegatalog.com, Odysee.com, chat.deterrencedispensed.com, the "Fuddbusters" Discord server, deterrencedispensed.com, gatalog.com, maf-arms.com, and ctrlpew.com;

B. Ms. Stroke served as an agent of MAF Corp.;

C. Ms. Stroke acted as "The Gatalog enterprise's 'Chief of Propaganda' since 2022";

D. Ms. Stroke promoted The Gatalog as an enterprise on social media;

E. Ms. Stroke promoted MAF and sites like thegatalog.com and ctrlpew.com in commerce according to a normal e-commerce calendar;

F. Ms. Stroke harassed and harasses Counterdefendant Defcad and its employees, and Counterdefendant Defcad had to secure a workplace-harassment injunction against her in Arizona, which he was "still violating";

G. Ms. Stroke committed extortion and threats of violence;

H. MAF Corp. paid Ms. Stroke as one of The Gatalog's de facto banks for its activities; and

I. Counterplaintiff Elik, Mr. Larosiere, Counterplaintiff Holladay, and Peter Celentano employed Ms. Stroke as their "Chief of Propaganda" to promote the "FEDCAD" trade libel and to tortiously interfere with DEFCAD creator partners.

530. Those allegations were false.

531. Ms. Stroke never worked for "The Gatalog."

532. Ms. Stroke never published, administered, or maintained the websites, services, and platforms attributed to her in the Middle District Action's Counterclaims.

533. Ms. Stroke was never an agent of MAF Corp.

534. Ms. Stroke never possessed any economic, employment, or contractual relationship with MAF Corp.

535. Ms. Stroke was never paid by MAF Corp.

536. Ms. Stroke was never employed by Mr. Elik, Mr. Larosiere, Mr. Holladay, or Mr. Celentano as a "Chief of Propaganda," or otherwise.

537. Ms. Stroke did not promote those websites in commerce according to any normal e-commerce calendar, and any commentary by Stroke was personal speech, criticism, satire, or consumer commentary, not paid commercial promotion.

538. Ms. Stroke did not commit extortion or threats of violence as alleged in the Middle District Action's Counterclaims.

539. The allegations that Stroke harassed Counterdefendant Defcad and its employees, that Counterdefendant Defcad "had to" secure the Arizona injunction, and that Stroke was "still violating" that injunction were false, materially misleading, unsupported, or made with reckless disregard for their truth.

540. Instead, the Arizona injunction was wrongfully procured through the misuse of judicial process as part of a retaliatory effort to transform protected criticism, commentary, parody, and online ridicule by Ms. Stroke into a fabricated narrative of sexual and violent harassment.

541. Counterdefendants and their agents materially misrepresented Ms. Stroke's parody of the 'Coast Runner' branding and distorted the nature and context of her communications, all to manufacture a false narrative of dangerous misconduct.

542. On information and belief, the injunction was pursued not for any legitimate workplace-safety purpose, but to punish and silence Ms. Stroke for her protected expression and for her role in disputes connected to the Middle District Action's Counterclaims.

543. Counterdefendants instituted, procured, directed, authorized, ratified, maintained, and/or continued the Middle District Action's Counterclaims against Ms. Stroke.

544. Counterdefendant Defense Distributed instituted and maintained the Middle District Action's Counterclaims by filing and prosecuting them in three

similarly defective pleadings culminating in the Middle District Action's Doc. 52 and the claims asserted therein.

545.     Counterdefendant Defcad authorized, ratified, adopted, benefited from, and/or maintained the Middle District Action's Counterclaims and the allegations asserted against Ms. Stroke therein.

546.     Counterdefendant Wilson authorized, directed, ratified, encouraged, and/or knowingly accepted the benefits of the Middle District Action's Counterclaims and the allegations asserted against Ms. Stroke therein.

547.     Counterdefendant Walliman knowingly supplied, procured, ratified, encouraged, and/or caused false factual allegations to be used in the Middle District Action's Counterclaims, including allegations derived from or tied to the Arizona workplace-harassment matter, and thereby participated in the institution and continuation of the Middle District Action's Counterclaims against Stroke.

548.     Counterdefendants Reynal, Flores, and Gingras prepared, signed, reviewed, authorized, advocated, maintained, and/or continued the Middle District Action's Counterclaims and the allegations asserted therein against Ms. Stroke.

549.     At the time the Middle District Action's Counterclaims were instituted and continued against Ms. Stroke, Counterdefendants lacked probable cause to believe the claims and allegations against Ms. Stroke were true or legally tenable.

