IN THE SOUTHERN DISTRICT OF FLORIDA

DEFENSE DISTRIBUTED, ET AL,

     Plaintiff,

VS.                 **CASE NO:   9:25-CV-81197-DMM**

ELIK, ET AL,

     Defendant,

_____/

ZOOM
MEET & CONFER MEETING

DATE:          April 14, 2026

TIME:          2:00 p.m. to 4:18 p.m.

PLACE:        Virtual Meeting via Zoom

PURSUANT TO:   Notice Regarding Meeting

BEFORE:       COLLEEN SUMNER, Court Reporter
               Notary Public, State of Florida
               At Large

ALL APPEARANCES:


**HOWARD FOSTER, ESQUIRE**
155 North Wacker Drive
Chicago, Illinois 60606

**BRENDAN EVERMAN, ESQUIRE**
Pryor Cashman
255 Alhambra Circle, 8th Floor
Miami, Florida 33134

     Attorneys for the Plaintiffs

**GARY CHARLES DE PURY, ESQUIRE**
Law Offices of Gary De Pury, P.A.
21035 Leonard Road
Lutz, Florida 33558

**MATTHEW MICHAEL LAROSIERE, ESQUIRE**
6964 Houlton Circle
Lake Worth, Florida 33467

**ZACHERY ZERMAY, ESQUIRE**
Zermay Law P.A.
3000 Coral Way, Apt 1115
Coral Gables, Florida 33145


     Attorneys for the Defendants




I N D E X


| | **PAGE** |
|---|---|
| PROCEEDINGS | 3 |
| REPORTER'S CERTIFICATE | 125 |

PROCEEDINGS

MR. EVERMAN:  Hey, guys.

MR. FOSTER:  Good morning, Brendan.

THE COURT REPORTER:  I'm here, Mr. Everman.  I'm Colleen Sumner, I'm the court reporter today.

MR. EVERMAN:  Hi, Colleen.  Thanks for joining us.  Welcome to the party.

THE COURT REPORTER:  Well, I wish it was a real party.  Those I'll always go to.

MR. FOSTER:  All right.  Gary, do you want to a start with the agenda?

MR. DE PURY:  Well, the agenda -- the first thing we have on the agenda is the deposition times for the clients of Matt and Zach.  So, I think you guys have already worked most of that out, correct?

MR. FOSTER:  All right.  So, can I just -- this is what I have.  Okay.  I think -- and look, it is going to be on the 24th, am I right, Matt?

MR. LAROSIERE:  I think it was the 21st, I think --

MR. FOSTER:  Wait a minute.  Okay.  I like the 21st.  Lettman.  All right.

MR. LAROSIERE:  Lettman was the 24th.

MR. FOSTER:  Lettman is the 24th.

MR LAROSIERE:  Again, we do have an e-mail that

covers that.

MR. FOSTER:  We have an e-mail with the dates. Are those dates all correct?

MR. LAROSIERE:  Yes, Howard, as I confirmed. Yes.

MR. FOSTER:  We've gone back and forth on this so many times.  Okay.  Stroke, I just want to be clear, that's 9:00 a.m. pacific time.

MR. EVERMAN:  Matt -- Howard, sorry to interrupt. Matt, is there a reason why you're not confirming in writing these depositions dates?  I think we've asked at least three or four times.

MR. LAROSIERE:  I am glad --

MR. EVERMAN:  And you've mentioned that you're talking to Howard about it, but you never put it in writing.

MR. FOSTER:  You never confirm it.  I know.

MR. LAROSIERE:  Okay.  Brendan, I did confirm it in writing with Howard.

MR. EVERMAN:  I've seen all the e-mails.

MR. FOSTER:  No, you don't.  You don't.

MR LAROSIERE:  I -- okay.

MR. FOSTER:  And it seems like there's some reason that you won't confirm it in writing.

MR. LAROSIERE:  I literally -- when you sent me

the dates, I sent them back.  And I literally used the word, confirm.  I'm going to go double-check that, but --

MR. FOSTER:  Will you tell me where this e-mail is?  When was this?

MR. LAROSIERE:  Howard, I'm going to double-check that and like we talked on the phone last time.  So, when we're were on the phone last time and we talked about this and I confirmed it for you again.  And now, I'm confirming it for you in front of the court reporter.

But when I -- let me tell you what happened. When I tried to find the e-mail after that, you had sent so many splintered e-mails, that I had a hard time even finding it.  But then, I saw that you replied to that e-mail chain again, where I did confirm it, where you acknowledged that it was confirmed.  So, I didn't think I needed to then come and confirm a third, or fourth, or fifth time.  But if would make you feel better, I'd be happy to --

MR. FOSTER:  All I want you to do is say, confirmed, one word.  You know, excuses, misgivings, qualifying words, that's what I need to see before I sent out notices.

MR. LAROSIERE:  Howard, you already sent out the

notices and I confirmed.

MR. FOSTER:  Okay.

MR. EVERMAN:  I have seen -- I have seen e-mails, Matt, where you've confirmed some of the dates.  I haven't seen all the dates.  So, we're just trying to finalize the schedule.

We also haven't received confirmations from your counsel, Mr. Zermay, or Gary.  And Gary, I know you had a hearing the other day that might have impacted your availability.  And -- and -- you know, I'm glad a court reporter's here.  We just -- we just want to cooperate and schedule these depositions.

There's no tricks.  We want to make sure everyone's available.  We don't want people saying, "you didn't give us sufficient notice."  We don't want games to be played about -- well -- you know, Matt agreed, but Zach didn't agree, or Gary didn't agree.  And so -- you know -- I don't -- it seems like we've put in a lot of effort to try to finalize these depositions.

And we've had to do two notices, because we haven't been able to get anybody to confirm, or everybody to confirm those depositions.  So, we just had to issue the notices without full confirmation, which isn't how we prefer to do it.  But if there's an

issue, we just -- we just want to hear it.

MR. LAROSIERE:  Yeah.  Brendan, and just to be clear.  Did Mr. Foster ever send you the communication where I explicitly waived any, you know, time issues as to setting the depositions of my client?

MR. EVERMAN:  I've seen a lot of your e-mails with him.  And I have not seen that all parties agree to waive that.  So, whether you did or did not, it doesn't necessarily alleviate my concerns, because Mr. Zermay has not and Gary has not.

MR. LAROSIERE:  Right.  No, I just want to make sure that we were on the same page as to my client, that's all.

MR. FOSTER:  Yes.  Again, if the other -- if all three lawyers don't give us an unqualified confirmation of the dep [sic] dates, we're -- we're just in no-man's-land.

MR. DE PURY:  I would disagree with that.  So, here's why.  One, Brendan brought up that you and I had a hearing on a certain day.  I think that's we're talking about deposition of your expert on that?

MR. FOSTER:  Right.

MR. DE PURY:  A hearing on the 16th.  And I keep saying (inaudible) so that is Howard's portion.  Same thing that I explained to you before when you kept

moving the Holliday deposition around.

MR. FOSTER:  Yep.

MR. DE PURY:  If -- if these are Matt's clients, if I'm available to attend then I will, if I'm not, I won't.  You're free to go forward without me.  I am putting that on the record right now.  I'll follow it up with e-mail.

MR. FOSTER:  Okay.

MR. DE PURY:  -- to both of you later to all parties.  But if it's my client, then obviously, I have to confirm.  I did.

MR. FOSTER:  But --

MR. DE PURY:  You changed it after my confirmation.  That's what we are trying to avoid today, that is why we have a court reporter.

MR. FOSTER:  Okay.  If you want to send that to us in an e-mail, Gary, that would help.

MR. DE PURY:  Okay.

MR. FOSTER:  That solves that issue, but Zachery hasn't said that.

MR. EVERMAN:  Yeah, Zach, can you confirm that Matt's deposition works for you on the 11th?  Zach, are you there?

MR. DE PURY:  Zach, you're muted.

MR. ZERMAY:  Yeah, I'm here.  Can you hear me?

MR. DE PURY:  Yes.

MR. LAROSIERE:  Yeah.

MR. ZERMAY:  Yeah, I -- yeah, it works.  It's a May 11th.  Again, what is it, 10:00?

MR. FOSTER:  May 11th at nine -- that would be 10:00 eastern time.

MR. ZERMAY:  Okay.

MR. FOSTER:  Would be Matt?

MR. LAROSIERE:  Yep.

MR. FOSTER:  Matt, does that work -- well, Matt does that work for you?

MR. EVERMAN:  Well, look, Howard, we're not asking Matt about Matt's depo -- being deposed.

MR. FOSTER:  No, I thought -- as long we're on the subject of the deposition, does that work for you?  We -- we want to notice it.

MR. EVERMAN:  Well, he has counsel so, Howard, we are --

MR. FOSTER:  Well -- sorry.  Counsel --

MR. ZERMAY:  He's here with me.  It's -- you could ask him.  It's like -- I might -- I asked him, he told me, it's --

MR. FOSTER:  Okay.  Okay.  All right.  I guess we're good.  I guess we're good.  All right.  It's going to be May 11th, and that one, as you will see in

the notice, will be videotaped.  Okay.  Because --

MR. EVERMAN:  We could of saved Gary some money if you guys just responded to the e-mails.

MR. ZERMAY:  I think we can save him money now by not casting dispersions back and forth and just sticking to the issues.

MR. FOSTER:  Yes.  And --

THE COURT REPORTER:  And -- and wait a second.

MR. FOSTER:  -- and --

THE COURT REPORTER:  Wait a second.  You're talking over each other a lot.

MR. FOSTER:  Yes, we are, I know.

THE COURT REPORTER:  And it's verbatim.  So, I need for that to stop happening if we're going to be going an hour and a half.  That's going to be a longtime for me.  Please.

MR. FOSTER:  I hope it doesn't take that long. Okay.  All right.  Matt on 20 -- wait, on dep dates.

MR. LAROSIERE:  Please.

MR. FOSTER:  Okay.  You want to depose our expert.  He is not available next week.  He will be available the week of May 4, pretty much all week. So, I suggest you notice it up, get it on the calendar.

MR. DE PURY:  Now, on hold a second.  Didn't the

judge order that you would produce him, prior to the last day of April?  Isn't that what the order or am I misreading the order?  Is that what the order said? Or was it last --

MR. EVERMAN:  I -- I don't -- I'm not sure what the order says.  You know, we gave -- we're giving you the dates that he's provided to us.  Which, you know, I understand that those dates that are, what, Thursday and Friday were quick.  So, maybe you guys aren't available, but he is out of town the next two weeks, returning the -- in May.

So, if you guys -- if there's a problem with the dates that he has available, we can confer about them. But we don't know when you guys want to take this deposition.

MR. FOSTER:  Right.  And he's -- he's literally not available for the next two weeks.  He's one week on -- he's in the Army reserves.  He's on reserve duty one week.  And then, one week, he's on a camping trip. But he'll be back May 4th.  And, you know, if that works for you, that's one day that week I really would urge you to take it.

MR. LAROSIERE:  Okay.  If I may?

MR. FOSTER:  Yes, go ahead.  Fine.

MR. LAROSIERE:  Here's the problem.  We -- I

think we can all agree that we need the materials he based his report on to properly depose him.  Can we -- can we agree on that?  It would be hard to depose to him without the materials he based his report on?

MR. EVERMAN:  Yes.

MR. LAROSIERE:  All right.  And do we agree that -- do we agree that, despite my having sent an e-mail that we've gone over multiple times, where I would treat everything as confidential, you still haven't handed that over?

MR. FOSTER:  No.  Wrong.  I don't agree with you about that.

MR. LAROSIERE:  Okay.

MR. FOSTER:  He has produced -- can I talk now without being interrupted?

MR. LAROSIERE:  Well, let me -- let me just say one thing just to maybe cut you off.  The only thing we've gotten from you, in this entire case, was his report.  Okay?  So, if that's wrong, show me.  But I have access to my file right now and the only thing I've gotten from you in this entire case, is his report.  So, I could have deposed him tomorrow.  I would have been able to do that.

I can't depose him without the materials on which he based his report.  So, that -- that's the thing --

that's my issue.  So, I'm just saying, could we -- hold on, Howard.  The only question I'm asking you, is, can we agree that we have not received the materials aside from his report?  Can we agree on that?

MR. FOSTER:  Matthew, you tend to be very repetitive.  I get your points.  You -- and you give materials other than the report and you want them. Now, I'd like to address that.

MR. LAROSIERE:  Well, hold on.  Wait.  We're talking about scheduling --

MR. FOSTER:  Do you want -- do you want more time --

MR. LAROSIERE:  Hold on.

MR. FOSTER:  -- to go over your point again?

MR. LAROSIERE:  Howard, let's just nail -- let's just go through this quickly.  I don't have the stuff that -- that I need.  We can all agree on that, right?

MR. FOSTER:  No, I don't agree.  Would you let me talk now?

MR. LAROSIERE:  Okay.  I -- but I want you to -- I don't want you to go on and on.  I want you to explain how --

MR. FOSTER:  I don't go on and on.

MR. LAROSIERE:  -- Howard, please stop talking

over me.

MR. FOSTER:  All right.  Will you let me address you -- your points?

MR. LAROSIERE:  They have a narrow question.

MR. FOSTER:  What is your question?  Do you have the things on which he based his report?  In my opinion, you do, but if you won't let me elaborate, we're not getting anywhere.

MR. LAROSIERE:  Okay.  Tell me how I have the things that I need to depose him.

MR. FOSTER:  Okay.  His -- okay.  Before I do that, I want to ask Brendan a question.  Brendan, we are sending out a revised damage disclosure -- is that --

MR. EVERMAN:  We cleared a revised initial, or a supplemental initial disclosures last night.

MR. FOSTER:  Great.

MR. EVERMAN:  We have tax returns, that I finally have uploaded now into our document management system.  They could be produced, Matt, once we get resolution on the Protective Order.

MR. FOSTER:  Okay.  Now, let me speak.  He did not rely on the tax returns for his report.  He did not.  Ask him that in his deposition, he will tell you that.  He said in his report that he relied on sales

data and subscription data supplied by --

MR. EVERMAN:  Howard.  Howard.  I think we --

MR. FOSTER:  Don't interrupt me...

MR. EVERMAN:  -- Howard, this is -- Howard, this is me.  This is Brendan.

MR. FOSTER:  Okay.  Oh, sorry.

MR. EVERMAN:  Hey.

MR. FOSTER:  I'm sorry.

MR. EVERMAN:  I -- I don't think -- I think we need to speak about exactly what he relied upon.  I'm not sure if what you just said is correct.  And I want to make sure, we have a court reporter here, that we're talking about the correct thing and we're not limiting our experts to --

MR. FOSTER:  Okay.

MR. EVERMAN:  -- I believe that he did tell me that he relied upon the tax returns.  That's the only document that he told me that he relied upon --

MR. FOSTER:  Yes.

MR. EVERMAN:  -- that has not been produced.  It is the tax returns.

MR. FOSTER:  Okay.  And my -- I spoke to him, he said he did not rely on his -- on the -- okay.  All right.

MR. EVERMAN:  We are --

MR. FOSTER:  I think -- I think he considered -- okay.  He looked at them, he didn't rely on them.  He looked at them, but there's a difference there.  Okay.  You're going to get the tax returns as soon as an Order of Protection is in place.  And I understand you want those tax returns when you depose him.

MR. LAROSIERE:  So --

MR. EVERMAN:  Well, look, Matt, -- one way or the other --

MR. LAROSIERE:  Hold on a second.  Let me --

MR. EVERMAN:  -- whether we agree on a Protective Order or not, the judge is going to enter it and we'll get you those tax returns and then you can depose him.

MR. LAROSIERE:  Here's the -- here's the -- like, I want to cover this question right now.  I'm reading from page nine of the expert report.  "To perform this analysis, I reviewed gross sales and subscriptions count data for DEFCAD, each month from November of 2021 through October of 2025, provided by plaintiffs.  I also reviewed income tax filings of Defense Distributed for tax years 2020 through 2023.  And sales data for the Ghost Gunner for the period of May 2022 through October of 2025.  I considered secondary factors, such as contemporaneous economic or social events, or other microeconomics trends that may have

an unusual impact upon sales."  See, so I don't think he has to provide economic events, right?  Like, that would be hard to provide.

But it sounds like we need the materials that he's explicitly referenced here which is the gross sales and subscription account data, tax filings, and sales data for the Ghost Gunner.  That sounds like the main things that he did.

MR. FOSTER:  Yes.

MR. LAROSIERE:  It's like -- okay.  I know, we're so we're on the same page -- I mean, maybe between the two of you, you're on the same page.

MR. FOSTER:  Okay.  I misspoke.  You know what --

Yeah, you are right.

MR. LAROSIERE:  Yep.

MR. EVERMAN:  Howard -- Howard, let me address this, because I just talked to -- and I asked him this yesterday about, I need to produce to you, Matt, all the documents he relied upon.  This is what he told me, and I am intimately familiar with all this.  So, if you think that any of this is inaccurate or incomplete, please let me know.

But what he told is that, other than the tax returns, which I now have as of yesterday --

MR. LAROSIERE:  Uh-huh.

MR. EVERMAN:  -- that everything else that he relied upon, all those things you said, are appendix exhibits to his report.  So, if you have his report with those exhibits, then you have everything except for the tax returns.  Which I now have as of yesterday and can produce with a Protective Order.

MR. LAROSIERE:  So, the appendixes that he attached were created by him, it's not the materials he relied upon.  And it's very clear, because it seems like you can look at it?

MR. FOSTER:  Agreed.

MR. LAROSIERE:  It's not the source data and we have the right to look at the source data.

MR. FOSTER:  What source data -- okay.  What source data are you referring to?

MR. LAROSIERE:  So, if you look at Appendix D, which is on page 21 of his report.  I feel like we can talk a look at that together.

MR. EVERMAN:  Give me a second, I don't have it pulled up.

MR. LAROSIERE:  I can share my screen if you want.

MR. FOSTER:  Please.

MR. DE PURY:  Gentlemen, keep going, I'm just going to grab a microphone battery because this one is

-- but keep going.

MR. LAROSIERE:  I need you to approve.  Okay.  Can we see it?  I'll resize it, so it's a little better.

MR. FOSTER:  Uh-huh.

MR. LAROSIERE:  Or I can zoom in.  Is that better?  Can you see it?

MR. FOSTER:  I can see that.  Yes.

MR. LAROSIERE:  Okay.  So, this clearly isn't the source data, right?  This is -- look Appendix D at the top.  This is the same font and everything as the rest of his report.

MR. FOSTER:  Right.

MR. LAROSIERE:  This was created and attached to the report.  And so then, we have month, revenue, month, revenue, month, revenue, right?  That's not the source data.  We need to see where this came from to confirm it's accuracy.

MR. EVERMAN:  And so, if with respect to source data, at least with respect to Appendix D --

MR. LAROSIERE:  Uh-huh.

MR. EVERMAN:  -- do you know what documents you're looking for?

MR. LAROSIERE:  I -- I didn't prepare this report.  Obviously, he got these revenue numbers from

somewhere.

MR. EVERMAN:  All right.  So, you want to see what he looked at?

MR. LAROSIERE:  Exactly -- that is just what the rules require.  Okay.  I want to see the basis of the report.  And then Appendix -- this is the same thing by DEFCAD subscriptions, but he got this from somewhere.  And then E is the revenue.

He just -- this is, again, in the same font as the report itself with the same headings as the report itself.  This was clearly generated in the report.  We need to see where this came from, right?  It's -- it's that simple.

MR. EVERMAN:  And I -- I mean, I guess we can -- I think I understand the request.  I'm not sure what the documents would be, but we can look into that and let you know what we've got.

MR. LAROSIERE:  Yeah.  Yeah.  No, I mean, I'm not -- I don't know exactly what it was, I didn't prepare this report.  But I think you're required to hand over whatever it was this came from.  And, you know, it's that -- right.  So, it's nothing -- right, it's not crazy.

MR. EVERMAN:  Yeah.  I mean, I suppose at the very granular level though, the source data would be,

you know, every customer transaction.  You know, that goes -- that goes into preparing the accounting records, that, you know, what they were accumulated to reach these figures.  So...

MR. LAROSIERE:  Yeah.  And I mean, I'm -- listen, I'm -- you know, Brendan, I'm not -- you know, we don't agree on everything, but I'm not going to -- I'm not going to ask for the butterfly flaps, you know what I mean?

MR. EVERMAN:  Okay.  I'll see what we can get, but I think I get it.

MR. LAROSIERE:  Uh-huh.

MR. EVERMAN:  I think I get that.

MR. LAROSIERE:  Yeah.  So that's fine.  But like here's the -- here's the other problem, right?  You've got some things already and we're talking about a Protective Order.  Here's the thing, and we're going to talk about the Protective Order later, but when we had our call the other week, we were very explicit where I said, "Okay.  Until we get this resolved, I will treat every single thing you give me as confidential."

And Brendan, you were on that e-mail and you were quiet and you asked me to confirm for my clients.  And I confirmed that as well.  Okay?

MR. EVERMAN: Okay. Hold on. Okay. Hold on. I will pull it up.

MR. FOSTER: No, I remember that happened, it did.

MR. LAROSIERE: Okay. I going to pull it up, just so we're all on the same page. Oh, no, Howard replied, you're right, Brendan.

MR. FOSTER: Okay. Our concern with that, was that it's not enforceable by the judge.

MR. LAROSIERE: It is -- it is a signed writing by the --

MR. EVERMAN: Howard -- Howard, let me handle this, please, because I'm handling the document production --

MR. FOSTER: All right.

MR. EVERMAN: -- issues.

MR. FOSTER: All right. All right.

MR. EVERMAN: And I don't want there to be any confusion.

MR. FOSTER: Okay.

MR. EVERMAN: But the issue we have right now, Matt, is we don't even agree what is confidential.

MR. LAROSIERE: Okay. So, hold on.

MR. EVERMAN: In my e-mail, you know, I think that what you're deeming to be confidential is not

supported by the rule or the case law.  And so, I don't think we've reached an agreement on that issue.

MR. LAROSIERE:  Okay.  So, look here at e-mail that you were included on.  It says -- and this is at the call we had, Mr. Foster said he would produce me that day.  Now, I understand if you had other things going on or whatever, but I said, "I agree to treat any documents you send me in no response to Alec's request for production, as confidential.  Meaning, that I will only share them with fellow counsel and my clients until further agreement or court order."

What -- and then, I define -- and then, Howard asks me to confirm and then I confirmed.  So, what more could you possibly want before providing me anything?  I have agreed to treat anything you send me as confidential until we resolve the, you know, the further agreement which we designations, right?  So, I guess what's the problem?

MR. EVERMAN:  There's two problems.  Okay.  One is, we don't have agreement on a Protective Order. I don't know what that means.  Okay?  I appreciate that you treat it as confidential, but there's provisions in the Protective Order that expressly specify what that means.

Obviously, given the history in this case,

there's been a lot of disagreements about discovery issues.  So, this leaves many issues open for interpretation that we're simply not comfortable with.

And two, is that I did not have, until yesterday, any documents to give you.  It's not even possible for me to have produced them last week, because I didn't have them.

MR. LAROSIERE:  Okay.

MR. EVERMAN:  I know you wanted the document production sooner and I understand that.  And I understand that you need those documents before you can depose our expert, or some of those documents. I didn't have them.  I can't produce to you what I don't have.  It's fine for you to say theoretically, "Yes, I'll give them to you and yes, my client had them."  But I had to upload -- I have hundreds, if not thousands of documents that are currently being uploaded onto a document review platform, for review and production in this case.

My document review professional at my firm, who handles that, was out on vacation last week.  He just returned yesterday.  I had to collect these documents from my client, upload them to tag them and produce that.  So, this isn't like a -- I'm not delaying things for the sake of delaying.  This takes time.

There's a lot of documents that have been requested.  Doing a piecemeal like that doesn't work, it gets confusing.  If we agree on a Protective Order, I believe I could produce documents to you today.  Some of them, not all of them, but then they would be able to go out from the document review platforms, so that I can, for example, apply BATES numbers easily.  I'll know where we left off, if I want to complete the production.

Just sending e-mails one by one for things you want, when you demand them, is not practical.

MR. LAROSIERE:  Okay.  So, and listen, Brendan, it is not lost on me that you've been on this case for what, 45 days?

MR. EVERMAN:  About.

MR. LAROSIERE:  Yeah.  And this is not lost on me, right?  But you joined the case late.  Mr. Foster's been on this case since day one.  And I don't really want to fight about this too much.  I hear what you're saying and I'm sensitive to what you're saying.

But the simple fact is, you were on the case when you first received these requests.  Okay?  At document 33, your client certified that they had many of these documents in their possession, custody and

control, right?  And that's the subject of another motion that's still -- and that maybe we can resolve, like I would love it if we resolved.  The Court would probably be happy if we resolved it, right?

You -- I don't think you get to file doc 33 in December of 2025, certifying that you have all of these things.  And then, now in April of 2026, more than an year later, tell me you literally don't have them.  That's -- I just don't think any court is going to look at that kindly.

So, I -- and look, the Protective Order is saying -- honestly, there's no reason you shouldn't have brought this up, if you thought it was an issue when the requests were first served.  I think I have extended an unbelievable olive branch by, in writing, just like we agreed over the phone.  Everything.  Everything.  If you sent me a picture of the front page of their website, under my written agreement, which under the Florida case law, that is a signed writing, it is binding.  I would not be able to share it with anybody beyond the exact people Howard and I agreed.  And that is more protective than the proposed Protective Order that you've handed over.

So, just -- can I ask you, just please send me something, so I can get started.  Please.

MR. EVERMAN:  I don't -- I don't -- Howard, I think you're on mute, by the way.  But Matt, I need a Protective Order.  That's our position.  I understand you disagree with it.  If we get a Protective Order, I'm telling you I could produce documents today.

We just -- there's been too many disagreements in this case to leave all these issues open-ended about what that e-mail means.

MR. LAROSIERE:  Okay.  So, here's my problem with that.  These -- this issue is between my clients and your client.  You want Mr. De Pury's clients and Mr. Zermay's client to also agree.  How is that --

MR. EVERMAN:  Under the case, yeah, of course.

MR. LAROSIERE:  How is that fair to my client?

MR. EVERMAN:  Well --

MR. LAROSIERE:  How is it fair to Mr. Elik?

MR. EVERMAN:  How is fair to our client that you want documents to be disseminated that are highly confidential and that we don't have a Protective Order in place?

MR. LAROSIERE:  This is the basis of your complaint.  Like this is the -- that's the -- see, I would -- from a defense posture, yeah, I'm very sensitive to what you're saying.

MR. EVERMAN:  We are -- we are -- we want a Protective Order entered.  Okay?  And whether the parties want to agree or not, the court will do it whether we agree or not, you know, so.  If you just wanted to say, no, or, you know, I've been trying to confer on this for a week now, the Protective Order.

MR. LAROSIERE:  Yeah, and we're going to talk about it.

MR. EVERMAN:  And if we are at an impasse then I'll just file a motion and the court will decide and then we'll produce it.  I don't see any prejudice to your client from -- from this.

MR. LAROSIERE:  Do you know when the discovery cutoff date is in this case?

MR. EVERMAN:  Do you?

MR. LAROSIERE:  Yeah.  It's the 14th of next month, so you see the prejudice problem.

MR. EVERMAN:  Well, if you wanted to get this done, you could of responded sooner.  All defense counsel, including you, could have responded sooner to the proposed protective order.

MR. LAROSIERE:  And you --

MR. EVERMAN:  I could have done things quicker and you could of done things quicker too.  Here we are.  Let's -- there's no time like the present.

MR. LAROSIERE:  All right.  Well, that's a subject on -- that's part of our agenda.  Gary, this is your meeting so, I'm going to yield the floor.

MR. DE PURY:  Well, so I wanted to interject two things.  One, when any member of the defense team says that they'll hold at full confidentiality, that pretty much extends to the other two members of the defense team in this case.  In that, I'm not going to go in front of this magistrate and play word games of, "Oh, well, only Matt said that."

So, but I also for the record, also I will also hold the confidentiality, but I would want to see these items, as well.  The second thing I want to address, is to say, as Matt just brought up, that when you file doc 33 in December and now, you're just saying that, "Well, I just got these yesterday." I believe part of that is because you won't agree to any of this.  And so, with the lack of agreement, we -- reaching out and telling your client, "Hey, we need this.  We're going to have to turn this over."

That should have been in your possession months and months.  Like it should've been in your possession by January 15th, at the latest.  So that then, we could come to an agreement.

So, I think the delay is -- it's not that you

just got it.  I think the delay is that you didn't want to get it, because you won't agree.

And then I lied, the third thing.  The Protective Order is so incredibly broad.  As I read it, it effectively says, you could look at it, but you can't do anything with it at all.  So, if we're going to submit a Protective Order for the judge, it needs to be something that they'll sign off on, or we're going to go in circles.

Because if he says nope, "go back to the drawing board."  Then, we're not going to make any discovery cut-offs and that's an issue too.  So, because this Court is obviously getting a little perturbed.  And we need to figure this out.

But I think your Protective Order, as I read it, is so incredibly broad, that a judge is not going to agree to it.  And that puts you at risk and then he's just going to say, "you know what, there's no Protective Order."  So, I think Matt did reply with some very narrow deadlines.

And I don't recall if I bought up on that or if it was in writing.  And I will do so if I have to, but I've been through that.  I think it's -- the deadlines are very reasonable.  But to say that you are stuck with -- we can't have it, you can look at it -- some

HOA -- it's -- document, you can't photograph it, you can't take a copy, you can't do anything, can't even spell.  And HOA tries to do that all the time.  And the court, you know -- them off.  And then I end up with all -- I think we're going to end up with the same thing here.

So, if we don't come to an agreement with something, which is why we're here today.  The court's probably going to say, "I'm not going to do any protective order."  And that's the risk you take and they risk we take if we don't get it.  So, we have to come to something.  But this is goes back to the deposition of Jason -- I have been e-mailing and e-mailing and e-mailing.  You were previously aware that I was not available on the 16th.  Been well aware of that.  You gave us the 16th.  That seems a little disingenuous.

I understood the 17th was open when you gave us that date.  Now, the 17th is closed.  I've asked multiple times if you would give us another date.  Those e-mails -- that's why I asked you, two days ago or yesterday, has anybody even been getting my e-mails because I want to know.  The 17th, I'm the only person in town on the 17th, clearly, I'm not going to depose him, just by myself.

I want the -- unless we are going to secure different dates with this individual.  And so, now we have an issue with that, because you're not allowing us an extra day.  And then, that brings me to the next thing.

I'm pretty sure the court said that it will happen before the end of this month.  And now you saying, well, he's available, he's just going camping.  I get the military part.  Howard and I have discussed it.  I spent 23 year serving.  I get serving.  I get the guard.  I'm fully aware of that, but I want to say the emphasis on you guys to go to the judge, and say, "Your Honor, we understand your order.  We understand you ordered it against us.  But all parties are in agreement if we can do it -- if we can do that --

MR. FOSTER:  I would -- if I -- if I --

MR. EVERMAN:  Howard, you just muted yourself.

MR. FOSTER:  Okay.  Am I un-muted now?

MR. DE PURY:  Yes, you are.

MR. FOSTER:  Okay.  I certainly would undertake at the hearing on Friday, bringing this up with the judge and to see if he will be amendable to allowing us to do the deposition the week of May 4.  I don't know why he wouldn't.  I don't see -- you're not

saying that you're going to be prejudiced in any way by that four-day delay.  But is it -- Gary, are you going to be available at some point on the week of the fourth for one day?

MR. DE PURY:  Yeah.  So, here's the thing.  Of all days that's the day I have surgery.  But I have a feeling that -- that any time else in that week, I have to pull my calendar, because I wasn't aware that we were going to discuss that.  I don't have my calendar in front of me.

As I just discussed before, this is a Zoom only -- because of the -- issues.  But Helena, print a copy of my May calendar for me, please.

