UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE №: 9:25-cv-81197

DEFENSE DISTRIBUTED, et. al.,

        *Plaintiffs,*

v.

JOHN ELIK, et al.,

        *Defendants.*

_____/

## **DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' EXPERT JASON M. TYRA AND INCORPORATED MEMORANDUM OF LAW**

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................iii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

ARGUMENT ..................................................................................................... 4

I.    TYRA'S CAUSATION OPINION IS *IPSE DIXIT*.......................................... 4

II.    TYRA'S OPINION DOES NOT FIT PLAINTIFFS' LIABILITY THEORY. 6

III.  TYRA'S GHOST GUNNER OPINION IS PARTICULARLY UNRELIABLE BECAUSE THE MEME DOES NOT MENTION GHOST GUNNER AND THE DATA ALREADY SHOWED DECLINE, PLUS A SUBSTANTIAL PEAK AFTER THE MEME. .......................................... 8

IV.  TYRA OPINED THAT THE MEME, IF POSTED ON DEFCAD'S OWN WEBSITE WITHOUT COMMENTARY OR REFUTATION, WOULD DRIVE CUSTOMERS AWAY—THEN AGREED THAT PLAINTIFFS' OWN POSTING HAD NO COMMENTARY OR REFUTATION....................................... 11

V.    TYRA FAILED TO DISAGGREGATE OBVIOUS ALTERNATIVE CAUSES, INCLUDING CONTEMPORANEOUS PUBLICITY ABOUT WILSON'S CRIMINAL CASE....................................................... 13

VI.  TYRA FAILED TO DISAGGREGATE OTHER OBVIOUS CAUSES........ 15

VII. TYRA'S "SALES POP" TESTIMONY CONTRADICTS HIS 100% ATTRIBUTION THEORY. ........................................................... 16

VIII.   TYRA'S OPINIONS REST ON UNVERIFIED LITIGATION SPREADSHEETS, NOT RELIABLE SOURCE DATA. ..................................... 17

IX.  TYRA'S OPINIONS REGARDING CONSUMER BEHAVIOR, MARKET EFFECTS, DIVERSION, AND FUTURE HARM EXCEED HIS QUALIFICATIONS AND METHODOLOGY. ......................................... 18

X.    AT MINIMUM, TYRA SHOULD BE LIMITED TO ARITHMETIC SUMMARIES OF CLIENT-PROVIDED DATA. .................................... 19

CONCLUSION ................................................................................................. 20

REQUEST FOR HEARING ............................................................................... 21

Local Rule 7.1(a)(3) Certification ...................................................................... 21

CERTIFICATE OF SERVICE ............................................................................. 22

## TABLE OF AUTHORITIES

**Cases**

*Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*,
  432 F. Supp. 2d 1319 (S.D. Fla. 2006)......................................................... 10

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*,
  582 F.3d 1227 (11th Cir. 2009) ............................................................. 3, 6, 12

*Chapman v. Procter & Gamble Distrib., LLC*,
  766 F.3d 1296 (11th Cir. 2014) .................................................................... 5

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ...................................................................... 11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ....................................................................................... 1

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ................................. 2, 3, 5, 13, 14

*Knepfle v. J-Tech Corp.*, 48 F.4th 1282
  (11th Cir. 2022) .................................................................... 2, 3, 5, 13, 14, 15

*MasForce Eur., BVBA v. MEC3 Co.*, No. 8:11-cv-1814-T-24AEP,
  2013 WL 12156469 (M.D. Fla. Dec. 4, 2013) ............................................... 17

*Rink v. Cheminova, Inc.*, 400 F.3d 1286
  (11th Cir. 2005) ............................................................................................ 3

*Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275
  (11th Cir. 2015) ............................................................................... 5, 13, 19

*United States v. Frazier*, 387 F.3d 1244
  (11th Cir. 2004) (en banc) ...................................................................... 3, 18

iii

Defendants move under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the causation and damages opinions of Plaintiffs' expert, Jason M. Tyra.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Tyra's opinions are not the product of reliable methodology. The Tyra report puts the purported damage into two buckets. The first one is revenue attributable to DEFCAD—the business actually identified in the complaint. SAC ¶15. The second, much larger bucket—approximately 95% of the purported damages—is revenue attributable to a Computer Numerically Controlled ("CNC") milling machine called the "Ghost Gunner" which is mentioned nowhere in the complaint. Ex. B at 9-14.