550. Counterdefendants lacked competent evidentiary support for alleging that Ms. Stroke was responsible for publication, administration, or maintenance of the sites and platforms attributed to her.

551. Counterdefendants lacked competent evidentiary support for alleging that Ms. Stroke was an agent of MAF Corp., was employed as "Chief of Propaganda," was paid by MAF Corp., or promoted websites in commerce on behalf of a supposed "Gatalog" enterprise.

552. Counterdefendants lacked competent evidentiary support for alleging that Ms. Stroke committed extortion or threats of violence.

553. Counterdefendants lacked competent evidentiary support for alleging that Ms. Stroke harassed Counterdefendant Defcad and its employees in the manner alleged, or that Ms. Stroke was "still violating" the Arizona injunction as pleaded.

554. Counterdefendants knew, or reasonably should have known after a reasonable pre-filing inquiry, that the allegations against Ms. Stroke were false, materially misleading, unsupported, or not reasonably likely to be proven.

555. Counterdefendants acted with malice.

556. Counterdefendants' primary purpose in instituting and continuing the Middle District Action's Counterclaims against Stroke was not to secure proper adjudication of legitimate claims, but to retaliate against Ms. Stroke, burden Ms. Stroke with litigation, damage Ms. Stroke's reputation, chill Ms. Stroke's

131

speech and associations, create leverage in collateral disputes, and manufacture a false narrative portraying Ms. Stroke as dangerous, extortionate, commercially tortious, and part of a supposed unlawful enterprise.

557. Counterdefendants continued to maintain and advocate the Middle District Action's Counterclaims against Ms. Stroke after they knew or should have known that the allegations against Ms. Stroke lacked evidentiary support.

558. Counterdefendants also used the proceeding and the allegations asserted therein to deadname and misgender Ms. Stroke, a transgender woman, thereby increasing the humiliation, stigma, and emotional harm caused by the wrongful proceeding.

559. On information and belief, Counterdefendants' conduct was motivated in part by hostility toward Ms. Stroke's transgender status and by a desire to degrade her, damage her credibility, and intensify the distress caused by the litigation.

560. That malice is further evidenced by transphobic public commentary associated with Counterdefendants Defcad, Defense Distributed, Wilson, and their personnel, including statements that referenced or targeted Ms. Stroke and mocked her transgender identity.

561. For example, in a Defcad blog post dated April 5, 2026, titled "FOSS-MG9 and RIP The Gatalog," Counterdefendants Defcad, Defense Distributed,

and Wilson published commentary in the section "RIP The Gatalog" that mocked, demeaned, or denigrated transgender persons and was reasonably understood as a hostile reference to Ms. Stroke's gender identity.



**NEWS**

**RIP The Gatalog**

It's with a heavy heart that we announce The Gatalog's formal cessation of publication. Nearly three months ago, in the face of California's pending motion for a preliminary injunction, the collective published The Trash Panda -- what would be its final quality-tested and Elik-approved release.

241 releases in five years. That's almost one release a week, and with only four copyrighted, closed-source sets of 3D models. Though the formula couldn't scale, it was a good run by any standard. We can look back at the "Oscars Committee" of 3D guns and celebrate their groundbreaking achievements in (social) science and representation. Remember, because of The Gatalog some of GunCAD's greatest men are its women.

562.     The Middle District Action's Counterclaims terminated in Ms. Stroke's favor on September 5, 2025, when Counterdefendants voluntarily dismissed

their claims, and that termination reflected the lack of merit of the claims against Ms. Stroke and/or Ms. Stroke's nonliability.

563.     Fourteen days later, on September 25, 2025, Counterdefendants Defcad and Defense Distributed, represented by new counsel, commenced a new action in the Southern District of Florida asserting a RICO theory and materially different claims.

564.     By abandoning the allegations previously asserted against Ms. Stroke in the Middle District Action's Counterclaims and substituting a new set of allegations in the Southern District action, Counterdefendants revealed that they lacked evidentiary support for their earlier claims and had no genuine intention of prosecuting those accusations on their merits.

565.     As a direct and proximate result of Counterdefendants' wrongful institution and continuation of the Middle District Action's Counterclaims, Ms. Stroke suffered damages, including reputational harm, humiliation, emotional distress, litigation expenses, attorneys' fees and costs incurred in defense of the proceeding, lost opportunities, interference with personal and business relationships, and other general and special damages according to proof.