MR. FOSTER:  Well, presume -- hopefully your surgery goes well.  And the following day or two days later, you're able to participate in a virtual deposition.  Would you be able to do it one day that week?

MR. DE PURY:  She is pulling my schedule right now.

MR. FOSTER:  Yeah, but assuming it's --

MR. DE PURY:  Yeah, oh, absolutely.  It's not a major surgery but it is I have it going on.

MR. FOSTER:  Hopefully, it's outpatient thing and you're --

MR. DE PURY:  Yeah, for the most part.

MR. FOSTER:  And then, Zachery, what about Zach?

MR. LAROSIERE:  Hold on.  Hold on.  I have an important issue here.  The complicating thing with this deposition is, I think we're going to have to show him materials that are -- that we're going to agree are going to be confidential.  I know there's mechanisms to do that digitally, but it's a mess.  And I don't want to -- I take confidentiality extremely seriously.

MR. FOSTER:  Okay.

MR. LAROSIERE:  I don't want to risk it.

MR. FOSTER:  But we are not -- but hang on.  Hang on.  Let me speak here to this.  I have been through this in other cases.  If the parties agree that you can show him a confidential document in a virtual deposition, marked confidential and he signs a confidentiality order.  I think we're okay.

MR. LAROSIERE:  So, the weirdness is giving it to the court reporter, because don't we have to -- I just don't know how to handle that digitally.  So, I would like --

MR. FOSTER:  I mean -- I mean --

MR. LAROSIERE:  All right.  I don't --

MR. FOSTER:  I mean, the court reporter could

sign a confidentiality order, as well.

MR. LAROSIERE:  Here's the thing, I would --

MR. EVERMAN:  Isn't this addressed -- sorry, Matt.  But this actually addressed in the Protective Order that I circulated.  It says, the confidential information may be disclosed to court reporter's -- as is necessary --

MR. LAROSIERE:  Okay.

MR. EVERMAN:  --- for the purpose of producing testimony in the case.

MR. LAROSIERE:  Right.  And so, I would feel most comfortable doing his deposition in person.  So, can you find out when he -- if he would be available to come to West Palm Beach at some point?

MR. FOSTER:  Well, I can ask.  All right?

MR. LAROSIERE:  Because I think that's going to be -- and like that's not -- I'm not going to be super hard about that, but --

MR. FOSTER:  I mean, why -- I mean, could you tell me -- I guess you have that right to do it in person.  I mean, other than confidentiality thing, which I think is easily dealt with, is there a reason why you need to have him in person?

MR. LAROSIERE:  Like well, so, my main concern is the handling of the documents.  Because when you're

handing them through them through a digital portal, I just don't like that.  I would much rather hand it straight to the person to whom, you know, the Protective Order -- everything is set.  I can hand it to the -- and say I'm sure we'll have something entered by then.  I can hand it straight to the court reporter.  I can hand it straight to the witness --

MR. FOSTER:  Right.

MR. LAROSIERE:  And then there's no issues.  But if I'm uploading it to a portal then a lot of people can access it.

MR. EVERMAN:  I agree.

MR. FOSTER:  I understand what you're saying.  Okay.  Can I just ask, Brendan, since you're in Miami, do you think you'd able to go up to West Palm and attend the deposition live?

MR. EVERMAN:  I'm not sure.  It depends on when it is, probably.  We'd have to discuss payment for that, because I believe it would the defendant's obligation to pay for our expert's time for the deposition.

MR. FOSTER:  I think that's true.  They have to pay either way whether it is virtual or live.

MR. EVERMAN:  Yeah, but I don't know where he is and whether he'd have to travel and all of that.

MR. FOSTER:  He's in -- he's in Texas.  So, he would have to fly to West Palm Beach.

MR. EVERMAN:  Yeah, but whether defendant's are willing to pay for that, I'm not sure.

MR. FOSTER:  What is your position on that?

MR. EVERMAN:  Whether they would have to, I'm not sure either.

MR. LAROSIERE:  We'd have to look at the rules. I don't -- I don't know.  I just like it if you've got availability.

MR. FOSTER:  I mean, if generally speaking, Brendan, if you could probably do it than, or -- you know, it would be a lot easier, so I don't have to fly back for that.

MR. EVERMAN: Right.  Yeah, right.  We can -- we can coordinate that.  And perhaps that is something that we should figure out sooner rather than later. Because the location of the deposition, obviously, could impact people's availability.

MR. FOSTER:  Right.

MR. EVERMAN:  You know, the deponents and all the attorneys here, whether they would have to be travelling or not, so.  Yeah.

MR. LAROSIERE:  But I think it has to be within -- I mean, we can, of course, agree to whatever we

want, right?  But generally, it's suppose to be within 100 miles of the courthouse, so.

MR. FOSTER:  Well, it would within 100 miles, I'm assuming, if it's in West Palm Beach, right?

MR. LAROSIERE:  Well, I'd be -- you know, I'm amenable.  We'll figure it out.  Maybe it would be easier to do it in Miami, I don't know.  We'll --

MR. FOSTER:  All right.  Okay.  I mean, are you -- okay, what about the other lawyers?  Are they going to participate, Gary and Zach, in this deposition?

MR. ZERMAY:  I am not sure --

MR. DE PURY:  Yes.

MR. FOSTER:  Are you going to ask questions?

MR. DE PURY:  Yes.

MR. FOSTER:  So, are you going to be there live?

MR. DE PURY:  Yeah, that's the plan, that's --

MR. FOSTER:  All three of you will be there in person?

MR. LAROSIERE:  Zach's the only one that lives there, so it's easiest for him.

MR. FOSTER:  Well, Zack lives in Key West.

MR. DE PURY:  Well, yeah, but that's -- I mean, just as close as I am, right?

MR. FOSTER:  All right.  All right.  If that's the idea then maybe it would be easier -- it probably

would be easy for everybody if you could do it in Miami, wouldn't it?

MR. LAROSIERE:  We'll figure it out, just give us your availability.

MR. FOSTER:  Yep, I know.  Okay.  I guess that's within 100 miles of the courthouse, but I'm sure you would agree to go to Miami rather than West Palm. It's just easier to get to.

MR. LAROSIERE:  If it is, yeah, I don't know. We'll figure it out.  It's easier for me.  West Palm is much easier for me, but I'm willing to -- you know, I'm willing to work with you guys, so.

MR. FOSTER:  Okay.  So, are we okay then for stipulating to the judge that we all want to do it the week of May 4th?

MR. LAROSIERE:  I need you to get me his availability first.  And --

MR. FOSTER:  He's available any day that week.

MR. LAROSIERE:  Okay.  Here's the -- here's the one issue I have, is I want to know -- I'm not going to take a final position on this, because of the camping trip, I'm just not convinced by.  I want to know what dates he's doing his military service, because we're going to respect that.  We are not going to touch that.  We do not want to touch that.

But I want to know the dates that he would be available to come down and I don't think a camping trip is a good excuse.  If it is then here's the problem.  I don't want to -- I don't want to depose him with 10 days left to do anything with that information, right?

MR. FOSTER:  I think you're saying you would prefer to do it the week prior.

MR. LAROSIERE:  I don't know if he's available that week.  I don't know which days his military service would be.

MR. FOSTER:  I think the military service comes first.  And that is next week.  The week of the 20th.

MR. LAROSIERE:  Uh-huh.

MR. FOSTER:  And then I believe he has this long scheduled trip in Arizona, in a rural area.

MR. LAROSIERE:  Yeah.

MR. FOSTER:  That's how he described it to me.

MR. LAROSIERE:  Yeah, I'm -- and maybe -- you know we can --

MR. FOSTER:  Are you saying that he -- that week? You don't believe him?

MR. LAROSIERE:  No, I'm not -- that's not -- that's not unavailability.  So -- or maybe we could do it the first day of it, so he only has to delay it

one day or something.  Let's just try our best.

MR. FOSTER:  All right.  All right.  I will speak to him again and see if he's available the week of the 27th, just to be confirmed, right?

MR. LAROSIERE:  Yeah, and just, you know, ask him to take it off of the front of his thing to disrupt him as little as possible.

MR. FOSTER:  Okay.  If he reiterates that he is on a trip, a long scheduled trip, for that whole week, are you willing to then go to plan B and stipulate to the week of May 4th?

MR. LAROSIERE:  We'll talk about -- we'll cross that bridge when we get there.  Right now I'm too concerned about the short timeframe of the --

MR. FOSTER:  Okay.  All right.  I understand your position.  I will talk to him and see what I can do.  Okay?

MR. LAROSIERE:  Thank you.

MR. DE PURY:  Now, I'll add, he is listed as an expert witness in this case.  If we depose him, he has a duty to appear.  The military thing, I understand.  I have never heard of someone going camping after their week or two week of actual guard or reserve duty.  So, I think that's a little awkward because everybody -- all everybody wants to do it go home

and spend a weekend in bed, instead of in the field.

MR. FOSTER:  Well --

MR. DE PURY:  Because --

MR. FOSTER:  -- you if think that is peculiar, you probably could ask him about that because he's done --

MR. DE PURY:  That is --

MR. FOSTER:  No.  All right.  But I'm going to talk to him about that today.

MR. DE PURY:  Okay.

MR. FOSTER:  I promise you that.  Where -- Brendan, are you there?

MR. EVERMAN:  I'm here.

MR. FOSTER:  Okay.  So, what about -- is there -- are you saying that there's no chance that you will be able to reach a compromise about the Protective Order?

MR. LAROSIERE:  Who said that?

MR. FOSTER:  I was just -- we couldn't -- I mean, well, you guys talked --

MR. LAROSIERE:  Well, if Gary's getting the schedule, so I'm letting him -- that was on the schedule.

MR. FOSTER:  Okay.  Okay.

MR. DE PURY:  Next week -- because the -- we jumped ahead in the schedule.  I put in that order and

now we jumped ahead.  We have to get a Protective Order stopped.

MR. FOSTER:  Yeah.

MR. DE PURY:  Some form of agreement, because the judge is not going to be happy if we say, "Well, Judge, they won't give us this."

MR. FOSTER:  No, that's not acceptable.  We've got -- both sides, I think agree -- would you agree that we really need to come to an agreement on this?

MR. DE PURY:  I -- yeah.

MR. EVERMAN:  I think we just need to exhaust this control process.  Because it sounds like we're not going to reach an agreement.  I'm not sure, but --

MR. LAROSIERE:  Why do you say that?  We haven't really talked about the meat and potatoes of it.

MR. FOSTER:  Okay.  Can I ask you this?  Would it be possible for Matt and Brendan to confer separately when this is over?

MR. LAROSIERE:  I want the court reporter.  I want to talk about this in front of the court reporter.

MR. FOSTER:  You do?

MR. LAROSIERE:  Yes.

MR. FOSTER:  Yeah, you want do -- you want to do it now?

MR. LAROSIERE:  Well, it's all on the agenda.

MR. FOSTER:  Okay.  I thought we would like put it aside for a while.

MR. DE PURY:  No, we're only 45 minutes in.  We have 45 minutes in --

MR. FOSTER:  Go ahead.  Are you guys -- just, keep going.

MR. LAROSIERE:  Gary, the floor is yours, I don't know where we're at.

MR. DE PURY:  Well, that's what, so -- as I -- the last thing I said on this was, was that the -- I thought the deadlines were reasonable.  You know, make -- and I'm not sure if Brendan seemed that you just shot back that, that's unacceptable and case law.

MR. EVERMAN:  I sent an e-mail, I don't know if you saw it, like an hour ago, half a hour ago?

MR. DE PURY:  Yes, I did.

MR. EVERMAN:  Okay.  So, yeah, I mean, that's our position.  I think it's supported by case law. I don't know what -- if you have a response to the e-mail?

MR. LAROSIERE:  Yes, I took a look and so the -- like, case law interprets these agreements.  What these are is agreements of the parties.  And we're basically agreeing to have the court enforce it.

So, we can put whatever we want in there.  And obviously, there's limits.  So let's just -- I mean, I think there's only two points of disagreement.  And tell me if you agree or not.

I think the only two points of disagreement are, number one, what is eligible for determination?  And number, what are the consequences for over-designation?  Can we agree those are the only two issues that we have?

MR. EVERMAN:  No.

MR. LAROSIERE:  Okay.  What issues?  Because that's the only thing that's changed.  So what else was an issue?

MR. EVERMAN:  There was one other edit you made which is, that the party that's designating materials as confidential would have to go through the material and identify which portions are confidential and which are not.

MR. LAROSIERE:  Oh, okay.  Yeah, so that's -- let -- I think that's assumed within the first part.  So, and I think that's a sub-point.  Do you want to talk about that?  Because I have an pretty easy way of dealing with that.

MR. DE PURY:  Yes, let's go ahead.

MR. EVERMAN:  Sure.  However, you'd like to

address it.

MR. LAROSIERE:  So, the way we handled this before is, you know -- for example, let's say there's a chat-log, right?  And there's one part of the chat that is really, you know, protectable business information and then, the rest of it is not.  So, what we do in that situation is, we put the confidential marking, the designation, on that part of it.  And so, that can be done a myriad of ways.  Like, for example, you can just put confidential.  And then, have lines extending up and down for the confidential portion.

And so, the way I've done this in the past is that, if a page of material -- so when we're dealing with, like, things that are printed, if a page of material is completely confidential, it's marked, confidential, top and bottom, right?  If only a part of it is confidential, you mark that part.  And that just makes it easy.

And if it's not a like normal document, like, you know, for example, there's code.  You put it in a folder and the folder is marked confidential.

MR. EVERMAN:  I've never done it that way.  And that would be incredibly burdensome for the document production that we are preparing to make.  There are voluminous documents, both in terms of document

numbers and page numbers.

MR. LAROSIERE:  Uh-huh.

MR. EVERMAN:  And a lot of it is, I think unquestionably confidential, but in order -- to have to go line-by-line and page-by-page to, what's likely to be thousands, if not tens of thousands of pages of confidential documents is just incredibly burdensome.

If the -- the way that I've always done it, is if we designate a document as confidential and then you want to say, use it in a public filing.  And you say, "I'm only going to cite, you know, this page four and these lines."  Can we agree that that doesn't not need to be filed under sealed?  Those four lines that we're relying on is not confidential?  Then we can confer and agree and say, "Yeah, that's fine, we agree."  If you, you know, just want to submit that limited portion, that limited portion doesn't reveal any confidential information, even if the document is contained within does contain confidential information.

Otherwise, it's just incredibly burdensome.  Like it's already very burdensome to respond to this discovery that's been served.  There's been another round of requests served over the last couple days.  I haven't had a chance to go through those yet.

So, I'm not sure how much of that is seeking confidential information.  But I don't see any need for it on the production side.  Especially when we know that the vast majority of those documents are never going to be used for anything.  You know, if they are relevant to some argument then I think we can address, like, the line-by-line, or sections of the document and whether they're confidential at that point.  That would be much, much less burdensome.

And I think accomplish the objectives that you're trying to accomplish.  Which is not being overly restricted to disseminating non-confidential information within an otherwise confidential document.

MR. LAROSIERE:  Uh-huh.  Yeah, so, I hear you.  Some of this is just the natural unforeseeable result of making these types of allegations, right?  Like, we have the right to test these allegations.

And you talked about burden and I'm with you.  Dealing with this stuff is burdensome, but when we look under Rule 26, the burden lies on the designating party.  It's very clear.  The burden is on the person who's asserting confidentiality.  Which is extraneous to the ordinary rules of civil procedure.

So, here's the other problem.  When you're talking like -- when you make such a designation

ordinarily, you're certifying to the other party that you have checked and found the protective information inside.  Okay?  So, that doesn't get done in a vacuum.  You have to find the thing that was confidential.

So, here's what I'm saying.  There's things that are obviously confidential, right?  Like, the tax returns, that's obvious.  You don't need to go through every page and da, da, da, da, da, right?  The only times that this is a problem is -- what I feel like you're -- where I feel like this is kind of going is where -- and look, I have two years of experience litigating against your client.  They mark everything confidential, everything.

Well, number one, they won't produce anything until they are compelled.  Number two, they mark everything confidential.  Your clients in another case marked as highly confidential, a public domain manual from the German Army about a transmission.  Marked it as confidential.

The burden there, right -- like, you don't get to over designate and then just shift the burden on the other party.  The burden is on the person that's serving it.  So, I don't see how it could be so difficult to say, "Oh, I looked through this document.  I found something confidential.  It's on this page."

You know, it's -- and when everything else is not.  That's different from when you're like, "Oh, wow, this is a sensitive discussion.  This is source code, whatever."  Obviously, you mark the whole thing confidential.

So, I guess my question is, if you found confidential material in an otherwise non-confidential document, how is it burdensome to only mark the confidential material versus having to mark every single page?

MR. DE PURY:  I'd like to interject also.  I'd like to know how it's less burdensome to go through the documents as the rule requires and find the confidential information and just mark those pages than it is to allow the other side to mark everything as confidential.  And then, have the other side as Matt just said, switch with burden, have them then propose to you, "Well, we want to enter these lines 12 through 14, lines this."  We have to have our meet and confer.  We probably won't agree.  We get in front of a judge.  This already -- each one is going to take a week, which we don't have.  How is that less burdensome?  What you're proposing, it seems twice as burdensome than, you know, than, you know, than just doing it the way the rule requires.

MR. EVERMAN:  Which rule are you referring to, Gary?

MR. DE PURY:  Was it Rule 26 that says the burdens upon you guys?  And that's what I'm trying to figure out.  How's it less burdensome for you to just mark everything confidential?  And then, us to say, "Oh, well, we really want to use this portion."  And then, we have to have a meet and confer.  No one's going to agree.  More court reporters, more court time, more angry judges and magistrates.

And what I'm hearing is that you haven't gone through this to -- what you -- to provide or seem to know what's confidential.  You're saying it's too burdensome to do that, that's required.

MR. EVERMAN:  Gary, I disagree with the way you guys are framing this issue.  I mean, I provided case law that supports my Protective Order.  You guys are just kind of telling me the way you think it should be done.  I'm not aware of these rules as you're framing them right now.

If you guys want to send me some authority supporting your positions on this issue, I will consider it.  But otherwise, I think that our position is -- is well-supported by the case law.

MR. LAROSIERE:  Okay.  So, you're -- here's what

I'm going to do.  I'm going to send you some case law that makes it clear that the burden is on the person asserting confidentiality.

MR. EVERMAN:  I agree.

MR. LAROSIERE:  From the 11th Circuit.  And --

MR. EVERMAN:  I agree with that.

MR. LAROSIERE:  Okay.

MR. EVERMAN:  Yeah.  But the burden is not a high burden at this point.  If we're saying it is and I send you the cases, right?  If we want a Protective Order.  The party that is seeking the Protective Order bears the burden, right?

MR. LAROSIERE:  Agreed.

MR. EVERMAN:  Okay?  But Rule 26, expressly says that a Protective Order should or can be issued to protective the disclosure of confidential commercial information.

MR. LAROSIERE:  Uh-huh.

MR. EVERMAN:  Now, if this is something that's done in the course of our client's business, that is private, commercial information, that's entitled to protection, period.  It doesn't need to be a line-by-line, sentence-by-sentence review of every document that gets produced.

And that's not -- that's just -- I've never heard

of that.  If you guys have done it that way, that's news to me.  Because I've never once seen a case where somebody goes line-by-line through thousands of pages of documents and goes, this is confidential, this is not.

MR. LAROSIERE:  Okay.  Well --

MR. DE PURY:  But you're -- if I may?  You're asking us to go through the documents.  Stating the entire documents confidential.  And then, we say, for instance, the German transmission.  We find some information on the German transmission.  We want to publish that to the court.  We have to meet and confer with you.  If you don't agree, we have to go back to the court.  You're going to argue that's less burdensome on all the parties?  Is that what I'm understanding?

MR. EVERMAN:  There is a procedure for how that would be resolved is set forth in the Protective Order that I don't think you've read yet.  But, yes, there's a good faith control, that if there's a disagreement about a confidentiality designation, the parties would try to resolve it.  That's consistent with the local rules.

MR. DE PURY:  Right.

MR. EVERMAN:  So, I don't think that that's

somehow shifting or creating a new burden on you. It's in a practice, the way it's always happened for me, I've never had to dispute about this.  Where I've had to actually go to the court.

If somebody says, "Hey, this German manual you said is confidential, we don't thinks it's confidential."  If it was improperly designated as confidential, I've always, in my practice, said you're right, I will take that designation back, feel free to file it.  Like that's not that hard.  That's not that much of a burden, to just point it out.

And if there's a legitimate dispute then the court can decide if somebody's being unreasonable. That's how every other discovery dispute is resolved. I don't see why there needs to be some other sort of procedure for confidentiality designations.

And that -- maybe you had bad experience.  I mean, obviously, you're kind of bias.  But I don't know that my client would agree with you.  But I was not involved in those cases.  And if I'm the one that's designating these documents as confidential, I'm not going to be purposefully over-designating documents as confidential.

And what's confidential depends upon the definition that we agree to in the Protective Order

that the court gives us in the Protective Order, which we don't even have agreement on, so...

MR. LAROSIERE:  Uh-huh.  We're just talking about that one sub-point, right?  And so, maybe we can resolve this by addressing the broader issue.  Which is, how are we going to define protectable information?  So, I think maybe we're chasing each other's tails, because we both don't have the same idea of what that is.

So, do you guys want to turn to the proposed confidentiality agreement?  And let's just talk about what -- what we think should be in there and maybe we can agree.

MR. EVERMAN:  Okay.  I have it -- I have it up in front of me.

MR. LAROSIERE:  Yeah, me too.  Oh, no, I have the wrong thing up.  Okay.  I have it up now.  Does everyone else have it?

MR. DE PURY:  Yes.

MR. LAROSIERE:  At the bottom of page one, top of page two.  So, let's go category by category.  And see if we can -- and see what everybody thinks.  You've got A through G.  Which G, I think we can agree.  All right.  I'm in agreement on subpart G.  Which is anything that we agree, right?  It's fine by me.

So A, this is -- and, of course, everything is documents, information, testimony and other materials that, hey, are not generally known to others and have competitive value.  Such that, unrestricted disclosures to others would create a reasonable risk of injury.

Now, I think that this is almost there.  I just -- I think that the only thing we need to change it to is irreparable harm, because that's what the case law addressing confidential things really hinges on.  Is that, you know, the outside disclosure causes irreparable harm.

MR. EVERMAN:  Send me that case law.  I've never seen that.

MR. LAROSIERE:  Sure, I'd be happy too.  I'm keeping notes of the case laws I send you.  But I mean, because -- just my problem with this is that injury, that could be anything, right?  I mean, you see my issue there?

MR. EVERMAN:  I mean, have you ever sought injunctive relief or litigated the issue of injunctive relief?

MR. LAROSIERE:  I have.

MR. EVERMAN:  In the irreparable harm standard is often primitive.  It often deems request for

injunctive relief, because the case law interpreting that is so high.

MR. LAROSIERE:  I -- I mean -- so, I was on the other side of a dispute like this.  And I found it to be pretty easy.  But, you know, we just might have different frames of reference there.

MR. EVERMAN:  Yes.

MR. LAROSIERE:  So, maybe we want to -- well, let's just -- so --

MR. EVERMAN:  If you send me the case law, I'll consider it.

MR. LAROSIERE:  But -- well, hold on.

MR. EVERMAN:  But we can move on.

MR. LAROSIERE:  Maybe we can find a middle ground.  What do you think?  I just think injury is too broad.  Can you think of something that's maybe in the middle?

MR. EVERMAN:  I don't even think injury is required.  If you look at case law, including one of the cases I cited to you.  There's -- the definition of what can be designated as confidential, you don't even have to prove the risk of injury.  So, I don't even think it's required.  You know, it's in there, because I think that's a reasonable condition to place.  So, that you are preventing parties from over

designating materials as confidential.  But I don't even think that's required.

MR. LAROSIERE:  Okay.  How about this --

MR. EVERMAN:  Rule 26 doesn't mention anything about injury.

MR. LAROSIERE:  That's all in the case law.  And you're -- and here's the problem.  A lot of the case law is assessing -- it basically comes out in contract cases, which, you know --

MR. EVERMAN:  Yeah, if you look at the cases I cited, for the years the one -- the first one.  The Hall case, the parties did not define commercial information, so, that's the court's definition --

MR. LAROSIERE:  Uh-huh.

MR. EVERMAN:  -- which did not require any showing of injury.

MR. LAROSIERE:  So, what was the court's definition of that case?  I don't remember.

MR. EVERMAN:  If you take a -- if you take a look on -- I can read it for you.

MR. LAROSIERE:  Yeah.  If you have it front of you, let's hear it.

MR. EVERMAN:  Sure, because I understand your point.  That is the parties agree to it, it's sort of, you know, the court's just interpreting their

agreement as opposed to imposing its circumstance.

MR. LAROSIERE:  Right.

MR. DE PURY:  And that's kind of the basis of all the case law is that it's interpreting -- interpreting most individuals cases and giving us guidance.  But if we agree that we that we can only look at this on Tuesday's and Thursday's.  And we're all in agreement, the court's going to -- we don't have to point to other case law that says, "Oh, you know, well, this other -- you know, Smith v. Jones, didn't do that."

MR. LAROSIERE:  Exactly.

MR. DE PURY:  So, I think if we can come to an agreement then -- you know -- well, I think --

MR. LAROSIERE:  I mean, it might be resolved by what the court said there.  So, I just want to hear it.

MR. EVERMAN:  Sure.  It says -- oh, here it is.  "Confidential information shall include a non-public information that qualifies for confidential treatment under Rule 26(c).  And that the designating party considers to be, and treats as confidential.  Including, but not limited to, non-public, proprietary and confidential, technical, commercial, financial, personal or business information, or other valuable information covered by legitimate privacy right or

interest."

MR. LAROSIERE:  Why don't we just put that?  Why don't we just A that and then G, the parties otherwise agree?

MR. EVERMAN:  Let me -- let me -- let me think about that.  That -- I mean, that sounds -- that's sounds fine.

MR. LAROSIERE:  Because here's like the -- you know, I think that's way simpler because, you know, here -- like, the words are not generally known to others.  You know, what the hell does that mean?  You get what I'm saying?

MR. EVERMAN:  Yeah.

MR. LAROSIERE:  Like, you know, if you -- if you've given it to people who aren't under some contract, I don't think it can legitimately be considered contract -- right?  Like, if it gets -- like, you get what I'm saying.  But I -- I don't see a problem with the language in that case.

MR. EVERMAN:  Yeah, I don't -- I dont' think I do either.  You know, I want -- I want to just double-check something before I confirm, but...

MR. LAROSIERE:  Uh-huh.

MR. EVERMAN:  Makes sense to me.

MR. LAROSIERE:  I mean, I think that would

resolve just about everything.  Well, at least as far as the definitions go.  And then I think that would probably resolve the subpart problem.

But like -- I mean, do you feel pretty confidently that we might be getting close to an agreement?  You said you have to check.  I'm sure that's going to take you more than a minute.

MR. EVERMAN:  I mean, on this paragraph one, yeah, I think it would resolve all of our disputes on paragraph one.

MR. LAROSIERE:  Yeah.

MR. EVERMAN:  Subpart issues, it still seems like -- I see there's -- I just noticed this one edit on paragraph two.

MR. LAROSIERE:  What did I do?

MR. EVERMAN:  You struck the word might.

MR. LAROSIERE:  Oh, yeah, that's -- and I put will, I think.

MR. EVERMAN:  Let me look at that line.  That doesn't strike me as problematic.

MR. LAROSIERE:  Yeah.

MR. EVERMAN:  I think the other one, the other edits though are still problematic on our end.

MR. LAROSIERE:  Uh-huh.  Yeah, no, and that's the -- that's the next part.  Which -- we'll get into all

of this.  Like, Gary?

MR. DE PURY:  Yeah, go ahead.

MR. LAROSIERE:  What do you think of that -- of that solution, I proposed?

MR. DE PURY:  Well, on with replacing that first paragraph where the definition -- yeah.

MR. LAROSIERE:  Well, no, it's replacing everything except things we like -- so, it's basically getting rid of A through F.  And just putting what the definition the court adopted, which is really a -- you know, an implementation of the law.  And I -- and I was very comfortable with that because that's --

MR. DE PURY:  Was that --

MR. LAROSIERE:  Yeah.

MR. DE PURY:  -- all three, they are not important.

MR. LAROSIERE:  Yeah.

MR. DE PURY:  I have no issue with that.  I mean, the only -- it gets rid of the vagueness and ambiguousness.  I think the one thing about that -- the, any parties to children is in there somewhere?  No one's ever going to cite any kids.  It -- you know, I wouldn't even recall in a case where they find -- (inaudible).  You know, but leave it in there, I get it.

But other than that, I think if we replace that with something the court talks about, that does that minor thing, we're done with that paragraph.  Zoom.  Zoom.

MR. LAROSIERE:  Yeah.  And I would -- I would just -- you know, like I said, I wouldn't agree to leaving in the information about -- because it's too vague.  But I think that -- and I think right now, I think you and I are on the same page, at least as far as what I'm suggesting.  And, of course, you've got to confirm, but I think we're on the same page.

So then, the other strikes were -- so, you don't have a problem with the might?  It's a small thing.  It's, you know, or well, you don't immediately see it as problematic, you're not agreeing to it right now?

MR. EVERMAN:  Yeah, if you just want to give me a second to read it more carefully, because I'm not -- I just didn't look at it earlier.  Sorry.

MR. LAROSIERE:  With the might part?

MR. EVERMAN:  Yeah.

MR. LAROSIERE:  Okay.  Go ahead.

THE COURT REPORTER:  Could we take a quick bathroom break?

MR. EVERMAN:  Yeah.  Yeah.  No, I'm sorry, yes.  I'm sorry, I agree to start your edit and the

restroom.

MR. DE PURY:  On a comfort break.

THE COURT REPORTER:  Yeah, could we take a five minute comfort break, please?

MR. DE PURY:  Yes.

MR. EVERMAN:  Works for me.

THE COURT REPORTER:  Okay.  Thanks.

MR. DE PURY:  Okay.  It's three -- right now -- okay, by three -- let's say 3:10.

THE COURT REPORTER:  Well, it's 3:07 now.

MR. DE PURY:  Oh, yeah, I'm looking at my watch not a clock, so 3:15?

THE COURT REPORTER:  Yeah, that's fine.  Thank you.

MR. DE PURY:  Okay.  I got to adjust my watch.

(Break taken)

THE COURT REPORTER:  Thank you for the break.

MR. EVERMAN:  Thank you.

THE COURT REPORTER:  I'm ready.

MR. LAROSIERE:  Gary, you're muted.

MR. EVERMAN:  I think Gary's going to ask you something real quick.

MR. DE PURY:  I think -- I think we all needed it.  And I've been drinking a ton of tea, too.  And so, just -- oregano tea and regular tea, all the time.

All right.

Does that wrap that up, as far as those paragraphs?  And also, I think we had a couple of other things.  Howard, we said we're going to have a -- trying to fit in this spoliation theory that you have, as well.  I want to address that.

MR. FOSTER:  Okay.

MR. DE PURY:  And I also want to address why I can't get a response from my e-mail, about why you changed the deposition of Peter Celentano.  I've asked that question about six or seven times.

MR. FOSTER:  Okay.  Can I speak?  Am I on mute?  Or un-muted or --

MR. DE PURY:  We can hear you.

MR. FOSTER:  You can hear me?

MR. DE PURY:  Yes, sir.

MR. FOSTER:  Okay.  I am trying to restore my --

MR. EVERMAN:  I don't think we finished the --

MR. FOSTER:  -- I am trying to restore my --

MR. EVERMAN:  -- about the --

MR. FOSTER:  -- video for that.  Can somebody tell me how to do that?

MR. LAROSIERE:  Your video is on.

THE COURT REPORTER:  Just a second.  So, just a second.  So Mr. Everman was saying that he felt that

something wasn't addressed.

MR. FOSTER:  Well, I heard -- I heard.

MR. EVERMAN:  We haven't finished the Protective Order.  That's fine if you guys want to discuss this first.  We can go back to the Protective Order.