Tyra's "calculation" is simple. For DEFCAD subscription revenue, he compares a pre-meme period to a post-meme period, excludes months that would be inconvenient to Plaintiffs, and calculates an average monthly difference of roughly $5,000. *Id*. at 9–11, 13–14. For Ghost Gunner revenue, he calculates an average monthly difference of $85,234. *Id*. at 11 14. He then combines those figures and concludes that Plaintiffs suffered $90,234 in average monthly lost sales, totaling $2,616,786 through October 2025, before inflation. *Id*. at 13–14. He then identifies a host of other possible factors to the decrease, ascribes 0% causal weight to any of them, and asserts that the meme must thus be responsible for 100% of the delta.

That is *ipse dixit*. When asked what materials supported his assertion that "Defendants' conduct inflicted economic harm on Plaintiffs," Tyra answered: "None." When pressed, he admitted he "made it up." Ex. A at 67:13–15. Rule 702 does not permit an "expert" to assume the conclusion Plaintiffs need and then dress the

1

assumption as damages arithmetic. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1296–97 (11th Cir. 2022).

The opinions also do not fit Plaintiffs' liability theory. Plaintiffs allege that Defendants disseminated the meme in commercial contexts to divert customers away from DEFCAD and toward "The Gatalog or MAF Corp." Tyra ignored that theory. He testified that he analyzed only "the existence of a publicly-accessible meme," not who posted it, where it appeared, who saw it, whether it affected a customer, or whether any customer went to a Defendant-affiliated business. Ex. A 23:3–25, 24:2–8. That mismatch is fatal under Eleventh Circuit precedent.

This is especially stark because Plaintiffs admit that they hosted the same allegedly harmful meme on Defcad.com during the damages period. Tyra initially denied knowledge that Plaintiffs had posted the meme, but when confronted with his own report to the contrary, Tyra then admitted that an unrefuted posting of the meme on DEFCAD's own website would have an acute effect on purchase decisions. When shown Plaintiffs' own posting, he agreed there was no commentary or refutation, and paradoxically insisted that his 100%-attribution was still correct.

Finally, Tyra's calculations rest on unverified litigation spreadsheets, not source data. He did not review any underlying records, and did nothing to verify them. A damages model built on unverified client-provided spreadsheets, combined with an assumed causal conclusion, is not reliable expert testimony. The Court should exclude Tyra's opinions in their entirety. At minimum, he should be limited to arithmetic summaries of client-provided numbers.

## LEGAL STANDARD

Rule 702 requires Plaintiffs, as the proponents of Tyra's testimony, to establish by a preponderance of the evidence that: (1) the expert is qualified to give the opinion provided, (2) the methodology used in arriving at the opinion is reliable, and (3) that the testimony would assist the trier of fact. *United States v. Frazier*, 387 F.3d 1244, 1260–62 (11th Cir. 2004) (en banc); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005). This gatekeeping function exists "to ensure that speculative, unreliable expert testimony does not reach the jury." *Rink*, 400 F.3d at 1291.

Reliability requires more than credentials and confidence. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. A court may exclude expert testimony where "there is simply too great an analytical gap between the data and the opinion proffered." *Id.*; *Knepfle*, 48 F.4th 1296–97.

Expert testimony must also fit the case. The party offering expert testimony must show that it is "relevant to the task at hand" and "logically advances a material aspect" of the case. *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009). If an opinion lacks a valid connection to the pertinent inquiry, "it should be excluded because there is no 'fit.'" *Id.* A plaintiff may not plead a narrow liability theory and then offer a "baggy injury and damages theory" that measures something else. *Id.* at 1233–34.

**ARGUMENT**

**I.      TYRA'S CAUSATION OPINION IS *IPSE DIXIT*.**

Tyra was not a stranger retained for this litigation. He described himself as Plaintiffs' tax preparer, Ex. A 36:17–21, and confirmed that he had been doing Wilson's taxes for years after a prior preparer dropped him *id*. at 109:21 110:1. Plaintiffs admit that "Mr. Tyra has prepared Defense Distributed's taxes since 2016," billed Defense Distributed annually for tax filings and public reports, and received compensation that varied over the relationship. Ex. D at 6.

Tyra's report, Plaintiffs' sole disclosed damages calculation, (Ex. C) states "Defendants' conduct inflicted economic harm on Plaintiffs by causing exactly the consumer behavior encouraged by the FEDCAD meme." Ex. B at 8. When asked what materials he reviewed to support that conclusion, Tyra answered: "None." Ex. A at 67:4–12. When pressed, he admitted he "made it up." *Id*. at 67:13–15. Tyra "didn't perform any analysis" about where the meme was available, did not render "any conclusions at all with respect to defendants' conduct," had no evidence "that suggests that the defendants [had] anything to do with the meme," and was engaged only to determine the supposed market impact of the meme's existence. Ex. A at 23:3–25. He further testified that his "report does not contain" and his "testimony will not contain any factual allegations related to the conduct by any particular defendant." *Id*. at 24:2–8. This, of course, despite his report alleging Defendants "inflicted economic harm on plaintiffs." Ex. B at 7. When pressed on this inconsistency, Tyra testified that his damages conclusion "does not depend on who caused them." Ex. A at 127:11–128:16; 134:24–136:12.*But see id*. pp. 43-47 (acknowledging Plaintiffs publication).