566.     Counterdefendants' conduct was intentional, malicious, and in conscious or reckless disregard of Ms. Stroke's rights, entitling Ms. Stroke to all damages permitted by Arizona law, including punitive damages to the extent allowed.

WHEREFORE, Counterplaintiff Josh Kiel Stroke demands judgment against Counterdefendants Defense Distributed, Defcad, Cody Rutledge Wilson, Garret Walliman, Federico Reynal, Chad Flores, and David Gingras, jointly and severally to the extent permitted by law, and requests:

A. Compensatory damages in an amount to be determined at trial;

B. Damages for attorneys' fees and costs incurred in defending against the wrongful proceedings;

C. Damages for emotional distress, humiliation, and reputational injury;

D. Damages for economic and financial losses according to proof;

E. Punitive damages;

F. Prejudgment and postjudgment interest as allowed by law;

G. Costs of suit; and

H. Such other and further relief as the Court deems just and proper.

**TENTH CAUSE OF ACTION – INTENTIONAL INFLUCTION OF EMOTIONAL DISTRESS UNDER ARIZONA LAW**

**COUNT 13 – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
BY COUNTERPLAINTIFF STROKE AGAINST COUNTERDEFENDANTS DEFENSE DISTRIBUTED, DEFCAD, AND CODY RUTLEDGE WILSON

567.    Counterplaintiff Josh Kiel Stroke repeats and re-alleges paragraphs 16, 144 through 148, 186 through 199, and 225 through 270 as if fully set forth herein.

568.     Counterplaintiff Stroke is a resident of Arizona and suffered the emotional and dignitary injuries alleged herein principally in Arizona.

569.     Counterdefendant Wilson, acting individually and through Counterdefendants Defense Distributed and Defcad, engaged in a deliberate and escalating campaign of harassment, humiliation, intimidation, and emotional targeting directed at Stroke.

570.     That campaign formed part of a broader retaliatory pattern in which Wilson targeted critics and perceived adversaries for investigation, exposure, harassment, and litigation burden.

571.     As part of that pattern, Counterdefendants caused Stroke to be publicly portrayed in retaliatory pleadings as part of a supposed criminal enterprise and as a participant in racketeering, export violations, wire fraud, money laundering, extortion, threats of murder, cyberattacks, and tortious interference, despite lacking a good-faith factual basis for those accusations.

572.     Counterdefendants then used those pleadings and the surrounding "The Gatalog" narrative as part of a broader campaign to stigmatize, degrade, and injure Stroke and other Counterplaintiffs personally.

573.     Between 2024 and 2025, Wilson communicated with Gary Flowers and agreed to provide him substantial payments totaling thousands of dollars.

574.     Those payments were made, at least in part, to induce or encourage Flowers to target Stroke and other Wilson critics online, including by harassing and intimidating them, amplifying narratives favorable to

Counterdefendants, antagonizing Wilson's critics, and provoking interactions that could later be repackaged against them.

575.    On December 17, 2024, after the retaliatory RICO counterclaims had been filed, Flowers asked Wilson whether he should continue "being provocative" and "poking the bear" because it "only helps," and Wilson agreed, specifically suggesting that such provocative and harassing conduct be directed toward Stroke.

576.    On or about April 1, 2025, Flowers proposed that Wilson upload the work titled the "Rose and Thorn Version II," created by "Ruby G," the recently deceased romantic partner of Stroke, for the purpose of emotionally provoking Stroke and causing her to "lose it."

577.    The "Rose and Thorn Version II" was not discussed as a neutral publication. It had been released subject to a Creative Commons Attribution-NonCommercial-ShareAlike 4.0 International License, and its creator had expressly prohibited commercial use and specifically singled out Defcad, and suggesting that others tell Defcad to take the work down if it used the work to make money.

578.    Thus, Wilson and Flowers were discussing use of the "Rose and Thorn Version II" in a manner that was both emotionally targeted at Stroke and contrary to the terms under which its creator had released it.

579. Wilson subsequently followed through on that proposal and published the "Rose and Thorn Version II" on Defcad.com, immediately following the death of its creator, specifically to emotionally distress Stroke.

580. Consistent with that same pattern of harassment, Wilson had earlier falsely designated the work titled "Come and Press It 3D Printable Reloading Press," also created by "Ruby G," as though it had been created by Stroke herself.

581. The conduct directed at Stroke was not incidental or random. When discussing Stroke, both Flowers and Wilson expressed overtly hostile and bigoted views toward persons with transgender identity characteristics.

582. Those views informed and intensified their treatment of Stroke and formed part of the motive for the harassment, provocation, and targeting directed at her.