MR. FOSTER:  Well, like -- what about the, yeah -- what about the Protective Order?  Is it not done?

MR. EVERMAN:  I mean, there's no agreement.

MR. LAROSIERE:  I think we're all --

MR. DE PURY:  I was just retapping the agenda with all of it to make sure that we try to get all of this in, but we are going to run out of time very quickly.  So, how are we on the Protective Order? I only had a couple things I wanted to address on the Protective Order.

MR. LAROSIERE:  Well, colleen, do you still have that hard stop?

THE COURT REPORTER:  No, I can go a little bit longer.

MR. LAROSIERE:  Okay.  I don't think we'll take too much more time, but I -- we can go back on the record now.  And I'll pick up the discussion with Mr. Everman.

THE COURT REPORTER:  Okay.

MR. DE PURY:  Thank you.

MR. LAROSIERE:  Yep.  Okay.

MR. FOSTER:  Can I -- Gary, I can address either of these two points.

MR. LAROSIERE:  Well, wait.  Some --

MR. FOSTER:  The Celentano deposition and this spoliation motion.  And in any order you want to do it.

MR. DE PURY:  Let's finish this up and we'll -- we're progressing here, but I just got that -- but I do want to get to on here.

MR. LAROSIERE:  Yeah.  So, no Brendan, I think we're -- we're good on paragraph one, which is the meat.  Well, I mean, we might be good.  You'll follow up with us.

MR. EVERMAN:  Yeah, I think we're going to be good with them, I just going to double-check something.

MR. LAROSIERE:  No, that's great.

MR. EVERMAN:  I'll let you know.

MR. LAROSIERE:  That's the meat.  And so, now well' just do the potatoes, which is -- and basically, all I'm asking for, and I understand you might have a problem with the way I drafted it because it shall, right?  The court's going to be giving force to this agreement.  I -- and let me also just tell you this,

Brendan, I think we've had a great working relationship ever since you've come into this case. I do trust you.  I don't think you're going to be making improper designations.

But given -- just given how the litigation has gone, we just need some assurance in the case of improper designation.  So, we can soften it or something.  But I want our agreement to specifically say that -- and we don't have to say, shall pay or whatever, but the agreement, I think should say that an improper designation -- we can say, may result in sanctions, such as attorney fees.  What do you think?

MR. EVERMAN:  I mean, I think that's probably fine.  I want to -- I do think I would want to think about that a little and see exactly what the language looks like.  If you could tweak the language.

I would say under the current rules, like that -- like that already exists.  So, I don't think it's necessary.  But I also don't think that it would necessarily be shifting the burden.

MR. LAROSIERE:  Uh-huh.

MR. EVERMAN:  Again, I think that in the event of an unsuccessful challenge to confidentiality, I would want it reciprocal.  Because things -- it looks at this point, either all or most of the confidentiality

designations are going to be coming from our side. So, I think that if you want to put in a provision saying, "If we over designate documents as confidential than we maybe be sanctioned." But I would also want that reciprocal to say, "If you over challenge, if you unsuccessfully challenge our confidentiality designations than that may result in sanctions, as well."

MR. LAROSIERE: Okay. So, here's what I'm going to do. I had something from a Protective Order that was a model Protective Order in the Middle District that had this. I couldn't find anything from the Southern District. I'm going to send that to you. And, you know, I think we -- I think we've had good success like, you know, by looking at things that other courts have already done. So, I think that might be the best path forward. And I think that one was reciprocal.

MR. EVERMAN: Okay.

MR. LAROSIERE: And we can treat it to be reciprocal, if it's not. Okay.

MR. EVERMAN: Okay. Yeah, I mean, Rule 57.105. And I'm not sure if that would really apply here, but, you know, but that generally provides that a contract entered into in Florida that provides for fees

one-way.  And, you know, it provides them the opposite way, regardless of how the contract is drafted, so.

MR. LAROSIERE:  Yeah, you know, 57.105 is a dirty word in this conference.  We are --

MR. EVERMAN:  Yeah, right.  But -- you know, this is the under ledge part of 57.105, not the frivolous filings --

MR. LAROSIERE:  Yeah.

MR. EVERMAN:  -- but the reciprocity of attorney's fee and --

MR. LAROSIERE:  Yeah.  The -- that's -- I think that 57.105 is unconstitutional, because only the Supreme Court of Florida can regulate lawyers.  But, I digress, so, I think -- I think we're done on the Protective Order, at least for now?

MR. EVERMAN:  I mean, I -- I -- I don't think we've reached agreement.  I'm glad we could resolve, or at least, we're getting closer to resolving all these other things.  But on paragraph four --

MR. LAROSIERE:  Which is that?

MR. EVERMAN:  -- about the issue of -- only, like, specifying which portions of a document are confidential.

MR. LAROSIERE:  I have a suggestion that you might like.  And I will provide it to you.  This is,

again, from the Middle District order.  And it's a lot softer than the language I used.  So, and it says, like, to the extent practicable and it's not like a hard requirement.  Would you be okay with something like that?

MR. EVERMAN:  Send me the language and --

MR. LAROSIERE:  I'll send it over.

MR. EVERMAN:  -- and I'll consider it.

MR. LAROSIERE:  Yeah.  And then we'll --- you and I can talk about that later.  I think -- I think we can get this done.

MR. EVERMAN:  I mean, like -- because here's -- here's one example, right?  And I don't want to make everybody stay here all night.  But one of the documents that we were going to produce are data security reports.  Our client hired a company to, you know, test the data security of its network.

Now, a report like that typically has many, many pages.  I haven't reviewed this one yet, so I don't know what ours looks like.  But I've seen them in other contexts.  It could be very long and I think we would probably agree that most of it is confidential, to the extent that it describes our clients' data security practices and systems.  And has other information in there that could be relevant to

somebody seeking to compromise or exploit the vulnerability with respect to that data security. It may also have pages of filler, of background information about the data security company that performed the review, about how great they are and what kind of process they followed.

MR. LAROSIERE:  Uh-huh.

MR. EVERMAN:  It has nothing to do with their clients' data security.  You know, so it's something like that.  I don't want to have to go through page-by-page and make that determination of, well, you know, is this really confidential?  Is this on their website?  And we're going to have to go search.

MR. LAROSIERE:  Yeah.

MR. EVERMAN:  Is this the description of their experience, is this confidential?  And then, go line-by-line --

MR. LAROSIERE:  No, I think we're actually in more agreement than you might think.  Because I envisioning a chat-log is what I'm envisioning.  And your -- and, like, I totally get it from your perspective.  But I think this is something that, when I hand you this language, I think it might just be solved and we can just hop on the phone later, you and I, and just iron out that wrinkle.

MR. EVERMAN:  Okay.  Yeah, and I don't -- I don't know chat-logs, so I'm not sure how that would work.

MR. LAROSIERE:  All right.  Yeah, but all right. No, that's -- that's fine.  So, you think we're good now?

MR. EVERMAN:  Yeah.  So I think -- I think that we're probably in agreement on one.  I think we're definitely in agreement on two.  And I think you're going to propose language in paragraph four.

MR. LAROSIERE:  Uh-huh.

MR. EVERMAN:  And then paragraph thirteen.

MR. LAROSIERE:  And we'll talk about it if we have to.

MR. EVERMAN:  Yes.

MR. LAROSIERE:  Okay.  I'm going to get that done to you if not today, then tomorrow.

MR. EVERMAN:  Okay.

MR. FOSTER:  And, of course, this is all -- you know.  The judge ultimately has to enter this agreed order.

MR. EVERMAN:  Right.

MR. FOSTER:  I mean, he probably will, but sometimes -- sometimes they don't.

MR. EVERMAN:  It would be ideal too if we could get this resolved one way or another, sooner rather

than later, since we're all --

MR. FOSTER:  I agree.

MR. EVERMAN:  -- heading to West Palm on Friday anyway.  If, you know, we're down to one issue.

MR. FOSTER:  Do you think the magistrate can enter this or does this judge Middle Brooks?

MR. LAROSIERE:  The magistrate can enter it.

MR. FOSTER:  Okay.

MR. EVERMAN:  Yeah, I agree.  I think that -- yeah, Judge Matthew anyway, enter it --

MR. FOSTER:  Well, if you do come to an agreement, hopefully you do, maybe one of you can submit it to Judge Matthew before Friday?

MR. LAROSIERE:  We're going to do our best.

MR. FOSTER:  Yeah, right.  Okay.

MR. EVERMAN:  Yep.

MR. FOSTER:  Okay.

MR. EVERMAN:  We can do that.  We can submit it if we obviously have an agreement.

MR. LAROSIERE:  And also, we can -- you know, if we agree, it will be joint.

MR. EVERMAN:  Right.

MR. FOSTER:  Well, okay.  All right.  So, can we move on from that?

MR. DE PURY:  One moment.  One moment.  The only

issue I had on the entirety of that is that I adopted Matt's changes to paragraph eight.  Where if there's anybody that's served subpoena, they have to notify everybody in writing within 10 days.  I'm in full agreement.  I want it defined in writing, because there's some contention of this.

I want to make sure that we specify e-mail is adequate, but that it will be replied to.  So, there's no contention later of, "Oh, well, I didn't get an e-mail."  I'm still missing Howard's 12:41 a.m. e-mail.  I can't find it anywhere.

So, I'd just like to alter paragraph eight to say that, in writing, you know, let's define in writing, that's it.

MR. EVERMAN:  Gary, can you extend us a redline with the language you want to insert?

MR. DE PURY:  I can.

MR. EVERMAN:  That sounds fine to me.

MR. DE PURY:  It makes sense.  It's just one of those things that -- okay.  The next thing on the list is -- well, Howard, we wanted to discuss those two items that I brought up a moment ago.

MR. FOSTER:  Yeah.  Before we do that, Gary, can I get back to my expert, because he has responded to my inquiry about his schedule.

MR. DE PURY:  Yes.

MR. FOSTER:  All right.  He says, "The week of 20th, he is at Army Reserve duty, "I have orders for that.  If you needed to see them."  He is not available the week of the 27th.  "I will be in Arizona that week to attend a training course."  So, I was wrong, it's not camping, "It is not military duty and it has been scheduled for some months."

And he gave me a description of the program, I actually see it here.  It is a -- the program is entitled -- and he paid for this program.  It is entitled -- it's a weapons training course, which I think is related to his military service.  But that's what it is.

MR. DE PURY:  What's the name of it?

MR. FOSTER:  A hand gun -- okay.  Well, it's called -- or whatever.  It's called -- okay.

MR. LAROSIERE:  Can you just forward the material and the course on it?  And then we will --

MR. FOSTER:  No, I'm not sure I'm at liberty to do that.

MR. LAROSIERE:  Okay.  Well, so then here's --

MR. FOSTER:  I would have to ask him about that, okay, before I forwarded it to anyone.

MR. DE PURY:  Well, if that's his reason for no

attending then I think we are entitled to see it, because, again --

MR. FOSTER:  Well --

(Cross-talk)

MR. FOSTER:  Wait.  Wait.  Assuming he paid for a course, are you accept -- will you accept that, or are you --

MR. LAROSIERE:  Okay.  Let me say something, because I'm very familiar with these things.  And he -- he said, it's not related to his military service.

MR. FOSTER:  No, he didn't say that.  He said --

MR. LAROSIERE:  You read that out loud, Mr. Foster.

MR. FOSTER:  That was my conclusion, he didn't say that.

MR. LAROSIERE:  No, he -- you -- at first said, I think it is related and then you read from the e-mail, it's not related to my military service.

MR. FOSTER:  He said -- hang on.  Hold on.  I know you're always quick to reach conclusions for me, Matthew.

MR. DE PURY:  Well, we are listening to what you say, your words.

MR. FOSTER:  Okay.  He said, I am reading it out from his e-mail.  He says and I quote, "I am not

available the week of the 27th.  I will be in Arizona that week to attend a training course.  It is not military duty and it has been scheduled for months."

MR. LAROSIERE:  Okay.

MR. FOSTER:  That's what he said, unquote.  Now, I'm just surmising if it's about weapons training, maybe it's somehow related to military.  I don't know, whatever.

MR. DE PURY:  It is not.

MR. FOSTER:  He's going to a seminar -- here, let me finish.  And the subject of it is, it's a defensive pistol class.  And he paid for it.

MR. LAROSIERE:  I'm familiar with this class.

MR. FOSTER:  You are?

MR. LAROSIERE:  Yes, I'm a competitive shooter.

MR. FOSTER:  Okay.

MR. LAROSIERE:  This is not -- this is purely recreational and I am not --

MR. FOSTER:  Okay.

MR. LAROSIERE:  -- I would like you to forward the materials in the class.  If it's -- you know, and we'll decide, defense counsel together.  But I'm not convinced that we should be prejudiced because he wants to enjoy his shooting week.

MR. FOSTER:  Well, then that's going to be up

to the -- probably a judge.  But he says that he is willing to go to Miami to be deposed, if he is reimbursed for the trip.  Which I believe -- I'll look at the case law on that, but I believe that you do have to pay him for this time and travel expenses, if you want him to come.  I believe you do.  But I will check on that.

MR. LAROSIERE:  Yeah, well --

MR. FOSTER:  If -- if you do have to pay for his time and his regular hourly rate, are you willing to do that?

MR. LAROSIERE:  I don't think that we have to. We're going to look at the rules and the case law. And then --

MR. FOSTER:  Okay.  We'll both -- we'll do that. But if you are -- are you willing to -- are you going to do that?  Are you going to comply?

MR. LAROSIERE:  Howard, if I'm required to do something, I have to do it.

MR. FOSTER:  Okay.  I'm just asking.  So, that's -- I mean, okay.  Now...

MR. EVERMAN:  It's pretty clear.  The rule is clear that you do have to pay for the opposing expert's time, because you're the one that's in control of the deposition.  But anyway, we'll all look

that and you guys can form your own --

MR. FOSTER:  We'll look at that, right.  And then --

MR. EVERMAN:  Travel expenses.

MR. FOSTER:  I don't know -- I know that he has to appear in the jurisdiction where the case is being litigated.  He's required to do that.  But you may have to pay for his travel costs to do that.

MR. LAROSIERE:  We're wasting time because we don't know.

MR. FOSTER:  Okay.  So, both of us will look at that.  I will look at that, you'll look at that.  I'll send you my authority and you send me yours.  Okay.

MR. LAROSIERE:  I'm going to tell you, frankly, if we determine that we are going to have to pay for it, it's probably going to make better sense to just let him do it remotely.  And then, we'll figure how to -- and probably the cleanest way is that we'll all agree that this is the way we're going to handle the documents.  And we'll all agree that it's okay.

But also, I'd like you to follow up with him and ask him if he would take an evening from -- because I know those training courses.  And they start at usually about 7:00 a.m. and they're usually done around lunchtime.

So, if he'd be willing to do it remotely during that week, we might be able to resolve all of this. But --

MR. FOSTER:  Are you saying -- wait.  Hang, hang on.  If you start a deposition in the afternoon --

MR. LAROSIERE:  Afternoon Arizona time would be --

MR. FOSTER:  Yeah, I mean, do you anticipate going for a full seven hours?

MR. LAROSIERE:  Probably not.

MR. FOSTER:  Probably not, I would think not with an -- with an economist.  I'll ask him about his availability while he's at this course.  Okay?  In that case -- as you acknowledge then that definitely would be remote?

MR. DE PURY:  No, we didn't acknowledge that it would --

MR. FOSTER:  Unless you want to go to Arizona?

MR. DE PURY:  -- may I finish a sentence, please, sir?

MR. FOSTER:  Yes.

MR. DE PURY:  I do -- I do very well not to talk over you.  We've had this discussion at every meet and confer.  We did not acknowledge that we would absolutely do it remotely.  We said, once we look at

the rules and if that's what --

MR. FOSTER:  Yeah.

MR. DE PURY:  -- the situation is.  But I'm going to say this, if he's just on a weekend trip to -- then that will probably come up on Friday when you guys are discussing everything else with the judge.  And I'll remind you, the reason we are on limited time to depose your witness is because first, you would not look at the rule or the attorney called it a rule. I -- once the judge signs an order, I consider it a rule.

MR. FOSTER:  Okay.  Gary, this is not productive.

MR. DE PURY:  I'm going to finish my sentence --

MR. FOSTER:  Please --

MR. DE PURY:  -- I'm going to finish my sentence. I would remind you that we're here because the court's order -- you refused to interpret the court's order. The court was very clear that is was your argument was without any merits.

MR. FOSTER:  Okay.

MR. DE PURY:  And that's why we're here.  I am not finished.  That's why we're here.  And now you telling us that we can't depose him, because he has a -- I've been to Gunsite, Matt's been to Gunsite.  You refused to tell us the name.  Those are the most

famous training program in that part of the world. And I'm -- it's nothing but a big party for gun enthusiasts.  And I'm telling you if the judge, who's probably -- I am pretty sure our judge is pretty liberal, he's not going to appreciate that your guy can't be deposed because he wants to go play with pew pews for the weekend.

MR. FOSTER:  Why -- we gave you some dates in April, why didn't you take either one of them -- three of them?

MR. DE PURY:  Okay.  I am going to reiterate. You gave us the 16th, correct?

MR. FOSTER:  I believe so.

MR. DE PURY:  All right.  And I have already -- I -- before you gave us the 16th, I made it very clear, I'm not available on the 16th.  Because you already decided you want to re-depose Mr. Holloway -- Holliday on the 16th.  And I told you, I'm unable -- I'm not available on the 16th.

MR. FOSTER:  Are you willing to re-depose him? I thought you were not willing to do that?

MR. DE PURY:  Then you gave us the 17th.  And on the 17th, you're not available, because you're going to Miami, to West Palm Beach.  And you gave us one other date.  And I sent out six e-mails saying, are

you willing to give us more than just the one date? Because I don't know if my fellow counsels are available on that date. Okay. You've given us impossible dates.

MR. EVERMAN: Okay. Gary -- sorry, I'm not sure any of this is constructive. I understand the point. When we gave you the 17th, that hearing wasn't scheduled. So, obviously, we have --

MR. DE PURY: I said that.

MR. EVERMAN: -- but we haven't gotten you the documents you need for the deposition anyway. We haven't finalized the Protective Order anyway's. So, we need to -- all these things we need to work out. So, those dates, I understand, it didn't work. We thought they might work when we gave them to you, but as time has passed, obviously they don't work anymore.

MR. DE PURY: Yeah. Okay.

MR. LAROSIERE: Let's move on. Let's move on. This is not --

MR. FOSTER: Why don't we move on from this? I will -- I will ask him. I'm not sure what you want to know actually, about this gun thing he's going to.

MR. EVERMAN: I think the question was whether he would be willing to do a remote deposition that week in the afternoon, if he --

MR. FOSTER:  I can ask him that, but I am not --

MR. LAROSIERE:  Let me bone crushingly clear now. I'm going to be devastatingly clear now.  And I'm going to harness everything I can of the English language to make this as clear as possible.

Mr. Foster, I am asking you to ask your expert if he would, during his seven day Gunsite party, which I know what it is, be willing to be remotely deposed, so that we can avoid having to go to the court?  And I'm now going to tell you -- I see you opening your mouth to interrupt me.  I'm now going to tell you, if you won't do that, I'm not convinced that him wanting to go to the gun party, is a reason that we should be further prejudiced by not taking his deposition.  And then we're going to have to promptly notify the court. I don't want to do that, because the court has admonished us so many times.

So, I'm offering this olive branch of, hey, let's potentially do it this way, so everybody can have there cake, right?  But -- and so, everything's going to hinge on your response to that.  Okay?  And you can give us --

MR. FOSTER:  Are you asking your -- you know what, Matthew --

MR. LAROSIERE:  Ask me and we'll figure it out.

Okay?

MR. FOSTER:  And I'm noting that you're said -- telling -- you categorized this whole thing as a party.  So --

MR. LAROSIERE:  Well, it is, I've been there.

MR. FOSTER:  Okay.  Let's move on.

MR. LAROSIERE:  Is it not Gunsite?  Mr. Foster, is it Gunsite?

MR. FOSTER:  I'm not answering any questions about it beyond what I told you.

MR. LAROSIERE:  Okay.

MR. EVERMAN:  Well, I'm not sure -- I'm sure with that information we can all figure it out.  The gun enthusiast -- you can figure it out.

MR. LAROSIERE:  So, it's -- well, anyway just because he knows I've caught him and so now he's squirming and that's fine.

MR. DE PURY:  It's actually not related to the military, the military frowns upon Gunsite for many people because --

MR. FOSTER:  He didn't say it was related to the military.

MR. LAROSIERE:  You did.

MR. DE PURY:  You did.

MR. FOSTER:  I did.  I thought it was.  Or -- I

thought it might be.

MR. LAROSIERE:  Anyway, Gary, what's next?

MR. DE PURY:  Howard's going to explain why he changed the deposition.

MR. FOSTER:  Yes.

MR. DE PURY:  Somehow.

MR. FOSTER:  All right.  So, my original plan was to do it remotely.  When we brought our motion for leave to do it, our local counsel prepared the motion as it was going to be done virtually.  Thereafter, we changed our minds.  My client wanted to do it in-person and we decided to do it in-person.  That's all, that's what happened.

Now, I understand, Gary, you -- are you claiming that you didn't know about the deposition being done in Ohio on that day?

MR. DE PURY:  Well, I'm just wondering why I had to pay for a court reporter to get an answer out of -- I sent six e-mails to you asking that same question.

MR. FOSTER:  Could you answer the question, Gary?

MR. DE PURY:  Would you please not interrupt me, sir?

MR. FOSTER:  No, I asked you a question, that's what we're here for answering each other's questions.

MR. DE PURY:  I was answering your question.

I've asked you multiple times.  You could have addressed that in your e-mail.  I wasn't planning on attending remote and you changed it.  You didn't give me an opportunity to jump, drop everything else and fly to -- to do a deposition.  And it's frankly, a little bit -- it's questionable because you committed to the court that you were going to do this via remote and then you unilaterally changed it.

MR. FOSTER:  Okay.  I get it.  Did you not see the notice of deposition?

MR. DE PURY:  I -- Howard, I did see it.  It didn't leave me enough time to change all my other plans and do it.  And I didn't object, because I realized that I an unable to just forward the transcript, but I really think it was -- your reasons are disingenuous.

MR. FOSTER:  Okay.  Are disingenuous?

MR. DE PURY:  Yes, sir.  I think that you unilaterally changing it, because your client wanted to and you didn't reach out to anybody else and say, "Hey, we're going to change this.  Is this going to create any hardship for anybody else to get there?"  You didn't do any of that stuff.  You just --

MR. FOSTER:  Mr. -- was in person.  You all saw the notice of dep and nobody asked -- nobody raised an

issue with me about it.

MR. DE PURY:  Correct.  We didn't, because at that point, there wasn't enough time to do anything about it anyway.  And I -- you're right, I should have.  And I'll also say this, I trust fellow counsel and opposing counsel typically, in everything I do.  And when someone tells the court they're going to do something and then they file a notice of taking deposition or a notice of this, or a notice of hearing, I don't expect they're going to slip something else in there.  So, I don't read it with a fine-tooth comb.  That's on me.  I should have read it with a fine-tooth comb.

From now on, everything you publish, everything you produce, I will read it with a fine-tooth comb.  And I will respond to it, I disagree, or I agree.  And this -- this case, you got one over of me is the way I see it.

MR. FOSTER:  All right.  I guess we talked about that and I think I've answered your question.  Do you want to move on?

MR. DE PURY:  What was the other -- yes, so I want to --

MR. FOSTER:  The other one is -- okay, we are going to bring a motion for spoliation sanctions.  And

it is based upon the fact, as I said in my e-mail that you were served with a litigation hold letter.

MR. LAROSIERE:  All right.

MR. FOSTER:  In conjunction with the Middle District litigation.  And your clients now, as I understand it in your discovery responses, are saying that they have no communications (indicating) to each other.

But they did make (indicating) communications on various platforms.  They just can't find them.  And it would seem to us that you have violated the litigation hold.

MR. DE PURY:  What -- what that -- what did that -- so -- you -- you are saying that -- when was that litigation hold letter served?  In --

MR. FOSTER:  Okay.  Okay.  Here's what I'm going to do.  All right.  I don't want to give you an inaccurate piece of information, Gary.  It's very important.  I'll get you the litigation hold letter by the end of the day, today.

MR. DE PURY:  Okay.  But -- but am I correct in thinking that, that litigation hold letter was served with all documents in relation to the -- to the copyright case?  Isn't that what this says?

MR. FOSTER:  I'm not going to answer this until I

have information -- I'll get you the letter.

MR. LAROSIERE:  Hold on.  I'll pull it up.

MR. FOSTER:  You have -- I think Matt, yeah, you probably have it.

MR. DE PURY:  Yeah.  I -- I think you should because we're here at a meet and confer and you're -- I mean, I'll say in the meet and confer, I am going to serve a sanctions motion that also -- so you already moved passed the meet and confer.  You're -- you're going to tell me, but you're not going to --

MR. FOSTER:  Here's what I'm going to do.  No, here's what I'm going to do.  I am required to meet and confer more specifically about this.

MR. DE PURY:  Right.

MR. FOSTER:  Put it on the agenda for today.  But I -- I undertake to have another meet and confer before we file the motion.  Okay?  Which will be more specific about -- okay.  You have to be very specific about these things, about what we exactly contend were destroyed.

MR. LAROSIERE:  Uh-huh.

MR. FOSTER:  Why we called on using violation of the litigation hold.  And I'd like to get back to you on that.

MR. DE PURY:  Just let Matt pull it up if he --

MR. LAROSIERE:  Yeah, I'm pulling it up, but I'm -- I have a -- because I know -- I know all about this.

MR. FOSTER:  You want to share it with us?

MR. LAROSIERE:  Yeah.  Hold on.  I'm actually pulling up the copyright case where it was filed.

MR. DE PURY:  So, that's not even this case?

MR. LAROSIERE:  No, well -- hold on.  Let's look at the letter.

MR. DE PURY:  Yeah, let's.

MR. FOSTER:  And before you get into the letter, I'll just point out also, Gary, in your client's deposition, Mr. Holliday said there were communications between him and Mr. Larosiere about this lawsuit and the Middle District lawsuit on various platforms and yet, he couldn't find any of them.

MR. DE PURY:  And --

MR. FOSTER:  Produce any of them.  You interrupted multiple times, but he said that.  Okay.  That also indicates potential spoliation.  And there's evidence right there.

MR. DE PURY:  Okay.

MR. LAROSIERE:  So, hold on -- hold on.  Let's -- let's get to this first.

MR. FOSTER:  Okay.

MR. LAROSIERE:  But I -- I think there's a couple problems that you might have already kind of flagged for yourself.  You know what, they actually did not attach this to their -- oh, wait, no.  It was in the -- in was when they filed 73 exhibits and were then reprimanded by the court for doing that.  One second.

So, I guess I just -- you know, aside from what was actually said at the deposition or not, which I was there and I don't think he said that.  I think that he said that he didn't know --

MR. FOSTER:  -- there's a --

MR. LAROSIERE:  But anyway --

MR. FOSTER:  There's a transcript.  We don't have to go argue about that, Matt.  There's a transcript -- let's not do that.

MR. LAROSIERE:  Right.  No, that's fine.  But anyway, there's something more important here.

MR. DE PURY:  The court reporter is recording everything, so try not to speak over each other. I have read the transcript.  While he's looking for that, I'll say I read the transcript extensively. And he did say, there are conversations.

He also attempted to tell you multiple times that he generally speaks to Matt in-person.  He walked next

door to speak to him.

MR. FOSTER:  He did.

MR. DE PURY:  He did also say, "I think there may have been some e-mails."  He didn't say, unequivocally, "Yes, there's 52 e-mails and I'm not turning them over."  He said, "I think there were some conversations that I think we did in-person."

MR. FOSTER:  Right, and you produced none.  So, I guess your position is, is that he was wrong?  Or -- or did he delete the e-mails?

MR. LAROSIERE:  Well, Gary, didn't you go there?

MR. DE PURY:  I did.  And there -- we couldn't find any responsive e-mails or any e-mails between he and Matt.  That were anything within the time periods.  They -- the gentleman just do not e-mail back and forth.

MR. FOSTER:  But then there was -- I don't mean to interrupt.  I get it.  I'm just trying to conserve time here.  He also said that they communicated on -- on other platforms, not just by e-mail.

MR. DE PURY:  Right.  And you also said that, Mr. Celentano said there were dozens and dozens and dozens of e-mails.  I'm sorry, dozens and dozens and dozens of communications.  I -- the transcript, I didn't have it -- I hope it says that.

MR. FOSTER:  You don't have the transcript?

MR. DE PURY:  No, no, I buy my transcripts.  In fact, Ms. Sumner will testify there was a very heated argument -- not a heated argument, but in a court -- Ms. Sumner is not going to testify, she would attest that I always protect court reporters and I always pay for their time.

MR. FOSTER:  No, no, I get it.  Did you -- I thought you -- by now, you would have done that and had it.

MR. DE PURY:  We ordered it and I don't have it.  I'll have it --

MR. FOSTER:  Oh, okay.  Okay.  You'll see it.  All right.  I didn't say dozens and dozens -- I mean -- it's not --

MR. DE PURY:  You didn't say, dozens and dozens?

MR. FOSTER:  All right.  Gary, I know you like to argue.  All right.  That's it.  That's all I have to say right now.  We --

MR. LAROSIERE:  So, I was leading -- I can't find it.  There was 79 exhibits that they attached.  But it did explicitly say, related to the copyright action.  So, and you can look and double-check that for yourself.  So, here's my question for you, what do you contend was deleted and by whom?

MR. FOSTER:  So, you'll find out.

MR. LAROSIERE:  We're here to confer.  What are you --

MR. FOSTER:  No, I mean, here's -- here's the thing.  You don't have any communications between defendants.  Not one.

MR. LAROSIERE:  That's not true.  Did you look at our --

MR. FOSTER:  Yeah, I look -- I looked.  No, not about anything pertaining to the litigation.  If you let me finish, Matt, you always interrupt me.  And not pertaining to the litigation, which is very odd, because when people get sued, it is very, very likely that they will communicate with each other about the lawsuit.

Yet, you can't produce even one, by any of these defendants to the others about the litigation.  The copyright lawsuit, which included RICO counterclaims or this.  That is why I think they are gone.

MR. LAROSIERE:  Are you done?

MR. FOSTER:  Yep.  I'm done.

MR. LAROSIERE:  Okay.  So for one, I'd like to encourage you to look through the productions that my clients made, because I think you're misrepresenting that.  And, in fact, some of my clients chose to take

the extra step and explicitly respond by request over and group them for you to help you.  Okay.  Which they weren't required to do.  So, you should be well aware that communications were handed over.

Now, if I understand what you are saying, it's that, you know, all of your requests pertain to this criminal enterprise and this actual competition happening and all that, right?  And so, I'm going to tell you, I think if all of that stuff was happening, there probably would be communications about it.  Okay.

So, let me just ask you as a theoretical question.  What if it wasn't happening?  Are you asking for proof of a negative?  Because I'm going to tell you the simple fact.

MR. FOSTER:  No.

MR. LAROSIERE:  I'm going to tell you the simple fact, Mr. Foster.  Nobody paid any -- none of the counter defenders -- the defendants were paid by any other defendant.  Okay.  You know that.  Because you got -- you had material that were very specific as to this.  There -- there's -- you're refusing to provide any evidence of any competition actually existed, which is again, telling.  Okay.  So, isn't it more -- you know that concept of Occam's razor?

MR. FOSTER:  No.

MR. LAROSIERE:  Okay.  Occam's razor is that when you have the cause -- when you have a result, you have a list of causes.  You're supposed to slice away them from the least probable one.  The one that takes the least amount of inferences.

I think when you slice away at your potential reasons, right?  So, one of your reasons for why there's no communications about this criminal RICO Enterprise that are deliberately stealing from -- stealing something, we don't know what it is, from your customers.  Is that, "Oh, well, they must have deleted all of them."  Does that take more inferential leaps -- which takes more inferential leaps?  I'm asking you a theoretical question.