4

Tyra is not a marketing expert, has never published anything about online marketing or consumer behavior, took no relevant courses, and performed no research. *Id.* at 11:10–13:21. He did not attempt to determine where the meme came from, or how many people saw it. *Id.* at 13:22 14:20. He did not attempt to identify a single customer who saw the meme and chose not to do business with Plaintiffs. *Id.* at 30:3–11. He did not review the customer exit surveys at all, which show scant few references to the meme. *Id.* at 106:16-25; *see generally* Ex. E.

That leaves only a temporal assumption. Tyra was told the meme first appeared in May 2023, compared revenue before and after that assumed date, and then attributed the difference to the meme. But "[t]emporal proximity is generally not a reliable indicator of a causal relationship." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1310 (11th Cir. 2014). Nor may an expert simply take the stand and ask the jury to accept his say-so. *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1285 (11th Cir. 2015) ("The district court's gatekeeping function requires more than simply taking the expert's word for it.") (cleaned up).

Tyra's testimony confirms there is no method. He allocated "100 percent of any downward trend" to the meme, despite the downward trend predating the meme. Ex. A 86:8–11. When asked whether he applied any "standard methods" for determining that causation, he answered: "No." *Id.* at 86:14–17. When asked whether the allocation was based on his "gut," he retreated only to "professional judgment." *Id.* at 87:8–25. But professional judgment is not a substitute for reliable application of a method to sufficient facts. *Joiner*, 522 U.S. at 146; *Knepfle*, 48 F.4th at 1296–97.

5

## II.   TYRA'S OPINION DOES NOT FIT PLAINTIFFS' LIABILITY THEORY.

Plaintiffs must prove injury caused by Defendants' actionable conduct, not injury supposedly caused by the abstract existence of a meme available from multiple sources—including Plaintiffs' own website. But Tyra analyzed only "the existence of a publicly-accessible meme." Ex. A, 23:11 17. He did not analyze where the meme was available, nor how much business was allegedly lost because of Defendants, nor did he analyze any conduct of any Defendant. *Id*. at 23:3–24:8. Rather, he testified that his damages conclusion "does not depend on who caused them." *Id*. at 136:7–17.

That admission is dispositive because Plaintiffs themselves admit that they hosted the same allegedly harmful meme during the damages period. Plaintiffs admitted the FEDCAD meme was available on Defcad.com from May 22, 2024 until May 2, 2026. Ex. D at 4. Wilson likewise testified that the meme was posted to his website so it could serve as a "primary source." Ex. F at 77:9–77:23.

In failing to account for any of that, Tyra's model does not measure damages caused by Defendants' alleged conduct. That is fatal under *Boca Raton Community Hospital*, where the Eleventh Circuit affirmed exclusion of a "baggy injury and damages theory" that "covered too much[,]" and did not measure the injury caused by the allegedly unlawful conduct. 582 F.3d at 1232–34. Tyra's opinion is even baggier.

The fit problem is reinforced by the content of the meme itself. Tyra recognized the meme says nothing of Ghost Gunner, Defense Distributed, or DD Foundation. Ex. A at 62:3–17. The meme also does not identify The Gatalog or any Defendant-owned website. Yet Tyra's report states that Defendants' conduct drove consumers "away

6

from Plaintiffs' website to Defendants' website." Ex. B at 8. When asked how the meme drives consumers to Defendants' website, Tyra answered that Defendants operate a "competing website." Ex. A at 63:4–21. When asked where he got that conclusion, and what this "competing website" was, he resisted:

> Q: You say defendant's operate a competing website.  I am asking you what website that is.
> A: I think it's listed in footnote 16, the Gatalog.
> Q: That doesn't mention a website. … Where did you get the conclusion that the defendants were operating a competing website?
> A: Where did I get the conclusion? You know what? I don't think that's really an integral part of the report […]I know damages are supposed to be tied to the meme, not to defendant's specific conduct.  Defendants didn't create the meme, but I guess defendants are now responsible for the harm, but that's not really within the scope of the report that I prepared.
> Q: But the conclusion is right here, where you say "Defendant's comment inflicted economic harm on plaintiffs by causing exactly the consumer behavior encouraged by the FEDCAD meme, that is, by driving consumers away from plaintiff's website to defendant's website." You wrote that, right?
> …
> A: Yes
> Q:--and now we just reviewed the meme and we couldn't find any reference – we reviewed it together and we couldn't find any reference to any other website, could we?
> A: No.
> Q: So I am asking you where you got this conclusion. Was it from the complaint?
> A: Okay, so I don't -- I don't believe this conclusion is an integral part of what I was hired to do.  Okay?  I was hired to estimate the economic damages associated with the meme.  I was not hired to assess the economic impact derived by defendants with respect to the meme, so to the extent we – I don't think this really is an integral part. […] I have no evidence of economic gain, and I don't think the report weighs in on it, other than the broad general statement that a consumer who was driven away from DEFCAD who still wanted what DEFCAD provides would get it from a competing provider.
> …
> Q: Do you see that you made this claim in your report: You claim "Defendants conduct inflicted economic harm on plaintiffs." Is that correct?
> A: Yes.
> Q: I am asking you what materials you reviewed to come to that conclusion.
> A: None. I did not review any material regarding that particular statement.

7

Q: You made it up?
A: It is my opinion, so yeah, I made it up.
Q: You made it up. You acknowledge and you write in this report, that regulations, litigation and other market factors can affect your client's sales? Is that correct? You agree with that?
A: Yes.
Q: But when you came to your conclusion…asserting the amount of total damages, you didn't calculate the dollar impact of any of those factors on revenue, did you?
A: No.
Q: You just attributed 100 percent of the purported lost sales to the meme, didn't you?
A: Yes.

Ex. A pp. 63-70. Rule 702 does not permit Plaintiffs to prove damages in a specific liability theory with an expert who expressly disclaims that causation analysis.

### III. TYRA'S GHOST GUNNER OPINION IS PARTICULARLY UNRELIABLE BECAUSE THE MEME DOES NOT MENTION GHOST GUNNER AND THE DATA ALREADY SHOWED DECLINE, PLUS A SUBSTANTIAL PEAK AFTER THE MEME.

The Ghost Gunner calculation supplies the bulk of Tyra's claimed damages. Tyra estimated roughly $2.6 million in total lost sales, with some 95% of such purportedly coming from Ghost Gunner. Ex. A at 69:19–70:5; Ex. B at 13–14. But the meme does not mention Ghost Gunner. Ex. A at 70:3–5.

Tyra tried to bridge that titanic gap by asserting a "symbiotic relationship" between DEFCAD and Ghost Gunner. *Id.* at 70:12–21. But he did not test that relationship. He based it on "personal knowledge" and his client's statements. *Id.* at 71:1–5; 93:8–24. He did not know the current version of the Ghost Gunner or when it was last updated. *Id.* at 90:18–25. He admitted that his understanding of how DEFCAD supports Ghost Gunner sales came from his client. *Id.* at 93:8–24.

The timing problem is even more fundamental. Plaintiffs allege the meme was first published in May 2023. But Tyra's Ghost Gunner data do not show a sales

8

collapse beginning in May 2023. To the contrary, Tyra's own report says May 2023 was the highest-grossing month in the Defense Distributed dataset, at $254,371. Ex. B at 12 n.35. He excluded that month from his "calculation." *Id.* at 12. That exclusion removed the most obvious data point cutting against his causal theory.

Nor does the post-May 2023 data show a persistent decline consistent with the meme causing a discrete break in Ghost Gunner demand. The report's own Ghost Gunner data show substantial collections continuing into 2024, including $158,400 in February 2024, $177,922.96 in March 2024, $121,750.66 in April 2024, and $129,994.99 in May 2024. Ex. H. Tyra's report likewise identifies March 2024 as the highest-grossing month in the alleged post-meme period. Ex. B at 12. The dramatic drop appears later, in 2025, with October 2025 identified by Tyra as the lowest-grossing month in the alleged post-meme period. *Id.*

If the meme supposedly caused Ghost Gunner demand to collapse in May 2023, one would expect the alleged causal break to appear around May or June 2023. Instead, Tyra's own data show a May 2023 peak, significant 2024 sales, and a much later 2025 cliff. Tyra offered no reliable method to explain why a meme allegedly published in May 2023 would leave substantial Ghost Gunner revenue intact through 2024, then cause a steep sales decline in 2025. He did no analysis and made no attempt to examine whether any 2025-specific event such as Plaintiff's decision to outsource production of the Ghost Gunner due to rising production costs–explained the 2025 revenue cliff. Ex. J. Instead, he simply blamed the meme.