583. Counterdefendants knew, or at minimum recklessly disregarded the near certainty, that targeting Stroke by using the work of her recently deceased romantic partner in this manner, while simultaneously orchestrating public accusations, harassment, and antagonism against her, would cause her severe emotional distress.

584. Counterdefendants' conduct toward Stroke was extreme and outrageous.

585. Counterdefendants' conduct consisted of a deliberate, paid, and coordinated campaign to harass and emotionally destabilize Stroke, including

the intentional use of a deceased loved one's work for the stated purpose of causing Stroke to "lose it."

586. An average member of the community would regard such conduct as atrocious, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

587. Counterdefendants either intended to cause Stroke severe emotional distress or recklessly disregarded the near certainty that such distress would result.

588. As a direct and proximate result of Counterdefendants' conduct, Stroke suffered and continues to suffer severe emotional distress, including humiliation, grief, anxiety, anguish, loss of peace of mind, and other emotional and psychological harm according to proof.

589. The distress suffered by Stroke was severe and was of a nature that no reasonable person should be expected to endure.

590. Counterdefendants' conduct was willful, malicious, oppressive, and undertaken in conscious disregard of Stroke's rights, entitling her to compensatory and punitive damages.

591. As a direct and proximate result of Counterdefendants' willful conduct, Ms. Stroke experienced sleeplessness, panic attacks, was proscribed anti-anxiety medication, experienced severe bouts of depression, and lost the ability to work.

592.     Ms. Stroke's injuries had physical manifestations, including cold sweats, panic attacks, sleepless nights, shortness of breath, anxiety attacks, and other physical manifestations.

WHEREFORE, Counterplaintiff Josh Kiel Stroke demands judgment against Counterdefendants Cody Rutledge Wilson, Defense Distributed, and Defcad, Inc., and requests:

A. compensatory damages in an amount to be proven at trial;

B. punitive damages as permitted by law;

C. costs of suit;

D. pre- and post-judgment interest as allowed by law; and

E. such other and further relief as the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
## WRONGFUL USE OF CIVIL PROCEEDINGS
## IN VIOLATION OF 42 Pa.C.S. §§ 8351-8354 (DRAGONETTI ACT)

### COUNT 14 – WRONGFUL USE OF CIVIL PROCEEDINGS
BY JOHN LETTMAN AGAINST COUNTERDEFENDANTS CODY RUTLEDGE WILSON, DEFENSE DISTRIBUTED, DEFCAD, FEDERICO REYNAL, CHAD FLORES, and DAVID GINGRAS

593. Counterplaintiff John Lettman repeats and re-alleges paragraphs 17, 144 through 148, 186 through 199, and 200 through 224 as if fully set forth herein.

594. This Count arises under 42 Pa.C.S. §§ 8351-8354 from the procurement, initiation, and continuation of civil proceedings against Mr. Lettman in the Middle District Action's Counterclaims.

595. The proceedings at issue include, without limitation, the counterclaims and third-party claims first asserted against Mr. Lettman in the Middle District Action and the later-filed "Defendants' Second Amended Answer with Counterclaims," Doc. 52, which continued and expanded those claims against him.

596. Counterdefendant Defense Distributed, acting by and through Counterdefendants Federico A. Reynal, Chad C. Flores, and David S. Gingras, procured, initiated, and continued the Middle District Action's Counterclaims against Mr. Lettman.

597. At all relevant times, Counterdefendant Defense Distributed filed and prosecuted the Middle District Action's Counterclaims on behalf of itself, Counterdefendant Defcad, and through its officers, agents, and counsel,

141

including Counterdefendant Wilson, Counterdefendant Reynal, Counterdefendant Flores, and Counterdefendant Gingras.

598.   In the Middle District Action's Counterclaims, Counterdefendants publicly and formally accused Mr. Lettman of being a principal of a supposed criminal enterprise called "The Gatalog," and of participating in a broad scheme involving racketeering, cybercrime, unlawful export-related conduct, and spoliation.