MR. FOSTER:  I don't see the point of this.

MR. LAROSIERE:  Okay.

MR. FOSTER:  I don't -- Matthew.

MR. LAROSIERE:  You just told me that I always interrupt you.

MR. FOSTER:  -- both defendants in this case have testified there were indications about the lawsuit on multiple platforms.  You didn't produce them.  Ergo, I inferred they were destroyed.

MR. LAROSIERE:  Howard, we did produce them.

MR. FOSTER:  No, you didn't.

MR. LAROSIERE:  Okay.  Look at the --

MR. FOSTER:  Not one.

MR. LAROSIERE:  -- look at the --

MR. FOSTER:  About the matter in the lawsuit. Now, there's no point in going back and forth about this, because I've looked at them, you've looked at them, they're not there.

MR. LAROSIERE:  Howard, let me ask you another question.  You say you've looked at all of these, right?

MR. FOSTER:  Uh-huh.

MR. LAROSIERE:  Do you remember a call the other week when you were -- and Howard, please stop interrupting me.  I don't appreciate -- and look, this is on the --

MR. FOSTER:  Okay.

MR. LAROSIERE:  -- record.  Stop talking.  This is a cold record.  Okay?  I grew up here in the South. I don't want a false reputation about me that I interrupt people.  Okay?  So, please talking over me and then saying it's me who's talking over you. Because that would be -- that's improper and it would -- you could --

MR. FOSTER:  I --

MR. LAROSIERE:  You could.

(Cross-talk)

MR. LAROSIERE:  -- on a cold record.

MR. FOSTER:  Go ahead.

THE COURT REPORTER:  It is making my job really, really hard.

MR. FOSTER:  Just get to the point, Matt.

MR. LAROSIERE:  Howard.  Stop.  Here's the simple fact.  I'm going to ask you something.  You said you looked at all of this.  Do you remember a couple weeks ago when we were on a call and I indicated that Ms. Stroke had made the meeting.  Do you remember you were shocked and you asked me three times, did Ms. Stroke make the meeting?

MR. FOSTER:  I don't want to talk about that.

MR. LAROSIERE:  You don't want to talk about that.  That's because you didn't read her responses to the interrogatories.

MR. FOSTER:  Okay.  I am now.

MR. LAROSIERE:  Yeah, but you didn't two weeks ago, did you?

MR. FOSTER:  What's the point of this, Matthew?

MR. LAROSIERE:  Because, Mr. Foster, I'm -- I'm a polite guy.  I don't do this lightly.  You are not reading these materials.  You are jumping to

conclusions your client has given you.  You know how I know, because this is the exact same playbook that he tried in the other case.  This spoliation, rhetoric that you're bringing now is frankly absurd.

MR. FOSTER:  Okay.

MR. LAROSIERE:  There's, no -- Mr. Foster, you are alleging that Mr. De Pury's client destroyed communications, based on nothing, not even a hunch.  You're saying that, because I alleged there was this grand criminal enterprise and there's no documents suggesting it, you must have deleted them.

Mr. Foster, that does not logically follow.  What logically follows is that this entire action is an absurd strike-suit brought in retaliation for actions that were taken against your client.

MR. FOSTER:  And --

MR. LAROSIERE:  And Mr. Foster, the -- you started this discussion by saying you were going to file a spoliation motion.  And then, now you've said you don't even no what was deleted, who deleted it, whether is can be restored by additional discovery.  That is definitional impropriety.  You talked --

MR. FOSTER:  No.  No.  Okay.  Matthew.  Matthew.  Okay.  You're making spurious allegations against me, that this is a strike-suit and I'm a strike-suit

lawyer.  I don't like it.  I don't think this is productive.

I've told you that your client's have admitted in depositions, that they communicated with each other about the lawsuit.  And they are not produced.

MR. LAROSIERE:  Mr. Foster, which of my clients did you depose?

MR. FOSTER:  If you can explain that to me.  I guess your answer is, "Well, they were wrong."

MR. LAROSIERE:  Mr. Foster, which of my clients have you deposed?

MR. FOSTER:  No, Gary's clients.  Holladay.

MR. LAROSIERE:  Okay.  Why did you say the other -- why did -- why did you say what you said then?

MR. FOSTER:  I just said, your clients, meaning collectively, yours.  And then, Peter Celentano, he's not your client, but he said that there were a lot of communications between you -- you -- your -- all the defendant's here.  And that's more evidence that there were communications on platforms where they presumably could be retrieved.  And nobody has done it.

MR. LAROSIERE:  Communications about what?

MR. FOSTER:  What?

MR. LAROSIERE:  Communications about what?

MR. FOSTER:  The lawsuit.  The underlying issues in this case.  The meme, Cody Wilson, his lawsuit.

MR. LAROSIERE:  So, this is -- this is -- I mean you --

MR. FOSTER:  Matt, this is about -- okay.  I guess that we've reached the point now where it's clear we're not going to resolve anything by further talking about this.  What I'll do is, I'm going to give -- very carefully, I'm going to share a copy of the litigation hold letter with all three lawyers. You can look at it.  And I will revert with you.  And we will have another meet and confer before we file my motion.

MR. LAROSIERE:  The motion you've already decided to file without identifying any communications that were deleted by who or whether --

MR. FOSTER:  How can I identify communications that were deleted, if they're deleted?

MR. LAROSIERE:  That is literally the --

MR. FOSTER:  No court requires you to produce --

MR. LAROSIERE:  That is really funny, he muted himself.

THE COURT REPORTER:  Sir, we can't hear you. You're on mute.

MR. DE PURY:  Un-mute yourself, Howard.

MR. LAROSIERE:  He's really moving his hands around.

MR. FOSTER:  Sorry, about that.  All right.  I don't have anything to say about it.  Let's move on.

MR. DE PURY:  You were interrupting Matt, when he was trying to ask you a question.

MR. FOSTER:  He asked that question.  How -- why don't -- as I understand his question is, why didn't you produce the materials that you claim were destroyed?  But that's like saying, where is the -- in a robbery case, the victim of the robbery cannot produce the stuff that was stolen, it's gone.

MR. LAROSIERE:  A victim could definitely say, I had a hundred dollar stolen from me, right?

MR. FOSTER:  Yeah, you can say that.

MR. LAROSIERE:  A hundred dollars.

MR. FOSTER:  But you can't prove what the thief took.  The thief made off with it.  And it's that when the spoliation motions -- the moving party does not have to produce the stuff that's gone.

MR. LAROSIERE:  So they have to identify it.

MR. FOSTER:  You -- no, you can't identify particular e-mails.  You don't know how many there were or when they were sent.  You'll see this when I brief it.

MR. LAROSIERE:  So, you're position is, you can just assert that something was deleted.  And you don't know what it was.  And that that's going to --

MR. FOSTER:  I'm going to argue the legal merits of it right now, Matt, I'm not.  And I'm not interrupting you, but I'm saying, I'm not prepared to argue this now.  You are not the judge.  And I don't have to argue the merits and cite cases for you right now.

I'm raising a general concern about spoliation right now.  So, that we can talk about it.  It's on the agenda, I've done it.  And I'm committing to you that we will have another meet and confer about this before I file the motion.  And I will get you a copy of the litigation hold letter on which this is based.

MR. LAROSIERE:  And Howard, let me just ask something.  If you find that the litigation hold letter expressly excludes anything that could have related to this case, are you still going to file your motion?  Because that's --

MR. FOSTER:  That's a hypothetical.  No, I'm not going to answer that.  No.

MR. LAROSIERE:  You started this conversation by saying that you were going -- Gary, am I -- am I remembering wrong?  Did he not start this by saying

he's going to file a spoliation motion?

MR. FOSTER:  I am.  But I'm willing to meet and confer with you and I will show you the litigation hold letter.  It was written before the Southern District lawsuit commenced.  How could it even contemplate this Southern District lawsuit?

MR. LAROSIERE:  You heard that right, Gary?

MR. FOSTER:  Gary's muted.

MR. DE PURY:  Yes, I did hear it.  And I believe, well, more importantly, Ms. Sumner heard it.  You just stated, how could this spoliation letter -- like anything about this hearing or for this case.

Now Howard, to Matt's point.  When he was trying to make a point, you were interrupting him again.  The issues -- (inaudible) and everything else.  You're basically basing a motion on a hypothetical that you believe there must have been some deleted e-mails.

I have read my client's deposition, cover to cover and it clearly says, there were conversations.  Now, if you haven't deposed anybody else except Peter Celentano.  And now, if you did -- you also just said something that struck me as odd.  That Peter Celentano said all these things in a deposition.  It certainly would have been very nice if one of us also could of got some clarifications on those answers, but we

didn't have that opportunity.  And we'll address that later.  That might require another meet and confer.

The point being, though, that I think that maybe you need to hold off on your motion.  I'm not telling you how to practice law.  But you might want to hold off on your motion until you depose some of the other folks and see if you're getting the same thing.

MR. FOSTER:  I hear you, Gary.  I didn't tell you when I was going to file the motion, but it's going to be soon.  Okay.  I hear what you've said.  I mean, the time is for doing this is pretty short.

MR. DE PURY:  Right.

MR. EVERMAN:  Let me ask -- let me ask.  So, Gary and Matt, so you guys -- I mean, you guys searched for documents, right?  I mean, I haven't reviewed these transcripts, but we understand that there's testimony about communications, three defendant's, relating to the plaintiffs and relating to the DEFCAD meme relating to Cody Wilson.  We asked for those documents in discovery.  We got very little.

Yeah, I see some communications, but very little.  And so, you guys produced it.  Are you guys saying that your clients -- this is the totality of the communications that existed and they've all be produced?  Or are you saying that some of those

communications are no longer assessable to them?

MR. LAROSIERE:  So, let me answer this with respect to my clients.  And we already went through this and I certified this for you.  That was the totality of the production.  The simple fact is, and I know this might be -- like, the simple fact is, my clients don't talk about your client.  And we found some things, you got them all.

And some of them were -- you know, there were somethings that were like memes and things that I thought were distasteful.  But they were responsive and so I felt duty-bound to hand them over.

MR. EVERMAN:  So, this isn't an issue of like docu -- like, I'm blanking on the names, but like, you know, like text messages, or certain platforms, communications are only stored for so long and then they are auto-deleted.  And so, it's not a matter of, "Oh, they're just no longer -- the communications are no longer available."  It's just that you guys already produced what existed and this is the totality of what ever existed.

MR. LAROSIERE:  Yeah, and I'll -- I'll tell you this.  This is, for my clients, it was very easy, because they are all internet-age people.  They don't text each other.  Right?  So then I checked.  I sat

there -- I take this very seriously.  Sat there, went through each one, all of their devices.  Went through everything.  Okay?  You got everything.  And there was -- there's no platforms that are auto-deleting, which, you know, I know you're from -- the past case, I know your clients have auto-deletion and stuff like that.  They don't have any of that.  There's none of that.  They don't have -- they don't have any signal communications where, you know, it does that as a matter of course.  They just don't.

So, it's not like -- and that was good, because I do think that if they were using some of those auto-deleting platforms, I think I would have had to disclose that, but they weren't.  And I'll represent to you that as officer of the court, if they were, you would've been told that.

MR. EVERMAN:  Okay.

MR. FOSTER:  I understand your position.  I do understand your position, Matthew.  It's not like I'm ignoring what you're saying.  I'm hearing what you're saying.

MR. LAROSIERE:  And Mr. Foster, the only issue that I -- the reason I got upset, is because you've decided you're going to file a spoliation motion.

MR. FOSTER:  Uh-huh.

MR. LAROSIERE:  You've decided that.  I don't think that there's anything we can do to convince you otherwise.  And it's because I've seen this before.  And if you look at Middle District lawsuit, I want you to look at everything that your client filed in that lawsuit -- and no, I see you opening your mouth to interrupt me.

MR. FOSTER:  No, I'm not.  I'm opening my mouth to breathe.

MR. LAROSIERE:  Okay.  You're going to want to look at all of those exhibits, right?  That they attached.  There was nothing.

MR. FOSTER:  Okay.

MR. LAROSIERE:  All right.  And they -- and let me tell you this.  They used that as an opportunity to try to cast mud on the other side.  They invoked that California lawsuit, which had nothing to do with anything.  And if you read the transcript of the hearing, you'll see that these attorney's spent 20 minutes talking about the unrelated California lawsuit.  And were then thoroughly admonished by that court.

MR. FOSTER:  All right.

MR. LAROSIERE:  Okay.  So, look at just -- I don't want to hear -- you don't need to tell me

anything.  I'm just, as a fellow practitioner, I'm telling you, I know where this is heading --

MR. FOSTER:  All right.

MR. LAROSIERE:  -- we'll look at how it went last time.

MR. FOSTER:  Okay.  Matthew, are you done?

MR. LAROSIERE:  No.

MR. FOSTER:  You're not done?  Can I speak?

MR. LAROSIERE:  I was just going to say, go look at how that went last time.  That is just my respectful suggestion as a fellow practitioner.

MR. FOSTER:  Are you done now?

MR. LAROSIERE:  Yes, Mr. Foster.

MR. FOSTER:  You can call me by my first name. We're beyond formalities here.  Okay?  I'm going to -- I'll carefully consider anything that you tell me or any aspect of the Middle District litigation that you want to show me, any filing, any transcript before I file in my motion.  Okay?

I am -- you've never litigated with me before, you don't know this, but I'm a very careful lawyer. Okay?  I look at stuff.  And until the other day, I have never been sanctioned.  I take things -- I don't like it when stuff like this doesn't go.  When someone's accused of being a careless litigator, I

don't like that.  If you didn't see a document, or did fail to notice something, it bothers me a lot.

So, here's what I'm going to do.  I will undertake to you, as I already did in this conversation, speak again before I file any motion.  Okay?

MR. LAROSIERE:  Okay.  And I just -- and here's what I am --

MR. FOSTER:  I'm going to -- I want --

MR. LAROSIERE:  Here's the important thing, Mr. Foster, is you -- we have to be forthright with each other.  That's our duty under the rules.  Now, you just told me you have never been sanctioned before in this case.  I want you to stop and tell me, was that true?  Okay.  And you're muted, just so you know.

MR. DE PURY:  You have to unmute again.

THE COURT REPORTER:  Sir, you're muted.  We cannot hear you.

MR. FOSTER:  Okay.  Okay.  I was recently with other counsel, subject to the sanctions order in Utah which is not appealable and that happened.  Prior to that, I was never sanctioned in 34 years or something.

MR. LAROSIERE:  You weren't sanctioned about 2010, 2011?

MR. FOSTER:  No.  Where?

MR. LAROSIERE:  Okay.  I found that, but I believe that you don't remember, it's okay.  I'm just saying.

MR. FOSTER:  No.

MR. LAROSIERE:  We need to be honest with each other.

MR. FOSTER:  Okay.  If you want -- I want to -- what case?

MR. LAROSIERE:  It's -- I remember -- so --

MR. FOSTER:  If you are checking my history, you want -- I mean, why don't you know?  If you are --

MR. LAROSIERE:  I always look at opposing counsel.

MR. FOSTER:  Okay.  It doesn't really matter, I guess, except that I'm being very careful.  As careful as I can be on this spoliation stuff.  It's serious. It's going to involve you, because you were counsel in the Middle District case, as well.  You had an obligation to prevent spoliation.  I guess, all three of you were.  You were all -- I don't know about Gary, but Zachery was there too.

MR. LAROSIERE:  Gary was --

MR. FOSTER:  So, I'm going to look at it very carefully.

MR. LAROSIERE:  Okay.  That is all --

MR. FOSTER:  Okay.

MR. DE PURY:  I think we're running out of time. I want to address Matt's -- Brendan's question as to whether or not we're stating that things were dismissed, or we deleted, because they didn't apply, or things they just never existed.

My position is that from what I saw, and I want to remind folks that we agree, we spoke on a Thursday about two and a half weeks ago, we agreed to give me until Friday the following week to go to Orlando.  I went to Orlando.  In the meantime, though, even though we had that agreement, I was getting an e-mail every single day.  When are you going to do this?  When are you going to respond?  When are you going to respond?

So, Howard, I don't think you're being uber careful, because we had an explicit agreement to give me until Friday.  I drove to Orlando and then everyday prior to that you kept saying, "Give us our answer."

MR. FOSTER:  Yeah --

MR. DE PURY:  And so, I'm going to mute you again, if you keep interrupting, please, sir.  Now, the issues, though, my contingent is, they never existed.  But I will say this.  And I like to say this all the time.  It's probably the dumbest joke ever. But I'm a doctor, but the wrong kind of doctor.  I'm

certainly not a psychologist.  The most psychology training I had was when I went through all the interrogation school.  However, I think your client is severely projecting.

And the reason I say that is because when we responded, and you'll see whenever you read the transcript thoroughly, you'll see that Mr. Holladay, did not say, "Oh, there's a bunch of e-mails."  He said, "We had communications and yeah, I believe there may be some e-mails."

The other part though, that Howard threw a fit about and accused me of 14 -- 14 instances of refusing or telling my client not to answer, which the 14 do not exist.  I believe that to be retaliatory also, based on the timeline.

The 14 instances don't exist, but the one that I found the -- somewhat, I think I put in there to you in the e-mails to you guys that I thought might be problematic, was where I said, I was telling Howard to move one.  But he was -- I was trying to clarify for the record, that he was saying, there are e-mails that we did not respond to on advice of counsel.  We did not say, "Not to respond."  What I said was, "Hey, you want to supply these, no."  The e-mails from DEFCAD to you, they have those, because he was just

trying to get through it.

Now, the issue, though, is, we went back.  We amended and I gave your -- you, your own client's e-mails to my client.  In reading those e-mails, what I found is this -- this is why I'm saying your client is objecting.  When I read those e-mails, every single one of those e-mails is all about everybody else.  Oh, this guy's evil, this guy's evil.  He's talking about the case.  He's talking about Mr. Holladay.  He's talking other people.  He's talking about that.  And he doesn't name names, but you know who he's talking about.  And he does name, specifically name Mr. Holladay.

And the reason I'm summarizing that up is, those were the responsive e-mails.  When we said, oh, we have e-mails with reference to DEFCAD, we gave those to you.  There's not -- there's just no -- these guys don't e-mail back and forth.

Now, I will say this, it might be quite possible that you guys sued in this district.  And one of those -- one of the defendants, also being a trained attorney said, "All right, guys, we can sit down and have a Budweiser and talk all kinds of smack, but don't anybody e-mail."  I don't think that happened, because my client just doesn't give a crap about your

client.  The entire industry thinks your client is a joke.  And I am saying the entire industry.

MR. FOSTER:  Can I --

MR. DE PURY:  I'm done.  Go ahead.  Sorry.

MR. FOSTER:  Gary, you're just wrong.  Your client's said he e-mailed, he communicated with Mr. Larosiere on a platform about this lawsuit.  Okay?  Not about DEFCAD, about this lawsuit.  And you didn't produce those.  He said there were some of those.  He was very insistent, it's there.  I can check the transcripts.  I'm going do that.

Okay.  Now, I think we're done with this, but I just want to tell you that I heard back from Jason Trya and he says, "It's not realistic for him to give a deposition when he's at his firearm training course.  He will spend the entire day each day, Monday through Friday, on an outdoor firing range in Northern Arizona.  Even if I was willing to step away for a few hours, which I am not, I don't think cellphone reception is good enough there that we could reliably complete the deposition.  It's Gunsite Academy, it's a well-known serious and very expensive place to train.  It's not a party."

Okay.  And he said the week of the 27th -- I can finish, was never available.  "I have been signed up

for the course since October of last year.  And I can provide the evidence that substantiates that, if necessary."  That's his position.

I guess, if you want to think about it a little more before you are obseferus (phonetic) and take it to the judge, maybe you want to do that.  Otherwise, I'm willing to show the judge this e-mail on Friday and let Judge --

MR. LAROSIERE:  Matthewman.

MR. FOSTER:  -- Middleman -- Matthewman decides he can deposed the week of May 4.  Okay.  He's had this thing booked since October.  And he's more than willing to deposed on May 4.  The week -- a whole week, you pick the day, in Miami, or wherever you want it to be.  If he's reimbursed, if required, by court rules.  That -- that's his position.

MR. DE PURY:  I know that Ms. Sumner has to go.

MR. FOSTER:  All right.

MR. DE PURY:  We went over time.  I will say, I would take it again.  Let it sit on your shoulder that both Matthew and I -- when you refused to tell us it was Gunsite, we both knew it was Gunsite.  So, I'm going to tell you this.  I know exactly what it is. I have actually taught there.  I was an instructor, not -- but I taught at a -- I was a guest instructor.

I'll tell you this.  You go ahead and present to the court that e-mail, telling him I'm not willing to step away.  You present that to the magistrate and we will let the magistrate decide.

MR. FOSTER:  All right.  So, that's your position, right?

MR. DE PURY:  Well, my position is he doesn't get to go on a little mini vacation when you -- you tell him for us, with your unreasonable interpretation of the judge's order.

MR. FOSTER:  And that your position is, you won't do it the week of the fourth?

MR. DE PURY:  My position is that you -- my position is that you are making it as difficult as possible for us to depose your expert witness.

MR. FOSTER:  How so?  Why is it more difficult for you to do it on the week of May 4th?  How is that --

MR. EVERMAN:  Howard, let's not -- Howard -- Howard, let's -- let's try to cooperate on this issue.  We have been sanctioned for this.  Let's -- let's work together.

All I will say, I understand you guys, you know, the courts already sanctioned us for not being more cooperative with this deposition.  So, we need to be

very cooperative here.

MR. FOSTER:  All right.

MR. EVERMAN:  All that I would say, though, is that if you guys can do it on the 4th I doubt there's going to be any prejudice to you.  And the fact that, you know, our expert had this preplanned thing, he's going to incurred a lot of fees.  It's not his fault that we weren't more cooperative.  So, we don't want to punish him, you know, for our own misgivings, or our own transgressions here.

If you guys can do it on the 4th, I doubt you're prejudice in any particular way.  If there's some particular issue that comes up and hey, you need to issue a subpoena.  I think we could agree in advance that, you know, we're not going to hold your feet to the fire and claim -- you know, to the extend that, that week makes a difference.  You know, we can try to cooperate with you.  And, you know, agree that you can do whatever further subpoena within a reasonable extra week after the discovery period, or something like that.  It still seems like there should be some sort of compromise here.  All right.

MR. FOSTER:  I think so.  And wouldn't you rather do it in person than virtual anyway?

MR. DE PURY:  I would.  Why don't you pay for his

trip down here?  We'll do it -- I can't do the 4th because of my surgery, the 7th.

MR. EVERMAN:  Sorry.  Yeah, sorry, Gary, of course.  I -- and I will not suggest you should skip your surgery.

MR. DE PURY:  I'm not.  I'm not.

MR. FOSTER:  Your surgery is on the 4th?

MR. DE PURY:  It is.

MR. FOSTER:  Okay.  So the 5th through the 8th are available?

MR. DE PURY:  Not on the 8th.  I have a tentative on the 8th.  But no -- I'm sorry.  I have a set hearing on the 7th, but they turned over -- that is the fourth case that they turned overed discovery two days ago.  So, I'm canceling that motion to strike.

The 8th, I have tentative and the plaintiff has already said that week -- we can pick another date on the 18th.  So, yeah, so Tuesday through Friday, gentleman.

MR. FOSTER:  I mean, is it --

MR. LAROSIERE:  How about this -- how about this?  Easy solution.  Easy solution.  Easy solution.  The prejudice problem right now and I'm sure you understand, is that what you get from expert discovery, you get follow up -- follow up discovery.

Okay?  How about this?  We'll do it -- you know whatever that week.  But you are going to fully cooperate and allow us one round of discovery requests, limited to whatever's discussed on there.  And you're going to produce it without -- without us having to go to the court.  Because the court is not going to let us extend the discovery deadline, I can tell you that.

MR. FOSTER:  Okay.  Matt, I'm -- I'm trying to understand what, like, sort of thing would you -- you shared a ton discovery requests about stuff.  So, I'm -- like I'm -- I'm concerned like that it's going to be very burdensome.  What do you have in mind that you would want to get?

MR. LAROSIERE:  Let's say -- so that's the whole point -- that's the whole reason these things go in sequence.  Let's say he refers to something we don't have.

MR. FOSTER:  Such as, what?

MR. LAROSIERE:  Howard, I mean -- Brendan, do you understand what I'm saying?

MR. EVERMAN:  Yeah.  It's -- it's hard to agree though in, in sort of a vacuum, though.  I also understand what Howard is saying.

MR. LAROSIERE:  I'm saying, exclusively limited

to something that comes up exactly during the -- the deposition.  And so, I'd say not more than -- and it wouldn't be like a billion -- so let's say -- well, we don't get any more wrong, so let's say 15 RFA's and RFP's?

MR. FOSTER:  Fifteen?

MR. LAROSIERE:  I'd say limited.  So, you can't -- so it can't possibly be more than that.

MR. EVERMAN:  And the reality is, it's too late today to serve document requests, so...

MR. LAROSIERE:  Right, which is --

MR. EVERMAN:  We -- produce them this week or --

MR. FOSTER:  Right.  But even if --

MR. EVERMAN:  -- the following week, it would be too late.

MR. FOSTER:  You couldn't do --

MR. LAROSIERE:  The only reason it's too late is because you wouldn't give them to us, like and that's the reason we had to serve the request that we did on the last day.  Was because of how -- of how this was structured, we had to cover all of our bases.  So, I'm just saying, we can agree amongst ourselves, however we want.

MR. FOSTER:  Can we agree to meet and confer about it?  If there is anything --

MR. DE PURY:  Not right now.

MR. LAROSIERE:  I think -- well, Colleen's got to go.  I think, right now, we're at an impasse, but let's talk more soon.

MR. EVERMAN:  Okay.  That works for me.

MR. FOSTER:  All right.  That works for me too.  Okay?

MR. LAROSIERE:  Okay.  All right.

MR. FOSTER:  All right.  Thank you, everybody.

MR. DE PURY:  Thank you, Ms. Sumner.  Sorry, we went over.  All right.  I'm going to close out.

THE COURT REPORTER:  Thanks, guys.

MR. DE PURY:  Everybody be well.  Bye-bye.

(Concluded at 4:18 p.m.)

REPORTER'S CERTIFICATE


STATE OF FLORIDA

COUNTY OF HILLSBOROUGH


          I, Colleen Sumner, Court Reporter, certify that
I was authorized to and did stenographically report the
MEET & CONFER MEETING, that a review of the transcript WAS
NOT requested; and that the transcript is a true and
complete record of my stenographic notes.

          I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties, nor
am I a relative or employee of any of the parties' attorney
or counsel connected with the action, nor am I financially
interested in the action.

          Dated this 19th day of May, 2026.


                         _____

                         Colleen Sumner, Court Reporter



## 1

**10** [2] - 40:5, 75:4
**100** [3] - 38:2, 38:3, 39:6
**10:00** [2] - 9:4, 9:6
**1115** [1] - 2:13
**11th** [5] - 8:22, 9:4, 9:5, 9:25, 52:5
**12** [1] - 50:18
**125** [1] - 2:23
**12:41** [1] - 75:10
**14** [6] - 1:16, 50:19, 115:12, 115:13, 115:16
**14th** [1] - 28:16
**15** [1] - 123:4
**155** [1] - 2:3
**15th** [1] - 29:23
**16th** [8] - 7:23, 31:15, 31:16, 83:12, 83:15, 83:16, 83:18, 83:19
**17th** [7] - 31:18, 31:19, 31:23, 31:24, 83:22, 83:23, 84:7
**18th** [1] - 121:18
**19th** [1] - 125:16

## 2

**20** [2] - 10:18, 110:19
**2010** [1] - 112:24
**2011** [1] - 112:24
**2020** [1] - 16:21
**2021** [1] - 16:19
**2022** [1] - 16:23
**2023** [1] - 16:21
**2025** [3] - 16:19, 16:23, 26:6
**2026** [3] - 1:16, 26:7, 125:16
**20th** [2] - 40:13, 76:3
**21** [1] - 18:17
**21035** [1] - 2:9
**21st** [2] - 3:19, 3:22
**23** [1] - 32:10
**24th** [3] - 3:18, 3:23, 3:24
**255** [1] - 2:5
**26** [4] - 48:20, 51:3, 52:14, 58:4
**26(c)** [1] - 59:20
**27th** [4] - 41:4, 76:5, 78:1, 117:24
**2:00** [1] - 1:17

## 3

**3** [1] - 2:21
**3000** [1] - 2:13

**33** [3] - 25:24, 26:5, 29:15
**33134** [1] - 2:6
**33145** [1] - 2:14
**33467** [1] - 2:11
**33558** [1] - 2:9
**34** [1] - 112:22
**3:07** [1] - 64:10
**3:10** [1] - 64:9
**3:15** [1] - 64:12

## 4

**4** [4] - 10:22, 32:24, 118:11, 118:13
**45** [3] - 25:14, 44:4, 44:5
**4:18** [2] - 1:17, 124:14
**4th** [8] - 11:20, 39:15, 41:11, 119:17, 120:4, 120:11, 121:1, 121:7

## 5

**52** [1] - 94:5
**57.105** [4] - 69:22, 70:3, 70:6, 70:12
**5th** [1] - 121:9

## 6

**60606** [1] - 2:3
**6964** [1] - 2:11

## 7

**73** [1] - 93:6
**79** [1] - 95:21
**7:00** [1] - 80:24
**7th** [2] - 121:2, 121:13

## 8

**8th** [5] - 2:5, 121:9, 121:11, 121:12, 121:16

## 9

**9:00** [1] - 4:8
**9:25-CV-81197-DMM** [1] - 1:8

## A

**a.m** [3] - 4:8, 75:10, 80:24
**able** [9] - 6:22, 12:23, 25:6, 26:20, 33:16, 33:17, 36:15, 42:16,

81:2
**absolutely** [2] - 33:22, 81:25
**absurd** [2] - 101:4, 101:14
**Academy** [1] - 117:21
**accept** [2] - 77:6
**acceptable** [1] - 43:7
**access** [2] - 12:20, 36:11
**accomplish** [2] - 48:10, 48:11
**account** [1] - 17:6
**accounting** [1] - 21:2
**accumulated** [1] - 21:3
**accuracy** [1] - 19:18
**accused** [2] - 111:25, 115:12
**acknowledge** [3] - 81:14, 81:16, 81:24
**acknowledged** [1] - 5:17
**action** [4] - 95:22, 101:13, 125:14, 125:15
**actions** [1] - 101:15
**actual** [2] - 41:23, 97:7
**add** [1] - 41:19
**additional** [1] - 101:21
**address** [12] - 13:9, 14:2, 17:16, 29:14, 46:1, 48:7, 65:6, 65:8, 66:14, 67:2, 107:1, 114:3
**addressed** [4] - 35:3, 35:4, 66:1, 88:2
**addressing** [2] - 55:5, 56:10
**adequate** [1] - 75:8
**adjust** [1] - 64:15
**admitted** [1] - 102:3
**admonished** [2] - 85:17, 110:21
**adopted** [2] - 62:10, 75:1
**advance** [1] - 120:14
**advice** [1] - 115:22
**afternoon** [3] - 81:5, 81:6, 84:25
**age** [1] - 108:24
**agenda** [8] - 3:11, 3:12, 3:13, 29:2, 44:1, 66:10, 91:15, 105:12
**ago** [8] - 31:21, 44:16, 75:22, 100:11, 100:21, 114:9, 121:15
**agree** [63] - 6:17, 7:7,