When shown the Ghost Gunner graph, Tyra agreed that it depicted a downward trend over the entire period shown, including before the meme. Ex. A at 79:1–11. When asked how sales could have been declining since at least 2022 with 100 percent of the downward trend being attributable to the meme, he answered that the meme was "the only singular outside factor" he identified with a "call to action." *Id*. at 81:6–24. This *post-hoc* attribution ignores the shape of the data. Here, the alleged causal event was May 2023, but Tyra's numbers show a peak in May 2023, continued substantial revenue in 2024, and a later cliff in 2025. Ex. H. Tyra's failure to account for that temporal mismatch is independently fatal under Rule 702.

*Alphamed* is instructive. There, this Court held that lost-profit proof failed where the plaintiff's financial problems preceded the alleged wrongful conduct and the causation chain depended on unproven assumptions. *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1344–48 (S.D. Fla. 2006). *Concord Boat* is likewise instructive because an economic model must incorporate the economic reality of the market and cannot attribute losses to the challenged conduct while

failing to separate unrelated causes. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056–57 (8th Cir. 2000). Tyra's Ghost Gunner analysis fails both principles.

At most, Tyra calculated the difference between one average and another after excluding selected months. He did not reliably determine that Ghost Gunner sales declined because of the FEDCAD meme, much less because of any Defendant.

### IV. TYRA OPINED THAT THE MEME, IF POSTED ON DEFCAD'S OWN WEBSITE WITHOUT COMMENTARY OR REFUTATION, WOULD DRIVE CUSTOMERS AWAY—THEN AGREED THAT PLAINTIFFS' OWN POSTING HAD NO COMMENTARY OR REFUTATION.

Tyra's treatment of Plaintiffs' own publication confirms that his opinion is not a reliable causation analysis. His theory is that the presence of the FEDCAD meme online caused customers to avoid DEFCAD. Ex. A at 44:2–8. But when confronted with the fact that the meme appeared on DEFCAD's own website, Tyra did not attribute any portion of the alleged harm to it.

Tyra's report acknowledged that the meme appeared on "DEFCAD's own website." Ex. B at 10–11 n.29. At deposition, however, Tyra initially denied knowing that Plaintiffs posted the meme on their own website. Ex. A at 22:15–22. He then testified that Plaintiffs' own publication would not affect his calculation because his "analysis was performed on the meme existing and being publicly available," and he "didn't perform any analysis with respect to where exactly it's available." *Id*. at 22:23–23:6. But the allegations in the SAC rise or fall on whether Defendants caused Plaintiffs economic harm. Tyra admitted he did not perform that analysis.

The problem became worse when Tyra was asked whether DEFCAD's own unrefuted hosting of the meme would affect customers. Tyra first suggested that

11

context might matter because DEFCAD could have posted the meme on a page "attempting to respond to the meme to inoculate DEFCAD against the meme's effects." *Id*. at 41:23–42:10. But when asked about where the meme was hosted plainly, "with no commentary or refutation," he agreed that "the presence of the meme online is what caused the damage to DEFCAD," and that DEFCAD customers seeing the meme would cause them to "shy away." *Id*. at 42:11–44:8. Asked whether a plain posting on DEFCAD's own website, without commentary or refutation, would have a significant impact, Tyra answered yes. *Id*. at 44:9–17. He explained that an average user seeing harmful material on DEFCAD's own website claiming DEFCAD had been hacked would assume "that's an example of DEFCAD being hacked," and he believed it would have "an acute effect on the customer's decision to buy." *Id*. at 44:18–45:2. Then Tyra was shown a screenshot of the FEDCAD meme hosted on Defcad.com. Ex. I. He was then shown the text all around the posting and asked whether he saw any refutation or commentary. He did not. Ex. A at 45:17–46:2. He also identified the metrics shown on the page: thousands of views and hundred of downloads. *Id*. at 47:18–25.

This is a decisive Rule 702 defect. Tyra admitted that an unrefuted posting of the meme on DEFCAD's own website would have an acute effect on customer purchasing decisions, yet his damages model attributes 100 percent of the alleged revenue decline to the meme, without distinguishing exposure caused by Defendants from exposure caused by Plaintiffs themselves. That is the same kind of failure of fit the Eleventh Circuit rejected in *Boca Raton Community Hospital*. 582 F.3d 1232–34.

12

It measures alleged harm from public availability, including Plaintiff's own amplification and reposting of the meme.

Rule 702 does not require admission of an opinion connected to data only by the expert's *ipse dixit*; the Court may exclude an opinion where there is too great an analytical gap between the data and the conclusion. *Gen. Elec. Co. v. Joiner*, 522 U.S. at 146; *Knepfle*, 48 F.4th 1296–97. And as *Sorrels* illustrates, an expert may not reliably extrapolate to untested conditions merely because he tested or assumed something else. *Sorrels*, 796 F.3d at 1285–86. Plaintiffs may not recover damages through an expert who admits Plaintiffs' own unrefuted publication could drive away customers but never accounted for it.