599.   More specifically, Counterdefendants alleged that Mr. Lettman:

A. was one of the "Gatalog Principals;"

B. was responsible for the past and current publication, administration, and maintenance of content at thegatalog.com, Odysee.com, chat.deterrencedispensed.com, deterrencedispensed.com, gatalog.com, maf-arms.com, and ctrlpew.com;

C. served as a business partner of Holladay in affairs regarding "The Gatalog;"

D. served as "The Gatalog enterprise's IT Director" and a systems administrator since at least 2022;

E. maintained access to complete chat and direct-message histories;

F. spent years facilitating and overseeing the unrestricted exchange of technical data, especially that of foreign developers;

G. executed and organized cyberattacks against the DEFCAD platform under the direction of Elik and Larosiere;

142

H. knowingly and intentionally used an Iranian reverse proxy in an attempt to access federally controlled technical data on DEFCAD by defeating geofencing and export controls;

I. hacked or participated in hacking-related conduct directed at the website of Defense Distributed's counsel David Gingras; and

J. was jointly and severally liable for the supposed acts of the broader alleged enterprise, which included:

    i. violations of the International Traffic in Arms Regulations;

    ii. violations of the EAR regime;

    iii. threat of murder;

    iv. civil RICO;

    v. false advertising and unfair competition under the Lanham Act;

    vi. violations of the Computer Fraud and Abuse Act;

    vii. tortious interference;

    viii. trade libel;

    ix. violations of FDUTPA; and

    x. spoliation.

K. Counterdefendants further accused Mr. Lettman and the supposed enterprise of engaging in conduct including:

    i. implicating him in the murder of UnitedHealth CEO Brian Thompson;

    ii. export-control violations;

iii. defamation;

iv. extortion;

v. cyberattacks;

vi. threats of murder;

vii. obstruction-of-justice.

600. Counterdefendants further sought to impose sweeping relief against Mr. Lettman based on those accusations, including compensatory damages, punitive damages, disgorgement, injunctive relief, attorney's fees, costs, and spoliation sanctions.

601. At the time they procured, initiated, and continued the Middle District Action's Counterclaims against Mr. Lettman, Counterdefendants acted in a grossly negligent manner and without probable cause.

602. Counterdefendants lacked competent evidentiary support to allege that Mr. Lettman was responsible for the publication, administration, or maintenance of the websites, services, and platforms attributed to him.

603. Counterdefendants lacked competent evidentiary support to allege that Mr. Lettman was "The Gatalog enterprise's IT Director," a systems administrator with the powers attributed to him, or a person with the operational authority and control they claimed.

604. Counterdefendants lacked competent evidentiary support to allege that Mr. Lettman executed or organized cyberattacks or distributed denial-of-service attacks against DEFCAD or any related system.

144

605. Counterdefendants lacked competent evidentiary support to allege that Mr. Lettman used an Iranian reverse proxy to defeat DEFCAD's geofencing or export controls, or that any materials they identified actually showed such conduct.

606. Counterdefendants lacked competent evidentiary support to allege that Mr. Lettman hacked David Gingras's website, that any intrusion occurred as alleged, or that Mr. Lettman made the statements or admissions attributed to him in support of that theory.

607. Counterdefendants likewise lacked competent evidentiary support to allege that Mr. Lettman was properly subject to the Middle District of Florida's jurisdiction based on suit-related conduct purposefully directed to Florida.

608. A reasonable pre-filing inquiry would have revealed that the allegations against Mr. Lettman were false, materially misleading, unsupported, or not reasonably likely to be proven.

609. Discovery in the Middle District Action further exposed the lack of factual basis for the accusations against Mr. Lettman, including the absence of competent materials showing cyberattacks, denial-of-service attacks, or an Iranian reverse-proxy attempt attributable to him.

610. Despite that, Counterdefendants continued to maintain and advocate the Middle District Action's Counterclaims against Mr. Lettman long after they knew, or reasonably should have known, that those allegations lacked probable cause and evidentiary support.

611. Counterdefendants' primary purpose in procuring, initiating, and continuing the Middle District Action's Counterclaims against Mr. Lettman was not to secure the proper discovery, joinder of parties, or adjudication of legitimate claims, but instead to retaliate against him and others associated with or friendly to Counterplaintiffs, burden him with expensive litigation in a distant forum, damage his reputation, create settlement and litigation leverage, chill protected speech and association, and manufacture a false public narrative portraying him as a criminal hacker and racketeer.

612. Counterdefendants' improper purpose is further shown by the sprawling and facially implausible nature of the counterclaims, the effort to drag unrelated out-of-state individuals into the Middle District Action, the persistence in maintaining those claims after discovery failed to substantiate them, and the ultimate voluntary dismissal of those claims only after Counterdefendants were pressed to disclose their factual bases.

613. The Middle District Action's Counterclaims terminated in favor of Mr. Lettman on September 5, 2025, when Counterdefendants voluntarily dismissed those claims after maintaining them through extensive motion practice and discovery.