12:1, 12:3, 12:6, 12:7, 12:11, 13:3, 13:4, 13:18, 13:19, 16:11, 21:7, 22:22, 23:7, 25:3, 27:13, 28:3, 28:4, 29:17, 30:2, 30:17, 34:7, 34:15, 36:12, 37:25, 39:7, 43:8, 45:4, 45:8, 47:12, 47:15, 47:16, 50:20, 51:9, 52:4, 52:6, 53:13, 54:19, 54:25, 55:13, 55:23, 55:25, 58:24, 59:6, 60:4, 63:6, 63:25, 71:22, 74:2, 74:9, 74:21, 80:19, 80:20, 89:16, 114:8, 120:14, 120:18, 122:22, 123:22, 123:24
**agreed** [8] - 6:17, 18:11, 23:15, 26:16, 26:22, 52:13, 73:19, 114:9
**agreeing** [2] - 44:25, 63:15
**agreement** [32] - 23:2, 23:11, 23:17, 23:20, 26:18, 29:18, 29:24, 31:7, 32:15, 43:4, 43:9, 43:13, 55:2, 55:11, 55:24, 59:1, 59:7, 59:13, 61:6, 66:8, 67:25, 68:8, 68:10, 70:17, 72:19, 73:7, 73:8, 74:12, 74:19, 75:5, 114:12, 114:16
**agreements** [2] - 44:23, 44:24
**ahead** [10] - 11:24, 42:25, 43:1, 44:6, 45:24, 62:2, 63:21, 100:4, 117:4, 119:1
**AL** [2] - 1:5, 1:10
**Alec's** [1] - 23:8
**Alhambra** [1] - 2:5
**ALL** [1] - 2:1
**allegations** [3] - 48:16, 48:17, 101:24
**alleged** [1] - 101:9
**alleging** [1] - 101:7
**alleviate** [1] - 7:9
**allow** [2] - 50:15, 122:3
**allowing** [2] - 32:3, 32:23
**almost** [1] - 56:7
**alter** [1] - 75:12

**ambiguousness** [1] - 62:20
**amenable** [1] - 38:6
**amendable** [1] - 32:23
**amended** [1] - 116:3
**amount** [1] - 98:6
**analysis** [1] - 16:17
**angry** [1] - 51:10
**answer** [8] - 87:18, 87:20, 90:25, 102:9, 105:22, 108:2, 114:18, 115:13
**answered** [1] - 89:20
**answering** [3] - 86:9, 87:24, 87:25
**answers** [1] - 106:25
**anticipate** [1] - 81:8
**anyway** [10] - 74:4, 74:10, 79:25, 84:11, 86:15, 87:2, 89:4, 93:13, 93:18, 120:24
**anyway's** [1] - 84:12
**appealable** [1] - 112:21
**appear** [2] - 41:21, 80:6
**APPEARANCES** [1] - 2:1
**appendix** [1] - 18:2
**Appendix** [4] - 18:16, 19:10, 19:20, 20:6
**appendixes** [1] - 18:7
**apply** [3] - 25:7, 69:23, 114:5
**appreciate** [3] - 23:21, 83:5, 99:15
**approve** [1] - 19:2
**April** [4] - 1:16, 11:2, 26:7, 83:9
**Apt** [1] - 2:13
**area** [1] - 40:16
**argue** [6] - 53:14, 93:15, 95:18, 105:4, 105:7, 105:8
**argument** [4] - 48:6, 82:18, 95:4
**Arizona** [6] - 40:16, 76:5, 78:1, 81:6, 81:18, 117:18
**Army** [3] - 11:18, 49:18, 76:3
**aside** [3] - 13:4, 44:3, 93:8
**aspect** [1] - 111:17
**assert** [1] - 105:2
**asserting** [2] - 48:22, 52:3
**assessable** [1] - 108:1
**assessing** [1] - 58:8
**assumed** [1] - 45:20

assuming [3] - 33:21, 38:4, 77:5
assurance [1] - 68:6
attach [1] - 93:5
attached [4] - 18:8, 19:14, 95:21, 110:12
attempted [1] - 93:24
attend [4] - 8:4, 36:16, 76:6, 78:2
attending [2] - 77:1, 88:3
attest [1] - 95:5
attorney [5] - 68:12, 82:9, 116:22, 125:12, 125:13
attorney's [2] - 70:10, 110:19
Attorneys [1] - 2:7
attorneys [2] - 2:15, 37:22
authority [2] - 51:21, 80:13
authorized [1] - 125:7
auto [4] - 108:17, 109:4, 109:6, 109:13
auto-deleted [1] - 108:17
auto-deleting [2] - 109:4, 109:13
auto-deletion [1] - 109:6
availability [6] - 6:10, 37:10, 37:19, 39:4, 39:17, 81:13
available [24] - 6:14, 8:4, 10:21, 10:22, 11:10, 11:13, 11:17, 31:15, 32:8, 33:3, 35:13, 39:18, 40:2, 40:9, 41:3, 76:5, 78:1, 83:16, 83:19, 83:23, 84:3, 108:19, 117:25, 121:10
avoid [2] - 8:14, 85:9
aware [6] - 31:14, 31:15, 32:11, 33:8, 51:19, 97:3
awkward [1] - 41:24

**B**

background [1] - 72:3
bad [1] - 54:17
based [8] - 12:2, 12:4, 12:25, 14:6, 90:1, 101:8, 105:15, 115:15
bases [1] - 123:21
basing [1] - 106:16
basis [3] - 20:5, 27:22,

59:3
BATES [1] - 25:7
bathroom [1] - 63:23
battery [1] - 18:25
Beach [4] - 35:14, 37:2, 38:4, 83:24
bears [1] - 52:12
bed [1] - 42:1
BEFORE [1] - 1:20
best [3] - 41:1, 69:17, 74:14
better [4] - 5:20, 19:4, 19:7, 80:16
between [6] - 17:11, 27:11, 92:14, 94:13, 96:5, 102:18
beyond [3] - 26:21, 86:10, 111:15
bias [1] - 54:18
big [1] - 83:2
billion [1] - 123:3
binding [1] - 26:20
bit [2] - 66:18, 88:6
blanking [1] - 108:14
board [1] - 30:11
bone [1] - 85:2
booked [1] - 118:12
bothers [1] - 112:2
bottom [2] - 46:16, 55:20
bought [1] - 30:21
bound [1] - 108:12
branch [2] - 26:15, 85:18
break [4] - 63:23, 64:2, 64:4, 64:17
Break [1] - 64:16
breathe [1] - 110:9
BRENDAN [1] - 2:4
Brendan [17] - 3:3, 7:2, 7:19, 14:12, 15:5, 21:6, 21:23, 22:7, 25:12, 36:14, 37:12, 42:12, 43:17, 44:13, 67:11, 68:1, 122:20
brendan [2] - 4:18, 14:12
Brendan's [1] - 114:3
bridge [1] - 41:13
brief [1] - 104:25
bring [1] - 89:25
bringing [2] - 32:22, 101:4
brings [1] - 32:4
broad [3] - 30:4, 30:16, 57:16
broader [1] - 55:5
Brooks [1] - 74:6

brought [6] - 7:19, 26:13, 29:14, 75:22, 87:8, 101:14
Budweiser [1] - 116:23
bunch [1] - 115:8
burden [14] - 48:18, 48:20, 48:21, 49:20, 49:21, 49:22, 50:17, 52:2, 52:8, 52:9, 52:12, 54:1, 54:11, 68:20
burdens [1] - 51:4
burdensome [14] - 46:23, 47:7, 47:21, 47:22, 48:9, 48:19, 50:8, 50:12, 50:23, 50:24, 51:5, 51:14, 53:15, 122:13
business [3] - 46:5, 52:20, 59:24
but.. [1] - 60:22
butterfly [1] - 21:8
buy [1] - 95:2
bye [2] - 124:13
bye-bye [1] - 124:13

**C**

cake [1] - 85:20
calendar [4] - 10:24, 33:8, 33:10, 33:13
California [2] - 110:17, 110:20
camping [6] - 11:19, 32:8, 39:22, 40:2, 41:22, 76:7
canceling [1] - 121:15
cannot [2] - 104:11, 112:18
careful [4] - 111:21, 113:15, 114:16
carefully [4] - 63:17, 103:9, 111:16, 113:24
careless [1] - 111:25
CASE [1] - 1:8
case [60] - 12:18, 12:21, 23:1, 23:25, 24:19, 25:13, 25:17, 25:18, 25:22, 26:19, 27:8, 27:14, 28:14, 29:8, 35:10, 41:20, 44:14, 44:19, 44:23, 49:16, 51:16, 51:24, 52:1, 53:2, 56:9, 56:13, 56:16, 57:1, 57:10, 57:19, 58:6, 58:7, 58:12, 58:18, 59:4, 59:9, 60:19,

62:23, 68:2, 68:6, 79:4, 79:13, 80:6, 81:14, 89:17, 90:24, 92:6, 92:7, 98:21, 101:3, 103:2, 104:11, 105:19, 106:12, 109:5, 112:14, 113:8, 113:18, 116:9, 121:14
cases [8] - 34:15, 52:10, 54:20, 57:20, 58:9, 58:10, 59:5, 105:8
Cashman [1] - 2:5
cast [1] - 110:16
casting [1] - 10:5
categorized [1] - 86:3
category [2] - 55:21
caught [1] - 86:16
causes [2] - 56:11, 98:4
Celentano [6] - 65:10, 67:5, 94:22, 102:16, 106:21, 106:22
cellphone [1] - 117:19
certain [2] - 7:20, 108:15
certainly [3] - 32:21, 106:23, 115:1
CERTIFICATE [2] - 2:23, 125:1
certified [2] - 25:24, 108:4
certify [2] - 125:6, 125:11
certifying [2] - 26:6, 49:1
chain [1] - 5:16
challenge [3] - 68:23, 69:6
chance [2] - 42:15, 47:25
change [3] - 56:8, 88:12, 88:21
changed [7] - 8:13, 45:12, 65:10, 87:4, 87:11, 88:3, 88:8
changes [1] - 75:2
changing [1] - 88:19
CHARLES [1] - 2:8
chasing [1] - 55:7
chat [4] - 46:4, 72:20, 73:2
chat-log [2] - 46:4, 72:20
chat-logs [1] - 73:2
check [8] - 5:2, 5:6, 60:22, 61:6, 67:16, 79:7, 95:23, 117:10

checked [2] - 49:2, 108:25
checking [1] - 113:10
Chicago [1] - 2:3
children [1] - 62:21
chose [1] - 96:25
Circle [2] - 2:5, 2:11
circles [1] - 30:9
Circuit [1] - 52:5
circulated [1] - 35:5
circumstance [1] - 59:1
cite [3] - 47:11, 62:22, 105:8
cited [2] - 57:20, 58:11
civil [1] - 48:23
claim [2] - 104:9, 120:16
claiming [1] - 87:14
clarifications [1] - 106:25
clarify [1] - 115:20
class [3] - 78:12, 78:13, 78:21
cleanest [1] - 80:18
clear [13] - 4:7, 7:3, 18:9, 48:21, 52:2, 79:22, 79:23, 82:18, 83:15, 85:2, 85:3, 85:5, 103:7
cleared [1] - 14:15
clearly [4] - 19:9, 20:11, 31:24, 106:19
client [30] - 7:5, 7:12, 8:10, 24:15, 24:23, 25:24, 27:12, 27:13, 27:15, 27:18, 28:12, 29:19, 49:12, 54:19, 71:16, 87:11, 88:19, 101:1, 101:7, 101:15, 102:17, 108:7, 110:5, 115:3, 115:13, 116:4, 116:5, 116:25, 117:1
client's [6] - 52:20, 92:12, 102:3, 106:18, 116:3, 117:6
clients [19] - 3:14, 8:3, 21:24, 23:11, 27:11, 27:12, 49:16, 90:5, 96:24, 96:25, 102:6, 102:10, 102:12, 102:15, 107:23, 108:3, 108:7, 108:23, 109:6
clients' [2] - 71:24, 72:9
clock [1] - 64:12
close [3] - 38:23, 61:5, 124:11

closed [1] - 31:19
closer [1] - 70:18
code [2] - 46:20, 50:4
Cody [2] - 103:2, 107:19
cold [2] - 99:19, 100:3
collect [1] - 24:22
collectively [1] - 102:16
colleen [1] - 66:16
COLLEEN [1] - 1:20
Colleen [4] - 3:5, 3:6, 125:6, 125:19
Colleen's [1] - 124:2
comb [3] - 89:12, 89:13, 89:15
comfort [2] - 64:2, 64:4
comfortable [3] - 24:3, 35:12, 62:12
coming [1] - 69:1
commenced [1] - 106:5
commercial [4] - 52:17, 52:21, 58:12, 59:23
committed [1] - 88:6
committing [1] - 105:12
communicate [1] - 96:14
communicated [3] - 94:19, 102:4, 117:6
communication [1] - 7:3
communications [23] - 90:7, 90:9, 92:14, 94:24, 96:5, 97:4, 97:10, 98:9, 101:8, 102:18, 102:20, 102:23, 102:25, 103:15, 103:17, 107:17, 107:21, 107:24, 108:1, 108:16, 108:18, 109:9, 115:9
company [2] - 71:16, 72:4
compelled [1] - 49:15
competition [2] - 97:7, 97:23
competitive [2] - 56:4, 78:15
complaint [1] - 27:23
complete [3] - 25:8, 117:21, 125:10
completely [1] - 46:15
complicating [1] - 34:4
comply [1] - 79:17

compromise [3] - 42:16, 72:1, 120:22
concept [1] - 97:25
concern [3] - 22:8, 35:24, 105:10
concerned [2] - 41:14, 122:12
concerns [1] - 7:9
concluded [1] - 124:14
conclusion [1] - 77:14
conclusions [2] - 77:20, 101:1
condition [1] - 57:24
confer [19] - 11:13, 28:6, 43:17, 47:15, 50:20, 51:8, 53:12, 81:24, 91:6, 91:7, 91:9, 91:13, 91:16, 96:2, 103:12, 105:13, 106:3, 107:2, 123:24
CONFER [2] - 1:14, 125:8
conference [1] - 70:4
confidential [67] - 12:9, 21:22, 22:22, 22:25, 23:9, 23:16, 23:22, 27:20, 34:7, 34:16, 34:17, 35:5, 45:16, 45:17, 46:7, 46:10, 46:11, 46:15, 46:16, 46:17, 46:21, 47:4, 47:7, 47:9, 47:14, 47:18, 47:19, 48:2, 48:8, 48:12, 48:13, 49:4, 49:6, 49:13, 49:16, 49:17, 49:19, 49:25, 50:5, 50:7, 50:9, 50:14, 50:16, 51:6, 51:13, 52:16, 53:4, 53:9, 54:6, 54:7, 54:8, 54:21, 54:23, 54:24, 56:10, 57:21, 58:1, 59:18, 59:19, 59:21, 59:23, 69:4, 70:23, 71:23, 72:12, 72:16
confidentiality [14] - 29:6, 29:12, 34:9, 34:18, 35:1, 35:21, 48:22, 52:3, 53:21, 54:16, 55:11, 68:23, 68:25, 69:7
confidently [1] - 61:5
confirm [15] - 4:17, 4:18, 4:24, 5:2, 5:17, 5:19, 6:22, 6:23, 8:11, 8:21, 19:18, 21:24, 23:13, 60:22,

63:11
confirmation [3] - 6:24, 7:16, 8:14
confirmations [1] - 6:7
confirmed [9] - 4:4, 5:9, 5:18, 5:22, 6:1, 6:4, 21:25, 23:13, 41:4
confirming [2] - 4:10, 5:10
confusing [1] - 25:3
confusion [1] - 22:19
conjunction [1] - 90:4
connected [1] - 125:14
consequences [1] - 45:7
conserve [1] - 94:18
consider [5] - 51:23, 57:11, 71:8, 82:10, 111:16
considered [3] - 16:1, 16:23, 60:17
considers [1] - 59:21
consistent [1] - 53:22
constructive [1] - 84:6
contain [1] - 47:19
contained [1] - 47:19
contemplate [1] - 106:6
contemporaneous [1] - 16:24
contend [2] - 91:19, 95:25
contention [2] - 75:6, 75:9
contexts [1] - 71:21
contingent [1] - 114:22
contract [5] - 58:8, 60:16, 60:17, 69:24, 70:2
control [4] - 26:1, 43:12, 53:20, 79:25
conversation [2] - 105:23, 112:5
conversations [3] - 93:23, 94:7, 106:19
convince [1] - 110:2
convinced [3] - 39:22, 78:23, 85:12
cooperate [4] - 6:12, 119:20, 120:18, 122:3
cooperative [3] - 119:25, 120:1, 120:8
coordinate [1] - 37:16
copy [4] - 31:2, 33:12, 103:9, 105:14

copyright [4] - 90:24, 92:6, 95:22, 96:18
Coral [2] - 2:13, 2:14
correct [7] - 3:15, 4:3, 15:11, 15:13, 83:12, 89:2, 90:21
costs [1] - 80:8
counsel [15] - 6:8, 9:17, 9:19, 23:10, 28:20, 78:22, 87:9, 89:5, 89:6, 112:20, 113:13, 113:17, 115:22, 125:12, 125:14
counsels [1] - 84:2
count [1] - 16:18
counter [1] - 97:19
counterclaims [1] - 96:18
COUNTY [1] - 125:4
couple [5] - 47:24, 65:3, 66:14, 93:2, 100:10
course [16] - 27:14, 37:25, 52:20, 56:1, 63:10, 73:18, 76:6, 76:12, 76:19, 77:6, 78:2, 81:13, 109:10, 117:15, 118:1, 121:4
courses [1] - 80:23
Court [6] - 1:20, 26:3, 30:13, 70:13, 125:6, 125:19
COURT [19] - 3:4, 3:8, 10:8, 10:10, 10:13, 63:22, 64:3, 64:7, 64:10, 64:13, 64:17, 64:19, 65:24, 66:18, 66:24, 100:5, 103:23, 112:17, 124:12
court [46] - 3:5, 5:10, 6:11, 8:15, 15:12, 23:11, 26:9, 28:3, 28:10, 31:4, 32:6, 34:20, 34:25, 35:6, 36:6, 43:19, 43:20, 44:25, 51:9, 53:12, 53:14, 54:4, 54:13, 55:1, 59:15, 62:10, 63:2, 82:18, 85:9, 85:15, 85:16, 87:18, 88:7, 89:7, 93:7, 93:19, 95:4, 95:6, 103:20, 109:15, 110:22, 118:15, 119:2, 122:6
court's [8] - 31:8, 58:13, 58:17, 58:25, 59:8, 67:24, 82:16,

82:17
courthouse [2] - 38:2, 39:6
courts [2] - 69:16, 119:24
cover [4] - 16:15, 106:18, 106:19, 123:21
covered [1] - 59:25
covers [1] - 4:1
crap [1] - 116:25
crazy [1] - 20:23
create [2] - 56:5, 88:22
created [2] - 18:8, 19:14
creating [1] - 54:1
criminal [3] - 97:7, 98:9, 101:10
cross [3] - 41:12, 77:4, 100:2
cross-talk [2] - 77:4, 100:2
crushingly [1] - 85:2
current [1] - 68:17
custody [1] - 25:25
customer [1] - 21:1
customers [1] - 98:12
cut [2] - 12:17, 30:12
cut-offs [1] - 30:12
cutoff [1] - 28:14

## D

damage [1] - 14:13
data [20] - 15:1, 16:18, 16:22, 17:6, 17:7, 18:12, 18:13, 18:14, 18:15, 19:10, 19:17, 19:20, 20:25, 71:15, 71:17, 71:24, 72:2, 72:4, 72:9
date [7] - 28:14, 31:19, 31:20, 83:25, 84:1, 84:3, 121:17
DATE [1] - 1:16
Dated [1] - 125:16
dates [17] - 4:2, 4:3, 4:11, 5:1, 6:4, 6:5, 7:16, 10:18, 11:7, 11:8, 11:13, 32:2, 39:23, 40:1, 83:8, 84:4, 84:14
days [9] - 25:14, 31:21, 33:6, 33:15, 40:5, 40:10, 47:24, 75:4, 121:15
DE [123] - 2:8, 3:12, 7:18, 7:23, 8:3, 8:9, 8:13, 8:18, 8:24, 9:1, 10:25, 18:24, 29:4,

32:20, 33:5, 33:19, 33:22, 34:1, 38:12, 38:14, 38:16, 38:22, 41:19, 42:3, 42:7, 42:10, 42:24, 43:4, 43:10, 44:4, 44:10, 44:17, 45:24, 50:11, 51:3, 53:7, 53:24, 55:19, 59:3, 59:12, 62:2, 62:5, 62:13, 62:15, 62:18, 64:2, 64:5, 64:8, 64:11, 64:15, 64:23, 65:8, 65:14, 65:16, 66:10, 66:25, 67:8, 74:25, 75:17, 75:19, 76:1, 76:15, 76:25, 77:22, 78:9, 81:16, 81:19, 81:22, 82:3, 82:13, 82:15, 82:21, 83:11, 83:14, 83:22, 84:9, 84:17, 86:18, 86:24, 87:3, 87:6, 87:17, 87:21, 87:25, 88:11, 88:18, 89:2, 89:22, 90:13, 90:21, 91:5, 91:14, 91:25, 92:7, 92:10, 92:18, 92:23, 93:19, 94:3, 94:12, 94:21, 95:2, 95:11, 95:16, 103:25, 104:5, 106:9, 107:12, 112:16, 114:2, 114:20, 117:4, 118:17, 118:19, 119:7, 119:13, 120:25, 121:6, 121:8, 121:11, 124:1, 124:10, 124:13
**De** [3] - 2:8, 27:12, 101:7
**deadline** [1] - 122:7
**deadlines** [3] - 30:20, 30:23, 44:12
**dealing** [3] - 45:23, 46:13, 48:19
**dealt** [1] - 35:22
**December** [2] - 26:6, 29:15
**decide** [4] - 28:10, 54:13, 78:22, 119:4
**decided** [5] - 83:17, 87:12, 103:14, 109:24, 110:1
**decides** [1] - 118:10
**deeming** [1] - 22:25
**deems** [1] - 56:25
**DEFCAD** [6] - 16:18, 20:7, 107:18,

115:25, 116:16, 117:8
**Defendant** [1] - 1:11
**defendant** [1] - 97:20
**defendant's** [4] - 36:19, 37:3, 102:19, 107:17
**defendants** [5] - 96:6, 96:17, 97:19, 98:21, 116:21
**Defendants** [1] - 2:15
**defenders** [1] - 97:19
**defense** [5] - 27:24, 28:19, 29:5, 29:7, 78:22
**Defense** [1] - 16:20
**DEFENSE** [1] - 1:5
**defensive** [1] - 78:12
**define** [4] - 23:12, 55:6, 58:12, 75:13
**defined** [1] - 75:5
**definitely** [3] - 73:8, 81:14, 104:13
**definition** [6] - 54:25, 57:20, 58:13, 58:18, 62:6, 62:10
**definitional** [1] - 101:22
**definitions** [1] - 61:2
**delay** [4] - 29:25, 30:1, 33:2, 40:25
**delaying** [2] - 24:24, 24:25
**delete** [1] - 94:10
**deleted** [12] - 95:25, 98:13, 101:11, 101:20, 103:16, 103:18, 105:2, 106:17, 108:17, 114:5
**deleting** [2] - 109:4, 109:13
**deletion** [1] - 109:6
**deliberately** [1] - 98:10
**demand** [1] - 25:11
**dep** [3] - 7:16, 10:18, 88:25
**depo** [1] - 9:13
**deponents** [1] - 37:21
**depose** [18] - 10:20, 12:2, 12:3, 12:24, 14:10, 16:6, 16:13, 24:12, 31:24, 40:4, 41:20, 82:8, 82:23, 83:17, 83:20, 102:7, 107:6, 119:15
**deposed** [9] - 9:13, 12:22, 79:2, 83:6, 85:8, 102:11,

106:20, 118:11, 118:13
**deposition** [37] - 3:13, 7:21, 8:1, 8:22, 9:15, 11:15, 14:24, 31:13, 32:24, 33:17, 34:5, 34:17, 35:12, 36:16, 36:21, 37:18, 38:10, 65:10, 67:5, 79:25, 81:5, 84:11, 84:24, 85:14, 87:4, 87:15, 88:5, 88:10, 89:9, 92:13, 93:9, 106:18, 106:23, 117:15, 117:21, 119:25, 123:2
**depositions** [6] - 4:11, 6:12, 6:20, 6:23, 7:5, 102:4
**described** [1] - 40:18
**describes** [1] - 71:23
**description** [2] - 72:15, 76:9
**designate** [3] - 47:9, 49:21, 69:3
**designated** [2] - 54:7, 57:21
**designating** [6] - 45:15, 48:20, 54:21, 54:22, 58:1, 59:20
**designation** [7] - 45:8, 46:8, 48:25, 53:21, 54:9, 68:7, 68:11
**designations** [5] - 23:17, 54:16, 68:4, 69:1, 69:7
**despite** [1] - 12:7
**destroyed** [4] - 91:20, 98:24, 101:7, 104:10
**determination** [2] - 45:6, 72:11
**determine** [1] - 80:15
**devastatingly** [1] - 85:3
**devices** [1] - 109:2
**difference** [2] - 16:3, 120:17
**different** [3] - 32:2, 50:2, 57:6
**difficult** [3] - 49:24, 119:14, 119:16
**digital** [1] - 36:1
**digitally** [2] - 34:8, 34:21
**digress** [1] - 70:14
**dirty** [1] - 70:3
**disagree** [4] - 7:18, 27:4, 51:15, 89:16
**disagreement** [3] - 45:3, 45:5, 53:20

**disagreements** [2] - 24:1, 27:7
**disclose** [1] - 109:14
**disclosed** [1] - 35:6
**disclosure** [3] - 14:13, 52:16, 56:11
**disclosures** [2] - 14:16, 56:5
**discovery** [15] - 24:1, 28:13, 30:11, 47:23, 54:14, 90:6, 101:21, 107:20, 120:20, 121:14, 121:25, 122:3, 122:7, 122:11
**discuss** [4] - 33:9, 36:18, 66:4, 75:21
**discussed** [3] - 32:9, 33:11, 122:4
**discussing** [1] - 82:6
**discussion** [4] - 50:3, 66:22, 81:23, 101:18
**disingenuous** [3] - 31:17, 88:16, 88:17
**dismissed** [1] - 114:5
**dispersions** [1] - 10:5
**dispute** [4] - 54:3, 54:12, 54:14, 57:4
**disputes** [1] - 61:9
**disrupt** [1] - 41:6
**disseminated** [1] - 27:19
**disseminating** [1] - 48:12
**distasteful** [1] - 108:11
**DISTRIBUTED** [1] - 1:5
**Distributed** [1] - 16:21
**DISTRICT** [1] - 1:1
**district** [1] - 116:20
**District** [10] - 69:11, 69:13, 71:1, 90:5, 92:15, 106:5, 106:6, 110:4, 111:17, 113:18
**doc** [2] - 26:5, 29:15
**doctor** [2] - 114:25
**docu** [1] - 108:14
**document** [23] - 14:19, 15:18, 22:13, 24:9, 24:18, 24:20, 25:6, 25:24, 31:1, 34:16, 46:19, 46:23, 46:25, 47:9, 47:18, 48:8, 48:13, 49:24, 50:8, 52:24, 70:22, 112:1, 123:10
**documents** [33] - 17:19, 19:22, 20:16, 23:8, 24:5, 24:11,

24:12, 24:17, 24:22, 25:1, 25:4, 25:25, 27:6, 27:19, 35:25, 46:25, 47:7, 48:4, 50:13, 53:4, 53:8, 53:9, 54:21, 54:23, 56:2, 69:3, 71:15, 80:20, 84:11, 90:23, 101:10, 107:15, 107:19
**dollar** [1] - 104:14
**dollars** [1] - 104:16
**domain** [1] - 49:17
**done** [31] - 28:19, 28:23, 28:24, 42:6, 46:9, 46:12, 46:22, 47:8, 49:3, 51:19, 52:20, 53:1, 63:3, 66:7, 69:16, 70:14, 71:11, 73:15, 80:24, 87:10, 87:15, 95:9, 96:20, 96:21, 102:21, 105:12, 111:6, 111:8, 111:12, 117:4, 117:12
**dont'** [1] - 60:20
**door** [1] - 94:1
**double** [5] - 5:2, 5:6, 60:22, 67:16, 95:23
**double-check** [5] - 5:2, 5:6, 60:22, 67:16, 95:23
**doubt** [2] - 120:4, 120:11
**down** [5] - 40:2, 46:11, 74:4, 116:22, 121:1
**dozens** [10] - 94:22, 94:23, 95:14, 95:16
**drafted** [2] - 67:23, 70:2
**drawing** [1] - 30:10
**drinking** [1] - 64:24
**Drive** [1] - 2:3
**drop** [1] - 88:4
**drove** [1] - 114:17
**dumbest** [1] - 114:24
**during** [3] - 81:1, 85:7, 123:1
**duty** [8] - 11:18, 41:21, 41:24, 76:3, 76:7, 78:3, 108:12, 112:12
**duty-bound** [1] - 108:12

## E

**e-mail** [29] - 3:25, 4:2, 5:4, 5:13, 5:16, 8:7, 8:17, 12:7, 21:23,

22:24, 23:3, 27:9, 44:15, 44:21, 65:9, 75:7, 75:10, 75:11, 77:17, 77:25, 88:2, 90:1, 94:15, 94:20, 114:12, 116:18, 116:24, 118:7, 119:2

**e-mailed** [1] - 117:6

**e-mailing** [3] - 31:13, 31:14

**e-mails** [29] - 4:20, 5:14, 6:3, 7:6, 10:3, 25:10, 31:21, 31:22, 83:25, 87:19, 94:4, 94:5, 94:10, 94:13, 94:23, 104:23, 106:17, 115:8, 115:10, 115:18, 115:21, 115:24, 116:4, 116:6, 116:7, 116:15, 116:16

**easier** [6] - 37:13, 38:7, 38:25, 39:8, 39:10, 39:11

**easiest** [1] - 38:20

**easily** [2] - 25:7, 35:22

**eastern** [1] - 9:6

**easy** [8] - 39:1, 45:22, 46:18, 57:5, 108:23, 121:22

**economic** [2] - 16:24, 17:2

**economist** [1] - 81:12

**edit** [3] - 45:14, 61:13, 63:25

**edits** [1] - 61:23

**effectively** [1] - 30:5

**effort** [1] - 6:19

**eight** [2] - 75:2, 75:12

**either** [6] - 36:23, 37:7, 60:21, 67:2, 68:25, 83:9

**elaborate** [1] - 14:7

**eligible** [1] - 45:6

**ELIK** [1] - 1:10

**Elik** [1] - 27:17

**emphasis** [1] - 32:12

**employee** [2] - 125:12, 125:13

**encourage** [1] - 96:23

**end** [5] - 31:4, 31:5, 32:7, 61:23, 90:20

**ended** [1] - 27:8

**enforce** [1] - 44:25

**enforceable** [1] - 22:9

**English** [1] - 85:4

**enjoy** [1] - 78:24

**enter** [6] - 16:12, 50:18, 73:19, 74:6, 74:7, 74:10

**entered** [3] - 28:2, 36:6, 69:25

**Enterprise** [1] - 98:10

**enterprise** [2] - 97:7, 101:10

**enthusiast** [1] - 86:14

**enthusiasts** [1] - 83:3

**entire** [7] - 12:18, 12:21, 53:9, 101:13, 117:1, 117:2, 117:16

**entirety** [1] - 75:1

**entitled** [4] - 52:21, 76:11, 76:12, 77:1

**envisioning** [2] - 72:20

**ergo** [1] - 98:23

**especially** [1] - 48:3

**ESQUIRE** [5] - 2:2, 2:4, 2:8, 2:10, 2:12

**ET** [2] - 1:5, 1:10

**evening** [1] - 80:22

**event** [1] - 68:22

**events** [2] - 16:25, 17:2

**everman** [2] - 3:4, 65:25

**Everman** [1] - 66:23

**EVERMAN** [160] - 2:4, 3:2, 3:6, 4:9, 4:14, 4:20, 6:3, 7:6, 8:21, 9:12, 9:17, 10:2, 11:5, 12:5, 14:15, 14:18, 15:2, 15:4, 15:7, 15:9, 15:16, 15:20, 15:25, 16:8, 16:11, 17:16, 18:1, 18:19, 19:19, 19:22, 20:2, 20:14, 20:24, 21:10, 21:13, 22:1, 22:12, 22:16, 22:18, 22:21, 22:24, 23:19, 24:9, 25:15, 27:1, 27:14, 27:16, 27:18, 28:1, 28:9, 28:15, 28:18, 28:23, 32:18, 35:3, 35:9, 36:12, 36:17, 36:24, 37:3, 37:6, 37:15, 37:21, 42:13, 43:11, 44:15, 44:18, 45:10, 45:14, 45:25, 46:22, 47:3, 51:1, 51:15, 52:4, 52:6, 52:8, 52:14, 52:19, 53:17, 53:25, 55:14, 56:13, 56:20, 56:24, 57:7, 57:10, 57:13, 57:18, 58:4, 58:10, 58:15, 58:19, 58:23, 59:17, 60:5, 60:13, 60:20, 60:24,