## V.  TYRA FAILED TO DISAGGREGATE OBVIOUS ALTERNATIVE CAUSES, INCLUDING CONTEMPORANEOUS PUBLICITY ABOUT WILSON'S CRIMINAL CASE.

Tyra's failure to account for alternative causes is especially stark because he acknowledged that reputation can affect consumer behavior. Ex. A 145:6–8. He was aware of Wilson's 2018 charge for sexual assault of a minor. *Id.* at 145:9–21. He then admitted he was not aware that Wilson had participated in a documentary in 2023. *Id.* at 145:22–24. That documentary, "Death Athletic: A Dissident Architecture," was first screened at the same time Plaintiffs purport the meme was posted. Public descriptions of the film describe it as detailing "the criminal case 'plaguing' Wilson's First Amendment fight."[1] Wilson likewise acknowledged that the film concerned his

---

[1] Death Athletic: A Dissident Architecture, Apple TV, https://tv.apple.com/us/movie/death-athletic-a-dissident-architecture/umc.cmc.4yyyjn2kzan3acypq70ayqxnc (last visited May 27, 2026) (describing the film as "trailing the Federal battles, personal struggles, growing 3D

13

company and discussed his prior legal issues. Ex. F 48:25–49:13. Wilson also testified that the documentary came out in 2023. *Id.* at 133:1–9. When asked whether a documentary about Wilson's "trials and tribulations" including his arrest for sexual assault of a minor would play into his analysis if it was published at the same time as the downturn, Tyra answered affirmatively. Ex. A at 146:7 15. But he did not check. *Id.* at 147:2–8. And despite that omission, he reaffirmed that he attributed 100 percent of the revenue downturn to the meme. *Id.* at 147:12–15.

Wilson's conduct with an underage girl being a part of the meme, Plaintiffs have removed any genuine dispute over whether Wilson's criminal case is part of the relevant reputational record. Plaintiffs stipulated that, "for purposes of this case, they are not challenging the truth of any statements in the FEDCAD meme regarding the criminal case against Wilson." Doc. 138 at 5 n.4. This is the kind of obvious alternative cause a reliable damages expert would consider. If Plaintiffs contend the FEDCAD meme—which contains statements they do not contest—caused reputational harm because it discussed Wilson's criminal case, then a contemporaneous documentary discussing the same subject is not a fringe possibility. Tyra simply assigned 100 percent of the "downturn" to the meme.

That is pure *ipse dixit*, not reliable application of any damages methodology. *See Joiner*, 522 U.S. at 146; *Knepfle*, 48 F.4th at 1296–97. Tyra's admission that the

gun community, and illicit criminal case plaguing Cody Wilson's fight for the 1st Amendment freedom to share code online").

14

documentary could matter, combined with his failure to investigate it, confirms that his causation opinion does not rest on sufficient facts or a reliable method.

## VI.   TYRA FAILED TO DISAGGREGATE OTHER OBVIOUS CAUSES.

Tyra's report identifies major market forces that could affect sales. He discusses regulation, election cycles, inflation, COVID-era firearms demand, and a broader decline in firearms sales. Ex. B at 12–13; Ex. A 27:23–29:4. But he did not account for any of those in the alleged downward trend. *Id*. at 29:2–4. He did the same thing with every other alternative cause. He acknowledged that "regulations, litigation and other market factors can affect" Plaintiffs' sales. *Id*. at 67:16–20. But he admitted he did not calculate the dollar impact of any of those factors. *Id*. at 67:21–68:4. This, despite the actual exit surveys consisting of primarily of reasons other than the meme, including financial hardship, being double-charged, and technical issues with the website. Ex. E; Ex. A at 88:7–90:12. Those map directly onto the very customer-behavior issues Tyra purports to explain, and yet he ignores them.

Plaintiffs produced exit surveys of DEFCAD members Ex. E, Tyra did not use it. When asked if exit surveys stating reasons for discontinuing accounts would affect his conclusion, he answered, "Potentially." Ex. A at 99:16–100:22. After seeing the exit-survey data, he admitted that it was more data than he reviewed in reaching his conclusion that all lost sales were caused by the meme. *Id*. at 108:15–109:20.

The Eleventh Circuit has repeatedly affirmed exclusion where an expert focuses on evidence confirming a predetermined theory while failing to test obvious alternatives. In *Knepfle*, the court affirmed exclusion where the expert failed to take measurements to exclude alternative theories and instead appeared to focus on

15

evidence confirming his theory. 48 F.4th at 1296–97. Tyra—the second "damages expert" Plaintiffs disclosed who has a years-long financial relationship with Plaintiffs—began with Plaintiffs' positions, then declined to quantify anything else.