614. That dismissal, under the circumstances, was tantamount to an unbidden abandonment of claims brought in bad faith.

615. As a direct and proximate result of Counterdefendants' wrongful use of civil proceedings, Mr. Lettman has suffered damages, including but not limited to:

    A. harm to his reputation and standing;

    B. litigation expenses, including attorneys' fees and costs reasonably incurred in defending himself in the Middle District Action;

    C. specific pecuniary loss, including the rescission of an executed job offer with a salary of $160,000 after the employer learned of the accusations made against him in the Middle District Action's Counterclaims;

    D. loss of future earning capacity and lost professional opportunities;

    E. emotional distress, humiliation, and anxiety; and

    F. other general and special damages according to proof.

616. The reputational and pecuniary harm to Mr. Lettman was especially severe because he works as an embedded software engineer in a field that depends heavily on trust, integrity, and confidence in a person's handling of enterprise systems, security, and technical infrastructure, such that accusations of hacking, denial-of-service attacks, and CFAA-type misconduct are uniquely damaging.

617. Counterdefendants have intentionally continued hosting copies of their abandoned claims on the DDLegio blog as part of an effort to maximize the reach and persistence of those allegations, including by causing them to

surface in search-engine results for Mr. Lettman's name and thereby prolonging the reputational harm caused by the claims.



618.     The allegations remain readily accessible and continue to surface prominently in internet search results for Mr. Lettman's name.

619.     The first several pages of Google search results for "John Lettman" include links to the docket, pleadings, or filings associated with the counterclaims.

620.     Counterdefendant Wilson and the business entity Counterdefendants further amplified that harm by encouraging journalists and publications to repeat and publicize the allegations outside the judicial process.

621.     As a result, internet searches for Mr. Lettman's name continue to return articles repeating or repackaging Counterdefendants' accusations, including a Florida Bulldog article bearing the headline, "UnitedHealthcare CEO's killer built gun, silencer from 3D-printing files supplied by Florida 'black-market operator,'" and using tags that include Mr. Lettman's name[28].

---

[28] https://www.floridabulldog.org/tag/john-lettman/, archived at: https://web.archive.org/web/20250523121200/https://www.floridabulldog.org/tag/john-lettman/

622. In this way, Counterdefendants' allegations have remained persistently associated with Mr. Lettman's identity in public search results, thereby prolonging and compounding the reputational, professional, and personal harm caused by the counterclaims.

623. Counterdefendants' conduct was intentional, malicious, grossly negligent, and in conscious or reckless disregard of Mr. Lettman's rights, entitling him to all damages available under 42 Pa.C.S. §§ 8351-8354, including punitive damages as permitted by law.

WHEREFORE, Counterplaintiff John Lettman demands judgment against Counterdefendants Defense Distributed, Defcad, Cody Rutledge Wilson, Federico A. Reynal, Chad C. Flores, and David S. Gingras, jointly and severally to the extent permitted by law, and requests:

A. A judgment in his favor and against Counterdefendants on this Count;

B. An award of all damages recoverable under 42 Pa.C.S. § 8353, including:

i. harm to reputation;

ii. expenses, including reasonable attorneys' fees incurred in defending against the prior proceedings;

iii. specific pecuniary loss;

iv. emotional distress; and

v. punitive damages according to law;

149

C. Prejudgment and postjudgment interest as allowed by law;

D. Costs of suit; and

E. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED:  April 20, 2026

| /s/ Gary C. De Pury | /s/Matthew Larosiere | /s/ Zachary Z. Zermay |
|---|---|---|
| Gary C. De Pury | Matthew Larosiere, Esq. | Zachary Z. Zermay, Esq. |
| Florida Bar No: 126588 | Fla. Bar. No. 1005581 | Fla. Bar № 1002905 |
| Law Offices of Gary De Pury, P.A. | The Law Offices of Matthew Larosiere | Zermay Law, P.A. |
| 21035 Leonard Road | 6964 Houlton Circle | 3000 Coral Way, Ste 1115 |
| Lutz, Florida 33558 | Lake Worth, FL 33467 | Coral Gables, FL 33145 |
| Tel: (813) 607-6404 | Email: | Email: |
| Email: Gary@DePury.com | Larosieremm@gmail.com | zach@zermaylaw.com |
| *Lead Counsel for Alex Holladay.* | Tel: (561) 452-7575 | Tel: (305) 767-3529 |
| | *Lead Counsel for Elik, Stroke, Lettman, and Clark.* | *Lead Counsel for Matthew Larosiere.* |