61:8, 61:12, 61:16, 61:19, 61:22, 63:16, 63:20, 63:24, 64:6, 64:18, 64:21, 65:18, 65:20, 66:3, 66:8, 67:15, 67:19, 68:13, 68:22, 69:19, 69:22, 70:5, 70:9, 70:16, 70:21, 71:6, 71:8, 71:12, 72:8, 72:15, 73:1, 73:6, 73:11, 73:14, 73:17, 73:21, 73:24, 74:3, 74:9, 74:16, 74:18, 74:22, 75:15, 75:18, 79:22, 80:4, 84:5, 84:10, 84:23, 86:12, 107:13, 108:13, 109:17, 119:19, 120:3, 121:3, 122:22, 123:9, 123:12, 123:14, 124:5

**everyday** [1] - 114:17

**evidence** [4] - 92:22, 97:23, 102:19, 118:2

**evil** [2] - 116:8

**exact** [2] - 26:21, 101:2

**exactly** [8] - 15:10, 20:4, 20:19, 59:11, 68:15, 91:19, 118:23, 123:1

**example** [5] - 25:7, 46:3, 46:9, 46:20, 71:13

**except** [4] - 18:4, 62:8, 106:20, 113:15

**excludes** [1] - 105:18

**exclusively** [1] - 122:25

**excuse** [1] - 40:3

**excuses** [1] - 5:22

**exhaust** [1] - 43:11

**exhibits** [5] - 18:3, 18:4, 93:6, 95:21, 110:11

**exist** [2] - 115:14, 115:16

**existed** [6] - 97:23, 107:24, 108:20, 108:21, 114:6, 114:23

**exists** [1] - 68:18

**expect** [1] - 89:10

**expenses** [2] - 79:5, 80:4

**expensive** [1] - 117:22

**experience** [3] - 49:11, 54:17, 72:16

**expert** [10] - 7:21, 10:21, 16:16, 24:12, 41:20, 75:24, 85:6, 119:15, 120:6, 121:24

**expert's** [2] - 36:20, 79:24

**experts** [1] - 15:14

**explain** [3] - 13:23, 87:3, 102:8

**explained** [1] - 7:25

**explicit** [2] - 21:19, 114:16

**explicitly** [4] - 7:4, 17:5, 95:22, 97:1

**exploit** [1] - 72:1

**expressly** [3] - 23:23, 52:14, 105:18

**extend** [3] - 75:15, 120:16, 122:7

**extended** [1] - 26:15

**extending** [1] - 46:11

**extends** [1] - 29:7

**extensively** [1] - 93:22

**extent** [2] - 71:3, 71:23

**extra** [3] - 32:4, 97:1, 120:20

**extraneous** [1] - 48:22

**extremely** [1] - 34:9

## F

**fact** [10] - 25:22, 90:1, 95:3, 96:25, 97:15, 97:18, 100:9, 108:5, 108:6, 120:5

**factors** [1] - 16:24

**fail** [1] - 112:2

**fair** [3] - 27:15, 27:17, 27:18

**faith** [1] - 53:20

**false** [1] - 99:20

**familiar** [3] - 17:20, 77:9, 78:13

**famous** [1] - 83:1

**far** [3] - 61:1, 63:9, 65:2

**fault** [1] - 120:7

**fee** [1] - 70:10

**fees** [3] - 68:12, 69:25, 120:7

**feet** [1] - 120:15

**fellow** [5] - 23:10, 84:2, 89:5, 111:1, 111:11

**felt** [2] - 65:25, 108:12

**few** [1] - 117:18

**field** [1] - 42:1

**fifteen** [1] - 123:6

**fifth** [1] - 5:19

**fight** [1] - 25:19

**figure** [10] - 30:14, 37:17, 38:6, 39:3, 39:10, 51:5, 80:17, 85:25, 86:13, 86:14

**figures** [1] - 21:4

**file** [17] - 12:20, 26:5, 28:10, 29:15, 54:10, 89:8, 91:17, 101:19, 103:12, 103:15, 105:14, 105:19, 106:1, 107:9, 109:24, 111:19, 112:5

**filed** [4] - 47:13, 92:6, 93:6, 110:5

**filing** [2] - 47:10, 111:18

**filings** [3] - 16:20, 17:6, 70:7

**filler** [1] - 72:3

**final** [1] - 39:21

**finalize** [2] - 6:6, 6:19

**finalized** [1] - 84:12

**finally** [1] - 14:18

**financial** [1] - 59:23

**financially** [1] - 125:14

**fine** [16] - 11:24, 21:14, 24:14, 47:15, 55:25, 60:7, 64:13, 66:4, 68:14, 73:4, 75:18, 86:17, 89:12, 89:13, 89:15, 93:17

**fine-tooth** [3] - 89:12, 89:13, 89:15

**finish** [7] - 67:8, 78:11, 81:19, 82:13, 82:15, 96:11, 117:25

**finished** [3] - 65:18, 66:3, 82:22

**fire** [1] - 120:16

**firearm** [1] - 117:15

**firing** [1] - 117:17

**firm** [1] - 24:20

**first** [14] - 3:12, 25:23, 26:14, 39:17, 40:13, 40:25, 45:20, 58:11, 62:5, 66:5, 77:16, 82:8, 92:25, 111:14

**fit** [2] - 65:5, 115:11

**five** [1] - 64:3

**flagged** [1] - 93:3

**flaps** [1] - 21:8

**floor** [2] - 29:3, 44:8

**Floor** [1] - 2:5

**FLORIDA** [2] - 1:1, 125:3

**Florida** [8] - 1:21, 2:6, 2:9, 2:11, 2:14,

26:19, 69:25, 70:13
**fly** [3] - 37:2, 37:13, 88:5
**folder** [2] - 46:21
**folks** [2] - 107:7, 114:8
**follow** [6] - 8:6, 67:13, 80:21, 101:12, 121:25
**followed** [1] - 72:6
**following** [3] - 33:15, 114:10, 123:14
**follows** [1] - 101:13
**font** [2] - 19:11, 20:9
**force** [1] - 67:24
**form** [2] - 43:4, 80:1
**formalities** [1] - 111:15
**forth** [6] - 4:6, 10:5, 53:18, 94:16, 99:6, 116:18
**forthright** [1] - 112:11
**forward** [5] - 8:5, 69:17, 76:18, 78:20, 88:14
**forwarded** [1] - 76:24
**FOSTER** [290] - 2:2, 3:3, 3:10, 3:16, 3:21, 3:24, 4:2, 4:6, 4:17, 4:21, 4:23, 5:4, 5:21, 6:2, 7:14, 7:22, 8:2, 8:8, 8:12, 8:16, 8:19, 9:5, 9:8, 9:10, 9:14, 9:19, 9:23, 10:7, 10:9, 10:12, 10:17, 10:20, 11:16, 11:24, 12:11, 12:14, 13:6, 13:12, 13:15, 13:19, 13:24, 14:2, 14:5, 14:11, 14:17, 14:22, 15:3, 15:6, 15:8, 15:15, 15:19, 15:22, 16:1, 17:9, 17:13, 18:11, 18:14, 18:23, 19:5, 19:8, 19:13, 22:3, 22:8, 22:15, 22:17, 22:20, 32:17, 32:19, 32:21, 33:14, 33:21, 33:24, 34:2, 34:11, 34:13, 34:23, 34:25, 35:15, 35:19, 36:8, 36:13, 36:22, 37:1, 37:5, 37:11, 37:20, 38:3, 38:8, 38:13, 38:15, 38:17, 38:21, 38:24, 39:5, 39:13, 39:18, 40:7, 40:12, 40:15, 40:18, 40:21, 41:2, 41:8, 41:15, 42:2, 42:4, 42:8, 42:11, 42:14,

42:18, 42:23, 43:3, 43:7, 43:16, 43:22, 43:24, 44:2, 44:6, 65:7, 65:12, 65:15, 65:17, 65:19, 65:21, 66:2, 66:6, 67:2, 67:5, 73:18, 73:22, 74:2, 74:5, 74:8, 74:11, 74:15, 74:17, 74:23, 75:23, 76:2, 76:16, 76:20, 76:23, 77:3, 77:5, 77:11, 77:14, 77:19, 77:24, 78:5, 78:10, 78:14, 78:16, 78:19, 78:25, 79:9, 79:15, 79:20, 80:2, 80:5, 80:11, 81:4, 81:8, 81:11, 81:18, 81:21, 82:2, 82:12, 82:14, 82:20, 83:8, 83:13, 83:20, 84:20, 85:1, 85:23, 86:2, 86:6, 86:9, 86:21, 86:25, 87:5, 87:7, 87:20, 87:23, 88:9, 88:17, 88:24, 89:19, 89:24, 90:4, 90:16, 90:25, 91:3, 91:11, 91:15, 91:22, 92:4, 92:11, 92:19, 93:1, 93:12, 93:14, 94:2, 94:8, 94:17, 95:1, 95:8, 95:13, 95:17, 96:1, 96:4, 96:9, 96:21, 97:16, 98:1, 98:16, 98:18, 98:21, 99:1, 99:3, 99:5, 99:12, 99:17, 99:25, 100:4, 100:7, 100:15, 100:19, 100:22, 101:5, 101:16, 101:23, 102:8, 102:12, 102:15, 102:24, 103:1, 103:5, 103:17, 103:20, 104:3, 104:7, 104:15, 104:17, 104:22, 105:4, 105:21, 106:2, 106:8, 107:8, 109:18, 109:25, 110:8, 110:13, 110:23, 111:3, 111:6, 111:8, 111:12, 111:14, 112:9, 112:19, 112:25, 113:4, 113:7, 113:10, 113:14, 113:23, 114:1, 114:19,

117:3, 117:5, 118:10, 118:18, 119:5, 119:11, 119:16, 120:2, 120:23, 121:7, 121:9, 121:20, 122:9, 122:19, 123:6, 123:13, 123:16, 123:24, 124:6, 124:9
**foster** [13] - 7:3, 77:13, 85:6, 86:7, 97:18, 100:23, 101:6, 101:17, 102:6, 102:10, 109:22, 111:13, 112:11
**Foster** [2] - 23:5, 101:12
**Foster's** [1] - 25:18
**four** [6] - 4:12, 33:2, 47:11, 47:13, 70:19, 73:9
**four-day** [1] - 33:2
**fourth** [4] - 5:19, 33:4, 119:12, 121:14
**frames** [1] - 57:6
**framing** [2] - 51:16, 51:19
**frankly** [3] - 80:14, 88:5, 101:4
**free** [2] - 8:5, 54:9
**Friday** [10] - 11:9, 32:22, 74:3, 74:13, 82:5, 114:10, 114:17, 117:17, 118:7, 121:18
**frivolous** [1] - 70:6
**front** [9] - 5:10, 26:17, 29:9, 33:10, 41:6, 43:20, 50:20, 55:15, 58:21
**frowns** [1] - 86:19
**full** [4] - 6:24, 29:6, 75:4, 81:9
**fully** [2] - 32:11, 122:2
**funny** [1] - 103:21

## G

**Gables** [1] - 2:14
**games** [2] - 6:16, 29:9
**gary** [8] - 3:10, 29:2, 44:8, 51:15, 64:20, 75:15, 84:5, 113:22
**GARY** [1] - 2:8
**Gary** [28] - 2:8, 6:8, 6:17, 7:10, 8:17, 10:2, 33:2, 38:10, 51:2, 62:1, 67:2, 75:23, 82:12, 87:2,

87:14, 87:20, 90:18, 92:12, 94:11, 95:17, 105:24, 106:7, 107:8, 107:13, 113:20, 117:5, 121:3
**Gary's** [4] - 42:20, 64:21, 102:12, 106:8
**general** [1] - 105:10
**generally** [6] - 37:11, 38:1, 56:3, 60:10, 69:24, 93:25
**generated** [1] - 20:11
**gentleman** [2] - 94:15, 121:19
**gentlemen** [1] - 18:24
**German** [4] - 49:18, 53:10, 53:11, 54:5
**Ghost** [2] - 16:22, 17:7
**given** [6] - 23:25, 60:15, 68:5, 84:3, 101:1
**glad** [3] - 4:13, 6:10, 70:17
**grab** [1] - 18:25
**grand** [1] - 101:10
**granular** [1] - 20:25
**great** [4] - 14:17, 67:18, 68:1, 72:5
**grew** [1] - 99:19
**gross** [2] - 16:17, 17:5
**ground** [1] - 57:15
**group** [1] - 97:2
**guard** [2] - 32:11, 41:23
**guess** [15] - 9:23, 9:24, 20:14, 23:18, 35:20, 39:5, 50:6, 89:19, 93:8, 94:9, 102:9, 103:6, 113:15, 113:19, 118:4
**guest** [1] - 118:25
**guidance** [1] - 59:5
**gun** [5] - 76:16, 83:2, 84:22, 85:13, 86:13
**Gunner** [2] - 16:22, 17:7
**Gunsite** [9] - 82:24, 85:7, 86:7, 86:8, 86:19, 117:21, 118:22
**guy** [2] - 83:5, 100:24
**guys** [32] - 3:2, 3:14, 10:3, 11:9, 11:12, 11:14, 32:12, 39:12, 42:19, 44:6, 51:4, 51:16, 51:17, 51:21, 53:1, 55:10, 66:4, 80:1, 82:5, 107:14, 107:22, 108:19,

115:18, 116:17, 116:20, 116:22, 119:23, 120:4, 120:11, 124:12

## H

**half** [3] - 10:15, 44:16, 114:9
**Hall** [1] - 58:12
**hand** [8] - 20:20, 36:2, 36:4, 36:6, 36:7, 72:23, 76:16, 108:12
**handed** [3] - 12:10, 26:23, 97:4
**handing** [1] - 36:1
**handle** [3] - 22:12, 34:21, 80:19
**handled** [1] - 46:2
**handles** [1] - 24:21
**handling** [2] - 22:13, 35:25
**hands** [1] - 104:1
**hang** [5] - 34:13, 77:19, 81:4
**happy** [4] - 5:20, 26:4, 43:5, 56:15
**hard** [9] - 5:14, 12:3, 17:3, 35:18, 54:10, 66:17, 71:4, 100:6, 122:22
**hardship** [1] - 88:22
**harm** [3] - 56:9, 56:12, 56:24
**harness** [1] - 85:4
**heading** [2] - 74:3, 111:2
**headings** [1] - 20:10
**hear** [14] - 7:1, 8:25, 25:20, 48:14, 58:22, 59:15, 65:14, 65:15, 103:23, 106:9, 107:8, 107:10, 110:25, 112:18
**heard** [7] - 41:22, 52:25, 66:2, 106:7, 106:10, 117:13
**hearing** [11] - 6:9, 7:20, 7:23, 32:22, 51:11, 84:7, 89:10, 106:12, 109:20, 110:19, 121:13
**heated** [2] - 95:3, 95:4
**Helena** [1] - 33:12
**hell** [1] - 60:11
**help** [2] - 8:17, 97:2
**hi** [1] - 3:6
**high** [2] - 52:8, 57:2
**highly** [2] - 27:19, 49:17

**HILLSBOROUGH** [1] - 125:4
**himself** [1] - 103:22
**hinge** [1] - 85:21
**hinges** [1] - 56:10
**hired** [1] - 71:16
**history** [2] - 23:25, 113:10
**HOA** [2] - 31:1, 31:3
**hold** [32] - 10:25, 13:2, 13:10, 13:14, 16:10, 22:1, 22:23, 29:6, 29:12, 34:3, 57:12, 77:19, 90:2, 90:12, 90:15, 90:19, 90:22, 91:2, 91:23, 92:5, 92:8, 92:24, 103:10, 105:15, 105:17, 106:4, 107:4, 107:5, 120:15
**Holladay** [4] - 102:12, 115:7, 116:9, 116:13
**Holliday** [3] - 8:1, 83:17, 92:13
**Holloway** [1] - 83:17
**home** [1] - 41:25
**honest** [1] - 113:5
**honestly** [1] - 26:12
**Honor** [1] - 32:13
**hop** [1] - 72:24
**hope** [2] - 10:17, 94:25
**hopefully** [3] - 33:14, 33:24, 74:12
**Houlton** [1] - 2:11
**hour** [3] - 10:15, 44:16
**hourly** [1] - 79:10
**hours** [2] - 81:9, 117:19
**HOWARD** [1] - 2:2
**Howard** [30] - 4:4, 4:9, 4:15, 4:19, 9:12, 9:17, 13:2, 13:25, 15:2, 15:4, 17:16, 22:6, 22:12, 23:12, 26:21, 27:1, 75:21, 88:11, 99:14, 103:25, 105:16, 106:13, 114:15, 115:11, 115:19, 119:19, 119:20, 122:20, 122:24
**howard** [14] - 5:6, 5:25, 13:16, 15:2, 17:16, 22:12, 32:9, 32:18, 65:4, 79:18, 98:25, 99:9, 100:8, 119:19
**Howard's** [3] - 7:24, 75:10, 87:3

**hunch** [1] - 101:8
**hundred** [2] - 104:14, 104:16
**hundreds** [1] - 24:16
**hypothetical** [2] - 105:21, 106:16

**I**

**idea** [2] - 38:25, 55:9
**ideal** [1] - 73:24
**identify** [4] - 45:17, 103:17, 104:21, 104:22
**identifying** [1] - 103:15
**ignoring** [1] - 109:20
**Illinois** [1] - 2:3
**immediately** [1] - 63:14
**impact** [2] - 17:1, 37:19
**impacted** [1] - 6:9
**impasse** [2] - 28:9, 124:3
**implementation** [1] - 62:11
**important** [5] - 34:4, 62:16, 90:19, 93:18, 112:10
**importantly** [1] - 106:10
**imposing** [1] - 59:1
**impossible** [1] - 84:4
**improper** [4] - 68:4, 68:7, 68:11, 99:23
**improperly** [1] - 54:7
**impropriety** [1] - 101:22
**IN** [1] - 1:1
**in-person** [4] - 87:12, 93:25, 94:7
**inaccurate** [2] - 17:21, 90:18
**inaudible** [2] - 7:24, 106:15
**inaudible)** [1] - 62:24
**include** [1] - 59:18
**included** [2] - 23:4, 96:18
**including** [3] - 28:20, 57:19, 59:22
**income** [1] - 16:20
**incomplete** [1] - 17:22
**incredibly** [5] - 30:4, 30:16, 46:23, 47:7, 47:21
**incurred** [1] - 120:7
**indicated** [1] - 100:11
**indicates** [1] - 92:21

**indicating** [2] - 90:7, 90:9
**indications** [1] - 98:22
**individual** [1] - 32:2
**individuals** [1] - 59:5
**industry** [2] - 117:1, 117:2
**inferences** [1] - 98:6
**inferential** [2] - 98:13, 98:14
**inferred** [1] - 98:24
**information** [25] - 35:6, 40:6, 46:6, 47:18, 47:20, 48:2, 48:13, 49:2, 50:14, 52:17, 52:21, 53:11, 55:7, 56:2, 58:13, 59:18, 59:19, 59:24, 59:25, 63:7, 71:25, 72:4, 86:13, 90:18, 91:1
**initial** [2] - 14:15, 14:16
**injunctive** [3] - 56:21, 57:1
**injury** [7] - 56:6, 56:18, 57:15, 57:18, 57:22, 58:5, 58:16
**inquiry** [1] - 75:25
**insert** [1] - 75:16
**inside** [1] - 49:3
**insistent** [1] - 117:10
**instance** [1] - 53:10
**instances** [2] - 115:12, 115:16
**instead** [1] - 42:1
**instructor** [2] - 118:24, 118:25
**interest** [1] - 60:1
**interested** [1] - 125:15
**interject** [2] - 29:4, 50:11
**internet** [1] - 108:24
**internet-age** [1] - 108:24
**interpret** [1] - 82:17
**interpretation** [2] - 24:3, 119:9
**interpreting** [4] - 57:1, 58:25, 59:4
**interprets** [1] - 44:23
**interrogation** [1] - 115:3
**interrogatories** [1] - 100:18
**interrupt** [9] - 4:9, 15:3, 85:11, 87:21, 94:18, 96:11, 98:20, 99:21, 110:7
**interrupted** [2] -

12:15, 92:20
**interrupting** [5] - 99:15, 104:5, 105:6, 106:14, 114:21
**intimately** [1] - 17:20
**invoked** [1] - 110:16
**involve** [1] - 113:17
**involved** [1] - 54:20
**iron** [1] - 72:25
**irreparable** [3] - 56:9, 56:12, 56:24
**issue** [29] - 6:24, 7:1, 8:19, 13:1, 22:21, 23:2, 26:13, 27:11, 30:12, 32:3, 34:4, 39:20, 45:13, 51:16, 51:22, 55:5, 56:19, 56:21, 62:18, 70:21, 74:4, 75:1, 89:1, 108:13, 109:22, 116:2, 119:20, 120:13, 120:14
**issued** [1] - 52:15
**issues** [14] - 7:4, 10:6, 22:16, 24:2, 27:8, 33:12, 36:9, 45:9, 45:11, 61:12, 103:1, 106:15, 114:22
**items** [2] - 29:13, 75:22
**itself** [2] - 20:10, 20:11

**J**

**January** [1] - 29:23
**Jason** [2] - 31:13, 117:13
**job** [1] - 100:5
**joined** [1] - 25:17
**joining** [1] - 3:6
**joint** [1] - 74:21
**joke** [2] - 114:24, 117:2
**Jones** [1] - 59:10
**Judge** [4] - 43:6, 74:10, 74:13, 118:8
**judge** [20] - 11:1, 16:12, 22:9, 30:7, 30:16, 32:12, 32:23, 39:14, 43:5, 50:21, 73:19, 74:6, 79:1, 82:6, 82:10, 83:3, 83:4, 105:7, 118:6, 118:7
**judge's** [1] - 119:10
**judges** [1] - 51:10
**jump** [1] - 88:4
**jumped** [2] - 42:25, 43:1
**jumping** [1] - 100:25

**jurisdiction** [1] - 80:6

**K**

**keep** [5] - 7:23, 18:24, 19:1, 44:7, 114:21
**keeping** [1] - 56:16
**kept** [2] - 7:25, 114:18
**Key** [1] - 38:21
**kids** [1] - 62:22
**kind** [7] - 49:10, 51:18, 54:18, 59:3, 72:6, 93:3, 114:25
**kindly** [1] - 26:10
**kinds** [1] - 116:23
**known** [3] - 56:3, 60:10, 117:22
**knows** [1] - 86:16

**L**

**lack** [1] - 29:18
**Lake** [1] - 2:11
**land** [1] - 7:17
**language** [9] - 60:19, 68:15, 68:16, 71:2, 71:6, 72:23, 73:9, 75:16, 85:5
**Large** [1] - 1:21
**Larosiere** [1] - 92:14
**LAROSIERE** [281] - 2:10, 3:19, 3:23, 3:25, 4:4, 4:13, 4:18, 4:22, 4:25, 5:6, 5:25, 7:2, 7:11, 9:2, 9:9, 10:19, 11:23, 11:25, 12:6, 12:13, 12:16, 13:10, 13:14, 13:16, 13:21, 13:25, 14:4, 14:9, 16:7, 16:10, 16:14, 17:10, 17:15, 17:25, 18:7, 18:12, 18:16, 18:21, 19:2, 19:6, 19:9, 19:14, 19:21, 19:24, 20:4, 20:18, 21:5, 21:12, 21:14, 22:5, 22:10, 22:23, 23:3, 24:8, 25:12, 25:16, 27:10, 27:15, 27:17, 27:22, 28:7, 28:13, 28:16, 28:22, 29:1, 34:3, 34:12, 34:19, 34:24, 35:2, 35:8, 35:11, 35:16, 35:24, 36:9, 37:8, 37:24, 38:5, 38:19, 39:3, 39:9, 39:16, 39:19, 40:9, 40:14, 40:17, 40:19, 40:23, 41:5, 41:12,

41:18, 42:17, 42:20, 43:14, 43:19, 43:23, 44:1, 44:8, 44:22, 45:11, 45:19, 46:2, 47:2, 48:14, 51:25, 52:5, 52:7, 52:13, 52:18, 53:6, 55:3, 55:16, 55:20, 56:15, 56:23, 57:3, 57:8, 57:12, 57:14, 58:3, 58:6, 58:14, 58:17, 58:21, 59:2, 59:11, 59:14, 60:2, 60:8, 60:14, 60:23, 60:25, 61:11, 61:15, 61:17, 61:21, 61:24, 62:3, 62:7, 62:14, 62:17, 63:5, 63:19, 63:21, 64:20, 65:23, 66:9, 66:16, 66:20, 67:1, 67:4, 67:11, 67:18, 67:20, 68:21, 69:9, 69:20, 70:3, 70:8, 70:11, 70:20, 70:24, 71:7, 71:9, 72:7, 72:14, 72:18, 73:3, 73:10, 73:12, 73:15, 74:7, 74:14, 74:20, 76:18, 76:22, 77:8, 77:12, 77:16, 78:4, 78:13, 78:15, 78:17, 78:20, 79:8, 79:12, 79:18, 80:9, 80:14, 81:6, 81:10, 84:18, 85:2, 85:25, 86:5, 86:7, 86:11, 86:15, 86:23, 87:2, 90:3, 91:2, 91:21, 92:1, 92:5, 92:8, 92:24, 93:2, 93:13, 93:17, 94:11, 95:20, 96:2, 96:7, 96:20, 96:22, 97:17, 98:2, 98:17, 98:19, 98:25, 99:2, 99:4, 99:9, 99:13, 99:18, 100:1, 100:3, 100:8, 100:16, 100:20, 100:23, 101:6, 101:17, 102:6, 102:10, 102:13, 102:23, 102:25, 103:3, 103:14, 103:19, 103:21, 104:1, 104:13, 104:16, 104:21, 105:1, 105:16, 105:23, 106:7, 108:2, 108:22, 109:22, 110:1, 110:10, 110:14, 110:24,

111:4, 111:7, 111:9, 111:13, 112:7, 112:10, 112:23, 113:1, 113:5, 113:9, 113:12, 113:22, 113:25, 118:9, 121:21, 122:15, 122:20, 122:25, 123:7, 123:11, 123:17, 124:2, 124:8
**larosiere** [1] - 117:7
**last** [13] - 5:7, 5:8, 11:2, 11:4, 14:16, 24:6, 24:21, 44:11, 47:24, 111:4, 111:10, 118:1, 123:20
**late** [4] - 25:17, 123:9, 123:15, 123:17
**latest** [1] - 29:23
**Law** [2] - 2:8, 2:13
**law** [21] - 23:1, 26:19, 44:14, 44:19, 44:23, 51:17, 51:24, 52:1, 56:9, 56:13, 57:1, 57:10, 57:19, 58:6, 58:8, 59:4, 59:9, 62:11, 79:4, 79:13, 107:5
**laws** [1] - 56:16
**lawsuit** [17] - 92:15, 96:15, 96:18, 98:22, 99:5, 102:5, 103:1, 103:2, 106:5, 106:6, 110:4, 110:6, 110:17, 110:21, 117:7, 117:8
**lawyer** [2] - 102:1, 111:21
**lawyers** [4] - 7:15, 38:9, 70:13, 103:10
**leading** [1] - 95:20
**leaps** [2] - 98:14
**least** [8] - 4:12, 19:20, 61:1, 63:9, 70:15, 70:18, 98:5, 98:6
**leave** [4] - 27:8, 62:24, 87:9, 88:12
**leaves** [1] - 24:2
**leaving** [1] - 63:7
**ledge** [1] - 70:6
**left** [2] - 25:8, 40:5
**legal** [1] - 105:4
**legitimate** [2] - 54:12, 59:25
**legitimately** [1] - 60:16
**Leonard** [1] - 2:9
**less** [5] - 48:9, 50:12, 50:22, 51:5, 53:14

**letter** [12] - 90:2, 90:15, 90:19, 90:22, 91:1, 92:9, 92:11, 103:10, 105:15, 105:18, 106:4, 106:11
**letting** [1] - 42:21
**Lettman** [2] - 3:22, 3:23
**lettman** [1] - 3:24
**level** [1] - 20:25
**liberal** [1] - 83:5
**liberty** [1] - 76:20
**lied** [1] - 30:3
**lies** [1] - 48:20
**lightly** [1] - 100:24
**likely** [2] - 47:5, 96:13
**limited** [7] - 47:17, 59:22, 82:7, 122:4, 122:25, 123:7
**limiting** [1] - 15:14
**limits** [1] - 45:2
**line** [11] - 47:5, 48:7, 52:23, 53:3, 61:19, 72:17
**line-by-line** [5] - 47:5, 48:7, 52:23, 53:3, 72:17
**lines** [5] - 46:10, 47:12, 47:13, 50:18, 50:19
**list** [2] - 75:20, 98:4
**listed** [1] - 41:19
**listen** [2] - 21:5, 25:12
**listening** [1] - 77:22
**literally** [5] - 4:25, 5:1, 11:16, 26:8, 103:19
**litigated** [3] - 56:21, 80:7, 111:20
**litigating** [1] - 49:12
**litigation** [16] - 68:5, 90:2, 90:5, 90:11, 90:15, 90:19, 90:22, 91:23, 96:10, 96:12, 96:17, 103:10, 105:15, 105:17, 106:3, 111:17
**litigator** [1] - 111:25
**live** [3] - 36:16, 36:23, 38:15
**lives** [2] - 38:19, 38:21
**local** [2] - 53:22, 87:9
**location** [1] - 37:18
**log** [2] - 46:4, 72:20
**logically** [2] - 101:12, 101:13
**logs** [1] - 73:2
**longtime** [1] - 10:16
**look** [51] - 3:17, 9:12, 16:8, 18:10, 18:13,

18:16, 18:18, 19:10, 20:16, 23:3, 26:10, 26:11, 30:5, 30:25, 37:8, 44:22, 48:20, 49:11, 57:19, 58:10, 58:19, 59:6, 61:19, 63:18, 79:3, 79:13, 79:25, 80:2, 80:11, 80:12, 81:25, 82:9, 92:8, 95:23, 96:7, 96:9, 96:23, 99:2, 99:4, 99:15, 103:11, 110:4, 110:5, 110:11, 110:24, 111:4, 111:9, 111:22, 113:12, 113:23
**looked** [9] - 16:2, 16:3, 20:3, 49:24, 96:9, 99:7, 99:10, 100:10
**looking** [4] - 19:23, 64:11, 69:15, 93:21
**looks** [3] - 68:16, 68:24, 71:20
**lost** [2] - 25:13, 25:16
**loud** [1] - 77:12
**love** [1] - 26:3
**lunchtime** [1] - 80:25
**Lutz** [1] - 2:9