## VII.   TYRA'S "SALES POP" TESTIMONY CONTRADICTS HIS 100% ATTRIBUTION THEORY.

Tyra's report and testimony also contradict his own conclusion. Tyra acknowledged that he wrote that the meme "may also have generated a pop in sales to customers who first became aware of DEFCAD in carrying the meme on social media." Ex. A at 24:9–15. He also wrote that May 2023 DEFCAD sales were $53,926, higher than the average over the previous 18 months. Id. at 24:16–20; Ex. B at 10–11. For Ghost Gunner, May 2023 was the highest-grossing month in the dataset at $254,371. Ex. B at 12 n.35. But Tyra excluded May 2023 from both the before and after periods. Ex. B at 10–12. The very month Plaintiffs identify as the month of publication was, by Tyra's own account, an unusually high month. Tyra therefore entertained the possibility that the meme increased awareness and sales, excluded the month in which that effect appeared, and then attributed all subsequent "losses" to the same meme without any method for distinguishing customers allegedly deterred by the meme from customers allegedly attracted by it. That is an analytical gap. *Joiner*, 522 U.S. at 146. Tyra acknowledged the "sales pop" theory, affirmed it at deposition, and could not explain why it was missing in the version of the report Plaintiffs handed over. Ex. A at 24:9–28:8; 183:16-185:11.

## VIII. TYRA'S OPINIONS REST ON UNVERIFIED LITIGATION SPREADSHEETS, NOT RELIABLE SOURCE DATA.

Tyra testified that the data in his report was provided by his client in spreadsheet form. Ex. A at 29:6–22. He did not verify that the numbers were actual amounts attributable to the business segments. *Id*. at 29:19–22. He again testified that his $5,000-per-month DEFCAD-loss conclusion was based on data provided by DEFCAD and that he did not verify that data. *Id*. at 53:16–23.

Later, Tyra was even clearer. He testified that he is Plaintiffs' tax preparer, not bookkeeper, and that the information used to generate his report was provided by Wilson. *Id*. at 152:18–25. He did not interview any bookkeepers. *Id*. at 153:2–4. He explained that he "wasn't engaged to attest as to the accuracy and completeness of the data" and did not "attempt to weigh in on the accuracy or completeness." *Id*. at 153:5–154:16. He admitted that his conclusions depend on the accuracy of what he was provided, not on independent reports. *Id*. at 155:19–156:3.

Wilson's testimony confirms the same source-data problem. Wilson also testified that the sheets Tyra was provided appeared to be the product of an undisclosed expert, that he had no reason to believe Tyra created it, and that he did not know who produced them. Ex. G at 59:12–60:18.

This is not a permissible expert damages model. "Adopting the unsupported beliefs of a business owner who has a financial motive to inflate recoverable damages is not a reliable methodology to project future lost profits." *MasForce Eur., BVBA v. MEC3 Co.*, No. 8:11-cv-1814-T-24AEP, 2013 WL 12156469, at *6 (M.D. Fla. Dec. 4, 2013). The same principle applies here. Tyra accepted Plaintiffs' litigation

17

spreadsheets, did nothing verify the underlying data, and then used those numbers as the foundation for millions in claimed damages. Nor does Tyra's CPA credential cure the defect. An expert may rely on data supplied by a client in appropriate circumstances, but Rule 702 still requires sufficient facts, a reliable method, and reliable application. Tyra expressly disclaims any opinion that the data is accurate or complete. Ex. A at 153:5–154:16. Yet the data is the entire foundation for his claimed loss. That is an impermissible analytical gap.

## IX. TYRA'S OPINIONS REGARDING CONSUMER BEHAVIOR, MARKET EFFECTS, DIVERSION, AND FUTURE HARM EXCEED HIS QUALIFICATIONS AND METHODOLOGY.

Tyra may be a CPA. But he is not a marketing expert. Ex. A at 11:10–12. He has never published anything about online marketing or consumer behavior. Id. at 11:13–12:2. His MBA focus was accounting, not marketing. Id. at 12:21–13:8. He took no social-media-marketing courses. Id. at 13:9–13. In this case, he conducted no consumer surveys, efficacy studies, market testing, Google Trends analysis, or customer-exposure analysis. Id. at 13:14–21; 142:17 143:7.

Despite that, his report purports to opine on consumer behavior, meme propagation, toxic memes, marketplace fear, reputational harm, customers being driven away, customers never returning, and future residual effects. Ex. B at 3–8, 13–14. Those opinions are not accounting opinions. They are marketing, consumer-behavior, and causation opinions unsupported by any reliable case-specific methodology.