## M

**magistrate** [5] - 29:9, 74:5, 74:7, 119:3, 119:4
**magistrates** [1] - 51:10
**mail** [29] - 3:25, 4:2, 5:4, 5:13, 5:16, 8:7, 8:17, 12:7, 21:23, 22:24, 23:3, 27:9, 44:15, 44:21, 65:9, 75:7, 75:10, 75:11, 77:17, 77:25, 88:2, 90:1, 94:15, 94:20, 114:12, 116:18, 116:24, 118:7, 119:2
**mailed** [1] - 117:6
**mailing** [3] - 31:13, 31:14
**mails** [29] - 4:20, 5:14, 6:3, 7:6, 10:3, 25:10, 31:21, 31:22, 83:25, 87:19, 94:4, 94:5, 94:10, 94:13, 94:23, 104:23, 106:17, 115:8, 115:10, 115:18, 115:21, 115:24, 116:4,

116:6, 116:7, 116:15, 116:16
**main** [2] - 17:8, 35:24
**major** [1] - 33:23
**majority** [1] - 48:4
**man's** [1] - 7:17
**management** [1] - 14:19
**manual** [2] - 49:17, 54:5
**mark** [9] - 46:17, 49:12, 49:15, 50:4, 50:8, 50:9, 50:14, 50:15, 51:6
**marked** [5] - 34:17, 46:15, 46:21, 49:17, 49:18
**marking** [1] - 46:8
**material** [7] - 45:16, 46:13, 46:15, 50:7, 50:9, 76:18, 97:21
**materials** [14] - 12:1, 12:4, 12:24, 13:4, 13:8, 17:4, 18:8, 34:6, 45:15, 56:2, 58:1, 78:21, 100:25, 104:9
**Matt** [34] - 3:14, 3:18, 4:9, 4:10, 6:4, 6:16, 9:8, 9:10, 9:13, 10:18, 14:20, 16:8, 17:18, 22:22, 27:2, 29:10, 29:14, 30:19, 35:4, 43:17, 50:17, 91:3, 91:25, 93:15, 93:25, 94:14, 96:11, 100:7, 103:5, 104:5, 105:5, 107:14, 122:9
**Matt's** [7] - 8:3, 8:22, 9:13, 75:2, 82:24, 106:13, 114:3
**matter** [4] - 99:5, 108:17, 109:10, 113:14
**MATTHEW** [1] - 2:10
**Matthew** [12] - 13:6, 74:10, 74:13, 77:21, 85:24, 98:18, 100:22, 101:23, 109:19, 111:6, 118:21
**matthewman** [1] - 118:9
**Matthewman** [1] - 118:10
**me..** [1] - 15:3
**mean** [52] - 17:11, 20:14, 20:18, 20:24, 21:5, 21:9, 34:23, 34:25, 35:19, 35:21,

37:11, 37:25, 38:8, 38:22, 42:18, 44:18, 45:2, 51:16, 54:18, 56:17, 56:18, 56:20, 57:3, 59:14, 60:6, 60:11, 60:25, 61:4, 61:8, 62:18, 66:8, 67:13, 68:13, 69:22, 70:16, 71:12, 73:22, 79:21, 81:8, 91:7, 94:17, 95:15, 96:4, 103:3, 107:10, 107:14, 107:15, 113:11, 121:20, 122:20

**meaning** [2] - 23:9, 102:15

**means** [3] - 23:21, 23:24, 27:9

**meantime** [1] - 114:11

**meat** [3] - 43:15, 67:13, 67:20

**mechanisms** [1] - 34:8

**MEET** [2] - 1:14, 125:8

**meet** [14] - 50:19, 51:8, 53:12, 81:23, 91:6, 91:7, 91:9, 91:12, 91:16, 103:12, 105:13, 106:2, 107:2, 123:24

**MEETING** [2] - 1:14, 125:8

**meeting** [3] - 29:3, 100:12, 100:14

**Meeting** [2] - 1:18, 1:19

**member** [1] - 29:5

**members** [1] - 29:7

**meme** [2] - 103:2, 107:18

**memes** [1] - 108:10

**mention** [1] - 58:4

**mentioned** [1] - 4:14

**merits** [3] - 82:19, 105:4, 105:8

**mess** [1] - 34:8

**messages** [1] - 108:15

**Miami** [8] - 2:6, 36:14, 38:7, 39:2, 39:7, 79:2, 83:24, 118:14

**MICHAEL** [1] - 2:10

**microeconomics** [1] - 16:25

**microphone** [1] - 18:25

**middle** [2] - 57:14, 57:17

**Middle** [8] - 69:11, 71:1, 74:6, 90:4,

92:15, 110:4, 111:17, 113:18

**Middleman** [1] - 118:10

**might** [23] - 6:9, 9:21, 57:5, 59:14, 61:5, 61:16, 63:13, 63:19, 67:13, 67:22, 69:17, 70:25, 72:19, 72:23, 81:2, 84:15, 87:1, 93:3, 107:2, 107:5, 108:6, 115:18, 116:19

**miles** [3] - 38:2, 38:3, 39:6

**military** [14] - 32:9, 39:23, 40:10, 40:12, 41:21, 76:7, 76:13, 77:10, 77:18, 78:3, 78:7, 86:19, 86:22

**mind** [1] - 122:13

**minds** [1] - 87:11

**mini** [1] - 119:8

**minor** [1] - 63:3

**minute** [3] - 3:21, 61:7, 64:4

**minutes** [3] - 44:4, 44:5, 110:20

**misgivings** [2] - 5:22, 120:9

**misreading** [1] - 11:3

**misrepresenting** [1] - 96:24

**missing** [1] - 75:10

**misspoke** [1] - 17:13

**model** [1] - 69:11

**moment** [3] - 74:25, 75:22

**Monday** [1] - 117:16

**money** [2] - 10:2, 10:4

**month** [6] - 16:18, 19:15, 19:16, 28:17, 32:7

**months** [4] - 29:21, 29:22, 76:8, 78:3

**morning** [1] - 3:3

**most** [8] - 3:15, 34:1, 35:11, 59:5, 68:25, 71:22, 82:25, 115:1

**motion** [22] - 26:2, 28:10, 67:6, 87:8, 87:9, 89:25, 91:8, 91:17, 101:19, 103:13, 103:14, 105:14, 105:20, 106:1, 106:16, 107:4, 107:6, 107:9, 109:24, 111:19, 112:5, 121:15

**motions** [1] - 104:19

**mouth** [3] - 85:10, 110:6, 110:8

**move** [9] - 57:13, 74:24, 84:18, 84:20, 86:6, 89:21, 104:4, 115:20

**moved** [1] - 91:9

**moving** [3] - 8:1, 104:1, 104:19

**MR** [856] - 3:2, 3:3, 3:6, 3:10, 3:12, 3:16, 3:19, 3:21, 3:23, 3:24, 3:25, 4:2, 4:4, 4:6, 4:9, 4:13, 4:14, 4:17, 4:18, 4:20, 4:21, 4:22, 4:23, 4:25, 5:4, 5:6, 5:21, 5:25, 6:2, 6:3, 7:2, 7:6, 7:11, 7:14, 7:18, 7:22, 7:23, 8:2, 8:3, 8:8, 8:9, 8:12, 8:13, 8:16, 8:18, 8:19, 8:21, 8:24, 8:25, 9:1, 9:2, 9:3, 9:5, 9:7, 9:8, 9:9, 9:10, 9:12, 9:14, 9:17, 9:19, 9:20, 9:23, 10:2, 10:4, 10:7, 10:9, 10:12, 10:17, 10:19, 10:20, 10:25, 11:5, 11:16, 11:23, 11:24, 11:25, 12:5, 12:6, 12:11, 12:13, 12:14, 12:16, 13:6, 13:10, 13:12, 13:14, 13:15, 13:16, 13:19, 13:21, 13:24, 13:25, 14:2, 14:4, 14:5, 14:9, 14:11, 14:15, 14:17, 14:18, 14:22, 15:2, 15:3, 15:4, 15:6, 15:7, 15:8, 15:9, 15:15, 15:16, 15:19, 15:20, 15:22, 15:25, 16:1, 16:7, 16:8, 16:10, 16:11, 16:14, 17:9, 17:10, 17:13, 17:15, 17:16, 17:25, 18:1, 18:7, 18:11, 18:12, 18:14, 18:16, 18:19, 18:21, 18:23, 18:24, 19:2, 19:5, 19:6, 19:8, 19:9, 19:13, 19:14, 19:19, 19:21, 19:22, 19:24, 20:2, 20:4, 20:14, 20:18, 20:24, 21:5, 21:10, 21:12, 21:13, 21:14, 22:1, 22:3, 22:5, 22:8, 22:10,

22:12, 22:15, 22:16, 22:17, 22:18, 22:20, 22:21, 22:23, 22:24, 23:3, 23:19, 24:8, 24:9, 25:12, 25:15, 25:16, 27:1, 27:10, 27:14, 27:15, 27:16, 27:17, 27:18, 27:22, 28:1, 28:7, 28:9, 28:13, 28:15, 28:16, 28:18, 28:22, 28:23, 29:1, 29:4, 32:17, 32:18, 32:19, 32:20, 32:21, 33:5, 33:14, 33:19, 33:21, 33:22, 33:24, 34:1, 34:2, 34:3, 34:11, 34:12, 34:13, 34:19, 34:23, 34:24, 34:25, 35:2, 35:3, 35:8, 35:9, 35:11, 35:15, 35:16, 35:19, 35:24, 36:8, 36:9, 36:12, 36:13, 36:17, 36:22, 36:24, 37:1, 37:3, 37:5, 37:6, 37:8, 37:11, 37:15, 37:20, 37:21, 37:24, 38:3, 38:5, 38:8, 38:11, 38:12, 38:13, 38:14, 38:15, 38:16, 38:17, 38:19, 38:21, 38:22, 38:24, 39:3, 39:5, 39:9, 39:13, 39:16, 39:18, 39:19, 40:7, 40:9, 40:12, 40:14, 40:15, 40:17, 40:18, 40:19, 40:21, 40:23, 41:2, 41:5, 41:8, 41:12, 41:15, 41:18, 41:19, 42:2, 42:3, 42:4, 42:7, 42:8, 42:10, 42:11, 42:13, 42:14, 42:17, 42:18, 42:20, 42:23, 42:24, 43:3, 43:4, 43:7, 43:10, 43:11, 43:14, 43:16, 43:19, 43:22, 43:23, 43:24, 44:1, 44:2, 44:4, 44:6, 44:8, 44:10, 44:15, 44:17, 44:18, 44:22, 45:10, 45:11, 45:14, 45:19, 45:24, 45:25, 46:2, 46:22, 47:2, 47:3, 48:14, 50:11, 51:1, 51:3, 51:15, 51:25, 52:4, 52:5, 52:6, 52:7, 52:8, 52:13, 52:14, 52:18, 52:19, 53:6, 53:7, 53:17,

53:24, 53:25, 55:3, 55:14, 55:16, 55:19, 55:20, 56:13, 56:15, 56:20, 56:23, 56:24, 57:3, 57:7, 57:8, 57:10, 57:12, 57:13, 57:14, 57:18, 58:3, 58:4, 58:6, 58:10, 58:14, 58:15, 58:17, 58:19, 58:21, 58:23, 59:2, 59:3, 59:11, 59:12, 59:14, 59:17, 60:2, 60:5, 60:8, 60:13, 60:14, 60:20, 60:23, 60:24, 60:25, 61:8, 61:11, 61:12, 61:15, 61:16, 61:17, 61:19, 61:21, 61:22, 61:24, 62:2, 62:3, 62:5, 62:7, 62:13, 62:14, 62:15, 62:17, 62:18, 63:5, 63:16, 63:19, 63:20, 63:21, 63:24, 64:2, 64:5, 64:6, 64:8, 64:11, 64:15, 64:18, 64:20, 64:21, 64:23, 65:7, 65:8, 65:12, 65:14, 65:15, 65:16, 65:17, 65:18, 65:19, 65:20, 65:21, 65:23, 66:2, 66:3, 66:6, 66:8, 66:9, 66:10, 66:16, 66:20, 66:25, 67:1, 67:2, 67:4, 67:5, 67:8, 67:11, 67:15, 67:18, 67:19, 67:20, 68:13, 68:21, 68:22, 69:9, 69:19, 69:20, 69:22, 70:3, 70:5, 70:8, 70:9, 70:11, 70:16, 70:20, 70:21, 70:24, 71:6, 71:7, 71:8, 71:9, 71:12, 72:7, 72:8, 72:14, 72:15, 72:18, 73:1, 73:3, 73:6, 73:10, 73:11, 73:12, 73:14, 73:15, 73:17, 73:18, 73:21, 73:22, 73:24, 74:2, 74:3, 74:5, 74:7, 74:8, 74:9, 74:11, 74:14, 74:15, 74:16, 74:17, 74:18, 74:20, 74:22, 74:23, 74:25, 75:15, 75:17, 75:18, 75:19, 75:23, 76:1, 76:2, 76:15, 76:16, 76:18, 76:20, 76:22, 76:23, 76:25, 77:3, 77:5, 77:8,

77:11, 77:12, 77:14, 77:16, 77:19, 77:22, 77:24, 78:4, 78:5, 78:9, 78:10, 78:13, 78:14, 78:15, 78:16, 78:17, 78:19, 78:20, 78:25, 79:8, 79:9, 79:12, 79:15, 79:18, 79:20, 79:22, 80:2, 80:4, 80:5, 80:9, 80:11, 80:14, 81:4, 81:6, 81:8, 81:10, 81:11, 81:16, 81:18, 81:19, 81:21, 81:22, 82:2, 82:3, 82:12, 82:13, 82:14, 82:15, 82:20, 82:21, 83:8, 83:11, 83:13, 83:14, 83:20, 83:22, 84:5, 84:9, 84:10, 84:17, 84:18, 84:20, 84:23, 85:1, 85:2, 85:23, 85:25, 86:2, 86:5, 86:6, 86:7, 86:9, 86:11, 86:12, 86:15, 86:18, 86:21, 86:23, 86:24, 86:25, 87:2, 87:3, 87:5, 87:6, 87:7, 87:17, 87:20, 87:21, 87:23, 87:25, 88:9, 88:11, 88:17, 88:18, 88:24, 89:2, 89:19, 89:22, 89:24, 90:3, 90:4, 90:13, 90:16, 90:21, 90:25, 91:2, 91:3, 91:5, 91:11, 91:14, 91:15, 91:21, 91:22, 91:25, 92:1, 92:4, 92:5, 92:7, 92:8, 92:10, 92:11, 92:18, 92:19, 92:23, 92:24, 93:1, 93:2, 93:12, 93:13, 93:14, 93:17, 93:19, 94:2, 94:3, 94:8, 94:11, 94:12, 94:17, 94:21, 95:1, 95:2, 95:8, 95:11, 95:13, 95:16, 95:17, 95:20, 96:1, 96:2, 96:4, 96:7, 96:9, 96:20, 96:21, 96:22, 97:16, 97:17, 98:1, 98:2, 98:16, 98:17, 98:18, 98:19, 98:21, 98:25, 99:1, 99:2, 99:3, 99:4, 99:5, 99:9, 99:12, 99:13, 99:17, 99:18, 99:25, 100:1, 100:3, 100:4, 100:7, 100:8, 100:15,

100:16, 100:19, 100:20, 100:22, 100:23, 101:5, 101:6, 101:16, 101:17, 101:23, 102:6, 102:8, 102:10, 102:12, 102:13, 102:15, 102:23, 102:24, 102:25, 103:1, 103:3, 103:5, 103:14, 103:17, 103:19, 103:20, 103:21, 103:25, 104:1, 104:3, 104:5, 104:7, 104:13, 104:15, 104:16, 104:17, 104:21, 104:22, 105:1, 105:4, 105:16, 105:21, 105:23, 106:2, 106:7, 106:8, 106:9, 107:8, 107:12, 107:13, 108:2, 108:13, 108:22, 109:17, 109:18, 109:22, 109:25, 110:1, 110:8, 110:10, 110:13, 110:14, 110:23, 110:24, 111:3, 111:4, 111:6, 111:7, 111:8, 111:9, 111:12, 111:13, 111:14, 112:7, 112:9, 112:10, 112:16, 112:19, 112:23, 112:25, 113:1, 113:4, 113:5, 113:7, 113:9, 113:10, 113:12, 113:14, 113:22, 113:23, 113:25, 114:1, 114:2, 114:19, 114:20, 117:3, 117:4, 117:5, 118:9, 118:10, 118:17, 118:18, 118:19, 119:5, 119:7, 119:11, 119:13, 119:16, 119:19, 120:2, 120:3, 120:23, 120:25, 121:3, 121:6, 121:7, 121:8, 121:9, 121:11, 121:20, 121:21, 122:9, 122:15, 122:19, 122:20, 122:22, 122:25, 123:6, 123:7, 123:9,

123:11, 123:12, 123:13, 123:14, 123:16, 123:17, 123:24, 124:1, 124:2, 124:5, 124:6, 124:8, 124:9, 124:10, 124:13
**mud** [1] - 110:16
**multiple** [6] - 12:8, 31:20, 88:1, 92:20, 93:24, 98:23
**must** [3] - 98:12, 101:11, 106:17
**mute** [5] - 27:2, 65:12, 103:24, 103:25, 114:20
**muted** [9] - 8:24, 32:18, 32:19, 64:20, 65:13, 103:21, 106:8, 112:15, 112:17
**myriad** [1] - 46:9

## N

**nail** [1] - 13:16
**name** [6] - 76:15, 82:25, 111:14, 116:11, 116:12
**names** [2] - 108:14, 116:11
**narrow** [2] - 14:4, 30:20
**natural** [1] - 48:15
**necessarily** [2] - 7:9, 68:20
**necessary** [3] - 35:7, 68:19, 118:3
**need** [33] - 5:23, 10:14, 12:1, 13:18, 14:10, 15:10, 17:4, 17:18, 19:2, 19:17, 20:12, 24:11, 27:2, 29:19, 30:14, 35:23, 39:16, 43:9, 43:11, 47:13, 48:2, 49:7, 52:22, 56:8, 68:6, 84:11, 84:13, 107:4, 110:25, 113:5, 119:25, 120:13
**needed** [3] - 5:18, 64:23, 76:4
**needs** [2] - 30:7, 54:15
**negative** [1] - 97:14
**network** [1] - 71:17
**never** [16] - 4:15, 4:17, 41:22, 46:22, 48:5, 52:25, 53:2, 54:3, 56:13, 111:20, 111:23, 112:13,

112:22, 114:6, 114:22, 117:25
**new** [1] - 54:1
**news** [1] - 53:2
**next** [11] - 10:21, 11:10, 11:17, 28:16, 32:4, 40:13, 42:24, 61:25, 75:20, 87:2, 93:25
**nice** [1] - 106:24
**night** [2] - 14:16, 71:14
**nine** [2] - 9:5, 16:16
**NO** [1] - 1:8
**no-man's-land** [1] - 7:17
**nobody** [4] - 88:25, 97:18, 102:21
**non** [4] - 48:12, 50:7, 59:18, 59:22
**non-confidential** [2] - 48:12, 50:7
**non-public** [2] - 59:18, 59:22
**none** [3] - 94:8, 97:18, 109:7
**normal** [1] - 46:19
**North** [1] - 2:3
**Northern** [1] - 117:17
**NOT** [1] - 125:9
**Notary** [1] - 1:21
**notes** [2] - 56:16, 125:10
**nothing** [6] - 20:22, 72:8, 83:2, 101:8, 110:12, 110:17
**notice** [10] - 6:15, 9:16, 10:1, 10:23, 88:10, 88:25, 89:8, 89:9, 112:2
**Notice** [1] - 1:19
**noticed** [1] - 61:13
**notices** [4] - 5:24, 6:1, 6:21, 6:24
**notify** [2] - 75:3, 85:15
**noting** [1] - 86:2
**November** [1] - 16:18
**now..** [1] - 79:21
**number** [4] - 45:6, 45:7, 49:14, 49:15
**numbers** [4] - 19:25, 25:7, 47:1

## O

**object** [1] - 88:13
**objecting** [1] - 116:6
**objectives** [1] - 48:10
**obligation** [2] - 36:20, 113:19

**obseferus** [1] - 118:5
**obvious** [1] - 49:7
**obviously** [12] - 8:10, 19:25, 23:25, 30:13, 37:18, 45:2, 49:6, 50:4, 54:18, 74:19, 84:8, 84:16
**Occam's** [1] - 97:25
**occam's** [1] - 98:2
**October** [4] - 16:19, 16:23, 118:1, 118:12
**odd** [2] - 96:12, 106:22
**OF** [3] - 1:1, 125:3, 125:4
**offering** [1] - 85:18
**officer** [1] - 109:15
**Offices** [1] - 2:8
**offs** [1] - 30:12
**often** [2] - 56:25
**Ohio** [1] - 87:16
**olive** [2] - 26:15, 85:18
**once** [4] - 14:20, 53:2, 81:25, 82:10
**one** [70] - 5:22, 7:19, 9:25, 11:17, 11:19, 11:21, 12:17, 16:8, 18:25, 23:19, 25:10, 25:18, 29:5, 33:4, 33:17, 38:19, 39:20, 41:1, 45:6, 45:14, 46:4, 49:14, 50:21, 54:20, 55:4, 55:20, 57:19, 58:11, 61:8, 61:10, 61:13, 61:22, 62:20, 67:12, 69:17, 70:1, 71:13, 71:14, 71:19, 73:7, 73:25, 74:4, 74:12, 74:25, 75:19, 79:24, 83:9, 83:24, 84:1, 89:17, 89:24, 93:7, 96:6, 96:16, 96:22, 98:5, 98:8, 99:3, 106:24, 109:2, 115:16, 115:20, 116:7, 116:20, 116:21, 122:3
**One** [1] - 74:25
**one's** [2] - 51:8, 62:22
**one-way** [1] - 70:1
**open** [3] - 24:2, 27:8, 31:18
**open-ended** [1] - 27:8
**opening** [3] - 85:10, 110:6, 110:8
**opinion** [1] - 14:7
**opportunity** [3] - 88:4, 107:1, 110:15
**opposed** [1] - 59:1

**opposing** [3] - 79:23, 89:6, 113:12
**opposite** [1] - 70:1
**order** [21] - 11:1, 11:2, 11:3, 11:6, 23:11, 28:21, 31:10, 32:13, 34:18, 35:1, 42:25, 47:4, 67:6, 71:1, 73:20, 82:10, 82:17, 112:20, 119:10
**Order** [40] - 14:21, 16:5, 16:12, 18:6, 21:17, 21:18, 23:20, 23:23, 25:3, 26:11, 26:23, 27:3, 27:5, 27:20, 28:2, 28:6, 30:4, 30:7, 30:15, 30:19, 35:5, 36:4, 42:16, 43:2, 51:17, 52:11, 52:15, 53:18, 54:25, 55:1, 66:4, 66:5, 66:7, 66:13, 66:15, 69:10, 69:11, 70:15, 84:12
**ordered** [2] - 32:14, 95:11
**orders** [1] - 76:3
**ordinarily** [1] - 49:1
**ordinary** [1] - 48:23
**oregano** [1] - 64:25
**original** [1] - 87:7
**Orlando** [3] - 114:10, 114:11, 114:17
**otherwise** [7] - 47:21, 48:13, 50:7, 51:23, 60:3, 110:3, 118:6
**ourselves** [1] - 123:22
**outdoor** [1] - 117:17
**outpatient** [1] - 33:24
**outside** [1] - 56:11
**over-designating** [1] - 54:22
**over-designation** [1] - 45:8
**overed** [1] - 121:14
**overly** [1] - 48:11
**own** [4] - 80:1, 116:3, 120:9, 120:10

## P

**P.A** [2] - 2:8, 2:13
**p.m** [3] - 1:17, 124:14
**pacific** [1] - 4:8
**page** [22] - 7:12, 16:16, 17:11, 17:12, 18:17, 22:6, 26:18, 46:13, 46:14, 47:1, 47:5, 47:11, 49:8, 49:25, 50:10, 55:20,

55:21, 63:9, 63:11, 72:11
**PAGE** [1] - 2:20
**page-by-page** [2] - 47:5, 72:11
**pages** [5] - 47:6, 50:14, 53:3, 71:19, 72:3
**paid** [5] - 76:11, 77:5, 78:12, 97:18, 97:19
**Palm** [8] - 35:14, 36:15, 37:2, 38:4, 39:7, 39:10, 74:3, 83:24
**paragraph** [11] - 61:8, 61:10, 61:14, 62:6, 63:3, 67:12, 70:19, 73:9, 73:11, 75:2, 75:12
**paragraphs** [1] - 65:3
**part** [14] - 29:2, 29:17, 32:9, 34:1, 45:20, 46:4, 46:8, 46:16, 46:17, 61:25, 63:19, 70:6, 83:1, 115:11
**participate** [2] - 33:16, 38:10
**particular** [3] - 104:23, 120:12, 120:13
**parties** [14] - 7:7, 8:10, 28:3, 32:14, 34:15, 44:24, 53:15, 53:21, 57:25, 58:12, 58:24, 60:3, 62:21, 125:12
**parties'** [1] - 125:13
**party** [14] - 3:7, 3:9, 45:15, 48:21, 49:1, 49:22, 52:11, 59:20, 83:2, 85:7, 85:13, 86:4, 104:19, 117:23
**passed** [2] - 84:16, 91:9
**past** [2] - 46:12, 109:5
**path** [1] - 69:17
**pay** [12] - 36:20, 36:23, 37:4, 68:9, 79:5, 79:9, 79:23, 80:8, 80:15, 87:18, 95:6, 120:25
**payment** [1] - 36:18
**peculiar** [1] - 42:4
**people** [9] - 6:14, 26:21, 36:10, 60:15, 86:20, 96:13, 99:21, 108:24, 116:10
**people's** [1] - 37:19
**perform** [1] - 16:16
**performed** [1] - 72:5
**perhaps** [1] - 37:16
**period** [3] - 16:22,

52:22, 120:20
**periods** [1] - 94:14
**person** [15] - 31:23, 35:12, 35:21, 35:23, 36:3, 38:18, 48:21, 49:22, 52:2, 87:12, 88:24, 93:25, 94:7, 120:24
**personal** [1] - 59:24
**perspective** [1] - 72:22
**pertain** [1] - 97:6
**pertaining** [2] - 96:10, 96:12
**perturbed** [1] - 30:13
**Peter** [4] - 65:10, 102:16, 106:20, 106:22
**pew** [1] - 83:6
**pews** [1] - 83:7
**phone** [4] - 5:7, 5:8, 26:16, 72:24
**phonetic** [1] - 118:5
**photograph** [1] - 31:1
**pick** [3] - 66:22, 118:14, 121:17
**picture** [1] - 26:17
**piece** [1] - 90:18
**piecemeal** [1] - 25:2
**pistol** [1] - 78:12
**PLACE** [1] - 1:18
**place** [4] - 16:5, 27:21, 57:25, 117:22
**plaintiff** [1] - 121:16
**Plaintiff** [1] - 1:6
**Plaintiffs** [1] - 2:7
**plaintiffs** [2] - 16:19, 107:18
**plan** [3] - 38:16, 41:10, 87:7
**planning** [1] - 88:2
**plans** [1] - 88:13
**platform** [2] - 24:18, 117:7
**platforms** [9] - 25:6, 90:10, 92:16, 94:20, 98:23, 102:20, 108:15, 109:4, 109:13
**play** [2] - 29:9, 83:6
**playbook** [1] - 101:2
**played** [1] - 6:16
**point** [23] - 13:15, 33:3, 35:14, 45:21, 48:9, 52:9, 54:11, 55:4, 58:24, 59:8, 68:25, 84:6, 89:3, 92:12, 98:16, 99:6, 100:7, 100:22, 103:6, 106:13,

106:14, 107:3, 122:16
**points** [5] - 13:7, 14:3, 45:3, 45:5, 67:3
**polite** [1] - 100:24
**portal** [2] - 36:1, 36:10
**portion** [5] - 7:24, 46:11, 47:17, 51:7
**portions** [2] - 45:17, 70:22
**position** [18] - 27:3, 37:5, 39:21, 41:16, 44:19, 51:23, 94:9, 105:1, 109:18, 109:19, 114:7, 118:3, 118:16, 119:6, 119:7, 119:11, 119:13, 119:14
**positions** [1] - 51:22
**possession** [3] - 25:25, 29:21, 29:22
**possible** [6] - 24:5, 41:7, 43:17, 85:5, 116:19, 119:15
**possibly** [2] - 23:14, 123:8
**posture** [1] - 27:24
**potatoes** [2] - 43:15, 67:21
**potential** [2] - 92:21, 98:7
**potentially** [1] - 85:19
**practicable** [1] - 71:3
**practical** [1] - 25:11
**practice** [3] - 54:2, 54:8, 107:5
**practices** [1] - 71:24
**practitioner** [2] - 111:1, 111:11
**prefer** [2] - 6:25, 40:8
**prejudice** [5] - 28:11, 28:17, 120:5, 120:12, 121:23
**prejudiced** [3] - 33:1, 78:23, 85:14
**prepare** [2] - 19:24, 20:19
**prepared** [2] - 87:9, 105:6
**preparing** [2] - 21:2, 46:24
**preplanned** [1] - 120:6
**present** [3] - 28:25, 119:1, 119:3
**presumably** [1] - 102:21
**presume** [1] - 33:14
**pretty** [10] - 10:22, 29:6, 32:6, 45:22,

57:5, 61:4, 79:22, 83:4, 107:11
**prevent** [1] - 113:19
**preventing** [1] - 57:25
**previously** [1] - 31:14
**primitive** [1] - 56:25
**print** [1] - 33:12
**printed** [1] - 46:14
**privacy** [1] - 59:25
**private** [1] - 52:21
**probable** [1] - 98:5
**problem** [16] - 11:12, 11:25, 21:15, 23:18, 27:10, 28:17, 40:4, 48:24, 49:9, 56:17, 58:7, 60:19, 61:3, 63:13, 67:23, 121:23
**problematic** [4] - 61:20, 61:23, 63:15, 115:19
**problems** [2] - 23:19, 93:3
**procedure** [3] - 48:23, 53:17, 54:16
**PROCEEDINGS** [2] - 2:21, 3:1
**process** [2] - 43:12, 72:6
**produce** [23] - 11:1, 17:18, 18:6, 23:5, 24:13, 24:23, 25:4, 27:5, 28:11, 49:14, 71:15, 89:15, 92:19, 96:16, 98:23, 98:25, 103:20, 104:9, 104:12, 104:20, 117:9, 122:5, 123:12
**produced** [10] - 12:14, 14:20, 15:20, 24:6, 52:24, 94:8, 102:5, 107:22, 107:25, 108:20
**producing** [1] - 35:9
**production** [8] - 22:14, 23:9, 24:10, 24:19, 25:9, 46:24, 48:3, 108:5
**productions** [1] - 96:23
**productive** [2] - 82:12, 102:2
**professional** [1] - 24:20
**program** [4] - 76:9, 76:10, 76:11, 83:1
**progressing** [1] - 67:9
**projecting** [1] - 115:4
**promise** [1] - 42:11
**promptly** [1] - 85:15
**proof** [1] - 97:14

**properly** [1] - 12:2
**propose** [2] - 50:18, 73:9
**proposed** [4] - 26:22, 28:21, 55:10, 62:4
**proposing** [1] - 50:23
**proprietary** [1] - 59:22
**protect** [1] - 95:6
**protectable** [2] - 46:5, 55:6
**protection** [1] - 52:22
**Protection** [1] - 16:5
**protective** [5] - 26:22, 28:21, 31:10, 49:2, 52:16
**Protective** [39] - 14:21, 16:11, 18:6, 21:17, 21:18, 23:20, 23:23, 25:3, 26:11, 26:23, 27:3, 27:5, 27:20, 28:2, 28:6, 30:3, 30:7, 30:15, 30:19, 35:4, 36:4, 42:16, 43:1, 51:17, 52:10, 52:11, 52:15, 53:18, 54:25, 55:1, 66:3, 66:5, 66:7, 66:13, 66:15, 69:10, 69:11, 70:15, 84:12
**prove** [2] - 57:22, 104:17
**provide** [6] - 17:2, 17:3, 51:12, 70:25, 97:22, 118:2
**provided** [3] - 11:7, 16:19, 51:16
**provides** [3] - 69:24, 69:25, 70:1
**providing** [1] - 23:14
**provision** [1] - 69:2
**provisions** [1] - 23:23
**Pryor** [1] - 2:5
**psychologist** [1] - 115:1
**psychology** [1] - 115:1
**public** [4] - 47:10, 49:17, 59:18, 59:22
**Public** [1] - 1:21
**publish** [2] - 53:12, 89:14
**pull** [5] - 22:2, 22:5, 33:8, 91:2, 91:25
**pulled** [1] - 18:20
**pulling** [3] - 33:19, 92:1, 92:6
**punish** [1] - 120:9
**purely** [1] - 78:17
**purpose** [1] - 35:9
**purposefully** [1] -