Rule 702 does not allow an accountant to become a consumer-behavior expert by reading articles and comparing before-and-after revenue averages. See *Frazier*,

387 F.3d at 1260–62. Nor may a damages expert supply speculative narrative conclusions merely because those conclusions are useful to Plaintiffs' liability theory. See *Sorrels*, 796 F.3d at 1285.

## X. AT MINIMUM, TYRA SHOULD BE LIMITED TO ARITHMETIC SUMMARIES OF CLIENT-PROVIDED DATA.

If the Court does not exclude Tyra's causation and damages opinions entirely, it should sharply limit his testimony. Tyra should not be permitted to testify that: (1) the FEDCAD meme caused Plaintiffs lost revenue, lost profits, lost customers, lost goodwill, reputational harm, market diversion, or future harm; (2) any Defendant's conduct caused Plaintiffs any economic loss; (3) any specific dollar amount is attributable to the FEDCAD meme; (4) any specific dollar amount is attributable to any Defendant; (5) that customers were diverted from Plaintiffs to The Gatalog, MAF Corp., or any Defendant-owned website; (6) that Ghost Gunner sales declined because of the meme; (7) the meme will continue causing future losses; (8) Plaintiffs' financial spreadsheets are accurate, complete, or reliable; or (9) consumer behavior, customer intent, market diversion, or reputational harm can be inferred from his before-and-after arithmetic.

At most, Tyra may be permitted to summarize the arithmetic he performed on numbers Plaintiffs gave him: what the client-provided spreadsheets say, what averages he calculated, and what mathematical differences result if those spreadsheets are assumed to be accurate. But he should be barred from presenting those arithmetic differences as causation, damages, lost profits, or recoverable injury.

19

## CONCLUSION

Tyra did not reliably determine that Plaintiffs lost revenue because of the FEDCAD meme, much less because of Defendants. He assumed causation, attributed 100 percent of the claimed post-May 2023 decline to the meme, ignored obvious alternative causes, failed to verify the financial data, failed to analyze Plaintiffs' own publication of the meme, and offered opinions that do not fit Plaintiffs' liability theory. The Court should exclude Tyra's causation and damages opinions.

Respectfully submitted,
DATED:  May 28, 2026

/s/ Gary C. De Pury
Gary C. De Pury
Florida Bar No: 126588
Law Offices of Gary De Pury, P.A.
21035 Leonard Road
Lutz, Florida 33558
Tel: (813) 607-6404
Email: Gary@DePury.com
*Lead Counsel for Alex Holladay.*

/s/ Matthew Larosiere
Matthew Larosiere, Esq.
Fla. Bar. No. 1005581
The Law Offices of Matthew Larosiere
6964 Houlton Circle
Lake Worth, FL 33467
Email: Larosieremm@gmail.com
Tel: (561) 452-7575
*Lead Counsel for Elik, Stroke, Lettman, and Clark.*

/s/ Zachary Z. Zermay
Zachary Z. Zermay, Esq.
Fla. Bar № 1002905
*Zermay Law, P.A.*
1200 Fourth Street, #1102
Key West, FL 33040
Email: zach@zermaylaw.com
Tel: (305) 767-3529
*Lead Counsel for Matthew Larosiere.*

**REQUEST FOR HEARING**

Defendants request oral argument under Local Rule 7.1(b). A hearing would assist the Court because Tyra's report contains several interrelated methodological failures, and because Plaintiffs identify Tyra's report as their sole damages computation. Defendants estimate that a hearing would require approximately 60 minutes total, with 30 minutes per side.

**Local Rule 7.1(a)(3) Certification**

Pursuant to Local Rule 7.1(a)(3), undersigned counsel certifies that Defendants made reasonable, good-faith efforts to confer regarding the relief sought in this motion but were unable to resolve the issues without Court intervention. This subject has been discussed in numerous emails, and most substantively in-person following the May 6 hearing in West Palm Beach. I further certify that I conferred with opposing counsel regarding the exhibits attached to this motion. Plaintiffs marked virtually every document they produced, including materials in the public domain, as "confidential." Following the May 6 hearing, I and fellow defense counsel discussed in-person with opposing counsel how this over-designation should be handled in that we would redact any PII from Plaintiffs' documents. I conferred still more via email and text on May 27 with opposing counsel regarding the exhibits to this motion, but they would not identify whether these materials—which contain no sensitive information—may need to be sealed.

Respectfully submitted,

*/s/ Matthew Larosiere*
Matthew Larosiere

21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on this 28th day of May, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

*/s/ Matthew Larosiere*

Matthew Larosiere, Esq.
Fla. Bar № 1005581

22