54:22
**PURSUANT** [1] - 1:19
**PURY** [123] - 2:8, 3:12, 7:18, 7:23, 8:3, 8:9, 8:13, 8:18, 8:24, 9:1, 10:25, 18:24, 29:4, 32:20, 33:5, 33:19, 33:22, 34:1, 38:12, 38:14, 38:16, 38:22, 41:19, 42:3, 42:7, 42:10, 42:24, 43:4, 43:10, 44:4, 44:10, 44:17, 45:24, 50:11, 51:3, 53:7, 53:24, 55:19, 59:3, 59:12, 62:2, 62:5, 62:13, 62:15, 62:18, 64:2, 64:5, 64:8, 64:11, 64:15, 64:23, 65:8, 65:14, 65:16, 66:10, 66:25, 67:8, 74:25, 75:17, 75:19, 76:1, 76:15, 76:25, 77:22, 78:9, 81:16, 81:19, 81:22, 82:3, 82:13, 82:15, 82:21, 83:11, 83:14, 83:22, 84:9, 84:17, 86:18, 86:24, 87:3, 87:6, 87:17, 87:21, 87:25, 88:11, 88:18, 89:2, 89:22, 90:13, 90:21, 91:5, 91:14, 91:25, 92:7, 92:10, 92:18, 92:23, 93:19, 94:3, 94:12, 94:21, 95:2, 95:11, 95:16, 103:25, 104:5, 106:9, 107:12, 112:16, 114:2, 114:20, 117:4, 118:17, 118:19, 119:7, 119:13, 120:25, 121:6, 121:8, 121:11, 124:1, 124:10, 124:13
**Pury** [1] - 2:8
**Pury's** [2] - 27:12, 101:7
**put** [13] - 4:15, 6:19, 42:25, 44:2, 45:1, 46:7, 46:10, 46:20, 60:2, 61:17, 69:2, 91:15, 115:17
**puts** [1] - 30:17
**putting** [2] - 8:6, 62:9

## Q

**qualifies** [1] - 59:19

**qualifying** [1] - 5:23
**questionable** [1] - 88:6
**questions** [3] - 38:13, 86:9, 87:24
**quick** [4] - 11:9, 63:22, 64:22, 77:20
**quicker** [2] - 28:23, 28:24
**quickly** [2] - 13:17, 66:13
**quiet** [1] - 21:24
**quite** [1] - 116:19
**quote** [1] - 77:25

## R

**raised** [1] - 88:25
**raising** [1] - 105:10
**range** [1] - 117:17
**rate** [1] - 79:10
**rather** [5] - 36:2, 37:17, 39:7, 73:25, 120:23
**razor** [2] - 97:25, 98:2
**re** [2] - 83:17, 83:20
**re-depose** [2] - 83:17, 83:20
**reach** [5] - 21:4, 42:16, 43:13, 77:20, 88:20
**reached** [3] - 23:2, 70:17, 103:6
**reaching** [1] - 29:19
**read** [17] - 30:4, 30:15, 53:19, 58:20, 63:17, 77:12, 77:17, 89:11, 89:12, 89:15, 93:21, 93:22, 100:17, 106:18, 110:18, 115:6, 116:6
**reading** [4] - 16:15, 77:24, 100:25, 116:4
**ready** [1] - 64:19
**real** [2] - 3:8, 64:22
**realistic** [1] - 117:14
**reality** [1] - 123:9
**realized** [1] - 88:14
**really** [16] - 11:21, 25:19, 43:9, 43:15, 46:5, 51:7, 56:10, 62:10, 69:23, 72:12, 88:15, 100:5, 100:6, 103:21, 104:1, 113:14
**reason** [13] - 4:10, 4:24, 26:12, 35:22, 76:25, 82:7, 85:13, 109:23, 115:5, 116:14, 122:16,

123:17, 123:19
**reasonable** [5] - 30:24, 44:12, 56:5, 57:24, 120:19
**reasons** [3] - 88:15, 98:8
**received** [3] - 6:7, 13:3, 25:23
**recently** [1] - 112:19
**reception** [1] - 117:20
**reciprocal** [4] - 68:24, 69:5, 69:18, 69:21
**reciprocity** [1] - 70:9
**record** [8] - 8:6, 29:11, 66:22, 99:18, 99:19, 100:3, 115:21, 125:10
**recording** [1] - 93:19
**records** [1] - 21:3
**recreational** [1] - 78:18
**redline** [1] - 75:15
**reference** [2] - 57:6, 116:16
**referenced** [1] - 17:5
**referring** [2] - 18:15, 51:1
**refers** [1] - 122:17
**refused** [3] - 82:17, 82:25, 118:21
**refusing** [2] - 97:22, 115:12
**Regarding** [1] - 1:19
**regardless** [1] - 70:2
**regular** [2] - 64:25, 79:10
**regulate** [1] - 70:13
**reimbursed** [2] - 79:3, 118:15
**reiterate** [1] - 83:11
**reiterates** [1] - 41:8
**related** [9] - 76:13, 77:10, 77:17, 77:18, 78:7, 86:18, 86:21, 95:22, 105:19
**relating** [3] - 107:17, 107:18, 107:19
**relation** [1] - 90:23
**relationship** [1] - 68:2
**relative** [2] - 125:11, 125:13
**relevant** [2] - 48:6, 71:25
**reliably** [1] - 117:20
**relied** [7] - 14:25, 15:10, 15:17, 15:18, 17:19, 18:2, 18:9
**relief** [3] - 56:21, 56:22, 57:1
**rely** [3] - 14:23, 15:23,

16:2
**relying** [1] - 47:14
**remember** [7] - 22:3, 58:18, 99:13, 100:10, 100:12, 113:2, 113:9
**remembering** [1] - 105:25
**remind** [3] - 82:7, 82:16, 114:8
**remote** [4] - 81:15, 84:24, 88:3, 88:7
**remotely** [5] - 80:17, 81:1, 81:25, 85:8, 87:8
**repetitive** [1] - 13:7
**replace** [1] - 63:1
**replacing** [2] - 62:5, 62:7
**replied** [3] - 5:16, 22:7, 75:8
**reply** [1] - 30:19
**report** [24] - 12:2, 12:4, 12:19, 12:22, 12:25, 13:4, 13:8, 14:6, 14:23, 14:25, 16:16, 18:3, 18:17, 19:12, 19:15, 19:25, 20:6, 20:10, 20:11, 20:20, 71:18, 125:7
**REPORTER** [19] - 3:4, 3:8, 10:8, 10:10, 10:13, 63:22, 64:3, 64:7, 64:10, 64:13, 64:17, 64:19, 65:24, 66:18, 66:24, 100:5, 103:23, 112:17, 124:12
**Reporter** [3] - 1:20, 125:6, 125:19
**reporter** [11] - 3:5, 5:11, 8:15, 15:12, 34:20, 34:25, 36:7, 43:19, 43:21, 87:18, 93:19
**reporter's** [2] - 6:11, 35:6
**REPORTER'S** [2] - 2:23, 125:1
**reporters** [2] - 51:9, 95:6
**reports** [1] - 71:16
**represent** [1] - 109:14
**reprimanded** [1] - 93:7
**reputation** [1] - 99:20
**request** [5] - 20:15, 23:9, 56:25, 97:1, 123:19
**requested** [2] - 25:2,

125:9
**requests** [7] - 25:23, 26:14, 47:24, 97:6, 122:4, 122:11, 123:10
**require** [3] - 20:5, 58:15, 107:2
**required** [10] - 20:20, 51:14, 57:19, 57:23, 58:2, 79:18, 80:7, 91:12, 97:3, 118:15
**requirement** [1] - 71:4
**requires** [3] - 50:13, 50:25, 103:20
**Reserve** [1] - 76:3
**reserve** [2] - 11:18, 41:23
**reserves** [1] - 11:18
**resize** [1] - 19:3
**resolution** [1] - 14:20
**resolve** [10] - 23:16, 26:2, 53:22, 55:5, 61:1, 61:3, 61:9, 70:17, 81:2, 103:7
**resolved** [7] - 21:20, 26:3, 26:4, 53:18, 54:14, 59:14, 73:25
**resolving** [1] - 70:18
**respect** [5] - 19:19, 19:20, 39:24, 72:2, 108:3
**respectful** [1] - 111:11
**respond** [7] - 47:22, 89:16, 97:1, 114:14, 115:22, 115:23
**responded** [5] - 10:3, 28:19, 28:20, 75:24, 115:6
**response** [4] - 23:8, 44:20, 65:9, 85:21
**responses** [2] - 90:6, 100:17
**responsive** [3] - 94:13, 108:11, 116:15
**rest** [2] - 19:11, 46:6
**restore** [2] - 65:17, 65:19
**restored** [1] - 101:21
**restricted** [1] - 48:12
**restroom** [1] - 64:1
**result** [4] - 48:15, 68:11, 69:7, 98:3
**retaliation** [1] - 101:14
**retaliatory** [1] - 115:14
**retapping** [1] - 66:10
**retrieved** [1] - 102:21
**returned** [1] - 24:22
**returning** [1] - 11:11
**returns** [10] - 14:18,

14:23, 15:17, 15:21, 16:4, 16:6, 16:13, 17:24, 18:5, 49:7
**reveal** [1] - 47:17
**revenue** [5] - 19:15, 19:16, 19:25, 20:8
**revert** [1] - 103:11
**review** [7] - 24:18, 24:20, 25:6, 52:23, 72:5, 125:8
**reviewed** [4] - 16:17, 16:20, 71:19, 107:15
**revised** [2] - 14:13, 14:15
**RFA's** [1] - 123:4
**RFP's** [1] - 123:5
**rhetoric** [1] - 101:3
**RICO** [2] - 96:18, 98:9
**rid** [2] - 62:9, 62:19
**risk** [6] - 30:17, 31:10, 31:11, 34:12, 56:5, 57:22
**Road** [1] - 2:9
**robbery** [2] - 104:11
**round** [2] - 47:24, 122:3
**rule** [9] - 23:1, 50:13, 50:25, 51:1, 58:4, 79:22, 82:9, 82:11
**Rule** [5] - 48:20, 51:3, 52:14, 59:20, 69:22
**rules** [10] - 20:5, 37:8, 48:23, 51:19, 53:23, 68:17, 79:13, 82:1, 112:12, 118:16
**run** [1] - 66:12
**running** [1] - 114:2
**rural** [1] - 40:16

## S

**sake** [1] - 24:25
**sales** [6] - 14:25, 16:17, 16:22, 17:1, 17:6, 17:7
**sanctioned** [7] - 69:4, 111:23, 112:13, 112:22, 112:23, 119:21, 119:24
**sanctions** [5] - 68:12, 69:8, 89:25, 91:8, 112:20
**sat** [2] - 108:25, 109:1
**save** [1] - 10:4
**saved** [1] - 10:2
**saw** [4] - 5:15, 44:16, 88:24, 114:7
**schedule** [7] - 6:6, 6:12, 33:19, 42:21, 42:22, 42:25, 75:25

**scheduled** [5] - 40:16, 41:9, 76:8, 78:3, 84:8
**scheduling** [1] - 13:11
**school** [1] - 115:3
**screen** [1] - 18:21
**sealed** [1] - 47:13
**search** [1] - 72:13
**searched** [1] - 107:14
**second** [10] - 10:8, 10:10, 10:25, 16:10, 18:19, 29:13, 63:17, 65:24, 65:25, 93:7
**secondary** [1] - 16:23
**sections** [1] - 48:7
**secure** [1] - 32:1
**security** [6] - 71:16, 71:17, 71:24, 72:2, 72:4, 72:9
**see** [46] - 5:23, 9:25, 17:1, 19:3, 19:7, 19:8, 19:17, 20:2, 20:5, 20:12, 21:10, 27:23, 28:11, 28:17, 29:12, 32:23, 32:25, 41:3, 41:16, 48:2, 49:23, 54:15, 55:21, 55:22, 56:19, 60:18, 61:13, 63:14, 68:15, 76:4, 76:10, 77:1, 85:10, 88:9, 88:11, 89:18, 95:13, 98:16, 104:24, 107:7, 107:21, 110:6, 110:19, 112:1, 115:6, 115:7
**seeking** [3] - 48:1, 52:11, 72:1
**seem** [2] - 51:12, 90:11
**seminar** [1] - 78:10
**send** [16] - 7:3, 8:16, 23:8, 23:15, 26:24, 51:21, 52:1, 52:10, 56:13, 56:16, 57:10, 69:13, 71:6, 71:7, 80:13
**sending** [2] - 14:13, 25:10
**sense** [3] - 60:24, 75:19, 80:16
**sensitive** [3] - 25:20, 27:25, 50:3
**sent** [11] - 4:25, 5:1, 5:14, 5:24, 5:25, 12:7, 26:17, 44:15, 83:25, 87:19, 104:24
**sentence** [5] - 52:23, 81:19, 82:13, 82:15
**sentence-by-**

**sentence** [1] - 52:23
**separately** [1] - 43:17
**sequence** [1] - 122:17
**serious** [2] - 113:16, 117:22
**seriously** [2] - 34:10, 109:1
**serve** [3] - 91:8, 123:10, 123:19
**served** [7] - 26:14, 47:23, 47:24, 75:3, 90:2, 90:15, 90:22
**service** [6] - 39:23, 40:11, 40:12, 76:13, 77:10, 77:18
**serving** [3] - 32:10, 49:23
**set** [3] - 36:4, 53:18, 121:12
**setting** [1] - 7:5
**seven** [3] - 65:11, 81:9, 85:7
**severely** [1] - 115:4
**shall** [3] - 59:18, 67:23, 68:9
**share** [5] - 18:21, 23:10, 26:20, 92:4, 103:9
**shared** [1] - 122:11
**shift** [1] - 49:21
**shifting** [2] - 54:1, 68:20
**shocked** [1] - 100:13
**shooter** [1] - 78:15
**shooting** [1] - 78:24
**short** [2] - 41:14, 107:11
**shot** [1] - 44:14
**should've** [1] - 29:22
**shoulder** [1] - 118:20
**show** [6] - 12:19, 34:6, 34:16, 106:3, 111:18, 118:7
**showing** [1] - 58:16
**sic** [1] - 7:16
**side** [6] - 48:3, 50:15, 50:16, 57:4, 69:1, 110:16
**sides** [1] - 43:8
**sign** [2] - 30:8, 35:1
**signal** [1] - 109:8
**signed** [3] - 22:10, 26:19, 117:25
**signs** [2] - 34:17, 82:10
**simple** [7] - 20:13, 25:22, 97:15, 97:17, 100:8, 108:5, 108:6
**simpler** [1] - 60:9
**simply** [1] - 24:3

**single** [4] - 21:21, 50:10, 114:13, 116:6
**sit** [2] - 116:22, 118:20
**situation** [2] - 46:7, 82:3
**six** [3] - 65:11, 83:25, 87:19
**skip** [1] - 121:4
**slice** [2] - 98:4, 98:7
**slip** [1] - 89:10
**smack** [1] - 116:23
**small** [1] - 63:13
**Smith** [1] - 59:10
**so..** [3] - 21:4, 55:2, 123:10
**social** [1] - 16:24
**soften** [1] - 68:7
**softer** [1] - 71:2
**solution** [4] - 62:4, 121:22
**solved** [1] - 72:24
**solves** [1] - 8:19
**someone** [2] - 41:22, 89:7
**sometimes** [2] - 73:23
**somewhat** [1] - 115:17
**somewhere** [3] - 20:1, 20:8, 62:21
**soon** [3] - 16:4, 107:10, 124:4
**sooner** [5] - 24:10, 28:19, 28:20, 37:17, 73:25
**sorry** [16] - 4:9, 9:19, 15:6, 15:8, 35:3, 63:18, 63:24, 63:25, 84:5, 94:23, 104:3, 117:4, 121:3, 121:12, 124:10
**sort** [5] - 54:15, 58:24, 120:22, 122:10, 122:23
**sought** [1] - 56:20
**sounds** [6] - 17:4, 17:7, 43:12, 60:6, 60:7, 75:18
**source** [9] - 18:12, 18:13, 18:14, 18:15, 19:10, 19:17, 19:19, 20:25, 50:3
**South** [1] - 99:19
**SOUTHERN** [1] - 1:1
**Southern** [3] - 69:13, 106:4, 106:6
**speaking** [1] - 37:11
**speaks** [1] - 93:25
**specific** [3] - 91:18, 97:21
**specifically** [3] - 68:8,

91:13, 116:12
**specify** [2] - 23:24, 75:7
**specifying** [1] - 70:22
**spell** [1] - 31:3
**spend** [2] - 42:1, 117:16
**spent** [2] - 32:10, 110:19
**splintered** [1] - 5:14
**spoliation** [13] - 65:5, 67:6, 89:25, 92:21, 101:3, 101:19, 104:19, 105:10, 106:1, 106:11, 109:24, 113:16, 113:19
**spurious** [1] - 101:24
**squirming** [1] - 86:17
**standard** [1] - 56:24
**start** [5] - 3:11, 63:25, 80:23, 81:5, 105:25
**started** [3] - 26:25, 101:18, 105:23
**STATE** [1] - 125:3
**State** [1] - 1:21
**stating** [2] - 53:8, 114:4
**stay** [1] - 71:14
**stealing** [2] - 98:10, 98:11
**stenographic** [1] - 125:10
**stenographically** [1] - 125:7
**step** [3] - 97:1, 117:18, 119:2
**sticking** [1] - 10:6
**still** [8] - 12:9, 26:2, 61:12, 61:23, 66:16, 75:10, 105:19, 120:21
**stipulate** [1] - 41:10
**stipulating** [1] - 39:14
**stolen** [2] - 104:12, 104:14
**stop** [7] - 10:14, 13:25, 66:17, 99:14, 99:18, 100:8, 112:14
**stopped** [1] - 43:2
**stored** [1] - 108:16
**straight** [3] - 36:3, 36:6, 36:7
**strike** [5] - 61:20, 101:14, 101:25, 121:15
**strike-suit** [3] - 101:14, 101:25
**strikes** [1] - 63:12
**Stroke** [3] - 4:7,

100:12, 100:13
**struck** [2] - 61:16, 106:22
**structured** [1] - 123:21
**stuck** [1] - 30:24
**stuff** [11] - 13:17, 48:19, 88:23, 97:9, 104:12, 104:20, 109:6, 111:22, 111:24, 113:16, 122:11
**sub** [2] - 45:21, 55:4
**sub-point** [2] - 45:21, 55:4
**subject** [5] - 9:15, 26:1, 29:2, 78:11, 112:20
**submit** [4] - 30:7, 47:16, 74:13, 74:18
**subpart** [3] - 55:24, 61:3, 61:12
**subpoena** [3] - 75:3, 120:14, 120:19
**subscription** [2] - 15:1, 17:6
**subscriptions** [2] - 16:17, 20:7
**substantiates** [1] - 118:2
**success** [1] - 69:15
**sued** [2] - 96:13, 116:20
**sufficient** [1] - 6:15
**suggest** [2] - 10:23, 121:4
**suggesting** [2] - 63:10, 101:11
**suggestion** [2] - 70:24, 111:11
**suit** [3] - 101:14, 101:25
**summarizing** [1] - 116:14
**SUMNER** [1] - 1:20
**sumner** [2] - 118:17, 124:10
**Sumner** [6] - 3:5, 95:3, 95:5, 106:10, 125:6, 125:19
**super** [1] - 35:17
**supplemental** [1] - 14:16
**supplied** [1] - 15:1
**supply** [1] - 115:24
**supported** [3] - 23:1, 44:19, 51:24
**supporting** [1] - 51:22
**supports** [1] - 51:17
**suppose** [2] - 20:24,

38:1
**supposed** [1] - 98:4
**Supreme** [1] - 70:13
**surgery** [6] - 33:6, 33:15, 33:23, 121:2, 121:5, 121:7
**surmising** [1] - 78:6
**switch** [1] - 50:17
**system** [1] - 14:19
**systems** [1] - 71:24

## T

**tag** [1] - 24:23
**tails** [1] - 55:8
**talks** [1] - 63:2
**taught** [2] - 118:24, 118:25
**tax** [13] - 14:18, 14:23, 15:17, 15:21, 16:4, 16:6, 16:13, 16:20, 16:21, 17:6, 17:23, 18:5, 49:6
**tea** [3] - 64:24, 64:25
**team** [2] - 29:5, 29:8
**technical** [1] - 59:23
**tend** [1] - 13:6
**tens** [1] - 47:6
**tentative** [2] - 121:11, 121:16
**terms** [1] - 46:25
**test** [2] - 48:17, 71:17
**testified** [1] - 98:22
**testify** [2] - 95:3, 95:5
**testimony** [3] - 35:10, 56:2, 107:16
**Texas** [1] - 37:1
**text** [2] - 108:15, 108:25
**THE** [20] - 1:1, 3:4, 3:8, 10:8, 10:10, 10:13, 63:22, 64:3, 64:7, 64:10, 64:13, 64:17, 64:19, 65:24, 66:18, 66:24, 100:5, 103:23, 112:17, 124:12
**theoretical** [2] - 97:12, 98:15
**theoretically** [1] - 24:14
**theory** [1] - 65:5
**thereafter** [1] - 87:10
**they've** [1] - 107:24
**thief** [2] - 104:17, 104:18
**thinking** [1] - 90:22
**thinks** [3] - 54:6, 55:22, 117:1
**third** [2] - 5:19, 30:3

**thirteen** [1] - 73:11
**thoroughly** [2] - 110:21, 115:7
**thousands** [4] - 24:17, 47:6, 53:3
**three** [11] - 4:12, 7:15, 38:17, 62:15, 64:8, 64:9, 83:9, 100:13, 103:10, 107:17, 113:19
**threw** [1] - 115:11
**Thursday** [2] - 11:9, 114:8
**Thursday's** [1] - 59:7
**TIME** [1] - 1:17
**timeframe** [1] - 41:14
**timeline** [1] - 115:15
**TO** [1] - 1:19
**today** [10] - 3:5, 8:15, 25:4, 27:6, 31:8, 42:9, 73:16, 90:20, 91:15, 123:10
**together** [3] - 18:18, 78:22, 119:22
**tomorrow** [2] - 12:22, 73:16
**ton** [2] - 64:24, 122:11
**took** [2] - 44:22, 104:18
**tooth** [3] - 89:12, 89:13, 89:15
**top** [3] - 19:11, 46:16, 55:20
**totality** [3] - 107:23, 108:5, 108:20
**totally** [1] - 72:21
**touch** [2] - 39:25
**town** [2] - 11:10, 31:24
**train** [1] - 117:22
**trained** [1] - 116:21
**training** [8] - 76:6, 76:12, 78:2, 78:6, 80:23, 83:1, 115:2, 117:15
**transaction** [1] - 21:1
**transcript** [12] - 88:15, 93:14, 93:15, 93:21, 93:22, 94:24, 95:1, 110:18, 111:18, 115:7, 125:8, 125:9
**transcripts** [3] - 95:2, 107:16, 117:11
**transgressions** [1] - 120:10
**transmission** [3] - 49:18, 53:10, 53:11
**travel** [4] - 36:25, 79:5, 80:4, 80:8
**travelling** [1] - 37:23
**treat** [6] - 12:9, 21:21,

23:7, 23:15, 23:22, 69:20
**treatment** [1] - 59:19
**treats** [1] - 59:21
**trends** [1] - 16:25
**tricks** [1] - 6:13
**tried** [2] - 5:13, 101:3
**tries** [1] - 31:3
**trip** [9] - 11:19, 39:22, 40:3, 40:16, 41:9, 79:3, 82:4, 121:1
**true** [4] - 36:22, 96:7, 112:15, 125:9
**trust** [2] - 68:3, 89:5
**try** [8] - 6:19, 41:1, 53:22, 66:11, 93:20, 110:16, 119:20, 120:17
**Trya** [1] - 117:14
**trying** [14] - 6:5, 8:14, 28:5, 48:11, 51:4, 65:5, 65:17, 65:19, 94:18, 104:6, 106:13, 115:20, 116:1, 122:9
**Tuesday** [1] - 121:18
**Tuesday's** [1] - 59:7
**turn** [2] - 29:20, 55:10
**turned** [2] - 121:13, 121:14
**turning** [1] - 94:6
**tweak** [1] - 68:16
**twice** [1] - 50:23
**two** [24] - 6:21, 11:11, 11:17, 17:12, 23:19, 24:4, 29:4, 29:7, 31:21, 33:15, 41:23, 45:3, 45:5, 45:8, 49:11, 49:15, 55:21, 61:14, 67:3, 73:8, 75:21, 100:20, 114:9, 121:14
**types** [1] - 48:16
**typically** [2] - 71:18, 89:6

## U

**uber** [1] - 114:15
**ultimately** [1] - 73:19
**un-mute** [1] - 103:25
**un-muted** [2] - 32:19, 65:13
**unable** [2] - 83:18, 88:14
**unacceptable** [1] - 44:14
**unavailability** [1] - 40:24
**unbelievable** [1] -

26:15
**unconstitutional** [1] - 70:12
**under** [10] - 26:18, 26:19, 27:14, 47:13, 48:20, 59:20, 60:15, 68:17, 70:6, 112:12
**underlying** [1] - 103:1
**understood** [1] - 31:18
**undertake** [3] - 32:21, 91:16, 112:4
**unequivocally** [1] - 94:5
**unforeseeable** [1] - 48:15
**unilaterally** [2] - 88:8, 88:19
**unless** [2] - 32:1, 81:18
**unmute** [1] - 112:16
**unqualified** [1] - 7:15
**unquestionably** [1] - 47:4
**unquote** [1] - 78:5
**unreasonable** [2] - 54:13, 119:9
**unrelated** [1] - 110:20
**unrestricted** [1] - 56:4
**unsuccessful** [1] - 68:23
**unsuccessfully** [1] - 69:6
**unusual** [1] - 17:1
**up** [36] - 7:19, 8:7, 10:23, 18:20, 22:2, 22:5, 26:13, 29:14, 30:21, 31:4, 31:5, 32:22, 36:15, 46:11, 55:14, 55:17, 65:2, 66:22, 67:8, 67:14, 75:22, 78:25, 80:21, 82:5, 91:2, 91:25, 92:1, 92:6, 99:19, 116:14, 117:25, 120:13, 121:25, 123:1
**upload** [2] - 24:16, 24:23
**uploaded** [2] - 14:19, 24:18
**uploading** [1] - 36:10
**upset** [1] - 109:23
**urge** [1] - 11:22
**Utah** [1] - 112:20

## V

**vacation** [2] - 24:21, 119:8

**vacuum** [2] - 49:3, 122:23
**vague** [1] - 63:8
**vagueness** [1] - 62:19
**valuable** [1] - 59:24
**value** [1] - 56:4
**various** [2] - 90:10, 92:16
**vast** [1] - 48:4
**verbatim** [1] - 10:13
**versus** [1] - 50:9
**via** [2] - 1:18, 88:7
**victim** [2] - 104:11, 104:13
**video** [2] - 65:21, 65:23
**videotaped** [1] - 10:1
**violated** [1] - 90:11
**violation** [1] - 91:22
**virtual** [4] - 33:16, 34:16, 36:23, 120:24
**Virtual** [1] - 1:18
**virtually** [1] - 87:10
**voluminous** [1] - 46:25
**VS** [1] - 1:8
**vulnerability** [1] - 72:2

## W

**Wacker** [1] - 2:3
**wait** [10] - 3:21, 10:8, 10:10, 10:18, 13:10, 67:4, 77:5, 81:4, 93:5
**waive** [1] - 7:8
**waived** [1] - 7:4
**walked** [1] - 93:25
**wants** [3] - 41:25, 78:24, 83:6
**WAS** [1] - 125:8
**wasting** [1] - 80:9
**watch** [2] - 64:11, 64:15
**ways** [1] - 46:9
**weapons** [2] - 76:12, 78:6
**website** [2] - 26:18, 72:13
**week** [51] - 10:21, 10:22, 11:17, 11:19, 11:21, 21:19, 24:6, 24:21, 28:6, 32:24, 33:3, 33:7, 33:18, 39:15, 39:18, 40:8, 40:10, 40:13, 40:21, 41:3, 41:9, 41:11, 41:23, 42:24, 50:22, 76:2, 76:5, 76:6, 78:1, 78:2, 78:24,

81:2, 84:24, 99:14, 114:10, 117:24, 118:11, 118:13, 118:14, 119:12, 119:17, 120:17, 120:20, 121:17, 122:2, 123:12, 123:14
**weekend** [3] - 42:1, 82:4, 83:7
**weeks** [5] - 11:11, 11:17, 100:10, 100:20, 114:9
**weirdness** [1] - 34:19
**welcome** [1] - 3:7
**well'** [1] - 67:21
**well-known** [1] - 117:22
**well-supported** [1] - 51:24
**west** [1] - 39:10
**West** [8] - 35:14, 36:15, 37:2, 38:4, 38:21, 39:7, 74:3, 83:24
**whatever's** [1] - 122:4
**whole** [6] - 41:9, 50:4, 86:3, 118:13, 122:15, 122:16
**willing** [18] - 37:4, 39:11, 39:12, 41:10, 79:2, 79:10, 79:16, 81:1, 83:20, 83:21, 84:1, 84:24, 85:8, 106:2, 117:18, 118:7, 118:13, 119:2
**Wilson** [2] - 103:2, 107:19
**wish** [1] - 3:8
**witness** [4] - 36:7, 41:20, 82:8, 119:15
**wondering** [1] - 87:17
**word** [5] - 5:2, 5:22, 29:9, 61:16, 70:4
**words** [3] - 5:23, 60:10, 77:23
**works** [6] - 8:22, 9:3, 11:21, 64:6, 124:5, 124:6
**world** [1] - 83:1
**Worth** [1] - 2:11
**would've** [1] - 109:16
**wow** [1] - 50:3
**wrap** [1] - 65:2
**wrinkle** [1] - 72:25
**writing** [12] - 4:11, 4:16, 4:19, 4:24, 22:10, 26:15, 26:20, 30:22, 75:4, 75:5, 75:13

**written** [2] - 26:18, 106:4

## Y

**year** [3] - 26:8, 32:10, 118:1
**years** [4] - 16:21, 49:11, 58:11, 112:22
**yesterday** [7] - 17:18, 17:24, 18:5, 24:4, 24:22, 29:16, 31:22
**yield** [1] - 29:3
**yourself** [4] - 32:18, 93:4, 95:24, 103:25

## Z

**Zach** [7] - 3:14, 6:17, 8:21, 8:22, 8:24, 34:2, 38:10
**zach's** [1] - 38:19
**ZACHERY** [1] - 2:12
**Zachery** [3] - 8:19, 34:2, 113:21
**Zack** [1] - 38:21
**zermay** [1] - 6:8
**ZERMAY** [7] - 2:12, 8:25, 9:3, 9:7, 9:20, 10:4, 38:11
**Zermay** [2] - 2:13, 7:10
**Zermay's** [1] - 27:13
**ZOOM** [1] - 1:14
**zoom** [3] - 19:6, 63:3, 63:4
**Zoom** [2] - 1:18, 33:11