DEFENSE DISTRIBUTED, Et al.,

     Plaintiff(s),

     vs.

JOHN ELIK, individually; MATTHEW LAROSIERE, individually; ALEXANDER HOLLADAY, individually; PETER CELENTANO, individually; JOSH KIEL STROKE, individually; and JOHN LETTMAN, individually, and Zackary Clark, individually,

     Defendant(s).

Case No.: 9:25-cv-81197

Deposition of Cody Wilson, Volume I

Wednesday, May 6, 2026, 9:00 AM

REPORTED BY: Abdullah Khalid

PAGES 1-371

APPEARANCES

For the Plaintiff(s):

    SPEAKER 1

    HOWARD FOSTER


For the Defendant(s):

    GARY DE PURY

    MATT LAROSIERE

INDEX

Deposition of Cody Wilson, Volume I                    Page No.

Direct examination by MR. DE PURY . . . . . . . . . . . . . . . .   6

Cross examination by MR. LAROSIERE  . . . . . . . . . . . . . . . 182

Certificate of Oath and True Testimony . . . . . . . . . . . . . 293

Errata Sheet. . . . . . . . . . . . . . . . . . . . . . . . . . 294

Transcript Index . . . . . . . . . . . . . . . . . . . . . . . 295

EXHIBITS

Exhibit A . . . . . . . . . . . . . . . . . . . . . . . . . . . 367

Exhibit B . . . . . . . . . . . . . . . . . . . . . . . . . . . 370

THE REPORTER:    Good morning, we are now on the record. Today is Wednesday. It is May 6th, 2026. The time is 9:00 a.m Eastern Standard Time. We are present to record the Deposition of Cody Wilson, Volume 1, in the case of Defense Distributed et al. versus John Elik and others. Court case number 9:25-cv-81197. My name is Abdullah Khalid, a Texas notary public, and I will be the Digital Reporter for today's Deposition. Could the Counsel for the Plaintiff identify themself and spell their name for the record?

MR. FOSTER:    Howard Foster, F-O-S-T-E-R. I represent the Plaintiffs in this lawsuit and Mr. Wilson, who is not a party to the lawsuit.

THE REPORTER:    And Mr. Gary De Pury is in the room?

MR. DE PURY:    Yes. Gary De Pury, D-E, space, capital P-U-R-Y. I represent Mr. Alexander Holladay.

THE REPORTER:    And Mr. Matt Larosiere?

MR. LAROSIERE:    Yes, I'm in the room. Matthew Larosier, L-A-R-O-S as in Sam, I-E-R-E for Elik, Stroke, Lettman, and Clark.

THE REPORTER:    Noted. Do all the parties stipulate to me conducting this oath and affirmation remotely, understanding we are not physically present with each other and may be located in different jurisdictions?

MR. DE PURY:    Yes.

MR. LAROSIERE: Yes.

THE WITNESS: Yes.

MR. DE PURY: You have three yeses.

MR. FOSTER: Three, yes.

THE REPORTER: Noted. Could the Witness please state and spell their full name for the record?

THE WITNESS: This camera?

MR. DE PURY: Yep.

THE WITNESS: My name is Cody Wilson, C-O-D-Y, W-I-L-S-O-N.

THE REPORTER: Noted. And Mr. Wilson, can you please hold a valid government photo identification up on the screen to verify your identity?

THE WITNESS: Up to the camera, you said?

MR. DE PURY: Yeah, so that--

THE REPORTER: Yes, please.

THE WITNESS: I'm not sure how close I should be.

THE REPORTER: And it's a driver's license.

MR. DE PURY: Yes. Is that focused enough?

THE REPORTER: Yes, thank you.

MR. DE PURY: Okay, there you go.

THE WITNESS: Thanks.

THE REPORTER: Mr. Wilson, please raise your right hand.

DIRECT EXAMINATION BY MR. DE PURY

THE WITNESS:    One moment. My fault.

THE REPORTER:    Do you swear or affirm to tell the truth, the whole truth, and nothing but the truth during this Deposition?

THE WITNESS:    I do.

THE REPORTER:    Thank you, you can lower your hand. Are there any other attendees in the room who haven't identified themselves yet?

MR. DE PURY:    No.

THE REPORTER:    Okay, so whenever you're ready, Counsel, you may proceed with the questioning.

(DIRECT EXAMINATION BY MR. DE PURY)

Q:    All right, thank you. Mr. Wilson, I know he just asked you to do it, but please go ahead and state your full name again for us.

A:    Fine. Cody Wilson, C-O-D-Y, W-I-L-S-O-N.

Q:    Thank you. And what companies do you-- well first, let me-- have you ever been deposed before?

A:    Once. Am I loud enough?

Q:    Yeah.

MR. DE PURY:    And you're able to hear him, right, Mr. Reporter? You'll let us know if he isn't speaking loud enough?

THE REPORTER:    Yes, Counsel, I'll let you know.

DIRECT EXAMINATION BY MR. DE PURY

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:** All right, thank you.

**A:** The mic is also here.

**Q:** Yeah. Yeah, so just speak into it. When were you deposed before?

**A:** March, middle of March.

**Q:** In this case?

**A:** No, it would have been Mr. Larosiere's copyright mat.

**Q:** Okay, that's the settled case out of the Middle District, correct?

**A:** As I understand it.

**Q:** As you understand it, what? I mean, it was for the Middle District case?

**A:** I'm not a lawyer. I believe it may be settled.

**Q:** You don't know if it's settled or not?

**A:** I believe it's settled.

**Q:** Did you attend settlement negotiations?

**A:** I did.

**Q:** Did you sign an agreement?

**A:** I did, yes.

**Q:** Have you written checks?

**A:** Uh, so to speak.

**Q:** So you've made payments?

**A:** Yes.

DIRECT EXAMINATION BY MR. DE PURY

Q:      Since you have been deposed before, I'll make this somewhat brief as you understand the rules. We try not to speak over each other. There's certain rules that govern us and there are certain rules that govern you, but the biggest rule is just we have a Court Reporter we're paying money to, he has to be able to understand what we're saying and transcribe it all accurately. So we'll try not to talk over each other. I'll try not to talk over you. I ask that you not talk over me. Allow us to finish all questions, which benefits you anyway. I'm sure that you've benefited from, you know, your great Counsel here, who's instructed you in that, and let us get the questions out and don't anticipate what we're asking. That way, he can hear everything. And also, all questions have to be verbal. Head shaking, uh-uh, uh-huh, is not easily perceptible to him, and so make sure that your answers are clear and we're able to get them all on the record. Okay?

A:      Yes, thank you.

Q:      What companies do you presently own or control?

A:      I own a company called Defense Distributed, a company called Defcad, Inc. It's a corporation, sorry, not a company. Did I say that Defense Distributed was a company? Forgive me.

Q:      That's fine. Any others?

A:      Yes, yes. I have a-- an LLC called DD Foundation, LLC. Um, slow me down if I need to be slowed down. I--

DIRECT EXAMINATION BY MR. DE PURY

**Q:**    No, it's fine.

**A:**    I see you're writing, so I don't know, but. I have an LLC named Gunspring.

**Q:**    All right.

**A:**    There are more. I-- would you like me to continue?

**Q:**    Yes, please.

**A:**    Um, a company called Coast Runner Industries. And sorry, it is a corporation. I think I'll be saying this a lot today. I'm not a lawyer, sir. I mean, that it's a corporation, I think it answers your question, but I may call it a company.

**Q:**    That's perfectly acceptable.

**A:**    Um, other companies. An LLC named Federal Consolidated. These-- uh, there is a corporation called Upsln.

**Q:**    Spell that?

**A:**    Um, it is said Upsilon, it is spelled U-P-S-L-N, um, like <unintelligible>. So those are the only active companies that I own. Was that the question?

**Q:**    It is. You say active there, are other companies that have recently been deactivated for any reason?

**A:**    Not recently, no, but over the years, I have had other companies and-- um, I have had other companies.

**Q:**    What is your role at the first one you mentioned, Defense Distributed?

**A:**    Defense Distributed. My title is director, um, this is an S-corp, and so I am its owner as well.

DIRECT EXAMINATION BY MR. DE PURY

Q:      What's your role though, as director?

A:      Uh, you mean beyond the title of director, what I-- what is director?

Q:      What do you do?

A:      Well, you could say the chief executive, it's more what you said.

Q:      Well, I'm not going to say anything. I'm asking you. So do you--

A:      I understand.

Q:      Do you administer the day-to-day operations of that company?

A:      I think that's fair to say. If not administer, certainly direct or oversee them.

Q:      How many employees do you have?

A:      I believe it's 10 to 12.

Q:      How many are in management positions?

A:      This is a loose idea at my company, but maybe three.

Q:      What about the Defcad company?

A:      I'm sorry, could you be more specific?

Q:      Same question, what's your role there?

A:      I am also titled the director of Defcad, Inc.

Q:      Do you also oversee the day-to-day operations?

A:      Uh, yes, yeah.

Q:      How many employees do you have there?

DIRECT EXAMINATION BY MR. DE PURY

A:     Uh, no employees. Well, there's one unpaid employee, I-- I don't know how to split these hairs. We have called him an employee, for sure.

Q:     What does he do there?

A:     Uh, you could say he-- he-- what's his title?

Q:     No, I'm not worried about title. What does he do? Does he sweep the floor, does he paint the walls, does he build stuff?

A:     It's all software.

Q:     Okay.

A:     And he has a hand in, uh, the website, the application.

Q:     What's his name?

A:     Tom Odom. Thomas Odom.

Q:     O-D-O-M?

A:     O-D-O-M.

Q:     How do you know him?

A:     I knew his father. Um, knew his father from maybe 15 years ago, and he asked me to hire him maybe in 2015.

Q:     But he's an unpaid employee?

A:     Yes, he's been an unpaid employee for some time.

Q:     How does he eat?

A:     Well, he has other jobs, he has other employment.

Q:     So he's doing it for the love of the game, basically?

DIRECT EXAMINATION BY MR. DE PURY

A:     I think so. Many people in this industry do.

Q:     What is DD Foundation?

A:     It's an LLC, uh, as I understand it, that's its legal description, but you mean what-- what does it do beyond that?

Q:     What's its mission?

A:     We've described it as a fraternity or a membership organization in support of Defense Distributed and, uh, Defense Distributed's mission.

Q:     So a fraternity. How many members of this fraternity?

A:     Uh, at last I checked, maybe, um, 6,000.

Q:     Are they all across the state, the country, the world? Do you know?

A:     The world.

Q:     You said that they are in support of the Defense Distributed. What do they support?

A:     Uh, I believe I said the mission of Defense Distributed, or you could say its non-profit purpose.

Q:     Which is?

A:     It's been described a few ways. Officially, it's in support of the right to keep and bear arms, production of digital files, digital models, the support of the global right to keep and bear arms.

Q:     Is this all directed towards generating more sales

DIRECT EXAMINATION BY MR. DE PURY

for your company?

A:    That mission? Is that the question?

Q:    Yeah.

A:    That mission direct-- I don't think so.

Q:    You don't think that's the mission?

A:    I don't think that was your question. Your question was, does that support the sales of the company or is that in order to support the sales of the company.

Q:    Yeah.

A:    My answer is no.

Q:    No? Okay. What is the mission of Defense Distributed, then? That's the mission?

A:    I believe I said it was a non-profit purpose, so that excludes profit by definition. Are sales a part of that mission, maybe that's fair to say.

Q:    I mean, I don't know that non-profit excludes profit. Would you agree that non-profit entities have payroll?

A:    Uh, oh, yes, I would agree.

Q:    You have 10 employees, right?

A:    Uh, I do.

Q:    Then rent, would you agree that non-profit entities have rent?

A:    They tend to, yes.

Q:    What is the product that Defense Distributed sells?

A:    Defense Distributed has a few lines of business and

DIRECT EXAMINATION BY MR. DE PURY

therefore, you know, more than one product.

Q:     Okay, so go ahead and describe them.

A:     There are hardware products and software products. The hardware products are probably the biggest lines of business. They include 80% receivers, kit products, kit components, small parts, work holding, a CNC machine. Those are the hardware products.

Q:     We'll start with the CNC machine. What's that called?

A:     The CNC machine is called the Ghost Gunner, CNC. It has had different versions, different names.

Q:     When did you start producing the Ghost Gunner?

A:     October 2014.

Q:     What's the most recent iteration of it?

A:     Ghost Gunner 3S, officially.

Q:     When was that produced? Last updated?

A:     3S begins November of '22. I don't know that it begins being shipped until '23.

Q:     The Ghost Gunner 3S, how vastly different is it from the-- how far had you advanced that product over the years?

A:     It's a difficult question to answer. I think the main essential difference is 3S is sturdy enough to do steel slide work, steel-- steel receivers. Not really from billet, although we experimented with that. That's the main difference,

DIRECT EXAMINATION BY MR. DE PURY

I think. I mean, hold on, we did this-- these titanium demonstrations and some of that technology became another version of the mill called the Coast Runner.

Q:    Coast Runner, wasn't that kind of a play on words?

A:    Well you could certainly say that.

Q:    Was that to get around the laws in California?

A:    No-- no. It was to comply with the laws of California.

Q:    To comply with the laws, how do you comply with the laws in California?

A:    Typically you read the law. And then observe--

Q:    I don't need an explanation. I need to know. How are you complying with the laws is what I meant.

A:    Well, the laws were updated over a period of three sessions in California. And it was like a game of cat and mouse, so they would watch what we were doing to sell more machines into California, and we would change the corporate form, and the description, the marketing of the mill because the laws were primarily about how you would market the mill. So we cut it fine, you see? It was important to make a separate corporate form, a separate machine. I wanted it to be white labeled so everyone understood what was going on, and so that I would have the opportunity to contest California's law.

Q:    You went to law school, right?

A:    I did.

DIRECT EXAMINATION BY MR. DE PURY

Q:     You've said three times that you're not a lawyer.

A:     I think I'll say it a few more times in this Deposition.

Q:     But you seem to have a firm grasp on the law when you want to, right?

A:     When I want to?

Q:     Right.

A:     I wish it was that easy.

Q:     Well, so we all do. But you certainly have a firm grasp of the differences, the nuances to the California law?

A:     I think I'm well versed in the California law concerning the CNC machine, yes.

Q:     Okay.

A:     Yes.

Q:     I mean, so much so that you could probably be an expert witness for somebody out there, right?

A:     I think I could be.

Q:     You said that Defcad, no employees but you have the one employee right? But he's unpaid?

A:     Let's call him one employee. If you count me, it's two employees.

Q:     Describe the business model of Defcad for me, please.

A:     Sure. On one level, Defcad is about compliance. you could say it's a way to-- again, like Ghost Gunner, adapting

DIRECT EXAMINATION BY MR. DE PURY

the current state of the law. To a business which complies with that law, it may not be the most profitable business, but it kind of-- it tries to perfectly track the nuances of the law. If it can make money, so be it. It doesn't really. How about this? It's hard for-- it's hard for me to do this. Does that answer your question?

Q:    No, I'm not sure that it does.

A:    No, because you're going to--

Q:    If it can make money that's fine, but if it's--

A:    So what's the business model of Defcad? Let's answer the most simplest way. Defcad relies upon subscription revenue to support, you know, any business purpose.

Q:    How many subscribers do you have?

A:    Again, it would be around that 6,000 number probably.

Q:    What do they pay? Do they pay annually, monthly, weekly, how do they pay?

A:    There have been many, like, chapters of the subscription. In general they pay an annual subscription. In general, the subscription is between $40 and $60 annually.

Q:    What do they get for that subscription?

A:    Well, to be clear, it's not a Defcad subscription, but that subscription almost always gives you access to Defcad. Which is to say the ability to download the files that are regulated at Defcad.

DIRECT EXAMINATION BY MR. DE PURY

**Q:** That are regulated?

**A:** Yes, you don't-- you don't need a subscription to use the website, or to download maybe even most of the files on-- on site. But some of the files will require a subscription.

**Q:** Okay.

**A:** So that you can download.

**Q:** How do you decide which files do and which files don't require the subscription?

**A:** There is a policy that governs the designation of-- of files.

**Q:** Whose policy is that?

**A:** It's Defcad's policy.

**Q:** So again, let me restate the question. What is in the policy that decides certain things are free, and certain things are behind this subscription?

**A:** It's like a tiered policy. It starts with the Federal categories and designations. There are exceptional additional categorizations based on state laws.

**Q:** Are you saying that your policies just track state law?

**A:** No, I'm not saying that. I think I'm saying something larger than that.

**Q:** Okay.

**A:** I think I'm saying the policies track Federal and

DIRECT EXAMINATION BY MR. DE PURY

state law, but not only those.

Q:     Let me ask you differently. What's the percentage of the downloads that people can get without paying the subscription?

A:     I'll understand your question to mean the percentage of the total file base or something.

Q:     Yeah.

A:     Most files on the website are not 3D models that are regulated in the way we have been discussing. And so therefore, most files-- you want a percentage. I'm not sure I could give you an exact percentage.

Q:     Is it more than 50 percent?

A:     I guess I would be speculating. I should be able to perhaps answer that for you tomorrow.

Q:     Well, you own the company, you're the director, there's no other employees except for one guy. I would think that you would have some general idea.

A:     I have a general idea, and I can speak in general terms.

Q:     Well that's fine. That's a start then. I don't know, it's better than.

A:     Well, yeah, I mean, I'm saying in exact terms, an exact percentage this moment, I can't give you that in good faith.

Q:     Okay.

DIRECT EXAMINATION BY MR. DE PURY

A:     But I am sure that it is most of the files available.

Q:     But you can you can provide it tomorrow. You don't have a staff, per se. Who are you going to ask?

A:     No, I do. There's a relationship between, you know, Defense Distributed and Defcad.

Q:     So you're going to go ask other people?

A:     Oh, I may, or I may make an inquiry, let's say, of documents. I may make an inquiry of the website, the application, Defcad, for example.

Q:     Okay.

A:     There's-- I guess some ways to answer your question beyond calling someone.

Q:     Well, about how many products do you have on Defcad?

A:     Well, it's more like Defcad is the product in that case.

Q:     How many downloadable items do you have on Defcad?

A:     Downloadables. By some counts it's between 17 and 20,000 active items. The-- the number changes day to day.

Q:     Who uploads all these items?

A:     There are members of the public who upload, there are third parties that we call contractors. There are members that we call partners who are both members of the site, but also have a partnership relationship with us.

DIRECT EXAMINATION BY MR. DE PURY

Q:      Okay.

A:      We have a librarian, she makes some uploads.

Q:      These are all volunteer positions for the most part?

A:      For the most part-- you mean the uploads?

Q:      Correct.

A:      For the most part, uploads are volunteer. I don't know-- do you mean unpaid, by volunteer?

MR. LAROSIERE:     Hey Greg, after your next question, so I have a second?

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:      Okay. Yeah, the folks, I mean, if it's just you and one other unpaid employee.

A:      I-- I don't-- I don't upload, but that's true.

Q:      Right, so who's doing all the actual physical labor, even though that's just clicking a button in many cases?

A:      I agree with you that there's physical labor, but it's kind of like knowledge work, so it passes through many hands. Uploaders are different from the people who may evaluate, review, approve. There's kind of the uploading side of it, and there's the actual approval and publication side of it. These aren't necessarily the same people.

Q:      We're going to take a break.

A:      Thank you.

MR. FOSTER:     Go off the record, Mr. Reporter.

DIRECT EXAMINATION BY MR. DE PURY

THE REPORTER:     The time is 9:25 a.m. and we are now off the record. We are on the record and the time is 9:36 Eastern Standard Time.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     Let me shrink this down, bring this back up. All right, so we're going back to the questions we've about Defcad. Well, one moment. Let me grab my notepad setup here. What perentage of-- you said you have roughly 6,000, you said roughly those same people are subscribers, is that?

A:     Yes.

Q:     So scratch that question, then. What percentage of revenue comes from subscriptions?

A:     Do you mean as to Defcad's revenue?

Q:     Yes.

A:     I can only speak to this in a general way. Defcad doesn't book the subscription revenue, if that's your meaning of your question.

Q:     Well, how does Defcad make money?

A:     Defcad is the platform for which you would buy the subscription.

Q:     Where does the money go, then?

A:     As I think I've explained, DD Foundation is where you would purchase the subscriptions that, among other things, afford you access to Defcad.

Q:     So DD Foundation is the hosting entity, then; is

DIRECT EXAMINATION BY MR. DE PURY

that correct, or no?

A:     No, now you-- if you mean hosting for the files, no.

Q:     Defcad is the host for the files.

A:     Yes.

Q:     DD Foundation would then host the participants though, right?

A:     Participants, I don't think so.

Q:     So what is it set up to do, then, just sell subscriptions?

A:     The DD Foundation is an LLC that offers subscriptions that support the mission of Defense Distributed, which includes the service Defcad.

Q:     What other services do you get if you are a subscriber?

A:     For example, you get certain access to Ghost Gunner software support. You get access to, like, our, you know, beta programs, our little missives, our litigation updates. It's a kind of-- it's a way to be in better contact and feel like you're in the support of the mission of Defense Distributed.

Q:     You mentioned litigation updates. Have you been posting litigation updates on that recently?

A:     Recently, I would say-- do you mean through DD Foundation?

Q:     Through wherever you post these litigation updates?

DIRECT EXAMINATION BY MR. DE PURY

A:      Yes, yes.

Q:      What have you recently posted?

A:      I posted updates about our Vanderstock case, which has become a Defense Distributed case in name. I posted an update about how that case has moved to the Fifth Circuit as well. There's an appeal from that case to the Fifth Circuit, things like that.

Q:      Have you posted anything about the litigants in this case?

A:      This case? I don't think I've recently posted about the litigants in this case.

Q:      Define recent.

A:      Well, your question was, have you recently posted?

Q:      No, my question was, have you posted anything about this, but you're correct in that because I did, prior to that, say recently. So since your answer was, I don't think I've recently posted anything, define recency in your mind.

A:      Within easy recall, within temporal recency, like in the last little bit.

Q:      So let's define it in the manner that the judge will understand. In the past month?

A:      Right, in the past month, I don't believe I've posted about the litigants in this case.

Q:      Past two months?

A:      Past two months? Hard to say. It's possible.

DIRECT EXAMINATION BY MR. DE PURY

**Q:**     Past three months?

**A:**     I think it's likely in the past three months one of the litigants has been mentioned in my litigation updates.

**Q:**     Which one?

**A:**     In the past three months. Mr. Holladay, I think.

**Q:**     What did you post about Mr. Holladay?

**A:**     I believe I mentioned the California suit in the past three months. The fact that he was being sued by California, and was, in fact, suing California in a different lawsuit.

**Q:**     Now, on any of the platforms, have you posted anything about any of the litigants in this case? Let's say, in the past six months?

**A:**     Surely, yeah. Surely in the past six months.

**Q:**     Who have you posted about in the last six months?

**A:**     I believe I've mentioned Mr. Elik by name.

**Q:**     What'd you post about Mr. Elik?

**A:**     Uh, let's see. In the past six months, right? That's inc-- that includes January? I think-- you know, all I can think of is a September post that mentions him by name. So I don't know if I can say more.

**Q:**     I mean, they're out there, the posts are still out there, right?

**A:**     As far as I know, yeah.

**Q:**     Is it fair to say that you commonly, somewhat

DIRECT EXAMINATION BY MR. DE PURY

commonly, and by commonly, I mean more than once or twice a quarter, you post about somebody in this litigation?

A:    Once or twice a quarter. Well, I'm not sure it's fair to say that. I post about litigation in which my company is involved.

Q:    By involved, you mean litigation you've brought, though, in many cases, right?

A:    No, I think by in large, I-- I post about litigation that usually I'm a party to involuntarily.

Q:    Are you a party to this case involuntarily?

A:    I don't think so.

Q:    Let's go back to the other question, then. About what percentage of your revenue comes from sales, no matter which platform receives the sales?

A:    Just sales of subscriptions?

Q:    Sales of subscriptions.

A:    Sales of subscriptions?

Q:    Yes.

A:    Percentage of revenue?

Q:    Yes.

A:    On an annual basis?

Q:    Monthly, weekly, annually. I mean, whatever you've had the most recency--

A:    I think annual is the easiest way for me to slice, so I'd like to answer annually.

DIRECT EXAMINATION BY MR. DE PURY

**Q:** Okay.

**A:** Uh, of course, the total revenue from the available products changes year-to-year. The percentage, I think, from the most recent accounting period that we've concluded is-- the subscription revenue makes up 1/4 to 1/5 of that revenue.

**Q:** All right. You said it changes from year to year. I mean, you felt the need to say that. Do you think that's unlike every other company in the world?

**A:** No, only that I thought if I should say the percentage, I wouldn't want you to understand it to be the same percentage, let's say, five years ago.

**Q:** But it's fair to say that every company has fluctuations in revenue all the time?

**A:** Is that fair to say?

**Q:** Yeah.

**A:** Sure.

**Q:** So fluctuations in revenue is just a standard part of business, right?

**A:** I-- if by fluctuation, you mean-- yes, differences in revenue.

**Q:** Let's go back to the Ghost Gunner. When you updated that you said that the last update came in 2023; is that correct? Is that what you said?

**A:** The last major version difference started shipping in 2023.

DIRECT EXAMINATION BY MR. DE PURY

Q:    All right.

A:    Of the machine. That would not be the last difference of the ecosystem.

Q:    Has the competition for that unit grown substantially?

A:    Honestly, I don't know. I'm not sure.

Q:    Let me rephrase. There a lot more CNC machines on the market today than there were, say, in 1985, right?

A:    I-- I don't know. I can't speak to the total CNC market, the global market.

Q:    I mean--

A:    I can speak more to the micro CNC market.

Q:    Okay. Well, the micro CNC market then?

A:    Are there more micro CNCs now than in the 1980s?

Q:    Right.

A:    Yes, I think so.

Q:    So very similar to a home computer? No one had a home computer in 1985, but now, everybody has three or four in their home, correct? Including cell phones?

A:    I understand the question. I don't think I can agree. CNC has not evolved so rapidly.

Q:    Not as rapidly because it's a niche market. You would agree with that though, right?

A:    I wouldn't agree because it's a niche market. I don't-- I don't think the technology has evolved in the same

DIRECT EXAMINATION BY MR. DE PURY

way computing or mobile devices have.

Q: But would it be fair to say that, I don't know, to the average, you know, homemaker?

A: Uh-huh.

Q: I don't want to sound misogynistic, but I was going to say housewife.

A: You don't have to worry about that.

Q: But the average homemaker, where he or she may need a computer or an iPod, Alexa or whatever.

A: Uh-huh.

Q: They're not going to be printing small guns. So they may have a small computer, but they're also not going to want a countertop CNC machine, correct? So--

A: I don't think I can agree.

Q: No? So you think the proliferation should be nearly equal to--

A: No, I don't mean that either. I don't think that's a necessary implication of your question.

Q: What do you think the implication of my question is, then?

A: Well, it seems to me that in our industry, homemade guns were adopted rather quickly by these innocent homemakers with, you're right, instant access to home computers. Um, but this is because 3D printing as a technology has evolved on a different track than CNC.

DIRECT EXAMINATION BY MR. DE PURY

Q:    But you would agree it's not like a Keurig coffee machine, though? It's not like a--

A:    Well, in fact, that is the model that we have pursued, so to some degree, no, I-- I think it kind of is like Keurig, and the more it can become like Keurig, the better adopted it would be.

Q:    So Keurig coffee machine, there has been a rapid proliferation of those over the past few years. I mean, we're not looking at a French press and every-- you know, coffee maker's change.

A:    Yes, I've heard Keurig is the number one business of the State of Vermont.

Q:    Right, okay. So with the proliferation of Keurig coffee machines where they've expanded.

A:    Yeah.

Q:    And it's gone from the percolator, which-- I'm dating myself, Howard probably had one at his grandparents' house.

A:    Well, I'm old enough to--

Q:    Remember those then? Okay, then we all remember the Mr. Coffee machines, when that was the only automatic drip coffee maker. So the proliferation of this item could follow along those same lines, correct?

A:    I think it is possible, like in the history of technology, it is possible that could have happened, but it did

DIRECT EXAMINATION BY MR. DE PURY

not happen.

Q:     But there's an expanding market?

A:     I think there was an expanding market, right.

Q:     And are there more manufacturers in the business now than there were, say, 10 years ago?

A:     For micro CNCs.

Q:     So it's more competition for you then?

A:     I can't agree.

Q:     No? Why not?

A:     I don't think people purchase our micro CNC because it's necessarily the best micro CNC.

Q:     Well, always the name of the best on any of them. Well, maybe Keurig, some people might think that's the best. I don't, but--

A:     It's not about competitive advantage or the evolution of the market or the technology. It's-- the success of the product is hitched to the application of the product, which is a gun-specific application, where no competitor in my industry-- it's a market that none of them cater to.

Q:     So nobody else is marketing a product that's substantially similar to yours?

A:     Not just marketing, but, you know, service and support.

Q:     So if I went looking on the internet right now, I wouldn't be able to find anything except your product that

DIRECT EXAMINATION BY MR. DE PURY

printed these?

A:     To do what they do, that's right.

Q:     Okay. So effectively, it's like saying, there is nothing else other than Mr. Coffee. And I'm using it as an analog. Obviously, there's 1,000 coffee makers now, but.

A:     You know, I wanted <unintelligible> to beat Mr. Coffee. How about that?

Q:     Yeah, okay, fair enough. So it's your contention that yours is the only product on the market that does what yours does then?

A:     I'm-- I'm sure that's an overstatement, but it is more true to the facts.

Q:     Let's go back to the revenue question a little bit. What percentage would you say comes from hardware sales? And I know you haven't looked at the books today, so I'm not expecting a 72.6%, but--

A:     I'm prepared to-- by that same picture where I described the percentage of subscription revenue, I can-- I'm prepared to say something about the hardware sales in that picture.

Q:     Which would be?

A:     Well, it's almost the remaining. Almost the remainder of the pie, if you will.

Q:     So 4 to 5% comes from the subscriptions and the remainder?

DIRECT EXAMINATION BY MR. DE PURY

A:   No, no, I don't believe I said 4 to 5%.

Q:   What did you say earlier then?

A:   I believe I said a fourth to a fifth.

Q:   A fourth to a fifth, okay. All right.

A:   I'm happy to--

Q:   So 25 to--

A:   --read it back if you want.

Q:   Sure.

A:   Let's say 20% subscription revenue, something like that.

Q:   So 80% then, if those numbers are accurate. And we're not looking for absolute accuracy, but I was trying to--

A:   Right, it feels like a pareto-- sure, yeah.

Q:   Okay.

A:   That seems accurate.

Q:   What percentage of that comes in on cryptocurrency? Do you still use cryptocurrency?

A:   I believe we do.

Q:   Do a lot of your people pay using crypto? Small percentage?

A:   It's kind of a scandal. People in the gun business don't really use crypto, but I'd say less than 5%.

Q:   Now, in the beginning, didn't you mostly use crypto?

A:   No. Not-- not with these businesses.

DIRECT EXAMINATION BY MR. DE PURY

**Q:** How do you take income in?

**A:** Standard e-commerce. Major American credit cards, e-check, money orders. Most people are privacy conscious, they send money orders. They don't send anything else.

**Q:** Oh, really? That's kind of funny.

**A:** Oh, it's a fact.

**Q:** I mean, I guess it makes sense. In my industry, we see money orders for people that don't know how to get a bank account.

**A:** Well.

**Q:** But I can see the reason why in your business.

**A:** Some of these people have a bank account.

**Q:** But in your situation, it may be that they do so on purpose. They're obviously-- let me rephrase, I'm not asking a question, it's kind of an observation. If you can buy a CNC machine, operate a computer, print guns, clearly smart enough to get in a car and drive down to the bank, right?

**A:** I-- I-- yes, I think we've-- yes, I think we've seen that.

**Q:** Yeah, so in your industry, I think it's a little bit different than my industry. A lot of the folks I deal with, especially on some of the lower-end stuff, they just don't-- I mean, they still go to like, a Cash Advance America, something like that, and pay 10% to cash their paycheck, so.

**A:** I-- I think we've seen that too, though.

DIRECT EXAMINATION BY MR. DE PURY

Q:      Really? In your industry? That would shock me.

A:      We have layaway options for these people.

Q:      Huh. Well, I haven't heard the term layaway in quite a few years, but it makes sense.

A:      We work with them.

Q:      When did you first start accepting Bitcoin?

A:      I think the only companies-- well, the answer would be different for each company.

Q:      Well, give me those answers then.

A:      Gosh.

Q:      You can ballpark.

A:      Yeah. Well, I can answer as to Defense Distributed, I think most easily. When Defense Distributed began, I think even from the beginning, maybe the first week, so 2012, Defense Distributed began accepting donations. It wasn't accepting or selling anything at that time, but it began accepting Bitcoin in that way at that time.

Q:      Is it tied to when you started each company?

A:      I don't think that's true now. There may be-- there may have been a time when that was true.

Q:      Do you find that a lot of your subscribers use Bitcoin because it's more difficult to trace than traditional?

A:      I think that's-- it's kind of-- there's, like, a folk tale about Bitcoin and that it's harder to trace. But modern Bitcoin, everyone knows it's inherently traceable.

DIRECT EXAMINATION BY MR. DE PURY

Q:      Okay.

A:      I-- I don't think most of our customers have that expectation.

Q:      Yeah, and we're not trying to get into the whole blockchain argument and all that stuff. I just--

A:      In my understanding, no, I don't think our customers feel that way about Bitcoin.

Q:      Now, what safeguards do your companies use to ensure that all of your revenue, like Bitcoin, is accurately recorded?

A:      Safeguards. Um, I think we use standard accounting practices in my companies. Safeguards. I mean, we use-- you know, we're PCI compliant with, uh, credit card information. We use authorize.net or NMI gateways. You know, we encrypt SSL encryption for financial transactions. I mean, you know, industry standard stuff.

Q:      Who does your accounting? I know Mr. Tyra--

A:      Mr. Tyra is--

Q:      --files your taxes.

A:      Mr. Tyra is, I would say, my CPA.

Q:      So he does your books?

A:      No, no, I'm not saying that.

Q:      Who does your books?

A:      The bookkeeper's name, Chad Dickenson.

Q:      How long has he been with you or working for you?

DIRECT EXAMINATION BY MR. DE PURY

A:     Yes, he's been working for us. He's not an employee.

Q:     Right.

A:     Ah, you know, that's a tough one. I believe before COVID. I'm not sure I can say the year exactly.

Q:     But he's been doing your books since, I mean, that's seven years, six years?

A:     I wouldn't say seven years.

Q:     How long ago was COVID now? It seems like a distant memory, but it's really not.

A:     I know, man. You-- you-- you know, it's either 2019 or 2020 depending upon your location. Uh, somewhere around 2020 Mr. Dickenson began doing my books.

Q:     He does them for all the companies?

A:     Uh, yes, the companies I've mentioned, yes.

Q:     The companies you mentioned, there were companies you didn't mention that are still active, or no?

A:     No, I mentioned that I had other companies. I don't think he did the books for those. I mean, this was probably before he worked with me.

Q:     Okay, got you.

A:     Just doing an inventory. I believe he does the books for the companies I have mentioned.

Q:     Let me ask you this. I'm going to jump a little bit ahead, so we might circle back to this later. And also, my

DIRECT EXAMINATION BY MR. DE PURY

fellow Counsel here may ask some of the same questions.

A:     That's fine.

Q:     Typically, when they do, they're going to end up in a different place, though, than where I'm going.

A:     All right.

Q:     When Mr. Dickenson-- and is that common spelling, D-I-C-K-E-N-S-O-N, or E-N, do you know?

A:     Did you say D-I-C-K?

Q:     D-I-C-K-E-N-S-O-N?

A:     As long as you understand D-I, yes.

Q:     Yeah, okay.

A:     Dickenson, S-O-N. I think that's the common spelling.

Q:     By the way, does he have a company name or is it just his name or?

A:     Uh, you know, he-- I believe he does have a company name in the past few years, um. Yes.

Q:     Who do you write your checks to when you pay him?

A:     Dickenson Sharp.

Q:     So like I said, I'm going to jump ahead a little. We deposed Mr. Tyra last week. Have you read that transcript yet?

A:     Uh, I haven't.

Q:     You haven't?

A:     I-- I suppose we ordered it, but I haven't-- I

DIRECT EXAMINATION BY MR. DE PURY

haven't seen it.

Q:     That explains why we're here today. Would it shock you that you gave him a bunch of numbers, correct? Gave him documents?

A:     Would it shock me if I gave him documents?

Q:     No, no. So you understand-- I started getting ahead of myself. You gave him the documents he needed to come up with his analysis, correct?

A:     I believe he based his report on the documents that I gave.

Q:     Right. He is your tax preparer, but doesn't do your books?

A:     I think that's fair to say, yes.

Q:     Okay. I mean, that's what he said under oath, so.

A:     Yeah.

Q:     And then he testified that he has no idea, he didn't verify any of these numbers whatsoever, did you know that?

A:     He-- that he testified that?

Q:     Well, did you know that he didn't do anything to verify any of the numbers?

A:     I can't say that I know that.

Q:     Would it shock you that he didn't do that?

A:     Would it shock me that he didn't do anything to verify the numbers?

DIRECT EXAMINATION BY MR. DE PURY

Q:     Right.

A:     Uh, I'm not sure the framing of the question is accurate, um.

Q:     Just answer it any way, as you understand the question.

A:     It's like a hypothetical. If I, Gary De Pury, told you he didn't do anything.

Q:     Well, let me rephrase the question for you, then. How much did you pay him as an expert witness for you? To become an expert, to render an opinion?

A:     Pay him as an expert witness. I don't believe I paid him up front. I believe I asked him to do it-- to tell me-- to send me the bill when he had done the work.

Q:     So you've still written a check to him though, right?

A:     I-- I didn't write the check literally, but I have paid him.

Q:     So again, how much did you pay him for the report?

A:     I'm not sure I can say an exact figure.

Q:     Give me a ballpark. Hundred thousand, 5,000?

A:     No, more like 5,000.

Q:     So when you pay someone $5,000, you expect them to do an accurate job, correct?

A:     Do I expect them to do an accurate job? Yes, sure.

Q:     Would it shock you, then, to find out that he

DIRECT EXAMINATION BY MR. DE PURY

didn't do anything to verify the numbers you gave him?

A:      Would it shock me? Well, I-- this feels like a rhetorical imposture. I-- I believe he did do something to verify the numbers, at least as an expert in this case.

Q:      You would want him to verify those numbers, right?

A:      Would I want him to verify those numbers? I only want him to provide an expert report based on the information he's been given.

Q:      Based on the information he's been given?

A:      Well, I'm just saying. If it's within the scope of his report to verify the numbers, then I'd expect him to do that, but I'm not sure that that was part of what I asked him to do.

Q:      What did you ask him to do?

A:      I asked him to prepare a report about the damages in this case.

MR. FOSTER:     Can we take a break?

MR. DE PURY:     Can we wait a little bit? I'm right on a thread here.

MR. FOSTER:     After this question?

MR. DE PURY:     No, let me finish the thread, if you don't mind. So Mr. Tyra-- I asked him, and it is Tyra, okay. I want to make sure it's not Tyra or Tyra. I hate doing that. Everybody butchers my name, so I'm kind of, you know. Everybody does it to Matt, but Germaine we all get. Foster,

DIRECT EXAMINATION BY MR. DE PURY

you're lucky, so.

MR. FOSTER:    Oh, yeah.

MR. DE PURY:    With the first name.

MR. FOSTER:    I get <unintelligible> sometimes.

MR. DE PURY:    <unintelligible>? Okay. That's just high school kids stuff, right?

MR. FOSTER:    Now with opposing Counsel.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    So anyway, Mr. Tyra testified that he did nothing to verify the numbers you gave him. So he totally relied on your numbers, and that doesn't shock you?

A:    I'm not familiar with his testimony, so.

Q:    You're going to get it, so you don't have to trust me, but hypothetically, if that was the situation and you were to believe my hypothetical, would that hypothetical shock you?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    But I-- I understand why that's a difficult question. These feel like questions for lawyers, right? It feels like almost you're not asking me a-- feels like you're asking me for a legal conclusion, um, probably-- you know, I don't know that I can answer the question. I feel like he performed his duties within his role, expected role as an

DIRECT EXAMINATION BY MR. DE PURY

expert.

Q: But you told him to provide a report as to the damages, correct?

A: He was asked to prepare an expert report as to the damages.

Q: Based on the numbers you gave him?

A: I'm-- sure. Sure.

Q: Are you familiar with the term confirmation bias?

A: Yes.

Q: Let's take that break.

MR. LAROSIERE: We'll be back on the record. Yeah. Mr. Foster, you are aware that during breaks, the only thing you can talk to your client about is whether or not privilege can be invoked, right?

MR. FOSTER: No, I'm not aware of that.

MR. LAROSIERE: Well, that is the case, so we're not going to leave this room. We're not leaving. You cannot coach him.

MR. FOSTER: I'm allowed to talk to my Witness.

MR. LAROSIERE: You are not allowed to coach your Witness.

MR. FOSTER: Says who?

MR. LAROSIERE: Says the rules, Howard.

MR. FOSTER: What rules?

DIRECT EXAMINATION BY MR. DE PURY

MR. DE PURY:     Says the Supreme Court.

MR. FOSTER:     What rules?

MR. DE PURY:     Howard, I sent you the Halt case last week.

MR. FOSTER:     No, I don't agree with you, Gary. You didn't send me a case.

MR. LAROSIERE:     Wait, hold on. Mr. Foster, if we leave, are you going to start talking to him about how to answer questions?

MR. FOSTER:     We're going to talk freely about anything that we want to talk about.

MR. LAROSIERE:     Okay, so--

MR. FOSTER:     And if you don't like that-- hang on. Take it up with the judge at 2 o'clock today.

MR. LAROSIERE:     Okay, no. I'm just making sure this is on the record.

MR. FOSTER:     Okay. I want to make it clear on this. I am not aware of any authority that holds <vocalization> pardon me, that a Deponent cannot talk to his lawyer during a break in the Deposition. If you have such authority--

MR. LAROSIERE:     We sent it to you.

MR. FOSTER:     I don't have it.

MR. LAROSIERE:     Okay, but here's the thing. You're allowed to talk to him. You can talk about the weather.

MR. FOSTER:     Sure.

DIRECT EXAMINATION BY MR. DE PURY

MR. LAROSIERE:    You can talk about whether or not privilege can be invoked. You cannot talk about the subject of the Deposition.

MR. FOSTER:    I don't agree with you.

MR. LAROSIERE:    Has that been your understanding for this entire case?

MR. FOSTER:    What? I don't understand.

MR. LAROSIERE:    That you can talk about the subject of the Deposition during breaks with the deponents?

MR. FOSTER:    Yes.

MR. LAROSIERE:    So have you been doing that previously?

MR. FOSTER:    I haven't defended any depositions in this case.

MR. LAROSIERE:    You haven't defended any depositions in this case?

MR. FOSTER:    Let me see if I can remember. Only the expert, we talked about that already. I don't think I've defended any other depositions in this case.

MR. LAROSIERE:    Mm-hmm.

MR. FOSTER:    Do you?

MR. LAROSIERE:    But you were talking to that expert during that--

MR. FOSTER:    Yes, I've already told you about this.

DIRECT EXAMINATION BY MR. DE PURY

MR. LAROSIERE:    About the subject then?

MR. FOSTER:    Absolutely.

MR. LAROSIERE:    Okay, thank you for that. We can go off the record.

MR. FOSTER:    Okay.

MR. LAROSIERE:    All right.

MR. DE PURY:    Okay, thank you. Let's go off the record.

MR. FOSTER:    Sure.

THE REPORTER:    The time is 10:05 a.m. Eastern Standard Time and we are off the record. We are on the record, and the time is 10:47 a.m. Eastern Standard Time.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    All right, thank you. Where I left off is I was saying, you know, effectively, you provided your information to Mr. Tyra, and does it shock you that he testified that he didn't reach out and verify anything? That's kind of where I left off. Are we in agreement there?

A:    We're in agreement that that's where we left off.

Q:    That's what I was looking for. The last thing I said was, are you familiar with the term confirmation bias? And then we went on the break.

A:    Yes, that is the last thing you said.

Q:    We'll start there. Would you agree that effectively, that is just confirmation bias, that Mr. Tyra just

DIRECT EXAMINATION BY MR. DE PURY

took the numbers you produced and came up with a report?

A:     No, I don't think I could agree to that.

Q:     What would you call it?

A:     You're saying what would I call what Mr. Tyra did?

Q:     Yeah. I mean, other than just saying the word, oh, he did a report, I mean.

A:     I believe he applied his expertise. I mean, I'm-- I don't know all of the things that he knows as a professional, so I'm not sure that I can speak to exactly what it is he did or applied.

Q:     Well--

A:     I know I-- I know I gave him the raw numbers, right? I-- I don't think his report is simply saying, here's the raw numbers, take a look.

Q:     No, it doesn't do that, but it seems to be a confidently and competently put together report. You got what you paid for.

A:     I mean, I read it, and it does seem to be a competent report.

Q:     But would you-- well, I don't expect you to agree or disagree with this, but the fact is is that he didn't verify-- he testified, so it's not fact, but according to his testimony, he did not verify any of your numbers.

                MR. FOSTER:     Objection, that's asked and answered.

DIRECT EXAMINATION BY MR. DE PURY

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    I think you need a question, actually.

Q:    Yeah I'm trying to get to that. So would you still say that that is a competent report?

A:    Well, yes. I-- I trust the numbers.

Q:    Okay. Your numbers?

A:    Yeah, the numbers from the business, yeah.

Q:    That you gave him?

A:    Yes.

Q:    So also, Mr. Tyra provided nothing in the form of causation. Are you aware of that?

A:    No, I'm not aware of that.

Q:    What was the name of the movie you were in?

A:    Uh, look, I mean, there's been a few.

Q:    Well, let's talk specifically about the one that dropped in March of '23.

A:    Uh, uh, there's a documentary called, um, Death Athletic. Is that the one?

Q:    Death Athletic? I think it's a--

A:    It's a-- I don't know what you're referring to.

Q:    Well, it's not exactly a phonetically viable word. Death-- I just want to make sure it's--

A:    Well, a German came up with it. That makes--

Q:    Yeah, I want to make sure it's clear for the Court Reporter, for the transcript. So Death Athletic, and that

DIRECT EXAMINATION BY MR. DE PURY

dropped in, went to-- did it go to Sundance or something, right? In March or?

**A:** I don't think so.

**Q:** It went somewhere. It dropped in March '23 and is now on Netflix and everything else, right?

**A:** I-- I-- honestly I don't know.

**Q:** That's about the same time that the meme that's the subject of this also dropped, right? In May of '23.

**A:** I believe the meme-- I believe the first publication of the meme was May of '23.

**Q:** Doesn't that movie spend the first 15 minutes of its documentary, first 15 minutes, discussing your other legal issues?

**A:** I'm not sure that that's a-- that that's true.

**Q:** Well then, that movie, in the movie, discusses the the prior legal issues, the child SA incident--

**A:** You-- you can say it. You can say it.

**Q:** So it was reintroduced to the world?

**A:** Your self-censorship is interesting--

**Q:** I'm sorry, what?

**A:** --to me. Did you say child SA?

**Q:** Yeah.

**A:** Could you say what you mean?

**Q:** Do you want me to say what I mean?

**A:** I think you should.

DIRECT EXAMINATION BY MR. DE PURY

Q:      When you raped a child?

A:      Do you-- do you believe that I raped a child?

Q:      Well, I believe that you had sex with a minor. I believe you filed--

A:      I don't think the movie talks about me raping a child.

Q:      Well, what's the movie talk about?

A:      I believe it talks about my company, and it's a seven-year documentary of the progress of that company.

Q:      But the movie spends time discussing your prior legal issues, correct?

A:      Discussing. Well, it's a documentary. I-- so I don't know if that's true.

Q:      Do you object to my-- I was actually trying to be polite to you, but I believe that you had sexual intercourse with a child.

A:      I don't think you were trying to be polite with me.

Q:      No, I said child SA. I mean, I was trying to be polite. Maybe to the court, maybe to--

A:      You probably meant to ask what you meant.

Q:      All right. Well, I'll say it. I mean, I'll say exactly what I think.

A:      But you--

Q:      So did you have sexual intercourse with a child?

A:      Did I have sexual intercourse with a child? Uh, not

DIRECT EXAMINATION BY MR. DE PURY

in any understanding--

MR. FOSTER:    Okay, I'm going to object to that question.

MR. DE PURY:    Did you put--

MR. FOSTER:    I'm going to object on the record to the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    Did you plead guilty to having sexual intercourse or to having relations with a child?

A:    No.

Q:    No? You didn't plead guilty?

A:    No.

Q:    Were you on probation?

A:    Was I on probation?

Q:    Yeah.

A:    I've been on probation.

Q:    Okay. For?

A:    Uh, I plead guilty to a third or fourth degree felony, maybe injury to a-- a minor.

Q:    Injury to a minor, all right. Was it alleged that you paid a child $500 or some amount for sex?

A:    Was that alleged?

Q:    Yes.

A:    By, like, the State?

MR. FOSTER:    Objection. Wait. Okay, let me

DIRECT EXAMINATION BY MR. DE PURY

say this. I think you're allowed to inquire about a prior conviction.

MR. DE PURY:    Is that a speaking objection, Howard?

MR. FOSTER:    Yeah.

MR. DE PURY:    Okay, I just wanted to make sure.

MR. FOSTER:    You're allowed, if necessary, to put your objection-- if you want to bring a protective order, you are required just to state the basis for that--

MR. DE PURY:    Okay.

MR. FOSTER:    --in-- during the Deposition. That's what I'm doing here.

MR. DE PURY:    Okay.

MR. FOSTER:    Okay? I am going to bring a motion for a protective order if you pursue this line of questioning, and instruct the Witness not to answer because it's not relevant. It can't be impeached for any of this because there was no conviction.

MR. DE PURY:    Okay. Thank you for saying that. Now I will clarify this because I want this part on the record. It's already on the record. I tried to be polite, I just mentioned child SA. Your Witness-- your client said, I want you to say what you mean. Your client invited it. So bring your objection for a protective order when your client invited

DIRECT EXAMINATION BY MR. DE PURY

this line of questioning. Go ahead, Howard. Let's take that to the judge and see what he says when your client invited this line of questioning.

MR. FOSTER:     He didn't invite this line of questioning.

MR. DE PURY:     Oh, he certainly did.

MR. FOSTER:     No.

MR. DE PURY:     He certainly did. So I'm going to go ahead and continue with my questioning. If you instruct him not to answer, I'm going to ask for sanctions against you.

MR. FOSTER:     I know you will.

MR. DE PURY:     It is not a protected item, all right?

MR. FOSTER:     I think it is.

MR. DE PURY:     Okay. Well, we're going to get to the bottom of it.

MR. FOSTER:     What are you trying to establish?

MR. LAROSIERE:     I think you've gone over three words, Howard, come on.

MR. DE PURY:     Yeah.

MR. LAROSIERE:     We agreed to this.

MR. DE PURY:     I think you've--

MR. FOSTER:     Can we go off the record for a minute?

DIRECT EXAMINATION BY MR. DE PURY

**MR. DE PURY:**    No.

**MR. LAROSIERE:**    No.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:**    No. So Mr. Wilson, you invited this line of questioning, so did you flee to Taiwan?

**A:**    Not in any understanding of that word.

**Q:**    Did you go to Taiwan?

**A:**    Ever?

**Q:**    Uh, shortly after you found out there was an indictment?

**A:**    No.

**Q:**    No? When did you go to Taiwan? Let me rephrase the question. At some point you allegedly dropped this young lady, the-- was she 15 or 16?

**A:**    Uh, who made this allegation?

**Q:**    The 15 or 16-year-old. You dropped this young lady off at a Whataburger, right? Texas food chain? Is that--

**A:**    You're saying--

**Q:**    --true?

**A:**    --is this alleged?

**Q:**    Well, did you do it?

**A:**    Have I dropped a lady off at a Whataburger?

**Q:**    Yeah.

**A:**    A lady?

**Q:**    A 15 or 16-year-old young lady that you just had

DIRECT EXAMINATION BY MR. DE PURY

sex with?

**A:**    I wouldn't say a 15 or a 16-year-old, no.

**Q:**    Okay. Did you then shortly-- in-- in between then-- then and the time you were arrested in Taiwan, extradited back to the United States, go to Taiwan?

**A:**    Uh, I was not extradited back to the United States.

**Q:**    How did you get back to the United States?

**A:**    I-- I flew back.

**Q:**    You weren't arrested by the U.S. Marshals?

**A:**    No.

**Q:**    Oh, I-- I-- so-- okay. I was under a different impression then.

**A:**    Did you do your research?

**Q:**    Well, I will. How did you get back? You just voluntarily flew back?

**A:**    Commercial air.

**Q:**    You voluntarily flew back?

**A:**    I did.

**Q:**    Okay. And you were arrested upon landing here?

**A:**    I was.

**Q:**    Okay. For what-- was the initial crime you were arrested for?

**A:**    I don't recall.

**Q:**    You don't recall?

**A:**    No.

DIRECT EXAMINATION BY MR. DE PURY

**Q:** Okay. Is that a common thing that you wouldn't recall?

**A:** That's a funny question.

**Q:** Well, I mean-- so there's different levels of I don't recall.

**A:** Yeah.

**Q:** Right? We all know that Hillary Clinton failed miserably at that. The judges like to look at this and say, okay, he does recall and he's just lying. I'm not accusing you of lying. Howard does that. He's accused my clients of lying and I don't appreciate that. I --

**MR. FOSTER:** Object to-- to the form of this. This is not a question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:** You can object to the form. What I'm saying-- I'm-- I'm-- no, this is a question. I'm laying groundwork. What I want to do, though, is caution you that I'm not going to accuse you of lying, but the judge may perceive--

**MR. FOSTER:** Object to the form. This is not a question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:** --the judge may perceive that you're being less than truthful.

**A:** I see.

**Q:** So you seriously do not recall any of this?

DIRECT EXAMINATION BY MR. DE PURY

A:      No. You asked if I recall the charge--

Q:      The ori--

A:      --upon which I was arrested.

Q:      Mm-hmm.

A:      I do not.

Q:      You don't recall being charged with--

A:      I recall being charged with a crime. I recall being arrested.

Q:      Uh-huh. Okay. So let's ask this. So you pled guilty to a misdemeanor or a felony?

A:      I believe it was a third or fourth degree felony.

Q:      Okay. So you can't own firearms, right?

A:      No, I can.

Q:      You can own firearms?

A:      Yeah.

Q:      So your record's cleared? How does that work?

A:      Yes. It was a-- a non-pros or a deferred adjudication.

Q:      Deferred-- okay. So you did your probation and then it was deferred after that? Is that--

A:      Yes. The State asked that I serve a term of probation. If I serve it without violation, that the case be dismissed.

Q:      Okay. So this movie, this documentary, because Howard asked where I was going with this. This documentary

DIRECT EXAMINATION BY MR. DE PURY

which is established-- I mean, it's on the internet, you pretty much just said, yeah, you think it did dropped around the same time that this meme that's in question also dropped, correct?

A:     I don't know that that's true.

Q:     No? Well, you know that the calendar has 12 months on it, right?

A:     Yes.

Q:     And March comes before May?

A:     Yes.

Q:     You would agree with that then, right?

A:     I agree that March comes before May.

Q:     Okay. And you would agree that they both occurred in 2023 right?

A:     The months of March and May?

Q:     Okay.

A:     They did happen.

Q:     And the rest is on the record, so we don't have-- I don't need your agreement with that. Did you inform Mr. Tyra at any time about this documentary, this movie?

A:     Are you asking if I've ever told him about this documentary?

Q:     Well, when you were giving him information specific to the report you needed him to create, did you tell him about it?

A:     About the movie?

DIRECT EXAMINATION BY MR. DE PURY

Q:     Yes.

A:     I don't believe I did.

Q:     You don't believe you--

A:     I don't believe I told him about the documentary.

Q:     Okay. Why not?

A:     Why did I not tell the expert about the documentary?

Q:     Right.

A:     I-- I'm not sure I have a reason.

Q:     All right. Could you be more specific? You're not sure you have a reason to tell him or you're not sure you have a reason you didn't tell him?

A:     I think your question--

Q:     No, I know my question.

A:     --is asking if I have a reason behind not talking about this movie, and I don't know that I do.

Q:     Okay. So you just-- no reason to tell him?

A:     I recall not telling him about the documentary.

Q:     Okay. Well, he testified he's never heard of it, or that he didn't--

A:     I'm not surprised. I don't think many people have heard of this documentary.

Q:     Apparently pretty popular.

A:     Well, it sounds like you haven't heard of this documentary.

DIRECT EXAMINATION BY MR. DE PURY

Q:     Why would you say that?

A:     You called it a movie. You said it played at Sundance. I-- it seems to me like you may not have described the first 15 minutes of it incorrect. I-- I don't think you have seen this movie.

Q:     Okay. Whether I have or haven't, is that relevant?

A:     Well, when you say you-- when you say you know the movie, I was observing I don't think you knew it.

Q:     Well, I mean, does it matter in the nuances of your mind whether I call it a film, a movie, kino, you know, theater?

A:     Only-- only as an indication of whether you actually were aware of it.

Q:     Okay. I mean, I've seen Gone With the Wind. Does that have any relevance to anything?

A:     You know, I'm sure it's attenuated.

Q:     Yeah. So I mean, what I think you're doing is wasting time and mincing words.

A:     Mincing?

Q:     Yeah, mincing. So what I'm going to say to you is you actually admitted in your request for admissions that you had sex with a 16-year-old. Now you're trying to say, well, I don't recall.

            MR. FOSTER:     Object to the form of the question.

DIRECT EXAMINATION BY MR. DE PURY

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:**    Okay. So I'm going to go ahead and continue my-- because I wasn't even asking a question yet. This is the groundwork for a question. He's improperly objected to the form of laying the groundwork. So you admitted in your RFAs that you had sex with a 16-year-old.

**MR. FOSTER:**    Object.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:**    Is that correct?

**A:**    Could you show me?

**Q:**    No. I'm not going to show you. Did you-- were you lying in your RFAs?

**A:**    No. I'm sure if that's the answer, that--

**Q:**    Okay.

**A:**    --that was the truth.

**Q:**    But now you don't recall or now you're just being evasive?

**A:**    Only asking if I could see it.

**Q:**    Okay.

**A:**    The construction of the question may be explanatory for--

**Q:**    Well, we're going to spend a lot more time interpreting your answers instead of interpreting my questions, how does that sound? So, who prepares the tax returns for your company? Now, I think we already know this, so Howard's going

DIRECT EXAMINATION BY MR. DE PURY

to say asked and object-- or asked and answered, but I just want to hear it on the record again.

**A:** Uh, Jason Tyra.

**Q:** Right. And how long has Mr. Tyra been doing your tax returns?

**A:** Um, well, it may be since 2017.

**Q:** Okay. I think you're really going to enjoy reading that transcript from him. And the reason, again, that's laying the groundwork for a question.

**A:** Uh-huh.

**Q:** Because he states-- and I kind of wish you would-- I understand that's outside of Mr. Foster's control at this point.

**A:** Uh-huh.

**Q:** Um, but he states in his-- his responses that he did nothing except rely totally on your work and that he only does your taxes. But Mr. Dickenson-- is that-- yeah, Dickenson does-- he didn't know that name-- he does your actual bookkeeping. Did you tell him, hey, here's Mr. Dickenson's information in case you want to reach out to him?

**MR. FOSTER:** Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:** Did you tell him--

**A:** I didn't tell him that.

DIRECT EXAMINATION BY MR. DE PURY

Q:     --that, hey, here's Mr. Dickenson's information in case you want to reach out to him?

A:     Are you asking if I've ever told him that?

Q:     I'm asking for the form of the report you needed him to prepare for you.

A:     Uh-huh. Uh, I don't-- I don't recall if I said that.

Q:     Okay. Now see, that's a believable I don't recall. That's a-- that's-- but that one, the judge is gonna believe that. That's not--

A:     Okay.

Q:     --you know, I was charged with a sexual crime of a minor I don't recall. Judge is not going to believe that one. So let's go to, why didn't you give your expert witness enough information to prepare an actual report?

               MR. FOSTER:     Object to the form of the question.

               (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I have to say the framing of the question is not something that I agree with.

Q:     Okay. So why didn't you give Mr. Tyra enough information to create an accurate report?

               MR. FOSTER:     Object to the form of the question.

               (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

DIRECT EXAMINATION BY MR. DE PURY

**A:**     I-- I disagree. I believe I gave him necessary, sufficient, enough information to make his report.

**Q:**     Would you agree that an expert report is supposed to be a true and accurate representation?

**A:**     Yes.

**Q:**     Okay. So again, the report does nothing to establish any causation. Are you aware of that?

**MR. FOSTER:**     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**     I don't know that I can say I'm aware of it.

**MR. DE PURY:**     So I'm going to invite an explanation from Howard on that. Why would you object to that one? I just want that on the record.

**MR. FOSTER:**     I'm not allowed to--

**MR. DE PURY:**     Oh, I'm inviting you.

**MR. FOSTER:**     We've been-- no. No speaking objections are allowed.

**MR. DE PURY:**     All right. So you don't have a reason, then. Because I'm inviting it. When I invite it, I'm overruling that. I'm inviting it for this question. My question was very simple, why would you object to the form? What was wrong with that form?

**MR. FOSTER:**     Assuming facts not in evidence.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

DIRECT EXAMINATION BY MR. DE PURY

Q:     Okay. All right. Well, I'll disagree, but okay. So did you give any information as far as Mr. Dickenson to Mr. Tyra?

A:     I've certainly given Mr.-- Mr. Dickenson's information to Mr. Tyra, many times.

Q:     Okay. I know you don't know why he didn't ask, so I'm not gonna ask you why he didn't do his job properly, I'm going to ask you why you didn't say to him, hey, please contact my bookkeeper-- what is-- is he a CPA? Is Mr. Dickenson a CPA, is he a bookkeeper, or is he a--

MR. FOSTER:     Yes. I-- I-- wait-- hold-- object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I know he has some professional credential. I'm--

Q:     Okay.

A:     I don't recall.

Q:     All right. And that's all I'm looking for. So I just want to be accurate when I'm talking about him.

A:     Mm-hmm.

Q:     Um, why didn't you say to Mr. Tyra, hey, call this guy. I want a completely accurate report?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     Go ahead and answer.

DIRECT EXAMINATION BY MR. DE PURY

**A:** Mm-hmm. Uh, I'm not saying I didn't say that, but I assume the two are in contact. They've been in contact for many years.

**Q:** Okay. Would it shock you that he's never spoken to him? According to Mr. Tyra, he's never spoken to him?

**MR. FOSTER:** Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:** Well, I know-- I guess would that shock me if-- okay. May we start over?

**Q:** No.

**A:** Would it shock-- my understanding of your question is, would it shock me if I learned that Mr. Tyra has never spoken to Chad Dickenson?

**Q:** Yeah.

**A:** Yeah. Sure.

**Q:** Okay. But you just said that they've been in communication for many years.

**A:** Uh, sure. Yeah.

**Q:** Oh. So when you say communication, are you saying that they must email each other back and forth?

**A:** They must.

**MR. FOSTER:** Object to the form of the question.

**MR. DE PURY:** That's a strange objection. I

DIRECT EXAMINATION BY MR. DE PURY

think you're just objecting for the right-- you want to just object for all questions I'm going to ask? That made no sense, Howard.

MR. FOSTER:    Are you--

MR. DE PURY:    With all due respect, that just--

MR. FOSTER:    What are you asking of me? I'm not supposed to elaborate.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    Okay. Well, I mean, but that's just a ridiculous objection. So the question is-- let me restate the question. Or let me just say it this way, Mr. Tyra seemed to not even know who your bookkeeper was.

MR. FOSTER:    I object to the form of that question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    Okay.

A:    I-- I didn't hear a question.

Q:    Um, he said, he stated, or he seemed to indicate he had zero idea of who your bookkeeper even was.

MR. FOSTER:    Object--

MR. DE PURY:    So--

MR. FOSTER:    --to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    That wasn't a question. I'm trying to get to the

DIRECT EXAMINATION BY MR. DE PURY

question. So how is someone having communication over multiple, several years if they don't even know who that person is?

MR. FOSTER: I object to the form of that question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:      Obviously I would-- it's a hard one to answer that posed that way, um--

Q:      Well, let me-- let me rephrase it this way.

A:      Mm-hmm.

Q:      Do you know who owns this building? Do you know the landlord of this building?

A:      Not personally.

Q:      Okay. So if I said to you, or if you were testifying right now-- or if I was testifying to you-- and this is hypothetical, but if I was testifying to you--

A:      Uh-huh.

Q:      --I've had communications with this landlord 100 times--

A:      Uh-huh.

Q:      --and then you found out later, I don't even know who the landlord is. Would you find that incredulous, unbelievable, whatever form you might want to use?

A:      Well, in this context, now I could understand maybe what you may mean.

Q:      Mm-hmm. What do you think I mean?

DIRECT EXAMINATION BY MR. DE PURY

A:     You may mean that you've been in contact in a way but you can't recall that person's name.

Q:     Okay. So is that what you think is going on is that Mr. Tyra, just at the moment after, I think, six times I asked him that he just couldn't recall the name?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     It sounds most likely to me, I mean.

Q:     Is it possible that he just didn't know who it was?

A:     Well, these-- these are hard things to trace out, like, he can-- he can not know who my bookkeeper is and have still been in communication with him.

Q:     All right. I'll buy that. So he testified though that he did not do anything to verify your records. He never spoke to your bookkeepers once. He really didn't even know who your bookkeepers were, no contact information and just had no explanation. So the question then is, do you still believe that without verifying your numbers, that he provided an accurate assessment of your company's dollars?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     The report I read, I believe was accurate, an accurate assessment.

DIRECT EXAMINATION BY MR. DE PURY

**Q:**     Okay. So based on just the numbers you gave him though, right?

     **MR. FOSTER:**     Object to the form of the question.

               (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**     I-- I can't say that I know what el-- what else he supplied or what else he brought, like, as a part of his expertise to his report. I don't suppose that his report is only based in some very narrow sense on the numbers that I gave.

**Q:**     But that's his testimony, that that's the only thing it's based on.

     **MR. FOSTER:**     I object to the form of the question.

               (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**     Here-- here's where it's a problem. I'm not a lawyer. I don't know the complexities of these things. I think it is reductionist to say all my-- expert used was the numbers I gave him and nothing else was included in the production of his report.

**Q:**     That's his testimony.

     **MR. FOSTER:**     Object. There's no question there.

               (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**     Again, I'm not trying to represent a legal

DIRECT EXAMINATION BY MR. DE PURY

conclusion about my expert's report, but a common person would believe that my expert brought his expertise to his report in addition to what I supplied.

Q:    So it doesn't worry you at all that he can't back these numbers up with any other analysis?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    I-- I understand the question. I don't agree with the framing of the question. I-- I believe the expert did the job that he was hired to do, and he did it competently.

Q:    All right. Let me ask you about Defcad. Was Defcad ever hacked?

A:    I don't believe so.

Q:    No?

A:    I don't believe it has been hacked.

Q:    Did you pay someone to try and hack it?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    No. I've never paid someone to try to hack it.

Q:    No. Have any of your websites ever been hacked?

A:    I think I would need clarity on the definition of the word hack.

Q:    Well, I'm not a computer programmer, so I guess I'm

DIRECT EXAMINATION BY MR. DE PURY

going to try and take a shot in the dark here. Unauthorized person gets into the back end of the computer software.

A:    I think it's a good definition, unintended access or something. To my understanding, no. None of-- none of our websites has been hacked.

Q:    To your understanding, who posted the meme?

A:    Uh, I-- every Defendant--

Q:    I'm sorry--

A:    Every Defendant in this case except Mr. Larosiere.

Q:    I'm sorry, that was a poorly-worded question.

A:    All right.

Q:    To your understanding, who posted the meme on your website?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    Who posted the meme on my website?

Q:    Yeah.

A:    Uh, I have made an inquiry into this. I believe it was Thomas Odom.

Q:    Your unpaid employee?

A:    Yes.

Q:    Now, who controls that website?

A:    Uh, well, ultimate-- you mean ultimate control?

Q:    Mm-hmm.

DIRECT EXAMINATION BY MR. DE PURY

A:      Sure. I'm-- I'm in ultimate control of that website.

Q:      You are?

A:      Yes.

Q:      Is that meme still on the website?

A:      Is it still on the website? That's a complicated question to answer.

Q:      It's not.

A:      No, it is, because the website is also an application, is also a CMS. In a way the meme is on the website, but I don't believe the meme is publicly available on the website.

Q:      Well, when you say publicly available, are subscribers able to see it?

A:      I don't think so.

Q:      So who can see it?

A:      I think only administrators of the website could see the meme.

Q:      When did that change?

        MR. FOSTER:     Object to the form of the question.

                (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:      Uh, it was recently. It was recently.

Q:      Why did you leave it up for so long?

        MR. FOSTER:     Object to the form.

DIRECT EXAMINATION BY MR. DE PURY

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    Why did I leave it up? I don't think I made a positive decision to leave it up so long.

Q:    Why didn't you make a positive decision to remove it?

A:    Well, un-- an important way, I think I have made that decision.

Q:    Why didn't you make that decision much sooner? Let me-- well, strike that. Let me ask you this way. Isn't it your contention that this meme and solely this meme has had a detrimental effect to your revenue?

A:    I don't believe that's my contention.

Q:    What is your contention in this lawsuit, then?

A:    As I understand the complaint, we've said a series of false statements--

Q:    I'm not asking about the complaint. I can go read the complaint and I know I said I wouldn't interrupt, but that's just a ridiculous answer.

MR. FOSTER:    Okay.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    What-- hold on, Howard. What I ask is--

A:    Uh-huh.

Q:    --what is your contention? You, Cody Wilson--

A:    Uh-huh.

Q:    --testifying today, what is your contention?

DIRECT EXAMINATION BY MR. DE PURY

A:      Yeah, me--

MR. FOSTER:     I object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:      Good.

A:      All right. Testifying today, I believe a series of false statements about the business were made. These are typified by the meme and most forcefully included in that meme, but they are not exclusive to the meme.

Q:      So you testified that you think Thomas Odom posted it on your website. Have you filed a lawsuit against him?

A:      A lawsuit against Thomas Odom?

Q:      Yeah.

A:      I have not filed a lawsuit against Thomas Odom.

Q:      Why not?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:      Why have I not sued Thomas Odom?

Q:      Yeah.

A:      I'm not gonna give the cheeky answer. Thomas Odom was not harming the company or trying to.

Q:      But he posted the meme.

A:      He posted the meme?

Q:      You believe.

DIRECT EXAMINATION BY MR. DE PURY

**MR. FOSTER:** Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A: I guess this is a-- this is a too simple of a description of what he did.

Q: Well, give me an elaborate description of what he did.

**MR. FOSTER:** Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A: All right. I want to answer, though. Maybe I do want to answer.

Q: I'm expecting you to.

A: Okay. Great. Uh, I believe he uploaded the meme. That-- that might be a more accurate way to answer the question.

Q: Same result, right? Upload, post?

A: Yeah, but you know it's, like, was it approved by other people? Who were those people? You know, um, was Thomas Odom trying to harm the business? No. I think Tom was collecting information related to the culture, potential litigation, we were doing some documentary work. I believe he thought he was doing a good thing. I believe the defendants in this case thought they were doing a harmful thing.

Q: So be because you think that he was doing-- he

DIRECT EXAMINATION BY MR. DE PURY

thinks he was doing a good thing, it's excusable, but if they posted this it's not excusable? I guess that's what I'm--

                    **MR. FOSTER:**     I object to the form of that, if that's a question.

                    (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

     **A:**     Okay. There are--

     **Q:**     It is a question.

     **A:**     --there are obvious differences.

     **Q:**     Okay. Let's talk about those. What are they?

     **A:**     For example, you-- you would have to talk about what the meme is.

     **Q:**     All right.

     **A:**     This is difficult to do. The-- the meme circulates, it gets deleted, sometimes by the Defendants. It's good to point to a common source, a primary source, for something like the meme.

     **Q:**     Right.

     **A:**     And in the end that's one useful. So that's one way to use the meme as it was on our website.

     **Q:**     All right. So what's the primary source?

     **A:**     Well, that's what I'm saying, creating a primary source, like, using that-- the meme that way on the website is-- is using it as a primary source.

     **Q:**     And I'm not going to post anything like this on my website because it would not benefit me. But if I were to post

DIRECT EXAMINATION BY MR. DE PURY

this on my Facebook page--

A:     Uh-huh.

Q:     --for instance, and say I deposed this guy and at the end of the deposition he's a hell of a nice guy. I like him. I think this meme is a horrible thing.

A:     And then-- and then you post the meme.

Q:     And I post that meme.

A:     Well, I'd interpret that as a kind of malicious irony.

Q:     So it doesn't really matter what my intention is then, does it?

A:     No, it does.

Q:     It does?

A:     It clearly does, yeah.

Q:     Well--

A:     Of course there's a social construction. You're the-- you're the Defendant's attorney, at least one of them.

Q:     All right.

A:     So obviously I would then be, like, Gary De Pury is a part of the enterprise.

Q:     Well, I mean, I'd figure you'd research me and you know that two people in this room didn't exactly like each other at the very beginning.

A:     I have no idea of anything about you.

Q:     You should.

DIRECT EXAMINATION BY MR. DE PURY

A:      I have noted your logo.

Q:      Yeah.

A:      I have seen it, you know, that--

Q:      I put it everywhere.

A:      --that's an interesting thing.

Q:      Yeah, I do. Here, have a pen.

A:      That is so-- thank you very much. But I-- I promise that's the extent I know about you.

Q:      So I mean, it--

A:      Are you saying you were former enemies or?

Q:      It's like Zach and I were ready to--

A:      Enemies for friends--

Q:      --beat each other's ass at one point.

A:      Well, it's like enemies.

Q:      And so, that happens and it's not-- several of my clients are prior litigants where I handle things--

A:      I can understand that. I can understand that.

Q:      So it is possible that I could post something like that. Let's say at the end of this litigation.

A:      Yeah.

Q:      I mean, Howard and I both owe each other a drink at the end of this. We both promised a martini or something and you know--

A:      Rock 'em sock 'em.

Q:      --that happens, right?

DIRECT EXAMINATION BY MR. DE PURY

**A:**      Sure. Sure.

**Q:**      It happens especially amongst lawyers. You yell at each other and you walk out and go play golf. I'm not a golfer. But if at the end of this--

**A:**      Yeah.

**Q:**      --and I know it's a hypothetical, Howard's going to object to my hypothetical, but--

**A:**      I understand.

**Q:**      If I posted that and I said look, I met the guy he's actually a pretty nice guy. And this meme-- this whole thing was over a meme. Maybe I didn't say I thought the meme was horrible, does the intent of the posting matter?

                **MR. FOSTER:**    Object to the form of the question.

                (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**      In this-- in this hypothetical, of course the intent would still matter, yeah.

**Q:**      Okay.

**A:**      And probably it will be the settlement agreement which governs whether you could or couldn't post the meme anyway.

**Q:**      I would settle.

**A:**      Well.

**Q:**      But that's-- yeah.

**A:**      There you go. So if you posted it and you didn't

DIRECT EXAMINATION BY MR. DE PURY

settle--

Q:    Yeah.

A:    --I would interpret it in a different way.

Q:    Okay. So, oh, I thought I-- sorry, I misunderstood. I thought you were saying that you would litigate with me and then I would-- we'd settle that case. Okay.

A:    No I--

Q:    You're saying if there's a settlement agreement here, in this case, and it said that it was okay for me to post it, then that would matter too?

A:    I think that's what I meant, yeah.

Q:    So settlement agreements matter then, right?

A:    I'm sure.

Q:    Okay.

A:    Sure.

Q:    So if someone-- if you had a settlement agreement and it said you're not supposed to make disparaging comments about the other party, would that matter?

A:    Absolutely.

Q:    Okay. I just want to make sure that's on the record. Thank you. Now does Defcad encrypt the customer information?

          MR. FOSTER:    Object to the form of the question.

          (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

DIRECT EXAMINATION BY MR. DE PURY

Q: Okay.

A: Customer information. I can understand his position. Um, if-- uh, let's back up, right? I-- you know, not every person who uses Defcad is a customer of ours.

Q: I'm listening. I'm going to grab my coffee.

A: That's fine.

Q: Keep going.

A: Uh, that is my answer.

Q: But does Defcad take precautions to encrypt certain things? Not everybody's a customer, but subscribers?

A: Uh, you know, in the interest of moving along, sure, Defcad, uh, uses standard encryption, uh, to handle data.

Q: Okay. It's a safe answer, I guess.

A: I'm sure.

Q: Well, were any of your users ever doxxed?

A: Were my users ever doxxed?

Q: Yeah.

A: Uh, not that I recall.

Q: No? Defcad ever suffer a data breach?

A: Uh. Not that I recall.

Q: So you don't recall ever being hacked, you don't recall any data breach?

A: I've looked for it. I've heard that it happened.

Q: Now, did you talk with Mr. Tyra after that deposition or during that deposition about a data breach?

DIRECT EXAMINATION BY MR. DE PURY

**A:**     Uh, no.

**Q:**     You were not familiar with the questions that we asked him?

        **MR. FOSTER:**    Object to the form of the question.

                (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**     Not familiar with the questions you asked. I have not read the transcript although I did participate at times. I listened to some of the-- the deposition.

**Q:**     All right, did you-- never mind. That would get into privilege. Was there a concern of yours that Mr. Tyra did not sign up for this?

        **MR. FOSTER:**    Object to the form of the question.

                (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**     I-- I can only guess what you mean.

**Q:**     I'll elaborate if you ask, because you invited me to elaborate about your issues and so--

**A:**     If you say so.

**Q:**     Okay.

**A:**     To answer your question directly, was there a concern? I don't think I had such a concern, if that's a good answer to your question.

**Q:**     All right. So--

**A:**     He did not sign up for it. Well, I mean, I think he

DIRECT EXAMINATION BY MR. DE PURY

signed up to be my expert.

Q:    But was there a concern on your part that Mr. Tyra did not sign up for the questions about the fact that he's possibly-- was possibly cheating on his wife?

MR. FOSTER:    Oh, object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    Look, uh, I-- news to me. I think he did sign up for it.

Q:    He signed up for that?

A:    Well, he signed up for abuse from the other side, certainly. I mean, it's-- look, if you-- it's-- it's your job to try to kick out my witness. I mean, I understand.

Q:    We didn't try to kick him out. I want him on the stand with us now.

A:    I'm sure you want him.

Q:    All right. Have independent security experts ever reviewed your your platforms? And by platforms I mean the websites and the back end where you take the money and things like that?

A:    Yes.

Q:    Who did those?

A:    I don't know that I can make a complete recounting.

Q:    About how many?

A:    Well, what comes first to mind is Mandiant.

DIRECT EXAMINATION BY MR. DE PURY

Q:      Spell that for us.

A:      M-A-N-D-I-A-N-T. They're somehow connected with Google now.

Q:      Okay.

A:      Coalition, my insurer, had its own expert consultant service that looked at it.

Q:      When did you have that done?

A:      Uh, it was a condition of my insurance coverage-- do you mean the Coalition review?

Q:      Yeah.

A:      It would have been upon the time the policy, the binding of the policy. That's what I recall about it.

Q:      All right. Now let's go back to the meme.

A:      Uh-huh.

Q:      Because that is kind of the main focus of what brought this litigation, right? Did you--

            MR. FOSTER:     Actually, wait, I object to the form of that question.

                    (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:      Uh, I don't know that I can say yes to your question.

Q:      Well, I mean, it's--

A:      I think the meme is a-- a focal point, a centerpiece or something.

Q:      I think I agree with you on that. And you would

DIRECT EXAMINATION BY MR. DE PURY

agree that meme was posted in a couple places, including your website, but other places as well, right?

A:     I would agree the meme has been posted across the Internet.

Q:     Have you ever asked requested any takedowns?

A:     Do you mean me personally?

Q:     Yeah. Your company, you personally, have you directed anybody on behalf of benefiting your company for it to be taken down?

A:     Yes, I have.

Q:     Who was that?

A:     Who did I direct to take it down or request to take it down?

Q:     Who, when, yeah.

A:     I recall asking-- um, or Defcad asking the moderators of a large subreddit related to our industry to remove the meme on more than one occasion.

Q:     Okay.

A:     It was pinned. On occasion, it would become pinned to the front page of that subreddit, which-- which would keep it on the front page and drive it high in the search results on Google.

Q:     How many members were on that subreddit, do you know?

A:     The subreddit's been deleted, but at its height, it

DIRECT EXAMINATION BY MR. DE PURY

was about 120,000 people.

Q:   You were a member of that as well?

A:   I don't think I ever joined it, no.

Q:   No? How does that work? I guess you can scroll through and see subreddits without joining, is that how that works?

A:   It seems that Google privileges Reddit results like it does Wikipedia. So often, when you Google anything, you'll find a Reddit result on the first page so, you know. You Google Defcad, that's one common way to come across the meme, for example.

Q:   Got you. So by posting this on your platform--

A:   Uh-huh.

Q:   --wouldn't that also contribute to the overall ratings, pushing it up in the memes?

A:   I understand your question. I don't think the meme was associated with the search terms for Defcad. So it was not a-- a result that you would find if you were searching for Defcad.

Q:   Let's go ahead and take a break here. We'll take five. Mr. Reporter, can we go ahead and take five on this?

**THE REPORTER:**   Yes, thank you. It's 10:26 a.m. Eastern Standard Time and we are off the record. It's 11:40 a.m. Eastern Standard Time and we are back on the record.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

DIRECT EXAMINATION BY MR. DE PURY

Q:     Okay, thank you. My mail's down. I had to open the mail back up to get-- everything closed down for some reason. All right, so we were asking if you requested takedowns, you responded that you did--

A:     Wait, wait, wait.

Q:     --of the Reddit, and then--

A:     Oh, yeah.

Q:     --we're going to ask you about your own things, so. Now, let's see. Did you seek any injunctions on this case before filing the lawsuit?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Seek any injunctions before filing the lawsuit?

Q:     Yeah.

A:     I'm not sure I-- I know the legal answer to that question.

Q:     Did you seek any other remedy to force these to be removed?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     You mean the posts of the Fetcad meme on Reddit?

Q:     Yeah.

A:     Did I do anything-- I don't believe I sent anything

DIRECT EXAMINATION BY MR. DE PURY

other-- anything else to Reddit.

Q:     Let's discuss the litigation profile. Initially, you were sued in the Middle District, correct?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Initially? I'm not sure-- I don't know how that relates to this lawsuit.

Q:     Well, that's fine. Just answer the question. You were initially sued in the Middle District for the Copyright Act, right?

A:     You're saying as an initial matter?

Q:     Between the litigants.

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Um, the-- the question seems to presume that the two lawsuits are--

Q:     I'm not worried about the presumption, it's just a simple yes or no.

A:     --one's initiated by the other. I-- I don't believe that one was initiated by the other.

Q:     We'll get to whether you believe it or not, but really, you're the deponent. I'm not worried about what you believe, I'm worried about what fact believes, so.

DIRECT EXAMINATION BY MR. DE PURY

A:     I'm trying to give you full answers.

Q:     So was the initial lawsuit in this entire suit-- let's say there's four lawsuits, basically. There's a claim and a counterclaim in the Middle District, correct?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I-- I see what's happening here. I would bracket the lawsuits differently.

Q:     How would you bracket them?

A:     I think this all starts with a lawsuit in New York.

Q:     Between these litigants?

A:     In a way.

Q:     Who sued who in New York?

A:     Everytown for Gun Safety was a Plaintiff in the Southern District of New York.

Q:     Who did they sue?

A:     They sued the Defendants-- some of the Defendants and the Plaintiffs.

Q:     Okay, so Everytown for Gun Safety sued you or Defcad and?

A:     Everytown for Gun Safety sued Mr. Elik and Mr. Holladay, and then some John Does. And then they sued me on a theory of contributory infringement in a trademark lawsuit.

Q:     That, you believe, started the series that landed

DIRECT EXAMINATION BY MR. DE PURY

us here today?

A:      If we're using the term initial and initiatory, yes, I believe that.

Q:      Okay.

A:      The first lawsuit.

Q:      I'll accept that. And I know you don't care whether I accept it or not, I'm just saying. Just a conversation.

A:      I'm happy for you.

Q:      Yeah, I'm happy for me too. But then the next thing that happened, and, I mean, there's a bunch of intervening things. I'm trying to head off the way your mind thinks, and I don't know that I can ever actually do that, but the next thing between these litigants would then be the lawsuit in the Middle District of Florida?

A:      I disagree.

MR. FOSTER:      Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:      The next litigation between these litigants would be in the Middle District of Florida? Or was there an intervening litigation somewhere else I'm unaware of?

A:      That's a good question. Intervening litigation. Um, there were additional appeals, but they were all, I think, related to that first case. I-- you know, again, I don't know if I'm answering correctly when I step into, like, legal

DIRECT EXAMINATION BY MR. DE PURY

opinion.

Q:    Are you answering truthfully?

A:    I believe that it's my best to be truthful.

Q:    That's all we need. That's all I could ever ask from you.

A:    Thank you.

Q:    In the Middle District of Florida, of the two lawsuits, which one being a counterclaim, so by definition, it is a counterclaim. And I understand you're not an attorney, but the counterclaim was counter, so the first claim was the present Defendants suing your companies for copyright infringement, correct?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    The first legal claim. Uh, that may be the first filed lawsuit.

Q:    Then the counterclaim was your companies suing them, correct?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    As I understand counterclaims, that seems right.

Q:    You're very good at the evasion portion. I'm going to give you some credit. I've had better, but I've had worse,

DIRECT EXAMINATION BY MR. DE PURY

so.

A: I-- listen, I would never evade.

Q: You are, though. You're very evasive in these, and that's fine.

A: I believe every answer is truthful and complete.

Q: Well, accept the compliment. And I've interrogated real world terrorists, so.

A: My compliments are--

Q: So the next thing, though, is that counterclaim was withdrawn, correct?

MR. FOSTER: Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A: Withdrawn. As an attorney, I'm not sure that that's true. I believe it was dismissed under Rule 41.

Q: Okay.

A: I-- I don't know that that means it was withdrawn.

Q: So you're more familiar with Rule 41 than you are with withdrawn?

MR. FOSTER: Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A: I don't know how familiar I am.

Q: But then, that claim didn't go forward, and then the suit down here was brought under RICO, correct?

DIRECT EXAMINATION BY MR. DE PURY

**MR. FOSTER:**     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**     You claim-- well, for a time, that claim did go forward. We dismissed that claim under Rule 41 and brought substantially similar claims as a new case.

**Q:**     Howard, if you start to lose your voice, we'll just get you a sign that says object. You can wave it right in front of the cam. We'll get a bottle of water for you. I'm teasing you, but subject to the form of the sentence.

**A:**     We'll get him a button.

**Q:**     There you go.

**A:**     Get him a button.

**Q:**     The easy button. Just says form. But we'll make sure you have a bottle of water. We're going to break for the hearing soon anyway, so-- well, we have another hour.

**A:**     Um, but you know, I think a number of legal claims were made in between the Everytown case and the first copyright matter, so that-- the copyright case itself, it may be the first lawsuit filed after that case, but it was not the first set of legal claims.

**Q:**     Got you, okay. What are some of those legal claims?

**MR. FOSTER:**     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

DIRECT EXAMINATION BY MR. DE PURY

**A:** What are some of those legal claims? Well, I've heard it all. I mean, any-- any form of-- I mean, I've heard it all. Extortion, I-- I've just heard all.

**Q:** Legal claims, well, did anybody file any actions in state or Federal court?

**MR. FOSTER:** Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:** By you or the--

**A:** Not that I know.

**Q:** --the litigants in this case? I know people have filed all kinds of actions.

**A:** Yeah, not that I know.

**Q:** So there really were no legal claims, then? I mean, people have said, hey, you extorted me, but no one paid money to a court or to an attorney to bring an action, right?

**A:** I don't know.

**MR. FOSTER:** Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:** I don't know. I know some of these people have attorneys. For example, Mr. Larosiere has sometimes been these people's attorneys in this intervening period. I don't know if they paid him money.

**Q:** I'm only going to discuss the ones that actually have a case number assigned by the court, then. All right, so then the next one after that case was either dismissed under

DIRECT EXAMINATION BY MR. DE PURY

Rule 41 or withdrawn, the RICO case was brought in the Southern District by your companies, correct?

**MR. FOSTER:**     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     That-- that order is the true order of events.

Q:     Okay, thank you. Then subsequently, the next thing that happened was the litigants settled the copyright case in this Middle District, correct?

**MR. FOSTER:**     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I think, you know, we're excluding a criminal case as well, which I think is related to all this. It is involved in the claims. For example, in the Fedcad meme, that case was brought in September or October of 2024, so probably before I made the counterclaim. So it probably would not be true to say there was the copyright case, then the counterclaims.

Q:     Which criminal case? Is that Salentano?

A:     The case against Salentano, who was himself a defendant in the Everytown case.

Q:     Okay.

A:     This is why I bring the Everytown case.

Q:     So I thought he was already incarcerated at the time this case was brought?

DIRECT EXAMINATION BY MR. DE PURY

**A:**     The RICO case?

**Q:**     Yeah.

**A:**     Yeah, he was. His criminal case nevertheless occurs before the counterclaims are brought, the first RICO case.

**Q:**     I see what you're saying. Is it your contention that this RICO is not retaliatory at all?

          **MR. FOSTER:**     Object to the form of the question.

                    (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**     Is it my contention that it's not retaliatory at all? Yeah, in my understanding of retaliatory, I do not believe it's a retaliation.

**Q:**     Why'd you bring it, then?

          **MR. FOSTER:**     Object to the form of the question.

                    (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**     You mean other than to retaliate?

**Q:**     Yeah. Why'd you bring the case?

**A:**     Well, I brought it to stop the harm to my business. By the way, I-- I don't think I can bring a cause of action against a copyright suit, but I believe the copyright suit was a part of the-- the RICO activity.

**Q:**     So you brought it to stop harm to the business?

**A:**     Yeah.

**Q:**     What harm is that?

DIRECT EXAMINATION BY MR. DE PURY

A:    The harm to the business?

Q:    Yeah.

A:    Uh, the intentional interruption of my business, the intentional spreading of false statements of fact about my business and commerce.

Q:    So you brought it under RICO. How far did you get in law school?

A:    Two years.

Q:    So you understand elements, then?

A:    I don't know that I do.

Q:    Well, I mean, it's taught in the first year. it's--

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    I went to law school a long time ago.

Q:    Yeah. So you don't recall learning about elements of a crime, elements of, you know, might be three elements to certain crimes, like a DUI in Florida has three elements?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    This is familiar. This sounds familiar.

Q:    So do you know what the elements of a RICO claim are?

MR. FOSTER:    Object to the form of the

DIRECT EXAMINATION BY MR. DE PURY

question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I-- I would not presume to stand here and tell you the elements of a RICO claim.

Q:     So how did you know that you had a RICO claim in order to seek out the assistance of counsel?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     It's more the other way around. I-- I have sought a RICO expert, a RICO attorney.

Q:     So the RICO attorney helped you understand that he had a RICO claim?

MR. FOSTER:     Wait, there's no question there. I object.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     There is a question, the inflection was on the end of the sentence. So did the--

MR. FOSTER:     Could you repeat the question, then?

MR. DE PURY:     Yeah, I will. You want me to repeat the exact question for the record, you want me to have it read back, or you want me to just rephrase it? I'll use the--

MR. FOSTER:     You want to rephrase it?

DIRECT EXAMINATION BY MR. DE PURY

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    I'll rephrase it. Instead of using the commonly understood inflection at the end of a sentence to signify a question, I will say, did the RICO expert help you understand that you had a RICO claim?

MR. FOSTER:    Object to the form of the question. I think this is probably going into attorney-client privilege.

MR. DE PURY:    Okay, yeah. It's probably right on the outside of that so because I researched--

MR. FOSTER:    So I'm going to object and instruct him not to answer.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    Okay well, I researched that question quite extensively before, but I'm not going to ever breach privilege, so I will not address that issue then. Without any advice of Counsel, did you think you had a RICO claim?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    Without the advice of Counsel--

Q:    Yeah.

A:    --um, did I ever think I had a RICO claim?

Q:    Mm-hmm.

A:    Oh, yeah.

DIRECT EXAMINATION BY MR. DE PURY

**Q:** Okay and so--

**MR. FOSTER:** Sorry, could you read back the answer? I didn't hear that.

**MR. DE PURY:** He said.

**MR. FOSTER:** I didn't hear the answer. Could the Reporter read back the answer?

**MR. DE PURY:** He said, yeah, I think I did, but let's let the Reporter read it back.

**MR. FOSTER:** Who's the Reporter?

**THE WITNESS:** He's here.

**THE REPORTER:** Sure, Counsel. One moment.

**MR. FOSTER:** The question and answer, please.

**MR. DE PURY:** While he's looking, the question was, without the advice of Counsel did you understand that you thought you had a Rico claim? His answer was, verbatim, yeah, I think I did.

**MR. FOSTER:** Okay, let's just.

**MR. DE PURY:** And if the Reporter wants to find it just go ahead and-- oh, oh, he's replaying.

**MR. FOSTER:** Are you saying there's no actual transcript?

**MR. DE PURY:** Let him-- no, he's.

**MR. FOSTER:** Or you just have a recording?

**MR. LAROSIERE:** No he's made-- I don't know how that works, but they do both.

DIRECT EXAMINATION BY MR. DE PURY

THE REPORTER:    All right, I'm going to try now.

THE WITNESS:    In all-- not your Deposition, Howard, chill out.

THE REPORTER:    <audio-playback-begins>. Did you get it Counsel?

MR. DE PURY:    Were you able to hear Howard?

MR. FOSTER:    I didn't hear that, I'm struggling. Sounds like two people or different people are talking.

MR. DE PURY:    That's how questions and answers work.

MR. FOSTER:    No, no, no, no, no. I thought there's one Reporter who would take transcribing and repeat it back.

THE REPORTER:    <audio-playback-begins>. Counsel if I may, the answer was, oh, yeah.

MR. FOSTER:    Right, oh, yeah. But am I correct, there's no transcription being taken? This is just a recording?

THE REPORTER:    Yes Counsel, I'm taking notes, but as advised by Filevine, I'm allowed to do the playbacks for the accuracy.

MR. FOSTER:    What is your name? I don't think that's right--

DIRECT EXAMINATION BY MR. DE PURY

MR. DE PURY:     That's--

MR. FOSTER:     --allowed.

MR. LAROSIERE:     It's not in the Notice. It's in the Notice. Did you read the Notice?

MR. FOSTER:     Yeah.

MR. LAROSIERE:     The Notice is very explicit about how all this all works. They record it all, and then at the end they do full transcription.

MR. FOSTER:     Okay.

MR. DE PURY:     Almost every Court Reporter does that now.

MR. LAROSIERE:     Yeah they simultaneously record them.

MR. DE PURY:     Yeah.

MR. LAROSIERE:     Yeah.

MR. DE PURY:     It's more accurate.

MR. FOSTER:     A voice recording?

THE WITNESS:     This method of recording.

MR. FOSTER:     This method?

THE WITNESS:     Seems to be simultaneous.

MR. FOSTER:     Is it simultaneous transcription while recording?

MR. DE PURY:     Yeah, he's taking all the notes.

MR. LAROSIERE:     That's what the Notice says.

DIRECT EXAMINATION BY MR. DE PURY

**MR. DE PURY:** If you ask him to certify a question, he's going to hit the right button at the same time.

**MR. FOSTER:** Okay, okay.

**MR. DE PURY:** They use an a very elaborate system. It blows your mind when you see the--

**MR. FOSTER:** Okay. Go ahead, go ahead.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q: Okay. All right, we're going to go ahead and continue on. Thank you, Mr. Reporter. So, the question was, without the advice of Counsel did you think that you had a RICO claim? And you answered, oh, yeah, I did. But without understanding elements, what led you to believe that?

**MR. FOSTER:** Object to the form of the question. Are you asking-- sounds like it's privileged. Going into attorney-client communications.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q: I literally said without the advice of Counsel. And then I said, so we're still on that same line. I'm not asking you to breach anything attorney-- I'm not asking you at any point what an attorney said. So I'm asking you, without advice of Counsel and the fact that you have testified that you really don't recall or understand elements, what led you to believe that you had a RICO claim?

A: Well, first I'd say, it's not that I don't recall elements. I don't recall being taught it. I don't recall that

DIRECT EXAMINATION BY MR. DE PURY

time in law school. I'm not sure that my testimony today is that I don't understand the elements of crimes or statutes. I-- I believe that these things are mostly made to be read by the public. I believe I can read a statute like the RICO statute and understand it.

**Q:** Okay. So again, what led you to believe you had a RICO claim specifically?

**A:** What was it, I recall--

**MR. FOSTER:** Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:** Okay, all right, go ahead.

**A:** I think the specific answer to your question, um, is a book by Jeff Grell.

**MR. FOSTER:** Who?

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:** Um, which is a treatise on RICO.

**Q:** What's the last name?

**A:** Grell, G-R-E-L-L.

**Q:** G-R-E-L, okay.

**A:** You know, you start with an intuition and then you read and, you know, you compare the facts. This was how I came to suspect I had a good RICO claim.

**Q:** So did you go looking for a book on RICO, or just happened to read it because you're a voracious reader? I mean,

DIRECT EXAMINATION BY MR. DE PURY

how'd you come across it?

A:     Did I go looking for-- that's a good question. I think I've been aware of this book for some time. Um, when I was sued, I was like well, probably time to really figure the rest of that theory out. So I think that I had had the theory before I was sued.

Q:     Okay.

A:     But I had never examined it in detail, like I've never had a consulting expert or hired an attorney to specifically answer those questions. But I-- I determined it would be important to understand it when I was sued.

Q:     Okay. So because of your understanding of that from Jeff Grell, I'm going to have to go find that book now. It's not-- because it sounds interesting, not because I need it for this.

A:     It's just-- it's good.

Q:     Sounds like a good read.

A:     It is.

Q:     Because of your understanding for that, that's kind of why you went to the search out a RICO expert?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I wouldn't look at it that way. I believed I already had a kind of-- this Fedcad meme has been bubbling up

DIRECT EXAMINATION BY MR. DE PURY

even before it was presented as a meme. And I thought by the posture of the parties, you know, they-- they don't hide behind a particular company, et cetera. I had been led to this understanding of RICO for some time, um. Knowing that I would have to then probably bring a RICO case, and I decided I should probably find a RICO attorney to bring that case, and then that actually took me longer, um, than I thought it would.

Q:     Yeah, how many attorneys did you speak with? And that's not privileged. I've researched it. Go ahead and object though.

A:     I don't know that I recall how-- exactly.

MR. FOSTER:     I object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     But it was more than one?

MR. FOSTER:     I object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Well, let's not-- how many attorneys did I speak to about what?

Q:     Uh, bringing a RICO claim?

A:     RICO claim?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

DIRECT EXAMINATION BY MR. DE PURY

A:      I spoke to every attorney in the-- in the copyright case about it, um, every one of them.

Q:      Mm-hmm. Were you turned down by any attorneys?

MR. FOSTER:      I object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:      I understand the objection. No, I was never turned down. It's mostly that RICO seems to be a specialization and, um, it's hard to find people who practice RICO law.

Q:      Okay. I mean, you're-- it is kind of a specialization. I would agree with you there. There's a joke in the industry, you know, I know RICO but he retired.

A:      Yeah but, um, there's many jokes about-- as I've discovered.

Q:      Yeah, so now let's kind of switch gears a little bit. You alleged a downturn in revenue around, when, '23, '24, somewhere in there?

MR. FOSTER:      Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:      I recall alleging a downturn began in '23.

Q:      Okay. Around when?

A:      I think we located it right after the publication of the meme.

Q:      That is what you put in the Complaint. Now, wasn't

DIRECT EXAMINATION BY MR. DE PURY

there an uptick also around that same time in revenue?

**MR. FOSTER:**     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     What time would this be? May of '23?

Q:     Well, I'm asking you. That's what you said, May '23. I--

A:     You said after the publication of the meme?

Q:     Right.

A:     Are you asking me after the publication of the meme, was there an uptick in revenue?

Q:     Yeah.

A:     Not to my knowledge.

Q:     No? Okay, so there was no uptick. Do you know how many iterations of the expert report were produced?

**MR. FOSTER:**     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I don't. No, I don't.

Q:     I mean, some were produced to you to hand over to Mr. Foster, right?

**MR. FOSTER:**     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I don't think so.

DIRECT EXAMINATION BY MR. DE PURY

Q:     You don't know?

A:     I don't believe so, no.

Q:     Okay. Did Mr. Tyra send them to you?

        MR. FOSTER:     Object to the form of the question.

                (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I believe he sent everything to my attorney.

Q:     Okay. Do you know if Mr. Tyra is not even sure how many iterations of the report he provided, or that are out there, but he only provided one?

        MR. FOSTER:     Object to the form of the question.

                (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     No, I don't know that, no.

Q:     Would you trust me if I said that he testified he's only ever provided one?

        MR. FOSTER:     Object to the form of the question.

                (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Uh, and-- and yet multiple versions exist; you're saying?

Q:     Yeah.

A:     Uh, I would believe that he prepared multiple versions of the report.

Q:     Okay, despite his testimony?

DIRECT EXAMINATION BY MR. DE PURY

**A:** I don't believe he would testify that he didn't make multiple drafts of the report.

**MR. FOSTER:** Object to the form, you've misstated his testimony.

**MR. DE PURY:** What's the objection?

**MR. FOSTER:** Of what Tyra said.

**THE WITNESS:** Misstated--

**MR. DE PURY:** Okay. Well, I'm just going on what he testified to.

**MR. FOSTER:** Yeah, you misstated it. Okay. Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:** Okay. All right. So he testified that he only ever provided one iteration--

**MR. FOSTER:** Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:** --but now there seems to be five iterations, four or five.

**MR. FOSTER:** Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:** Do you know why?

**A:** You're asking me to solve this problem?

**MR. FOSTER:** Object to form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:** Well, I'm asking you if you know why?

DIRECT EXAMINATION BY MR. DE PURY

A:    I'm assuming he means he only provided one final version of his report.

Q:    He said he only ever provided one version of the report.

A:    One final version of his report.

MR. FOSTER:    Object to form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    So are you changing his testimony?

MR. FOSTER:    Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    I'm assuming-- you're asking me to guess what he means?

Q:    Well, I'm telling you exactly what he said.

MR. FOSTER:    No, object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    I'm not sure I can trust you to tell me exactly what he said.

Q:    Well, and I don't ask you to trust me now. You'll find out that I'm correct when you read it. Now, let me correct myself.

A:    All right.

Q:    So there was a period, right at the very end. There were two breaks. On one of those breaks, Howard got on the phone with you.

A:    Mm-hmm.

DIRECT EXAMINATION BY MR. DE PURY

Q:    During that break he could be heard speaking to you and told by the Court Reporter, hey, you're not muted, he ignored that, and we could hear everything that he was saying to you--

A:    Mm-hmm.

Q:    --about, well, I know he didn't sign up for this. Okay, I'll file a Motion for Protective Order.

A:    <laughing>.

Q:    He didn't do this, that's not his fault, those things, right?

            MR. FOSTER:    Object to the form of the question.

            (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    Okay, then there's a second-- there's no question, Howard. Then the second point when there was a break, Howard came back and openly admitted on the record that he altered the in-- he got Mr. Tyra to change his--

            MR. FOSTER:    Object to the form of question.

            (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    --answers. During that second iteration--

A:    Mm-hmm.

Q:    --when he changed his answers, that's when Howard tried to say, wait a second, I clearly told you guys, we altered the document. So he said that he did it, then in another subsequent phone call, conference between all of us, he

DIRECT EXAMINATION BY MR. DE PURY

said he didn't do it, your other attorney said he did it. That's not what I'm getting at.

A:     It's complicated.

MR. FOSTER:     Object-- all right, whatever. There's no question pending.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     The question now comes, though. The question now comes. I'm just kind of laying the groundwork since he wasn't there, and Howard was.

MR. FOSTER:     He was there.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Clearly, I was there for some of it.

Q:     Yeah, there for some of it, and you've said that, and I know that. And you were on the phone with him, so you were aware of that?

A:     I was on the cell phone, I mean.

Q:     Right. And so the issue then becomes, why are there multiple iterations when your expert witness testified under oath, he only ever provided one. Who altered the report?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     Go ahead and answer.

A:     I don't believe anyone altered the report.

Q:     It's altered.

DIRECT EXAMINATION BY MR. DE PURY

MR. FOSTER:   No, object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:   To me this is-- this is kind of typical Larosiere litigation of it.

MR. DE PURY:   Yeah, no. Matt, how many instances of that report did you show the witness at his deposition?

MR. FOSTER:   Only one lawyer can ask a question at a time.

MR. DE PURY:   I'm not asking--

MR. LAROSIERE:   No, I'm not-- he's-- I'm not asking him anything. Okay, number one, Howard, you're objecting to every single question.

MR. FOSTER:   I am.

MR. DE PURY:   And the judge is going to love that.

MR. LAROSIERE:   The judge is going to love that.

MR. FOSTER:   To the form of the question.

MR. LAROSIERE:   Okay, you're going to get in trouble, because they're telling him--

MR. FOSTER:   All right, go ahead.

MR. LAROSIERE:   To answer your question, he saw four, and then the five, he emailed us the fifth.

DIRECT EXAMINATION BY MR. DE PURY

**MR. DE PURY:** When he emailed us the fifth, yeah. Okay, all right. And that was all on the record, correct?

**MR. LAROSIERE:** Yes.

**MR. DE PURY:** All right, so that's where I'm going. It's all on the record. It'll be in the transcript. I'm not asking you to believe me. I'm just saying you will find out. Howard should have briefed you on it.

**MR. FOSTER:** What are-- what are you--

**THE WITNESS:** I know that you're making allegations.

**MR. FOSTER:** All right, all right.

**MR. DE PURY:** It's not an allegation, it's in the record.

**MR. FOSTER:** Whatever.

**MR. DE PURY:** So again, I'm going to ask the same question again.

**THE REPORTER:** Counsels, for the sake of clear record, please speak one at a time.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:** Thank you for reminding us. I'm so sorry about that.

**A:** I thought this software would blow my mind?

**Q:** Their software will. Compared to the average.

**A:** No, I'm playing, go ahead.

**Q:** A little bit off as an aside. Did anybody watch the

DIRECT EXAMINATION BY MR. DE PURY

Boston trial where the court reporter was-- speaking of court reporters--

A:    I've seen the-- I've seen that.

Q:    That was-- I've never seen that. Twenty-five years in the--

MR. FOSTER:    I've seen court reporters do that.

MR. DE PURY:    I've never--

MR. FOSTER:    It's called a Stenomask.

MR. DE PURY:    That's exactly right.

MR. FOSTER:    And I hated it.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    Yeah, never seen it. I don't know how they can do it.

A:    Yeah, it's like a two-brain thing. Yeah.

Q:    Yeah, exactly. It's like when I work with simultaneous transcription or simultaneous-- because I've been deployed all over the world, and you have your folks standing behind you, very difficult. You're speaking in English, they're responding, they're asking the question, they're repeating to you in Russian.

A:    Yeah, I'm not listening to them.

Q:    Right. Mr. Reporter, we're sorry. So to go back to that, you will see the transcript. I would have thought that Howard would have prepped you that your expert-- well, in my

DIRECT EXAMINATION BY MR. DE PURY

words, dismally, I would expect him to say that to you.

**A:**     I understand.

**Q:**     But what I'm still getting at is, who changed this? If your expert witness testified under oath he only ever produced one copy, who altered the copies that were produced?

        **MR. FOSTER:**     Object to the form of the question.

                    (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:**     He's right. Let me rephrase that, because you don't know then. Did you alter any copies of the report?

**A:**     I've-- I've never altered a copy of the report.

**Q:**     That's kind of where I was trying to get at. You keep interrupting and objecting to the form, so it's taking me longer to get there, because I have to lay the groundwork for each question to override your objections. So let me go back to the initial, then. So your expert is going to have a difficult time with this, which brings me back to the initial question. You allege that there's a downturn in the revenue. You've already answered that question.

**A:**     Mm-hmm.

**Q:**     And you said it was around May, you said it was right after the meme came out, and I'm going back to other things that are in the record, Mr. Foster--

**A:**     Thank you.

**Q:**     --that you did not tell your expert about the movie

DIRECT EXAMINATION BY MR. DE PURY

that came out?

A:     Uh-huh.

Q:     Since you've never saw another report or you didn't alter any other reports, someone issued a report that had an uptick and then the downturn. How come that's not a final report?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I doubt that how he described that is true.

Q:     Is your report just simply based on only things that would benefit you in this litigation?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I don't think so. The report is based on the-- the accurate numbers. I can't control the numbers.

Q:     But what's the veracity of the accuracy? Let's stop. You can't control the numbers?

A:     I can't.

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     I know you do, Howard.

A:     No, I understand what you mean, but if the question

DIRECT EXAMINATION BY MR. DE PURY

is playing with the definition of control, I-- I had-- sent the numbers to Mr. Tyra, there's no doubt, and yeah, the numbers are the numbers. That's what I'm saying. Those reflect the sales and the lack of sales.

**Q:**    No, you just gave him the data and the numbers themselves. Did you give him the-- let's see, I'm not going to tell you what he said. What did you give him?

**A:**    What did I give him? I recall spreadsheets.

**Q:**    Did you give him underlying bank statements?

**A:**    I don't think I gave him bank statements.

**MR. FOSTER:**    I don't either.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:**    So why not?

**A:**    Why didn't I give him bank statements?

**Q:**    Yeah, why wouldn't you give him bank statements?

**A:**    Why did I not give him bank statements?

**Q:**    If I handed you a recipe for a cake.

**A:**    Uh-huh.

**Q:**    And it's really a pot roast, but you don't know.

**A:**    Uh-huh.

**Q:**    You're going to bake a pot roast, right?

**MR. FOSTER:**    Wait, object to the form of the question.

**MR. DE PURY:**    It's an analog, Howard.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

DIRECT EXAMINATION BY MR. DE PURY

A:    Though that's a little difficult. If I follow the directions, I may end up with a pot roast, but of course.

Q:    But if that's the material I gave you and the instructions I gave you, you're not going to get a cake, are you?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    Uh, Mr. De Pury, if you-- if you say, here, bake a cake with these ingredients--

Q:    Mm-hmm.

A:    --then what I have produced is a cake by those ingredients.

Q:    All right, so if you call it a cake even though it's a pot roast, it's a cake?

A:    We are getting into deep water. What I mean is ontology.

Q:    Huh?

A:    Isn't a meatloaf like a cake?

Q:    Well, I mean, it depends.

A:    Can a pot roast be compared to one, especially if the ingredients are so similar that you don't recognize you're not making cake?

Q:    Yeah, no, I don't think so. I don't think in any world anybody--

DIRECT EXAMINATION BY MR. DE PURY

A:     Well then, your hypothetical, it's, like, almost self-defeating. I would realize, oh, I'm not baking a cake, I'm making--

Q:     Well, that's where I'm going.

A:     Yeah.

Q:     I'm sorry, Mr. Reporter. That's exactly where I'm going with this, because in my opinion--

A:     Uh-huh.

Q:     --and my opinion, in the grand scheme of things, doesn't matter.

A:     Uh-huh.

Q:     But the trier of facts' opinion does matter. Your expert opinion--

A:     Uh-huh.

Q:     --is a self-defeating thing, because you just gave him--

A:     Uh-huh.

Q:     --only the ingredients to get to one outcome.

A:     Uh-huh. You're saying?

Q:     Correct?

          MR. FOSTER:     Wait, wait, wait. There's no question. Object to the form of the question.

          (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     He did say right at the end.

          MR. FOSTER:     He said correct.

DIRECT EXAMINATION BY MR. DE PURY

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     Did I say right or correct?

A:     Correct-- look, I don't know how you could say that. The numbers don't lobby for themselves.

Q:     Well, but you didn't give him anything to verify any of those numbers, did you?

A:     I think your use of verification is intentionally a difficult usage of the word.

Q:     Did you give him any bank statements before? You said no.

MR. FOSTER:     Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Again, there's all these implicit assumptions in what you're asking. Did I give him bank statements? No.

Q:     Okay.

MR. FOSTER:     He answered that, just for the record, like, 15 minutes ago.

MR. DE PURY:     No, he didn't.

MR. FOSTER:     About bank statements.

MR. DE PURY:     He answered it less than two minutes ago--

THE WITNESS:     I wouldn't say 15 minutes.

MR. FOSTER:     Okay.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     Um, was revenue-- well, what he did answer, not 15

DIRECT EXAMINATION BY MR. DE PURY

minutes ago, but about 95 minutes ago, was whether or not every business has fluctuations. So I'm going to ask-- it's going to be asked and answered if you-- but I'm going to get into something else.

A:     Mm-hmm.

Q:     Was revenue already fluctuating before the meme?

A:     Already fluctuating?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Well, not in the way that it was fluctuating after the meme.

Q:     Okay. And in what way?

A:     Of course businesses have cyclical patterns of revenue, you could say even seasonal business.

Q:     Okay.

A:     And so I would observe that there were seasonal variations in the business well before the meme.

Q:     All right. Now, this was '23. This is during the Biden term, right? So is there a political component to the fluctuation?

A:     Is there?

MR. FOSTER:     Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     You're asking me is there?

DIRECT EXAMINATION BY MR. DE PURY

Q:     Well, is it possible or is there-- I don't like the word, is it possible, or the term, is it possible, because anything's possible, right?

A:     You know, this is-- if you're asking me a factual question about my business, I think I can answer. Otherwise, I don't think I have the expertise.

Q:     Okay, well, factual question. Was that during the Biden administration?

A:     The downturn in the revenue of the business?

Q:     Was 2023, specifically May, June, July 2023, during the Biden administration?

A:     I believe so.

Q:     Do you think that political events cause fluctuations in every industry?

                MR. FOSTER:     Object to the form of the question.

                (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Do I think political events cause fluctuations? It's probably fair-- it's attenuated, I think, in our industry, and in fact, inversely related, often. The Biden years should be good years for my business.

Q:     Okay, how so?

A:     Um, there should be more panic buying, there should be more attention and fixation on the products. The products themselves are advertised to a certain anxiety about political

DIRECT EXAMINATION BY MR. DE PURY

events.

Q:     All right, I would agree with that, I think. So did changes in Federal regulation affect sales?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Um, I've attempted to study and understand that. I don't think what changes occurred on the Federal level hurt our sales.

Q:     Okay.

A:     They seem to have helped our sales.

Q:     Helped our sales.

MR. DE PURY:     I'm going to ask, Howard, are you just going to object to every-- because you're just objecting to every question.

MR. FOSTER:     Not every one.

MR. DE PURY:     All right.

MR. FOSTER:     A few of yours are non-objectionable.

MR. DE PURY:     I mean, I research all my questions well. Most of these are not objectionable.

MR. FOSTER:     Well, there's a few that you might be--

MR. DE PURY:     But you're just objecting to every--

DIRECT EXAMINATION BY MR. DE PURY

MR. FOSTER:    Not every one.

MR. DE PURY:    Okay, 90% of them. Over 90%. I'm going to start keeping a tick mark, because we're going to probably discuss this at 2 o'clock.

THE WITNESS:    You put notches on a club?

MR. DE PURY:    Yeah, exactly.

MR. FOSTER:    But they're never-- do I go beyond no speaking objections.

MR. DE PURY:    No, but you're abusing the other is the issue.

MR. FOSTER:    I'm abusing the other?

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    Yeah. Do you think the media coverage affected sales?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    Did media coverage of the business affect sales of the business?

Q:    The media coverage in about-- well, for instance, you know, we discussed earlier about the proliferation of 3D printers, and specifically, we were talking about desktop CNCs and countertop CNCs.

A:    Yes.

Q:    But that's a new thing. So there has been new media

DIRECT EXAMINATION BY MR. DE PURY

coverage about it, there's media coverage about the drones, proliferation of drones. I mean, hell, I own four damn drones.

A:       Wow. Well, I can see that.

Q:       So there's media coverage about everything, but specifically, there's been a lot of media coverage about the 3D gun rights stuff. Do you think that's affected sales? Probably in a positive way would be my guess, but do you think it has?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:       I don't have the expertise. It is complicated in that, yes, there's interest and media, but I don't know if there's more or less media. There seems to be more and less censorship depending upon what media channel you're discussing.

Q:       Right.

A:       It is a mixed bag.

Q:       So you don't know whether media has--

A:       It's hard for me to judge. I can compare to much older times.

Q:       Yeah.

A:       It's hard for me to judge how media has truly influenced-- usually the media follows on with some of the political changes these days. It's companion media.

Q:       Do you think your own reputation has affected sales?

DIRECT EXAMINATION BY MR. DE PURY

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    My reputation has affected sales. I think my reputation has driven sales. For example, the unfortunate matter we discussed earlier happened many years before I even started the Defcad line of business.

Q:    Right.

A:    For example, the Defendants in this case all wanted to work with me after they learned of my unfortunate matter in Texas.

Q:    Okay.

A:    So in a way, you could say they only knew about me because of those events and only wanted to work with me because of those events.

Q:    Now, when you say they wanted to work with you, how so?

A:    Most of the Defendants in this case have tried to work with me or be an employee or some kind of associate or affiliate. In fact, I think that's the reason why these claims have emerged.

Q:    Have you produced any of that in Discovery?

A:    I've produced--

MR. FOSTER:    Object to the form of the question.

DIRECT EXAMINATION BY MR. DE PURY

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     --what, a non-disclosure agreement with Mr. Elik, I think. What else have I produced? I think so, yeah, especially with the-- of the recent production we've made. I think I've-- I've produced what I have on that.

Q:     So there's some things going back and forth where people have inquired about employment?

A:     Yeah, there's some emails with Mr. Elik, for example, where he's clearly pursuing product development with us, some kind of employment, some kind of way to make regular revenue. Messages between Mr. Elik and our representatives saying he's not getting enough money or wants the money to be paid a different way.

Q:     So because of you not employing him, that's why this litigation came about, you're saying?

A:     I don't think that's the direct.

Q:     Isn't that kind of what you said, though?

A:     Because I'm not-- well, look, if we really have to boil it down, that's probably what's going on here.

Q:     But you sued him?

A:     No, no, no.

Q:     You're the Plaintiff.

A:     I think we've all discussed the initiatory lawsuits in this matter.

Q:     Okay.

DIRECT EXAMINATION BY MR. DE PURY

A:      They start with Southern District of New York.

Q:      All right, I see.

A:      Mr. Elik's being sued, and then they start with a copyright suit where Mr. Elik, through a proxy, is suing me.

Q:      I mean, your platforms were hosting other people's designs, right?

        MR. FOSTER:      Object to the form of the question.

        (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:      My platforms were hosting other people's designs?

Q:      Right.

A:      I disagree with the implicit assumption of other people's property being hosted on my website.

Q:      Are you a designer?

A:      Am I a designer?

Q:      Yeah. Do you design 3D printed guns?

A:      Sure, by any definition.

Q:      By any definition? Well, by the definition that something that you start out, you could sit in your front of your computer at home or in your office, start to finish, put something together that I could subscribe, go on, print, and go shoot?

A:      Of course.

Q:      Really?

A:      My company's put out many designs.

DIRECT EXAMINATION BY MR. DE PURY

Q:      You personally, are you a designer?

          MR. FOSTER:      Object to the form of the question.

                    (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:      I don't identify as a designer, but of course I can make designs in CAD, so.

Q:      How many have you designed?

A:      How many have I designed?

Q:      Yeah.

A:      None of my--

          MR. FOSTER:      Object to the form of the question.

                    (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:      None of my products are my exclusive-- of my exclusive design.

Q:      Do you think that the news coverage regarding your criminal case affected your sales?

          MR. FOSTER:      Object to the form of the question.

                    (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:      No, I-- the bulk of that coverage, of course, did improve my sales at the time, but Defcad was not a business at that time. The bulk of that coverage was in 2018.

Q:      And that improved your sales?

A:      It did. Uh, my sales with the Ghost Gunner CNC

DIRECT EXAMINATION BY MR. DE PURY

dramatically improved upon the news of my arrest.

**Q:**    Wow. Because people knew what you were arrested for they just knew there was an arrest?

**MR. FOSTER:**    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**    No, I think people feared that my business was in peril and if they were ever going to get the product, they better get in line.

**Q:**    Oh, so you had a kind of a weird backwards--

**A:**    Um, I've benefited from it.

**MR. FOSTER:**    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**    Yes, that political events seem to have a kind of inverse relationship to sales in this business.

**Q:**    Did the expert analyze that issue at all?

**MR. FOSTER:**    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**    Did he analyze my sales in 2018?

**Q:**    Yeah.

**A:**    I don't believe he analyzed my sales in 2018, no. I believe he analyzed sales for the period when my Defcad business was operating.

DIRECT EXAMINATION BY MR. DE PURY

Q:     But the issue is is that the documentary, make sure I use the proper term for you, came out in 2023 in March, and then it's been playing since, correct?

A:     As I understand it.

Q:     Did he analyze any of that?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I-- I don't think he did. I don't believe he did.

MR. DE PURY:     Okay. Howard, do you want all these certified so that the Court can look at them all, or you're just putting them on the record so we can--

MR. FOSTER:     Putting them on the record.

MR. DE PURY:     Okay.

MR. FOSTER:     If you don't, you waive your rights. What do you think I'm doing this for, my health?

MR. DE PURY:     No, I don't know why you're doing it. You're objecting to literally almost every--

MR. FOSTER:     If you don't object to the form of a question at a deposition, you waive your right to have it objected to and decided at trial.

MR. DE PURY:     I understand that. So you're literally just objecting to all of these?

MR. FOSTER:     That I think is objectionable. A few of yours are not, but I believe I am doing what should be

DIRECT EXAMINATION BY MR. DE PURY

done.

MR. DE PURY:     You saying you're--

MR. FOSTER:     I am not doing this to assert improper speaking objections or abuse the Rule 30.

MR. LAROSIERE:     Would you say you're objecting them prophylactically so that it can be--

MR. FOSTER:     That's what I'm saying; if I believe a question is objectionable on some evidentiary basis, I am stating so in order to protect my right to have a judge decide that later on.

MR. DE PURY:     Here's what I guarantee, though. You're not going to be able to defend most of those objections. When the judge says, what's the underlying basis, you're not going to be able to--

MR. FOSTER:     I don't agree with you, Gary.

MR. DE PURY:     You're not going to be able to come up with a relevance objection. You're not going to be able to come up with an asked and answered.

MR. FOSTER:     I am totally telling you that I agree with you, Gary. I'm doing my best to object to questions where I believe there is an evidentiary problem with the question.

MR. DE PURY:     Okay.

MR. FOSTER:     Okay?

MR. DE PURY:     To every question.

DIRECT EXAMINATION BY MR. DE PURY

MR. FOSTER:     To every time-- and that is right. And if you want to discuss-- sometimes you like doing this because you've done it a number of times. If you want to probe into my thinking, you can ask.

MR. DE PURY:     I've only done it once today. I'm just curious why you're objecting--

MR. FOSTER:     You've done it in prior depositions.

MR. DE PURY:     Because here's what's going to happen; you're objecting to almost every question, to the point that the Court's just going to ignore all of your objections. You can't just put every objection.

MR. FOSTER:     Wait. Wait. Wait. Wait. I don't--

MR. DE PURY:     Well, because we're going to put it in front of the Court. They--

MR. FOSTER:     Okay. I mean, the Court isn't going to see this.

MR. DE PURY:     Well, they may, because as we discussed on the phone, I'm not going to bring it up in front of your client, but what we discussed on the phone, I'm filing a motion.

MR. FOSTER:     Okay.

MR. DE PURY:     And I believe that motion's going to carry some weight.

DIRECT EXAMINATION BY MR. DE PURY

MR. FOSTER:     Okay. Okay. Okay.

MR. DE PURY:     Okay. All right.

MR. FOSTER:     State it on the record why you're doing this.

MR. DE PURY:     Well, I mean, here would be a proper objection; did you disclose this-- this is the next question. Did you disclose the release of the film Death Athletic to your expert? It's clearly been asked and answered, objection to the form of the question. Then when he has to defend it, well, it was asked and answered 12 minutes ago, 14 minutes ago. That's the difference. What you're doing, Howard, is you're just objecting, and like you said, prophylactic or you said prophylactically, the issue is is that you're just doing it to do it. And you pretty much stated as such. These are not defendable. It's a waste of time, and I'm wasting even more of our time, so I'm going to go on.

MR. FOSTER:     It's your time. You like talking.

MR. DE PURY:     I love talking. That's why I'm in this business. I don't like swinging a hammer, that's why I'm not in that business.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     It's a good business for talkers.

Q:     Yep. So I'm going to skip several questions because they were asked and answered, but here's the one that hasn't

DIRECT EXAMINATION BY MR. DE PURY

been. Did you provide your expert with reviews or commentary concerning the film? Now, I would assume the answer is no, since you didn't provide him with even the knowledge-- he'd never heard of the film, but did you tell him-- did you give him any inkling, hey, there's something else you might want to look at that may have adjusted sales?

**A:** I'm sorry, and I'm hearing that I'm answering or repeating of your questions. Is your question, did I give him any inkling of anything that was--

**Q:** Any inkling whatsoever?

**A:** Of the film--

**Q:** Of the documentary.

**A:** --or of anything? No, the documentary is a pitiful thing that I don't think anyone has seen.

**Q:** No? Okay. I think rotten tomatoes disagrees, but.

**A:** I'd love to see your numbers on viewership.

**Q:** I know they're out there, but the answer is, you didn't tell him at all?

**MR. FOSTER:** Well, I mean, I object to the form of that question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:** Okay. So the answer is, did you tell him at all-- or the question is, did you tell him at all?

**A:** I communicated nothing about this documentary to my expert.

DIRECT EXAMINATION BY MR. DE PURY

Q:      Okay. Is it because it didn't fit your narrative?

        MR. FOSTER:      I object to the form of the question.

                (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:      I understand the question, Gary. If anything, that documentary should have helped the sales of this company.

Q:      Okay, but should have, but it's possible it didn't?

A:      I don't think it did.

Q:      You don't know, do you?

A:      I think it was a blip in people's attention online. It was a very--

Q:      Did you provide your expert with any of the expert-- or I'm sorry, did you provide your expert with any of the exit surveys or exit responses?

A:      Provide the expert with--

Q:      Do you know what I mean by exit responses?

A:      I think you're referring to some of what we produced in Discovery that actually--

Q:      Yeah, hey, why did you leave our company?

A:      Exit surveys.

Q:      Yeah.

A:      No, I don't think I gave him those.

Q:      No? Why not?

A:      I didn't think that he could perform anything useful with those.

DIRECT EXAMINATION BY MR. DE PURY

Q:     Okay. Is it because it didn't fit your narrative?

MR. FOSTER:     Objection to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I disagree. In fact, I think that they do fit the narrative.

Q:     How many people in those exit questionnaires actually said, oh, it's because of the meme?

A:     You'd need to show me that, the report--

Q:     No, they're your numbers. You don't know, do you?

A:     They're not numbers, they're a compilation.

Q:     Well, compilation, how many people?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I'm not going to be able to accurately tell you how many people.

Q:     Well, do you think it's the majority of the people that left?

A:     Do the majority of the people say, it's the meme and that's why I left?

Q:     Yeah.

A:     I believe that the responses indicate the meme even where they don't necessarily say Fedcad, though many of the responses say Fedcad.

DIRECT EXAMINATION BY MR. DE PURY

Q:      Right. Now, what is Fedcad?

A:      That's a good question.

Q:      Really? It's not something that you own? You don't own a website or anything called Fedcat?

A:      No, I don't.

Q:      You don't? You don't have anything? Is that just totally made up?

A:      Oh, is that the problem? You guys think that Fedcad is a website?

Q:      I don't know what it is. I'm asking you.

A:      You don't know what it is?

Q:      No, I have no idea.

A:      I believe Fedcad in this case refers to--

Q:      I'm not in this space at all. I'm scared of it.

A:      Well, it's disappointing to me that you have not yet learned what Fedcad means in this case.

           **MR. FOSTER:**    I object to the form of the question, if there was one. I don't think--

                (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:      I think he's lost.

A:      Let's just do a question.

Q:      What is Fedcad?

A:      What is Fedcad?

Q:      Yeah, and you said, I don't know, right?

A:      Oh. I said, I don't know.

DIRECT EXAMINATION BY MR. DE PURY

**Q:** That's what I-- yeah.

**A:** I'd like to know.

**Q:** What you said was well, I'd like to know. Yeah, you said, I'd like to know. Who is Fedcad?

**A:** Who is Fedcad?

**Q:** Yeah.

**A:** Well, I think Fedcad refers to Defcad, and therefore, I guess the Defendants mean that Fedcad is Defcad.

**Q:** Okay.

**A:** Which would make sense.

**Q:** And so is it just a made-up word, you're saying, by the Defendants?

**A:** I do think the Defendants probably coined the term.

**Q:** Okay.

**A:** I can't know that. I know Defendant Stroke said she created the meme, but Fedcad may predate the meme as an idea.

**Q:** Okay. You are aware of her testimony, then?

**A:** I think I've seen her Discovery responses.

**Q:** Okay.

**A:** Like a response to an Interrogatory.

**Q:** Right.

**A:** I haven't read a transcript of her deposition.

**Q:** Okay, and you haven't discussed it with-- and that would-- well, let me-- okay. Because that would potentially get into Discovery. But you are aware that she was deposed?

DIRECT EXAMINATION BY MR. DE PURY

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I'm aware that Stroke was deposed, yes.

Q:     All right. By no other way, you probably got a bill for Howard's time, right? But you are aware, you answered the question. I'm not trying to go into that.

A:     I attended some of Stroke's Deposition.

Q:     Okay. That's right, you were there. I remember seeing-- you didn't have a camera on but I did see your name there. In effect that you were there during this part of the question, so you're aware that she admitted she's the author of that, right?

A:     Author of the meme?

Q:     Creator or author or whatever.

A:     I don't know if she said author, but I think she has taken responsibility for creating and publishing the meme.

Q:     Is that the first time you've been aware of that, or you've known that for a while?

A:     Do you mean, at her deposition?

Q:     Mm-hm.

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     No. No. I believe that she responded in Discovery,

DIRECT EXAMINATION BY MR. DE PURY

claiming credit for authorship of the meme before her deposition.

Q:     Okay. Did you-- no, that would have been-- you wouldn't have been able to tell the expert about that because you didn't know it at the time. My cameras at my house keep going off, sorry, but my girlfriend's watching them.

A:     Is that a bad sign?

Q:     My girlfriend's watching them. No, we have construction going on so it just keeps buzzing.

A:     I see.

Q:     I have workers there; hurricane damage, so. You don't have that in Texas. Well, you do have it in Southern Texas. Where do you live, Dallas?

A:     Harvey blew up Houston.

Q:     Yeah, where are you?

A:     I was not in Houston.

Q:     No, but what part of Texas? I don't care. I'm just asking.

          MR. FOSTER:     Wait, is this on the record?

          THE WITNESS:     Yes.

          MR. DE PURY:     Yeah, it's on the record, but I'm just literally just making small talk. I don't care.

          MR. FOSTER:     I know. I want to know for that reason.

          MR. DE PURY:     Yeah.

DIRECT EXAMINATION BY MR. DE PURY

MR. FOSTER:     Go ahead. I'm not objecting to those questions, Gary.

MR. DE PURY:     Well, because it's completely-- I have another-- I have a trip planned in Texas and I have a great attorney out there that I want to go meet. We're working on a fairly large case.

MR. FOSTER:     I would just like to point out there have been a number of questions in this last 10 minutes to which I did not.

MR. DE PURY:     I know, because we just started yelling at you about it.

MR. FOSTER:     They weren't objectionable.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     All right.

A:     Let's do it. Let's keep going.

Q:     Yeah. I'm kind of getting at a theme here which you've picked out, your attorney's picked out. Your your expert really didn't do anything except take the spreadsheet you gave him and come to those numbers. And then there's a whole bunch of other factual bases that could go to causation. And I'm asking, the theme is, did you give him any of that?

MR. FOSTER:     Wait. I object to the form of that question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     Did you give him any of the factual bases that

DIRECT EXAMINATION BY MR. DE PURY

could have addressed causation?

A:    I trusted my expert's expertise. He's an attorney. He's a CPA. He's writing in business classes. He's familiar with marketing. I determined he was a suitable expert to give his opinion and do his own research, which he did. I did not supply him with those research materials. I supplied him with the numbers, which I thought he could make an independent, neutral expert opinion concerning.

Q:    Would you agree with the statement-- and it's really not-- the genesis is not in this, but the statement is, we don't know what we don't know, correct?

MR. FOSTER:    I object to the form of that.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    I understand Howard's objection. Unfortunately, I think it's a very difficult question, especially in the era of psychoanalysis--

Q:    Okay so--

A:    --being conscious. I think sometimes we do know what we don't know.

Q:    Really, so you do know what you don't know?

A:    Do. And I'm not trying to be difficult. I'm just saying, I can't say yes to your question.

Q:    All right. If you didn't give your accountant any underlying bank statements, you didn't give him any of these other information, any of the information about the documentary

DIRECT EXAMINATION BY MR. DE PURY

film, the kino, the whatever, movie, the short-- whatever you want to call it. You didn't give him any of that. You didn't really talk about the-- he was slightly familiar with the arrest in '18.

A:     Uh-huh.

Q:     But he didn't know that it had come back. You didn't provide any information to him, so how is he supposed to-- besides his clearly accomplished resume, how is he supposed to come to this conclusion?

MR. FOSTER:     Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     A conclusion, I'm sorry. A conclusion as to the causation of the perceived downturn.

A:     Mm-hmm.

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     Okay.

A:     I will answer. Beyond being an expert and a professional, he's very familiar with the firearms industry; a member and a participant, a customer in that industry. He's attuned to developments in our industry and the law. There are very few people who I would trust and-- to make an expert opinion about this matter other than Mr. Tyra.

Q:     So you trusted Mr. Tyra to give you the response or

DIRECT EXAMINATION BY MR. DE PURY

the report you needed, right?

A:     I only trusted--

MR. FOSTER:     I object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Thank you. I only trusted Mr. Tyra to give his honest opinion. I didn't ask him to produce any result, hit any number. I gave him the numbers that I had.

Q:     All right. With that said, again, to the whole thing of you don't know what you don't know. Like, for instance, he's an Army officer, right?

MR. FOSTER:     Object.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Is he?

Q:     You didn't know that? You said you've known him for years.

A:     I have worked with him for years.

Q:     You knew he was an Army officer?

MR. FOSTER:     Wait, there's no question there.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Gary, on the record, I do not know right now if he is or is not an Army officer.

Q:     Okay. His resume has it. He has it. It came up in the deposition a couple times. It's come up that he was unable to attend the deposition when he needed to. There was several

DIRECT EXAMINATION BY MR. DE PURY

emails that went back and forth about not being able to attend, which now that seems to have possibly disappeared; text message, emails. So you were unaware the whole time that he was a military officer?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    I've never heard about him being connected with the military until that deposition.

Q:    Okay.

A:    And I still don't understand. Are you saying he is yet in the military?

Q:    Yeah.

A:    I thought he was retired. Or I heard he was retired.

Q:    No, he's a lieutenant colonel in the Army Reserves.

A:    I do not understand that, so maybe I understand it now.

Q:    All right. So that didn't play into your-- so not knowing that about his resume, that didn't play into any-- because the reason I'm bring this up is because you said, well, based on the fact he's an attorney, he's an accountant, he should be able to provide an accurate report.

A:    And that he's familiar with the firearms industry.

Q:    Okay. If someone's familiar with the firearms

DIRECT EXAMINATION BY MR. DE PURY

industry, is that supposed to allow them to come up with the data to analyze the numbers from your business?

MR. FOSTER:    Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    The data to analyze the numbers? I think there are implicit assumptions there that I don't think I can agree with or understand.

Q:    Well, that's kind of what we're getting at. It just--

A:    Uh-huh.

Q:    --the implicit assumptions of my question aside--

A:    Uh-huh.

Q:    --you're asking Mr. Tyra to make implicit assumptions about your business without giving him the data.

A:    Am I?

Q:    Yeah, you are. That's the way it seems. I mean, that's what I'm asking you.

A:    If it seems that way to you. It doesn't seem that way to me.

Q:    But you didn't give him any bank records?

MR. FOSTER:    There's no question there. Object to the--

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    Did you give him any bank records?

MR. FOSTER:    Object.

DIRECT EXAMINATION BY MR. DE PURY

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**    I know that I've answered this question.

**MR. DE PURY:**    Okay. Do you want to object to that for asked and answered basis? Go ahead.

**MR. FOSTER:**    You told me not to do that. I'm not doing that.

**MR. DE PURY:**    You can--

**THE WITNESS:**    That's a special--

**MR. FOSTER:**    No, he told me not to do that.

**MR. DE PURY:**    So, you can ask it-- you can do the objection because that one is clearly asked and answered, but I'm just kind of--

**MR. FOSTER:**    I objected to it without saying asked and answered.

**MR. DE PURY:**    I'm just kind of--

**MR. FOSTER:**    So, I'm not supposed to say it.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:**    I'm just kind of beating a dead horse because that's going to be a big thing I think. So-- because here's a bunch of questions I will ask you. And I'm not going to ask you the questions. Did he audit the records? No, because you didn't give them to him. Did he reconcile any bank statements? No, because you didn't give them to him.

**MR. FOSTER:**    Well, are you <unintelligible>.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

DIRECT EXAMINATION BY MR. DE PURY

**A:**     <unintelligible>

**Q:**     Did he inspect the cryptocurrency wallets? No because you didn't give them to him. Did he verify customer accounts? No, because you didn't give them to him. Did he independently confirm revenue losses? No, he said-- he testified under oath he did not independently confirm anything except the spreadsheet you gave him. Did he rely primarily on the information you supplied? Yes, you've testified to that, he testified to that. Did he test the reliability of your inputs? No, he testified that he did not. Did he request source documents? No, he did not nor did you give them to him. Did he review tax returns? He prepared them, therefore he should have known better. Did he review blockchain records? No, he didn't know what blockchain was. Did he verify wallet ownership? No. Did he conduct forensic accounting? No. Did he identify missing records? No. And so here's the question, is there anything that I have just said that is incorrect?

**A:**     Very likely. I can't speak to his testimony.

**MR. FOSTER:**     Wait, I object to the form of that question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**     It was-- you listed so many things. I-- I don't know how I could <unintelligible>

**Q:**     <crosstalk> Then let's go ahead and ask the questions. Howard, get your objection button ready.

DIRECT EXAMINATION BY MR. DE PURY

A:     I'll state again for the record I have not read Mr. Tyra's transcript of his testimony.

Q:     Okay.

A:     I don't feel--

Q:     That's okay.

A:     --comfortable representing what he said in his deposition.

Q:     I'm not asking you. Did he reconcile any bank statements?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I don't know if he did or he didn't.

Q:     Well, did you give him any to reconcile?

A:     I did not provide him with any bank statements.

Q:     So, the answer, naturally, I'm assuming would be no, right?

A:     It would be assumed.

MR. FOSTER:     Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     Did he inspect the cryptocurrency wallets?

MR. FOSTER:     Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I don't know.

Q:     Did you provide him any?

DIRECT EXAMINATION BY MR. DE PURY

**MR. FOSTER:** Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:** I did not provide him any wallets in connection with--

**Q:** Did he verify any customer counts?

**A:** I don't know.

**Q:** Did you provide him any?

**A:** Is your question, did I provide him any customer accounts in connection with his expert report?

**Q:** The count of customers-- the number of customers-- did you?

**A:** Customer counts?

**Q:** Yeah.

**A:** Oh, not accounts. My question-- or my answer is probably the same. I don't believe I gave him customer counts.

**Q:** You didn't give him any. So did he independently confirm revenue losses, and the word being independently confirmed?

**A:** I don't know if he did and I don't know what that means.

**Q:** Did he primarily rely on the information that you supplied to him?

**MR. FOSTER:** Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

DIRECT EXAMINATION BY MR. DE PURY

**A:** Primarily rely upon it? I don't know if that is his testimony. I don't know if that is true.

**Q:** Did he test the reliability of your input? Your inputs, your spreadsheet that you gave him?

**MR. FOSTER:** Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:** Genuinely, I don't even know what that means.

**Q:** Did he request source documents from you?

**A:** Did he request source documents from me?

**MR. FOSTER:** Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:** I believe-- did he request them from me? I believe he might have requested the documents I provided. Those documents are sufficient as source documents.

**Q:** Those would not be source documents, those would be the data would be the--

**A:** Who-- who said?

**Q:** I'm saying the law says the word--

**A:** The law says?

**Q:** --there's a source, right?

**A:** Uh-huh.

**Q:** There's a source, and then there's the document you provide from that source. So where did you generate the

DIRECT EXAMINATION BY MR. DE PURY

spreadsheet that you generated to give to him?

A:    Where did I generate it?

Q:    Right.

A:    Uh, probably Quickbooks.

Q:    So did he request your entire Quickbooks?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    I believe he has them.

Q:    Did he review the tax returns?

A:    I don't know.

MR. FOSTER:    Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    Did he review the blockchain records?

MR. FOSTER:    Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    I don't-- I don't know.

Q:    Did you give them to him?

A:    Uh, what records?

Q:    Did he conduct-- did he verify the wallet ownership of the--

A:    I-- I don't know.

MR. FOSTER:    Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    Did you give them to him?

DIRECT EXAMINATION BY MR. DE PURY

A:      I'm not sure I know what you mean.

Q:      Did he conduct any forensic accounting of your data?

A:      Forensic accounting? I-- I don't know that he did.

Q:      Did he identify any missing records and request those missing records from you?

MR. FOSTER:    Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:      Uh, I don't recall.

Q:      Did he identify any discrepancies between the data and the source information that he didn't review?

A:      Did he identify discrepancies?

Q:      Yeah.

A:      I don't know if he did.

Q:      Did he ask about unreported crypto transactions?

MR. FOSTER:    Well, okay. I think you're asking now stuff that is--

THE WITNESS:    Privileged.

MR. FOSTER:    Well--

MR. DE PURY:    No, that's actually not privileged.

THE WITNESS:    Because he's an expert.

MR. DE PURY:    Let me show you. He's an expert witness and he's a testimonial expert witness which blows your privilege theory that you--

DIRECT EXAMINATION BY MR. DE PURY

MR. FOSTER:     No, it doesn't. Uh-huh.

MR. DE PURY:     Okay.

MR. LAROSIERE:     Your client seems to--

MR. DE PURY:     Yeah, but you want to look at the rule?

MR. FOSTER:     Yeah, well I-I don't have the rule.

MR. DE PURY:     I sent it--

MR. FOSTER:     You didn't know it the last time we went through this?

MR. DE PURY:     No, we did know it and I sent it to you but I just stopped.

MR. FOSTER:     No, you didn't.

THE WITNESS:     I'm happy to answer the question.

MR. DE PURY:     Yeah, let's just keep it going.

MR. FOSTER:     All right.

MR. DE PURY:     It's not privileged and I'll-- we'll take that up later if we want.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     You've got a willing guy, you know? Yeah.

Q:     Did he ask you about any cash transactions?

A:     Talking past the sale, you know what I mean?

Q:     Yeah, yeah.

MR. FOSTER:     Ask him?

DIRECT EXAMINATION BY MR. DE PURY

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**   Did he ask me about any cash transactions?

**Q:**   Did he ask you-- did Mr. Tyra ask you about any cash transactions?

**A:**   I don't think so.

**Q:**   Do you have any cash transactions?

**A:**   Gosh, ever?

**Q:**   In the grand scheme of things, do you have--

**A:**   <unintelligible> it happens.

**Q:**   I mean, you know so, I think we all sometimes do, and I got away from them because it's a pain in the ass.

**A:**   It happens but they're-- they're still booked as income on the--

**Q:**   Did he investigate whether any revenue was hidden or diverted?

**A:**   I don't believe he did.

**Q:**   Now, you have multiple businesses, right?

**A:**   Do I have them?

**Q:**   You have multiple?

**A:**   I direct multiple businesses. I'm the owner of more than one business.

**Q:**   And do each of these businesses have their own bank accounts?

**A:**   Yes.

**Q:**   Their own operating expenses?

DIRECT EXAMINATION BY MR. DE PURY

A:     Yes.

Q:     Are they all housed in one location or do you have multiple locations for each one?

A:     Multiple locations.

Q:     So you have different buildings for each one?

A:     Different buildings, different addresses. Depends on the state of the business.

Q:     Did he ask you about any commingled funds?

A:     Commingled?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Uh, I don't believe he did.

Q:     Did he review any general ledgers?

A:     I don't know.

Q:     Did he independently calculate damages?

A:     Uh, I assume that's what he did.

Q:     Okay.

A:     I assume he did that.

Q:     Or did he merely repeat figures that you supplied?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I don't believe he merely repeated figures that I supplied.

DIRECT EXAMINATION BY MR. DE PURY

Q:     So again, laying the groundwork for the next question. We know that you didn't give him any bank statements, we know from-- you don't know from him, but we know from him that he did not review anything else.

A:     Uh-huh.

Q:     So given those two things, and he didn't speak to your bookkeeper, Mr. Dickenson.

MR. FOSTER:     Object. I'm sorry. Go--

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     Would it be fair to say his opinions depend on your accuracy?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I'm not sure that it is fair to say that.

Q:     Well, where else would he get numbers from?

A:     For his opinions?

Q:     Yeah.

A:     You-- you asked me about numbers versus opinions, so.

Q:     Well, no, I asked about his accuracy. His opinions, yeah. So, would it be fair to say his opinions, his report is an opinion, right?

MR. FOSTER:     Object to the form of the question.

DIRECT EXAMINATION BY MR. DE PURY

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**    I believe his report reflects his expert opinion.

**Q:**    And so, since the only source he was able to get that from was the spreadsheet you gave him--

**A:**    Uh-huh.

**Q:**    --then that opinion is totally relying on your accuracy, correct?

**MR. FOSTER:**    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**    No, I disagree. The question presumes that my data is the only source upon which he can derive an opinion. I don't agree with that.

**Q:**    What other source did he have?

**A:**    Of course, he has his expertise, which is, you know, conceptual but-- but he has the source of public events, Google, AI, research, all this body of, you know.

**Q:**    Well that goes to causation though, right?

**MR. FOSTER:**    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**    That's not a necessary conclusion from what I've said.

**Q:**    Well, he--

**A:**    I'm saying he can draw from a-- a wide body of-- of

DIRECT EXAMINATION BY MR. DE PURY

literature and--

Q:      Okay well--

A:      --you know--

Q:      Let's go down that path.

A:      --to form his opinion.

Q:      Let's go down that path.

A:      Uh-huh.

Q:      So a wide body of literature--

A:      Uh-huh.

Q:      --name any one of them; New York Times, any lit-- I mean, just make any one up for the sake of this literature.

A:      Name literature.

Q:      Just any anything, any reporting literature.

A:      Composite and literature.

Q:      You-- I mean, I'm just saying we could just-- for the sake of this hypothetical, we can just arbitrarily say the Dallas--

A:      Let's do it.

Q:      The Dallas Times, right?

A:      Yes.

Q:      If he were to pick up the Dallas Times and it said, okay, 3D printers and Gun Rights advocates-- advocacy has really exploded blah, blah, blah. Does that form a basis where he can look at the raw numbers, the raw data and say, okay, this went up by $12,000 this month, or down by $12,000 this

DIRECT EXAMINATION BY MR. DE PURY

month? Does anything, in any news article anywhere, from the public or private sector--

A:    Uh-huh.

Q:    --give him anything that would give him any ability to look at the numbers?

A:    As you have constructed that question, I would have to say yes.

Q:    You would have to say yes?

A:    I would have to.

Q:    So your bank records are published in the Dallas Daily Times or whatever we--

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    I didn't understand that to be what you were asking me.

Q:    Huh?

A:    That did not seem to be what you were asking me.

Q:    Well, that's what I'm saying. How would he derive-- we're talking about the-- we're not talking about--

A:    Uh-huh.

Q:    --the-- we're not talking about the causation right now. We're talking about just the numbers.

A:    Uh-huh.

Q:    And he's testified that he did nothing to verify

DIRECT EXAMINATION BY MR. DE PURY

your numbers.

A:    I see. You're saying--

MR. FOSTER:    I object--

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    You're saying is there a literature somewhere that could provide my numbers?

Q:    Well, no.

A:    Other than my numbers?

Q:    No, I'm not saying that.

A:    Uh-huh.

Q:    So, your response was--

A:    Uh-huh.

Q:    --that he has a wide, vast area based on his experience and as an attorney and a accountant.

A:    Yeah, it's like multi-disciplinary.

Q:    Yeah, he can get all this information from all different kinds of places?

A:    Yeah.

Q:    However, just name any place in the world he can go get your bank records other than you or the bank?

MR. FOSTER:    There's-- can't-- that's not a-- I object to that. That's not a question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    I'm gonna answer.

Q:    That is a question.

DIRECT EXAMINATION BY MR. DE PURY

**MR. FOSTER:**    What's the question?

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    Name any place in the world--

A:    I guess where--

Q:    --where he can go get your bank records.

**MR. FOSTER:**    It's not a question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:    It calls for an answer. It's a-- it's an interrogatory.

A:    It does call for an answer. Uh, he could ask Chad Dickenson for my bank statements.

Q:    But he didn't?

A:    Is that true?

Q:    According to him.

A:    Uh, yeah, he could.

Q:    He could?

A:    I think the answer to your question is yes.

Q:    I'll go with that. But he didn't, so therefore where else did he get the information? Because we're going back to the previous question.

A:    Well, I've certainly answered this question. Where did he get the information that was provided to him for his report?

Q:    Only the spreadsheet?

A:    I do not think that he only used the spreadsheet as

DIRECT EXAMINATION BY MR. DE PURY

information for his report.

Q:    So you didn't sit side-by-side with him while he did this report, obviously, so if your numbers are not accurate, though-- and I'm not saying they are or aren't, but if they're not accurate, then his conclusions will fail, correct?

A:    I don't think that's a necessary result.

Q:    Well, you've heard of GIGO, obviously, right?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    I don't know what GIGO is?

Q:    Garbage in, garbage out.

A:    Oh, GIGO. Okay. I've never heard it called that. I'm sorry. I've never heard that.

Q:    Well, what have you heard it called? That's all--

A:    Garbage in garbage out.

Q:    Oh, okay.

A:    Yeah, yeah.

Q:    But that's effectively-- again, I'm not leaping to that conclusion yet that your numbers are garbage, but if they were--

A:    Uh-huh.

Q:    --right? Going back to the earlier analogy--

A:    Uh-huh.

DIRECT EXAMINATION BY MR. DE PURY

Q:     --you're not going to get a cake out of a pot roast, right?

A:     Yeah.

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I don't love the analogy, but here's what I think. I-- I think Mr. Tyra, if he saw numbers which he felt were clearly in error, that he would not produce a report.

Q:     But he did produce a report?

A:     He probably produced that report, uh, under the belief that the numbers were accurate.

Q:     And did nothing to verify the numbers?

A:     Well, if you're under the assumption that the numbers are accurate and they match your expectation of the numbers you would receive, I mean, of course he's familiar with--

Q:     Okay.

A:     --the gross numbers of my business.

Q:     And we already determined that you paid him an amount, $5,000, you weren't really certain at the time. So did you pay it-- were you a producer on the documentary at all?

A:     A producer?

Q:     Yeah. Did you pay any monies whatsoever to produce that documentary?

DIRECT EXAMINATION BY MR. DE PURY

A:    You mean the Death Athletic documentary?

Q:    Yes.

A:    No.

Q:    Nothing at all?

A:    No. No, I was not a producer. I don't think I'm listed as any kind of--

Q:    I'm asking.

A:    I guess I'm in the credits as, like, the guy.

Q:    Okay.

A:    I don't know how it works with documentaries. I-- I paid nothing for it. Other people paid for it.

Q:    So did Mr. Tyra ever investigate any alternative reasons for the loss of revenue?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    I'd have to assume he did, but I-- I-- I don't know.

Q:    Did he isolate any reputational damage from other unrelated controversies?

A:    Did he isolate?

MR. FOSTER:    Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:    I only know what he did within the four corners of

DIRECT EXAMINATION BY MR. DE PURY

his report.

Q:     Did he conduct any independent market analysis?

A:     I think his report reflects that he did.

Q:     You know by now on-- I would hope that you know by now--

A:     Uh-huh.

Q:     --I'm not asking whether your attorney told you or not because that would breach privilege. But you know by now that we've been asking for the source documents from those reports, correct?

MR. FOSTER:     Object to the form.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Do I know that?

Q:     Yeah.

A:     Do I know that you are now doing that?

Q:     That we've been asking for them?

A:     Well, I-- I presume that you're asking for it, yeah. I don't I don't know that I know.

Q:     Okay.

MR. FOSTER:     If that's something he knows because of an attorney-client conversation, it is privileged.

MR. DE PURY:     Well, he could also be speaking to Mr. Tyra who--

MR. FOSTER:     That's true. So you should ask that.

DIRECT EXAMINATION BY MR. DE PURY

MR. DE PURY:     So are you objecting on a privilege then? I mean--

MR. FOSTER:     What's the question, I guess?

MR. DE PURY:     Do you know-- are you aware--

THE WITNESS:     That they're asking?

MR. DE PURY:     --that we've been asking for the source documents?

MR. FOSTER:     Right, and I think that that is something that was communicated to him by his lawyers.

MR. DE PURY:     So, your answer-- you're answering for him that yes, he does know. Thanks.

MR. FOSTER:     I didn't answer it.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

Q:     Oh, you just said it's been communicated to him, but I'm not going to drive any point.

MR. FOSTER:     No, that's fair enough. That's fair. I do think that that's correct.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     Thanks for answering for me. I don't-- I don't know.

Q:     Yeah, okay. So do you have any problem providing those source documents?

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

DIRECT EXAMINATION BY MR. DE PURY

**A:**    A problem with it?

**Q:**    Yeah.

**A:**    I'll provide what I'm legally required to provide.

**Q:**    So if we wanted to see-- never mind. I'm not going to go into that. I already know the answers.

**A:**    Look, I know you want to see a lot. I mean, I know you want it.

**Q:**    Well, is there anything that we want to see that you're not going to give us?

                    **MR. FOSTER:**    We object to the form of the question.

                    (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**A:**    Look, I'm busy, man. Uh, you know, with the-- this, uh, large volume of discovery-- pending discovery responses and, uh, requests for production--

**Q:**    Right.

**A:**    --I intend to provide, uh, everything I can. You know, and it's a-- it's a large volume. In fact, it may even maybe the requests in there-- there are so many, it's hard to remember.

**Q:**    Right.

**A:**    Maybe those requests also refer to some of these source documents.

**Q:**    Right.

**A:**    So maybe we can resolve this.

DIRECT EXAMINATION BY MR. DE PURY

Q:     Did you or he-- when I say he, I mean Mr. Tyra, and I'm saying that for the record, analyze any negative publicity concerning the criminal conviction, and to it, I mean the movie?

          MR. FOSTER:     Object to the form of the question.

               (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     This fixation on the movie is interesting, but I-- I guess it's because it's-- yeah, and this proximity to the meme or something. Um, if we're relating that question to the movie, I don't know that he did any analysis. Sounds like he didn't. You-- it seems you're also asking me this time if I did any analysis.

Q:     Yeah, I am. Did you-- I mean, look, yeah.

A:     I don't recall doing any analysis about the movie.

Q:     So in effect, you just simply experienced a downturn?

A:     Uh-huh.

Q:     You don't know why?

A:     I'm not saying that.

          MR. FOSTER:     Object to the form of the question.

               (CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:     I'm certainly not saying that.

Q:     Well--

DIRECT EXAMINATION BY MR. DE PURY

**MR. FOSTER:** We object.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:** But you had people leave, and there's a whole bunch of reasons that people left and only five--

**MR. FOSTER:** Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

**Q:** --said because of this meme? Only five, is that what it was?

**A:** You're asking me if I said that?

**Q:** No, I'm asking about what you produced.

**A:** Uh-huh.

**Q:** I mean, I don't recall because I don't have it right here in front of me, but is that--

**A:** I think there were lots of ways to try to-- we approach-- lots of ways to index the extent of the loss--

**Q:** Uh-huh.

**A:** --the degree of the loss. We tried to kind of, um, define how much of it was related to the meme over time. And there are multiple ways to to do that. We did what we could.

**Q:** Mm-hmm.

**A:** Um, it is a vast-- uh, it's a difficult thing to say only five people left the website. I'm not agreeing to that.

**Q:** Well, I mean, but what did people tell you? How

DIRECT EXAMINATION BY MR. DE PURY

many people on your exit interview-- what do they call that in the--

A:     Like, an exit survey?

Q:     No, I know the exit. There's another term that I've-- forgive me, but--

A:     That's fine.

Q:     Recently learned and it has to do with SaaS.

A:     Oh.

Q:     And it'll hit me when we're eating lunch or something. I'll know it later in the afternoon.

A:     Mmm.

Q:     It's on the tip of my tongue. It's one of those stupid terms.

A:     It'll come in the next question.

Q:     It goes to the rate of people that come and go every month in any kind of--

A:     Yeah, you mean churn?

Q:     Churn rate, thank you.

A:     Mm-hmm.

Q:     Churn rate. It was right there.

A:     Yes.

Q:     I knew you knew it. I knew I knew it. I couldn't think of it. But in your exit strategy or exit interviews--

A:     Mm-hmm.

Q:     --what is your churn rate?

DIRECT EXAMINATION BY MR. DE PURY

A:      Uh.

MR. FOSTER:     Object to the form of the question.

(CONTINUING DIRECT EXAMINATION BY MR. DE PURY)

A:      I don't know that I can accurately answer that.

Q:      You don't have any-- is it 10%?

A:      Well--

Q:      5%?

A:      There's controversy about how to measure churn.

Q:      Yeah.

A:      You know, there's different formulas. And over time we've applied different formulas. Looked at it on a monthly basis, looked at it on an annual basis. I'm not sure that I know an-- an industry standardized way to say this is what my churn rate is indefinitely.

Q:      But there's the very most basic, we bring in 100 people a month and we lose 7, that'd be 7%, right?

A:      If you want to do like a--

Q:      You can do the most basic analysis of it.

A:      Yes, uh, some years ago we did that, some years ago we tried to automate that. I have on occasion, um, like, had a print of that, you could say.

Q:      Yeah.

A:      Um, when I was reflecting on the-- whatever the status of the monthly memberships were.

DIRECT EXAMINATION BY MR. DE PURY

Q:      Yeah.

A:      So we had tried to learn what customer lifetime value, churn rate, things like that.

Q:      'Cause every industry is obviously different and you said you don't know an industry standard.

A:      This industry is rather unique.

Q:      So, yeah.

A:      And this-- this business is kind of unique. Um, but right, the-- I think churn is among the indications that we've-- that we've tried to look at, yeah.

Q:      Because I have a client that-- the industry is a morbid industry. He owns a crematorium.

A:      Mm-hmm.

Q:      And he jokingly told me one day, he says my churn rate's 100%. Okay. It's a morbid business, but--

A:      Well, every business in the long term does have 100%.

Q:      Right. And I get that if you don't know the exact but there-- and there are different ways to define it.

A:      Yeah.

Q:      But you got to have some generalized number that you know.

A:      Well, there isn't a general number. I-- I wish I could give it to you. There's a monthly number I used to recall and kind of keep as--

DIRECT EXAMINATION BY MR. DE PURY

Q:    What was that?

A:    I don't recall it.

Q:    You're a pretty smart businessman. You run all these businesses. You've done very well for yourself.

A:    That's a good compliment.

Q:    You got into law school. I know you didn't finish, but that's probably--

A:    Got in and I got out.

Q:    Could go back if you wanted. So--

A:    No, I-- honestly, standing here, I don't recall. It would be-- it would have been a monthly figure.

Q:    Yeah.

A:    But it wasn't anything we ended up using in our-- our regular reporting.

Q:    And you just don't have any idea about what that was? I mean that's a crucial--

A:    I'm not saying I don't have any idea.

Q:    Well--

A:    I'm saying I don't know what the churn rate was.

Q:    Well, what do you think it would be? I mean--

A:    Uh, well it was-- okay, there are industry standards, right?

Q:    Yeah.

A:    Like, you can-- and then you try to analogize your business to, like, a similar business.

DIRECT EXAMINATION BY MR. DE PURY

**Q:** Right.

**A:** And the churn was not much worse than you might see in a related, let's say, digital platform.

**Q:** Okay.

**A:** Okay? Now, it was a small, I think, single digit percentage monthly churn rate.

**Q:** Okay.

**A:** I can recall at least that much. I'm not saying I have no idea.

**Q:** All right. So under 10% then?

**A:** Was it 3%? Was it 5%? I don't recall.

**Q:** Okay.

**A:** Was it under 10%? I think it was.

**Q:** Well, you said single digit. I'm hoping it'd be under 10%, that's generally the definition of that.

**A:** Unless there's the new math out there that I don't know about.

**Q:** Yeah, that's true. I just find it hard to believe a guy in your position that has a subscription-based business wouldn't know the--

**A:** You find that hard to believe?

**Q:** Yeah, I do.

**A:** Well, this business has been--

**Q:** So--

**A:** --around for a long time.

DIRECT EXAMINATION BY MR. DE PURY

**Q:** Yeah, but I mean, that's, like, the crucial thing. If you go get a bank loan, that's one of the first questions they're going to ask you.

**A:** No one's going to give me a loan, Gary.

**Q:** All right. Well, and you clearly don't need it.

**MR. FOSTER:** Object-- wait.

**MR. DE PURY:** I mean, you know, Howard's bills alone are probably more than, you know.

**THE WITNESS:** This Deposition is--

**MR. FOSTER:** Gentlemen--

**THE WITNESS:** --subtitled, how to <unintelligible>.

**MR. FOSTER:** <crosstalk> You know so deposing a meme of-- you're answering for him, you're jumping in, it's like tag team.

**THE WITNESS:** All right. So all right, all right.

**MR. FOSTER:** It's 1 o'clock. We're ready to go.

**THE WITNESS:** Yeah, I am.

**MR. DE PURY:** I'm pretty much-- 'cause this is where you take over anyway.

**MR. LAROSIERE:** I take over. All right. So are you done? Because it would be nice to just have you be--

**MR. DE PURY:** Yeah.

DIRECT EXAMINATION BY MR. DE PURY

MR. LAROSIERE:    You don't have anything else?

MR. DE PURY:    No, that's it.

MR. LAROSIERE:    All right. So Gary's done. All right, we can go off the record.

<off-the-record-discussion>

THE REPORTER:    Counsel, do you want me to go off the record?

MR. DE PURY:    Yeah 'cause it's 1 o'clock, that's when I wrote in there that we're going to break anyway because we have to haul butt to--

THE WITNESS:    Or it is good.

MR. FOSTER:    Wait, what's he say?

THE WITNESS:    I don't know, something happened.

MR. DE PURY:    And we'll be back about 3:30.

MR. FOSTER:    Well, we don't know. I think you should let them know--

MR. LAROSIERE:    How about this, you send them an email-- yeah, send them an email as soon as it's over and then we'll be about 30 minutes after that.

MR. DE PURY:    Okay. Does that sound good? That should be in your notes that we have to break for a court hearing anyway. I informed the parent company.

MR. FOSTER:    I think he just got some more military money. I think that's all this is.

CROSS EXAMINATION BY MR. LAROSIERE

MR. 1:     Oh, okay, okay, okay.

MR. FOSTER:     Another billion for?

MR. DE PURY:     You got that?

MR. FOSTER:     Don't have a boy die for Israel. Aren't you glad we're too old?

THE WITNESS:     Feels that way.

MR. 1:     Oh, we're too old for now. You saw Ukraine. We'll be prime age in about three years.

MR. DE PURY:     All right. All right.

MR. FOSTER:     Well, I'm a diabetic. I'm good. Okay, gentlemen. Are we off the record?

MR. DE PURY:     Yeah we're off the record.

MR. FOSTER:     Okay, so we're going to all just leave now.

THE REPORTER:     Counsel, we are off the record at 12:57 p.m. It's 4:13 p.m. Eastern Standard Time and we are now on the record.

(CROSS EXAMINATION BY MR. LAROSIERE)

Q:     Okay, thank you. All right, Mr. Wilson, thanks for being here. Of course, you took an oath earlier, you understand you're still under oath?

A:     Yes.

Q:     Okay. Now I'm going to talk about a subject that's-- well, actually, let me take a step back. You familiar with the Fedcad meme?

CROSS EXAMINATION BY MR. LAROSIERE

**A:** Reasonably so.

**Q:** You know about what it says?

**A:** I have read it.

**Q:** You remember it or do you need to be refreshed by it?

**A:** If you're offering to put it in front of me, I wouldn't complain.

**Q:** Just to refresh your recollection.

**A:** Uh-huh, yes.

**Q:** Yeah, so there's a number of different claims made in this; would you agree it's fair to say?

**A:** I would agree there are multiple claims.

**Q:** So if you'll be so kind as to help me out here, I'd like to kind of separate them out. We're at the hacked and dumped claim, right? Defcad's database has been hacked and dumped on multiple occasions. You say that's one claim, or would you say that's a broader part of that paragraph which also includes, they don't encrypt their data?

**A:** It may be both.

**Q:** Both, yeah?

**A:** Yeah.

**Q:** So that's one claim which has some sub claims, right?

**A:** It's at least one claim.

**Q:** Then there's the next one, which talks about

CROSS EXAMINATION BY MR. LAROSIERE

basically what's on the website, untested, M82, video game, stuff like that.

A:     I believe that claim is about something more than what's on the website.

Q:     Mm-hmm.

A:     It is about Defcad's motive or intent to steal people's money or deceive customers.

Q:     To steal people's money?

A:     Yes, I believe it's not, uh, an innocent commentary about what's on the website.

Q:     Okay.

A:     It is, in fact, about Defcad's motive, commercial motive, unethical motive, things like that.

Q:     I guess, how do you reckon that is?

A:     Uh, well, a reading of the meme, first.

Q:     Mm-hmm, yeah.

A:     An interpretation of the meme, and perhaps the overall context of the surrounding claims--

Q:     Mm-hmm.

A:     --the progression of the claims, the meme as a posture or exhortation to action.

Q:     So I'm going to need you to work with me here. I mean, you're clearly very well read and you use a lot of high literary words, and I really don't understand those. So I would really love it if you would speak to me at like a high school

CROSS EXAMINATION BY MR. LAROSIERE

level when I'm asking you questions; is that okay?

A:     The Court warned us against working and speaking at high school level today.

Q:     At a high school reading comprehension level.

A:     Do what I can.

Q:     So I'd like you to explain to me, in that claim, how do you get that from it? The things you were just telling me about, how it's about stealing.

A:     All right. I can do it without looking at the meme or we can do it with looking at the meme.

Q:     I want to know what's in your mind.

A:     When you say about what's on the website.

Q:     Mm-hmm.

A:     I remember the part of the meme that says they pass off--

Q:     You don't have to be exact.

A:     --bogus or untested models. I focus on the pass off part of that, right? That's almost-- it's a claim of laundry, it's a claim of fraud, it's a claim of inducement. You know, pass off has itself a-- a direct and obvious negative connotation. It is meant to even be interpreted as a kind of commercial malfeasance.

Q:     I don't understand what you mean by commercial malfeasance.

A:     I don't know that I'm meaning anything legal.

CROSS EXAMINATION BY MR. LAROSIERE

**Q:**     Okay I'm s--

          **MR. FOSTER:**     Okay, I do object to that. I don't think that's a question. Thank you. So I'm trying to be--

          (CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**Q:**     Okay, we can stop. What do you mean by commercial malfeasance?

**A:**     I think when it says pass off, for example, that claim is leading with the idea that Defcad is knowingly providing bad files.

**Q:**     Mm-hmm.

**A:**     It's tricking you, it's inducing you into paying money to get what it knows to be bad files. That seems to be the-- the substance of that claim, which is a claim of-- of some kind of misdemeanor, of some kind of malicious.

**Q:**     What do you mean when you say misdemeanor?

**A:**     I'm saying it is normative language. They pass--

**Q:**     And what is that? I'm sorry, what is normative language?

**A:**     Pass off has a normative bent.

**Q:**     What is normative?

**A:**     What is normative? I-- I think anyone would know what normative means.

**Q:**     I'm sorry. Can you tell me?

**A:**     As I understand the word normative, it is according to expected behavior, according to standards which are

CROSS EXAMINATION BY MR. LAROSIERE

identified or would be expected. Norms are, if not rules, if not expressed laws, they are what would nevertheless be presumed--

**Q:** Mm-hmm.

**A:** --to happen or should be expected.

**Q:** Mm-hmm.

**A:** Or maybe they're socially enforced. I mean, that's a big question.

**Q:** Right. But you said there's a normative statement in there.

**A:** Yes, it feels to me like it has a normative quality, to say Defcad passes things off.

**Q:** And by that do you mean like it's violating some kind of social norm?

**A:** I think at least it is saying a social norm, but it seems to be saying more than that.

**Q:** Okay.

**A:** It seems to be a commercial claim.

**Q:** Seems to be a commercial claim? What do you mean by that? You're saying commercial claim?

**A:** Pass off has a certain context or evokes a certain idea about business, bad business, right, um--

**Q:** Like counterfeiting almost>

**A:** A little bit. A little bit like counterfeit. But in that context, the claim, we can read it in a different way.

CROSS EXAMINATION BY MR. LAROSIERE

It's not saying Defcad's counterfeiting work. It's saying Defcad's taking work that it knows is bad--

Q: Mm-hmm.

A: --and is trying to somehow represent it as something else--

Q: Mm-hmm.

A: --usable or tested or--

Q: Mm-hmm.

A: --the claim seems to make specific-- specific representations about--

Q: Okay.

A: --our knowledge about how bad some files are--

Q: Mm-hmm.

A: --in a normative or commercial context.

Q: We'll talk tomorrow about what's actually on the website and stuff, because I know that you're not tasked with knowing all of that today.

A: Not today.

Q: Yeah. So I'm just kind of probing your mind, and so I really appreciate that, those are good answers.

A: You're welcome.

Q: I want to talk about the next paragraph, and then we'll talk about, if you can help me, whether there's one or multiple claims in there. This one that starts with Defcad Canon has doxxed developer information to anti-gunners.

CROSS EXAMINATION BY MR. LAROSIERE

**A:** Doxxed developer information.

**Q:** Mm-hmm. So what do you think is claimed in that paragraph?

**A:** I think the use of that word doxxed is also, like, a heavily laden term, like pass off. It's meant to first carry an emotional burden and to give you an instinctual reaction, oh, doxxing, we know that that's a bad thing. Nobody wants to be doxxed. It's trying to say that Defcad performed something unethical, just like pass off. It's trying to say that it did something surreptitiously-- that's a big word for today, right? Doxxed.

**Q:** Mm-hmm.

**A:** It's saying that first, more-- more than any of the facts at issue, it's that Defcad did this knowingly and in a bid to kind of hide that decision or that choice. That's the first thing that I-- I would say that doxxed means or is meant to convey to the reader.

**Q:** I mean, you said a lot just now. You got all that from that one sentence?

**A:** Absolutely.

**Q:** Wow, that's impressive.

**A:** Thank you.

**Q:** Yeah, I don't know whether you'd know the next part in your personal capacity or not, so I'm going to go ahead and ask anyway, and, you know, feel free to steer me off.

CROSS EXAMINATION BY MR. LAROSIERE

A:     Steer you off?

Q:     If you don't know, you don't know, right?

A:     I would never want to steer you off.

Q:     Well, I appreciate that. So there's a couple things in here that refers to myself. Do you know who that is, who's the speaker in this?

A:     Yes. If the speaker is not the best use of the word, helpfully, Mr. Stroke has attributed the text to John Elik.

Q:     When the meme says that, like, for example, they then attempted to blackmail myself and others with our personal information in an attempt to force money out of us to support a lawsuit where Defcad was getting sued, and myself and such others were not.

A:     Yes.

Q:     Do you think you'd replace myself with John Elik?

A:     Uh, I wouldn't replace it.

Q:     But you understand it that way?

A:     I understand that to be a representation that Mr. Elik has made. Myself is most likely John Elik.

Q:     Right. No, I'm just trying for comprehension. I don't have a--

A:     Myself and such others were not. The such others are not John Elik. He's clearly referring to other people.

Q:     Okay, right.

CROSS EXAMINATION BY MR. LAROSIERE

**A:** He seems to be saying he was not being sued in the Everytown lawsuit, which is not true.

**Q:** How do you know that?

**A:** How do I know it?

**Q:** Mm-hmm.

**A:** How do I know that John Elik was not sued?

**Q:** Well, no. Sorry, maybe I jumped you. I think you were just saying he seems to be indicating that he wasn't, which is not true.

**A:** Oh, you're right. It's all the negatives.

**Q:** Yeah, yeah.

**A:** John Elik was being sued by Everytown for Gun Safety in 2021. He's referring to that lawsuit and that statement.

**Q:** What do you mean he was sued in that lawsuit?

**A:** He was a party.

**Q:** He was?

**A:** Well, he didn't answer the complaint, but he was nevertheless sued.

**Q:** Was he a listed Defendant in that case?

**A:** Not by name.

**Q:** Not by name?

**A:** By pseudonym.

**Q:** What pseudonym?

**A:** Gatalog Printable Magazines, the Odyssey account

CROSS EXAMINATION BY MR. LAROSIERE

Gatalog Printable Magazines.

**Q:**     So you believe that the Gatalog Printable Magazines is John Elik?

**A:**     Was.

**Q:**     Was. I guess, why do you believe that?

**A:**     I went through that lawsuit.

**Q:**     Uh-huh.

**A:**     Discovery confirmed that it was John Elik.

**Q:**     What do you mean? What discovery?

**A:**     Uh, the discovery that we saw from Everytown.

**Q:**     So I'm sorry, you have the--

**A:**     I'm sorry. The discovery that we saw produced from Odyssey. The Court allowed third-party preliminary discovery, you know. Um, Twitter tried to not produce. Odyssey did produce. What Odyssey did produce were sufficient communications to show that the operator of that account and others tied to the Gatalog was John Elik, and he was in frequent communication with Odyssey.

**Q:**     I mean, I guess, how do you know it was John Elik? Like, was his name on it or you--

**A:**     Yeah, his ivanthetroll@protonmail.com, he used the word our to associate the account with himself. He used the word our a few times. I think he used the word we. It was sufficient. Of course, that allegation was made by Everytown as well in later filings. They wanted the court to take notice

CROSS EXAMINATION BY MR. LAROSIERE

that it was John Elik, but in the end, they never-- I don't think they pursued it beyond defaulting him.

**Q:** And that being the Defendant, the Gatalog Printable Magazine's Odyssey account?

**A:** As I recall, that Defendant took a default judgment.

**Q:** I guess just while we're on that, that lawsuit's been mentioned a lot by you in the past couple of years. I guess I don't really understand why. Like--

**A:** You wouldn't understand why?

**Q:** Not really. Can you help me out? Like, what--

**A:** Can I help you understand why?

**Q:** Yeah.

**A:** I think you're in the best position to understand why. You can tell me, I think, why this lawsuit has been so important to you and the Defendants of this case.

**Q:** I haven't thought about this lawsuit.

**A:** You haven't thought about it?

**Q:** No.

**A:** You seem to have a central role in the progression of that lawsuit.

**Q:** Tell me about that.

**A:** Would you like me to?

**Q:** Yes.

**A:** I think it's rare in cases like these where a

CROSS EXAMINATION BY MR. LAROSIERE

member of a conspiracy admits to the conspiracy.

**Q:** Mm-hmm.

**A:** Being a member of the conspiracy and that everything in the conspiracy happened and he admits it.

**Q:** So that's your position, that such communications exist?

**A:** Well I think Defendant Peter Celentano confirmed for me what I had already discovered, that you were a moving force behind why things happened in that Everytown suit.

**Q:** I know this is a little awkward, but we have a cold record. When you refer to me, can you just say Mr. Larosiere, just so the record's clear? I know it's annoying, but could you do that for me?

**A:** Okay, I can do that for you.

**Q:** No, and I definitely want to hear about this, but let's take a step back. You were saying that there's some-- I asked why you kept talking about this lawsuit.

**A:** Mm-hmm.

**Q:** You said, well, Mr. Larosiere should know, because you've never before seen such direct information of the existence of the conspiracy. That's fair to say that was about your testimony, right?

**A:** Close enough.

**Q:** Close enough? So like, I guess, what document are you talking about?

CROSS EXAMINATION BY MR. LAROSIERE

**A:**     I guess the first thing I mentioned was the deposition of Peter Celentano.

**Q:**     Okay, but which deposition of Peter Celentano?

**A:**     Which one?

**Q:**     The one in this case?

**A:**     Yeah, I mean that one.

**Q:**     What about before that?

**A:**     You mean other depositions of Peter Celentano?

**Q:**     No. I mean any other--

**A:**     Oh, I see. How could I know you were a moving force in the Everytown lawsuit before the Peter Celentano?

**Q:**     How would you know who was a moving force?

**A:**     Oh, my god, man.

**Q:**     I know. I'm sorry.

**A:**     No, I think it's probably my fault. Okay. How could I know that Matthew Larosiere was a moving force in the Everytown for Gun Safety lawsuit--

**Q:**     Yep.

**A:**     --against Defcad?

**Q:**     Yeah, against Defcad.

**A:**     Well, there are lots of answers to that question.

**Q:**     I'd love to hear them.

**A:**     Okay. Like with Mr. Elik's discovery provided by Odyssey, Mr. Elik mentions, Matt will want to hear this. Our lawyer will want to know this. Right? There's this initial

CROSS EXAMINATION BY MR. LAROSIERE

indication that it's actually Matthew Larosiere kind of acting as a shadow attorney, you could say, in that lawsuit, a kind of backseat driver.

Q:     What's a shadow attorney?

A:     A-- a backseat driver, I guess. I've never had one before. Again, maybe you could help me understand what a shadow attorney is.

Q:     And so a backseat driver in the Everytown lawsuit?

A:     Yes.

Q:     What do you think this backseat driver did there?

A:     Uh, I think he did a lot. In fact, I'm not sure I know everything that he did in that lawsuit.

Q:     Well, I mean, just help me out, give me some examples.

A:     Well, for example, uh, he-- he had lots of communications with Peter Celentano.

Q:     Did he?

A:     A Defendant in that lawsuit.

Q:     Okay.

A:     He did. He had communications with John Elik, another Defendant in that lawsuit. He told John Elik not to answer the complaint.

Q:     Did he?

A:     He did.

Q:     How do you know that?

CROSS EXAMINATION BY MR. LAROSIERE

**A:**      John Elik told me.

**Q:**      John Elik told you that?

**A:**      He did.

**Q:**      Do you have those communications?

**A:**      He told me on the phone, in fact.

**Q:**      What about the things with Peter Celentano? Do you have any communications that reflect that?

**A:**      I have a deposition with Peter Celentano.

**Q:**      Well, we're still waiting on that transcript.

**A:**      Are you?

**Q:**      Yeah.

**A:**      That was a mistake to not have that before today.

**Q:**      Well, I appreciate your feelings on that.

**A:**      Those aren't feelings.

**Q:**      So you haven't identified any documents, though?

**A:**      Have I not?

**MR. FOSTER:**      Object to the form of that would-be question.

**MR. LAROSIERE:**      Okay, Mr. Foster. On the record, I'd like you to explain your objection to form.

**MR. FOSTER:**      There was no question.

**MR. LAROSIERE:**      I wasn't done, Mr. Foster. My mouth is still open. I'd like you to explain your objection.

**MR. FOSTER:**      I did.

**MR. LAROSIERE:**      Certainly you made it with a

CROSS EXAMINATION BY MR. LAROSIERE

good faith basis, right?

MR. FOSTER: Of course.

MR. LAROSIERE: Okay, explain your objection. What was--

MR. FOSTER: There was still--

MR. LAROSIERE: --wrong with the form?

MR. FOSTER: There was no question.

MR. LAROSIERE: But I wasn't done.

MR. FOSTER: You were done.

MR. LAROSIERE: No, I wasn't. Can you please hold?

MR. FOSTER: I thought you were done.

MR. LAROSIERE: Mr. Foster, do you think that I can lay a foundation for a question?

MR. FOSTER: I thought you were done with your question.

MR. LAROSIERE: I'm just going to ask you this one more time. Do you think that I can lay a foundation for a question?

MR. FOSTER: Sure.

MR. LAROSIERE: Okay, thank you.

MR. FOSTER: And I can object if I believe it's an improper question, as to form.

MR. LAROSIERE: Mr. Court Reporter, can we read back the question or where it started?

CROSS EXAMINATION BY MR. LAROSIERE

**MR. FOSTER:**    It wasn't a question.

**THE REPORTER:**    Yeah, just one moment.


(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**A:**    I asked the question.

**Q:**    Yeah. All right, we're good to go back on.

**A:**    Thank you.

**Q:**    Can you identify any documents that suggest this? Well, I guess we have to kind of phrase the thing that you're suggesting here, which is that Mr. Larosiere is the shadow attorney making a lot of decisions in this Everytown lawsuit. I mean, is that a fair characterization? It may be blunted, but--

**A:**    Shadow attorney making all the decisions?

**Q:**    Or a bunch of decisions.

**A:**    How about a shadow attorney interfering with the decisions in this lawsuit? How about that?

**Q:**    Okay. So that's--

**A:**    Can I identify documents? Yes, I believe we've produced some, in fact.

**Q:**    Can you describe them?

**A:**    I call one-- and it is called the declaration of Erin Galloway.

**Q:**    Mm-hmm.

**A:**    It was declaration in that lawsuit. It's been produced in Discovery here. It's a pretty good summary of not

CROSS EXAMINATION BY MR. LAROSIERE

just the facts that they've identified in communications from Mr. Elik, but in fact, a counter-notice, for example, that you, Matthew Larosiere, issued before the beginning of that lawsuit. And in it, you say, this office has the pleasure of representing the Gatalog-- the Gatalog Foundation and its members. And you seem to identify those things as two separate organizations-- associations, in fact. And you say you act on behalf of them, which I found to be curious language.

**Q:** Okay. And so you--

**A:** I found it curious at the time--

**Q:** Yeah.

**A:** --don't get me wrong.

**Q:** Mm-hmm.

**A:** At the time.

**Q:** Yeah, I know. I do believe this is one of your favorite documents.

**A:** You've seen it produced today?

**Q:** Yeah, I've seen it produced in almost every discovery request.

**A:** It fascinates me.

**Q:** So who's Erin Galloway?

**A:** Who is she? I guess she works for Venable. I don't know.

**Q:** Well, but it's her declaration, right?

**A:** It's in Federal Court.

CROSS EXAMINATION BY MR. LAROSIERE

Q:      Right, so who is she?

A:      I assume she's an attorney with Venable.

Q:      You assume that?

A:      Yes, I--

Q:      But you don't know?

A:      I do assume that.

Q:      But you don't know, right?

A:      Do I know it for a fact?

Q:      Yeah.

A:      I don't know if she's with Venable right now. I think she was.

Q:      So I guess that's your favorite document, I know that. Are there any others?

A:      I'm not saying it's my favorite document, all right? I think there's some greatest hits in this case, okay? One of my favorites is the Defcad meme. Another of my favorites is you with-- uh, well, why should I list the greatest hits? I'll let you conduct the Deposition.

Q:      No, go ahead.

A:      One of-- one of my favorites has been shown to Mr. Elik as an exhibit. He said he's so glad that the document's in the case. I'm glad he's glad.

Q:      What document is that?

A:      That document is a communication to Garrett Wallman saying, I'm not okay with Cody using Defcad as a tool to

CROSS EXAMINATION BY MR. LAROSIERE

influence developers. I'm going to need X, Y, and Z, and if I don't get it, I will be forced to disavow-- to publicly disavow Defcad. I will have no other course of action.

Q:     Okay.

A:     I-- I love that document.

Q:     Why do you love it?

A:     Uh, it's very rare for members in a RICO conspiracy to say, this is what I'm going to do to you if you don't give me what I want.

Q:     Okay. You believe that the Erin Galloway declaration and the message between Mr. Elik and Garret Wallman, you believe that--

A:     Yes.

Q:     --those are, would you say, crown jewels of your proof of the RICO conspiracy?

A:     I don't believe they're crown jewels.

Q:     Yeah.

A:     I just enjoy those documents. I enjoyed them in the other lawsuit--

Q:     Mm-hmm.

A:     --right, for-- for different reasons, right? For different evidentiary reasons. It's interesting to me, your role, in all of this.

Q:     Who's--

A:     The role of Matthew Larosiere. It's very

CROSS EXAMINATION BY MR. LAROSIERE

interesting to me, and then it kind of confirms--

Q:      Mm-hmm.

A:      --all these questions Dan Schroeder asked me at the time. Why is Matthew Larosiere calling me? What does he have to do with any of this stuff? I say, Dan, I don't-- he works for them. I don't know. It all-- you know, it's-- it's really interesting now, in this case, looking back and understanding.

Q:      Mm-hmm.

A:      And so when we talk about these representations in this meme about doxxing developers and things like that, I know why he feels-- felt so confident that he could say that.

Q:      Why is that?

A:      You, Matthew Larosiere.

Q:      Okay, tell me more. What do you mean? How did Matthew Larosiere make him feel confident to say--

A:      That's a big answer.

Q:      But which one?

A:      That's a big answer. It's kind of like this, you know, I don't-- you don't like my fan fiction.

Q:      What do you mean by that? What do you mean?

A:      You don't like my fan fiction about you, Mr. L, right? But that's a good way of talking about, you know, the kind of encouragement over time that you have given him as a-- as a, not just a developer, but as like a law understander, you know. Uh, so many of these claims in this Fedcad meme I have

CROSS EXAMINATION BY MR. LAROSIERE

seen defended, and I have seen protected by you.

**Q:**    I know it's very hard, but please try to--

**A:**    If you, Mr. Larosiere.

**Q:**    Yeah, I know.

**A:**    It's gonna be difficult. It will be difficult.

**Q:**    Yeah, I'm just asking you to, good faith, just try your best.

**A:**    I promise you I'm trying.

**Q:**    Yeah.

**A:**    It's rare.

**Q:**    Yeah. No, a lot of things are rare. You're dancing around the questions, though, and I'm kind of struggling, so let me try to ask it another way.

**A:**    Sure.

**Q:**    Okay. So you said those two documents that are some of your favorites.

**A:**    They're beautiful documents.

**Q:**    Beautiful documents. You said they're not the crown jewels in the evidence of this RICO conspiracy?

**A:**    Yeah.

**Q:**    I guess, can you think of one that is?

**A:**    Yes, I think the Celentano deposition is like the single best thing that's happened in this case.

**Q:**    Mm-hmm.

**A:**    In terms of evidence. If you-- if you're asking me

CROSS EXAMINATION BY MR. LAROSIERE

to opine about the evidence.

Q:   Tell me about it.

A:   About the deposition?

Q:   Yeah.

A:   Where would you like me to begin?

Q:   You say it's a crown jewel. I want to hear why.

A:   Gosh, and you really haven't read it?

Q:   I'm not being deposed.

A:   Okay, I-- I mean, for real, man, uh. You know, on his own--

Q:   Mm-hmm.

A:   --Mr. Celentano said the first place I ever saw a Fedcad meme was on the Rocket Chat--

Q:   Mm-hmm.

A:   --the Deterrence Dispensed Rocket Chat. He said, Mr. Holladay and Mr. Larosiere impressed upon me that I should share this if I wanted engagement and that it would be a good thing for us because Defcad was on its last legs commercially, and this is one way we could push them over the cliff. He said you, Mr. Larosiere, and Alex Holladay told him that, and encouraged him to share that meme, that FEDCAD meme everywhere on the internet, including Reddit. And I believe him.

Q:   That's interesting. Did he identify any specific time frame that--

A:   He did.

CROSS EXAMINATION BY MR. LAROSIERE

Q:    --this happened?

A:    He did.

Q:    When was it?

A:    2023.

Q:    2023?

A:    When he did it. Because you told him to do it.

Q:    Do you know about when?

A:    Yeah, after the creation of the meme.

Q:    Can you just tell me a month?

A:    He did it many times after May 2023.

Q:    So he posted the meme a lot, is that what you're saying.

A:    He did.

Q:    Okay. Where did he post it?

A:    For a fact, Mr. Celentano posted it on Reddit.

Q:    Mm-hmm.

A:    He posted it on Twitter. He says that he posted it other places. I don't know if that's a fact, but I have seen him post it--

Q:    Mm-hmm.

A:    --on those places.

Q:    Okay. Is that it?

A:    Is that it?

Q:    Yeah, I want to hear more. I mean, was that--

A:    You asked me a question--

CROSS EXAMINATION BY MR. LAROSIERE

**Q:** Hold on, sorry.

**A:** --what's the best evidence? I go well, I think this is probably the best evidence. You say, is there any more best evidence?

**Q:** What's the second best?

**A:** What's the second-best evidence? I-- I didn't know for a fact some of the things that Stroke said, for example. And I think some of the things that Stroke said are lies, but Stroke claims authorship of-- of the meme.

**Q:** Mm-hmm.

**A:** Well, Stroke has very good-- we have evidence, Stroke didn't produce it-- we have it, we've given it to you. Um, she was asked, well, where did you get this information? I'm trying to do independent research on this meme.

**Q:** Mmm.

**A:** Ms. Stroke, I see you share this meme all the time. How can I verify these facts for myself? She says, you know what, I got this directly from John Elik. She at his <unintelligible>.

**Q:** Mm-hmm.

**A:** She says the other people you need to talk to about this, who have first-hand knowledge of Fedcad's fuckery are Alex Holladay at his CTRLPew handle, Fudd Busters, who is Mr.-- Mr. Larosiere, so at your handle.

**Q:** Mm-hmm.

CROSS EXAMINATION BY MR. LAROSIERE

**A:**    And Freeman1337, who is Peter Celentano.

**Q:**    Mm-hmm.

**A:**    Now she lists other people, but she lists you three first.

**Q:**    Okay.

**A:**    I think that's really good evidence.

**Q:**    Of what?

**A:**    Uh, when we say this line of questioning--

**Q:**    Mm-hmm.

**A:**    --is like what do you think the best evidence in this case is? So I think it's good evidence of a lot of things--

**Q:**    Mmm.

**A:**    --okay? It's good evidence that Ms. Stroke, you know, really is like a-- a meme, you know, I could name her as a RICO enterprise if I wanted to.

**Q:**    Really?

**A:**    Uh, yeah, I think under the law I could.

**Q:**    Mmm.

**A:**    For example, that evidence allows me to do something like that, I think.

**Q:**    You think? Please walk me through that. How would Ms. Stroke-- just give me a hypothetical. I know that's not--

**A:**    Sure.

**Q:**    --what you're doing here.

CROSS EXAMINATION BY MR. LAROSIERE

**A:**     Sure.

**Q:**     But how would you use that evidence to make Ms. Stroke the center of the RICO enterprise?

**A:**     It doesn't mean the center of the RICO--

**Q:**     Or whatever, you're--

**A:**     How would I--

**MR. FOSTER:**     Object to the form.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**A:**     I understand. All I want to say-- and I want to answer the question, uh, is an organization or a person can be named an enterprise. That doesn't mean that they're necessarily a defendant, as I understand RICO. I'm simply saying when you have one person who's doing bad things, and like a person who's an instrument, the one person could be a defendant and the other person, uh, can be the enterprise.

**Q:**     Right.

**A:**     As I understand RICO, that's all I'm saying.

**Q:**     Yeah, there's like different types of. I was just wondering, you used that as an example, and it seemed interesting to me. So I just wanted to hear how you would say it.

**A:**     Ms. Stroke's behavior is some of the most interesting behavior of these last few years.

**Q:**     Interesting how?

**A:**     Uh, this is a-- a motley crew of people, a real,

CROSS EXAMINATION BY MR. LAROSIERE

you know?

Q:	Now, when you say motley crew, I'm sorry, I'm not well read. What does that mean?

A:	I think the Defendants and the Plaintiffs are all kind of like circus actors. They're all pretty odd people. Uh, Ms. Stroke, if she's listening, is one of the oddest, and her decisions don't, uh, communicate like a survival instinct, you know?

Q:	I guess, can you tell me a little more about that? I mean, you kind of made a face when you said-- before you said survival instinct, I mean, speak freely, what do you mean?

A:	No, I was trying to think of how do you communicate the kind of reckless abandon of someone who's like, hey, I'm out here, and I want to let everybody know. I'm fucking with this business on purpose. I'm fucking with this business to make sure that I can take this business down. It's personal for me. I'm gonna interfere with anybody who does business with this company. That's wild. That's pretty wild.

Q:	Yeah, that's the way.

A:	I think you're a circumspect guy. I don't think you would say that, you, Matthew Larosiere.

Q:	You don't think Mr. Larosiere would say what?

A:	I don't think you would, uh, roll out on Twitter and say, hey, everybody, I'm doing the Fedcad thing, I'm going to interfere with everybody. I don't think you would say what

CROSS EXAMINATION BY MR. LAROSIERE

Ms. Stroke said, uh, in the history of this case. I consider it wild, I consider it just wild.

Q:     Hmm.

A:     And I think she's proud of that, and you know what, good on her.

Q:     Mm-hmm.

A:     I mean, she clearly is very proud of it.

Q:     Mm-hmm.

A:     And that's itself very interesting.

Q:     Yeah. Is that it?

A:     Is that it about Ms. Stroke?

Q:     Yeah.

A:     No, Ms. Stroke is-- is bizarre. She's very bizarre. At least it has an aesthetic quality, but the decisions are strange. I could go on and on and on. It would be the rest of the time.

Q:     When you say it has an aesthetic quality, what do you mean?

A:     Uh, okay, like the criticism of, uh-- you know, it's easy to reduce events or like decisions to--

Q:     Mm-hmm.

A:     --like moral things. Like, in fact, I think that's kind of what like Fudd Busters. Um, but I think Ms. Stroke does things, uh, with an aesthetic feel. Um, I think she pursues the poetry of what she's doing, and that's interesting.

CROSS EXAMINATION BY MR. LAROSIERE

**Q:** I'm going to be completely honest with you.

**A:** Yeah.

**Q:** I have no idea what you're talking about. By saying the poetry--

**A:** I'm just doing my best.

**Q:** You're saying the poetry and the aesthetic, those words together, it's like word salad. Can you please try to explain?

**A:** Everybody-- look, you read a poem, right? You read a poem. Why you read a poem? The question is probably not appropriate for me to put to the attorney, right? But if I mean it rhetorically, you read a poem for its aesthetic value, for its claim to aesthetic value in part. I'm not saying that's an exclusive reason you read a poem or write a poem. The study of these things, right? Or why you make a meme, right? You guys want to say, well, this is art, this is criticism. Okay, there's a claim to the aesthetic there. That's all I'm saying.

**Q:** When you say aesthetic, you mean like not just visual aesthetics, you mean also like-- because I'm familiar with visual aesthetics, like when I--

**A:** In philosophy, aesthetic is also an experience.

**Q:** Okay. Yeah, the way I think of aesthetic, it's like, for example, a Volkswagen Beetle. That evokes a certain time and stuff like that. Can you help me understand the non-visual philosophy aesthetic?

CROSS EXAMINATION BY MR. LAROSIERE

**A:**   Well, no, of course-- listen, we just talked about poems. Poems themselves, you could argue, are not visual.

**Q:**   Mm-hmm.

**A:**   Right? It's about this overall recruitment of the faculties and an aesthetic experience, okay?

**Q:**   To how it makes you feel?

**A:**   If you want.

**Q:**   I'm trying to understand. This is your word. I'm trying to understand. So would you say that--

**A:**   I think we're on the same page though.

**Q:**   Yeah.

**A:**   You know, it's like it's more than--

**Q:**   What it evokes in the reader?

**A:**   What it evokes in the reader.

**Q:**   Is that?

**A:**   In part-- in part, sure, but I think a poem in itself makes claims regardless of its reader. You know, these are-- these are fine, fine lines.

**Q:**   Okay. I think I understand now. There's another part, of course, they forget to mention that they'll extort you, and that they've yet to actually win a lawsuit. I think that's two separate things, right?

**A:**   They forget to mention-- you know, it's at least two things.

**Q:**   Yeah. I guess are either one of those true?

CROSS EXAMINATION BY MR. LAROSIERE

**A:**	That we forget to mention these?

**Q:**	Well, no. Forget about that one. What about your legal fraternity won a lawsuit yet?

**A:**	Yes.

**Q:**	Which one?

**A:**	You know I've won a lawsuit. You cite it in your own efforts to defeat California.

**Q:**	What are you talking about?

**A:**	You know that we've won at the Fifth Circuit, Defense Distributed v. Bruck, Defense Distributed v. Platkin, you know it.

**Q:**	Which year was that?

**A:**	You, Matthew Larosiere, know it.

**Q:**	Okay, what year was that?

**A:**	I don't know, '22, probably both of them were in '22. Maybe one of them was in '21. You're-- you're in a position to tell me. You need me. You need that win to be a win for you. You know I've won some lawsuits. He knows I've won some lawsuits because you're the only lawyer, you, Matthew Larosiere, are the only lawyer that he looks to and understands these things from.

**Q:**	Here's what you really have to understand--

**A:**	Uh-huh.

**Q:**	Right, and this might help the way this is going.

**A:**	I hope it does.

CROSS EXAMINATION BY MR. LAROSIERE

Q:    The way you're referring to me as you--

A:    Uh-huh.

Q:    --you need to understand, I'm just looking at words in front of me--

A:    Uh-huh.

Q:    --and trying to get meaning out of them.

A:    Uh.

Q:    So, forget about everything else.

A:    Uh-huh.

Q:    I just want to talk about this.

A:    I don't know what you mean.

Q:    Okay. That's fine. When would you say was your first big win, like the <unintelligible>?

A:    <crosstalk> Big win?

Q:    Yeah?

A:    Man, lots of wins don't even have to be formal wins. In fact, some losses can be better than any win, all right? So my first win is a settlement with the United States Department of State.

Q:    Mm-hmm.

A:    That's a win by any reckoning, even though you can't put the W in the column.

Q:    Right.

A:    Okay? I would say it's my first big win.

Q:    I think I agree.

CROSS EXAMINATION BY MR. LAROSIERE

A:      Uh-huh.

Q:      But I'm talking-- I know you keep saying that you're not really legally-minded, but I think you probably are.

A:      I don't know that I do.

Q:      Yeah. But that's kind of a more subsurface thing. So from a layperson's perspective--

A:      Everyone knows this about Defense Distributed. If they know anything about it, that we tango with the State Department, and then you can do the stuff online. So out the gate--

Q:      Hold on, wait.

A:      Why?

Q:      You're not responding to a question right now.

A:      Oh.

Q:      I get what you're saying.

A:      Uh.

Q:      I do. I'm not arguing.

A:      Okay.

Q:      I'm asking from a layperson's perspective, which was the first win, which case?

A:      It would have to be Defense Distributed versus U.S. Department of State.

Q:      Okay.

A:      I believe that's the name of the case. I believe we brought it in the Western District of Texas, if that's your

CROSS EXAMINATION BY MR. LAROSIERE

question.

Q:     But aside from a settlement?

A:     The first big actual win? But see, that's a layperson's perspective.

Q:     Forget about big. Just the first lawsuit where, like you said, you just said because you can't check the W, right? What's the first one where you can check the W?

A:     If I have to be exact, it's in that line of cases with the-- the Attorney General of New Jersey.

Q:     Which started as Grewal, right?

A:     It probably started that way. I believe the first W is this decision-- I think-- it's a Fifth Circuit panel anyway. Okay, I-- I blend these two Fifth Circuit decisions together because they basically--

Q:     Right.

A:     --one reinforces.

Q:     Yes.

A:     Okay, it's one of those cases.

Q:     What was the outcome of that one?

A:     Uh, it-- both I'll just put them together, okay?

Q:     Well, I need you-- I'm trying to figure out timing, right? Because I legitimately don't know, so I'd like you to tell me what happened in that one you're talking about?

A:     Let's talk about Bruck, okay?

Q:     Bruck?

CROSS EXAMINATION BY MR. LAROSIERE

**A:** All right, the decision is about can you establish personal jurisdiction over an attorney general who's basically, you know, coming into your state and threatening you with-- I mean, you know, Matthew Larosiere, what I'm talking about, all right? The Fifth Circuit says, you know what, this is sufficient if an attorney general does X, Y, and Z, this is sufficient to haul them into a Texas Court and start slapping them around.

**Q:** Yeah.

**A:** That's a huge win for me because I have to deal a lot with out-of-state attorneys general. And now so do you, Matthew Larosiere.

**Q:** I think we've nailed down a case now. What was the terminal outcome of that case?

**A:** I-- I don't know if it was administratively terminated or not.

**Q:** Something about first filed, does that ring a bell?

**A:** I think the law of this case or the case in Platkin extends into this Third Circuit-- this recent Third Circuit decision. So technically, there's a debate about when the case ended and where. And I-- it's-- it's too advanced for me to really understand. So I think in Texas we won, and the Fifth Circuit said send it back, and that's the end of the case.

**Q:** Right. I mean, even if I agree with you that it's a win though, I mean, this is kind of still something that you

CROSS EXAMINATION BY MR. LAROSIERE

have to explain how it's a win. What's the first case where there was a unambiguous win?

A:     I don't think it's an unam-- it is not an ambiguous win. It is simply at a level of administrative-- you know, it's-- it's so turgid.

Q:     Right.

A:     And who cares about administrative wins? It's, like, very difficult to bring people to the fact. It's not-- it's not the absence of the fact.

Q:     How about this. What was the first case that there was an order that said, judgment for Defense Distributed, Defcad, whichever one?

A:     What was the first?

Q:     Final judgment?

A:     Sitting here, I-- you know, we've been associated with-- with lots of 2nd Amendment foundation cases. I don't know that there's ever been a final judgment in the way that you describe.

Q:     Yeah, and I know that there's a lot of nuance. In fact, the law is all nuance, but.

A:     I-- I would say some of the best wins we had were those injunctions in Vanderstock.

Q:     I think I agree.

A:     You know what I mean? Like, uh, intervener plaintiffs or whatever. So they're not even our case, like, we

CROSS EXAMINATION BY MR. LAROSIERE

jump in and we just go get injunctions too.

**Q:** Mm-hmm.

**A:** Okay, well, those are wins. Are they-- you know, did you win a lawsuit?

**Q:** So what was the final outcome in Vanderstock?

**A:** It's still going, baby.

**Q:** Mm-hmm.

**A:** Still going, in fact.

**Q:** What did the Supreme Court say?

**A:** Well, the Supreme Court didn't end the case. I think it answered, what, one or two questions presented, and then it sent the-- the case back down for further proceedings.

**Q:** Right. So a layperson could understand that that's not a win, at least yet?

**A:** Well, here's the thing. The media makes it the other way around. The media would make you think that case is over and that everybody lost, and of course, that's not true, you know? The case continues.

**Q:** And oftentimes, everyone loses in litigation.

**A:** Well, I would-- I would argue-- I would argue there are multiple losses and wins all along the way, right? And I think as an attorney, you understand that or maybe feel that way, uh, and so you could say in that respect, there have been many wins and many losses, and again, the meme is wrong.

**Q:** You're saying the meme is wrong. What do you mean?

CROSS EXAMINATION BY MR. LAROSIERE

**A:** If we're discussing that Defcad fails to disclose that they haven't actually won a lawsuit, this is wrong. Defcad--

**Q:** Is that because you actually did disclose that you've yet to win a lawsuit?

**A:** We have disclosed when we make wins. It doesn't happen often, but we disclose it.

**Q:** But you did also disclose on a podcast that you've yet to win a lawsuit, right? Around 2024?

**A:** No, it's not a disclosure. That's called humor.

**Q:** Oh.

**A:** 'Cause even when you win, in fact, especially when you win, like in Vanderstock, that's not a win.

**Q:** Conceptual wins.

**A:** No, no. All I mean is, in this-- in my experience alone, and I-- you know, I get it, it's because I'm probably a bad Plaintiff, right?

**Q:** What do you mean? Wait, hold on, stop. What do you mean you're a bad Plaintiff?

**A:** People don't like guns, right? Even in this court, we have to be careful about saying anti-gun or not, even though that's the term that we all naturally use. Courts don't like 2nd Amendment cases.

**Q:** That's not you, right, as a Plaintiff? That's the subject.

CROSS EXAMINATION BY MR. LAROSIERE

**A:**    It is. I think I'm emblematic to these people of a kind of threat, a kind of 3D gun, you know, boogeyman or something. They see me-- literally, this hap-- this happened in the Everytown case at the Second Circuit. One of the judges turned around and faced the wall. He wouldn't even look at our attorney.

**Q:**    Really?

**A:**    On principle.

**Q:**    Huh.

**A:**    And so this is, I think, a real felt thing in the courts. We are--

**Q:**    So you think this separates you from other 2nd Amendment litigants?

**A:**    I'm not sure if it's me personally. I think it's the subject matter and the 3D-- it's, like, this very scary thing for these people.

**Q:**    No, that must have been terrible when the judge turned around.

**A:**    I wasn't there.

**Q:**    Oh, that's just ridiculous. So then there's the second to last paragraph, which I think is a whole opinion. You know, I'm sure you don't agree with this about being wretchedly-- I mean, it says, while I could go on, I'll leave you with the notion that Defcad is wretchedly awful, should be avoided, shouldn't be used, and should be publicly shamed. I

CROSS EXAMINATION BY MR. LAROSIERE

don't really think there's a claim there, right?

**A:**     Ah, no. There is a claim, of course there is. At the end, there's a call to action.

**Q:**     Should be publicly shamed?

**A:**     Yes, yes. And in fact, that is what the Fedcad campaign largely stands in for. A kind of social campaign of ostracism and shame, public shame. And, in fact, the first time Mr. Elik wrote the substance of this meme, he opened this Twitter thread, saying, no one should use it, bully people who do. Bully them with this. And this is what Ms. Stroke decided to do.

**Q:**     Well, you're saying he pointed to this meme when he opened that thread?

**A:**     He pointed to this text of this meme, the sub-- these two major columns of this meme.

**Q:**     Are those different tweets?

**A:**     No, no. One tweet contains the two major columns. When he opens this thread, he says, <unintelligible> don't use FedCAD, bully those who use it, it's for their own good. And then he proceeds with this text.

**Q:**     Then there's this last bit, we can discuss its founder having paid a 16-year-old for sex and other outstanding things that your money will be used for if you give to them another time. So there's a couple different things in there, right?

CROSS EXAMINATION BY MR. LAROSIERE

A:     Yes, starting with we can discuss, which is interesting.

Q:     Tell me about that.

A:     Well, it seems to be an invitation.

Q:     To who?

A:     I think Mr. Elik would like to discuss it. I think it's also-- it's an offer, it's a seek more information from me, we can do it another time. I'd like to do it.

Q:     So you're saying he's inviting people to talk about what follows?

A:     Absolutely. It's-- it's at least an invitation to discourse.

Q:     And that discourse being, would you agree there's two sub-things there basically, paying a 16-year-old for sex?

A:     Yes. And the other outstanding things.

Q:     That it'll be used for?

A:     That your money will be used for. Which, by being bracketed with paying a 16-year-old for sex, is being compared to that. So saying the other outstanding things will clearly be other normatively bad things.

Q:     I'm not going to-- Mr. De Pury earlier was, like, talking about this in terms of rape. I'm not going to call this that.

A:     I appreciate that.

Q:     Yeah, because anyway, we can talk about that

CROSS EXAMINATION BY MR. LAROSIERE

offline sometimes. But did you pay a 16-year-old for sex?

A:      I don't think I paid a 16-year-old for sex.

Q:      It sounds like you've got more to say there. Is that the case?

A:      Does it sound like that?

Q:      Yeah.

A:      I don't mean for it to sound that way.

Q:      Do you have an account on the Sugar Daddy Meet website?

A:      Do I currently have one?

Q:      Did you?

A:      Did I have one?

Q:      Yeah.

A:      Uh, I believe I did, yeah.

Q:      Okay.

A:      I believe I did.

Q:      So what do you mean? Did you or not?

A:      Can you give me a time period?

Q:      2017 to December 31st, 2018. I'm really not trying to nail you here.

A:      No, I don't feel like I'm being nailed. I-- again, I-- I worry that, uh, I'm being asked to say something that's not true, that's--

Q:      Right.

A:      Maybe that's the same thing as being nailed.

CROSS EXAMINATION BY MR. LAROSIERE

Q:      Given the subject matter, I think I'll avoid the term nailed.

A:      Thank you.

Q:      So did you have a Sugar Daddy Meet account at that time?

A:      Yes.

Q:      And you did in fact meet a young lady through that website, right?

A:      Did I meet a young lady through the Sugar Daddy website?

Q:      Right.

A:      Uh, I have met at least one lady through the Sugar Daddy website.

Q:      More than one?

A:      That Sugar Daddy website.

Q:      Yeah.

A:      At least one.

Q:      At least one? Is this young lady the same one that the State calls the victim in your criminal matter?

A:      Well, I-- I don't think I have a pending criminal matter.

Q:      The criminal matter that you did have at one point?

A:      Don't think the State is making any representation anymore about what I did or didn't do.

Q:      Yeah, I'm talking about what happened in 2018.

CROSS EXAMINATION BY MR. LAROSIERE

**A:**      Okay.

**Q:**      So I'm just asking. The person you met on Sugar Daddy Meet, was that the same person that the State back then called the victim?

**A:**      I guess I don't-- I can't prove that.

**Q:**      Did she ever, like, appear in court or testify?

**A:**      Uh, no, it-- it never reached that stage.

**Q:**      So you never saw her after it was filed?

**A:**      No.

**Q:**      So I guess, is that why you're saying you don't know exactly, because they used a Jane Doe name?

**A:**      No, no, it's not, in fact, what I'm saying. I'm-- I'm talking about, again, do I know that the person that I met or this one woman that we're talking about-- do I know that she was the person operating the account, the person I was talking to? I don't know that.

**Q:**      Oh, right. But you met this person in-person, right?

**A:**      Again, I don't know that I can prove that. That's what I'm saying--

**Q:**      Right.

**A:**      --that there's an identity here. I-- I don't know that.

**Q:**      All right.

**A:**      The State seemed to think that there was.

CROSS EXAMINATION BY MR. LAROSIERE

Q:     Look, we can spend as much time on this as you want. I don't really want to circle the drain--

A:     If-- if you want to.

Q:     Well, if you'll let me get through it quickly, we can get through it.

A:     I'm obstructing you from getting through.

Q:     Maybe it's because I'm being too polite. Whoever the person you talked to on the website aside--

A:     Uh-huh.

Q:     --you ultimately met up with somebody who you believed or may have been that person that you were talking to on the website, right?

A:     I think that's right.

Q:     Do you think that person is the same person who was purported to be the victim in the criminal matter that you had back then, which is no longer pending?

A:     Do I think that that's the same? Uh, yes, yes.

Q:     How old was this person?

A:     I don't know.

Q:     You don't know. You still don't know?

A:     How old was this person? I guess, yes, sitting here, I-- I don't recall.

Q:     Okay, that's fine. Did the subject of her age ever come up when you were talking?

A:     With-- with her?

CROSS EXAMINATION BY MR. LAROSIERE

**Q:** Yeah.

**A:** Uh, I-- I think it might have, yeah.

**Q:** Okay.

**A:** I think it might have. I think it was only after we had met, though.

**Q:** When you say met, do you mean after you had had sex?

**A:** I don't mean that.

**Q:** Well, was that after you had already had sex? When it came up?

**A:** It's hard to remember. I believe it was.

**Q:** So you're not 100% sure, but you don't know that you asked for her age before you met up? And we'll use met up as the time you had sex.

**A:** No, I-- you know, I must have. I mean, I think I must have.

**Q:** You must have?

**A:** Yeah, must have.

**Q:** Why do you say you must have?

**A:** Well, it's easy to say, yes, I remember, but do you really remember? This is almost 10 years ago--

**Q:** It's a long time ago.

**A:** Yeah, I would have to suppose. It's probably in the record.

**Q:** You would think that you would have.

CROSS EXAMINATION BY MR. LAROSIERE

**A:**    If they have her messages, for example.

**Q:**    Right. Which you don't know because the case didn't last that long?

**A:**    No, no. I mean, there was discovery in this case. I mean, I just don't-- you know, I know these things were talked about. I don't remember the exact order any longer.

**Q:**    Do you remember talking with my client, John Elik, back in 2019 about the launch of Defcad?

**A:**    2019? I don't think I would have spoken to him in 2019 about the launch of Defcad.

**Q:**    Okay.

**A:**    Only because Defcad launched in March of 2020.

**Q:**    Were you talking to my client, Mr. Elik, around that time at all?

**A:**    Around March of 2020?

**Q:**    Nineteen.

**A:**    Around 2019?

**Q:**    Yeah.

**A:**    Uh, we had to have been speaking in 2019, yeah.

**Q:**    Do you recall any of these communications?

**A:**    In general terms, I think I do.

**Q:**    I think you know where I'm going.

**A:**    I genuinely don't.

**Q:**    Do you remember talking about the GoLive?

**A:**    Okay, help me. Help me, 'cause I-- that doesn't

CROSS EXAMINATION BY MR. LAROSIERE

mean anything to me.

Q:     Okay, read this message. I've informed G of your planned involvement. We spoke about you in the meeting as well, which Mr. Elik says, all good things, I hope. The 18th, I'll check things out and see what I think, but GoLive would be later, I assume. Do you remember that?

A:     This means nothing to me.

Q:     This is June 11th, 2019. Would it refresh your recollection if I showed you these communications?

A:     I'm willing to look at them.

Q:     There you go.

A:     And we're saying the blue is me?

Q:     Yeah.

A:     You want me to read all of it, right?

Q:     Uh, sure. It's up to you.

A:     This is June of 2019. I-- honestly, I-- I don't recall any of this.

Q:     Okay.

A:     I'll say that I-- when I talk about Garrett, I would say G. But I don't know that I can sit here and say, that was definitely a message from me to your client. I-- I certainly don't recognize if that's, in fact, me talking to your client.

Q:     Okay.

A:     Again, I don't think there's anything in there

CROSS EXAMINATION BY MR. LAROSIERE

that's-- I-- I don't know. I just-- I've never seen this message before.

MR. LAROSIERE:   Go ahead and hey, Gary?

MR. DE PURY:   Yeah?

MR. LAROSIERE:   Can you take that PDF from that last exhibit, upload it, and introduce it as Exhibit A?

MR. DE PURY:   Which one? Which one is it?

MR. LAROSIERE:   The one PDF in the last email.

MR. DE PURY:   Okay.

MR. LAROSIERE:   So while he's doing that, I'll just read.

MR. DE PURY:   So just to verify it's--

MR. LAROSIERE:   Yes, the-- yeah.

MR. DE PURY:   Okay.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

Q:   Blue message, I've informed G of your plan involvement. We spoke about you in the meeting as well. Grey message, which is Mr. Elik. All good things I hope, crying laughing emoji. On the 18th, I'll check things out and see what I think but GoLive would be later I assume, question mark? Blue message, we just want to begin getting your feedback at that time. Launch is conditioned upon multiple scenarios. Grey message, which is Mr. Elik. Gotcha, sounds good. Any conditions outside of the legal cases? Blue message, June 11th 2019, 5:23

CROSS EXAMINATION BY MR. LAROSIERE

p.m. There's some underlying Fintech stuff that needs more development, there's my criminal matter, and a data transfer certification I'd like. Grey message, gotcha. Don't mean to pry just curious. To which you respond, no one disputes the facts. She fucked like she was 18.

**A:** How are those messages connected?

**Q:** They're all in a row. These were-- so these are signals.

**A:** Show me it again. Show me it again.

**Q:** No.

**A:** Show me it again.

**Q:** This is the pretty slow.

**A:** Yeah, yeah. Okay. So-- so your representation is?

**Q:** Mhm.

**A:** No, no keep going. Your representation is I-- I volunteered that message to him apropose of nothing.

**Q:** All I have is what's in front of me.

**A:** It's all-- that's all you have?

**Q:** This is what's in front of me and it's--

**A:** Classic shit, man.

**Q:** Classic what?

**A:** No, I would just-- 'cause I would just throw that in there, in the middle of a business conversation. Absurd.

**Q:** I didn't write it.

**A:** Manipulative. I think you might have.

CROSS EXAMINATION BY MR. LAROSIERE

**Q:**      So, okay. So do you remember any conversation like this at all? No?

**A:**      No. About the commentary about like, uh, how this girl fucked?

**Q:**      Skip the last one.

**A:**      Or something?

**Q:**      Skip the last part.

**A:**      No, show me. I don't see this, uh, I don't see an actual--

**Q:**      So, this was a--

**A:**      --fucking part. Show me the fucking part.

**Q:**      This something that doesn't let me. So I'll tell you where we got this.

**A:**      Oh, please.

**Q:**      Spin it around.

**A:**      You didn't get it from me.

**Q:**      Yeah, go ahead and spin it back around. Well, it's because these were your Signal communications and you implemented a deleting policy.

**A:**      Oh, I did. Can you prove that?

**Q:**      Uh, yes, actually, because we got this on a recovered device, yeah.

**A:**      Can you really?

**Q:**      And that's why it's photographed on the screen.

**A:**      You-- you can?

CROSS EXAMINATION BY MR. LAROSIERE

Q:   Mm-hmm, okay.

A:   Ah, I see, I see.

Q:   Yeah.

A:   You have spliced two conversations together.

Q:   No.

A:   And you have cut them up.

Q:   Okay. So, we'll see about that.

A:   Uh-huh.

Q:   But let me ask you something. When you wrote, she fucked like she was 18, what did you mean by that?

A:   I'm not saying by looking at that exhibit that that is something that I wrote, or that that message was from your client, or that that was a conversation that I recall having with your client.

Q:   So is that the type of language you would use with even a friend?

A:   With even a friend?

Q:   Mm-hmm.

A:   Of course.

Q:   Of course?

A:   Yeah, language like that--

Q:   Yeah.

A:   --I think is not beyond the pale with a friend.

Q:   Right, between you and a friend?

A:   Yeah, I don't think it's beyond the pale. That

CROSS EXAMINATION BY MR. LAROSIERE

language doesn't seem opprobrious or whatever to me.

Q:     Yeah. So it seems like it's something you could have said. I understand you're not agreeing that you did say it.

A:     Uh, I'm not agreeing that the message, especially this spliced-- uh, I'm certainly not agreeing that that was a conversation and that I recall it being had that way.

Q:     Mm-hmm.

A:     In fact, I-- I very much doubt that a conversation about launching moved seamlessly into me just apropos of nothing.

Q:     Well, right now you-- I mean, you did say right before that, there's my criminal matter.

A:     Uh-huh.

Q:     And I mean, that was June 11th, 2019, so it was still ongoing?

A:     Uh-huh. Give me the timestamps.

Q:     5:23 p.m., June 11th, 2019.

A:     And then when were the rest of these messages happened?

Q:     What?

A:     When were the rest of these messages happened?

Q:     Here you can show him. 5:31.

A:     Uh-huh. So a seven-minute gap?

Q:     5:13, 5:14, 5:16.

CROSS EXAMINATION BY MR. LAROSIERE

**MR. DE PURY:**    Yeah, June 11th, 2019 at 4:52 p.m.

**THE WITNESS:**    Uh-huh.

**MR. DE PURY:**    The response was at 4:52 p.m.

**THE WITNESS:**    Uh-huh.

**MR. DE PURY:**    Next response 4:53 p.m.

**THE WITNESS:**    Uh-huh.

**MR. DE PURY:**    your response 5:13 p.m. Next response, launch is conditioned 5:14 p.m.

**THE WITNESS:**    Just show me the sequence between.

**MR. LAROSIERE:**    No, I'm guessing the next two is the ones he wants to see.

**MR. FOSTER:**    Yeah.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**A:**    Absurd, absurd that I would just volunteer that in the middle of a business conversation.

**Q:**    Yeah. So, now actually, look at this, so there's one minute after, don't mean to pry just curious. It's no one disputes the facts. She fucked like she was 18.

**A:**    Uh-huh.

**Q:**    I mean, so you're-- at-- that case was still going on, right?

**A:**    In June of 2019?

**Q:**    Yeah.

CROSS EXAMINATION BY MR. LAROSIERE

A:      June of 2019?

Q:      Uh-huh.

A:      Was that case still going? I guess I don't know as a non-attorney. I don't know what you mean.

Q:      So, this young lady we're talking about.

A:      Uh-huh. Who I know you don't want to talk about.

Q:      Uh, actually, hold on. If this makes you feel better, Gary, I'm going to send you this.

                **MR. DE PURY:**     Okay.

                (CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

Q:      And you can put this as Exhibit B. Do you remember what your handle was on Signal around that time?

A:      In June of 2019?

Q:      Yeah.

A:      No.

Q:      You have any idea as to what it could have been, like a couple different options?

A:      No.

Q:      No? Does c-dubs sound familiar?

A:      No, I would have never made that my handle. That must have been what Mr. Elik named me himself.

Q:      What was your phone number around that time?

A:      It would have been the same phone number I have now.

Q:      Which is?

CROSS EXAMINATION BY MR. LAROSIERE

**A:** 501 743 9680.

**Q:** That lines up with this. So I'll go ahead and I'll send these over to Mr. De Pury and he can show them to you.

**A:** Yeah, nice.

**MR. DE PURY:** It's what you should expect.

**MR. LAROSIERE:** Let's give him a moment.

**MR. DE PURY:** It's okay. Let me-- Matt, did you sent them via email?

**MR. LAROSIERE:** Mm-hmm.

**MR. DE PURY:** It's poor form.

**MR. LAROSIERE:** Yeah, it's--

**MR. DE PURY:** All right.

**THE WITNESS:** Larosiere just took a photo of you.

**MR. LAROSIERE:** I'm going to delete it, but you need to know what you were doing.

**MR. FOSTER:** I was closing my eyes.

**MR. LAROSIERE:** Howard, you were not.

**THE WITNESS:** Do you need coffee? You said you don't drink coffee.

**MR. FOSTER:** Do you need coffee?

**MR. LAROSIERE:** Delete that--

**THE WITNESS:** I will. I promise.

**MR. FOSTER:** --or I'm suing you. I promise.

**MR. DE PURY:** Or he's suing you.

CROSS EXAMINATION BY MR. LAROSIERE

**MR. LAROSIERE:**   Do you want coffee?

**MR. FOSTER:**   No, thank you. I don't.

**MR. DE PURY:**   You want an Adderall?

**MR. LAROSIERE:**   Want a cigarette?

**THE WITNESS:**   I have my Coca-Cola, you know.

**MR. FOSTER:**   No.

**MR. LAROSIERE:**   Do you want one?

**MR. FOSTER:**   I'm just bored.

**THE WITNESS:**   No, I think I have one.

**MR. LAROSIERE:**   All right.

**MR. FOSTER:**   No they're-- I put them in the fridge.

**MR. LAROSIERE:**   Okay.

**THE WITNESS:**   No, no. I got-- I got one.

**MR. FOSTER:**   Hang on, guys. Do you think we can stop at 5:30?

**MR. DE PURY:**   What-- that was when-- do you think it's okay for a break while I get this? You sent this to me.

**MR. LAROSIERE:**   Yeah, let's take a five-minute break.

**MR. DE PURY:**   Stretch.

**MR. FOSTER:**   I'm not like stepping in your lines.

**MR. DE PURY:**   No, you're not.

CROSS EXAMINATION BY MR. LAROSIERE

MR. FOSTER:     No but you-- you were dozing for a minute, so.

MR. LAROSIERE:     Yeah, you should be here.

MR. FOSTER:     No, no I mean, do you think we can wrap up at 5:30?

MR. LAROSIERE:     Probably not. I can definitely finish this line of questioning around then.

MR. FOSTER:     Yeah. You're a lawyer.

MR. LAROSIERE:     You're what?

MR. DE PURY:     You got a date, Howard? Are you married? I don't mean to intrude.

MR. FOSTER:     No, I'm married. I have two children.

MR. LAROSIERE:     Oh, good for you.

MR. DE PURY:     How old?

MR. FOSTER:     They're young. They're 3 and 1.

MR. DE PURY:     Let's-- why don't we go off the record real quick and then stretch.

MR. LAROSIERE:     Yeah, is that okay?

MR. DE PURY:     Yeah.

MR. LAROSIERE:     We're going to go off the record. Take a five-minute or 10-minute break.

MR. DE PURY:     That's awesome.

THE REPORTER:     We're now off the record and the time is 5:13 p.m. Eastern Standard Time. The time is 5:21

CROSS EXAMINATION BY MR. LAROSIERE

p.m. Eastern Standard Time and we are on the record.

MR. DE PURY:    All right, thank you.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

A:    Okay.

Q:    Hey Mr. Wilson, we're back on.

A:    Yes.

Q:    So, yeah, we were talking about this thing with this young lady.

A:    Yes, and the messages-- these messages.

Q:    The messages, right. So when did you find out she was 16?

A:    I'd like to say for the record that these messages, I-- I want to--

MR. DE PURY:    They're coming.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

A:    -- point out that the first Exhibit I've seen seems to have conspicuous breaks--

Q:    Mhm.

A:    --between the represented images. I find that odd, and the breaks seem to conceal time gaps.

Q:    So if you saw one without the breaks would that alleviate some of your concern?

A:    I'd like to see them without the time gaps, yes. I'd like to see the full message sequence.

Q:    And you're talking about the one minute gap, right?

CROSS EXAMINATION BY MR. LAROSIERE

**A:**    I don't mean the time gaps, only. I mean also these conspicuous breaks in the images.

**MR. DE PURY:**    Can you send these to me that in a-- well, let me see if I can drag it over here and open it up as a-- there, I just did that.

**MR. LAROSIERE:**    There you go.

**MR. DE PURY:**    Okay, that's the best I can do with-- unless you send them to me as a actual separate--

**MR. LAROSIERE:**    Was it not an attachment?

**MR. DE PURY:**    Yeah, it wasn't an attachment so.

**MR. LAROSIERE:**    Oh, my fault. Well-- that's good enough for now, I think.

**MR. DE PURY:**    That's the one you want?

**MR. LAROSIERE:**    Go ahead and pull it up.

**MR. DE PURY:**    All right.

**THE WITNESS:**    Thank you very much.

**MR. DE PURY:**    Let me know when you want me to scroll down a little bit.

**THE WITNESS:**    Oh, there's more? I see that, okay. Uh, June at 5:23. Keep going. Keep going.

**MR. DE PURY:**    You just want-- just the first one at this point or all of them?

**MR. LAROSIERE:**    Just the first one.

**MR. DE PURY:**    Yeah.

CROSS EXAMINATION BY MR. LAROSIERE

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

A:     You know, no, no I-- I don't remember this message sequence and I don't remember it that way.

Q:     Do you-- wait so-- wait, hold on. You said you don't remember it and you don't remember it that way?

A:     I think this is being offered to me as some representation that this was a Signal chat that I had with Mr. Elik. I don't remember that sequence.

Q:     So, do you remember the general context of the conversation?

A:     I remember-- let me see that Exhibit again. I remember Mr. Elik at least once asking me about the charges and I said something-- something along-- can we scroll down?

MR. DE PURY:     That's it.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

A:     Well, I don't want to-- yeah, uh, yeah. I remember-- if this was true, I remember this being a part of his line of questions about the case. Uh, but now you're telling me this is interspersed with a business conversation, which isn't impossible but this doesn't-- this doesn't match my recollection of any of the times I discussed my case with Mr. Elik.

Q:     But you're saying one of those times, the last thing there kind of fits with what you would have said?

A:     Uh, if you had shown me that message by itself and

CROSS EXAMINATION BY MR. LAROSIERE

you said, have you ever said anything like that? I would say yes, I remember saying something like that to Mr. Elik.

**MR. DE PURY:**   Do you remember saying something like she fucked like she was 18 to Mr. Ellick?

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**A:**   Yes, I think I remember saying something like that, and this may have been what I said.

**Q:**   Okay.

**MR. FOSTER:**   Just point of order, did you get this in discovery or?

**MR. LAROSIERE:**   No, we just found it.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**Q:**   So, let me ask you this--

**MR. DE PURY:**   And we just found it.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**Q:**   Do you still have those messages with Mr. Elik?

**A:**   I do not have these messages.

**Q:**   Do you have messages with Mr. Elik going back to 2019?

**A:**   Do I have any messages with him?

**Q:**   On Signal?

**A:**   No.

**Q:**   What happened to them?

**A:**   What happened to the messages? I-- I guess I can't know that they're-- they were deleted or not. You're telling me

CROSS EXAMINATION BY MR. LAROSIERE

that they were deleted.

**Q:** I don't know, I'm asking.

**A:** You're tell-- earlier in this Deposition I was told that apparently I put a time deletion on Signal at that time.

**Q:** Does that sound right?

**A:** I-- I couldn't know if I put the deletion on it at that time.

**Q:** Did you ever like--

**A:** Probably Mr. Elik and I were on-- I think he's very conscious of his privacy and the fact that he was speaking to me. It doesn't seem unreasonable to me that there would have been disappearing messages when we spoke back then.

**Q:** Right.

**A:** He was very privacy conscious.

**Q:** Okay.

**MR. FOSTER:** You said you just found these? They weren't produced to us in discovery.

**THE WITNESS:** He didn't technically say that. I said that.

**MR. FOSTER:** Just curious why they weren't produced to us in discovery.

**MR. DE PURY:** Who's we? We asked for this.

**MR. FOSTER:** I'm asking you.

**MR. LAROSIERE:** Yeah, these are-- well, you don't get to, but you'll email me afterwards and I'll tell you.

CROSS EXAMINATION BY MR. LAROSIERE

**THE WITNESS:**    This is the first time they've ever shown this or produced this to me.

**MR. LAROSIERE:**    Yep. So send me an email and you'll get a response right away, okay?

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**Q:**    So, okay. Agree that you had sex with her. We don't need to get into the details, right?

**A:**    Right.

**Q:**    Yeah.

**MR. FOSTER:**    Please mark it as a Deposition Exhibit.

**THE WITNESS:**    I'm not--

**MR. FOSTER:**    What number is it?

**MR. DE PURY:**    The first one was Exhibit A, these-- the second ones that are joined together, do you want that also, or do you want me to just send them to you?

**MR. FOSTER:**    I want to know which exhibit numbers these are.

**MR. LAROSIERE:**    Exhibit A, and you'll also get everything, okay?

**MR. DE PURY:**    It'll come with the transcript.

**MR. FOSTER:**    Yep.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**A:**    Anyway, for-- no, for the record, no, not right.

**Q:**    Which is not right?

CROSS EXAMINATION BY MR. LAROSIERE

A:      If you're saying, right, you had sex with her but we don't need to get into the details, right? Uh, no, I'm not agreeing to that.

Q:      You said earlier you had sex with her.

A:      I'm not agreeing that. I had sex with her and we need-- and we don't need to get in the details. I'm not, uh, accepting your frame. It's-- I'm being frame-mogged, right?

Q:      I'm going to be completely--

A:      Your Honor, objection. He's frame-mogging my client.

Q:      I'm going to be completely honest with you, and I don't know what mogging is.

                MR. FOSTER:     Yeah.

                (CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

A:      You're natural.

Q:      Thank you? But-- I okay, so you had sex with her, right?

A:      Who's her? You know, I think it's been asked and answered.

Q:      Yeah, I think so too.

A:      Okay? <unintelligible>.

Q:      Anyway. Right. So this young lady that you met off of Sugar Daddy Meet, at some point--

A:      That I-- that may-- I may have met her there.

Q:      Right. And at some point, you paid this woman

CROSS EXAMINATION BY MR. LAROSIERE

money.

A:      <vocalization>

Q:      About $500, right?

A:      I believe she--

MR. FOSTER:     Objection, relevance.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

A:      I believe-- look. It's been-- here's the thing. My memory of it is now more from the press than the-- you know. I have no memory--

Q:      Mm-hmm.

A:      --of giving this chick money.

MR. FOSTER:     How is this relevant?

MR. LAROSIERE:     It's in the meme, Howard.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

A:      It is in the meme. The meme, Mr. Elik says, we can discuss the founder giving the girl $500 or whatever, paying a girl for sex. Uh, I think I simply disagree with the simple proposition that I paid her for sex.

Q:      Right. But you paid her for something, right?

A:      Did I?

Q:      I'm asking.

A:      The State says I did; the State didn't prove that I did.

Q:      Did you give her any money?

A:      Did I? I have no memory any longer of giving this

CROSS EXAMINATION BY MR. LAROSIERE

girl money.

Q:    Do you remember what car you drove that day?

A:    Do I remember the car?

Q:    Mm-hmm.

A:    In this moment, uh, no. Uh, do you want me to work--

Q:    Ford?

A:    You want me to work on it?

Q:    Ford?

A:    Uh, ye-- uh, yeah. I think it was a Ford, yeah.

Q:    Do you remember who owned that car?

A:    I-- I don't know what you mean.

Q:    It's a Ford Escape, right?

A:    I guess, uh, maybe Ford owned the car. I mean, I didn't-- I certainly didn't own the car at that point, if that's what you're asking.

Q:    Ford Edge. Sorry, Ford Edge.

A:    Ah, there you go. The right car for an edgelord. Um, I think-- I think that Ford or the bank or some bank owned the car--

Q:    Mm-hmm.

A:    --at that time.

Q:    Do you remember who it was leased to or who was on the title? Is it Defense Distributed?

A:    On the title? I-- I had no title to the car at that

CROSS EXAMINATION BY MR. LAROSIERE

time. So I don't think I can answer your question--

Q:      Do you remember if it was leased?

A:      --as you asked it. I don't think I leased it from anyone.

Q:      So it was financed?

A:      It-- it must have been. I-- I suppose it was financed.

Q:      Do you remember who was financing it? Was it you personally or Defense Distributed?

A:      You'd be asking me to guess.

Q:      I don't want you to guess. I just want you to think, because you're actually kind of a car guy, right?

A:      No.

Q:      No? Don't you have a E46 BMW?

A:      I don't know what that is.

Q:      Huh?

THE WITNESS:     You mean for power, Howard?

MR. LAROSIERE:    <unintelligible>.

MR. FOSTER:    Yes. <unintelligible>.

THE WITNESS:     That's-- is that, like, <vocalization> lore.

MR. LAROSIERE:    I think it's pretty good.

THE WITNESS:     It's the one--

MR. LAROSIERE:    It's the one you have.

MR. FOSTER:    Oh, that's not the

CROSS EXAMINATION BY MR. LAROSIERE

<unintelligible>.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

A:    I have a BMW?

Q:    Don't you?

A:    No. An E46 even?

Q:    So--

A:    I don't have a BMW.

Q:    You don't have an older German car?

A:    No.

Q:    Oh. I was told you did.

A:    Well--

Q:    Something I thought we had in common.

A:    Very dangerous.

Q:    <laughing>

A:    You get told too many things, you'll exaggerate them online and then you'll get sued for RICO.

Q:    Oh. Well, we'll see how that all goes.

A:    We will.

Q:    What car do you drive?

A:    Uh, Ford F-150.

Q:    That's it?

A:    Yes.

Q:    Do you like it?

A:    Do I like it? Yes.

Q:    So you say you have almost no memory of those

CROSS EXAMINATION BY MR. LAROSIERE

events in 2018? You said your memory is more informed by what the press said about it?

A:    Yeah, you-- you just have to-- I have so little memory of--

Q:    Yeah.

A:    --of what-- of any of that stuff. So much of it is just now the reaction.

Q:    You remember the girl, right?

A:    I don't know that I could even point her out.

Q:    Yeah?

A:    I don't know that I know her face.

Q:    Really? You know her name?

A:    I swear to God. Uh, do I know her name? Gosh, I don't know what the, like, rules are for this stuff. Um, I guess I could answer that question. I know a name. I don't know if it's her name.

Q:    It's just a first name?

A:    Yeah. And I don't-- uh, I don't think it-- there-- was ever told to me what her real name was. She gave me a name.

Q:    Okay. I don't even know the name.

A:    Thank you.

Q:    Did you, at some point, become aware that this woman had talked to the police concerning your interaction?

A:    Yes. It would have been after my indictment, I think.

CROSS EXAMINATION BY MR. LAROSIERE

**Q:** That was when you first became aware?

**A:** That she had spoken to the police.

**Q:** Mm-hmm.

**A:** I don't know if that's when I first became aware of it. It seems to be when I knew that she had spoken, that the actual police had interviewed her. Yeah.

**Q:** Uh-huh. Okay. Wilson, did you have any mutual friends with this person?

**A:** No.

**Q:** No?

**A:** No.

**Q:** Okay. So at what point did you go to Taiwan?

**A:** In this sequence of events?

**Q:** No, I'm asking you when.

**A:** Man. I don't even have the date here, man. It would have been September 2018. I think September.

**Q:** Why were you going there?

**A:** Why was I going to Taiwan? Let's see. Um, I-- it was a part of a progression, of a series of places I was going.

**Q:** Mm-hmm.

**A:** Okay.

**Q:** Just to visit?

**A:** Just to visit? No, I needed a-- there was some business I was conducting there. And I had a virtual office.

**Q:** Mm-hmm.

CROSS EXAMINATION BY MR. LAROSIERE

**A:** And I spoke to some suppliers.

**Q:** So when you were interrogated-- not interrogated. When you were--

**A:** I was.

**Q:** No, when you first went in, right? When you went through what their version of customs is.

**A:** Uh-huh.

**Q:** What did you tell them you were going there for?

**A:** Uh, I told them about the business stuff.

**Q:** You didn't tell them you were a student?

**A:** Not at customs, no.

**Q:** No? What did you put on your passport?

**A:** Gosh. What did I put in my passport?

**Q:** Mm-hmm.

**A:** I don't know if I put anything in there. Are you saying I travel on a student visa? Are you asking me if I travel on a student visa?

**Q:** Nope.

**A:** I don't know that I put anything in my passport.

**Q:** Oh, the visa, yeah. What visa was it under?

**A:** Again, it seems that, uh, I guess I can't recall.

**Q:** Can't recall?

**A:** It would have either been a-- a-- a tourist visa. Probably the easiest way to go to Taiwan is a tourist visa.

**Q:** Mm-hmm.

CROSS EXAMINATION BY MR. LAROSIERE

**A:**     I no longer have the-- the passport. I-- I don't recall.

**Q:**     Where'd you stay when you were in Taiwan?

          **MR. FOSTER:**     Uh, objection, relevance.

          (CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**Q:**     Go ahead.

**A:**     I-- I think I see where-- why this might come up. Where did I stay? I stayed at a series of hotels while I was in Taiwan.

**Q:**     Mm-hmm. A series of hotels?

**A:**     Yes.

**Q:**     So how long did you make these bookings for? Like, five days, a week, two weeks?

**A:**     I had an open-ended booking. I'm struggling for names of these hotels.

          **MR. FOSTER:**     How is this relevant?

          **MR. LAROSIERE:**     Your objection's noted.

          **MR. FOSTER:**     How is it relevant?

          **MR. LAROSIERE:**     Your objection's noted.

          **MR. FOSTER:**     I know that. And if it's not relevant, then--

          **MR. LAROSIERE:**     Howard, we're getting into speaking objections--

          **MR. FOSTER:**     Well, I'm allowed to instruct the Witness not to answer and bring a motion for a protective

CROSS EXAMINATION BY MR. LAROSIERE

order if I believe that is the correct procedure. If you told me how it's relevant, that would help.

**MR. LAROSIERE:**    I want you to remember this morning's testimony.

**MR. FOSTER:**    I remember.

**MR. LAROSIERE:**    Okay. So you should know what this is about.

**MR. FOSTER:**    What about this morning's testimony?

**MR. LAROSIERE:**    He also admitted-- Howard, you have to stop.

**MR. FOSTER:**    No, I don't have to stop, Matthew. I'm not going to stop. So if you can't explain to me how it's relevant, we're going to be back where we were with the Ashley Madison thing, where--

**MR. LAROSIERE:**    This is a personal Deposition. You can ask anything, okay?

**MR. FOSTER:**    Even if it's irrelevant?

**MR. LAROSIERE:**    No. You can ask irrelevant things at his Deposition. This is relevant, and you'll see in two questions why. Okay?

**MR. FOSTER:**    If it's not relevant, I'm going to move for a protective order--

**MR. LAROSIERE:**    It's very relevant.

**MR. FOSTER:**    --to block it.

CROSS EXAMINATION BY MR. LAROSIERE

**MR. LAROSIERE:**    It's very relevant.

**MR. FOSTER:**    I may do that. So I want you to just tell me how it's relevant.

**MR. DE PURY:**    Howard, what are the rules, as far as--

**MR. FOSTER:**    No, you tell me how it's relevant.

**MR. DE PURY:**    We don't have to. We don't have to.

**MR. LAROSIERE:**    I'm not going to spoil the line I'm doing--

**MR. FOSTER:**    If you're going--

**MR. LAROSIERE:**    --because of your unsupported objection, Mr. Foster.

**MR. FOSTER:**    If you--

**MR. LAROSIERE:**    So just let me-- as an officer of the Court, I'm going to tell you that you will understand the relevance very shortly, okay?

**MR. FOSTER:**    All right. Let's see it.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**A:**    You'll have to remind me of the current question.

**Q:**    It was how long you-- I think you said it was open-ended. Was that the end of your answer?

**A:**    The question was how long were my bookings?

**Q:**    Yeah.

CROSS EXAMINATION BY MR. LAROSIERE

**A:** To the best of my knowledge, it-- it's hard-- it's hard for me to say.

**Q:** Mm-hmm. But earlier you said they were open-ended, right?

**A:** Yes. I believe my first reservation was open-ended--

**Q:** Mm-hmm.

**A:** Kind of like today. Like, I-- um, I didn't renew at the Hilton, so they had all my shit-- my shit removed. Um--

**Q:** Okay. That's fine. So earlier you said that you voluntarily left Taiwan; is that right? You remember that testimony?

**A:** I surrendered. Mm-hmm.

**Q:** That's different from what you said earlier, isn't it?

**A:** I don't think it is. The diplomatic situation in Taiwan requires us to all be very careful about what we did and didn't do, what the American authorities did and didn't do, and what the Taiwanese authorities did and didn't do. So I was ushered into a situation to be told very carefully about what it was that everyone around me was doing, what I had agreed to do in advance.

**Q:** I'm a little confused. You said earlier you said you came back voluntarily on a line or something like that.

**A:** Yes. I made contact through my attorney with the

CROSS EXAMINATION BY MR. LAROSIERE

Travis County DA and made arrangements to surrender at a certain place and time.

**Q:**     In Taiwan?

**A:**     Yes.

**Q:**     Okay.

**A:**     But not to American authorities.

**Q:**     Right, yeah. Right.

**A:**     It's all very complicated.

**Q:**     Yeah. Okay.

**A:**     So I guess I'm saying this because on the-- to the record it looked like I was some kind of fugitive trying to flee from, you know, those pursuing me or something. That was not the scenario.

**Q:**     Yeah, I don't know if I've said that.

**A:**     No, no. I'm only saying it for the record.

**Q:**     Mm-hmm, yeah, no. And the only reason I was asking you about this was because of the--

            **MR. FOSTER:**    I still don't see the relevance. You said I would see it in a minute.

                    (CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**A:**     Maybe one more question.

**Q:**     One more?

**A:**     I'm rooting for you.

**Q:**     I was impeaching him, and then he fixed the earlier testimony just now.

CROSS EXAMINATION BY MR. LAROSIERE

**MR. FOSTER:**    I still don't see the relevance.

**THE WITNESS:**    But I think maybe he was getting to where he could impeach me.

**MR. FOSTER:**    Oh, got it.

**MR. LAROSIERE:**    And then he cut me off by saying what happened.

**MR. FOSTER:**    Even though he's trying to impeach you, and maybe he did, the whole Taiwan thing, I don't see the relevance.

**MR. LAROSIERE:**    Okay, so how about I try this.

**MR. FOSTER:**    <vocalization>.

**MR. LAROSIERE:**    So around that--

**MR. FOSTER:**    You won't tell me how it's relevant to the case.

**MR. DE PURY:**    There's no one wearing a black robe in this room, so us arguing relevance doesn't matter.

**MR. FOSTER:**    But I may bring a motion for protection.

**MR. DE PURY:**    Well, that's fine. Your objection's noted. It's on the record.

**MR. FOSTER:**    I can instruct him--

**MR. LAROSIERE:**    And you won't stop talking.

**MR. FOSTER:**    --not to answer.

**MR. LAROSIERE:**    Well, it's answered, it's

CROSS EXAMINATION BY MR. LAROSIERE

done.

MR. DE PURY:    <unintelligible>.

MR. FOSTER:    I can instruct not to answer any more questions.

MR. LAROSIERE:    We're done about Taiwan, Howard.

MR. FOSTER:    We are?

MR. LAROSIERE:    Yes.

MR. FOSTER:    All right.

MR. LAROSIERE:    He got to the end of the story, which is his coming back.

MR. FOSTER:    All right.

MR. LAROSIERE:    And so.

THE WITNESS:    His homecoming.

MR. LAROSIERE:    All right, that's fine, so we're done with Taiwan.

MR. FOSTER:    All right.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

Q:    Um, so around the same time, I mean, was that late '18 still, during your homecoming?

A:    I think it was September; it was all like the same month.

Q:    September of '18?

A:    To the best of my--

Q:    Yeah, it's okay. You don't have to be exact. But so

CROSS EXAMINATION BY MR. LAROSIERE

around that same time you stepped down from your positions at your companies; is that correct?

A:     Yes, now I do remember this.

Q:     Yeah.

A:     Yes.

Q:     Why'd you do that?

A:     I thought it made sense to do it.

Q:     Why?

A:     Why would it make sense to do it?

Q:     Yeah.

A:     Well, I figured my indictment would last quite a while and I didn't want it to interrupt or interfere with, you know, the work of my company, active litigation of my company. And I felt at that time someone could--

Q:     Use it against you, basically?

A:     Uh, I just-- look, I have-- I've always been surrounded by attorneys and I asked everyone what they thought I should do, and it was a careful decision. It was not like a knee-jerk decision.

Q:     Mm-hmm.

A:     And I guess to some degree it was about, you know, also kind of reflecting, like, some type of sobriety or, uh, continuity of the company for the digestion in the public press.

Q:     What that last part, sobriety and continuity of the

CROSS EXAMINATION BY MR. LAROSIERE

company?

A: Yeah, yeah, yeah, like, uh, it makes sense for a company to, uh, make these kinds of corporate moves, do a press conference, announce a resignation. You know, not necessarily change the subject but kind of make some kind of positive statement that would be carried in the press about what it intends to do, how it's dealing with Mr. Wilson, things like that. It seemed to be, um, intelligent.

Q: So this was for the press?

A: No, no. I mean, press is certainly a factor, right? Like, you want-- you don't just want to do it. You need there to also be a witnessing of it being done. It was also a good decision to do it, but, of course, like, there was this firestorm of this media. So the media was a consideration in those decisions.

Q: We're just going to take a step back and talk about now the consequences from your interactions with the young lady.

A: Uh-huh.

Q: Aside from the Texas County Court complaint or whatever it was.

A: The State of Texas?

Q: Yeah, State of Texas complaint. Are there any others that stand out to you?

A: The consequences?

CROSS EXAMINATION BY MR. LAROSIERE

**Q:**     Yeah.

**A:**     Well, manifold. In fact, so many it would be hard to take their measure.

**Q:**     Can you maybe give the three that stand out in your mind as, you know, particularly impacting?

**A:**     I guess the biggest one would be-- you want me to make a top three--

**Q:**     Sure.

**A:**     --ranking? Uh, I guess it permanently-- like, when you-- it will always be attached to my name and the company. I think it will always be a matter of knowledge, a matter of-- what's the right way to say it?

**Q:**     Not sure.

**A:**     You know, it's like-- uh, it's just a permanent dimension of-- gosh, it's-- it's affected 3D guns. I mean, it's, like, this thing that kind of cast 3D guns in this more suspicious direction, where I had this success beforehand of kind of representing 3D guns as having a different character. That's probably the number one biggest thing, like-- and I hear it in the depositions in this case too, like, well, we don't like him so much because he gives 3D printing a bad name. That's probably number one, but I think you're asking me about personal consequences.

**Q:**     So if that's number one, what's number two the same way you're formulating in your head right now?

CROSS EXAMINATION BY MR. LAROSIERE

**A:**     And you say consequences, this is what we're talking about?

**Q:**     Yeah.

**A:**     Well, I hate to rate my own legal difficulties so highly, but of course I think it biases my, you know, fortunes in the courts, and I think that's one of the more consequential things, because at least at the time, it had threatened a couple major cases. At least, that was our perception. And I worry about the state of gun laws, and I didn't want to affect it negatively, so I worry that on some level, I-- I made it easier where some cases at the margin, you know, a judge could have looked at the case and said, oh, this is that crazy criminal 3D gun guy, and that would have maybe made the difference. I can never know, but I still worry that that's maybe the second most consequential thing. There were a lot of lawsuits that we had in the immediate, like, year, two years.

**Q:**     I remember that time, yeah.

**A:**     A lot. Um, you want me to to list a third?

**Q:**     Yeah, just one more, yeah.

**A:**     Uh, I don't know. I think you pay a soul tax for that kind of stuff.

**Q:**     What do you mean, a soul tax?

**A:**     I think you pay a-- I think you pay a price when you-- you pay a personal price, and I guess I'd have to rank that highly.

CROSS EXAMINATION BY MR. LAROSIERE

Q:     So is that, like, a reference to something, a soul tax or?

A:     I mean, you see it around. I've seen the words around. I don't think I'm referring to anything in particular.

Q:     You mean it just hurts personally?

A:     Yeah, yeah. I think you-- you know, there are events in your life that there's before and there's after?

Q:     You know, something that you keep thinking about going forward? Is that like soul tax?

A:     Sure, whether you keep thinking about it or not, but I think a soul tax is itself, it implies the karmic-- it implies-- you know, it implies some kind of debt, even if tax is not exactly the word, uh.

Q:     Is that you saying it just taxes you generally?

A:     No, I'm just saying the consequence is it led to an inevitable reform of character and a kind of wilderness, mental wilderness at times, and a total departure from the philosophical aesthetic track I was on onto another one, and I think I'm a different person now because of what happened. And it's a huge consequence.

Q:     Do you think you're a bad person?

A:     I'm not saying that.

Q:     I'm just asking, like looking back. I'm not saying because of what happened, I'm just saying, do you think the whole experience--

CROSS EXAMINATION BY MR. LAROSIERE

**A:**     I'm not going to make value judgments. I just am a different person because it happened, and there are things like that in your life, especially when you're young, you don't understand that you become a different person.

**Q:**     Yeah. How old were you at the time? You're in your late 20s?

**A:**     Uh, 29, 30.

**Q:**     Yeah, that must have been just really shocking. Would you say it affected your relationship with your parents?

**A:**     Oh, absolutely--

**MR. FOSTER:**     Objection.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**A:**     --absolutely. Of course-- of course it did.

**Q:**     This is just going to be a bunch of quick ones like this.

**MR. FOSTER:**     How is it relevant?

**MR. LAROSIERE:**     You'll see, Howard. State your objection for the record. And also, relevance is not an objection under a deposition.

**MR. FOSTER:**     It is.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**Q:**     Look it up. Did this affect your relationship with other close family members?

**A:**     I think that's the same-- oh, because you asked parents first.

CROSS EXAMINATION BY MR. LAROSIERE

**Q:**      Like siblings?

**A:**      I-- I suspect it did. I mean--

**Q:**      They start to, like, kind of push you back a little?

**A:**      I never felt that way.

**Q:**      Okay.

**A:**      But again, I always interpreted that itself as a kind of charity on their part, like a hospitality. You know, it's-- you begin to be-- uh, you know, it's probably like experiencing, uh, discrimination or something in America. You always begin to kind of second guess, well, why is someone behaving this way toward me? Is it that they feel this way about me, that way about me? You begin to second guess your own interactions. That's not necessarily evidence that someone's treating you differently.

**Q:**      Is that part of the soul tax? Like, you might start thinking, are they being nice to me because they're raking coals or something like that?

**A:**      I think it is, yeah. I mean, I think it is.

**Q:**      Yeah. Same thing with your friends?

**A:**      Uh, we can include-- yeah, I think we can include all those people in it.

**Q:**      What about your business partners?

**A:**      My business partner. I don't know that I have any business partners. Oh, you mean third parties that do business

CROSS EXAMINATION BY MR. LAROSIERE

with me?

Q:     I don't know. I'm using the term generally, business partners, you know, Ben Denio, you know, the people, like, that work closely with you in your business?

A:     I don't think it would be-- it's not true to have ever called Ben Denio a business partner.

Q:     Yeah.

A:     Um, uh, Ben Denio is probably the exception that proves the rule. I don't think it affected things with him, but he's just--

Q:     He was steadfast?

A:     I think he's one of these odd birds like the rest of us.

Q:     Right. Did it affect your business?

A:     I think-- yes, especially the media surrounding the event and, like, the immediate aftermath of the event. It did affect the business, but as I've described, it affected it in this kind of perversely positive way.

Q:     Perversely positive? How do you mean?

A:     Well, you shouldn't-- I think in times like that, it's almost an embarrassment to be rewarded, you know? And that seemed to be, like, the-- the judgment of the market, like, oh, we need to get in line, we need to buy this guy's product, or, they're trying to put this guy down.

Q:     Mm-hmm.

CROSS EXAMINATION BY MR. LAROSIERE

A:     You know, and it-- it's the way the Internet works, it's like this-- uh, there's just this perversity to the Internet economics, the economics of, uh, prominence.

Q:     Mm-hmm. So have you seen a lot of people online saying that what happened to you was, like, a setup?

A:     I used to see that.

Q:     Yeah. What do you think about that? Do you think there's any truth to that?

A:     I don't know. I doubt it, but it's probably my own bias because you don't want to believe you were set up. You know what I mean?

Q:     I don't really know what you mean. I would feel like that would kind of help.

A:     Exactly, but, you know, we have to fight those things that help us. I think in our heart of hearts, most people want to feel like they're conscious agents and that they're somehow responsible for things that happen to them in life.

Q:     Mm-hm.

A:     And that isn't-- there isn't actually some opposing force that can overwhelm them, and it-- it helps make narrative sense of the things that happen to us.

Q:     Yeah, that there's not some grand conspiracy against them.

A:     Yeah. I want to believe-- and look, these are the

CROSS EXAMINATION BY MR. LAROSIERE

days of the American conspiracy. It's pretty scary.

Q:    Mm-hmm.

A:    Uh, I still want to believe that there was no conspiracy, you know, behind what happened.

Q:    You want to believe, but what do you believe in your heart of hearts?

A:    In my heart of hearts, I think it's a simple story about some stuff in Texas, and I think it was easily exploitable by the powers that be. The timing was exquisite.

Q:    Mm-hm.

A:    Nevertheless, I know it makes me sound like a-- a stooge, but nevertheless, I think it was mostly coincidental.

Q:    I don't think that makes you sound like a stooge, but.

A:    In these times, kind of makes you sound like a-- the normie.

Q:    So the complaint talks about the exit interviews with the customer. Do you remember that?

A:    I don't remember if the complaint talks about the exit interviews.

Q:    Specifically it mentions exit interviews and then Collier and Goldhapper.

A:    Would you mind showing me this line?

Q:    Sure. Just to refresh your recollection.

A:    I appreciate it.

CROSS EXAMINATION BY MR. LAROSIERE

Q:      Paragraph 67. There you go.

A:      Thank you. Paragraph 67?

Q:      Mm-hm.

A:      Uh, I'm going to read it one more time.

Q:      Mm-hm.

A:      Okay, I've read it.

Q:      So-- sorry.

A:      No, you're fine. In fact, it may be mine, I don't know.

Q:      So this says, interviews with former customers of the Defcad site confirmed multiple customers specifically stopped doing business with DEFCAD through the site because of the Fedcad meme and related misinformation propagated by the Defendants. So what are those interviews? Do you remember?

A:      Am I being asked if I personally remember, or?

Q:      You've got one brain in your head, man. I'm asking, what's in there?

A:      I'm only asking if I'm being asked as the representative of my companies or in a personal capacity.

Q:      Just asking you what's rattling up in there.

A:      I wonder. Uh, can you restate the question?

Q:      Sure. So you read the paragraph, right?

A:      I just read it.

Q:      Yeah. Do you know what it's talking about with interviews?

CROSS EXAMINATION BY MR. LAROSIERE

**A:**     Uh, yes, I suspect I do.

**Q:**     What are those? Like, what are they?

**A:**     I think it's referencing a set of exit interviews conducted over a period of time, and probably communications with third-party partners. It seems to be suggesting those two. There's two different--

**Q:**     The exit interviews are kind of like when you unsubscribe from an email, you can state the reasons, right?

**A:**     It's not-- it's not dissimilar to that. The conditions are more narrow. It's-- it's not like every person who unsubscribes gets an exit interview.

**Q:**     And then the other one would be actual conversations, right? Like, the other category you're talking about?

**A:**     Uh, I'm-- I'm tempted to say yes, but I don't mean to say by saying yes.

**Q:**     You think so?

**A:**     That the interviews are not somehow actual interviews. Your emphasis on the word actual just, I don't know, for some reason it kind of raised a flag for me.

**Q:**     No, I just meant like a conversation, back and forth?

**A:**     Yeah, the word actual, though, you know, to me is like, well, the interviews are actual interviews, the conversations are actual conversations.

CROSS EXAMINATION BY MR. LAROSIERE

Q:      I think I understand what you're saying. I think we can dive into that more tomorrow. Let me go through, let me just look and see if there's anything else in my notes I have to button up your personal. You said that it's not everybody who's leaving gets the interview?

A:      I think I said not everybody who unsubscribes gets the interview. We can read it back if you want.

Q:      So who does get them?

A:      Uh, currently, and I think for the entire life of the exit interviews, you get an interview if you make the positive choice to leave. Which is itself maybe not even the primary way people leave.

Q:      What do you mean?

A:      As I understand it right now, you have to take some positive step to leave or to unsubscribe.

Q:      Right, because it's automatically billing, right?

A:      Unsubscribe's probably the right word.

Q:      Cancel?

A:      Yes, I think what triggers the exit interview is, like, a positive action, um, that the subscriber or the Defcad account holder takes.

Q:      I guess, could you do me a favor in your preparation for tomorrow?

A:      That'd be a good thing to do.

Q:      Yeah, know that a little better, because I'm

CROSS EXAMINATION BY MR. LAROSIERE

curious about how that works.

A:      I'm going to know that better for you.

Q:      Okay, this is important.

A:      Mm-hmm.

Q:      I think it's important for you, right? Because you've got three businesses that are in this case.

A:      Mm-hmm.

Q:      But you own more than that. Which are the-- I don't think you're going to like this question, but I'm going to ask it anyway.

A:      Mm-hmm.

Q:      Which are the ones that drive the most revenue for you of your entities?

A:      For me personally?

Q:      Sure.

A:      Well, the only business that pays me is Defense Distributed, so it would be Defense Distributed.

Q:      That's it?

A:      That pays me?

Q:      Yeah.

A:      Yeah.

Q:      You don't benefit in some other way from any of the other ones?

A:      Well, hold on now.

Q:      Oh, okay. No, that's a bad question. I take it

CROSS EXAMINATION BY MR. LAROSIERE

back, don't answer it. Because there's all kinds of ways you benefit, I'm sure.

**A:**     I don't know.

**Q:**     Even psychically. But--

**A:**     You gotta pay that tax somehow.

**Q:**     So the only one you get money or property from is Defense Distributed?

**A:**     Um, yes, I'm a payrolled employee of Defense Distributed.

**Q:**     How much does it pay you per year?

**A:**     Uh, $70,000 a year.

**Q:**     Does it go up and down?

**A:**     No, it's been kind of right at 75 or 70 for, like, four years.

**Q:**     I'd say that's fairly modest. Is it because you--

**A:**     You'd say it's modest?

**Q:**     Well, I mean, I think you could pay yourself more. Is that because you--

**A:**     I don't feel like I could pay more.

**Q:**     No?

**A:**     The payroll's too big as it is.

**Q:**     You got a lot of payrolled employees?

**A:**     I just feel like the payroll itself is too large. Like, the employees that I have soak up enough of the free revenue.

CROSS EXAMINATION BY MR. LAROSIERE

**Q:** That you don't want to bogart it?

**A:** I don't know what that means. I've heard that before.

**Q:** You don't want to hog it all for yourself, so to say?

**A:** No, no, no. It's more like you got to stay profitable.

**Q:** Right.

**A:** And you need-- you actually need work to get done. It can't just be this thing--

**Q:** Right.

**A:** --with jobs for other people.

**Q:** Right.

**A:** And that's always the problem in this-- in this company, uh, people think they've signed up for activism or--

**Q:** You have that a lot with your employees, they think they can just think really hard and--

**A:** I don't know, yeah. I mean, that's a consistent theme when you hire a libertarian.

**Q:** Yeah.

**A:** You know?

**Q:** Trust me, I know.

**A:** I'm sure you do.

**MR. DE PURY:** Hey, I only booked this till 6:00 tonight.

CROSS EXAMINATION BY MR. LAROSIERE

**MR. LAROSIERE:**   Okay, well, I'll be done.

**MR. DE PURY:**   Yeah.

**MR. LAROSIERE:**   I'll be done.

**MR. DE PURY:**   That's--

**MR. LAROSIERE:**   It's 6:00 now?

**MR. DE PURY:**   Yeah, that's what I'm--

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**Q:**   Well, give me just another second. So you only get paid in US currency, you don't get paid in crypto from your company?

**A:**   That's right.

**Q:**   Never?

**A:**   Never.

**Q:**   Defense Distributed, does it own Defcad?

**A:**   Man, that's a hard question.

**Q:**   Yeah.

**A:**   I guess I can answer more confidently tomorrow.

**Q:**   So are the other two-- I just want to make sure the ones that we're thinking about are all going to be covered tomorrow.

**A:**   I suspect they will be. I mean, the Plaintiffs.

**Q:**   Right, right.

**A:**   You can elect-- you can elect to tell the State sometimes if a company's a related company, a closely held company, or other kinds of things like this. I've asked for

CROSS EXAMINATION BY MR. LAROSIERE

advice on this over the years. I think I've designated it different ways.

Q:    There's one last thing if we have a couple more minutes. I'm sure you've read that Southern Poverty Law Center about your Bitcoin thing article, right?

A:    You're saying there's an article about my Bitcoin?

Q:    Yeah, the title was, Cody Wilson's on the run in Taiwan with 1 billion in Bitcoin, or whatever it was?

A:    I don't think it said that. I-- I don't--

Q:    Or a million, something like that.

A:    I don't know.

MR. FOSTER:    Can you show it if it's <unintelligible>--

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

A:    <crosstalk> That sounds like it-- a million sounds like what they'd say.

Q:    Yeah.

A:    I'm sure that no one accused me of being a-- a billionaire.

Q:    Yeah. Do you remember that?

A:    Only-- only vaguely.

Q:    Yeah.

A:    It was-- it probably was in a-- while I was in Taiwan.

Q:    Right. I'll show you the article, and they do

CROSS EXAMINATION BY MR. LAROSIERE

this-- so you'll remember that one, right?

A:     Can you go up?

MR. FOSTER:     Have I seen it?

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

A:     You know, in general, I-- sure, this is among the kind of more high-profile or memorable articles. I-- I have memory that this was an article at the time.

Q:     Right. Do you remember the things they said in there?

A:     You'll have to help me remember.

Q:     So the thing I'm getting to is these accounts.

A:     Uh-huh.

Q:     They've all went together in this account. Did that happen?

A:     Huh. I don't know if I've ever seen this photo.

Q:     No?

A:     No.

MR. FOSTER:     Is that an exhibit?

MR. LAROSIERE:     I'm showing him the article.

MR. FOSTER:     You don't want to make it an exhibit?

MR. LAROSIERE:     We don't want to waste time.

MR. FOSTER:     Exhibit number or--

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

A:     Uh, you know, I remember that there was, like, an

CROSS EXAMINATION BY MR. LAROSIERE

intelligence unit kind of chasing me around. SLPC had an intelligence unit, I don't know if they have it now. And I remember them.

**Q:**    They don't have that much right now.

**A:**    No, no, I-- I understand they're being sued, but their endowment's huge. I mean, I think they still have something like this. Um, and I remember conversations with people about, like, where-- you know, where are they getting this information, how are they, you know, determining all this stuff? Uh, I think the problem with this characterization is that they somehow said, well, this-- this went to me, I took this money, the timing to them made sense. But to me, I always-- I always dismissed it because the timing doesn't actually make sense. It only makes sense if you're SPLC and you want to see it as a, oh, Cody Wilson knew he'd go on the run, and so in August of 2018, he embezzled a lot of money or something. But I didn't know I was in trouble until, I don't know, September of 2018. So the whole order doesn't make sense.

**MR. FOSTER:**    Yeah, so I got 60.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**A:**    What they were-- what they thought they were looking at is different from what was happening, which was a-- a fundraiser we were doing for our lawsuits against the State Department and all these other state attorneys general that were suing us. This, I think, was an unfair piece of journalism

CROSS EXAMINATION BY MR. LAROSIERE

trying to motivate the State to go, you know, chase me down or something. Like, oh, he's on the line, he's stolen a bunch of money. It was a-- it was meant to kind of accentuate-- and I think-- I think they probably took a lot of creative liberties with-- with what they did there, so I-- I can't say no-- I can't say yes that that happened. I don't believe that it happened the way they described it.

Q:    You don't believe that it happened the way they-- because they're describing it as, he took all this money to--

A:    Yeah. To me, the timing doesn't make sense. I didn't-- listen, I wasn't like, you know what I'm going to do? I'm going to steal a bunch of money from my own company, then I'm going to go fuck this girl and then I'm going to run away. It doesn't make any sense.

Q:    What you're saying makes sense. That was August 16th, 2018, that's when there's, like-- and again, this is the SPLC.

A:    That would be really close to, like, the, uh, alleged events. In fact, it-- it-- it looks-- it makes it look even crazier. It's like-- I-- I just don't-- that is not what happened, and so no, it's SPLC, it's, like, come on, who's-- of course SPLC's gonna say some shit like that.

Q:    Right. But these transactions, they happened. It's just not what what they say it was for.

A:    I-- I can't represent here that the transaction I'm

CROSS EXAMINATION BY MR. LAROSIERE

looking at happened with the wallets. They're saying Patreon-- I don't recall ever having a Patreon wallet or however <unintelligible> I think what they've done is they did some chain analysis, and in early 2018, chain analysis is not what it is today. So they associated a bunch of transactions and said, well, this must be his, you know, universe of Bitcoin wallets or something. But that does not reflect the reality of, uh, what was going on at the time.

**Q:** Your indictment was August 15th, 2018.

**A:** Right, but how would I have known that?

**Q:** I don't know how it works in Texas. But I understand what you're saying.

**A:** I think I was pocket warranted. I mean, I didn't even know.

**Q:** Mm-hmm.

**A:** I-- it was in the month of September, and I think the New York Times broke it to me. The first time anybody said anything to me was a reporter from the New York Times. While I'm in Taiwan, I get a voicemail saying that, you know, Austin has had a surprise press conference and blah, blah, blah, did you do it? First I'd heard of any of it.

**Q:** It's interesting. But you're saying that whatever this is, most of this activity is for a fundraiser?

**A:** No, I'm not saying that.

**Q:** Okay.

CROSS EXAMINATION BY MR. LAROSIERE

**A:** I-- I believe that's what they captured. I believe--

**Q:** Do you remember a fundraiser happening around that time?

**A:** Yeah, we were asking for money to fight all these states that were suing us.

**Q:** Okay.

**A:** As-- as you feel the weight of it.

**Q:** That's fine.

**A:** I believe--

**MR. FOSTER:** I'm not going to turn it on you.

(CONTINUING CROSS EXAMINATION BY MR. LAROSIERE)

**A:** In fact, here-- here's my prime theory about this, 'cause it seems that they-- you know, they want to use this term consolidating. I-- I've heard you use it too, consolidated.

**Q:** I don't think you've heard me use it.

**A:** You're right. Have I ever heard you say it? I guess you could say it, and then I could say I heard you say it.

**Q:** Would you like me to?

**A:** If you want. Uh, anyway, my theory about this is related to Bitcoin Cash. At the time, in 2018, you could take a wallet and you could reseed that wallet, and you could create new tokens out of your Bitcoin tokens. I believe a lot of what they sh-- what they actually captured here was us moving some

CROSS EXAMINATION BY MR. LAROSIERE

of that Bitcoin to create the Bitcoin Cash for the fundraiser. They created-- I don't know.

Q:     It makes it more liquid?

A:     No, no, no. I'm simply saying we created out of nothing, out of the exist-- but in order to do that, the only way you could do it would be to move, uh, to a new wallet or, like, reseed the wallet or something. This is all beyond. Uh, I believe that's what they captured, because we were conducting a fundraiser at that time. So we created that money from our own money, but it makes it look like we moved the money to somebody, but that's simply just on-chain activity or-- again, I-- I highly, highly discount the way they painted it.

Q:     Yeah, there's certainly a bent to the article. Give me one second, hopefully I have some good news for you.

A:     For me?

Q:     Yeah.

A:     I don't think I'm within my rights to conclude this.

Q:     Well, let me ask you one other question. Earlier today, when you were at the very beginning, you were talking to Mr. De Pury about this action and stuff like that, and you were talking about a settlement. So let me talk to them for two minutes.

**MR. DE PURY:**     Yeah.

**THE REPORTER:**     Counsels?

CROSS EXAMINATION BY MR. LAROSIERE

MR. LAROSIERE:    Yeah.

THE REPORTER:    The voice was gone first, and now I cannot see the deponent.

MR. LAROSIERE:    Uh-oh. Oh, when you blow stuff up, did-- hold on. Oh, because he closed the laptop.

MR. DE PURY:    This one, let me--

MR. LAROSIERE:    Uh, oh.

MR. DE PURY:    Oh, I--

MR. LAROSIERE:    You're right.

MR. DE PURY:    Yeah. Let's see if it-- let me go back to-- well, he's still sitting right there. Let me see if I can figure out what happened here. The USB cable, this is what I'm thinking happened.

THE WITNESS:    Yeah, I think that's right.

MR. LAROSIERE:    Talk amongst yourselves. Where's that coming from?

MR. FOSTER:    You have a scheduled flight home tomorrow?

THE WITNESS:    Yeah, I-- I think I do, but--

MR. DE PURY:    Can you see him now?

THE WITNESS:    I get the sense I'll probably miss it.

MR. DE PURY:    Right, you got a good picture now, right? And good audio?

MR. FOSTER:    <unintelligible> Well, I

CROSS EXAMINATION BY MR. LAROSIERE

wouldn't count on it. Well, you're not gonna count on it.

THE WITNESS:    I think mine's around the same time.

MR. LAROSIERE:    All right. Nothing further. We're all done for the day, for the day.

MR. FOSTER:    Okay, guys. We'll be back at 9:00 tomorrow morning.

MR. LAROSIERE:    Okay, do you want to--

THE REPORTER:    Counsels?

THE WITNESS:    Yeah, 9:00 is fine.

MR. LAROSIERE:    We're going to wrap it up for the day.

MR. DE PURY:    Do you want to start a little earlier?

THE WITNESS:    Hell no.

MR. LAROSIERE:    No, I usually wake up at 11:00.

MR. FOSTER:    The explains a lot.

MR. LAROSIERE:    I go to bed at 2:00.

MR. DE PURY:    I didn't think you slept at all.

MR. FOSTER:    Damn, bro. Yeah, you can't--

MR. DE PURY:    Are you able to--

MR. LAROSIERE:    No, I mean, look at me.

THE WITNESS:    No, you-- you'll be-- been

CROSS EXAMINATION BY MR. LAROSIERE

looking at you. I heard you talking about starving yourself the other day.

MR. LAROSIERE:    <crosstalk> <unintelligible>

THE WITNESS:    I'm saying I think you know how to modulate. It's more like that's <unintelligible>.

MR. LAROSIERE:    Well, once this is all over, I do want to ask you how to--

THE WITNESS:    Uh-huh.

MR. LAROSIERE:    How I should look more like that.

THE REPORTER:    Counsels?

THE WITNESS:    Right now, yeah.

MR. LAROSIERE:    Go ahead.

THE WITNESS:    What is it? Don't--

THE REPORTER:    Counsels.

THE WITNESS:    Hey, guys, I gotta--

THE REPORTER:    Counsels?

MR. LAROSIERE:    No, but you work out.

THE WITNESS:    Yeah, I think if you work out a little bit. I think--

MR. LAROSIERE:    And you probably work out in a way that's fun which is the problem.

THE REPORTER:    Counsels, this is the Digital Reporter.

MR. LAROSIERE:    Yes, go ahead.

CROSS EXAMINATION BY MR. LAROSIERE

MR. DE PURY:    Did you tell him we're off-- we're done?

THE REPORTER:    Before we conclude for today, I just need to clarify a couple of spellings.

MR. LAROSIERE:    Okay, go ahead.

THE WITNESS:    Oh, shit.

THE REPORTER:    The first one is Thomas Odom.

MR. DE PURY:    I got it Cody, that's good.

MR. LAROSIERE:    Odom, O-D-O-M. Yeah, Thomas, common spelling, Odom, O-D-O-M.

THE WITNESS:    Well, I'll-- I'll help you out.

THE REPORTER:    And there was a term used as RICO claim.

MR. LAROSIERE:    R-I-C-O, RICO.

THE WITNESS:    Capital.

MR. LAROSIERE:    All capital. It's an acronym.

THE REPORTER:    And there's a name, Erin Galloway.

THE WITNESS:    What's that?

MR. DE PURY:    Erin Galloway?

THE WITNESS:    E.

MR. DE PURY:    E-R-I-N?

THE WITNESS:    And then, uh, double L.

MR. DE PURY:    G-A-L-L-O-W-A-Y?

THE WITNESS:    Right, correct, yeah.

CROSS EXAMINATION BY MR. LAROSIERE

THE REPORTER:   And Mr. Tyra?

MR. DE PURY:   T-Y-R-A.

THE REPORTER:   And Jason Tyre?

MR. DE PURY:   I'm sorry, who?

THE REPORTER:   Jason Tyre?

MR. DE PURY:   No, Tyra, same one. Jason Tyra, T-Y-R-A.

THE REPORTER:   Oh, got it. And there was a term known as def tapped [sic]?

MR. DE PURY:   D-E-F-C-A-D, Defcad.

THE REPORTER:   C-A-T [sic].

MR. DE PURY:   C-A-D, as in delta.

THE REPORTER:   D as in delta. Okay, my apologies. And DD Foundation is D as in doctor, D as in doctor, then Foundation?

MR. DE PURY:   Yes. Yep.

THE REPORTER:   Okay. And about the transcript orders, Counsel, you're going to give it tomorrow or should I take it from you today?

MR. DE PURY:   Are you going to order on this?

MR. LAROSIERE:   Uh, well, we'll decide tomorrow.

MR. DE PURY:   Yeah, we'll decide tomorrow.

THE REPORTER:   And are we having the same Witness tomorrow?

CROSS EXAMINATION BY MR. LAROSIERE

**MR. DE PURY:**     Same Witness, yes. Same Witness, same everybody.

**THE REPORTER:**     Right. And the read and sign, is he doing the read and sign, Counsel?

**MR. DE PURY:**     We didn't ask him. You want to ask Howard real quick?

**MR. LAROSIERE:**     Just email him. I think they're gone. They ran out.

**MR. DE PURY:**     Yeah. We'll have to email him. They've already jumped in the car and left. Howard had a day.

**THE REPORTER:**     Well, okay. So if there's nothing else further, Counsel, allow me to take us off the record.

**MR. LAROSIERE:**     Yep.

**THE REPORTER:**     So the time is 6:15 and we are off the record.

<div style="border:1px solid">

### CERTIFICATE OF OATH AND TRUE TESTIMONY

I, Abdullah Khalid, a Notary Public in and for the State of Texas, County of Tarrant, and the officer before whom the foregoing testimony was taken, do hereby certify that on the 6th of May, 2026, Cody Wilson appeared before me remotely via audio and video communication technology with the stipulation of the parties, and Cody Wilson was by me duly sworn and placed under oath and affirmed that the testimony they give during the foregoing proceeding shall be the truth, the whole truth, and nothing but the truth.

I, Abdullah Khalid, further certify that the foregoing transcript is a full or complete, true, and accurate record of the testimony given by Cody Wilson which was taken before me electronically via Zoom videoconference with the aid of computer-assisted non-stenographic transcription.

Produced Identification or Stipulation to Identity by the parties: Valid Driver's License

I, Abdullah Khalid, further certify that the witness and/or the parties waived the right to read or review and sign the record of the testimony.

I, Abdullah Khalid, further certify that I am not a relative, employee, attorney, or counsel of any parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

*Abdullah Khalid*

_____

Abdullah Khalid,
Digital Reporter

NOTARY PUBLIC, STATE OF TEXAS
COMMISSION #134961157
COMMISSION EXPIRES 06-25-2028

Signed on: 05/21/2026

</div>

ERRATA SHEET


DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS SHEET

IN RE: DEFENSE DISTRIBUTED, Et al. vs. JOHN ELIK,
individually; MATTHEW LAROSIERE, individually; ALEXANDER
HOLLADAY, individually; PETER CELENTANO, individually; JOSH
KIEL STROKE, individually; and JOHN LETTMAN, individually, and
Zackary Clark, individually
Taken on: 6th of May, 2026

| PAGE NO. | LINE NO. | CHANGE | REASON |
|----------|----------|--------|--------|
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |

Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are true and
correct, subject to any changes in form or substance entered
here.


_____     _____
DATE:                           NAME:

TRANSCRIPT INDEX

## Symbols

**'cause** 177:4, 180:21, 181:8, 221:12, 230:25, 233:22, 285:14
**'em** 79:24, 79:24

## A

**abandon** 210:13
**abdullah** 4:6
**ability** 17:24, 164:4
**able** 6:21, 8:6, 8:15, 19:13, 31:25, 73:14, 102:7, 135:12, 135:14, 135:16, 135:17, 140:16, 144:4, 149:1, 149:23, 162:3, 288:23
**absence** 219:9
**absolute** 33:12
**absolutely** 46:2, 81:19, 189:20, 224:11, 268:10, 268:13
**absurd** 233:23, 237:16, 237:16
**abuse** 84:11, 135:4
**abusing** 127:9, 127:11
**accentuate** 283:3
**accept** 91:6, 91:7, 93:6
**acceptable** 9:11
**accepting** 35:6, 35:15, 35:15, 35:16, 248:7
**access** 17:23, 22:24, 23:16, 23:17, 29:23, 72:3
**accomplished** 147:8
**according** 47:22, 66:5, 166:14, 186:24, 186:25
**account** 34:9, 34:12, 191:25, 192:16, 192:22, 193:4,

225:8, 226:4, 227:15, 275:21, 281:13
**accountant** 146:23, 149:22, 165:14
**accounting** 27:4, 36:11, 36:17, 152:15, 157:2, 157:4
**accounts** 152:4, 154:9, 154:14, 159:23, 281:11
**accuracy** 33:12, 102:23, 119:18, 161:11, 161:21, 162:7
**accurate** 33:11, 33:15, 40:3, 40:23, 40:24, 63:22, 64:4, 65:18, 65:21, 69:19, 69:24, 69:25, 76:15, 103:16, 119:17, 149:23, 167:4, 167:5, 168:12, 168:15
**accurately** 8:7, 36:9, 140:16, 176:5
**accuse** 56:17
**accused** 56:10, 280:18
**accusing** 56:9
**acronym** 290:16
**across** 12:13, 86:3, 87:10, 106:1
**act** 89:11, 200:7
**acting** 196:1
**action** 95:15, 97:20, 184:21, 202:3, 223:3, 275:20, 286:21
**actions** 95:4, 95:11
**active** 9:16, 9:18, 20:20, 37:17, 263:13
**activism** 278:15
**activity** 97:22,

284:23, 286:11
**actors** 210:5
**actual** 21:15, 21:21, 62:18, 63:15, 101:20, 217:3, 234:9, 243:8, 254:6, 274:12, 274:18, 274:19, 274:23, 274:24, 274:25
**actually** 48:2, 50:14, 60:13, 60:21, 80:10, 85:17, 91:12, 95:23, 107:7, 139:18, 140:8, 157:20, 182:24, 188:15, 196:1, 213:21, 221:2, 221:4, 234:21, 237:18, 238:7, 251:12, 271:20, 278:9, 282:14, 285:25
**adapting** 16:25
**adderall** 240:3
**addition** 71:3
**additional** 18:19, 91:23
**address** 100:16
**addressed** 146:1
**addresses** 160:6
**adjudication** 57:18
**adjusted** 138:6
**administer** 10:10, 10:12
**administration** 125:8, 125:11
**administrative** 219:4, 219:7
**administratively** 218:15
**administrators** 73:17
**admissions** 60:21
**admits** 194:1, 194:4
**admitted** 60:21, 61:5, 113:16, 143:12, 257:10
**adopted** 29:22, 30:6

advance 34:23,
259:22
advanced 14:20,
218:21
advantage 31:15
advertised 125:25
advice 100:16,
100:21, 101:14,
104:10, 104:17,
104:20, 280:1
advised 102:22
advocacy 163:22
advocates 163:22
aesthetic 211:14,
211:17, 211:24,
212:6, 212:12,
212:13, 212:17,
212:18, 212:21,
212:22, 212:25,
213:5, 267:18
aesthetics 212:19,
212:20
affect 126:3,
127:18, 266:9,
268:22, 270:14,
270:17
affected 127:13,
128:6, 128:24,
129:4, 132:17,
265:15, 268:9,
270:9, 270:17
affiliate 129:20
affirm 6:2
affirmation 4:22
afford 22:24
aftermath 270:16
afternoon 175:10
afterwards 246:25
age 182:8, 228:23,
229:13
agents 271:16
ago 11:19, 27:11,
31:5, 37:9, 98:15,
123:17, 123:21,
124:1, 124:1,
137:10, 137:11,
176:20, 176:20,
229:21, 229:22
agree 13:17, 13:18,
13:21, 21:17,
28:21, 28:23,

28:24, 29:14,
30:1, 31:8, 44:5,
45:4, 46:24, 47:2,
47:20, 58:10,
58:11, 58:12,
63:20, 64:3, 71:9,
85:25, 86:1, 86:3,
108:11, 126:2,
135:15, 135:20,
146:9, 150:6,
162:13, 183:11,
183:12, 215:25,
218:24, 219:23,
222:22, 224:13,
247:6
agreed 53:22, 259:21
agreeing 174:23,
236:3, 236:5,
236:6, 248:3,
248:5
agreement 7:20,
46:18, 46:19,
58:18, 80:19,
81:8, 81:16, 130:2
agreements 81:12
ah 37:4, 223:2,
235:2, 250:18
ahead 6:14, 14:2,
37:25, 38:20,
39:6, 53:1, 53:9,
61:2, 65:25,
87:20, 87:21,
101:19, 104:6,
104:6, 104:8,
105:12, 107:9,
114:23, 115:23,
116:24, 145:1,
151:4, 152:24,
189:24, 201:19,
232:3, 234:17,
239:2, 243:15,
256:6, 289:13,
289:25, 290:5
ai 162:17
air 55:16
al 4:5
alex 205:20, 207:23
alexa 29:9
alexander 4:16
allegation 54:15,
116:12, 192:24

allegations 116:10
allege 118:18
alleged 51:20,
51:22, 54:20,
108:16, 283:19
allegedly 54:13
alleging 108:21
alleviate 242:22
allow 8:8, 150:1,
292:12
allowed 43:19,
43:21, 44:24,
52:1, 52:8, 64:15,
64:18, 102:22,
103:2, 192:13,
256:24
allows 208:20
almost 17:23, 32:22,
32:22, 42:22,
103:10, 122:1,
134:18, 136:10,
185:18, 200:18,
229:21, 252:25,
270:21
alone 180:8, 221:16
along 30:23, 82:11,
220:21, 244:13
already 45:18,
45:24, 52:22,
61:25, 96:24,
106:25, 118:19,
124:6, 124:7,
168:20, 172:5,
194:8, 229:9,
292:10
also 7:3, 8:13,
10:22, 10:23,
20:25, 29:12,
37:25, 48:10,
49:8, 58:3, 73:9,
73:10, 87:14,
109:1, 170:22,
172:22, 173:12,
183:18, 189:4,
212:19, 212:21,
221:8, 224:7,
243:1, 247:16,
247:19, 257:10,
263:22, 264:12,
264:12, 268:18
alter 118:10, 119:4

**altered** 113:16, 113:24, 114:19, 114:24, 114:25, 118:5, 118:11
**alternative** 169:12
**although** 14:25, 83:8
**always** 17:23, 31:12, 263:16, 265:10, 265:11, 269:7, 269:11, 278:14, 282:13, 282:13
**ambiguous** 219:3
**amendment** 219:16, 221:23, 222:13
**america** 34:23, 269:10
**american** 34:2, 259:18, 260:6, 272:1
**among** 22:23, 177:9, 281:5
**amongst** 80:2, 287:15
**amount** 51:21, 168:21
**analog** 32:5, 120:24
**analogize** 178:24
**analogy** 167:24, 168:7
**analysis** 39:8, 71:5, 170:2, 173:11, 173:13, 173:15, 176:19, 284:4, 284:4
**analyze** 133:17, 133:21, 134:5, 150:2, 150:5, 173:2
**analyzed** 133:23, 133:24
**announce** 264:4
**annoying** 194:12
**annual** 17:19, 26:21, 26:24, 176:13
**annually** 17:16, 17:20, 26:22, 26:25
**another** 15:2, 94:16, 113:25, 119:3, 145:4, 175:4, 182:2, 196:21, 201:16, 204:13, 213:19, 223:24,

224:8, 267:18, 279:8
**answer** 13:10, 14:22, 17:6, 17:11, 19:14, 20:12, 24:16, 26:25, 35:7, 35:12, 40:4, 42:24, 44:9, 52:17, 53:10, 61:13, 65:25, 68:6, 73:7, 74:18, 75:21, 76:11, 76:12, 76:15, 82:8, 82:13, 83:21, 83:23, 88:16, 89:9, 93:5, 100:12, 101:3, 101:5, 101:6, 101:12, 101:15, 102:17, 105:13, 106:10, 114:23, 115:24, 123:25, 125:5, 138:2, 138:17, 138:22, 147:19, 153:16, 154:14, 158:14, 165:24, 166:8, 166:10, 166:17, 171:10, 171:12, 176:5, 191:18, 196:22, 203:16, 203:18, 209:10, 251:1, 253:15, 256:25, 258:23, 261:24, 262:3, 277:1, 279:17
**answered** 47:25, 62:1, 104:11, 118:19, 123:16, 123:20, 124:3, 135:18, 137:8, 137:10, 137:25, 143:6, 151:2, 151:4, 151:11, 151:14, 166:21, 220:11, 248:19, 261:25
**answering** 91:25, 92:2, 138:7, 171:11, 171:19, 180:14

**answers** 8:15, 9:10, 35:9, 61:23, 90:1, 102:12, 113:20, 113:22, 172:5, 188:20, 195:21
**anti-gun** 221:21
**anti-gunners** 188:25
**anticipate** 8:12
**anxiety** 125:25
**anybody** 86:8, 95:4, 116:25, 121:25, 210:17, 284:17
**anymore** 226:24
**anyone** 114:24, 138:14, 186:21, 251:4
**anything** 10:7, 24:8, 24:14, 24:17, 25:12, 31:25, 34:4, 35:16, 39:20, 39:24, 40:7, 41:1, 44:11, 46:17, 60:15, 69:15, 77:24, 78:24, 87:8, 88:25, 88:25, 89:1, 104:19, 115:13, 123:5, 138:9, 138:13, 139:5, 139:24, 141:4, 141:6, 145:18, 152:6, 152:16, 161:4, 163:13, 164:1, 164:4, 172:8, 178:13, 181:1, 185:25, 216:8, 231:1, 231:25, 245:1, 255:15, 255:19, 257:17, 267:4, 275:3, 284:18
**anything's** 125:3
**anyway** 8:9, 42:10, 80:21, 94:16, 180:22, 181:9, 181:23, 189:25, 217:12, 224:25, 247:24, 248:22, 276:10, 285:21
**anywhere** 164:1

apologies  291:14
apparently  59:23,
    246:4
appeal  24:6
appeals  91:23
appear  227:6
application  11:12,
    20:10, 31:17,
    31:18, 73:10
applied  47:7, 47:10,
    176:12
appreciate  56:11,
    188:20, 190:4,
    197:13, 224:24,
    272:25
approach  174:16
appropriate  212:11
approval  21:21
approve  21:20
approved  76:18
apropos  236:10
apropose  233:16
arbitrarily  163:16
area  165:13
argue  213:2, 220:20,
    220:20
arguing  216:17,
    261:17
argument  36:5
arms  12:22, 12:24
army  148:11, 148:18,
    148:22, 149:16
around  15:6, 17:14,
    37:12, 58:2,
    99:10, 108:16,
    108:22, 109:1,
    118:21, 179:25,
    204:12, 218:8,
    220:16, 221:9,
    222:5, 222:18,
    230:13, 230:15,
    230:17, 234:15,
    234:17, 238:12,
    238:22, 241:7,
    259:21, 261:13,
    262:19, 263:1,
    267:3, 267:4,
    282:1, 285:3,
    288:2
arrangements  260:1
arrest  133:1, 133:3,

147:4
arrested  55:4, 55:9,
    55:19, 55:22,
    57:3, 57:8, 133:2
art  212:16
article  164:1,
    280:5, 280:6,
    280:25, 281:7,
    281:19, 286:13
articles  281:6
ashley  257:15
aside  116:25,
    150:11, 217:2,
    228:8, 264:20
ask  8:8, 19:2, 20:4,
    20:7, 37:24, 38:1,
    41:14, 50:20,
    53:10, 57:9, 65:6,
    65:7, 65:8, 67:2,
    71:12, 74:9,
    74:21, 83:17,
    88:8, 92:4, 104:1,
    112:18, 115:9,
    116:15, 124:2,
    126:13, 136:4,
    148:7, 151:10,
    151:20, 151:20,
    152:24, 157:15,
    158:22, 158:25,
    159:2, 159:3,
    159:3, 160:8,
    166:10, 170:24,
    180:3, 189:25,
    198:17, 204:13,
    235:9, 245:13,
    257:17, 257:19,
    276:9, 286:19,
    289:7, 292:5,
    292:6
asked  6:14, 11:19,
    40:12, 41:12,
    41:15, 41:22,
    43:4, 47:24, 57:1,
    57:21, 57:25,
    62:1, 62:1, 69:4,
    83:3, 83:7, 86:5,
    124:3, 135:18,
    137:8, 137:10,
    137:25, 151:4,
    151:11, 151:14,
    161:19, 161:21,

194:17, 199:5,
    203:3, 206:25,
    207:13, 225:22,
    229:13, 246:22,
    248:18, 251:3,
    263:17, 268:24,
    273:15, 273:18,
    279:25
asking  8:12, 10:7,
    34:14, 42:22,
    42:23, 58:20,
    59:15, 61:3,
    61:18, 63:3, 63:4,
    67:7, 74:16,
    86:15, 86:15,
    88:3, 104:14,
    104:18, 104:19,
    104:20, 109:6,
    109:10, 111:22,
    111:25, 112:11,
    115:11, 115:13,
    116:6, 117:20,
    123:14, 124:25,
    125:4, 141:10,
    144:18, 145:21,
    150:13, 150:17,
    153:8, 157:17,
    164:15, 164:18,
    169:7, 170:7,
    170:9, 170:16,
    170:17, 171:5,
    171:6, 173:12,
    174:10, 174:11,
    185:1, 204:6,
    204:25, 216:19,
    227:2, 244:12,
    246:2, 246:23,
    249:21, 250:16,
    251:10, 254:14,
    255:16, 260:16,
    265:22, 267:23,
    273:16, 273:18,
    273:20, 285:5
ass  79:13, 159:11
assert  135:3
assessment  69:20,
    69:25
assigned  95:24
assistance  99:6
associate  129:19,
    192:22

**associated** 87:17, 219:15, 284:5
**associations** 200:7
**assume** 66:2, 138:2, 160:17, 160:19, 169:17, 201:2, 201:3, 201:6, 231:6, 232:21
**assumed** 153:18
**assuming** 64:24, 112:1, 112:11, 153:16
**assumption** 131:12, 168:14
**assumptions** 123:13, 150:6, 150:11, 150:14
**athletic** 48:18, 48:19, 48:25, 137:8, 169:1
**attached** 265:10
**attachment** 243:9, 243:10
**attempt** 190:12
**attempted** 126:7, 190:11
**attend** 7:18, 148:25, 149:1
**attended** 143:8
**attendees** 6:7
**attention** 125:24, 139:10
**attenuated** 60:16, 125:19
**attorney** 78:17, 92:9, 93:14, 95:15, 99:11, 99:12, 104:19, 104:20, 106:9, 107:6, 108:1, 110:7, 114:1, 145:5, 146:2, 149:22, 165:14, 170:7, 196:2, 196:4, 196:7, 199:11, 199:13, 199:15, 201:2, 212:11, 217:9, 218:2, 218:6, 220:22, 222:6, 259:25

**attorney-client** 100:7, 104:15, 170:21
**attorney's** 145:17
**attorneys** 95:20, 95:21, 107:8, 107:19, 108:3, 218:11, 263:17, 282:24
**attributed** 190:8
**attuned** 147:22
**audio** 287:24
**audit** 151:21
**august** 282:16, 283:15, 284:9
**austin** 284:19
**author** 143:12, 143:14, 143:15, 143:16
**authorities** 259:18, 259:19, 260:6
**authority** 44:18, 44:20
**authorize** 36:14
**authorship** 144:1, 207:9
**automate** 176:21
**automatic** 30:21
**automatically** 275:16
**available** 20:2, 27:2, 73:11, 73:13
**average** 29:3, 29:8, 116:23
**avoid** 226:1
**avoided** 222:25
**aware** 43:12, 43:15, 44:18, 48:11, 48:12, 60:13, 64:7, 64:11, 106:3, 114:15, 142:17, 142:25, 143:4, 143:6, 143:12, 143:18, 171:4, 253:22, 254:1, 254:4
**away** 159:11, 247:4, 283:13
**awesome** 241:23
**awful** 222:24
**awkward** 194:10

## B

**baby** 220:6
**back** 22:5, 22:6, 26:12, 27:21, 32:13, 33:7, 37:25, 43:11, 55:4, 55:6, 55:7, 55:8, 55:14, 55:15, 55:17, 66:21, 71:4, 72:2, 82:3, 84:19, 85:13, 87:24, 88:2, 99:23, 101:2, 101:6, 101:8, 102:15, 113:16, 117:23, 118:15, 118:17, 118:22, 130:6, 147:6, 149:1, 166:19, 167:24, 178:9, 181:15, 182:24, 194:16, 198:25, 199:6, 203:7, 218:23, 220:12, 227:3, 228:16, 230:8, 234:17, 242:5, 245:18, 246:12, 257:14, 259:24, 262:11, 264:16, 267:23, 269:3, 274:21, 275:7, 277:1, 287:11, 288:6
**backseat** 196:3, 196:5, 196:8, 196:10
**backwards** 133:10
**bad** 144:7, 186:9, 186:12, 187:22, 188:2, 188:12, 189:7, 209:13, 221:17, 221:19, 224:20, 265:21, 267:21, 276:25
**bag** 128:16
**bake** 120:21, 121:9
**baking** 122:2
**ballpark** 35:11, 40:20

**bank** 34:8, 34:12,
34:17, 120:9,
120:10, 120:14,
120:15, 120:16,
123:9, 123:14,
123:19, 146:24,
150:20, 150:24,
151:22, 153:8,
153:15, 159:22,
161:2, 164:10,
165:20, 165:20,
166:5, 166:11,
180:2, 250:19,
250:19
**base** 19:6
**based** 18:19, 39:9,
41:7, 41:9, 43:6,
70:1, 70:9, 70:12,
119:11, 119:16,
149:22, 165:13
**bases** 145:20, 145:25
**basic** 176:16, 176:19
**basically** 11:25,
90:3, 184:1,
217:14, 218:2,
224:14, 263:15
**basis** 26:21, 52:10,
135:8, 135:13,
151:4, 163:23,
176:13, 176:13,
198:1
**bear** 12:22, 12:24
**beat** 32:6, 79:13
**beating** 151:18
**beautiful** 204:17,
204:18
**became** 15:2, 254:1,
254:4
**become** 24:4, 30:5,
40:10, 86:19,
253:22, 268:4
**becomes** 114:17
**bed** 288:19
**beetle** 212:23
**beforehand** 265:17
**began** 35:13, 35:15,
35:16, 37:13,
108:21
**begin** 205:5, 232:22,
269:9, 269:11,
269:13

**beginning** 33:23,
35:14, 78:23,
200:3, 286:20
**begins** 14:17, 14:18
**behalf** 86:8, 200:8
**behaving** 269:12
**behavior** 186:25,
209:22, 209:23
**behind** 18:16, 59:15,
107:2, 117:19,
194:9, 272:4
**belief** 168:12
**believable** 63:8
**believe** 7:15, 7:17,
10:15, 12:18,
13:13, 24:22,
25:7, 25:16, 33:1,
33:3, 33:18, 37:4,
37:22, 38:16,
39:9, 40:11,
40:12, 41:3,
42:16, 47:7, 49:9,
49:9, 50:2, 50:3,
50:4, 50:8, 50:15,
57:11, 59:2, 59:3,
59:4, 63:9, 63:13,
64:1, 69:18,
69:24, 71:2,
71:10, 71:14,
71:16, 72:19,
73:11, 74:12,
75:6, 75:25,
76:14, 76:22,
76:23, 88:25,
89:21, 89:23,
89:25, 90:25,
91:3, 92:3, 93:5,
93:15, 97:11,
97:21, 104:12,
104:22, 105:3,
105:4, 105:6,
110:2, 110:7,
110:23, 111:1,
114:24, 116:6,
125:12, 133:23,
133:24, 134:9,
134:25, 135:8,
135:21, 136:24,
140:23, 141:13,
143:25, 154:15,
155:14, 155:14,

156:9, 159:16,
160:13, 160:24,
162:2, 179:18,
179:21, 184:3,
184:9, 192:2,
192:5, 198:22,
199:18, 200:15,
202:10, 202:12,
202:16, 205:22,
216:24, 216:24,
217:11, 225:14,
225:16, 229:11,
249:4, 249:7,
257:1, 259:5,
271:10, 271:25,
272:3, 272:5,
272:5, 283:6,
283:8, 285:1,
285:2, 285:10,
285:24, 286:8
**believed** 106:24,
228:11
**believes** 89:25
**bell** 218:17
**ben** 270:3, 270:6,
270:8
**benefit** 77:25,
119:12, 276:22,
277:2
**benefited** 8:10,
133:11
**benefiting** 86:8
**benefits** 8:9
**bent** 186:19, 286:13
**besides** 147:8
**best** 31:11, 31:12,
31:13, 92:3,
135:20, 190:7,
193:14, 204:7,
204:23, 207:2,
207:3, 207:3,
207:5, 208:10,
212:5, 219:21,
243:7, 259:1,
262:24
**beta** 23:17
**better** 19:21, 23:19,
30:5, 92:25,
133:9, 152:13,
215:17, 238:8,
275:25, 276:2

**beyond**  10:2, 12:4, 20:13, 127:8, 147:19, 193:2, 235:23, 235:25, 286:7
**bias**  43:8, 46:21, 46:25, 271:10
**biases**  266:5
**bid**  189:15
**biden**  124:20, 125:8, 125:11, 125:20
**big**  151:19, 187:8, 189:10, 203:16, 203:18, 215:13, 215:14, 215:24, 217:3, 217:5, 277:21
**biggest**  8:4, 14:4, 265:6, 265:19
**bill**  40:13, 143:5
**billet**  14:24
**billing**  275:16
**billion**  182:2, 280:8
**billionaire**  280:19
**bills**  180:8
**binding**  85:12
**birds**  270:12
**bit**  24:19, 32:13, 34:21, 37:24, 41:18, 108:16, 116:25, 187:24, 187:24, 223:21, 243:19, 289:20
**bitcoin**  35:6, 35:16, 35:22, 35:24, 35:25, 36:7, 36:9, 280:5, 280:6, 280:8, 284:6, 285:22, 285:24, 286:1, 286:1
**bizarre**  211:13, 211:13
**black**  261:16
**blackmail**  190:11
**blah**  163:23, 163:23, 163:23, 284:20, 284:20, 284:20
**blend**  217:13
**blew**  144:14
**blip**  139:10
**block**  257:25

**blockchain**  36:5, 152:13, 152:14, 156:14
**blow**  116:22, 287:4
**blows**  104:5, 157:24
**blue**  231:12, 232:17, 232:21, 232:25
**blunted**  199:12
**bmw**  251:14, 252:3, 252:7
**body**  162:17, 162:25, 163:8
**bogart**  278:1
**bogus**  185:17
**boil**  130:19
**boogeyman**  222:2
**book**  22:16, 105:14, 105:24, 106:3, 106:13
**booked**  159:12, 278:24
**booking**  256:14
**bookings**  256:12, 258:24
**bookkeeper**  65:9, 65:10, 67:13, 67:20, 69:12, 161:7
**bookkeeper's**  36:24
**bookkeepers**  69:16, 69:17
**bookkeeping**  62:19
**books**  32:15, 36:21, 36:23, 37:6, 37:13, 37:19, 37:23, 39:12
**bored**  240:8
**boston**  117:1
**bottle**  94:9, 94:15
**bottom**  53:16
**boy**  182:4
**bracket**  90:8, 90:10
**bracketed**  224:18
**brain**  273:16
**breach**  82:19, 82:22, 82:25, 100:15, 104:19, 170:8
**break**  21:23, 41:17, 43:10, 44:20, 46:22, 87:20, 94:15, 113:1,

113:15, 181:9, 181:22, 240:18, 240:21, 241:22
**breaks**  43:12, 45:9, 112:23, 112:23, 242:17, 242:20, 242:21, 243:2
**brief**  8:2
**briefed**  116:7
**bring**  22:5, 52:9, 52:15, 52:24, 95:15, 96:23, 97:13, 97:18, 97:20, 107:5, 107:6, 136:20, 149:21, 176:16, 219:8, 256:25, 261:18
**bringing**  107:21
**brings**  118:17
**bro**  288:22
**broader**  183:17
**broke**  284:17
**brought**  26:6, 70:7, 71:2, 85:16, 93:25, 94:5, 96:1, 96:16, 96:25, 97:4, 97:19, 97:23, 98:6, 216:25
**bruck**  214:10, 217:24, 217:25
**bubbling**  106:25
**build**  11:7
**building**  68:10, 68:11
**buildings**  160:5, 160:6
**bulk**  132:21, 132:23
**bully**  223:9, 223:10, 223:19
**bunch**  39:3, 91:10, 145:19, 151:20, 174:3, 199:14, 268:14, 283:2, 283:12, 284:5
**burden**  189:6
**business**  13:25, 14:5, 16:22, 17:1, 17:2, 17:10, 17:12, 27:18,

30:11, 31:4,
33:21, 34:11,
48:7, 75:7, 76:20,
97:19, 97:23,
98:1, 98:3, 98:5,
124:2, 124:15,
124:18, 125:5,
125:9, 125:21,
127:18, 127:19,
129:7, 132:22,
133:7, 133:16,
133:25, 137:20,
137:21, 137:23,
146:3, 150:2,
150:14, 159:21,
160:7, 168:19,
177:8, 177:15,
177:16, 178:25,
178:25, 179:19,
179:23, 187:22,
187:22, 210:15,
210:15, 210:16,
210:17, 233:23,
237:17, 244:19,
254:24, 255:9,
269:23, 269:24,
269:25, 269:25,
270:3, 270:4,
270:6, 270:14,
270:17, 273:12,
276:16

**businesses** 33:25,
124:14, 159:17,
159:20, 159:22,
178:4, 276:6

**businessman** 178:3

**busters** 207:23,
211:23

**busy** 172:13

**butchers** 41:24

**butt** 181:10

**button** 21:16, 94:11,
94:13, 94:14,
104:2, 152:25,
275:4

**buy** 22:19, 34:15,
69:14, 270:23

**buying** 125:23

**buzzing** 144:9

## C

**c-a-d** 291:12
**c-a-t** 291:11
**c-dubs** 238:19
**c-o-d-y** 5:10, 6:16
**cable** 287:12
**cad** 132:6
**cake** 120:17, 121:4,
121:10, 121:12,
121:14, 121:15,
121:19, 121:23,
122:2, 168:1
**calculate** 160:16
**calendar** 58:5
**california** 15:6,
15:8, 15:10,
15:15, 15:17,
16:10, 16:11,
25:7, 25:9, 25:9,
214:7
**california's** 15:23
**call** 9:10, 16:20,
20:23, 20:24,
47:3, 47:4, 60:10,
65:20, 113:25,
121:14, 147:2,
166:10, 175:1,
199:21, 223:3,
224:22
**called** 8:19, 8:20,
8:24, 9:7, 9:13,
11:3, 14:9, 14:10,
15:3, 48:17, 60:2,
117:9, 141:4,
167:14, 167:16,
199:21, 221:10,
227:4, 270:6
**calling** 20:13, 203:4
**calls** 166:8, 226:19
**cam** 94:9
**came** 27:22, 47:1,
48:23, 105:22,
113:16, 118:22,
119:1, 130:15,
134:2, 148:23,
229:10, 259:24
**camera** 5:7, 5:14,
143:10
**cameras** 144:5
**campaign** 223:6,

223:6
**cancel** 275:18
**cannot** 43:18, 44:19,
45:2, 287:3
**canon** 188:25
**capacity** 189:24,
273:19
**capital** 4:16,
290:15, 290:16
**captured** 285:1,
285:25, 286:8
**car** 34:17, 250:2,
250:3, 250:11,
250:14, 250:15,
250:18, 250:20,
250:25, 251:12,
252:8, 252:19,
292:10
**card** 36:13
**cards** 34:2
**care** 91:6, 144:17,
144:22
**careful** 221:21,
259:17, 263:18
**carefully** 259:20
**cares** 219:7
**carried** 264:6
**carry** 136:25, 189:5
**case** 4:4, 4:5, 7:7,
7:10, 7:14, 20:17,
24:3, 24:4, 24:5,
24:6, 24:9, 24:10,
24:11, 24:23,
25:12, 26:10,
41:4, 41:16,
43:16, 44:4, 44:6,
45:6, 45:14,
45:16, 45:19,
57:22, 62:20,
63:2, 72:9, 76:24,
81:6, 81:9, 88:9,
91:24, 94:6,
94:18, 94:19,
94:20, 95:10,
95:24, 95:25,
96:1, 96:8, 96:13,
96:15, 96:18,
96:19, 96:20,
96:21, 96:23,
96:25, 97:1, 97:3,
97:4, 97:18,

107:5, 107:6,
108:2, 129:9,
129:18, 132:17,
141:13, 141:16,
145:6, 191:20,
193:16, 195:5,
201:15, 201:22,
203:7, 204:23,
208:11, 211:1,
216:20, 216:24,
218:13, 218:14,
218:18, 218:18,
218:20, 218:23,
219:1, 219:10,
219:25, 220:10,
220:12, 220:16,
220:18, 222:4,
225:4, 230:2,
230:4, 237:22,
238:3, 244:18,
244:21, 261:15,
265:20, 266:12,
276:6
**cases** 21:16, 26:7,
193:25, 217:8,
217:18, 219:16,
221:23, 232:25,
266:8, 266:11
**cash** 34:23, 34:24,
158:22, 159:2,
159:4, 159:6,
285:22, 286:1
**cast** 265:16
**cat** 15:15
**categories** 18:18
**categorizations**
18:19
**category** 274:13
**cater** 31:19
**causation** 48:11,
64:7, 145:20,
146:1, 147:13,
162:18, 164:22
**cause** 97:20, 125:13,
125:18
**caution** 56:17
**celentano** 194:7,
195:2, 195:3,
195:8, 195:11,
196:16, 197:6,
197:8, 204:22,

205:12, 206:15,
208:1
**cell** 28:19, 114:16
**censorship** 128:14
**center** 209:3, 209:4,
280:4
**centerpiece** 85:24
**central** 193:20
**certain** 8:3, 8:4,
18:15, 18:15,
23:16, 82:9,
98:18, 125:25,
168:21, 187:21,
187:21, 212:23,
260:2
**certainly** 10:13,
15:5, 16:9, 53:6,
53:8, 65:4, 84:12,
166:21, 173:24,
197:25, 231:22,
236:6, 250:15,
264:10, 286:13
**certification** 233:3
**certified** 134:11
**certify** 104:1
**cetera** 107:3
**chad** 36:24, 66:14,
166:10
**chain** 54:17, 284:4,
284:4
**change** 15:17, 30:10,
73:19, 113:17,
264:5
**changed** 113:22,
118:3
**changes** 20:20, 27:3,
27:6, 126:3,
126:8, 128:23
**changing** 112:8
**channel** 128:14
**chapters** 17:18
**character** 265:18,
267:16
**characterization**
199:12, 282:10
**charge** 57:1
**charged** 57:6, 57:7,
63:12
**charges** 244:12
**charity** 269:8
**chase** 283:1

**chasing** 282:1
**chat** 205:13, 205:15,
244:7
**cheating** 84:4
**check** 40:14, 40:16,
217:6, 217:7,
231:5, 232:20
**checked** 12:12
**checks** 7:22, 38:18
**cheeky** 75:21
**chick** 249:11
**chief** 10:5
**child** 49:16, 49:21,
50:1, 50:2, 50:6,
50:16, 50:18,
50:24, 50:25,
51:9, 51:21, 52:23
**children** 241:13
**chill** 102:4
**choice** 189:15,
275:11
**churn** 175:17,
175:18, 175:20,
175:25, 176:9,
176:15, 177:3,
177:9, 177:14,
178:19, 179:2,
179:6
**cigarette** 240:4
**circle** 37:25, 228:2
**circuit** 24:5, 24:6,
214:9, 217:12,
217:13, 218:5,
218:19, 218:19,
218:23, 222:4
**circulates** 77:13
**circumspect** 210:20
**circus** 210:5
**cite** 214:6
**claim** 90:3, 92:10,
92:16, 93:24,
94:4, 94:4, 94:5,
98:23, 99:4, 99:5,
99:13, 100:5,
100:17, 100:23,
101:15, 104:11,
104:23, 105:7,
105:23, 107:21,
107:22, 183:15,
183:16, 183:22,
183:24, 184:3,

185:6, 185:18, 185:19, 185:19, 186:8, 186:13, 186:13, 187:18, 187:19, 187:20, 187:25, 188:9, 212:13, 212:17, 223:1, 223:2, 290:13

**claimed** 189:2

**claiming** 144:1

**claims** 94:6, 94:17, 94:21, 94:22, 95:1, 95:4, 95:13, 96:15, 129:20, 183:10, 183:12, 183:22, 184:18, 184:20, 188:24, 203:25, 207:9, 213:17

**clarify** 52:21, 290:4

**clarity** 71:23

**clark** 4:20

**classes** 146:3

**classic** 233:20, 233:21

**clear** 8:15, 17:22, 44:17, 48:24, 116:18, 194:12

**cleared** 57:16

**clearly** 34:16, 78:14, 113:23, 114:12, 130:9, 137:8, 147:8, 151:11, 168:9, 180:5, 184:23, 190:24, 211:7, 224:19

**clicking** 21:16

**client** 43:13, 52:23, 52:24, 52:25, 53:2, 136:21, 158:3, 177:11, 230:7, 230:13, 231:21, 231:23, 235:13, 235:14, 248:10

**clients** 56:10, 79:16

**cliff** 205:19

**clinton** 56:7

**close** 5:17, 194:23, 194:24, 268:23, 283:18

**closed** 88:2, 287:5

**closely** 270:4, 279:24

**closing** 239:17

**club** 127:5

**cms** 73:10

**cnc** 14:6, 14:8, 14:10, 14:10, 16:12, 28:7, 28:9, 28:12, 28:13, 28:21, 29:13, 29:25, 31:10, 31:11, 34:15, 132:25

**cncs** 28:14, 31:6, 127:22, 127:23

**coach** 43:18, 43:21

**coalition** 85:5, 85:9

**coals** 269:18

**coast** 9:7, 15:3, 15:4

**coca-cola** 240:5

**cody** 4:4, 5:9, 6:16, 74:23, 201:25, 280:7, 282:15, 290:8

**coffee** 30:1, 30:7, 30:9, 30:14, 30:21, 30:22, 32:4, 32:5, 32:7, 82:5, 239:19, 239:20, 239:21, 240:1

**coincidental** 272:12

**coined** 142:13

**cold** 194:10

**collecting** 76:21

**collier** 272:22

**colonel** 149:16

**column** 215:22

**columns** 223:15, 223:17

**com** 192:21

**come** 39:7, 53:20, 87:10, 106:1, 119:5, 135:17, 135:18, 145:19, 147:6, 147:9, 148:24, 150:1,

175:14, 175:15, 228:24, 247:21, 256:7, 283:21

**comes** 22:12, 26:13, 32:14, 32:24, 33:16, 58:8, 58:11, 84:25, 114:7, 114:8

**comfortable** 153:6

**coming** 218:3, 242:14, 262:11, 287:16

**commentary** 138:1, 184:9, 234:3

**comments** 81:17

**commerce** 98:5

**commercial** 55:16, 184:12, 185:22, 185:23, 186:5, 187:18, 187:19, 187:20, 188:14

**commercially** 205:18

**commingled** 160:8, 160:9

**common** 38:6, 38:12, 56:1, 71:1, 77:15, 87:10, 252:12, 290:10

**commonly** 25:25, 26:1, 26:1, 100:2

**communicate** 210:7, 210:12

**communicated** 138:24, 171:9, 171:14

**communication** 66:18, 66:20, 68:1, 69:13, 192:18, 201:24

**communications** 68:17, 104:15, 192:16, 194:5, 196:16, 196:20, 197:4, 197:7, 200:1, 230:20, 231:9, 234:18, 274:4

**companies** 6:17, 8:18, 9:12, 9:17, 9:18, 9:21, 9:21, 35:7, 36:8, 36:12, 37:14, 37:15,

37:16, 37:16,
37:18, 37:23,
92:11, 92:18,
96:2, 273:19
**companion** 128:23
**company** 8:19, 8:20,
8:21, 8:21, 9:7,
9:10, 10:11,
10:17, 10:19,
13:1, 13:7, 13:8,
19:15, 26:4, 27:8,
27:12, 35:8,
35:18, 38:14,
38:16, 50:8, 50:9,
61:25, 75:22,
86:7, 86:8, 107:3,
139:6, 139:19,
181:23, 210:18,
263:13, 263:13,
263:23, 264:1,
264:3, 265:10,
278:15, 279:10,
279:24, 279:25,
283:12
**company's** 69:20,
131:25, 279:24
**compare** 105:22,
128:18
**compared** 116:23,
121:21, 224:18
**competent** 47:19,
48:4
**competently** 47:16,
71:11
**competition** 28:4,
31:7
**competitive** 31:15
**competitor** 31:18
**compilation** 140:11,
140:12
**complain** 183:7
**complaint** 74:14,
74:16, 74:17,
108:25, 191:18,
196:22, 264:20,
264:23, 272:17,
272:19
**complete** 84:23, 93:5
**completely** 65:21,
145:3, 212:1,
248:8, 248:11

**complexities** 70:17
**compliance** 16:24
**compliant** 36:13
**complicated** 73:6,
114:3, 128:11,
260:8
**complies** 17:1
**compliment** 93:6,
178:5
**compliments** 93:8
**comply** 15:7, 15:9,
15:9
**complying** 15:13
**component** 124:20
**components** 14:6
**composite** 163:14
**comprehension** 185:4,
190:21
**computer** 28:17,
28:18, 29:9,
29:12, 34:16,
71:25, 72:2,
131:20
**computers** 29:23
**computing** 29:1
**conceal** 242:20
**conceptual** 162:16,
221:14
**concern** 83:11,
83:22, 83:22,
84:2, 242:22
**concerning** 16:12,
138:2, 146:8,
173:3, 253:23
**conclude** 286:17,
290:3
**concluded** 27:4
**conclusion** 42:23,
71:1, 147:9,
147:12, 147:12,
162:22, 167:21
**conclusions** 167:5
**condition** 85:8
**conditioned** 232:23,
237:9
**conditions** 232:24,
274:10
**conduct** 152:15,
156:20, 157:2,
170:2, 201:18
**conducted** 274:4

**conducting** 4:22,
254:24, 286:8
**conference** 113:25,
264:4, 284:20
**confident** 203:11,
203:15
**confidently** 47:16,
279:17
**confirm** 152:5,
152:6, 154:17
**confirmation** 43:8,
46:21, 46:25
**confirmed** 154:18,
192:8, 194:7,
273:11
**confirms** 203:1
**confused** 259:23
**connected** 85:2,
149:8, 233:6
**connection** 154:3,
154:9
**connotation** 185:21
**conscious** 34:3,
146:18, 246:10,
246:14, 271:16
**consequence** 267:15,
267:20
**consequences** 264:17,
264:25, 265:23,
266:1
**consequential** 266:6,
266:15
**consider** 211:1,
211:2
**consideration** 264:14
**consistent** 278:18
**consolidated** 9:13,
285:16
**consolidating** 285:15
**conspicuous** 242:17,
243:2
**conspiracy** 194:1,
194:1, 194:3,
194:4, 194:21,
202:7, 202:15,
204:19, 271:23,
272:1, 272:4
**constructed** 164:6
**construction** 61:20,
78:16, 144:9
**consultant** 85:6

consulting 106:9
contact 23:19, 65:8,
    66:2, 66:2, 69:1,
    69:17, 259:25
contains 223:17
contention 32:8,
    74:10, 74:12,
    74:13, 74:23,
    74:25, 97:5, 97:10
contest 15:23
context 68:23,
    184:18, 187:21,
    187:25, 188:14,
    244:9
continue 9:5, 53:9,
    61:2, 104:9
continues 220:18
continuity 263:23,
    263:25
contractors 20:23
contribute 87:14
contributory 90:24
control 8:18, 62:12,
    72:24, 73:1,
    119:17, 119:19,
    120:1
controls 72:23
controversies 169:20
controversy 176:9
conversation 91:7,
    170:21, 233:23,
    234:1, 235:13,
    236:7, 236:9,
    237:17, 244:10,
    244:19, 274:21
conversations 235:4,
    274:13, 274:25,
    274:25, 282:7
convey 189:17
conviction 52:2,
    52:19, 173:3
copies 118:5, 118:10
copy 118:5, 118:11
copyright 7:8,
    89:10, 92:11,
    94:18, 94:19,
    96:8, 96:18,
    97:21, 97:21,
    108:1, 131:4
corners 169:25
corporate 15:17,

15:21, 264:3
corporation 8:20,
    9:8, 9:9, 9:13
correct 7:11, 21:6,
    23:1, 24:15,
    27:23, 28:19,
    29:13, 30:23,
    39:3, 39:8, 40:23,
    43:3, 50:11, 58:3,
    61:9, 89:3, 90:4,
    92:12, 92:19,
    93:10, 93:25,
    96:2, 96:9,
    102:19, 112:19,
    112:19, 116:2,
    122:20, 122:25,
    123:2, 123:3,
    134:3, 146:11,
    162:7, 167:6,
    170:10, 171:17,
    257:1, 263:2,
    290:25
correctly 91:25
could 4:8, 5:5,
    10:5, 10:20, 11:5,
    12:19, 15:5,
    16:15, 16:17,
    16:25, 19:11,
    30:22, 30:25,
    47:2, 49:23,
    59:10, 61:10,
    61:18, 68:23,
    73:17, 79:18,
    80:20, 92:4,
    99:19, 101:2,
    101:5, 113:1,
    113:3, 123:3,
    124:15, 129:13,
    131:19, 131:21,
    139:24, 145:20,
    146:1, 146:7,
    152:23, 163:15,
    165:6, 166:10,
    166:15, 166:16,
    170:22, 174:20,
    176:22, 177:24,
    178:9, 194:12,
    195:10, 195:15,
    196:2, 196:6,
    203:11, 205:19,
    208:15, 208:18,

209:14, 211:15,
    213:2, 220:13,
    220:23, 222:23,
    236:2, 238:16,
    253:9, 253:15,
    261:3, 263:14,
    266:11, 275:22,
    277:17, 277:19,
    285:19, 285:19,
    285:22, 285:23,
    285:23, 286:6
counsel 4:8, 6:11,
    6:24, 8:10, 38:1,
    42:8, 99:6,
    100:17, 100:21,
    101:11, 101:14,
    102:6, 102:17,
    102:21, 104:10,
    104:17, 104:21,
    181:6, 182:15,
    291:18, 292:4,
    292:12
counsels 116:17,
    286:25, 288:9,
    289:11, 289:15,
    289:17, 289:23
count 16:20, 154:10,
    288:1, 288:1
counter 92:10
counter-notice 200:2
counterclaim 90:4,
    92:8, 92:9, 92:10,
    92:18, 93:9, 96:17
counterclaims 92:23,
    96:18, 97:4
counterfeit 187:24
counterfeiting
    187:23, 188:1
countertop 29:13,
    127:23
country 12:13
counts 20:19, 154:5,
    154:12, 154:15
county 260:1, 264:20
couple 86:1, 148:24,
    190:4, 193:8,
    223:24, 238:17,
    266:8, 280:3,
    290:4
course 27:2, 78:16,
    80:16, 121:2,

124:14, 131:23,
132:5, 132:21,
162:15, 168:16,
182:20, 192:24,
198:2, 202:3,
213:1, 213:20,
220:17, 223:2,
235:19, 235:20,
264:13, 266:5,
268:13, 268:13,
283:22
**court** 4:5, 8:5,
44:1, 48:24,
50:19, 95:5,
95:15, 95:24,
103:10, 113:2,
117:1, 117:1,
117:6, 134:11,
136:16, 136:17,
181:22, 185:2,
192:13, 192:25,
198:24, 200:25,
218:7, 220:9,
220:10, 221:20,
227:6, 258:17,
264:20
**court's** 136:11
**courts** 221:22,
222:11, 266:6
**coverage** 85:8,
127:13, 127:18,
127:20, 128:1,
128:1, 128:4,
128:5, 132:16,
132:21, 132:23
**covered** 279:19
**covid** 37:5, 37:9
**cpa** 36:20, 65:9,
65:9, 146:3
**crazier** 283:20
**crazy** 266:12
**create** 58:23, 63:22,
285:23, 286:1
**created** 142:16,
286:2, 286:4,
286:9
**creating** 77:21,
143:17
**creation** 206:8
**creative** 283:4
**creator** 143:15

**credential** 65:14
**credit** 34:2, 36:13,
92:25, 144:1
**credits** 169:8
**crematorium** 177:12
**crew** 209:25, 210:2
**crime** 55:21, 57:7,
63:12, 98:17
**crimes** 98:18, 105:2
**criminal** 96:13,
96:19, 97:3,
132:17, 173:3,
226:19, 226:20,
226:22, 228:15,
233:2, 236:13,
266:13
**criticism** 211:19,
212:16
**crown** 202:14,
202:16, 204:18,
205:6
**crucial** 178:16,
180:1
**crying** 232:19
**crypto** 33:19, 33:22,
33:24, 157:15,
279:9
**cryptocurrency**
33:16, 33:17,
152:2, 153:21
**ctrlpew** 207:23
**culture** 76:21
**curious** 136:6,
200:8, 200:10,
233:4, 237:19,
246:20, 276:1
**currency** 279:9
**current** 17:1, 258:21
**currently** 225:10,
275:9
**customer** 81:21,
82:2, 82:4, 82:10,
147:21, 152:3,
154:5, 154:8,
154:12, 154:15,
177:2, 272:18
**customers** 36:2,
36:7, 154:10,
154:10, 184:7,
273:10, 273:11
**customs** 255:6,

255:11
**cut** 15:20, 235:6,
261:5
**cyclical** 124:14

---

**D**

---

**d-e** 4:15
**d-e-f-c-a-d** 291:10
**d-i** 38:10
**d-i-c-k** 38:8
**d-i-c-k-e-n-s-o-n**
38:7, 38:9
**da** 260:1
**daddy** 225:8, 226:4,
226:9, 226:13,
226:15, 227:3,
248:23
**daily** 164:11
**dallas** 144:13,
163:17, 163:19,
163:21, 164:10
**damage** 144:11,
169:19
**damages** 41:15, 43:3,
43:5, 160:16
**damn** 128:2, 288:22
**dan** 203:3, 203:5
**dancing** 204:11
**dangerous** 252:13
**dark** 72:1
**data** 82:12, 82:19,
82:22, 82:25,
120:5, 150:2,
150:5, 150:14,
155:18, 157:3,
157:10, 162:11,
163:24, 183:18,
233:2
**database** 183:15
**date** 241:10, 254:15
**dating** 30:17
**day** 20:20, 20:20,
177:14, 250:2,
288:5, 288:5,
288:12, 289:2,
292:10
**day-to-day** 10:10,
10:23
**days** 128:23, 256:13,
272:1

**dd** 8:24, 12:2, 22:22, 22:25, 23:6, 23:11, 23:23, 291:14
**de** 4:13, 4:15, 40:6, 78:19, 121:9, 224:21, 239:3, 286:21
**deactivated** 9:19
**dead** 151:18
**deal** 34:21, 218:10
**dealing** 264:7
**death** 48:17, 48:19, 48:22, 48:25, 137:7, 169:1
**debate** 218:20
**debt** 267:12
**deceive** 184:7
**december** 225:19
**decide** 18:8, 135:10, 291:21, 291:23
**decided** 107:5, 134:21, 223:10
**decides** 18:15
**decision** 74:3, 74:4, 74:7, 74:8, 189:15, 217:12, 218:1, 218:20, 263:18, 263:19, 264:13
**decisions** 199:11, 199:13, 199:14, 199:16, 210:7, 211:14, 211:20, 217:13, 264:15
**declaration** 199:21, 199:24, 200:24, 202:11
**deep** 121:16
**def** 291:9
**default** 193:5
**defaulting** 193:2
**defcad** 8:20, 10:19, 10:22, 16:18, 16:22, 16:24, 17:10, 17:11, 17:22, 17:23, 17:25, 20:6, 20:10, 20:15, 20:16, 20:18, 22:6, 22:15,

22:18, 22:19, 22:24, 23:4, 23:13, 71:12, 71:12, 81:21, 82:4, 82:9, 82:12, 82:19, 86:15, 87:10, 87:17, 87:19, 90:21, 129:7, 132:22, 133:24, 142:7, 142:8, 186:8, 187:12, 188:24, 189:8, 189:14, 190:13, 195:19, 195:20, 201:16, 201:25, 202:3, 205:18, 219:12, 221:1, 221:3, 222:24, 230:8, 230:10, 230:12, 273:11, 273:12, 275:20, 279:14, 291:10
**defcad's** 18:13, 22:13, 183:15, 184:6, 184:12, 188:1, 188:2
**defeat** 214:7
**defend** 135:12, 137:10
**defendable** 137:15
**defendant** 72:7, 72:9, 96:21, 142:15, 191:20, 193:3, 193:5, 194:7, 196:18, 196:21, 209:12, 209:14
**defendant's** 78:17
**defendants** 76:23, 77:14, 90:18, 90:18, 92:11, 129:9, 129:18, 142:8, 142:12, 142:13, 193:16, 210:4, 273:14
**defended** 45:13, 45:15, 45:19, 204:1
**defense** 4:4, 8:19, 8:21, 9:23, 9:24,

12:8, 12:8, 12:16, 12:18, 13:11, 13:24, 13:25, 20:6, 23:12, 23:20, 24:4, 35:12, 35:13, 35:14, 214:10, 214:10, 216:7, 216:21, 219:11, 250:24, 251:9, 276:16, 276:17, 277:7, 277:8, 279:14
**deferred** 57:17, 57:19, 57:20
**define** 24:12, 24:17, 24:20, 174:19, 177:19
**definitely** 194:15, 231:21, 241:7
**definition** 13:14, 71:23, 72:3, 92:8, 120:1, 131:17, 131:18, 131:18, 179:15
**degree** 30:4, 51:18, 57:11, 174:18, 263:21
**delete** 239:15, 239:22
**deleted** 77:14, 86:25, 245:25, 246:1
**deleting** 234:19
**deletion** 246:4, 246:6
**delta** 291:12, 291:13
**demonstrations** 15:2
**denio** 270:3, 270:6, 270:8
**department** 215:19, 216:9, 216:22, 282:24
**departure** 267:17
**depend** 161:10
**depending** 37:12, 128:14
**depends** 121:20, 160:6
**deployed** 117:18
**deponent** 44:19,

89:24, 287:3

**deponents** 45:9

**deposed** 6:18, 7:5, 8:1, 38:21, 78:3, 142:25, 143:4, 205:8

**deposing** 180:13

**deposition** 4:4, 4:8, 6:4, 16:3, 44:20, 45:3, 45:9, 52:12, 78:4, 82:25, 82:25, 83:9, 102:3, 115:8, 134:20, 142:22, 143:8, 143:20, 144:2, 148:24, 148:25, 149:9, 153:7, 180:9, 195:2, 195:3, 197:8, 201:18, 204:22, 205:3, 246:3, 247:10, 257:17, 257:20, 268:19

**depositions** 45:14, 45:16, 45:19, 136:8, 195:8, 265:20

**derive** 162:12, 164:19

**describe** 14:2, 16:22, 199:20, 219:18

**described** 12:7, 12:21, 32:18, 60:3, 119:10, 270:17, 283:7

**describing** 283:9

**description** 12:4, 15:18, 76:5, 76:6

**design** 131:16, 132:15

**designated** 280:1

**designation** 18:10

**designations** 18:18

**designed** 132:7, 132:8

**designer** 131:14, 131:15, 132:1, 132:5

**designs** 131:6,

131:10, 131:25, 132:6

**desktop** 127:22

**despite** 110:25

**detail** 106:8

**details** 247:7, 248:2, 248:6

**determined** 106:10, 146:4, 168:20

**determining** 282:9

**deterrence** 205:15

**detrimental** 74:11

**developer** 188:25, 189:1, 203:24

**developers** 202:1, 203:10

**development** 130:9, 233:2

**developments** 147:22

**device** 234:22

**devices** 29:1

**diabetic** 182:10

**dickenson** 36:24, 37:13, 38:6, 38:12, 38:19, 62:17, 62:17, 65:2, 65:9, 66:14, 161:7, 166:11

**dickenson's** 62:19, 63:1, 65:4

**die** 182:4

**difference** 14:23, 14:25, 27:24, 28:3, 137:11, 266:14

**differences** 16:10, 27:19, 77:8

**different** 4:24, 14:11, 14:11, 14:19, 21:19, 25:9, 29:25, 34:21, 35:8, 38:4, 55:11, 56:4, 81:3, 102:9, 130:13, 160:5, 160:6, 160:6, 165:17, 176:11, 176:12, 177:4, 177:19, 183:10, 187:25, 202:21, 202:22, 209:18, 223:16,

223:24, 238:17, 259:14, 265:18, 267:19, 268:2, 268:4, 274:6, 280:2, 282:22

**differently** 19:2, 90:9, 269:15

**difficult** 14:22, 35:22, 42:20, 77:13, 117:19, 118:16, 121:1, 123:8, 146:15, 146:21, 174:22, 204:5, 204:5, 219:8

**difficulties** 266:4

**digestion** 263:23

**digit** 179:5, 179:14

**digital** 4:7, 12:23, 12:23, 179:3, 289:23

**dimension** 265:15

**diplomatic** 259:16

**direct** 10:13, 13:4, 86:12, 130:16, 159:20, 185:20, 194:20

**directed** 12:25, 86:8

**direction** 265:17

**directions** 121:2

**directly** 83:21, 207:18

**director** 9:24, 10:1, 10:2, 10:3, 10:22, 19:15

**disagree** 47:21, 64:1, 65:1, 91:15, 131:12, 140:5, 162:11, 249:17

**disagrees** 138:15

**disappearing** 246:12

**disappointing** 141:15

**disavow** 202:2, 202:2

**disclose** 137:6, 137:7, 221:1, 221:4, 221:7, 221:8

**disclosed** 221:6

**disclosure** 221:10

**discount** 286:12

**discourse** 224:12,

224:13

**discovered** 108:14, 194:8

**discovery** 129:22, 139:18, 142:18, 142:25, 143:25, 172:14, 172:14, 192:8, 192:9, 192:10, 192:12, 192:13, 195:23, 199:25, 200:19, 230:4, 245:10, 246:17, 246:21

**discrepancies** 157:10, 157:12

**discrimination** 269:10

**discuss** 89:2, 95:23, 127:4, 136:2, 223:21, 224:1, 224:6, 249:16

**discussed** 127:21, 129:6, 130:23, 136:20, 136:21, 142:23, 244:21

**discusses** 49:15

**discussing** 19:9, 49:12, 50:10, 50:12, 128:14, 221:1

**dismally** 118:1

**dismissed** 57:23, 93:15, 94:5, 95:25, 282:13

**disparaging** 81:17

**dispensed** 205:15

**disputes** 233:4, 237:20

**dissimilar** 274:9

**distant** 37:9

**distributed** 4:5, 8:19, 8:21, 9:23, 9:24, 12:8, 12:17, 12:19, 13:12, 13:24, 13:25, 20:6, 23:12, 23:20, 24:4, 35:12, 35:13, 35:15, 214:10, 214:10, 216:7, 216:21, 219:11,

250:24, 251:9, 276:17, 276:17, 277:7, 277:9, 279:14

**distributed's** 12:9

**district** 7:11, 7:14, 89:3, 89:10, 90:4, 90:16, 91:14, 91:20, 92:7, 96:2, 96:9, 131:1, 216:25

**dive** 275:2

**diverted** 159:15

**doctor** 291:14, 291:14

**document** 113:24, 155:24, 194:24, 201:12, 201:14, 201:23, 201:24, 202:5

**document's** 201:21

**documentaries** 169:10

**documentary** 48:17, 49:12, 50:9, 50:12, 57:24, 57:25, 58:19, 58:21, 59:4, 59:7, 59:18, 59:22, 59:25, 76:22, 134:1, 138:12, 138:13, 138:24, 139:6, 146:25, 168:22, 168:25, 169:1

**documents** 20:9, 39:4, 39:5, 39:7, 39:9, 152:11, 155:9, 155:10, 155:15, 155:16, 155:16, 155:17, 170:9, 171:7, 171:22, 172:23, 197:15, 199:8, 199:18, 200:16, 202:18, 204:15, 204:17, 204:18

**doe** 227:11

**dollars** 69:20

**donations** 35:15

**done** 40:13, 85:7, 135:1, 136:3,

136:5, 136:7, 178:4, 180:24, 181:3, 197:22, 198:8, 198:9, 198:12, 198:15, 262:1, 262:5, 262:16, 264:12, 278:9, 279:1, 279:3, 284:3, 288:5, 290:2

**double** 290:23

**doubt** 119:10, 120:2, 236:9, 271:9

**download** 17:24, 18:3, 18:7

**downloadable** 20:18

**downloadables** 20:19

**downloads** 19:3

**downturn** 108:16, 108:21, 118:18, 119:5, 125:9, 147:13, 173:17

**doxxed** 82:15, 82:16, 188:25, 189:1, 189:4, 189:8, 189:11, 189:16

**doxxing** 189:7, 203:10

**dozing** 241:1

**drafts** 111:2

**drag** 243:4

**drain** 228:2

**dramatically** 133:1

**draw** 162:25

**drink** 79:21, 239:20

**drip** 30:21

**drive** 34:17, 86:21, 171:15, 252:19, 276:12

**driven** 129:5

**driver** 196:3, 196:5, 196:8, 196:10

**driver's** 5:19

**drones** 128:1, 128:2, 128:2

**dropped** 48:16, 49:1, 49:4, 49:8, 54:13, 54:16, 54:22, 58:2, 58:3

**drove** 250:2

**due** 67:5

dui  98:18
dumped  183:15,
    183:16
duties  42:25

**E**

e-check  34:3
e-commerce  34:2
e-n  38:7
e-r-i-n  290:22
earlier  33:2,
    127:21, 129:6,
    167:24, 182:20,
    224:21, 246:3,
    248:4, 259:3,
    259:10, 259:14,
    259:23, 260:24,
    286:19, 288:14
early  284:4
easier  266:11
easiest  26:24,
    255:24
easily  8:14, 35:13,
    272:8
eastern  4:3, 22:3,
    46:10, 46:12,
    87:23, 87:24,
    182:16, 241:25,
    242:1
easy  16:8, 24:18,
    94:14, 211:20,
    229:20
eat  11:22
eating  175:9
economics  271:3,
    271:3
ecosystem  28:3
edge  250:17, 250:17
edgelord  250:18
effect  74:11,
    143:11, 173:16
effectively  32:3,
    46:15, 46:25,
    167:20
efforts  214:7
either  29:17, 37:11,
    95:25, 120:11,
    213:25, 255:23
el  70:6
elaborate  67:8,
    76:6, 83:17,

83:18, 104:4
elect  279:23, 279:23
elements  98:9,
    98:16, 98:17,
    98:17, 98:18,
    98:23, 99:4,
    104:12, 104:22,
    104:25, 105:2
elik  4:5, 4:19,
    25:16, 25:17,
    90:22, 130:2,
    130:8, 130:11,
    131:4, 190:9,
    190:16, 190:20,
    190:20, 190:24,
    191:6, 191:12,
    192:3, 192:8,
    192:17, 192:19,
    193:1, 195:24,
    196:20, 196:21,
    197:1, 197:2,
    200:2, 201:21,
    202:11, 207:18,
    223:8, 224:6,
    230:7, 230:13,
    231:4, 232:19,
    232:24, 238:21,
    244:8, 244:12,
    244:22, 245:2,
    245:16, 245:18,
    246:9, 249:15
elik's  131:3, 195:23
ellick  245:4
else  31:20, 32:4,
    34:4, 49:5, 70:6,
    70:7, 70:19, 89:1,
    91:21, 124:4,
    130:3, 138:5,
    161:4, 161:16,
    166:19, 181:1,
    188:5, 215:8,
    275:3, 292:12
email  66:21, 181:19,
    181:19, 232:9,
    239:8, 246:25,
    247:3, 274:8,
    292:7, 292:9
emailed  115:25,
    116:1
emails  130:8, 149:1,
    149:3

embarrassment  270:21
embezzled  282:16
emblematic  222:1
emerged  129:21
emoji  232:20
emotional  189:6
emphasis  274:19
employee  11:2, 11:3,
    11:20, 11:21,
    16:19, 16:20,
    21:13, 37:2,
    72:21, 129:19,
    277:8
employees  10:14,
    10:25, 11:1,
    13:19, 16:18,
    16:21, 19:16,
    277:22, 277:24,
    278:16
employing  130:14
employment  11:23,
    130:7, 130:10
encouraged  205:21
encouragement  203:23
encrypt  36:14,
    81:21, 82:9,
    183:18
encryption  36:15,
    82:12
end  38:3, 72:2,
    77:18, 78:4,
    79:19, 79:22,
    80:4, 84:19,
    99:17, 100:3,
    103:8, 112:22,
    121:2, 122:24,
    193:1, 218:23,
    220:10, 223:3,
    258:23, 262:10
ended  178:13, 218:21
endowment's  282:6
enemies  79:10,
    79:12, 79:14
enforced  187:7
engagement  205:17
english  117:19
enjoy  62:7, 202:18
enjoyed  202:18
enough  5:20, 6:19,
    6:23, 14:23,
    30:19, 32:8,

34:16, 63:14,
63:21, 64:2,
130:12, 171:16,
194:23, 194:24,
243:13, 277:24
**ensure** 36:9
**enterprise** 78:20,
208:16, 209:3,
209:11, 209:15
**entire** 45:6, 90:2,
156:5, 275:9
**entities** 13:17,
13:21, 276:13
**entity** 22:25
**equal** 29:16
**era** 146:15
**erin** 199:22, 200:21,
202:10, 290:17,
290:20
**error** 168:9
**escape** 250:13
**especially** 34:22,
80:2, 121:21,
130:3, 146:15,
221:12, 236:5,
268:3, 270:15
**essential** 14:23
**establish** 53:18,
64:7, 218:1
**established** 58:1
**et** 4:5, 107:3
**evade** 93:2
**evaluate** 21:20
**evasion** 92:24
**evasive** 61:17, 93:3
**even** 18:3, 21:16,
35:14, 61:3,
67:12, 67:20,
68:2, 68:20,
69:16, 107:1,
110:8, 121:14,
124:15, 129:6,
137:15, 138:3,
140:23, 155:8,
172:18, 185:21,
215:16, 215:21,
218:24, 219:25,
221:12, 221:20,
221:21, 222:5,
235:16, 235:17,
252:5, 253:9,

253:20, 254:15,
257:18, 261:7,
267:12, 275:11,
277:4, 283:20,
284:14
**event** 270:16, 270:16
**events** 96:6, 125:13,
125:18, 126:1,
129:14, 129:15,
133:15, 162:16,
211:20, 253:1,
254:13, 267:7,
283:19
**ever** 6:18, 54:8,
58:20, 63:3,
71:13, 71:22,
82:15, 82:16,
82:19, 82:21,
84:17, 86:5, 87:3,
91:12, 92:4,
100:15, 100:23,
110:16, 111:13,
112:3, 114:19,
118:4, 133:8,
159:7, 169:12,
205:12, 219:17,
227:6, 228:23,
245:1, 246:8,
247:2, 253:19,
270:6, 281:15,
284:2, 285:18
**every** 27:8, 27:12,
30:9, 72:7, 72:9,
82:4, 93:5,
103:10, 108:1,
108:2, 115:14,
124:1, 125:14,
126:14, 126:15,
126:16, 126:25,
127:1, 134:18,
135:25, 136:1,
136:10, 136:12,
175:16, 177:4,
177:16, 200:18,
274:10
**everybody** 28:18,
41:24, 41:25,
210:14, 210:24,
210:25, 212:9,
220:17, 275:4,
275:6, 292:2

**everybody's** 82:10
**everyone** 15:22,
35:25, 216:7,
220:19, 259:21,
263:17
**everything** 8:13,
49:5, 88:2, 110:7,
113:3, 128:4,
172:17, 194:4,
196:12, 215:8,
247:20
**everytown** 90:15,
90:20, 90:22,
94:18, 96:21,
96:23, 191:2,
191:12, 192:10,
192:24, 194:9,
195:11, 195:17,
196:8, 199:11,
222:4
**everywhere** 79:4,
205:21
**evidence** 64:24,
204:19, 204:25,
205:1, 207:2,
207:3, 207:4,
207:6, 207:11,
208:6, 208:10,
208:11, 208:14,
208:20, 209:2,
269:14
**evidentiary** 135:8,
135:21, 202:22
**evokes** 187:21,
212:23, 213:13,
213:14
**evolution** 31:16
**evolved** 28:21,
28:25, 29:24
**exact** 19:11, 19:22,
19:23, 40:19,
99:22, 177:18,
185:16, 217:8,
230:6, 262:25
**exactly** 37:5, 47:9,
48:21, 50:22,
78:22, 107:11,
112:13, 112:16,
117:10, 117:16,
122:6, 127:6,
227:11, 267:13,

271:14
**exaggerate** 252:15
**examined** 106:8
**example** 20:10,
23:16, 77:10,
87:11, 95:20,
96:15, 129:5,
129:9, 130:9,
186:7, 190:10,
196:15, 200:2,
207:7, 208:20,
209:19, 212:23,
230:1
**examples** 196:14
**except** 19:16, 31:25,
62:16, 72:9,
145:18, 152:7
**exception** 270:8
**exceptional** 18:18
**excludes** 13:14,
13:16
**excluding** 96:13
**exclusive** 75:9,
132:14, 132:15,
212:14
**excusable** 77:1, 77:2
**executive** 10:5
**exhibit** 201:21,
232:6, 232:6,
235:11, 238:11,
242:16, 244:11,
247:11, 247:14,
247:17, 247:19,
281:18, 281:21,
281:23
**exhortation** 184:21
**exist** 194:6, 286:5
**existence** 194:21
**exit** 139:14, 139:14,
139:16, 139:20,
140:7, 175:1,
175:3, 175:4,
175:23, 175:23,
272:17, 272:20,
272:21, 274:3,
274:7, 274:11,
275:10, 275:19
**expanded** 30:14
**expanding** 31:2, 31:3
**expect** 40:22, 40:24,
41:11, 47:20,

118:1, 239:5
**expectation** 36:3,
168:15
**expected** 42:25,
186:25, 187:1,
187:5
**expecting** 32:16,
76:13
**expenses** 159:25
**experience** 165:14,
212:21, 213:5,
221:15, 267:25
**experienced** 173:16
**experiencing** 269:10
**experimented** 14:25
**expert** 16:16, 40:9,
40:10, 40:11,
41:4, 41:7, 43:1,
43:4, 45:18,
45:23, 59:6,
63:14, 64:3,
70:18, 71:2,
71:10, 84:1, 85:5,
99:11, 100:4,
106:9, 106:20,
109:15, 114:18,
117:25, 118:4,
118:16, 118:25,
122:13, 133:17,
137:8, 138:1,
138:25, 139:12,
139:13, 139:13,
139:15, 144:4,
145:17, 146:4,
146:8, 147:19,
147:23, 154:9,
157:22, 157:23,
157:24, 162:2
**expert's** 71:1, 146:2
**expertise** 47:7,
70:8, 71:2, 125:6,
128:11, 146:2,
162:15
**experts** 84:17
**explain** 185:6,
197:20, 197:23,
198:3, 212:8,
219:1, 257:13
**explained** 22:22
**explains** 39:2,
288:18

**explanation** 15:12,
64:13, 69:18
**explanatory** 61:20
**explicit** 103:6
**exploded** 163:23
**exploitable** 272:9
**expressed** 187:2
**exquisite** 272:9
**extends** 218:19
**extensively** 100:15
**extent** 79:8, 174:16
**extort** 213:20
**extorted** 95:14
**extortion** 95:3
**extradited** 55:4,
55:6
**eyes** 239:17

### F

**f-o-s-t-e-r** 4:10
**face** 210:10, 253:11
**facebook** 78:1
**faced** 222:5
**fact** 25:8, 25:9,
30:3, 34:6, 47:21,
47:22, 84:3,
89:25, 98:4,
104:21, 125:20,
129:20, 140:5,
149:22, 172:18,
184:12, 196:11,
197:5, 199:19,
200:2, 200:7,
201:8, 206:15,
206:18, 207:7,
211:22, 215:17,
219:8, 219:9,
219:20, 220:8,
221:12, 223:5,
223:7, 226:7,
227:12, 231:22,
236:9, 246:10,
265:2, 273:8,
283:19, 285:13
**factor** 264:10
**facts** 32:12, 64:24,
105:22, 189:14,
200:1, 207:17,
233:4, 237:20
**facts'** 122:12

**factual** 125:4, 125:7, 145:20, 145:25
**faculties** 213:5
**fail** 167:5
**failed** 56:7
**fails** 221:1
**fair** 10:12, 13:15, 25:25, 26:4, 27:12, 27:14, 29:2, 32:8, 39:13, 125:19, 161:10, 161:15, 161:22, 171:16, 171:17, 183:11, 194:21, 199:12
**fairly** 145:6, 277:15
**faith** 19:24, 198:1, 204:6
**false** 74:15, 75:7, 98:4
**familiar** 42:13, 43:8, 46:21, 83:2, 83:7, 93:18, 93:23, 98:22, 98:22, 146:3, 147:3, 147:20, 149:24, 149:25, 168:16, 182:24, 212:19, 238:19
**family** 268:23
**fan** 203:19, 203:21
**far** 14:20, 25:24, 65:2, 98:6, 258:5
**fascinates** 200:20
**father** 11:18, 11:18
**fault** 6:1, 113:9, 195:15, 243:12
**favor** 275:22
**favorite** 200:16, 201:12, 201:14
**favorites** 201:16, 201:16, 201:20, 204:16
**feared** 133:7
**fedcad** 96:15, 106:25, 140:24, 140:25, 141:1, 141:8, 141:13, 141:16, 141:22, 141:23, 142:4,

142:5, 142:7, 142:8, 142:16, 182:25, 203:25, 205:13, 205:21, 210:24, 223:5, 223:19, 273:13
**fedcad's** 207:22
**fedcat** 141:4
**federal** 9:12, 18:18, 18:25, 95:5, 126:3, 126:8, 200:25
**feedback** 232:22
**feel** 23:19, 36:7, 42:21, 42:24, 153:4, 189:25, 203:15, 211:24, 213:6, 220:22, 225:21, 238:7, 269:12, 271:12, 271:16, 277:19, 277:23, 285:8
**feelings** 197:13, 197:14
**feels** 33:13, 41:2, 42:22, 42:22, 182:6, 187:11, 203:11
**fellow** 38:1
**felony** 51:19, 57:10, 57:11
**felt** 27:7, 168:8, 203:11, 222:10, 263:14, 269:5
**fetcad** 88:23
**fiction** 203:19, 203:21
**fifth** 24:5, 24:6, 33:3, 33:4, 115:25, 116:1, 214:9, 217:12, 217:13, 218:5, 218:22
**fight** 271:14, 285:5
**figure** 40:19, 78:21, 106:4, 178:11, 217:21, 287:12
**figured** 263:11
**figures** 160:20, 160:24
**file** 19:6, 95:4,

113:7
**filed** 50:4, 75:11, 75:14, 92:17, 94:20, 95:11, 218:17, 227:8
**files** 12:23, 17:24, 18:3, 18:4, 18:8, 18:8, 18:11, 19:8, 19:10, 20:1, 23:2, 23:4, 36:19, 186:9, 186:12, 188:12
**filevine** 102:22
**filing** 88:10, 88:14, 136:21
**filings** 192:25
**film** 60:10, 137:7, 138:2, 138:4, 138:11, 147:1
**final** 112:1, 112:5, 119:5, 219:14, 219:17, 220:5
**financed** 251:5, 251:7
**financial** 36:15
**financing** 251:8
**find** 31:25, 35:21, 40:25, 68:21, 87:9, 87:18, 101:19, 106:13, 107:6, 108:9, 112:19, 116:6, 179:18, 179:21, 242:10, 242:19
**fine** 6:16, 8:23, 9:1, 15:20, 17:9, 19:20, 38:2, 82:6, 89:9, 93:4, 175:6, 213:18, 213:18, 215:12, 228:23, 259:10, 261:20, 262:15, 273:8, 285:9, 288:10
**finish** 8:9, 41:21, 131:20, 178:6, 241:7
**fintech** 233:1
**firearms** 57:12, 57:14, 147:20, 149:24, 149:25
**firestorm** 264:14

**firm** 16:4, 16:9
**first** 6:17, 9:22, 35:6, 35:14, 42:3, 49:9, 49:11, 49:12, 60:4, 84:25, 87:9, 91:5, 91:24, 92:10, 92:16, 92:16, 94:18, 94:20, 94:20, 97:4, 98:11, 104:24, 143:18, 180:2, 184:15, 189:5, 189:13, 189:16, 195:1, 205:12, 208:4, 215:13, 215:18, 215:24, 216:20, 217:3, 217:5, 217:7, 217:11, 218:17, 219:1, 219:10, 219:13, 223:7, 242:16, 243:22, 243:24, 247:1, 247:14, 253:17, 254:1, 254:4, 255:5, 259:5, 268:25, 284:17, 284:21, 287:2, 290:7
**first-hand** 207:22
**fit** 139:1, 140:1, 140:5
**fits** 244:24
**five** 27:11, 87:21, 87:21, 111:17, 111:18, 115:25, 174:4, 174:8, 174:23, 256:13
**five-minute** 240:21, 241:22
**fixation** 125:24, 173:8
**fixed** 260:24
**flag** 274:20
**flee** 54:5, 260:12
**flew** 55:8, 55:15, 55:17
**flight** 287:17
**floor** 11:7
**florida** 91:14,

91:20, 92:7, 98:18
**fluctuating** 124:6, 124:7, 124:11
**fluctuation** 27:19, 124:21
**fluctuations** 27:13, 27:17, 124:2, 125:14, 125:18
**focal** 85:23
**focus** 85:15, 185:17
**focused** 5:20
**folk** 35:24
**folks** 21:12, 34:21, 117:18
**follow** 30:22, 121:1
**follows** 128:22, 224:10
**food** 54:17
**force** 88:18, 190:12, 194:9, 195:10, 195:12, 195:16, 271:21
**forced** 202:2
**forcefully** 75:8
**ford** 250:7, 250:9, 250:10, 250:13, 250:14, 250:17, 250:17, 250:19, 252:20
**forensic** 152:15, 157:2, 157:4
**forget** 213:20, 213:23, 214:1, 214:2, 215:8, 217:5
**forgive** 8:22, 175:5
**form** 15:18, 15:21, 42:17, 48:10, 56:12, 56:15, 56:19, 60:24, 61:4, 62:21, 63:4, 63:16, 63:23, 64:8, 64:22, 64:23, 65:12, 65:22, 66:6, 66:23, 67:14, 67:23, 68:3, 68:22, 69:6, 69:21, 70:3, 70:13, 71:6, 71:18, 72:14,

73:20, 73:25, 75:2, 75:16, 76:1, 76:8, 77:3, 80:13, 81:23, 83:4, 83:13, 84:5, 85:18, 88:11, 88:20, 89:4, 89:14, 90:5, 91:16, 92:13, 92:20, 93:11, 93:20, 94:1, 94:10, 94:14, 94:23, 95:2, 95:6, 95:17, 96:3, 96:10, 97:7, 97:14, 98:12, 98:19, 98:25, 99:7, 100:6, 100:18, 104:13, 105:9, 106:21, 107:12, 107:16, 107:23, 108:4, 108:18, 109:2, 109:16, 109:22, 110:4, 110:11, 110:17, 111:3, 111:11, 111:15, 111:19, 111:23, 112:6, 112:9, 112:14, 113:11, 113:18, 114:20, 115:1, 115:20, 118:6, 118:13, 119:7, 119:13, 119:21, 120:22, 121:6, 122:22, 123:11, 124:8, 124:23, 125:15, 126:4, 127:15, 128:8, 129:1, 129:24, 131:7, 132:2, 132:11, 132:18, 133:4, 133:12, 133:18, 134:6, 134:19, 137:9, 138:20, 139:2, 140:2, 140:13, 141:17, 143:1, 143:22, 145:22, 146:12, 147:10, 147:15,

148:3, 149:5, 150:3, 152:19, 153:10, 153:19, 153:22, 154:1, 154:23, 155:5, 155:11, 156:6, 156:12, 156:15, 156:23, 157:7, 160:10, 160:21, 161:12, 161:24, 162:8, 162:19, 163:5, 163:23, 164:12, 167:9, 168:4, 169:14, 169:22, 170:11, 171:23, 172:10, 173:5, 173:21, 174:5, 176:2, 197:17, 197:20, 198:6, 198:23, 209:7, 239:10

**formal** 215:16

**former** 79:10, 273:10

**formulas** 176:11, 176:12

**formulating** 265:25

**forth** 66:21, 130:6, 149:1, 274:22

**fortunes** 266:5

**forward** 93:24, 94:5, 267:9

**foster** 4:10, 41:25, 43:12, 44:7, 109:21, 118:23, 197:19, 197:22, 198:13, 258:14

**foster's** 62:12

**found** 54:9, 68:20, 200:8, 200:10, 245:11, 245:14, 246:16

**foundation** 8:24, 12:2, 22:22, 22:25, 23:6, 23:11, 23:24, 198:14, 198:18, 200:5, 219:16, 291:14, 291:15

**founder** 223:22, 249:16

**four** 28:18, 90:3,

111:17, 115:25, 128:2, 169:25, 277:14

**fourth** 33:3, 33:4, 51:18, 57:11

**frame** 205:24, 248:7

**frame-mogged** 248:7

**frame-mogging** 248:9

**framing** 40:2, 63:19, 71:10

**fraternity** 12:7, 12:10, 12:11, 214:3

**fraud** 185:19

**free** 18:15, 189:25, 277:24

**freely** 44:10, 210:11

**french** 30:9

**frequent** 192:18

**fridge** 240:12

**friend** 235:16, 235:17, 235:23, 235:24

**friends** 79:12, 254:8, 269:20

**front** 40:12, 86:20, 86:21, 94:8, 131:19, 136:16, 136:20, 174:14, 183:6, 215:4, 233:17, 233:19

**fuck** 283:13

**fucked** 233:5, 234:4, 235:10, 237:20, 245:4

**fuckery** 207:22

**fucking** 210:14, 210:15, 234:11, 234:11

**fudd** 207:23, 211:23

**fugitive** 260:11

**full** 5:6, 6:14, 90:1, 103:8, 242:24

**fun** 289:22

**fundraiser** 282:23, 284:23, 285:3, 286:1, 286:9

**funds** 160:8

**funny** 34:5, 56:3

## G

**g-a-l-l-o-w-a-y** 290:24

**g-r-e-l** 105:20

**g-r-e-l-l** 105:19

**galloway** 199:22, 200:21, 202:10, 290:18, 290:20

**game** 11:24, 15:15, 184:1

**gap** 236:24, 242:25

**gaps** 242:20, 242:23, 243:1

**garbage** 167:13, 167:13, 167:17, 167:17, 167:21

**garret** 202:11

**garrett** 201:24, 231:19

**gary** 4:13, 4:15, 40:6, 44:6, 78:19, 135:15, 135:20, 139:5, 145:2, 148:21, 180:4, 232:3, 238:8

**gary's** 181:3

**gatalog** 191:25, 192:1, 192:2, 192:17, 193:3, 200:5, 200:5

**gate** 216:10

**gateways** 36:14

**gave** 39:3, 39:3, 39:5, 39:7, 39:10, 41:1, 42:11, 43:6, 47:12, 48:8, 64:1, 70:1, 70:10, 70:19, 120:5, 120:10, 121:3, 121:4, 122:15, 139:22, 145:18, 148:8, 152:7, 154:15, 155:4, 162:4, 253:19

**gears** 108:15

**general** 17:19, 17:20, 19:17, 19:18, 19:18, 22:15, 160:14, 177:23, 217:9,

218:2, 218:6, 218:11, 230:21, 244:9, 281:5, 282:24

**generalized** 177:21

**generally** 179:15, 267:14, 270:2

**generate** 155:25, 156:2

**generated** 156:1

**generating** 12:25

**genesis** 146:10

**gentlemen** 180:10, 182:11

**genuinely** 155:8, 230:23

**germaine** 41:25

**german** 48:23, 252:8

**get** 8:11, 8:15, 15:6, 17:21, 19:3, 23:14, 23:16, 23:17, 34:8, 34:17, 36:4, 41:25, 42:4, 42:14, 48:3, 53:15, 55:7, 55:14, 67:25, 83:10, 88:2, 89:23, 94:8, 94:9, 94:11, 94:13, 98:6, 102:6, 115:21, 118:12, 118:14, 121:4, 122:18, 124:3, 133:8, 133:9, 142:24, 152:25, 161:16, 162:3, 165:16, 165:20, 166:5, 166:19, 166:22, 168:1, 177:18, 180:2, 185:7, 186:12, 200:12, 202:2, 207:13, 215:6, 216:15, 220:1, 221:16, 228:4, 228:5, 234:16, 240:18, 245:9, 246:25, 247:4, 247:7, 247:20, 248:2, 248:6,

252:15, 252:16, 270:23, 275:8, 275:10, 277:6, 278:9, 279:8, 279:9, 284:19, 287:21

**gets** 72:2, 77:14, 274:11, 275:5, 275:6

**getting** 39:6, 114:2, 118:3, 121:16, 130:12, 145:16, 150:8, 190:13, 228:6, 232:22, 256:22, 261:3, 281:11, 282:8

**ghost** 14:10, 14:12, 14:15, 14:19, 16:25, 23:16, 27:21, 132:25

**gigo** 167:8, 167:12, 167:14

**girl** 234:4, 249:16, 249:17, 250:1, 253:8, 283:13

**girlfriend's** 144:6, 144:8

**give** 19:11, 19:23, 35:9, 40:20, 63:14, 63:21, 65:2, 75:21, 76:6, 90:1, 92:25, 120:6, 120:7, 120:8, 120:9, 120:14, 120:15, 120:16, 123:5, 123:9, 123:14, 138:4, 138:8, 145:21, 145:25, 146:4, 146:23, 146:24, 147:2, 147:25, 148:6, 150:20, 150:24, 151:22, 151:23, 152:3, 152:4, 152:11, 153:14, 154:16, 156:1, 156:18, 156:25, 161:2, 164:4, 164:4, 172:9, 177:24, 180:4,

189:6, 196:13, 202:8, 208:23, 223:23, 225:18, 236:17, 239:6, 249:24, 265:4, 279:8, 286:13, 291:18

**given** 41:8, 41:9, 65:4, 161:6, 203:23, 207:12, 226:1

**gives** 17:23, 265:21

**giving** 58:22, 150:14, 249:11, 249:16, 249:25

**glad** 182:5, 201:21, 201:22, 201:22

**global** 12:23, 28:10

**go** 5:22, 6:14, 14:2, 20:7, 21:25, 22:21, 26:12, 27:21, 32:13, 34:23, 46:4, 46:7, 49:1, 53:1, 53:9, 53:24, 54:7, 54:12, 55:5, 61:2, 63:14, 65:25, 74:16, 80:3, 80:25, 85:13, 87:20, 87:21, 93:24, 94:4, 94:12, 101:19, 104:6, 104:6, 104:8, 105:12, 105:24, 106:2, 106:13, 107:9, 114:23, 115:23, 116:24, 117:23, 118:15, 127:7, 131:21, 131:21, 137:16, 143:7, 145:1, 145:5, 145:20, 151:4, 152:24, 161:8, 163:4, 163:6, 165:19, 166:5, 166:18, 172:5, 175:15, 178:9, 180:2, 180:19, 181:4, 181:6, 189:24, 199:6,

201:19, 207:2, 211:15, 220:1, 222:23, 231:11, 232:3, 234:17, 239:2, 241:17, 241:21, 243:6, 243:15, 250:18, 254:12, 255:24, 256:6, 273:1, 275:2, 277:12, 281:2, 282:15, 283:1, 283:13, 287:11, 288:19, 289:13, 289:25, 290:5

**god** 195:13, 253:13

**goes** 162:18, 175:15, 252:17

**going** 10:7, 15:22, 17:8, 20:4, 20:7, 21:23, 22:6, 29:5, 29:11, 29:12, 37:24, 38:3, 38:4, 38:20, 42:14, 43:17, 44:8, 44:10, 51:2, 51:5, 52:15, 53:8, 53:10, 53:15, 56:17, 57:25, 60:20, 61:2, 61:11, 61:22, 61:25, 62:7, 63:13, 64:12, 65:8, 67:2, 69:3, 72:1, 77:24, 80:6, 82:5, 82:7, 88:8, 92:24, 94:15, 95:23, 100:7, 100:11, 100:15, 102:1, 104:2, 104:8, 104:14, 106:13, 111:8, 115:16, 115:18, 115:21, 116:5, 116:15, 118:16, 118:22, 120:6, 120:21, 121:4, 122:4, 122:7, 124:2, 124:2, 124:3, 126:13, 126:14, 127:3,

127:3, 130:6, 130:19, 133:8, 135:12, 135:14, 135:16, 135:17, 136:9, 136:11, 136:15, 136:18, 136:20, 136:25, 137:16, 137:24, 140:16, 144:6, 144:9, 145:15, 151:19, 151:20, 158:16, 166:19, 167:24, 168:1, 171:15, 172:4, 172:9, 180:3, 180:4, 181:9, 182:13, 182:23, 184:22, 189:24, 198:17, 202:1, 202:8, 210:24, 212:1, 214:24, 220:6, 220:8, 224:21, 224:22, 230:22, 233:15, 237:22, 238:3, 238:8, 239:15, 241:21, 243:21, 243:21, 245:18, 248:8, 248:11, 254:17, 254:18, 254:19, 255:8, 257:13, 257:14, 257:22, 258:10, 258:12, 258:17, 264:16, 267:9, 268:1, 268:14, 273:4, 276:2, 276:9, 276:9, 279:19, 283:11, 283:12, 283:13, 283:13, 284:8, 285:11, 288:11, 291:18, 291:20

**goldhapper** 272:22

**golf** 80:3

**golfer** 80:3

**golive** 230:24, 231:5, 232:21

**gone** 30:16, 53:19, 60:14, 287:2, 292:8

**gonna** 63:9, 65:7, 75:21, 165:24, 204:5, 210:17, 283:22, 288:1

**good** 4:1, 19:23, 72:3, 75:5, 76:23, 77:1, 77:14, 83:22, 91:22, 92:24, 105:23, 106:2, 106:16, 106:17, 125:21, 137:23, 141:2, 178:5, 181:11, 181:21, 182:10, 188:20, 198:1, 199:6, 199:25, 203:22, 204:6, 205:17, 207:11, 208:6, 208:11, 208:14, 211:5, 223:19, 231:4, 232:19, 232:24, 241:14, 243:13, 251:22, 264:12, 275:24, 286:14, 287:23, 287:24, 290:8

**google** 85:3, 86:22, 87:7, 87:8, 87:9, 162:17

**gosh** 35:10, 159:7, 205:7, 253:13, 255:13, 265:15

**got** 37:21, 47:16, 87:12, 94:22, 112:23, 113:17, 143:5, 158:21, 159:11, 177:21, 178:6, 178:8, 178:8, 181:24, 182:3, 189:18, 207:18, 225:3, 234:13, 234:21, 240:14, 240:14, 241:10, 261:4, 262:10, 273:16, 276:6, 277:22, 278:6, 282:19, 287:23, 290:8, 291:8

**gotcha** 232:24, 233:3

**gotta** 277:5, 289:16
**govern** 8:3, 8:4
**government** 5:12
**governs** 18:10, 80:20
**grab** 22:7, 82:5
**grand** 122:9, 159:8, 271:23
**grandparents'** 30:17
**grasp** 16:4, 16:10
**great** 8:10, 76:14, 145:5
**greatest** 201:15, 201:17
**greg** 21:9
**grell** 105:14, 105:19, 106:13
**grewal** 217:10
**grey** 232:18, 232:23, 233:3
**gross** 168:19
**groundwork** 56:16, 61:4, 61:5, 62:9, 114:8, 118:14, 161:1
**grown** 28:4
**guarantee** 135:11
**guess** 19:13, 20:12, 34:7, 66:9, 71:25, 76:4, 77:2, 82:13, 83:16, 87:4, 112:11, 128:7, 142:8, 166:4, 169:8, 171:3, 173:9, 184:14, 192:5, 192:19, 193:7, 193:9, 194:24, 195:1, 196:5, 199:9, 200:22, 201:12, 204:21, 210:9, 213:25, 227:5, 227:10, 228:21, 238:3, 245:24, 250:14, 251:10, 251:11, 253:15, 255:21, 260:10, 263:21, 265:6, 265:9, 266:24, 269:11, 269:13, 275:22, 279:17, 285:18

**guessing** 237:12
**guilty** 51:8, 51:11, 51:18, 57:9
**gun** 33:21, 90:15, 90:20, 90:22, 128:6, 163:22, 191:12, 195:17, 222:2, 266:9, 266:13
**gun-specific** 31:18
**gunner** 14:10, 14:12, 14:15, 14:19, 16:25, 23:16, 27:21, 132:25
**guns** 29:11, 29:22, 34:16, 131:16, 221:20, 265:15, 265:16, 265:18
**gunspring** 9:3
**guy** 19:16, 65:21, 78:3, 78:4, 80:9, 80:10, 158:21, 169:8, 179:19, 210:20, 251:12, 266:13, 270:24
**guy's** 270:23
**guys** 113:23, 141:8, 212:15, 240:15, 288:6, 289:16

---

### H

**hack** 71:17, 71:21, 71:24
**hacked** 71:13, 71:16, 71:22, 72:5, 82:21, 183:14, 183:15
**hairs** 11:2
**halt** 44:3
**hammer** 137:20
**hand** 5:25, 6:7, 11:11, 109:20
**handed** 120:17
**handle** 79:16, 82:12, 207:23, 207:24, 238:12, 238:20
**hands** 21:19
**hang** 44:14, 240:15
**hap** 222:3
**happen** 31:1, 58:16,

187:5, 221:7, 271:17, 271:22, 281:14
**happened** 30:25, 82:23, 91:10, 96:8, 105:25, 129:6, 181:14, 194:4, 194:9, 204:23, 206:1, 217:23, 222:3, 226:25, 236:20, 236:22, 245:23, 245:24, 261:6, 267:19, 267:24, 268:2, 271:5, 272:4, 283:6, 283:7, 283:8, 283:21, 283:23, 284:1, 287:12, 287:13
**happening** 90:8, 282:22, 285:3
**happens** 79:15, 79:25, 80:2, 159:9, 159:12
**happy** 33:5, 91:8, 91:9, 158:14
**hard** 17:5, 17:5, 24:25, 68:6, 69:11, 108:9, 128:18, 128:21, 172:19, 179:18, 179:21, 204:2, 229:11, 259:1, 259:2, 265:2, 278:17, 279:15
**harder** 35:24
**hardware** 14:3, 14:4, 14:7, 32:14, 32:19
**harm** 76:20, 97:19, 97:23, 97:25, 98:1
**harmful** 76:24
**harming** 75:22
**harvey** 144:14
**hate** 41:23, 266:4
**hated** 117:11
**haul** 181:10, 218:7
**head** 8:13, 91:11, 265:25, 273:16
**health** 134:16
**hear** 6:21, 8:12,

62:2, 67:18,
101:3, 101:5,
102:7, 102:8,
113:3, 194:15,
195:22, 195:24,
205:6, 206:24,
209:20, 265:19
**heard** 30:11, 35:3,
59:19, 59:22,
59:24, 82:23,
95:2, 95:2, 95:3,
113:1, 138:4,
149:8, 149:14,
167:8, 167:14,
167:15, 167:16,
278:2, 284:21,
285:15, 285:17,
285:18, 285:19,
289:1
**hearing** 94:16,
138:7, 181:23
**heart** 271:15, 272:6,
272:7
**hearts** 271:15,
272:6, 272:7
**heavily** 189:5
**height** 86:25
**held** 279:24
**hell** 78:4, 128:2,
288:15
**help** 100:4, 183:13,
188:23, 193:11,
193:12, 196:6,
196:13, 212:24,
214:24, 230:25,
230:25, 257:2,
271:13, 271:15,
281:10, 290:11
**helped** 99:12,
126:11, 126:12,
139:6
**helpfully** 190:8
**helps** 271:21
**hey** 21:9, 62:19,
63:1, 65:8, 65:20,
95:14, 113:2,
138:5, 139:19,
210:13, 210:24,
232:3, 242:5,
278:24, 289:16
**hidden** 159:14

**hide** 107:2, 189:15
**high** 42:7, 86:21,
184:23, 184:25,
185:3, 185:4
**high-profile** 281:6
**highly** 266:5,
266:25, 286:12,
286:12
**hillary** 56:7
**hilton** 259:9
**hire** 11:19, 278:19
**hired** 71:11, 106:9
**history** 30:24, 211:1
**hit** 104:2, 148:7,
175:9
**hitched** 31:17
**hits** 201:15, 201:17
**hog** 278:4
**hold** 5:12, 15:1,
44:7, 65:11,
74:21, 198:11,
207:1, 216:11,
221:18, 238:7,
244:4, 276:24,
287:5
**holder** 275:21
**holding** 14:6
**holds** 44:18
**holladay** 4:16, 25:5,
25:6, 90:23,
205:16, 205:20,
207:23
**home** 28:17, 28:18,
28:19, 29:23,
131:20, 287:17
**homecoming** 262:14,
262:20
**homemade** 29:21
**homemaker** 29:3, 29:8
**homemakers** 29:22
**honest** 148:7, 212:1,
248:11
**honestly** 28:6, 49:6,
178:10, 231:16
**honor** 248:9
**hope** 170:4, 214:25,
231:4, 232:19
**hopefully** 286:14
**hoping** 179:14
**horrible** 78:5, 80:12
**horse** 151:18

**hospitality** 269:8
**host** 23:4, 23:6
**hosted** 131:13
**hosting** 22:25, 23:2,
131:5, 131:10
**hotels** 256:8,
256:10, 256:15
**hour** 94:16
**house** 30:18, 144:5
**housed** 160:2
**housewife** 29:6
**houston** 144:14,
144:16
**howard** 4:10, 30:17,
43:24, 44:3, 52:4,
53:1, 53:20,
56:10, 57:25,
64:13, 67:3,
74:21, 79:21,
94:7, 102:4,
102:7, 112:23,
113:15, 113:15,
113:22, 114:9,
115:13, 116:7,
117:25, 119:24,
120:24, 126:13,
134:10, 137:11,
152:25, 239:18,
241:10, 249:13,
251:17, 256:22,
257:10, 258:4,
262:6, 268:17,
292:6, 292:10
**howard's** 61:25,
80:6, 143:6,
146:14, 180:7
**however** 165:19,
284:2
**huge** 218:10, 267:20,
282:6
**huh** 35:3, 121:18,
164:17, 222:9,
251:16, 281:15
**humor** 221:10
**hundred** 40:20
**hurricane** 144:11
**hurt** 126:8
**hurts** 267:5
**hypothetical** 40:6,
42:16, 42:16,
68:15, 80:6, 80:7,

80:16, 122:1,
163:16, 208:23
**hypothetically** 42:15

# I

**i-e-r-e** 4:19
**i-i** 158:6
**idea** 10:17, 19:17,
19:18, 39:16,
67:20, 78:24,
141:12, 142:16,
178:15, 178:17,
179:9, 186:8,
187:22, 212:3,
238:16
**identification** 5:12
**identified** 6:8,
187:1, 197:15,
200:1
**identify** 4:8, 132:5,
152:15, 157:5,
157:10, 157:12,
199:8, 199:18,
200:6, 205:23
**identity** 5:13,
227:22
**ignore** 136:11
**ignored** 113:3
**images** 242:19, 243:2
**immediate** 266:16,
270:16
**impacting** 265:5
**impeach** 261:3, 261:8
**impeached** 52:18
**impeaching** 260:24
**implemented** 234:19
**implication** 29:18,
29:19
**implicit** 123:13,
131:12, 150:6,
150:11, 150:13
**implies** 267:11,
267:12, 267:12
**important** 15:20,
74:6, 106:11,
193:16, 276:3,
276:5
**impossible** 244:20
**imposture** 41:3
**impressed** 205:16

**impression** 55:12
**impressive** 189:21
**improper** 135:4,
198:23
**improperly** 61:4
**improve** 132:22
**improved** 132:24,
133:1
**in-person** 227:17
**inc** 8:20, 10:22,
25:19
**incarcerated** 96:24
**incident** 49:16
**include** 14:5,
269:21, 269:21
**included** 70:19, 75:8
**includes** 23:13,
25:19, 183:18
**including** 28:19,
86:1, 205:22
**income** 34:1, 159:13
**incorrect** 60:4,
152:17
**incredulous** 68:21
**indefinitely** 176:15
**independent** 84:17,
146:7, 170:2,
207:14
**independently** 152:5,
152:6, 154:16,
154:17, 160:16
**index** 174:16
**indicate** 67:19,
140:23
**indicating** 191:8
**indication** 60:12,
196:1
**indications** 177:9
**indictment** 54:10,
253:24, 263:11,
284:9
**inducement** 185:19
**inducing** 186:11
**industries** 9:7
**industry** 12:1,
29:21, 31:19,
34:7, 34:20,
34:21, 35:1,
36:16, 86:16,
108:12, 125:14,
125:19, 147:21,

147:22, 149:24,
150:1, 176:14,
177:4, 177:5,
177:6, 177:11,
177:12, 178:21
**inevitable** 267:16
**inflection** 99:17,
100:3
**influence** 202:1
**influenced** 128:22
**inform** 58:18
**information** 36:13,
41:7, 41:9, 46:15,
58:22, 62:20,
63:1, 63:15,
63:22, 64:2, 65:2,
65:5, 69:17,
76:21, 81:22,
82:2, 146:25,
146:25, 147:7,
152:8, 154:21,
157:11, 165:16,
166:19, 166:22,
167:1, 188:25,
189:1, 190:12,
194:20, 207:13,
224:7, 282:9
**informed** 181:23,
231:2, 232:17,
253:1
**infringement** 90:24,
92:12
**ingredients** 121:10,
121:13, 121:22,
122:18
**inherently** 35:25
**initial** 55:21,
89:12, 90:2, 91:2,
118:16, 118:17,
195:25
**initially** 89:2,
89:7, 89:10
**initiated** 89:21,
89:22
**initiatory** 91:2,
130:23
**injunctions** 88:9,
88:14, 219:22,
220:1
**injury** 51:19, 51:20
**inkling** 138:5,

138:9, 138:10
**innocent**  29:22, 184:9
**input**  155:3
**inputs**  152:9, 155:4
**inquire**  52:1
**inquired**  130:7
**inquiry**  20:8, 20:9, 72:19
**inspect**  152:2, 153:21
**instance**  78:3, 127:20, 148:11
**instances**  115:7
**instant**  29:23
**instead**  61:23, 100:2
**instinct**  210:7, 210:11
**instinctual**  189:6
**instruct**  52:17, 53:9, 100:12, 256:24, 261:22, 262:3
**instructed**  8:11
**instructions**  121:4
**instrument**  209:14
**insurance**  85:8
**insurer**  85:5
**intelligence**  282:1, 282:2
**intelligent**  264:8
**intend**  172:17
**intends**  264:7
**intent**  80:12, 80:17, 184:6
**intention**  78:10
**intentional**  98:3, 98:4
**intentionally**  123:7
**interaction**  253:23
**interactions**  264:17, 269:14
**intercourse**  50:15, 50:24, 50:25, 51:8
**interest**  82:11, 128:12
**interesting**  49:19, 79:5, 106:14, 173:8, 202:22, 203:1, 203:7, 205:23, 209:20,

209:23, 209:24, 211:9, 211:25, 224:2, 284:22
**interfere**  210:17, 210:25, 263:12
**interfering**  199:15
**internet**  31:24, 58:1, 86:4, 205:22, 271:1, 271:3
**interpret**  78:8, 81:3
**interpretation**  184:17
**interpreted**  185:21, 269:7
**interpreting**  61:23, 61:23
**interrogated**  93:6, 255:2, 255:2
**interrogatory**  142:20, 166:9
**interrupt**  74:17, 263:12
**interrupting**  118:13
**interruption**  98:3
**interspersed**  244:19
**intervener**  219:24
**intervening**  91:10, 91:21, 91:22, 95:21
**interview**  175:1, 274:11, 275:5, 275:7, 275:10, 275:19
**interviewed**  254:6
**interviews**  175:23, 272:17, 272:20, 272:21, 273:10, 273:14, 273:25, 274:3, 274:7, 274:18, 274:19, 274:24, 274:24, 275:10
**introduce**  232:6
**intrude**  241:11
**intuition**  105:21
**inventory**  37:22
**inverse**  133:16
**inversely**  125:20
**investigate**  159:14, 169:12

**invitation**  224:4, 224:11
**invite**  53:4, 64:12, 64:20
**invited**  52:24, 52:25, 53:2, 54:4, 83:17
**inviting**  64:16, 64:20, 64:21, 224:9
**invoked**  43:14, 45:2
**involuntarily**  26:9, 26:10
**involved**  26:5, 26:6, 96:14
**involvement**  231:3, 232:18
**ipod**  29:9
**irony**  78:9
**irrelevant**  257:18, 257:19
**isolate**  169:19, 169:21
**israel**  182:4
**issue**  100:16, 114:17, 127:10, 133:17, 134:1, 137:13, 189:14
**issued**  119:4, 200:3
**issues**  49:13, 49:16, 50:11, 83:18
**item**  30:22, 53:12
**items**  20:18, 20:20, 20:21
**iteration**  14:14, 111:14, 113:20
**iterations**  109:15, 110:9, 111:17, 114:18

---

### J

---

**jane**  227:11
**january**  25:19
**jason**  62:3, 291:3, 291:5, 291:6
**jeff**  105:14, 106:13
**jersey**  217:9
**jewel**  205:6
**jewels**  202:14, 202:16, 204:19

**job**  40:23, 40:24, 65:7, 71:11, 84:12
**jobs**  11:23, 278:12
**john**  4:5, 90:23, 190:8, 190:16, 190:20, 190:24, 191:6, 191:12, 192:3, 192:8, 192:17, 192:19, 193:1, 196:20, 196:21, 197:1, 197:2, 207:18, 230:7
**joined**  87:3, 247:15
**joining**  87:5
**joke**  108:11
**jokes**  108:13
**jokingly**  177:14
**journalism**  282:25
**judge**  24:20, 44:14, 53:2, 56:18, 56:22, 63:9, 63:13, 115:16, 115:18, 128:18, 128:21, 135:9, 135:13, 222:17, 266:11
**judges**  56:8, 222:4
**judgment**  193:6, 219:11, 219:14, 219:17, 270:22
**judgments**  268:1
**july**  125:10
**jump**  37:24, 38:20, 220:1
**jumped**  191:7, 292:10
**jumping**  180:14
**june**  125:10, 231:8, 231:16, 232:25, 236:15, 236:18, 237:1, 237:24, 238:1, 238:13, 243:21
**jurisdiction**  218:2
**jurisdictions**  4:24

## K

**karmic**  267:11
**keep**  12:22, 12:24, 82:7, 86:20,

118:13, 144:5, 145:15, 158:16, 177:25, 216:2, 233:15, 243:21, 243:21, 267:8, 267:10
**keeping**  127:3
**keeps**  144:9
**kept**  194:17
**keurig**  30:1, 30:5, 30:5, 30:7, 30:11, 30:13, 31:13
**khalid**  4:6
**kick**  84:13, 84:14
**kids**  42:7
**kind**  15:4, 17:3, 21:18, 21:20, 23:19, 30:4, 33:21, 34:5, 34:15, 35:23, 41:24, 46:17, 62:11, 78:8, 85:15, 106:19, 106:25, 108:10, 108:15, 114:8, 115:4, 118:12, 129:19, 130:10, 130:10, 130:17, 133:10, 133:15, 145:16, 150:8, 151:12, 151:15, 151:18, 169:6, 174:18, 175:16, 177:8, 177:25, 183:13, 183:14, 185:21, 186:14, 186:14, 187:14, 188:19, 189:15, 196:1, 196:2, 199:9, 203:1, 203:18, 203:23, 204:12, 210:5, 210:10, 210:13, 211:23, 216:5, 218:25, 222:2, 222:2, 223:6, 244:24, 251:12, 259:8, 260:11, 263:22, 264:5, 264:5, 265:16, 265:18, 266:21,

267:12, 267:16, 269:3, 269:8, 269:11, 270:18, 271:13, 272:15, 274:7, 274:20, 277:13, 281:6, 282:1, 283:3
**kinds**  95:11, 165:17, 264:3, 277:1, 279:25
**kino**  60:10, 147:1
**kit**  14:5, 14:5
**knee-jerk**  263:19
**knew**  11:18, 11:18, 60:8, 129:13, 133:2, 133:3, 148:18, 175:22, 175:22, 175:22, 175:22, 254:5, 282:15
**know**  6:13, 6:22, 6:25, 7:16, 8:10, 9:2, 11:2, 11:17, 12:14, 13:16, 14:1, 14:17, 15:12, 17:12, 19:21, 20:5, 21:8, 23:17, 25:19, 25:21, 25:24, 28:6, 28:9, 29:2, 29:3, 30:9, 31:22, 32:6, 32:15, 34:8, 36:13, 36:14, 36:15, 36:17, 37:4, 37:11, 37:11, 38:7, 38:16, 39:17, 39:20, 39:22, 41:24, 42:23, 42:24, 46:15, 47:8, 47:12, 47:12, 48:20, 49:6, 50:13, 53:11, 56:7, 58:4, 58:5, 59:14, 59:16, 60:7, 60:10, 60:16, 61:25, 62:18, 63:12, 64:11, 65:6, 65:6, 65:14, 66:9, 67:12, 68:2,

68:10, 68:10,
68:20, 69:10,
69:12, 69:16,
70:6, 70:17,
74:17, 76:18,
76:19, 78:22,
79:3, 79:8, 79:23,
80:6, 82:3, 82:11,
84:23, 85:20,
86:24, 87:9,
88:16, 89:7, 91:6,
91:12, 91:24,
91:24, 93:17,
93:23, 94:17,
95:9, 95:10,
95:12, 95:16,
95:19, 95:19,
95:21, 96:13,
98:10, 98:17,
98:23, 99:5,
101:24, 105:21,
105:22, 107:2,
107:11, 108:12,
108:12, 109:14,
110:1, 110:8,
110:14, 111:21,
111:25, 113:6,
114:14, 116:9,
117:13, 118:10,
119:24, 120:19,
123:3, 125:4,
127:21, 128:12,
128:17, 134:17,
138:17, 139:9,
139:16, 140:10,
141:10, 141:11,
141:24, 141:25,
142:2, 142:3,
142:4, 142:15,
142:15, 143:16,
144:5, 144:23,
144:23, 145:10,
146:11, 146:11,
146:18, 146:19,
146:20, 146:20,
147:6, 148:10,
148:10, 148:15,
148:21, 151:2,
152:14, 152:23,
153:13, 153:24,
154:6, 154:19,

154:19, 155:1,
155:2, 155:8,
156:11, 156:17,
156:22, 157:1,
157:4, 157:14,
158:9, 158:11,
158:21, 158:23,
159:10, 160:15,
161:2, 161:3,
161:3, 161:3,
162:16, 162:17,
163:3, 167:12,
169:10, 169:18,
169:25, 170:4,
170:4, 170:8,
170:13, 170:15,
170:18, 170:18,
171:4, 171:11,
171:20, 172:5,
172:6, 172:6,
172:13, 172:18,
173:11, 173:19,
175:4, 175:10,
176:5, 176:11,
176:14, 177:5,
177:18, 177:22,
178:6, 178:19,
179:17, 179:20,
180:7, 180:8,
180:13, 181:13,
181:16, 181:17,
183:2, 185:11,
185:19, 185:25,
186:21, 188:16,
189:7, 189:23,
189:23, 189:25,
190:2, 190:2,
190:5, 191:3,
191:4, 191:6,
192:14, 192:19,
194:10, 194:12,
194:19, 195:10,
195:12, 195:14,
195:16, 195:25,
196:12, 196:25,
200:15, 200:23,
201:5, 201:7,
201:8, 201:10,
201:12, 203:6,
203:6, 203:10,
203:19, 203:22,

203:25, 204:2,
204:4, 205:9,
206:7, 206:18,
207:6, 207:17,
208:15, 208:15,
208:23, 210:1,
210:8, 210:14,
211:4, 211:19,
213:12, 213:17,
213:23, 214:6,
214:9, 214:11,
214:13, 214:15,
214:18, 215:11,
216:2, 216:4,
216:8, 217:22,
218:3, 218:4,
218:5, 218:15,
219:4, 219:15,
219:17, 219:19,
219:24, 220:3,
220:18, 221:16,
222:2, 222:22,
227:11, 227:13,
227:14, 227:16,
227:19, 227:22,
228:19, 228:20,
228:20, 229:12,
229:15, 230:2,
230:5, 230:5,
230:22, 231:20,
232:1, 238:3,
238:4, 238:6,
239:16, 240:5,
243:18, 244:2,
245:25, 246:2,
246:6, 247:17,
248:12, 248:18,
249:8, 250:12,
251:15, 253:9,
253:11, 253:11,
253:12, 253:13,
253:14, 253:15,
253:15, 253:20,
254:4, 255:15,
255:19, 256:20,
257:6, 260:12,
260:14, 263:13,
263:21, 264:4,
265:5, 265:14,
266:5, 266:11,
266:14, 266:20,

267:6, 267:8, 267:12, 269:8, 269:9, 269:24, 270:2, 270:3, 270:3, 270:21, 271:1, 271:9, 271:11, 271:12, 271:14, 272:4, 272:11, 273:9, 273:24, 274:20, 274:23, 275:25, 276:2, 277:3, 278:2, 278:18, 278:21, 278:22, 280:11, 281:5, 281:15, 281:25, 282:2, 282:8, 282:9, 282:17, 282:18, 283:1, 283:11, 284:6, 284:11, 284:14, 284:19, 285:14, 286:2, 289:4

**knowing** 107:4, 149:20, 188:17

**knowingly** 186:8, 189:14

**knowledge** 21:18, 109:13, 138:3, 188:12, 207:22, 259:1, 265:11

**known** 143:19, 148:15, 152:13, 284:10, 291:9

**knows** 35:25, 47:8, 170:20, 186:12, 188:2, 214:18, 216:7

## L

**l-a-r-o-s** 4:19
**labeled** 15:22
**labor** 21:16, 21:17
**lack** 120:4
**laden** 189:5
**lady** 54:13, 54:16, 54:22, 54:24, 54:25, 226:7, 226:9, 226:12, 226:18, 238:5, 242:8, 248:22,

264:18
**landed** 90:25
**landing** 55:19
**landlord** 68:11, 68:17, 68:21
**language** 186:16, 186:18, 200:8, 235:15, 235:21, 236:1
**laptop** 287:5
**large** 26:8, 86:16, 145:6, 172:14, 172:18, 277:23
**largely** 223:6
**larger** 18:23
**larosier** 4:19
**larosiere** 4:17, 72:9, 95:20, 115:4, 194:11, 194:19, 195:16, 196:1, 199:10, 200:3, 202:25, 203:4, 203:13, 203:15, 204:3, 205:16, 205:20, 207:24, 210:21, 210:22, 214:13, 214:20, 218:4, 218:12, 239:13
**larosiere's** 7:8
**last** 12:12, 14:16, 24:19, 25:15, 27:22, 27:24, 28:2, 38:21, 44:4, 46:20, 46:23, 105:18, 145:8, 158:9, 205:18, 209:23, 222:21, 223:21, 230:3, 232:6, 232:8, 234:5, 234:7, 244:23, 263:11, 263:25, 280:3
**late** 262:19, 268:6
**later** 37:25, 68:20, 135:10, 158:19, 175:10, 192:25, 231:6, 232:21
**laughing** 232:20
**launch** 230:8, 230:10, 232:23,

237:9
**launched** 230:12
**launching** 236:10
**laundry** 185:18
**law** 15:11, 15:23, 15:24, 16:4, 16:10, 16:11, 17:1, 17:2, 17:3, 18:21, 19:1, 98:7, 98:15, 105:1, 108:9, 147:22, 155:20, 155:21, 178:6, 203:24, 208:18, 218:18, 219:20, 280:4
**laws** 15:6, 15:7, 15:9, 15:10, 15:13, 15:14, 15:19, 18:19, 187:2, 266:9
**lawsuit** 4:11, 4:12, 25:10, 74:13, 75:11, 75:12, 75:14, 88:10, 88:14, 89:8, 90:2, 90:11, 90:24, 91:5, 91:13, 92:17, 94:20, 190:13, 191:2, 191:13, 191:15, 192:6, 193:15, 193:17, 193:21, 194:17, 195:11, 195:17, 196:2, 196:8, 196:12, 196:18, 196:21, 199:11, 199:16, 199:24, 200:3, 202:19, 213:21, 214:3, 214:6, 217:5, 220:4, 221:2, 221:5, 221:9
**lawsuit's** 193:7
**lawsuits** 89:18, 90:3, 90:9, 92:8, 130:23, 214:18, 214:19, 266:16, 282:23
**lawyer** 7:15, 9:9, 16:1, 44:19,

70:17, 115:9,
195:25, 214:19,
214:20, 241:8
**lawyers** 42:21, 80:2,
171:9
**lay** 118:14, 198:14,
198:18
**layaway** 35:2, 35:3
**laying** 56:16, 61:5,
62:8, 114:8, 161:1
**layperson** 220:13
**layperson's** 216:6,
216:19, 217:4
**leading** 186:8
**leaping** 167:20
**learn** 177:2
**learned** 66:13,
129:10, 141:16,
175:7
**learning** 98:16
**leased** 250:23,
251:2, 251:3
**least** 41:4, 78:17,
179:8, 183:24,
187:15, 211:14,
213:23, 220:14,
224:11, 226:12,
226:17, 226:18,
244:12, 266:7,
266:8
**leave** 43:17, 44:8,
73:24, 74:2, 74:3,
139:19, 174:3,
182:14, 222:23,
275:11, 275:12,
275:15
**leaving** 43:17, 275:5
**led** 104:12, 104:22,
105:6, 107:3,
267:15
**ledgers** 160:14
**left** 46:14, 46:18,
46:19, 140:19,
140:21, 174:4,
174:23, 259:11,
292:10
**legal** 12:4, 42:23,
49:12, 49:16,
50:11, 70:25,
88:16, 91:25,
92:16, 94:17,

94:21, 94:22,
95:1, 95:4, 95:13,
185:25, 214:3,
232:25, 266:4
**legally** 172:3
**legally-minded** 216:3
**legitimately** 217:22
**legs** 205:18
**less** 33:22, 56:22,
123:20, 128:13,
128:13
**let** 6:18, 6:22,
6:24, 8:11, 18:14,
19:2, 22:5, 22:7,
28:7, 34:14,
37:24, 40:8,
41:21, 45:17,
51:25, 54:12,
67:11, 67:12,
68:8, 68:8, 71:12,
74:8, 74:9, 101:8,
101:22, 112:19,
118:9, 118:15,
142:24, 157:23,
181:17, 182:24,
201:18, 204:13,
210:14, 228:4,
234:12, 235:9,
239:7, 243:4,
243:18, 244:11,
245:13, 258:16,
275:2, 275:2,
286:19, 286:22,
287:6, 287:10,
287:11
**let's** 16:20, 17:10,
20:8, 24:20,
25:12, 25:18,
26:12, 27:11,
27:21, 32:13,
33:9, 43:10, 46:7,
48:15, 53:1, 57:9,
63:14, 77:9,
79:19, 82:3,
85:13, 87:20,
88:9, 89:2, 90:3,
101:8, 101:17,
107:19, 108:15,
119:18, 120:6,
141:21, 145:15,
145:15, 152:24,

158:16, 163:4,
163:6, 163:18,
179:3, 194:16,
217:24, 239:6,
240:20, 241:17,
254:18, 258:19,
287:10
**lettman** 4:20
**level** 16:24, 126:8,
185:1, 185:3,
185:4, 219:4,
266:10
**levels** 56:4
**libertarian** 278:19
**liberties** 283:4
**librarian** 21:2
**license** 5:19
**lies** 207:8
**lieutenant** 149:16
**life** 267:7, 268:3,
271:18, 275:9
**lifetime** 177:2
**like** 9:5, 9:16,
15:15, 16:25,
17:18, 18:17,
20:16, 21:18,
23:17, 23:19,
24:7, 24:18,
26:25, 30:1, 30:2,
30:4, 30:5, 30:24,
32:3, 33:9, 33:13,
34:23, 34:24,
35:23, 36:9, 37:9,
38:20, 40:6,
40:21, 41:2,
42:21, 42:22,
42:22, 42:24,
44:13, 51:24,
56:8, 59:24, 60:3,
69:12, 70:7,
76:18, 77:15,
77:22, 77:24,
78:4, 78:19,
78:22, 79:11,
79:14, 79:18,
84:20, 87:7,
91:25, 98:18,
102:9, 104:14,
105:4, 106:4,
106:8, 106:17,
117:15, 117:16,

121:19, 122:1,
123:17, 125:1,
136:2, 137:12,
137:17, 137:20,
142:2, 142:3,
142:4, 142:20,
145:7, 148:10,
165:15, 169:8,
173:11, 175:3,
176:18, 176:21,
177:3, 178:24,
178:25, 180:1,
180:15, 183:14,
184:2, 184:13,
184:25, 185:6,
187:11, 187:13,
187:23, 187:24,
189:4, 189:5,
189:9, 190:10,
192:20, 193:9,
193:11, 193:23,
193:25, 194:24,
195:23, 197:20,
197:23, 203:10,
203:18, 203:19,
203:21, 203:24,
204:22, 205:5,
208:10, 208:15,
208:21, 209:13,
209:18, 210:5,
210:7, 210:13,
211:19, 211:20,
211:22, 211:22,
211:23, 212:7,
212:18, 212:19,
212:20, 212:23,
212:24, 213:12,
215:13, 217:6,
217:22, 219:8,
219:24, 219:25,
221:13, 221:20,
221:22, 222:15,
224:6, 224:8,
224:21, 225:3,
225:5, 225:21,
227:6, 233:3,
233:5, 234:1,
234:3, 235:10,
235:21, 236:2,
237:20, 238:17,
240:23, 242:12,

242:23, 242:24,
245:1, 245:2,
245:4, 245:4,
245:6, 246:8,
251:20, 252:23,
252:24, 253:14,
256:12, 259:8,
259:8, 259:24,
260:11, 262:21,
263:18, 263:22,
264:2, 264:7,
264:11, 264:13,
265:9, 265:14,
265:16, 265:19,
265:20, 265:21,
266:16, 267:1,
267:9, 267:23,
268:2, 268:14,
269:1, 269:3,
269:8, 269:9,
269:16, 269:18,
270:4, 270:12,
270:16, 270:20,
270:22, 270:22,
271:2, 271:5,
271:13, 271:16,
272:11, 272:13,
272:15, 274:2,
274:7, 274:10,
274:13, 274:21,
274:24, 275:20,
276:9, 277:13,
277:19, 277:23,
277:24, 278:6,
279:25, 280:10,
280:15, 280:16,
281:25, 282:7,
282:8, 283:2,
283:11, 283:16,
283:18, 283:20,
283:21, 283:22,
285:20, 286:7,
286:10, 286:21,
289:5, 289:9

**likely** 25:2, 69:9,
151:18, 190:20
**line** 52:16, 53:1,
53:3, 53:4, 54:4,
104:18, 129:7,
133:9, 208:8,
217:8, 241:7,

244:18, 258:11,
259:24, 270:23,
272:23, 283:2
**lines** 13:25, 14:4,
30:23, 213:18,
239:2, 240:24
**liquid** 286:3
**list** 201:17, 266:18
**listed** 152:22,
169:6, 191:20
**listen** 93:2, 213:1,
283:11
**listened** 83:9
**listening** 82:5,
117:22, 210:6
**lists** 208:3, 208:3
**lit** 163:10
**literally** 40:16,
104:17, 134:18,
134:23, 144:22,
222:3
**literary** 184:24
**literature** 163:1,
163:8, 163:11,
163:12, 163:13,
163:14, 165:5
**litigants** 24:8,
24:11, 24:23,
25:3, 25:12,
79:16, 89:13,
90:12, 91:13,
91:19, 95:10,
96:8, 222:13
**litigate** 81:5
**litigation** 23:18,
23:21, 23:22,
23:25, 25:3, 26:2,
26:4, 26:6, 26:9,
76:22, 79:19,
85:16, 89:2,
91:19, 91:21,
91:22, 115:5,
119:12, 130:15,
220:19, 263:13
**little** 23:18, 24:19,
32:13, 34:20,
37:24, 38:20,
41:18, 108:15,
116:25, 121:1,
187:24, 187:24,
194:10, 210:9,

243:19, 253:3, 259:23, 269:4, 275:25, 288:13, 289:20

**live** 144:13

**llc** 8:24, 8:25, 9:3, 9:12, 12:3, 23:11

**loan** 180:2, 180:4

**lobby** 123:4

**located** 4:24, 108:23

**location** 37:12, 160:2

**locations** 160:3, 160:4

**logo** 79:1

**long** 36:25, 37:9, 38:10, 62:4, 73:24, 74:3, 98:15, 177:16, 179:25, 229:22, 230:3, 256:12, 258:22, 258:24

**longer** 107:7, 118:14, 228:16, 230:6, 249:25, 256:1

**look** 47:14, 48:14, 56:8, 80:9, 84:8, 84:12, 106:24, 123:3, 130:18, 134:11, 138:6, 158:4, 163:24, 164:5, 172:6, 172:13, 173:14, 177:10, 212:9, 222:5, 228:1, 231:10, 237:18, 249:7, 263:16, 268:22, 271:25, 275:3, 283:19, 286:10, 288:24, 289:9

**looked** 32:15, 82:23, 85:6, 176:12, 176:13, 260:11, 266:12

**looking** 30:9, 31:24, 33:12, 46:20, 65:17, 101:13, 105:24, 106:2, 185:9, 185:10,

203:7, 215:3, 235:11, 267:23, 282:22, 284:1, 289:1

**looks** 214:20, 283:19

**loose** 10:17

**lore** 251:21

**lose** 94:7, 176:17

**loses** 220:19

**loss** 169:13, 174:16, 174:18

**losses** 152:5, 154:17, 215:17, 220:21, 220:24

**lost** 141:20, 220:17

**lot** 9:8, 28:7, 33:19, 34:21, 35:21, 61:22, 128:5, 172:6, 184:23, 189:18, 193:8, 196:11, 199:11, 204:11, 206:11, 208:11, 218:11, 219:19, 266:15, 266:18, 271:4, 277:22, 278:16, 282:16, 283:4, 285:24, 288:18

**lots** 174:15, 174:16, 195:21, 196:15, 215:16, 219:16

**loud** 6:19, 6:23

**love** 11:24, 115:16, 115:18, 137:19, 138:16, 168:7, 184:25, 195:22, 202:5, 202:6

**lower** 6:6

**lower-end** 34:22

**lucky** 42:1

**lunch** 175:9

**lying** 56:9, 56:10, 56:10, 56:18, 61:12

---

## M

**m-a-n-d-i-a-n-t** 85:2

**machine** 14:6, 14:8, 14:10, 15:21, 16:12, 28:2,

29:13, 30:2, 30:7, 34:16

**machines** 15:17, 28:7, 30:14, 30:21

**made** 7:24, 54:15, 67:2, 72:19, 74:2, 74:6, 75:7, 94:18, 96:17, 101:24, 105:3, 130:4, 141:7, 183:10, 190:20, 192:24, 197:25, 210:10, 238:20, 259:25, 260:1, 263:7, 266:10, 266:13, 282:12

**made-up** 142:11

**madison** 257:15

**magazine's** 193:4

**magazines** 191:25, 192:1, 192:2

**mail** 88:2

**mail's** 88:1

**main** 14:23, 14:25, 85:15

**major** 27:24, 34:2, 223:15, 223:17, 266:8

**majority** 140:18, 140:20

**make** 8:1, 8:15, 15:20, 17:4, 17:9, 20:8, 20:9, 22:18, 41:23, 44:17, 48:22, 48:24, 52:6, 64:2, 74:4, 74:8, 81:17, 81:20, 84:23, 94:14, 111:2, 130:10, 132:6, 134:1, 142:10, 146:7, 147:23, 150:13, 163:11, 188:9, 203:15, 209:2, 210:16, 212:15, 220:16, 221:6, 256:12, 263:9, 264:3, 264:5, 265:7, 268:1, 271:21, 275:10, 279:18,

281:20, 282:14,
282:18, 283:10,
283:14
**maker** 30:22
**maker's** 30:10
**makers** 32:5
**makes** 21:2, 27:5,
34:7, 35:4, 48:23,
213:6, 213:17,
220:15, 238:7,
264:2, 272:11,
272:13, 272:15,
282:14, 283:15,
283:19, 286:3,
286:10
**making** 44:15, 116:9,
121:23, 122:3,
144:22, 199:11,
199:13, 226:23
**malfeasance** 185:22,
185:24, 186:6
**malicious** 78:8,
186:14
**man** 37:11, 172:13,
195:13, 205:9,
215:16, 233:20,
254:15, 254:15,
273:16, 279:15
**management** 10:16
**mandiant** 84:25
**manifold** 265:2
**manipulative** 233:25
**manner** 24:20
**manufacturers** 31:4
**many** 10:14, 10:16,
10:25, 12:1,
12:10, 17:13,
17:18, 20:14,
20:18, 21:16,
21:18, 26:7,
59:21, 65:5, 66:2,
66:18, 84:24,
86:23, 107:8,
107:19, 108:13,
109:15, 110:9,
115:6, 129:6,
131:25, 132:7,
132:8, 140:7,
140:12, 140:17,
140:24, 152:22,
172:19, 175:1,

203:25, 206:10,
220:24, 220:24,
252:15, 265:2
**march** 7:6, 7:6,
48:16, 49:2, 49:4,
58:8, 58:11,
58:14, 134:2,
230:12, 230:15
**margin** 266:11
**mark** 127:3, 232:21,
247:10
**market** 15:19, 28:8,
28:10, 28:10,
28:12, 28:13,
28:22, 28:24,
31:2, 31:3, 31:16,
31:19, 32:9,
170:2, 270:22
**marketing** 15:18,
31:20, 31:22,
146:4
**married** 241:11,
241:12
**marshals** 55:9
**martini** 79:22
**mat** 7:9
**match** 168:15, 244:20
**material** 121:3
**materials** 146:6
**math** 179:16
**matt** 4:17, 41:25,
115:6, 195:24,
239:7
**matter** 26:13, 60:9,
78:10, 80:12,
80:17, 81:10,
81:12, 81:18,
89:12, 94:19,
122:10, 122:12,
129:6, 129:10,
130:24, 147:24,
222:15, 226:1,
226:19, 226:21,
226:22, 228:15,
233:2, 236:13,
261:17, 265:11,
265:11
**matthew** 4:18,
195:16, 196:1,
200:3, 202:25,
203:4, 203:13,

203:15, 210:21,
214:13, 214:19,
218:4, 218:12,
257:13
**may** 4:2, 4:24, 6:11,
7:15, 9:10, 17:2,
20:8, 20:8, 20:9,
21:19, 29:8,
29:12, 34:13,
35:19, 35:20,
38:1, 49:8, 49:10,
56:18, 56:22,
58:8, 58:11,
58:14, 60:3,
61:20, 62:6,
66:10, 68:24,
69:1, 92:16,
94:19, 102:17,
109:5, 109:6,
118:21, 121:2,
125:10, 136:19,
138:6, 142:16,
172:18, 183:19,
199:12, 206:10,
228:11, 245:7,
248:24, 248:24,
258:2, 261:18,
273:8
**maybe** 10:17, 11:18,
11:19, 12:12,
13:15, 18:3,
31:13, 35:14,
50:19, 50:19,
51:19, 68:23,
76:11, 80:11,
149:17, 172:19,
172:22, 172:25,
187:7, 191:7,
196:6, 214:16,
220:22, 225:25,
228:7, 250:14,
260:21, 261:2,
261:8, 265:4,
266:13, 266:15,
275:11
**mean** 7:13, 9:9,
10:2, 12:4, 13:16,
15:1, 16:15, 19:5,
19:22, 21:5, 21:8,
21:12, 22:13,
23:2, 23:23,

25:22, 26:1, 26:6,
26:22, 27:7,
27:19, 28:11,
29:17, 30:8, 34:7,
34:23, 36:12,
36:15, 37:6,
37:19, 39:14,
47:5, 47:6, 47:7,
47:18, 48:14,
49:23, 49:24,
50:18, 50:21,
52:24, 56:4, 58:1,
60:9, 60:14,
60:17, 67:10,
68:24, 68:25,
69:1, 69:9, 72:24,
78:21, 79:9,
79:21, 83:16,
83:25, 84:12,
84:13, 84:18,
85:9, 85:22, 86:6,
88:23, 91:10,
95:2, 95:2, 95:13,
97:17, 98:11,
105:25, 108:10,
109:20, 114:16,
119:25, 121:16,
121:20, 126:20,
128:2, 131:5,
136:17, 137:5,
138:19, 139:16,
142:8, 143:20,
150:16, 157:1,
158:23, 159:10,
163:11, 163:15,
168:16, 169:1,
171:2, 172:6,
173:1, 173:3,
173:14, 174:13,
174:25, 175:17,
178:16, 178:20,
180:1, 180:7,
184:23, 185:23,
186:5, 186:15,
187:7, 187:13,
187:19, 189:18,
191:15, 192:9,
192:19, 195:6,
195:8, 195:9,
196:13, 199:12,
203:14, 203:20,

203:20, 205:9,
206:24, 209:4,
209:11, 210:3,
210:10, 210:11,
210:11, 211:7,
211:18, 212:11,
212:18, 212:19,
215:11, 218:4,
218:24, 218:25,
219:24, 220:25,
221:15, 221:18,
221:19, 222:23,
225:7, 225:17,
229:6, 229:8,
229:15, 230:4,
230:5, 231:1,
233:3, 235:10,
236:12, 236:15,
237:19, 237:22,
238:4, 241:4,
241:11, 243:1,
243:1, 250:12,
250:14, 251:17,
262:19, 264:10,
265:15, 266:22,
267:3, 267:5,
269:2, 269:19,
269:25, 270:19,
271:11, 271:12,
274:15, 275:13,
277:17, 278:18,
279:21, 282:6,
284:13, 288:24
**meaning** 22:16,
185:25, 215:6
**means** 93:17, 112:1,
112:12, 141:16,
154:20, 155:8,
186:22, 189:16,
231:7, 278:2
**meant** 15:13, 50:20,
50:20, 81:11,
185:21, 189:5,
189:16, 274:21,
283:3
**measure** 176:9, 265:3
**meatloaf** 121:19
**media** 127:13,
127:18, 127:20,
127:25, 128:1,
128:4, 128:5,

128:12, 128:13,
128:14, 128:17,
128:21, 128:22,
128:23, 220:15,
220:16, 264:14,
264:14, 270:15
**meet** 145:5, 225:8,
226:4, 226:7,
226:9, 227:3,
248:23
**meeting** 231:3,
232:18
**member** 87:2, 147:21,
194:1, 194:3
**members** 12:10,
20:22, 20:23,
20:24, 86:23,
200:6, 202:7,
268:23
**membership** 12:7
**memberships** 176:25
**meme** 49:7, 49:9,
49:10, 58:3, 72:6,
72:12, 72:17,
73:5, 73:10,
73:11, 73:18,
74:10, 74:10,
75:8, 75:8, 75:9,
75:23, 75:24,
76:14, 77:11,
77:13, 77:16,
77:19, 77:22,
78:5, 78:6, 78:7,
80:10, 80:11,
80:11, 80:20,
85:13, 85:23,
86:1, 86:3, 86:17,
87:10, 87:16,
88:23, 96:15,
106:25, 107:1,
108:24, 109:8,
109:11, 118:22,
124:6, 124:12,
124:18, 140:8,
140:20, 140:23,
142:16, 142:16,
143:14, 143:17,
144:1, 173:10,
174:8, 174:19,
180:14, 182:25,
184:15, 184:17,

184:20, 185:9, 185:10, 185:14, 190:10, 201:16, 203:10, 203:25, 205:13, 205:21, 205:21, 206:8, 206:11, 207:9, 207:14, 207:16, 208:15, 212:15, 220:24, 220:25, 223:8, 223:12, 223:14, 223:15, 249:13, 249:15, 249:15, 273:13
**memes** 87:15
**memorable** 281:6
**memory** 37:10, 249:8, 249:9, 249:25, 252:25, 253:1, 253:4, 281:7
**mental** 267:16
**mention** 37:17, 213:20, 213:23, 214:1
**mentioned** 9:22, 23:21, 25:3, 25:7, 25:16, 37:15, 37:16, 37:18, 37:23, 52:23, 193:8, 195:1
**mentions** 25:20, 195:24, 272:21
**merely** 160:20, 160:24
**message** 149:3, 202:11, 231:2, 231:21, 232:2, 232:17, 232:19, 232:22, 232:24, 232:25, 233:3, 233:16, 235:12, 236:5, 242:24, 244:2, 244:25
**messages** 130:11, 230:1, 233:6, 236:19, 236:22, 242:9, 242:9, 242:10, 242:12, 245:16, 245:17, 245:18, 245:20, 245:24, 246:12

**met** 80:9, 226:12, 227:2, 227:13, 227:17, 228:10, 229:5, 229:6, 229:13, 229:13, 248:22, 248:24
**method** 103:18, 103:19
**mhm** 233:14, 242:18
**mic** 7:3
**micro** 28:12, 28:13, 28:14, 31:6, 31:10, 31:11
**middle** 7:6, 7:10, 7:14, 89:3, 89:10, 90:4, 91:13, 91:20, 92:7, 96:9, 233:23, 237:17
**might** 31:13, 37:25, 68:22, 76:15, 98:17, 126:23, 138:5, 155:15, 179:2, 214:24, 229:2, 229:4, 233:25, 256:7, 269:16
**military** 149:4, 149:9, 149:12, 181:25
**mill** 15:3, 15:18, 15:19
**million** 280:10, 280:15
**mincing** 60:18, 60:19, 60:20
**mind** 24:17, 41:22, 60:10, 83:10, 84:25, 91:11, 104:5, 116:22, 172:4, 185:11, 188:19, 265:5, 272:23
**mine** 273:8
**mine's** 288:2
**minor** 50:3, 51:19, 51:20, 63:13
**minute** 53:25, 237:19, 241:2, 242:25, 260:19
**minutes** 49:11, 49:12, 60:4,

123:17, 123:21, 123:22, 124:1, 124:1, 137:10, 137:11, 145:8, 181:20, 280:4, 286:23
**misdemeanor** 57:10, 186:14, 186:15
**miserably** 56:8
**misinformation** 273:13
**misogynistic** 29:5
**miss** 287:22
**missing** 152:15, 157:5, 157:6
**mission** 12:6, 12:9, 12:18, 13:2, 13:4, 13:5, 13:11, 13:12, 13:15, 23:12, 23:20
**missives** 23:18
**misstated** 111:4, 111:7, 111:10
**mistake** 197:12
**misunderstood** 81:4
**mixed** 128:16
**mobile** 29:1
**model** 16:22, 17:10, 30:3
**models** 12:23, 19:8, 185:17
**moderators** 86:16
**modern** 35:25
**modest** 277:15, 277:16
**modulate** 289:5
**mogging** 248:12
**moment** 6:1, 19:23, 22:7, 69:4, 101:11, 199:2, 239:6, 250:5
**money** 8:5, 17:4, 17:9, 22:18, 22:21, 34:3, 34:4, 34:8, 84:19, 95:14, 95:22, 130:12, 130:12, 181:25, 184:7, 184:8, 186:12, 190:12, 223:23, 224:17, 249:1,

249:11, 249:24, 250:1, 277:6, 282:12, 282:16, 283:3, 283:9, 283:12, 285:5, 286:9, 286:10, 286:10

**monies** 168:24

**month** 24:21, 24:22, 163:25, 164:1, 175:16, 176:17, 206:9, 262:22, 284:16

**monthly** 17:16, 26:22, 176:12, 176:25, 177:24, 178:11, 179:6

**months** 24:24, 24:25, 25:1, 25:2, 25:5, 25:8, 25:13, 25:14, 25:15, 25:18, 58:5, 58:14

**moral** 211:22

**morbid** 177:12, 177:15

**morning** 4:1, 288:7

**morning's** 257:4, 257:8

**mostly** 33:23, 105:3, 108:8, 272:12

**motion** 52:16, 113:7, 136:22, 256:25, 261:18

**motion's** 136:24

**motivate** 283:1

**motive** 184:6, 184:12, 184:13, 184:13

**motley** 209:25, 210:2

**mouse** 15:16

**mouth** 197:23

**move** 257:23, 286:6

**moved** 24:5, 236:10, 286:10

**moves** 264:3

**movie** 48:13, 49:11, 49:15, 49:15, 50:5, 50:7, 50:10, 57:24, 58:19, 58:25, 59:16, 60:2, 60:5, 60:8,

60:10, 118:25, 147:1, 173:4, 173:8, 173:11, 173:15

**moving** 82:11, 194:8, 195:10, 195:12, 195:16, 285:25

**mr** 4:11, 4:13, 4:16, 4:17, 5:11, 5:24, 6:13, 6:22, 7:8, 21:25, 25:5, 25:6, 25:16, 25:17, 30:21, 32:4, 32:6, 36:17, 36:18, 36:20, 37:13, 38:6, 38:21, 41:22, 42:10, 43:12, 44:7, 46:16, 46:25, 47:4, 48:10, 54:4, 58:18, 62:4, 62:12, 62:17, 62:19, 63:1, 63:21, 65:2, 65:2, 65:4, 65:4, 65:5, 65:9, 65:20, 66:5, 66:13, 67:12, 69:4, 72:9, 82:24, 83:11, 84:2, 87:21, 90:22, 90:22, 95:20, 104:9, 109:21, 110:3, 110:8, 113:17, 117:23, 118:23, 120:2, 121:9, 122:6, 130:2, 130:8, 130:11, 131:3, 131:4, 147:24, 147:25, 148:6, 150:13, 153:1, 159:3, 161:7, 168:8, 169:12, 170:23, 173:1, 182:19, 190:8, 190:19, 194:11, 194:19, 195:23, 195:24, 197:19, 197:22, 198:13, 198:24, 199:10, 200:2, 201:20,

202:11, 203:21, 204:3, 205:12, 205:16, 205:16, 205:20, 206:15, 207:23, 207:24, 210:22, 223:8, 224:6, 224:21, 230:13, 231:4, 232:19, 232:24, 238:21, 239:3, 242:5, 244:7, 244:12, 244:21, 245:2, 245:4, 245:16, 245:18, 246:9, 249:15, 258:14, 264:7, 286:21, 291:1

**ms** 207:16, 208:14, 208:23, 209:2, 209:22, 210:6, 211:1, 211:11, 211:13, 211:23, 223:10

**much** 16:15, 40:9, 40:18, 58:2, 74:8, 79:7, 128:18, 137:14, 174:19, 179:2, 179:8, 180:21, 228:1, 236:9, 243:17, 253:6, 265:21, 277:10, 282:4

**multi-disciplinary** 165:15

**multiple** 68:1, 110:20, 110:23, 111:2, 114:18, 159:17, 159:19, 159:20, 160:3, 160:4, 174:20, 183:12, 183:16, 188:24, 220:21, 232:23, 273:11

**must** 66:21, 66:22, 222:17, 229:15, 229:16, 229:17, 229:18, 229:19, 238:21, 251:6, 268:8, 284:6

**muted** 113:2

**mutual** 254:7

## N

nail 225:20
nailed 218:13, 225:21, 225:25, 226:2
name 4:6, 4:9, 5:6, 5:9, 6:15, 11:13, 24:4, 25:16, 25:20, 31:12, 36:24, 38:14, 38:15, 38:17, 41:24, 42:3, 48:13, 62:18, 69:2, 69:5, 102:24, 105:18, 143:10, 163:10, 163:12, 165:19, 166:3, 191:21, 191:22, 192:20, 208:15, 216:24, 227:11, 253:12, 253:13, 253:15, 253:16, 253:17, 253:19, 253:19, 253:20, 265:10, 265:21, 290:17
named 9:3, 9:12, 209:11, 238:21
names 14:11, 256:15
narrative 139:1, 140:1, 140:6, 271:21
narrow 70:9, 274:10
natural 248:15
naturally 153:16, 221:22
nearly 29:15
necessarily 21:22, 31:11, 140:24, 209:11, 264:4, 269:14
necessary 29:18, 52:8, 64:1, 162:22, 167:7
need 8:25, 15:12, 15:12, 18:2, 27:7, 29:8, 48:2, 58:18, 71:23, 92:4, 106:14, 140:9, 180:5, 183:4,

184:22, 202:1, 207:21, 214:17, 214:17, 215:3, 217:21, 239:16, 239:19, 239:21, 247:7, 248:2, 248:6, 248:6, 264:11, 270:23, 270:23, 278:9, 278:9, 290:4
needed 39:7, 58:23, 63:4, 148:1, 148:25, 254:23
needs 233:1
negative 173:2, 185:20
negatively 266:10
negatives 191:10
negotiations 7:18
net 36:14
netflix 49:5
neutral 146:8
never 59:19, 66:4, 66:5, 66:13, 69:15, 71:21, 83:10, 93:2, 106:8, 106:9, 108:7, 117:4, 117:8, 117:13, 118:11, 119:3, 127:7, 138:4, 149:8, 167:14, 167:15, 172:4, 190:3, 193:1, 194:20, 196:5, 227:7, 227:8, 232:1, 238:20, 266:14, 269:5, 279:12, 279:13
nevertheless 97:3, 187:2, 191:19, 272:11, 272:12
new 90:11, 90:14, 90:16, 94:6, 127:25, 127:25, 131:1, 163:10, 179:16, 217:9, 284:17, 284:18, 285:24, 286:6
news 84:8, 132:16, 133:1, 164:1,

286:14
next 21:9, 91:9, 91:12, 91:19, 93:9, 95:25, 96:7, 137:6, 161:1, 175:14, 183:25, 188:22, 189:23, 237:6, 237:8, 237:12
nice 78:4, 80:10, 180:24, 239:4, 269:17
niche 28:22, 28:24
nineteen 230:16
nmi 36:14
nobody 31:20, 189:7
non-attorney 238:4
non-disclosure 130:2
non-objectionable 126:19
non-profit 12:19, 13:13, 13:16, 13:17, 13:21
non-pros 57:17
non-visual 212:25
none 31:19, 72:4, 72:4, 132:10, 132:14
nope 255:18
norm 187:14, 187:15
normative 186:16, 186:17, 186:19, 186:20, 186:21, 186:22, 186:24, 187:9, 187:11, 188:14
normatively 224:20
normie 272:16
norms 187:1
notary 4:7
notches 127:5
noted 4:21, 5:5, 5:11, 79:1, 256:17, 256:19, 261:21
notepad 22:7
notes 102:21, 103:24, 181:22, 275:3
nothing 6:3, 32:4, 42:10, 48:10,

62:16, 64:6,
70:19, 138:24,
164:25, 168:13,
169:4, 169:11,
231:7, 233:16,
236:11, 286:5,
288:4, 292:12
**notice** 103:3, 103:4,
103:4, 103:6,
103:25, 192:25
**notion** 222:24
**november** 14:17
**nuance** 219:19,
219:20
**nuances** 16:10, 17:3,
60:9
**number** 4:6, 17:14,
20:20, 30:11,
94:17, 95:24,
115:13, 136:3,
145:8, 148:8,
154:10, 177:21,
177:23, 177:24,
183:10, 238:22,
238:23, 247:13,
265:19, 265:22,
265:24, 265:24,
281:23
**numbers** 33:11, 39:3,
39:17, 39:21,
39:25, 41:1, 41:4,
41:5, 41:6, 41:11,
42:11, 42:12,
43:6, 47:1, 47:12,
47:14, 47:23,
48:5, 48:6, 48:7,
69:19, 70:1, 70:9,
70:18, 71:5,
119:17, 119:17,
119:19, 120:2,
120:2, 120:3,
120:5, 123:4,
123:6, 138:16,
140:10, 140:11,
145:19, 146:7,
148:8, 150:2,
150:5, 161:16,
161:19, 163:24,
164:5, 164:23,
165:1, 165:6,
165:8, 167:3,

167:21, 168:8,
168:12, 168:13,
168:15, 168:16,
168:19, 247:18

---

## O

**o-d-o-m** 11:15,
11:16, 290:9,
290:10
**o'clock** 44:14,
127:4, 180:18,
181:8
**oath** 4:22, 39:14,
114:19, 118:4,
152:6, 182:20,
182:21
**object** 42:17, 50:14,
51:2, 51:5, 56:12,
56:15, 56:19,
60:24, 61:7, 62:1,
62:21, 63:16,
63:23, 64:8,
64:13, 64:22,
65:12, 65:22,
66:6, 66:23, 67:2,
67:14, 67:21,
68:3, 69:6, 69:21,
70:3, 70:13,
70:22, 71:6,
71:18, 72:14,
73:20, 73:25,
75:2, 75:16, 76:1,
76:8, 77:3, 80:7,
80:13, 81:23,
83:4, 83:13, 84:5,
85:17, 88:11,
88:20, 89:4,
89:14, 90:5,
91:16, 92:13,
92:20, 93:11,
93:20, 94:1, 94:8,
94:23, 95:6,
95:17, 96:3,
96:10, 97:7,
97:14, 98:12,
98:19, 98:25,
99:7, 99:15,
100:6, 100:11,
100:18, 104:13,
105:9, 106:21,

107:9, 107:12,
107:16, 107:23,
108:4, 108:18,
109:2, 109:16,
109:22, 110:4,
110:11, 110:17,
111:3, 111:11,
111:15, 111:19,
111:23, 112:6,
112:9, 112:14,
113:11, 113:18,
114:4, 114:20,
115:1, 118:6,
119:7, 119:13,
119:21, 120:22,
121:6, 122:22,
123:11, 124:8,
124:23, 125:15,
126:4, 126:14,
127:15, 128:8,
129:1, 129:24,
131:7, 132:2,
132:11, 132:18,
133:4, 133:12,
133:18, 134:6,
134:19, 135:20,
138:19, 139:2,
140:13, 141:17,
143:1, 143:22,
145:22, 146:12,
147:10, 147:15,
148:3, 148:12,
149:5, 150:3,
150:22, 150:25,
151:3, 152:19,
153:10, 153:19,
153:22, 154:1,
154:23, 155:5,
155:11, 156:6,
156:12, 156:15,
156:23, 157:7,
160:10, 160:21,
161:8, 161:12,
161:24, 162:8,
162:19, 164:12,
165:3, 165:22,
167:9, 168:4,
169:14, 169:22,
170:11, 171:23,
172:10, 173:5,
173:21, 174:1,

174:5, 176:2,
180:6, 186:2,
197:17, 198:22,
209:7
**objected** 61:4,
134:21, 151:13
**objecting** 67:1,
115:13, 118:13,
126:15, 126:24,
134:18, 134:23,
135:6, 136:6,
136:10, 137:12,
145:1, 171:1
**objection** 47:24,
51:25, 52:3, 52:9,
52:25, 66:25,
67:11, 108:7,
111:5, 135:17,
136:12, 137:9,
140:2, 146:14,
151:11, 152:25,
197:20, 197:23,
198:3, 248:9,
249:5, 256:4,
258:14, 268:11,
268:18, 268:19
**objection's** 256:17,
256:19, 261:21
**objectionable**
126:21, 134:24,
135:8, 145:12
**objections** 64:18,
118:15, 127:8,
135:4, 135:13,
136:11, 256:23
**observation** 34:15
**observe** 15:11,
124:17
**observing** 60:8
**obstructing** 228:6
**obvious** 77:8, 185:20
**obviously** 32:5,
34:14, 68:6,
78:19, 167:3,
167:8, 177:4
**occasion** 86:17,
86:19, 176:21
**occasions** 183:16
**occurred** 58:12,
126:8
**occurs** 97:3

**october** 14:13, 96:16
**odd** 210:5, 242:19,
270:12
**oddest** 210:6
**odom** 11:14, 11:14,
72:20, 75:10,
75:12, 75:14,
75:19, 75:21,
76:20, 290:7,
290:9, 290:10
**odyssey** 191:25,
192:13, 192:14,
192:15, 192:18,
193:4, 195:24
**offer** 224:7
**offered** 244:6
**offering** 183:6
**offers** 23:11
**office** 131:20,
200:4, 254:24
**officer** 148:11,
148:18, 148:22,
149:4, 258:17
**officially** 12:21,
14:15
**offline** 225:1
**often** 87:8, 125:20,
221:7
**oftentimes** 220:19
**okay** 5:22, 6:10,
7:10, 8:16, 11:10,
13:11, 14:2,
16:13, 18:6,
18:24, 19:25,
20:11, 21:1,
21:12, 27:1,
28:13, 30:13,
30:20, 32:3, 32:8,
33:4, 33:14, 36:1,
37:21, 38:11,
39:14, 41:23,
42:6, 44:12,
44:15, 44:17,
44:23, 46:3, 46:5,
46:7, 48:6, 51:2,
51:17, 51:25,
52:6, 52:11,
52:14, 52:15,
52:20, 53:15,
55:3, 55:11,
55:19, 55:21,

56:1, 56:9, 57:9,
57:12, 57:19,
57:24, 58:12,
58:15, 59:5,
59:17, 59:19,
60:6, 60:14, 61:2,
61:14, 61:19,
62:7, 63:8, 63:11,
63:21, 64:6, 65:1,
65:1, 65:6, 65:15,
66:4, 66:10,
66:17, 67:10,
67:17, 68:13,
69:3, 70:1, 74:19,
76:14, 77:6, 77:9,
80:18, 81:4, 81:6,
81:9, 81:14,
81:20, 82:1,
82:13, 83:20,
85:4, 86:18, 88:1,
90:20, 91:4,
93:16, 94:22,
96:7, 96:22,
100:9, 100:14,
101:1, 101:17,
103:9, 104:3,
104:3, 104:6,
104:8, 105:6,
105:12, 105:20,
106:7, 106:12,
108:10, 108:22,
109:14, 110:3,
110:8, 110:25,
111:8, 111:10,
111:13, 113:7,
113:14, 115:13,
115:21, 116:2,
123:15, 123:23,
124:13, 124:16,
125:7, 125:22,
126:10, 127:2,
129:12, 130:25,
134:10, 134:14,
135:23, 135:24,
136:17, 136:23,
137:1, 137:1,
137:1, 137:2,
138:15, 138:22,
139:1, 139:7,
140:1, 142:9,
142:14, 142:17,

142:19, 142:23, 142:24, 143:9, 144:3, 146:17, 147:18, 148:23, 149:10, 149:25, 151:3, 153:3, 153:5, 157:16, 158:2, 160:18, 163:2, 163:22, 163:24, 167:14, 167:18, 168:18, 169:9, 170:19, 171:21, 177:15, 178:21, 179:4, 179:5, 179:7, 179:12, 181:21, 182:1, 182:1, 182:1, 182:11, 182:13, 182:19, 182:23, 184:11, 185:1, 186:1, 186:2, 186:5, 187:17, 188:11, 190:25, 194:14, 195:3, 195:15, 195:23, 196:19, 197:19, 198:3, 198:21, 199:17, 200:9, 201:15, 201:25, 202:4, 202:10, 203:14, 204:15, 205:9, 206:14, 206:22, 208:5, 208:14, 211:19, 212:16, 212:22, 213:5, 213:19, 214:14, 215:12, 215:24, 216:18, 216:23, 217:13, 217:18, 217:20, 217:24, 220:3, 225:15, 227:1, 228:23, 229:3, 230:11, 230:25, 231:2, 231:18, 231:24, 232:10, 232:15, 233:13, 234:1, 235:1, 235:7, 238:9, 239:7, 240:13, 240:18,

241:19, 242:4, 243:7, 243:21, 245:8, 246:15, 247:4, 247:6, 247:20, 248:16, 248:21, 253:20, 254:7, 254:12, 254:21, 257:6, 257:17, 257:21, 258:18, 259:10, 260:5, 260:9, 261:10, 262:25, 269:6, 273:6, 276:3, 276:25, 279:1, 284:25, 285:7, 288:6, 288:8, 290:5, 291:13, 291:17, 292:11

**old**  30:19, 182:5, 182:7, 228:18, 228:21, 241:15, 268:5

**older**  128:19, 252:8

**on-chain**  286:11

**one**  6:1, 9:22, 11:1, 14:1, 16:19, 16:20, 16:24, 19:16, 21:13, 22:7, 25:2, 25:4, 28:17, 30:11, 30:17, 37:4, 48:15, 48:18, 63:9, 63:13, 64:14, 68:6, 77:18, 77:18, 78:17, 79:13, 86:17, 87:10, 89:22, 92:8, 95:14, 95:25, 101:11, 102:14, 107:15, 108:2, 110:10, 110:16, 111:14, 112:1, 112:3, 112:5, 112:23, 114:19, 115:9, 115:13, 116:18, 118:5, 121:21, 122:18, 126:16, 127:1, 137:25, 141:18,

151:11, 159:21, 160:2, 160:3, 160:5, 163:10, 163:11, 175:12, 177:14, 180:2, 183:16, 183:22, 183:24, 183:25, 188:23, 188:24, 189:19, 195:4, 195:5, 195:6, 196:5, 198:18, 199:2, 199:21, 200:15, 201:16, 201:20, 201:20, 203:17, 204:21, 205:19, 209:13, 209:14, 210:6, 213:25, 214:2, 214:5, 214:16, 217:7, 217:16, 217:18, 217:19, 217:23, 219:12, 220:11, 222:4, 223:9, 223:17, 225:10, 225:12, 226:12, 226:14, 226:17, 226:18, 226:18, 226:22, 227:14, 232:7, 232:7, 232:8, 233:4, 234:5, 237:19, 237:19, 240:7, 240:9, 240:14, 242:21, 242:25, 243:14, 243:23, 243:24, 244:23, 247:14, 251:23, 251:24, 260:21, 260:22, 261:16, 265:6, 265:19, 265:22, 265:24, 266:6, 266:19, 267:18, 270:12, 273:4, 273:16, 274:12, 277:6, 280:3, 280:18, 281:1, 286:14, 286:19, 287:6, 290:7, 291:6

**one's**  89:21, 180:4

ones  95:23, 237:13,
    247:15, 268:14,
    276:12, 276:23,
    279:19
ongoing  236:16
online  139:10,
    216:9, 252:16,
    271:4
onto  267:18
ontology  121:17
open  88:1, 197:23,
    243:4
open-ended  256:14,
    258:23, 259:3,
    259:6
opened  223:8, 223:13
openly  113:16
opens  223:18
operate  34:16
operating  133:25,
    159:25, 227:15
operations  10:10,
    10:23
operator  192:16
opine  205:1
opinion  40:10, 92:1,
    122:7, 122:9,
    122:12, 122:13,
    146:5, 146:8,
    147:24, 148:7,
    161:23, 162:2,
    162:6, 162:12,
    163:5, 222:21
opinions  161:10,
    161:17, 161:19,
    161:21, 161:22
opportunity  15:23
opposing  42:8,
    271:20
opprobrious  236:1
options  35:2, 238:17
order  13:8, 52:9,
    52:16, 52:25,
    96:6, 96:6, 99:6,
    113:7, 135:9,
    219:11, 230:6,
    245:9, 257:1,
    257:23, 282:18,
    286:5, 291:20
ordered  38:25
orders  34:3, 34:4,

34:8, 291:18
organization  12:8,
    209:10
organizations  200:7
ori  57:2
ostracism  223:7
others  4:5, 8:23,
    190:11, 190:14,
    190:23, 190:23,
    192:17, 201:13,
    264:24
otherwise  125:5
out-of-state  218:11
outcome  122:18,
    217:19, 218:14,
    220:5
outside  62:12,
    100:10, 232:25
outstanding  223:22,
    224:15, 224:19
overall  87:14,
    184:18, 213:4
override  118:15
overruling  64:21
oversee  10:13, 10:23
overstatement  32:11
overwhelm  271:21
owe  79:21
owned  250:11,
    250:14, 250:19
owner  9:25, 159:20
ownership  152:14,
    156:20
owns  68:10, 177:12

---

### P

p-u-r-y  4:16
page  78:1, 86:20,
    86:21, 87:9,
    213:10
paid  40:12, 40:17,
    47:17, 51:21,
    71:21, 95:14,
    95:22, 130:13,
    168:20, 169:11,
    169:11, 223:22,
    225:2, 248:25,
    249:18, 249:19,
    279:9, 279:9
pain  159:11

paint  11:7
painted  286:12
pale  235:23, 235:25
panel  217:12
panic  125:23
paragraph  183:17,
    188:22, 189:3,
    222:21, 273:1,
    273:2, 273:22
pardon  44:19
parent  181:23
parents  268:9,
    268:25
pareto  33:13
part  13:14, 21:4,
    21:5, 21:7, 27:17,
    41:12, 52:21,
    70:7, 78:20, 84:2,
    97:22, 143:11,
    144:17, 183:17,
    185:14, 185:18,
    189:23, 212:13,
    213:16, 213:16,
    213:20, 234:7,
    234:11, 234:11,
    244:17, 254:19,
    263:25, 269:8,
    269:16
participant  147:21
participants  23:6,
    23:8
participate  83:8
particular  107:3,
    267:4
particularly  265:5
parties  4:21, 20:23,
    107:2, 269:25
partner  269:24,
    270:6
partners  20:24,
    269:23, 269:25,
    270:3, 274:5
partnership  20:25
parts  14:6
party  4:12, 26:9,
    26:10, 81:18,
    191:16
pass  185:14, 185:17,
    185:20, 186:7,
    186:16, 186:19,
    187:21, 189:5,

189:9
**passes**  21:18, 187:12
**passport**  255:12,
    255:13, 255:19,
    256:1
**past**  24:21, 24:22,
    24:24, 24:25,
    25:1, 25:2, 25:5,
    25:8, 25:13,
    25:14, 25:18,
    30:8, 38:17,
    158:23, 193:8
**path**  163:4, 163:6
**patreon**  284:1, 284:2
**patterns**  124:14
**pay**  17:16, 17:16,
    17:17, 17:19,
    33:19, 34:24,
    38:18, 40:9,
    40:11, 40:18,
    40:22, 71:17,
    168:22, 168:24,
    225:1, 266:20,
    266:23, 266:23,
    266:24, 277:5,
    277:10, 277:17,
    277:19
**paycheck**  34:24
**paying**  8:5, 19:3,
    186:11, 224:14,
    224:18, 249:16
**payments**  7:24
**payroll**  13:17,
    277:23
**payroll's**  277:21
**payrolled**  277:8,
    277:22
**pays**  276:16, 276:19
**pci**  36:13
**pdf**  232:5, 232:8
**pen**  79:6
**pending**  114:5,
    172:14, 226:20,
    228:16
**people**  12:1, 19:3,
    20:7, 21:19,
    21:22, 22:9,
    31:10, 31:13,
    33:19, 33:21,
    34:3, 34:8, 34:12,
    35:2, 59:21,

76:19, 76:19,
    78:22, 87:1,
    95:10, 95:14,
    95:19, 102:9,
    102:9, 108:9,
    130:7, 133:2,
    133:7, 140:7,
    140:12, 140:17,
    140:18, 140:20,
    147:23, 169:11,
    174:3, 174:4,
    174:23, 174:25,
    175:1, 175:15,
    176:17, 190:24,
    207:21, 208:3,
    209:25, 210:5,
    219:8, 221:20,
    222:1, 222:16,
    223:9, 224:9,
    269:22, 270:3,
    271:4, 271:16,
    275:12, 278:12,
    278:15, 282:8
**people's**  95:21,
    131:5, 131:10,
    131:13, 139:10,
    184:7, 184:8
**per**  20:4, 277:10
**perceive**  56:18,
    56:22
**perceived**  147:13
**percent**  19:12
**percentage**  19:2,
    19:6, 19:10,
    19:11, 19:23,
    22:11, 26:13,
    26:19, 27:3,
    27:10, 27:11,
    32:14, 32:18,
    33:16, 33:20,
    179:6
**perceptible**  8:14
**perception**  266:8
**percolator**  30:16
**perentage**  22:8
**perfectly**  9:11, 17:3
**perform**  139:24
**performed**  42:25,
    189:8
**perhaps**  19:14,
    184:17

**peril**  133:8
**period**  15:14, 27:4,
    95:21, 112:22,
    133:24, 225:18,
    274:4
**permanent**  265:14
**permanently**  265:9
**person**  68:2, 71:1,
    72:2, 82:4,
    209:10, 209:13,
    209:13, 209:14,
    209:15, 227:2,
    227:3, 227:13,
    227:15, 227:15,
    227:17, 228:8,
    228:11, 228:14,
    228:14, 228:18,
    228:21, 254:8,
    267:19, 267:21,
    268:2, 268:4,
    274:10
**person's**  69:2
**personal**  189:24,
    190:11, 210:16,
    218:2, 257:16,
    265:23, 266:24,
    273:19, 275:4
**personally**  68:12,
    86:6, 86:7, 132:1,
    222:14, 251:9,
    267:5, 273:15,
    276:14
**perspective**  216:6,
    216:19, 217:4
**perversely**  270:18,
    270:19
**perversity**  271:2
**peter**  194:7, 195:2,
    195:3, 195:8,
    195:11, 196:16,
    197:6, 197:8,
    208:1
**philosophical**  267:18
**philosophy**  212:21,
    212:25
**phone**  112:24,
    113:25, 114:14,
    114:16, 136:20,
    136:21, 197:5,
    238:22, 238:23
**phones**  28:19

**phonetically** 48:21
**photo** 5:12, 239:13, 281:15
**photographed** 234:24
**phrase** 199:9
**physical** 21:15, 21:17
**physically** 4:23
**pick** 163:21
**picked** 145:17, 145:17
**picture** 32:17, 32:20, 287:23
**pie** 32:23
**piece** 282:25
**pinned** 86:19, 86:19
**pitiful** 138:13
**place** 38:4, 165:19, 166:3, 205:12, 260:2
**places** 86:1, 86:2, 165:17, 206:18, 206:21, 254:19
**plaintiff** 4:8, 90:15, 130:22, 221:17, 221:19, 221:24
**plaintiffs** 4:11, 90:19, 210:4, 219:25, 279:21
**plan** 232:17
**planned** 145:4, 231:3
**platform** 22:19, 26:14, 87:12, 179:3
**platforms** 25:11, 84:18, 84:18, 131:5, 131:10
**platkin** 214:10, 218:18
**play** 15:4, 80:3, 149:19, 149:20
**playbacks** 102:22
**played** 60:2
**playing** 116:24, 120:1, 134:3
**plead** 51:8, 51:11, 51:18
**please** 5:6, 5:12, 5:16, 5:24, 6:14, 9:6, 16:23, 65:8,

101:12, 116:18, 198:10, 204:2, 208:22, 212:7, 234:14, 247:10
**pleasure** 200:4
**pled** 57:9
**pocket** 284:13
**podcast** 221:8
**poem** 212:9, 212:10, 212:10, 212:12, 212:14, 212:14, 213:16
**poems** 213:2, 213:2
**poetry** 211:25, 212:4, 212:6
**point** 54:13, 62:13, 77:15, 79:13, 85:23, 104:20, 113:15, 136:10, 145:7, 171:15, 226:22, 242:16, 243:23, 245:9, 248:23, 248:25, 250:15, 253:9, 253:22, 254:12
**pointed** 223:12, 223:14
**police** 253:23, 254:2, 254:6
**policies** 18:20, 18:25
**policy** 18:10, 18:12, 18:13, 18:15, 18:17, 85:11, 85:12, 234:19
**polite** 50:15, 50:17, 50:19, 52:22, 228:7
**political** 124:20, 125:13, 125:18, 125:25, 128:23, 133:15
**poor** 239:10
**poorly-worded** 72:10
**popular** 59:23
**portion** 92:24
**posed** 68:7
**position** 82:3, 179:19, 193:14, 194:5, 214:17
**positions** 10:16,

21:3, 263:1
**positive** 74:3, 74:4, 128:7, 264:5, 270:18, 270:19, 275:11, 275:15, 275:20
**possible** 24:25, 30:24, 30:25, 69:10, 79:18, 125:1, 125:2, 125:2, 125:3, 139:7
**possibly** 84:4, 84:4, 149:2
**post** 23:25, 25:6, 25:17, 25:20, 26:2, 26:4, 26:8, 76:17, 77:24, 77:25, 78:6, 78:7, 79:18, 80:20, 81:9, 206:14, 206:19
**posted** 24:2, 24:3, 24:4, 24:8, 24:10, 24:13, 24:14, 24:17, 24:23, 25:11, 25:15, 72:6, 72:12, 72:17, 75:10, 75:23, 75:24, 77:2, 80:9, 80:25, 86:1, 86:3, 206:11, 206:15, 206:17, 206:17
**posting** 23:22, 80:12, 87:12
**posts** 25:22, 88:23
**posture** 107:2, 184:21
**pot** 120:19, 120:21, 121:2, 121:15, 121:21, 168:1
**potential** 76:21
**potentially** 142:24
**poverty** 280:4
**power** 251:17
**powers** 272:9
**practice** 108:9
**practices** 36:12
**precautions** 82:9
**predate** 142:16

**preliminary** 192:13
**preparation** 275:23
**prepare** 41:15, 43:4, 63:5, 63:15
**prepared** 32:17, 32:19, 110:23, 152:12
**preparer** 39:11
**prepares** 61:24
**prepped** 117:25
**present** 4:3, 4:23, 92:11
**presented** 107:1, 220:11
**presently** 8:18
**press** 30:9, 249:8, 253:2, 263:24, 264:3, 264:6, 264:9, 264:10, 284:20
**presume** 89:17, 99:3, 170:17
**presumed** 187:3
**presumes** 162:11
**presumption** 89:19
**pretty** 58:1, 59:23, 80:10, 137:14, 178:3, 180:21, 199:25, 210:5, 210:18, 233:12, 251:22, 272:1
**previous** 166:20
**previously** 45:12
**price** 266:23, 266:24
**primarily** 15:19, 152:7, 154:21, 155:1
**primary** 77:15, 77:20, 77:21, 77:23, 275:12
**prime** 182:8, 285:13
**principle** 222:8
**print** 34:16, 131:21, 176:22
**printable** 191:25, 192:1, 192:2, 193:3
**printed** 32:1, 131:16
**printers** 127:22, 163:22
**printing** 29:11,

29:24, 265:21
**prior** 24:15, 49:16, 50:10, 52:1, 79:16, 136:7
**privacy** 34:3, 246:10, 246:14
**private** 164:2
**privilege** 43:14, 45:2, 83:11, 100:8, 100:15, 157:25, 170:8, 171:2
**privileged** 104:14, 107:9, 157:18, 157:21, 158:18, 170:21
**privileges** 87:7
**probably** 14:4, 16:15, 17:15, 30:17, 37:19, 42:23, 50:20, 80:19, 96:16, 96:17, 100:7, 100:9, 106:4, 107:5, 107:6, 125:19, 127:4, 128:6, 130:19, 142:13, 143:5, 154:15, 156:4, 168:11, 178:7, 180:8, 195:15, 207:3, 212:10, 214:15, 216:3, 217:11, 221:16, 229:23, 241:6, 246:9, 255:24, 265:19, 265:22, 269:9, 270:8, 271:9, 274:4, 275:17, 280:23, 283:4, 287:21, 289:21
**probation** 51:13, 51:14, 51:16, 57:19, 57:22
**probe** 136:4
**probing** 188:19
**problem** 70:16, 111:22, 135:21, 141:8, 171:21, 172:1, 278:14,

282:10, 289:22
**procedure** 257:1
**proceed** 6:11
**proceedings** 220:12
**proceeds** 223:20
**produce** 148:7, 168:9, 168:10, 168:24, 192:14, 192:15, 192:15, 207:12
**produced** 14:16, 47:1, 109:15, 109:20, 118:5, 118:5, 121:12, 129:22, 129:23, 130:3, 130:5, 139:18, 168:11, 174:11, 192:12, 199:19, 199:25, 200:17, 200:18, 246:17, 246:21, 247:2
**producer** 168:22, 168:23, 169:5
**producing** 14:12
**product** 13:24, 14:1, 14:20, 20:16, 31:17, 31:17, 31:20, 31:25, 32:9, 130:9, 133:8, 270:23
**production** 12:22, 70:19, 130:4, 172:15
**products** 14:3, 14:3, 14:4, 14:5, 14:7, 20:14, 27:3, 125:24, 125:24, 132:14
**professional** 47:8, 65:14, 147:20
**profile** 89:2
**profit** 13:14, 13:17
**profitable** 17:2, 278:7
**programmer** 71:25
**programs** 23:18
**progress** 50:9
**progression** 184:20, 193:20, 254:19
**proliferation** 29:15,

30:8, 30:13,
30:22, 127:21,
128:2
**prominence** 271:3
**promise** 79:7, 204:8,
239:23, 239:24
**promised** 79:22
**proof** 202:15
**propagated** 273:13
**proper** 134:2, 137:6
**properly** 65:7
**property** 131:13,
277:6
**prophylactic** 137:12
**prophylactically**
135:6, 137:13
**proposition** 249:18
**protect** 135:9
**protected** 53:12,
204:1
**protection** 261:19
**protective** 52:9,
52:16, 52:25,
113:7, 256:25,
257:23
**proud** 211:4, 211:7
**prove** 227:5, 227:19,
234:20, 249:22
**proves** 270:9
**provide** 20:3, 41:7,
43:2, 138:1,
138:3, 139:12,
139:13, 139:15,
147:7, 149:23,
153:15, 153:25,
154:3, 154:7,
154:8, 155:25,
165:6, 172:3,
172:3, 172:17
**provided** 46:15,
48:10, 69:19,
110:9, 110:10,
110:16, 111:14,
112:1, 112:3,
114:19, 155:15,
166:22, 195:23
**providing** 171:21,
186:9
**proximity** 173:9
**proxy** 131:4
**pry** 233:3, 237:19

**pseudonym** 191:23,
191:24
**psychically** 277:4
**psychoanalysis**
146:16
**public** 4:7, 20:22,
105:4, 162:16,
164:2, 223:7,
263:23
**publication** 21:21,
49:10, 108:23,
109:8, 109:10
**publicity** 173:2
**publicly** 73:11,
73:13, 202:2,
222:25, 223:4
**published** 164:10
**publishing** 143:17
**pull** 243:15
**purchase** 22:23,
31:10
**purported** 228:15
**purpose** 12:19,
13:13, 17:12,
34:14, 210:15
**pursue** 52:16
**pursued** 30:4, 193:2
**pursues** 211:24
**pursuing** 130:9,
260:12
**pury** 4:13, 4:15,
40:6, 78:19,
121:9, 224:21,
239:3, 286:21
**push** 205:19, 269:3
**pushing** 87:15
**put** 47:16, 51:4,
52:9, 79:4,
108:25, 127:5,
131:20, 131:25,
136:12, 136:16,
183:6, 212:11,
215:22, 217:20,
238:11, 240:11,
246:4, 246:6,
255:12, 255:13,
255:15, 255:19,
270:24
**putting** 134:12,
134:13

## Q

**quality** 187:12,
211:14, 211:17
**quarter** 26:2, 26:3
**question** 9:10, 9:17,
10:21, 13:2, 13:6,
13:6, 14:22, 17:6,
18:14, 19:5,
20:12, 21:10,
22:11, 22:17,
24:13, 24:14,
26:12, 28:20,
29:18, 29:19,
32:13, 34:15,
40:2, 40:5, 40:8,
41:20, 42:18,
42:21, 42:24,
48:2, 51:3, 51:6,
54:13, 56:3,
56:13, 56:16,
56:20, 58:3,
59:13, 59:14,
60:25, 61:3, 61:4,
61:20, 62:9,
62:22, 63:17,
63:19, 63:24,
64:9, 64:21,
64:21, 65:12,
65:23, 66:7,
66:12, 66:24,
67:11, 67:11,
67:15, 67:18,
67:23, 67:25,
68:1, 68:4, 69:7,
69:18, 69:22,
70:4, 70:14,
70:22, 71:7, 71:9,
71:10, 71:19,
72:10, 72:15,
73:7, 73:21, 75:3,
75:17, 76:2, 76:9,
76:16, 77:4, 77:7,
80:14, 81:24,
83:5, 83:14,
83:21, 83:23,
84:6, 85:18,
85:21, 87:16,
88:12, 88:17,
88:21, 89:5, 89:9,
89:15, 89:17,

90:6, 91:17,
91:22, 92:14,
92:21, 93:12,
93:21, 94:2,
94:24, 96:4,
96:11, 97:8,
97:15, 98:13,
98:20, 99:1, 99:8,
99:14, 99:17,
99:19, 99:22,
100:4, 100:7,
100:14, 100:19,
101:12, 101:14,
104:2, 104:9,
104:14, 105:10,
105:13, 106:2,
106:22, 107:13,
107:17, 107:24,
108:5, 108:19,
109:3, 109:17,
109:23, 110:5,
110:12, 110:18,
111:11, 113:12,
113:14, 113:18,
114:5, 114:7,
114:7, 114:21,
115:2, 115:10,
115:14, 115:20,
115:24, 116:16,
117:20, 118:7,
118:15, 118:17,
118:19, 119:8,
119:14, 119:22,
119:25, 120:23,
121:7, 122:22,
122:22, 124:9,
125:5, 125:7,
125:16, 126:5,
126:15, 127:16,
128:9, 129:2,
129:25, 131:8,
132:3, 132:12,
132:19, 133:5,
133:13, 133:19,
134:7, 134:20,
135:8, 135:22,
135:25, 136:10,
137:7, 137:9,
138:8, 138:20,
138:23, 139:3,
139:5, 140:3,

140:14, 141:2,
141:18, 141:21,
143:2, 143:7,
143:12, 143:23,
145:23, 146:15,
146:22, 147:16,
148:4, 148:19,
149:6, 150:11,
150:21, 151:2,
152:16, 152:20,
153:11, 154:8,
154:14, 154:24,
155:6, 155:12,
156:7, 158:15,
160:11, 160:22,
161:2, 161:13,
161:25, 162:9,
162:11, 162:20,
164:6, 164:13,
165:22, 165:25,
166:1, 166:6,
166:17, 166:20,
166:21, 167:10,
168:5, 169:15,
169:23, 171:3,
171:24, 172:11,
173:6, 173:10,
173:22, 174:6,
175:14, 176:3,
186:3, 187:8,
195:21, 197:18,
197:21, 198:7,
198:14, 198:16,
198:19, 198:23,
198:25, 199:1,
199:5, 206:25,
209:10, 212:10,
216:13, 217:1,
232:21, 251:1,
253:15, 258:21,
258:24, 260:21,
273:21, 276:9,
276:25, 279:15,
286:19
**questioning**  6:11,
    52:17, 53:1, 53:3,
    53:5, 53:9, 54:5,
    208:8, 241:7
**questionnaires**  140:7
**questions**  8:9, 8:11,
    8:13, 22:6, 38:1,

42:21, 44:9,
61:23, 67:2, 83:2,
83:7, 84:3,
102:11, 106:10,
126:21, 135:20,
137:24, 138:8,
145:2, 145:8,
151:20, 151:21,
152:25, 180:2,
203:3, 204:12,
220:11, 244:18,
257:21, 262:4
**quick**  241:18,
    268:14, 292:6
**quickbooks**  156:4,
    156:5
**quickly**  29:22, 228:4
**quite**  35:4, 100:14,
    263:11

---

### R

**r-i-c-o**  290:14
**raise**  5:24
**raised**  274:20
**raking**  269:17
**ran**  292:8
**rank**  266:24
**ranking**  265:9
**rape**  224:22
**raped**  50:1, 50:2
**rapid**  30:7
**rapidly**  28:21, 28:22
**raping**  50:5
**rare**  193:25, 202:7,
    204:10, 204:11
**rate**  175:15, 175:18,
    175:20, 175:25,
    176:15, 177:3,
    178:19, 179:6,
    266:4
**rate's**  177:15
**rather**  29:22, 177:6
**ratings**  87:15
**rattling**  273:20
**raw**  47:12, 47:14,
    163:24, 163:24
**reach**  46:17, 62:20,
    63:2
**reached**  227:7
**reaction**  189:6,
    253:7

**read** 15:11, 33:7, 38:21, 47:18, 69:24, 74:16, 83:8, 99:23, 101:2, 101:6, 101:8, 103:4, 105:3, 105:4, 105:22, 105:25, 106:17, 112:19, 142:22, 153:1, 183:3, 184:23, 187:25, 198:25, 205:7, 210:3, 212:9, 212:9, 212:10, 212:12, 212:14, 231:2, 231:14, 232:12, 273:4, 273:6, 273:22, 273:23, 275:7, 280:4, 292:3, 292:4
**reader** 105:25, 189:17, 213:13, 213:14, 213:17
**reading** 62:7, 184:15, 185:4
**ready** 6:11, 79:11, 152:25, 180:18
**real** 93:7, 205:9, 209:25, 222:10, 241:18, 253:19, 292:6
**reality** 284:7
**realize** 122:2
**really** 14:24, 17:4, 33:22, 34:5, 35:1, 37:10, 62:7, 69:16, 78:10, 89:24, 95:13, 104:21, 106:4, 120:19, 130:18, 131:24, 141:3, 145:18, 146:10, 146:20, 147:3, 163:23, 168:21, 184:24, 184:25, 188:20, 193:9, 193:11, 203:6, 205:7, 208:6, 208:15, 208:17, 214:22, 216:3,

218:22, 222:7, 223:1, 225:19, 228:2, 229:21, 234:23, 253:12, 268:8, 271:12, 278:17, 283:18
**reason** 9:19, 34:11, 59:9, 59:11, 59:12, 59:15, 59:17, 62:8, 64:20, 88:2, 129:20, 144:24, 149:21, 212:14, 260:16, 274:20
**reasonably** 183:1
**reasons** 169:13, 174:4, 202:21, 202:22, 274:8
**recall** 24:18, 55:23, 55:24, 56:2, 56:5, 56:9, 56:25, 57:1, 57:6, 57:7, 57:7, 59:18, 60:23, 61:16, 63:6, 63:8, 63:13, 65:16, 69:2, 69:5, 82:18, 82:20, 82:21, 82:22, 85:12, 86:15, 98:16, 104:22, 104:24, 104:25, 104:25, 105:8, 107:11, 108:21, 120:8, 157:9, 173:15, 174:13, 177:24, 178:2, 178:10, 179:8, 179:11, 193:5, 228:22, 230:20, 231:17, 235:13, 236:7, 255:21, 255:22, 256:2, 284:2
**receive** 168:16
**receivers** 14:5, 14:24
**receives** 26:14
**recency** 24:17, 24:18, 26:23
**recent** 14:14, 24:12, 27:4, 130:4, 218:19

**recently** 9:19, 9:20, 23:22, 23:23, 24:2, 24:10, 24:13, 24:16, 24:17, 73:23, 73:23, 175:7
**recipe** 120:17
**reckless** 210:13
**reckon** 184:14
**reckoning** 215:21
**recognize** 121:22, 231:22
**recollection** 183:8, 231:9, 244:21, 272:24
**reconcile** 151:22, 153:8, 153:14
**record** 4:2, 4:3, 4:9, 5:6, 8:16, 21:25, 22:2, 22:2, 43:11, 44:16, 46:4, 46:8, 46:11, 46:11, 51:6, 52:22, 52:22, 53:24, 58:17, 62:2, 64:14, 81:21, 87:23, 87:24, 99:22, 103:7, 103:13, 113:16, 116:2, 116:5, 116:13, 116:18, 118:23, 123:17, 134:12, 134:13, 137:3, 144:19, 144:21, 148:21, 153:1, 173:2, 181:4, 181:7, 182:11, 182:12, 182:15, 182:17, 194:11, 197:20, 229:24, 241:18, 241:22, 241:24, 242:1, 242:12, 247:24, 260:11, 260:15, 261:21, 268:18, 292:13, 292:16
**record's** 57:16, 194:12
**recorded** 36:10
**recording** 101:23,

102:20, 103:17,
103:18, 103:22
**records** 69:15,
150:20, 150:24,
151:21, 152:13,
152:16, 156:14,
156:19, 157:5,
157:6, 164:10,
165:20, 166:5
**recounting** 84:23
**recovered** 234:22
**recruitment** 213:4
**reddit** 87:7, 87:9,
88:6, 88:23, 89:1,
205:22, 206:15
**reduce** 211:20
**reductionist** 70:18
**refer** 172:22, 194:11
**reference** 267:1
**referencing** 274:3
**referring** 48:20,
139:17, 190:24,
191:13, 215:1,
267:4
**refers** 141:13,
142:7, 190:5
**reflect** 120:3,
197:7, 284:7
**reflecting** 176:24,
263:22
**reflects** 162:2,
170:3
**reform** 267:16
**refresh** 183:8,
231:8, 272:24
**refreshed** 183:4
**regarding** 132:16
**regardless** 213:17
**regular** 130:10,
178:14
**regulated** 17:25,
18:1, 19:9
**regulation** 126:3
**reinforces** 217:16
**reintroduced** 49:18
**related** 76:21,
86:16, 91:24,
96:14, 125:20,
174:19, 179:3,
273:13, 279:24,
285:22

**relates** 89:8
**relating** 173:10
**relations** 51:9
**relationship** 20:5,
20:25, 133:16,
268:9, 268:22
**release** 137:7
**relevance** 60:15,
135:17, 249:5,
256:4, 258:18,
260:18, 261:1,
261:9, 261:17,
268:18
**relevant** 52:18,
60:6, 249:12,
256:16, 256:18,
256:21, 257:2,
257:14, 257:20,
257:22, 257:24,
258:1, 258:3,
258:7, 261:15,
268:16
**reliability** 152:9,
155:3
**relied** 42:11
**relies** 17:11
**rely** 62:16, 152:7,
154:21, 155:1
**relying** 162:6
**remainder** 32:23,
32:25
**remaining** 32:22
**remedy** 88:18
**remember** 30:20,
30:20, 45:17,
143:9, 172:20,
183:4, 185:14,
229:11, 229:20,
229:21, 230:6,
230:7, 230:24,
231:6, 234:1,
238:11, 244:2,
244:3, 244:5,
244:5, 244:8,
244:9, 244:11,
244:12, 244:17,
244:17, 245:2,
245:3, 245:6,
250:2, 250:3,
250:11, 250:23,
251:2, 251:8,

253:8, 257:3,
257:5, 259:11,
263:3, 266:17,
272:18, 272:19,
273:14, 273:15,
280:20, 281:1,
281:8, 281:10,
281:25, 282:3,
282:7, 285:3
**remind** 258:21
**reminding** 116:20
**remotely** 4:22
**remove** 74:4, 86:17
**removed** 88:19, 259:9
**render** 40:10
**renew** 259:8
**rent** 13:21, 13:22
**repeat** 99:19, 99:22,
102:14, 160:20
**repeated** 160:24
**repeating** 117:20,
138:8
**rephrase** 28:7,
34:14, 40:8,
54:12, 68:8,
99:23, 99:25,
100:2, 118:9
**replace** 190:16,
190:17
**replaying** 101:19
**report** 39:9, 40:18,
41:7, 41:11,
41:15, 43:2, 43:4,
47:1, 47:6, 47:13,
47:16, 47:19,
48:4, 58:23, 63:4,
63:15, 63:22,
64:2, 64:3, 64:6,
65:21, 69:24,
70:8, 70:8, 70:20,
71:1, 71:2,
109:15, 110:9,
110:24, 111:2,
112:2, 112:4,
112:5, 114:19,
114:24, 115:7,
118:10, 118:11,
119:3, 119:4,
119:6, 119:11,
119:16, 140:9,
148:1, 149:23,

154:9, 161:22, 162:2, 166:23, 167:1, 167:3, 168:9, 168:10, 168:11, 170:1, 170:3

**reporter** 4:7, 6:22, 8:5, 21:25, 48:25, 87:21, 101:6, 101:8, 101:9, 101:18, 102:14, 103:10, 104:9, 113:2, 117:1, 117:23, 122:6, 198:24, 284:18, 289:24

**reporters** 117:2, 117:6

**reporting** 163:13, 178:14

**reports** 119:4, 170:10

**represent** 4:11, 4:16, 70:25, 188:4, 283:25

**representation** 64:4, 190:19, 226:23, 233:13, 233:15, 244:7

**representations** 188:10, 203:9

**representative** 273:19

**representatives** 130:11

**represented** 242:19

**representing** 153:6, 200:5, 265:18

**reputation** 128:24, 129:4, 129:5

**reputational** 169:19

**request** 60:21, 86:12, 152:10, 155:9, 155:10, 155:14, 156:5, 157:5, 200:19

**requested** 86:5, 88:3, 155:15

**requests** 172:15, 172:19, 172:22

**require** 18:4, 18:9

**required** 52:10, 172:3

**requires** 259:17

**research** 55:13, 78:21, 126:20, 146:5, 146:6, 162:17, 207:14

**researched** 100:10, 100:14, 107:9

**reseed** 285:23, 286:7

**reservation** 259:5

**reserves** 149:16

**resignation** 264:4

**resolve** 172:25

**respect** 67:5, 220:23

**respond** 233:4

**responded** 88:4, 143:25

**responding** 117:20, 216:13

**response** 142:20, 147:25, 165:11, 237:4, 237:6, 237:8, 237:9, 247:4

**responses** 62:15, 139:14, 139:16, 140:23, 140:25, 142:18, 172:14

**responsibility** 143:17

**responsible** 271:17

**rest** 58:17, 106:5, 211:15, 236:19, 236:22, 270:12

**restate** 18:14, 67:11, 273:21

**result** 76:17, 87:9, 87:18, 148:7, 167:7

**results** 86:21, 87:7

**resume** 147:8, 148:23, 149:20

**retaliate** 97:17

**retaliation** 97:12

**retaliatory** 97:6, 97:10, 97:11

**retired** 108:12, 149:14, 149:15

**returns** 61:24, 62:5, 152:12, 156:10

**revenue** 17:12, 22:12, 22:13, 22:16, 26:13, 26:19, 27:2, 27:5, 27:5, 27:13, 27:17, 27:20, 32:13, 32:18, 33:9, 36:9, 74:11, 108:16, 109:1, 109:11, 118:18, 123:25, 124:6, 124:15, 125:9, 130:11, 152:5, 154:17, 159:14, 169:13, 276:12, 277:25

**review** 21:20, 85:9, 152:12, 152:13, 156:10, 156:14, 157:11, 160:14, 161:4

**reviewed** 84:18

**reviews** 138:1

**rewarded** 270:21

**rfas** 61:5, 61:12

**rhetorical** 41:3

**rhetorically** 212:12

**rico** 93:25, 96:1, 97:1, 97:4, 97:6, 97:22, 98:6, 98:23, 99:4, 99:5, 99:11, 99:11, 99:12, 99:13, 100:4, 100:5, 100:17, 100:23, 101:15, 104:10, 104:23, 105:4, 105:7, 105:17, 105:23, 105:24, 106:20, 107:4, 107:5, 107:6, 107:21, 107:22, 108:8, 108:9, 108:12, 202:7, 202:15, 204:19, 208:16, 209:3, 209:4, 209:12, 209:17, 252:16, 290:13, 290:14

**ridiculous** 67:10, 74:18, 222:20

**right** 5:25, 6:13, 6:22, 7:2, 9:4, 12:22, 12:23, 13:19, 15:24, 16:5, 16:7, 16:16, 16:19, 21:15, 22:6, 23:7, 24:22, 25:18, 25:23, 26:7, 27:6, 27:18, 28:1, 28:8, 28:15, 28:23, 29:23, 30:13, 31:3, 31:24, 32:2, 33:4, 33:13, 34:17, 37:3, 38:5, 39:11, 40:1, 40:15, 41:5, 41:19, 42:7, 42:21, 43:14, 46:6, 46:14, 47:13, 49:2, 49:5, 49:8, 50:21, 51:20, 53:13, 54:17, 56:7, 57:12, 58:6, 58:10, 58:13, 59:8, 59:10, 62:4, 64:19, 65:1, 65:17, 67:1, 68:14, 69:14, 70:2, 71:12, 72:11, 75:6, 76:11, 76:17, 77:12, 77:17, 77:20, 78:18, 79:25, 81:12, 82:3, 83:10, 83:24, 84:17, 85:13, 85:16, 86:2, 88:3, 89:11, 92:23, 94:8, 95:15, 95:24, 100:9, 102:1, 102:18, 102:25, 104:2, 104:8, 105:12, 108:23, 109:9, 109:21, 111:13, 112:21, 112:22, 113:10, 114:4, 114:17, 115:23, 116:2, 116:4, 116:11,

116:11, 117:10, 117:23, 118:9, 118:22, 120:21, 121:14, 122:24, 123:2, 124:19, 124:20, 125:3, 126:2, 126:17, 128:15, 129:8, 131:2, 131:6, 131:11, 134:20, 135:9, 136:2, 137:2, 141:1, 141:24, 142:21, 143:5, 143:6, 143:9, 143:13, 145:14, 146:23, 148:1, 148:9, 148:11, 148:21, 149:19, 153:17, 155:22, 156:3, 158:17, 159:17, 161:23, 162:18, 163:19, 164:22, 167:8, 167:24, 168:2, 171:8, 172:16, 172:21, 172:24, 174:14, 175:20, 176:17, 177:9, 177:18, 178:22, 179:1, 179:10, 180:5, 180:16, 180:16, 180:17, 180:23, 181:3, 181:4, 182:9, 182:9, 182:19, 183:15, 183:23, 185:9, 185:18, 187:9, 187:22, 189:10, 190:2, 190:21, 190:25, 191:10, 194:22, 195:25, 198:1, 199:6, 200:24, 201:1, 201:7, 201:10, 201:15, 202:21, 202:21, 203:22, 209:16, 212:9, 212:11, 212:15, 212:15, 213:4, 213:22, 214:24,

215:18, 215:23, 216:13, 217:7, 217:10, 217:15, 217:22, 218:1, 218:5, 218:24, 219:6, 220:13, 220:21, 221:9, 221:17, 221:20, 221:24, 223:1, 223:25, 225:24, 226:8, 226:11, 227:17, 227:18, 227:21, 227:24, 228:12, 228:13, 230:2, 231:14, 235:24, 236:12, 236:12, 237:23, 239:12, 240:10, 242:2, 242:10, 242:25, 243:16, 246:5, 246:13, 247:4, 247:7, 247:8, 247:24, 247:25, 248:1, 248:2, 248:7, 248:17, 248:22, 248:25, 249:3, 249:19, 249:19, 250:13, 250:18, 251:12, 253:8, 255:5, 258:19, 259:4, 259:11, 260:7, 260:7, 262:9, 262:12, 262:15, 262:17, 264:10, 265:12, 265:25, 270:14, 273:22, 274:8, 274:13, 275:14, 275:16, 275:16, 275:17, 276:5, 277:13, 278:8, 278:11, 278:13, 279:11, 279:22, 279:22, 280:5, 280:25, 281:1, 281:8, 282:4, 283:23, 284:10, 285:18, 287:9, 287:11, 287:14, 287:23, 287:24,

288:4, 289:12,
290:25, 292:3
**rights** 128:6,
134:16, 163:22,
286:17
**ring** 218:17
**roast** 120:19,
120:21, 121:2,
121:15, 121:21,
168:2
**robe** 261:17
**rock** 79:24
**rocket** 205:13,
205:15
**role** 9:22, 10:1,
10:21, 42:25,
42:25, 193:20,
202:23, 202:25
**roll** 210:23
**room** 4:14, 4:18,
6:7, 43:17, 78:22,
261:17
**rooting** 260:23
**rotten** 138:15
**roughly** 22:8, 22:9
**row** 233:7
**rule** 8:4, 93:15,
93:18, 94:5, 96:1,
135:4, 158:5,
158:7, 270:9
**rules** 8:2, 8:3, 8:4,
43:24, 43:25,
44:2, 187:1,
253:14, 258:4
**run** 178:3, 280:7,
282:15, 283:13
**runner** 9:7, 15:3,
15:4
**russian** 117:21

## S

**s-corp** 9:25
**s-o-n** 38:12
**sa** 49:16, 49:21,
50:18, 52:23
**saas** 175:7
**safe** 82:13
**safeguards** 36:8,
36:11, 36:12
**safety** 90:15, 90:20,
90:22, 191:13,

195:17
**said** 5:14, 9:15,
10:6, 12:16,
12:18, 13:13,
16:1, 16:18, 22:8,
22:8, 27:6, 27:22,
27:23, 33:1, 33:3,
38:20, 39:14,
46:21, 46:23,
50:18, 52:23,
58:2, 60:2, 63:6,
66:17, 67:19,
68:13, 74:14,
74:17, 80:9, 81:9,
81:17, 95:14,
101:4, 101:7,
104:17, 104:18,
104:20, 109:6,
109:8, 110:15,
111:6, 112:3,
112:13, 112:17,
113:24, 114:1,
114:1, 114:13,
118:21, 118:21,
120:7, 122:25,
123:10, 130:17,
137:12, 137:13,
140:8, 141:24,
141:25, 142:3,
142:4, 142:15,
143:16, 148:9,
148:15, 149:21,
152:5, 152:17,
153:6, 155:19,
162:23, 163:21,
171:14, 174:8,
174:10, 177:5,
179:14, 187:9,
189:18, 194:19,
201:21, 204:15,
204:18, 205:12,
205:15, 205:19,
207:7, 207:8,
210:10, 210:10,
211:1, 217:6,
217:6, 218:23,
219:11, 236:3,
239:19, 244:4,
244:13, 244:24,
245:1, 245:1,
245:7, 246:16,

246:19, 248:4,
253:1, 253:2,
258:22, 259:3,
259:10, 259:14,
259:23, 259:23,
260:14, 260:19,
266:12, 275:4,
275:6, 280:9,
281:8, 282:11,
284:6, 284:17
**sake** 116:17, 163:11,
163:16
**salad** 212:7
**sale** 158:23
**salentano** 96:19,
96:20
**sales** 12:25, 13:7,
13:8, 13:14,
26:13, 26:14,
26:15, 26:16,
26:17, 32:14,
32:19, 120:4,
120:4, 126:3,
126:9, 126:11,
126:12, 127:14,
127:18, 128:6,
128:25, 129:4,
129:5, 132:17,
132:22, 132:24,
132:25, 133:16,
133:21, 133:23,
133:24, 138:6,
139:6
**sam** 4:19
**sanctions** 53:10
**saw** 115:25, 119:3,
168:8, 182:7,
192:10, 192:12,
205:12, 227:8,
242:21
**say** 8:21, 9:18,
10:5, 10:7, 10:12,
11:5, 12:19,
13:15, 15:5, 16:2,
16:25, 17:24,
20:8, 23:23,
24:16, 24:25,
25:12, 25:21,
25:25, 26:4, 27:7,
27:9, 27:11,
27:12, 27:14,

28:8, 29:2, 29:6,
31:5, 32:14,
32:19, 33:2, 33:9,
33:22, 36:20,
37:5, 37:8, 38:8,
39:13, 39:22,
40:19, 48:4,
49:17, 49:17,
49:21, 49:23,
49:24, 50:21,
50:21, 52:1,
52:24, 55:2, 56:8,
60:1, 60:7, 60:7,
60:20, 60:22,
62:1, 63:19,
64:11, 65:8,
65:20, 66:1,
66:20, 67:12,
70:6, 70:18,
73:13, 78:3,
79:19, 80:11,
83:19, 85:20,
90:3, 96:17,
100:4, 104:24,
113:23, 118:1,
121:9, 122:24,
123:2, 123:3,
123:22, 124:15,
129:13, 129:16,
135:5, 140:20,
140:24, 140:25,
146:22, 151:16,
161:10, 161:15,
161:22, 163:16,
163:24, 164:7,
164:8, 173:1,
174:23, 176:14,
176:22, 179:3,
181:12, 183:11,
183:16, 183:17,
185:12, 186:15,
187:12, 189:8,
189:9, 189:16,
194:11, 194:21,
196:2, 200:4,
200:7, 202:8,
202:14, 203:5,
203:11, 203:15,
205:6, 207:3,
208:8, 209:9,
209:20, 210:2,

210:21, 210:22,
210:24, 210:25,
211:17, 212:16,
212:18, 213:9,
215:12, 215:24,
219:21, 220:9,
220:23, 225:3,
225:22, 229:6,
229:19, 229:20,
231:19, 231:20,
231:20, 236:3,
236:12, 242:12,
245:1, 246:18,
252:25, 259:2,
265:12, 266:1,
268:9, 274:15,
274:16, 277:15,
277:16, 278:5,
280:16, 283:5,
283:6, 283:22,
283:24, 285:18,
285:19, 285:19,
285:19

**saying**  8:6, 9:8,
18:20, 18:22,
18:22, 18:25,
19:22, 32:3,
36:22, 41:10,
46:15, 47:4, 47:5,
47:13, 52:20,
54:18, 56:15,
66:1, 66:20,
77:21, 79:10,
81:5, 81:8, 89:12,
91:7, 97:5,
101:20, 110:21,
113:3, 116:6,
120:3, 122:19,
130:12, 130:15,
135:2, 142:11,
146:22, 149:11,
151:13, 155:20,
162:25, 163:15,
164:19, 165:2,
165:5, 165:9,
167:4, 173:2,
173:20, 173:24,
178:17, 178:19,
179:8, 186:16,
187:15, 187:16,
187:20, 188:1,

188:1, 189:13,
191:1, 191:8,
194:16, 201:14,
201:25, 206:12,
209:12, 209:17,
212:3, 212:6,
212:13, 212:17,
216:2, 216:15,
220:25, 221:21,
223:9, 223:12,
224:9, 224:19,
227:10, 227:12,
227:20, 231:12,
235:11, 244:23,
245:2, 245:3,
245:6, 248:1,
255:16, 260:10,
260:15, 261:6,
267:14, 267:15,
267:22, 267:23,
267:24, 271:5,
274:16, 275:1,
280:6, 283:15,
284:1, 284:12,
284:19, 284:22,
284:24, 286:4,
289:4
**says**  43:23, 43:24,
44:1, 53:2, 94:8,
94:14, 103:25,
135:13, 155:20,
155:21, 177:14,
183:2, 185:14,
186:7, 190:10,
206:17, 207:17,
207:21, 218:5,
222:23, 223:18,
231:4, 249:15,
249:22, 273:10
**scandal**  33:21
**scared**  141:14
**scary**  222:15, 272:1
**scenario**  260:13
**scenarios**  232:23
**scheduled**  287:17
**scheme**  122:9, 159:8
**school**  15:24, 42:7,
98:7, 98:15,
105:1, 178:6,
184:25, 185:3,
185:4

**schroeder** 203:3
**scope** 41:10
**scratch** 22:11
**screen** 5:13, 234:24
**scroll** 87:4, 243:19, 244:13
**se** 20:4
**seamlessly** 236:10
**search** 86:21, 87:17, 106:20
**searching** 87:18
**seasonal** 124:15, 124:17
**second** 21:10, 113:14, 113:15, 113:20, 113:23, 207:5, 222:4, 222:21, 247:15, 266:15, 269:11, 269:13, 279:8, 286:14
**second-best** 207:6
**sector** 164:2
**security** 84:17
**see** 9:2, 15:20, 25:18, 34:8, 34:11, 45:17, 53:2, 56:24, 61:18, 63:8, 73:14, 73:16, 73:18, 87:5, 88:9, 90:8, 97:5, 104:5, 117:24, 120:6, 128:3, 131:2, 136:18, 138:16, 143:10, 144:10, 165:2, 172:4, 172:6, 172:8, 179:2, 195:10, 207:16, 217:3, 222:3, 231:5, 232:20, 234:8, 234:8, 235:2, 235:2, 235:7, 237:13, 242:23, 242:24, 243:4, 243:20, 244:11, 252:17, 254:18, 256:7, 257:20, 258:19, 260:18, 260:19, 261:1,

261:9, 267:3, 268:17, 271:6, 275:3, 282:15, 287:3, 287:10, 287:11, 287:20
**seeing** 143:10
**seek** 88:9, 88:14, 88:18, 99:6, 224:7
**seem** 16:4, 47:18, 126:11, 133:15, 150:18, 164:18, 193:20, 200:6, 236:1, 242:20, 246:11
**seemed** 67:12, 67:19, 209:19, 227:25, 264:8, 270:22
**seems** 29:21, 33:15, 37:9, 47:15, 60:3, 87:7, 89:17, 92:23, 103:20, 108:8, 111:17, 128:13, 149:2, 150:16, 150:18, 158:3, 173:12, 186:12, 187:16, 187:18, 187:19, 188:9, 191:1, 191:8, 224:4, 236:2, 242:16, 254:5, 255:21, 274:5, 285:14
**seen** 34:19, 34:25, 39:1, 60:5, 60:14, 79:3, 117:3, 117:3, 117:4, 117:6, 117:13, 138:14, 142:18, 194:20, 200:17, 200:18, 204:1, 204:1, 206:18, 232:1, 242:16, 267:3, 271:4, 281:3, 281:15
**self-censorship** 49:19
**self-defeating** 122:2, 122:15
**sell** 15:16, 23:9
**selling** 35:16
**sells** 13:24

**send** 34:4, 34:4, 40:13, 44:6, 110:3, 181:18, 181:19, 218:23, 238:8, 239:3, 243:3, 243:8, 247:3, 247:16
**sense** 34:7, 35:4, 67:2, 70:9, 142:10, 263:7, 263:9, 264:2, 271:22, 282:12, 282:14, 282:14, 282:18, 283:10, 283:14, 283:15, 287:21
**sent** 44:3, 44:21, 88:25, 110:7, 120:1, 158:8, 158:11, 220:12, 239:8, 240:18
**sentence** 94:10, 99:18, 100:3, 189:19
**separate** 15:20, 15:21, 183:14, 200:6, 213:22, 243:8
**separates** 222:12
**september** 25:20, 96:16, 254:16, 254:16, 262:23, 282:18, 284:16
**sequence** 237:10, 242:24, 244:3, 244:8, 254:13
**series** 74:14, 75:6, 90:25, 254:19, 256:8, 256:10
**seriously** 56:25
**serve** 57:21, 57:22
**service** 23:13, 31:22, 85:6
**services** 23:14
**sessions** 15:15
**set** 23:9, 94:21, 271:10, 274:3
**settle** 80:22, 81:1, 81:6
**settled** 7:10, 7:15, 7:16, 7:17, 96:8

settlement 7:18,
    80:19, 81:8,
    81:12, 81:16,
    215:18, 217:2,
    286:22
setup 22:7, 271:5
seven 37:7, 37:8
seven-minute 236:24
seven-year 50:9
several 68:2, 79:15,
    137:24, 148:25
sex 50:3, 51:21,
    55:1, 60:22, 61:6,
    223:22, 224:14,
    224:18, 225:1,
    225:2, 229:7,
    229:9, 229:14,
    247:6, 248:1,
    248:4, 248:5,
    248:16, 249:17,
    249:18
sexual 50:15, 50:24,
    50:25, 51:8, 63:12
sh 285:25
shadow 196:2, 196:4,
    196:6, 199:10,
    199:13, 199:15
shaking 8:14
shame 223:7, 223:7
shamed 222:25, 223:4
share 205:17,
    205:21, 207:16
sharp 38:19
shipped 14:18
shipping 27:24
shit 233:20, 259:9,
    259:9, 283:22,
    290:6
shock 35:1, 39:2,
    39:5, 39:23,
    39:24, 40:25,
    41:2, 42:12,
    42:16, 46:16,
    66:4, 66:9, 66:12,
    66:13
shocking 268:8
shoot 131:22
short 147:1
shortly 54:9, 55:3,
    258:18
shot 72:1

show 61:10, 61:11,
    115:7, 140:9,
    157:23, 192:16,
    233:9, 233:9,
    233:11, 234:8,
    234:11, 236:23,
    237:10, 239:3,
    280:12, 280:25
showed 231:9
showing 272:23,
    281:19
shown 201:20,
    244:25, 247:2
shrink 22:5
siblings 269:1
side 21:20, 21:21,
    84:11
side-by-side 167:2
sign 7:20, 83:12,
    83:25, 84:3, 84:8,
    94:8, 113:6,
    144:7, 292:3,
    292:4
signal 234:18,
    238:12, 244:7,
    245:21, 246:4
signals 233:8
signed 84:1, 84:10,
    84:11, 278:15
signify 100:3
similar 28:17,
    31:21, 94:6,
    121:22, 178:25
simple 64:22, 76:4,
    89:20, 249:17,
    272:7
simplest 17:11
simply 47:13,
    119:11, 173:16,
    209:12, 219:4,
    249:17, 286:4,
    286:11
simultaneous 103:20,
    103:21, 117:17,
    117:17
simultaneously
    103:12
since 8:1, 24:16,
    37:6, 62:6, 114:8,
    119:3, 134:3,
    138:3, 162:3

single 115:14,
    179:5, 179:14,
    204:23
sir 9:9
sit 131:19, 167:2,
    231:20
site 18:4, 20:24,
    273:11, 273:12
sitting 219:15,
    228:21, 287:11
situation 34:13,
    42:15, 259:16,
    259:20
six 25:13, 25:14,
    25:15, 25:18,
    37:7, 69:4
skip 137:24, 234:5,
    234:7
slapping 218:7
slept 288:20
slice 26:24
slide 14:24
slightly 147:3
slow 8:25, 233:12
slowed 8:25
slpc 282:1
small 14:6, 29:11,
    29:12, 33:19,
    144:22, 179:5
smart 34:16, 178:3
soak 277:24
sobriety 263:22,
    263:25
social 78:16,
    187:14, 187:15,
    223:6
socially 187:7
sock 79:24
software 11:9, 14:3,
    23:17, 72:2,
    116:22, 116:23
solely 74:10
solve 111:22
somebody 16:16,
    26:2, 228:10,
    286:11
somehow 85:2, 188:4,
    271:17, 274:18,
    277:5, 282:11
someone 20:13,
    40:22, 68:1,

71:17, 71:21,
81:16, 119:4,
210:13, 263:14,
269:11
**someone's** 149:25,
269:14
**something** 18:23,
19:6, 32:19, 33:9,
34:23, 41:3, 49:1,
63:20, 72:4,
77:15, 79:18,
79:22, 85:24,
124:4, 131:19,
131:21, 138:5,
141:3, 170:20,
171:9, 173:10,
175:10, 181:13,
184:3, 188:5,
189:8, 189:10,
208:21, 218:17,
218:25, 222:3,
225:22, 234:6,
234:12, 235:9,
235:12, 236:2,
244:13, 244:13,
245:2, 245:4,
245:6, 249:19,
252:12, 259:24,
260:12, 267:1,
267:8, 269:10,
269:18, 280:10,
282:7, 282:17,
283:2, 284:7,
286:7
**sometimes** 42:5,
77:14, 95:20,
136:2, 146:18,
159:10, 225:1,
279:24
**somewhat** 8:2, 25:25
**somewhere** 37:12,
49:4, 91:21,
108:17, 165:5
**soon** 94:16, 181:19
**sooner** 74:8
**sorry** 8:20, 9:8,
10:20, 49:20,
72:8, 72:10, 81:4,
101:2, 116:20,
117:23, 122:6,
138:7, 139:13,

144:6, 147:12,
161:8, 167:15,
186:17, 186:23,
191:7, 192:11,
192:12, 195:14,
207:1, 210:2,
250:17, 273:7,
291:4
**sought** 99:10
**soul** 266:20, 266:22,
267:1, 267:9,
267:11, 269:16
**sound** 29:5, 61:24,
181:21, 225:5,
225:7, 238:19,
246:5, 272:11,
272:13, 272:15
**sounds** 59:24, 69:9,
98:22, 102:9,
104:14, 106:14,
106:17, 173:11,
225:3, 232:24,
280:15, 280:15
**source** 77:15, 77:15,
77:20, 77:22,
77:23, 152:10,
155:9, 155:10,
155:16, 155:17,
155:22, 155:24,
155:25, 157:11,
162:3, 162:12,
162:14, 162:16,
170:9, 171:7,
171:22, 172:23
**southern** 90:16,
96:1, 131:1,
144:12, 280:4
**space** 4:15, 141:14
**speak** 7:4, 7:23,
8:2, 19:18, 22:15,
28:9, 28:12, 47:9,
107:8, 107:19,
116:18, 152:18,
161:6, 184:25,
210:11
**speaker** 190:6, 190:7
**speaking** 6:22, 52:3,
64:17, 113:1,
117:1, 117:19,
127:8, 135:4,
170:22, 185:2,

230:19, 246:10,
256:23
**special** 151:8
**specialization**
108:8, 108:11
**specific** 10:20,
58:22, 59:10,
105:13, 188:9,
188:9, 205:23
**specifically** 48:15,
105:7, 106:10,
125:10, 127:22,
128:5, 272:21,
273:11
**speculating** 19:13
**spell** 4:9, 5:6,
9:14, 85:1
**spelled** 9:15
**spelling** 38:6,
38:13, 290:10
**spellings** 290:4
**spend** 49:11, 61:22,
228:1
**spends** 50:10
**spin** 234:15, 234:17
**splc** 282:14, 283:17,
283:21
**splc's** 283:22
**spliced** 235:4, 236:6
**split** 11:2
**spoil** 258:10
**spoke** 69:16, 108:1,
231:3, 232:18,
246:12, 255:1
**spoken** 66:4, 66:5,
66:14, 230:9,
254:2, 254:5
**spreading** 98:4
**spreadsheet** 145:18,
152:7, 155:4,
156:1, 162:4,
166:24, 166:25
**spreadsheets** 120:8
**ssl** 36:14
**staff** 20:4
**stage** 227:7
**stand** 84:15, 99:3,
264:24, 265:4
**standard** 4:3, 22:3,
27:17, 34:2,
36:11, 36:16,

46:11, 46:12,
82:12, 87:23,
87:24, 177:5,
182:16, 241:25,
242:1
**standardized** 176:14
**standards** 178:22,
186:25
**standing** 117:18,
178:10
**stands** 223:6
**start** 14:8, 14:12,
19:20, 35:6, 44:8,
46:24, 66:10,
94:7, 105:21,
127:3, 131:1,
131:3, 131:19,
131:20, 218:7,
269:3, 269:16,
288:13
**started** 27:24,
35:18, 39:6,
90:25, 129:7,
145:10, 198:25,
217:10, 217:11
**starting** 224:1
**starts** 18:17, 90:11,
188:24
**starving** 289:1
**state** 5:6, 6:14,
12:13, 17:1,
18:19, 18:20,
19:1, 30:12,
51:24, 52:10,
57:21, 95:5,
137:3, 153:1,
160:7, 215:19,
216:8, 216:22,
218:3, 226:19,
226:23, 227:3,
227:25, 249:22,
249:22, 264:22,
264:23, 266:9,
268:17, 274:8,
279:23, 282:23,
282:24, 283:1
**stated** 67:19, 137:14
**statement** 146:9,
146:10, 187:9,
191:14, 264:6
**statements** 74:15,

75:7, 98:4, 120:9,
120:10, 120:14,
120:15, 120:16,
123:9, 123:14,
123:19, 146:24,
151:22, 153:9,
153:15, 161:2,
166:11
**states** 55:5, 55:6,
55:7, 62:11,
62:15, 215:18,
285:6
**stating** 135:9
**status** 176:25
**statute** 105:4, 105:4
**statutes** 105:2
**stay** 256:3, 256:8,
278:6
**stayed** 256:8
**steadfast** 270:11
**steal** 184:6, 184:8,
283:12
**stealing** 185:8
**steel** 14:23, 14:24,
14:24
**steer** 189:25, 190:1,
190:3
**stenomask** 117:9
**step** 91:25, 182:24,
194:16, 264:16,
275:15
**stepped** 263:1
**stepping** 240:23
**still** 25:22, 33:17,
34:23, 37:17,
40:14, 48:3,
69:13, 69:18,
73:5, 73:6, 80:17,
104:18, 118:3,
149:11, 159:12,
182:21, 197:9,
197:23, 198:5,
218:25, 220:6,
220:8, 228:20,
236:16, 237:22,
238:3, 245:16,
260:18, 261:1,
262:20, 266:14,
272:3, 282:6,
287:11
**stipulate** 4:22

**stolen** 283:2
**stooge** 272:12,
272:13
**stop** 97:19, 97:23,
119:19, 186:5,
221:18, 240:16,
257:11, 257:12,
257:13, 261:23
**stopped** 158:12,
273:12
**story** 262:11, 272:7
**strange** 66:25,
211:15
**strategy** 175:23
**stretch** 240:22,
241:18
**strike** 74:9
**stroke** 4:19, 142:15,
143:4, 190:8,
207:7, 207:8,
207:9, 207:11,
207:12, 207:16,
208:14, 208:23,
209:3, 210:6,
211:1, 211:11,
211:13, 211:23,
223:10
**stroke's** 143:8,
209:22
**struggling** 102:9,
204:12, 256:14
**student** 255:10,
255:16, 255:17
**study** 126:7, 212:14
**stuff** 11:8, 34:22,
36:5, 36:16, 42:7,
128:6, 157:17,
184:2, 188:16,
203:5, 212:24,
216:9, 233:1,
253:6, 253:14,
255:9, 266:21,
272:8, 282:10,
286:21, 287:5
**stupid** 175:13
**sturdy** 14:23
**sub** 183:22, 223:14
**sub-things** 224:14
**subject** 45:2, 45:9,
46:1, 49:8, 94:10,
182:23, 221:25,

222:15, 226:1,
228:23, 264:5
**subreddit**  86:16,
86:20, 86:23
**subreddit's**  86:25
**subreddits**  87:5
**subscribe**  131:21
**subscriber**  23:15,
275:20
**subscribers**  17:13,
22:9, 35:21,
73:14, 82:10
**subscription**  17:11,
17:19, 17:19,
17:20, 17:21,
17:22, 17:23,
18:2, 18:5, 18:9,
18:16, 19:4,
22:16, 22:20,
27:5, 32:18, 33:9
**subscription-based**
179:19
**subscriptions**  22:12,
22:23, 23:10,
23:12, 26:15,
26:16, 26:17,
32:24
**subsequent**  113:25
**subsequently**  96:7
**substance**  186:13,
223:8
**substantially**  28:5,
31:21, 94:6
**subsurface**  216:5
**subtitled**  180:11
**success**  31:16,
265:17
**sue**  90:17
**sued**  25:8, 75:19,
89:3, 89:10,
90:14, 90:18,
90:20, 90:22,
90:23, 106:4,
106:6, 106:11,
130:20, 131:3,
190:13, 191:1,
191:6, 191:12,
191:15, 191:19,
252:16, 282:5
**suffer**  82:19
**sufficient**  64:2,

155:16, 192:15,
192:24, 218:6,
218:7
**sugar**  225:8, 226:4,
226:9, 226:12,
226:15, 227:2,
248:23
**suggest**  199:8
**suggesting**  199:10,
274:5
**suing**  25:9, 92:11,
92:18, 131:4,
239:24, 239:25,
282:25, 285:6
**suit**  25:7, 90:2,
93:25, 97:21,
97:21, 131:4,
194:9
**suitable**  146:4
**summary**  199:25
**sundance**  49:1, 60:3
**supplied**  70:7, 71:3,
146:6, 152:8,
154:22, 160:20,
160:25
**suppliers**  255:1
**supply**  146:6
**support**  12:8, 12:16,
12:17, 12:22,
12:23, 13:7, 13:8,
17:12, 23:12,
23:17, 23:20,
31:23, 190:12
**suppose**  38:25, 70:8,
229:23, 251:6
**supposed**  64:3, 67:8,
81:17, 147:7,
147:9, 150:1,
151:16
**supreme**  44:1, 220:9,
220:10
**sure**  5:17, 8:9,
8:15, 11:3, 16:24,
17:7, 19:10, 20:1,
26:3, 27:16, 28:6,
32:11, 33:8,
33:13, 37:5, 40:2,
40:19, 40:24,
41:12, 41:23,
43:7, 43:7, 44:16,
44:25, 46:9, 47:9,

48:22, 48:24,
49:14, 52:7, 59:9,
59:11, 59:11,
60:16, 61:13,
66:16, 66:19,
73:1, 80:1, 80:1,
81:13, 81:15,
81:20, 82:12,
82:14, 84:16,
88:16, 89:7,
93:14, 94:15,
101:11, 105:1,
110:8, 112:16,
131:17, 134:1,
157:1, 161:15,
176:13, 196:11,
198:20, 204:14,
208:24, 209:1,
210:16, 213:16,
222:14, 222:22,
229:12, 231:15,
265:8, 265:13,
267:10, 272:24,
273:22, 276:15,
277:2, 278:23,
279:18, 280:4,
280:18, 281:5
**surely**  25:14, 25:14
**surprise**  284:20
**surprised**  59:21
**surrender**  260:1
**surrendered**  259:13
**surreptitiously**
189:10
**surrounded**  263:17
**surrounding**  184:18,
270:15
**survey**  175:3
**surveys**  139:14,
139:20
**survival**  210:7,
210:11
**suspect**  105:23,
269:2, 274:1,
279:21
**suspicious**  265:17
**swear**  6:2, 253:13
**sweep**  11:7
**swinging**  137:20
**switch**  108:15
**system**  104:5

## T

**t-y-r-a** 291:2, 291:7
**tag** 180:15
**taiwan** 54:5, 54:7, 54:12, 55:4, 55:5, 254:12, 254:18, 255:24, 256:3, 256:9, 259:17, 260:3, 261:8, 262:5, 262:16, 280:8, 280:24, 284:19
**taiwanese** 259:19
**take** 21:23, 34:1, 41:17, 43:10, 44:14, 47:14, 53:1, 72:1, 82:9, 84:19, 86:12, 86:12, 87:20, 87:20, 87:21, 102:14, 145:18, 158:19, 180:22, 180:23, 182:24, 192:25, 194:16, 210:16, 232:5, 240:20, 241:22, 264:16, 265:3, 275:14, 276:25, 285:22, 291:19, 292:12
**takedowns** 86:5, 88:3
**taken** 86:9, 102:19, 143:17
**takes** 275:21
**taking** 102:21, 103:23, 118:13, 188:2
**tale** 35:24
**talk** 8:7, 8:8, 8:8, 43:13, 43:19, 44:10, 44:11, 44:19, 44:24, 44:24, 45:1, 45:2, 45:8, 48:15, 50:7, 77:9, 77:10, 82:24, 144:22, 147:3, 182:23, 188:15, 188:22, 188:23, 203:9, 207:21, 215:10,

217:24, 224:9, 224:25, 231:19, 238:6, 264:16, 286:22, 287:15
**talked** 45:18, 213:1, 228:8, 230:5, 253:23
**talkers** 137:23
**talking** 44:8, 45:22, 59:15, 65:18, 102:10, 127:22, 137:18, 137:19, 158:23, 164:20, 164:20, 164:22, 164:23, 194:17, 194:25, 203:22, 212:3, 214:8, 216:2, 217:23, 218:4, 224:22, 226:25, 227:13, 227:14, 227:15, 228:11, 228:24, 230:7, 230:13, 230:24, 231:22, 238:5, 242:7, 242:25, 261:23, 266:2, 273:24, 274:13, 286:20, 286:22, 289:1
**talks** 50:5, 50:8, 183:25, 272:17, 272:19
**tango** 216:8
**tapped** 291:9
**tasked** 188:16
**taught** 98:11, 104:25
**tax** 39:11, 61:24, 62:5, 152:12, 156:10, 266:20, 266:22, 267:2, 267:9, 267:11, 267:12, 269:16, 277:5
**taxes** 36:19, 62:17, 267:14
**team** 180:15
**teasing** 94:9
**technically** 218:20, 246:18
**technology** 15:2, 28:25, 29:24,

30:25, 31:16
**tell** 6:2, 40:12, 58:23, 59:6, 59:11, 59:12, 59:17, 62:19, 62:24, 62:25, 99:3, 112:16, 118:25, 120:7, 138:4, 138:18, 138:22, 138:23, 140:16, 144:4, 174:25, 186:23, 193:15, 193:22, 203:14, 205:2, 206:9, 210:9, 214:17, 217:23, 224:3, 234:12, 246:3, 246:25, 255:8, 255:10, 258:3, 258:6, 258:17, 261:14, 279:23, 290:1
**telling** 59:18, 112:13, 115:22, 135:19, 185:7, 244:19, 245:25
**temporal** 24:18
**tempted** 274:15
**tend** 13:23
**term** 35:3, 43:8, 46:21, 57:21, 91:2, 124:20, 125:2, 134:2, 142:13, 175:4, 177:16, 189:5, 221:22, 226:2, 270:2, 285:15, 290:12, 291:9
**terminal** 218:14
**terminated** 218:16
**terms** 19:19, 19:22, 87:17, 175:13, 204:25, 224:22, 230:21
**terrible** 222:17
**terrorists** 93:7
**test** 152:9, 155:3
**tested** 188:7
**testified** 39:16, 39:19, 42:10, 46:16, 47:22,

59:19, 69:14,
75:10, 104:21,
110:15, 111:9,
111:13, 114:18,
118:4, 152:6,
152:8, 152:9,
152:10, 164:25
**testify** 111:1, 227:6
**testifying** 68:14,
68:14, 68:15,
74:25, 75:6
**testimonial** 157:24
**testimony** 42:13,
47:23, 70:11,
70:21, 105:1,
110:25, 111:4,
112:8, 142:17,
152:18, 153:2,
155:2, 194:22,
257:4, 257:9,
259:12, 260:25
**texas** 4:6, 54:17,
129:11, 144:12,
144:13, 144:17,
145:4, 216:25,
218:7, 218:22,
264:20, 264:22,
264:23, 272:8,
284:11
**text** 149:2, 190:8,
223:14, 223:20
**thank** 5:21, 6:6,
6:13, 6:17, 7:2,
8:17, 21:24, 46:3,
46:7, 46:14,
52:20, 79:7,
81:21, 87:22,
88:1, 92:6, 96:7,
104:9, 116:20,
118:24, 148:6,
175:18, 182:19,
186:3, 189:22,
198:21, 199:7,
226:3, 240:2,
242:2, 243:17,
248:16, 253:21,
273:2
**thanks** 5:23, 171:11,
171:19, 182:19
**theater** 60:11
**theme** 145:16,

145:21, 278:19
**themself** 4:9
**theory** 90:24, 106:5,
106:5, 157:25,
285:13, 285:21
**therefore** 14:1,
19:10, 142:8,
152:12, 166:18
**thing** 43:13, 44:23,
46:20, 46:23,
56:1, 70:12,
76:23, 76:24,
77:1, 78:5, 79:5,
80:11, 91:9,
91:12, 93:9, 96:7,
117:15, 122:15,
127:25, 138:14,
148:10, 151:19,
174:22, 180:1,
189:7, 189:16,
195:1, 199:9,
204:23, 205:18,
210:24, 216:5,
220:15, 222:10,
222:16, 225:25,
242:7, 244:24,
249:7, 257:15,
261:8, 265:16,
265:19, 266:15,
269:20, 275:24,
278:10, 280:3,
280:5, 281:11
**things** 18:15, 18:16,
22:23, 24:7, 47:8,
69:11, 70:17,
79:16, 82:10,
84:19, 88:8,
91:11, 105:3,
113:10, 118:23,
119:11, 122:9,
130:6, 152:22,
159:8, 161:6,
177:3, 184:13,
185:7, 187:12,
190:4, 194:9,
197:6, 200:6,
203:10, 204:11,
207:7, 207:8,
208:12, 209:13,
211:22, 211:24,
212:15, 213:22,

213:24, 214:21,
223:23, 223:24,
224:15, 224:19,
224:20, 230:5,
231:4, 231:5,
232:19, 232:20,
252:15, 257:20,
264:7, 266:7,
268:2, 270:9,
271:15, 271:17,
271:22, 279:25,
281:8

**think** 9:8, 9:10,
10:12, 12:1, 13:4,
13:5, 13:6, 14:22,
15:1, 16:2, 16:11,
16:17, 18:22,
18:25, 19:16,
22:22, 23:8,
24:10, 24:16,
25:2, 25:5, 25:19,
25:20, 26:8,
26:11, 26:24,
27:3, 27:7, 28:16,
28:20, 28:25,
29:14, 29:15,
29:17, 29:19,
30:4, 30:24, 31:3,
31:10, 31:13,
34:18, 34:18,
34:20, 34:25,
35:7, 35:13,
35:13, 35:19,
35:23, 36:2, 36:6,
36:11, 37:19,
38:12, 39:13,
45:18, 47:2,
47:13, 48:2,
48:19, 49:3,
49:25, 50:5,
50:17, 50:22,
52:1, 53:14,
53:19, 53:23,
58:2, 59:13,
59:21, 60:4, 60:8,
60:17, 61:25,
62:7, 67:1, 68:25,
69:3, 69:4, 70:17,
71:23, 72:3,
73:15, 73:17,
74:2, 74:6, 75:10,

76:20, 76:25,
78:5, 81:11,
83:22, 83:25,
84:8, 85:23,
85:25, 87:3,
87:16, 90:11,
91:23, 94:17,
96:13, 96:14,
97:20, 100:7,
100:17, 100:23,
101:7, 101:16,
102:24, 104:10,
105:13, 106:3,
106:5, 108:23,
109:25, 119:16,
120:10, 121:24,
121:24, 123:7,
125:5, 125:6,
125:13, 125:18,
125:19, 126:2,
126:8, 127:13,
128:6, 128:7,
128:24, 129:4,
129:20, 130:3,
130:3, 130:4,
130:16, 130:23,
132:16, 133:7,
134:9, 134:16,
134:24, 138:14,
138:15, 139:8,
139:10, 139:17,
139:22, 139:24,
140:5, 140:18,
141:8, 141:18,
141:20, 142:7,
142:13, 142:18,
143:16, 146:15,
146:18, 150:5,
150:6, 151:19,
157:16, 159:5,
159:10, 166:17,
166:25, 167:7,
168:7, 168:8,
169:5, 170:3,
171:8, 171:17,
174:15, 175:23,
177:9, 178:20,
179:5, 179:13,
181:16, 181:24,
181:25, 186:3,
186:7, 186:21,

187:15, 189:2,
189:4, 190:16,
191:7, 192:23,
193:2, 193:14,
193:15, 193:25,
194:7, 195:15,
196:10, 196:11,
198:13, 198:18,
201:11, 201:15,
204:21, 204:22,
207:2, 207:8,
208:6, 208:10,
208:11, 208:18,
208:21, 208:22,
210:4, 210:12,
210:20, 210:20,
210:22, 210:23,
210:25, 211:4,
211:22, 211:23,
211:24, 212:22,
213:10, 213:16,
213:19, 213:21,
215:25, 216:3,
217:12, 218:13,
218:18, 218:22,
219:3, 219:23,
220:11, 220:16,
220:22, 222:1,
222:10, 222:12,
222:14, 222:21,
223:1, 224:6,
224:6, 225:2,
226:1, 226:20,
226:23, 227:25,
228:13, 228:14,
228:17, 229:2,
229:4, 229:4,
229:15, 229:25,
230:9, 230:21,
230:22, 231:5,
231:25, 232:21,
233:25, 235:23,
235:25, 240:9,
240:15, 240:18,
241:4, 243:13,
244:6, 245:6,
246:9, 248:18,
248:20, 249:17,
250:10, 250:19,
250:19, 251:1,
251:3, 251:12,

251:22, 253:18,
253:25, 254:16,
256:7, 258:22,
259:16, 261:2,
262:21, 265:11,
265:22, 266:5,
266:6, 266:20,
266:23, 266:23,
267:4, 267:6,
267:11, 267:19,
267:21, 267:24,
268:24, 269:19,
269:19, 269:21,
270:5, 270:9,
270:12, 270:15,
270:20, 271:7,
271:7, 271:15,
272:7, 272:8,
272:12, 272:13,
274:3, 274:17,
275:1, 275:1,
275:6, 275:9,
275:19, 276:5,
276:9, 277:17,
278:15, 278:16,
278:17, 280:1,
280:9, 282:6,
282:10, 282:25,
283:4, 283:4,
284:3, 284:13,
284:16, 285:17,
286:17, 287:14,
287:19, 288:2,
288:20, 289:4,
289:19, 289:20,
292:7
**thinking** 136:4,
    267:8, 267:10,
    269:17, 279:19,
    287:13
**thinks** 77:1, 91:11
**third** 20:23, 51:18,
    57:11, 218:19,
    218:19, 266:18,
    269:25
**third-party** 192:13,
    274:5
**thomas** 11:14, 72:20,
    75:10, 75:12,
    75:14, 75:19,
    75:21, 76:19,

290:7, 290:9

**though** 10:1, 21:16, 23:7, 26:7, 28:23, 30:2, 34:25, 38:4, 40:14, 56:17, 69:14, 70:2, 76:11, 93:3, 93:9, 107:10, 114:7, 121:1, 121:14, 130:17, 135:12, 140:24, 162:18, 167:4, 197:15, 204:12, 213:10, 215:21, 218:25, 221:21, 229:5, 261:7, 274:23

**thought** 27:9, 76:23, 76:24, 80:11, 81:4, 81:5, 96:24, 101:15, 102:13, 107:1, 107:7, 116:22, 117:24, 146:7, 149:14, 193:17, 193:18, 198:12, 198:15, 252:12, 263:7, 263:17, 282:21

**thousand** 40:20

**thread** 41:19, 41:21, 223:9, 223:13, 223:18

**threat** 222:2

**threatened** 266:7

**threatening** 218:3

**three** 5:3, 5:4, 10:18, 15:14, 16:1, 25:1, 25:2, 25:5, 25:8, 28:18, 53:20, 98:17, 98:18, 182:8, 208:3, 265:4, 265:7, 276:6

**throw** 233:22

**tick** 127:3

**tied** 35:18, 192:17

**tiered** 18:17

**till** 278:24

**time** 4:2, 4:3, 11:21, 22:1, 22:2, 22:3, 27:13, 35:16, 35:17,

35:20, 46:10, 46:11, 46:12, 46:12, 49:7, 50:10, 55:4, 58:3, 58:19, 60:18, 61:22, 85:11, 87:23, 87:24, 94:4, 96:25, 98:15, 104:2, 105:1, 106:3, 106:4, 107:4, 109:1, 109:5, 115:10, 116:18, 118:17, 132:22, 132:23, 136:1, 137:15, 137:16, 137:17, 143:6, 143:18, 144:5, 149:3, 158:9, 168:21, 173:12, 174:19, 176:11, 179:25, 182:16, 198:18, 200:10, 200:14, 203:4, 203:23, 205:24, 207:16, 211:16, 212:24, 223:7, 223:24, 224:8, 225:18, 226:5, 228:1, 229:14, 229:22, 230:14, 232:23, 238:12, 238:22, 241:25, 241:25, 241:25, 242:1, 242:20, 242:23, 243:1, 246:4, 246:4, 246:7, 247:1, 250:22, 251:1, 260:2, 262:19, 263:1, 263:14, 266:7, 266:17, 268:5, 273:4, 274:4, 281:7, 281:22, 284:8, 284:17, 285:4, 285:22, 286:9, 288:3, 292:15

**times** 16:1, 16:2, 65:5, 68:18, 69:4, 83:8, 128:19,

136:3, 148:24, 163:10, 163:19, 163:21, 164:11, 192:23, 206:10, 244:21, 244:23, 267:17, 270:20, 272:15, 284:17, 284:18

**timestamps** 236:17

**timing** 217:21, 272:9, 282:12, 282:13, 283:10

**tip** 175:12

**titanium** 15:1

**title** 9:24, 10:2, 11:5, 11:6, 250:24, 250:25, 250:25, 280:7

**titled** 10:22

**today** 4:2, 9:9, 28:8, 32:15, 39:2, 44:14, 74:25, 75:6, 91:1, 105:1, 136:5, 185:3, 188:17, 188:18, 189:10, 197:12, 200:17, 259:8, 284:5, 286:20, 290:3, 291:19

**today's** 4:7

**together** 47:16, 131:21, 212:7, 217:13, 217:20, 235:4, 247:15, 281:13

**tokens** 285:24, 285:24

**told** 40:6, 43:2, 45:24, 58:20, 59:4, 63:3, 113:2, 113:23, 151:5, 151:9, 170:7, 177:14, 196:21, 197:1, 197:2, 197:5, 205:20, 206:6, 246:3, 252:10, 252:15, 253:19, 255:9, 257:1, 259:20

**tom** 11:14, 76:20

**tomatoes** 138:15

tomorrow 19:14, 20:3, 188:15, 275:2, 275:23, 279:17, 279:20, 287:18, 288:7, 291:18, 291:22, 291:23, 291:25
tongue 175:12
tonight 278:25
took 47:1, 107:7, 182:20, 193:5, 239:13, 282:11, 283:4, 283:9
tool 201:25
top 265:7
total 19:6, 27:2, 28:9, 267:17
totally 42:11, 62:16, 135:19, 141:7, 162:6
tough 37:4
tourist 255:23, 255:24
toward 269:12
towards 12:25
trace 35:22, 35:24, 69:11
traceable 35:25
track 17:3, 18:20, 18:25, 29:25, 267:18
trademark 90:24
traditional 35:22
transaction 283:25
transactions 36:15, 157:15, 158:22, 159:2, 159:4, 159:6, 283:23, 284:5
transcribe 8:6
transcribing 102:14
transcript 38:21, 48:25, 62:8, 83:8, 101:21, 116:5, 117:24, 142:22, 153:2, 197:9, 247:21, 291:17
transcription 102:19, 103:8, 103:21, 117:17
transfer 233:2

travel 255:16, 255:17
travis 260:1
treating 269:15
treatise 105:17
trial 117:1, 134:21
tricking 186:11
tried 52:22, 113:23, 129:18, 174:18, 176:21, 177:2, 177:10, 192:14
trier 122:12
tries 17:3
triggers 275:19
trip 145:4
trouble 115:22, 282:17
true 21:14, 32:12, 35:19, 35:20, 49:14, 50:13, 54:19, 58:4, 64:4, 93:15, 96:6, 96:17, 119:10, 155:2, 166:13, 170:24, 179:18, 191:2, 191:9, 213:25, 220:17, 225:23, 244:17, 270:5
truly 128:21
trust 42:14, 48:5, 110:15, 112:16, 112:18, 147:23, 278:22
trusted 146:2, 147:25, 148:2, 148:6
truth 6:3, 6:3, 6:3, 61:15, 271:8
truthful 56:23, 92:3, 93:5
truthfully 92:2
try 8:2, 8:7, 8:7, 71:17, 71:21, 72:1, 84:13, 84:14, 102:1, 174:15, 178:24, 204:2, 204:6, 204:13, 212:7, 261:10
trying 33:12, 36:4,

48:3, 50:14, 50:17, 50:18, 53:17, 60:22, 67:25, 70:25, 75:22, 76:20, 90:1, 91:11, 118:12, 143:7, 146:21, 186:3, 188:4, 189:8, 189:9, 190:21, 204:8, 207:14, 210:12, 213:8, 213:9, 215:6, 217:21, 225:19, 260:11, 261:7, 270:24, 283:1
turgid 219:5
turn 285:11
turned 108:3, 108:7, 222:5, 222:18
tweet 223:17
tweets 223:16
twenty-five 117:4
twice 26:1, 26:3
twitter 192:14, 206:17, 210:23, 223:9
two 16:21, 24:24, 24:25, 66:2, 78:22, 89:18, 92:7, 98:8, 102:9, 112:23, 123:20, 161:6, 200:6, 204:15, 213:22, 213:24, 217:13, 220:11, 223:15, 223:17, 224:14, 235:4, 237:12, 241:12, 256:13, 257:21, 265:24, 266:16, 274:5, 274:6, 279:18, 286:22
two-brain 117:15
type 235:15, 263:22
types 209:18
typical 115:4
typically 15:11, 38:3
typified 75:8
tyra 36:17, 36:18,

36:20, 38:21,
41:22, 41:22,
41:23, 41:23,
42:10, 46:16,
46:25, 47:4,
48:10, 58:18,
62:3, 62:4, 63:21,
65:3, 65:5, 65:20,
66:5, 66:13,
67:12, 69:4,
82:24, 83:11,
84:2, 110:3,
110:8, 111:6,
113:17, 120:2,
147:24, 147:25,
148:6, 150:13,
159:3, 168:8,
169:12, 170:23,
173:1, 291:1,
291:6, 291:6
**tyra's** 153:2
**tyre** 291:3, 291:5

---

## U

---

**u-p-s-l-n** 9:15
**uh-oh** 287:4
**ukraine** 182:8
**ultimate** 72:24,
72:24, 73:1
**ultimately** 228:10
**un** 74:6
**unable** 148:24
**unam** 219:3
**unambiguous** 219:2
**unauthorized** 72:1
**unaware** 91:21, 149:3
**unbelievable** 68:22
**underlying** 120:9,
135:13, 146:24,
233:1
**understand** 7:12,
7:13, 8:2, 8:6,
10:9, 12:3, 19:5,
24:21, 27:10,
28:20, 38:10,
39:6, 40:4, 42:20,
45:7, 62:12,
68:23, 71:9,
74:14, 79:17,
79:17, 80:8, 82:2,

84:13, 87:16,
92:9, 92:23, 98:9,
99:12, 100:4,
101:14, 104:22,
105:2, 105:5,
106:11, 108:7,
118:2, 119:25,
126:7, 134:4,
134:22, 139:5,
146:14, 149:11,
149:17, 149:17,
150:7, 164:15,
182:20, 184:24,
185:23, 186:24,
190:18, 190:19,
193:9, 193:10,
193:12, 193:14,
196:6, 209:9,
209:12, 209:17,
212:24, 213:8,
213:9, 213:19,
214:22, 215:3,
218:22, 220:13,
220:22, 236:3,
258:18, 268:4,
275:1, 275:14,
282:5, 284:12
**understander** 203:24
**understanding** 4:23,
36:6, 45:6, 51:1,
54:6, 66:12, 72:4,
72:6, 72:12,
97:11, 104:12,
106:12, 106:19,
107:4, 203:7
**understands** 214:20
**understood** 15:22,
100:3
**unethical** 184:13,
189:9
**unfair** 282:25
**unfortunate** 129:5,
129:10
**unfortunately** 146:14
**unintended** 72:3
**unique** 177:6, 177:8
**unit** 28:4, 282:1,
282:2
**united** 55:5, 55:6,
55:7, 215:18
**universe** 284:6

**unless** 179:16, 243:8
**unlike** 27:7
**unpaid** 11:1, 11:20,
11:21, 16:19,
21:8, 21:13, 72:21
**unreasonable** 246:11
**unrelated** 169:20
**unreported** 157:15
**unsubscribe** 274:8,
275:15
**unsubscribe's** 275:17
**unsubscribes** 274:11,
275:6
**unsupported** 258:13
**untested** 184:1,
185:17
**update** 24:5, 27:22
**updated** 14:16,
15:14, 27:21
**updates** 23:18,
23:21, 23:22,
23:25, 24:3, 25:3
**upload** 20:22, 21:14,
76:17, 232:6
**uploaded** 76:14
**uploaders** 21:19
**uploading** 21:20
**uploads** 20:21, 21:2,
21:5, 21:7
**upon** 17:11, 37:12,
55:19, 57:3,
85:11, 128:14,
133:1, 155:1,
162:12, 205:16,
232:23
**upsilon** 9:15
**upsln** 9:13
**uptick** 109:1,
109:11, 109:14,
119:5
**us** 6:15, 6:22, 8:3,
8:8, 8:11, 20:25,
37:1, 84:15, 85:1,
91:1, 113:25,
115:25, 116:1,
116:20, 130:10,
172:9, 185:2,
190:12, 205:18,
246:17, 246:21,
259:17, 261:17,
270:13, 271:15,

271:22, 279:9,
282:25, 285:6,
285:25, 292:12
**usable**  188:7
**usage**  123:8
**usb**  287:12
**use**  18:3, 33:17,
33:22, 33:23,
35:21, 36:8,
36:11, 36:12,
36:14, 68:22,
77:19, 99:23,
104:4, 123:7,
134:2, 184:23,
189:4, 190:7,
209:2, 221:22,
223:9, 223:18,
223:19, 229:13,
235:15, 263:15,
285:14, 285:15,
285:17
**used**  70:18, 166:25,
177:24, 192:21,
192:22, 192:23,
209:19, 222:25,
223:23, 224:16,
224:17, 227:11,
271:6, 290:12
**useful**  77:18, 139:25
**users**  82:15, 82:16
**uses**  82:4, 82:12
**ushered**  259:20
**using**  32:4, 33:19,
77:22, 77:23,
91:2, 100:2,
178:13, 201:25,
270:2
**usually**  26:9,
128:22, 288:16

───────────────

### V

───────────────

**vaguely**  280:21
**valid**  5:12
**value**  177:3, 212:12,
212:13, 268:1
**vanderstock**  24:3,
219:22, 220:5,
221:13
**variations**  124:18
**vast**  165:13, 174:22

**vastly**  14:19
**venable**  200:22,
201:2, 201:10
**veracity**  119:18
**verbal**  8:13
**verbatim**  101:16
**verification**  123:7
**verify**  5:13, 39:17,
39:21, 39:25,
41:1, 41:4, 41:5,
41:6, 41:11,
42:11, 46:17,
47:22, 47:23,
69:15, 123:5,
152:3, 152:14,
154:5, 156:20,
164:25, 168:13,
207:17, 232:13
**verifying**  69:19
**vermont**  30:12
**versed**  16:11
**version**  15:3, 27:24,
112:2, 112:3,
112:5, 255:6
**versions**  14:11,
110:20, 110:24
**versus**  4:5, 161:19,
216:21
**via**  239:8
**viable**  48:21
**victim**  226:19,
227:4, 228:15
**video**  184:1
**viewership**  138:16
**violating**  187:13
**violation**  57:22
**virtual**  254:24
**visa**  255:16, 255:17,
255:20, 255:20,
255:23, 255:24
**visit**  254:22, 254:23
**visual**  212:19,
212:20, 213:2
**voice**  94:7, 103:17,
287:2
**voicemail**  284:19
**volkswagen**  212:23
**volume**  4:4, 172:14,
172:18
**voluntarily**  55:15,
55:17, 259:11,

259:24
**volunteer**  21:3,
21:7, 21:8, 237:16
**volunteered**  233:16
**voracious**  105:25

───────────────

### W

───────────────

**w-i-l-s-o-n**  5:10,
6:16
**wait**  41:18, 44:7,
51:25, 65:11,
85:17, 88:5, 88:5,
88:5, 99:14,
113:23, 120:22,
122:21, 122:21,
122:21, 136:13,
136:13, 136:13,
136:13, 144:19,
145:22, 148:19,
152:19, 180:6,
181:12, 216:11,
221:18, 244:4,
244:4
**waiting**  197:9
**waive**  134:15, 134:20
**wake**  288:16
**walk**  80:3, 208:22
**wall**  222:5
**wallet**  152:14,
156:20, 284:2,
285:23, 285:23,
286:6, 286:7
**wallets**  152:2,
153:21, 154:3,
284:1, 284:7
**wallman**  201:24,
202:12
**walls**  11:7
**want**  16:5, 16:6,
19:10, 27:10,
29:5, 29:13, 33:7,
41:5, 41:6, 41:7,
41:23, 44:11,
44:17, 48:22,
48:24, 49:24,
52:9, 52:21,
52:24, 56:17,
62:2, 62:20, 63:2,
64:14, 65:18,
65:21, 67:1,
68:22, 76:11,

76:12, 81:20,
84:14, 84:16,
99:21, 99:22,
99:23, 99:25,
134:10, 136:2,
136:3, 138:5,
144:23, 145:5,
147:2, 151:3,
158:4, 158:19,
172:6, 172:7,
172:8, 176:18,
181:6, 185:11,
188:22, 190:3,
194:15, 195:24,
195:25, 202:9,
205:6, 206:24,
209:9, 209:9,
210:14, 212:16,
213:7, 215:10,
228:2, 228:2,
228:3, 231:14,
232:22, 238:6,
240:1, 240:3,
240:4, 240:7,
242:13, 243:14,
243:18, 243:22,
244:16, 247:15,
247:16, 247:17,
250:5, 250:8,
251:11, 251:11,
257:3, 258:2,
263:12, 264:11,
264:11, 265:6,
266:9, 266:18,
271:10, 271:16,
271:25, 272:3,
272:5, 275:7,
278:1, 278:4,
279:18, 281:20,
281:22, 282:15,
285:14, 285:21,
288:8, 288:13,
289:7, 292:5
**wanted**  15:21, 32:6,
52:6, 129:9,
129:14, 129:16,
172:4, 178:9,
192:25, 205:17,
208:16, 209:20
**wants**  101:18,
130:12, 189:7,

237:13
**warned**  185:2
**warranted**  284:13
**waste**  137:15, 281:22
**wasting**  60:18,
137:15
**watch**  15:16, 116:25
**watching**  144:6,
144:8
**water**  94:9, 94:15,
121:16
**wave**  94:8
**way**  8:12, 16:25,
17:11, 19:9,
22:15, 23:19,
26:24, 29:1,
35:17, 36:7,
38:14, 40:4,
67:12, 68:7, 68:8,
69:1, 73:10, 74:6,
74:9, 76:15,
77:18, 77:22,
81:3, 87:10,
90:13, 91:11,
97:20, 99:10,
106:24, 124:11,
124:13, 128:7,
129:13, 130:10,
130:13, 143:5,
150:16, 150:18,
150:19, 176:14,
182:6, 187:25,
190:18, 203:22,
204:13, 205:19,
210:19, 212:22,
214:24, 215:1,
217:11, 219:17,
220:16, 220:21,
220:23, 225:7,
236:7, 244:3,
244:5, 255:24,
265:12, 265:25,
269:5, 269:12,
269:12, 269:13,
270:18, 271:1,
275:12, 276:22,
283:7, 283:8,
286:6, 286:12,
289:22
**ways**  12:21, 20:12,
174:15, 174:16,

174:20, 177:19,
277:1, 280:2
**wearing**  261:16
**weather**  44:24
**website**  11:11, 18:3,
19:8, 20:9, 72:13,
72:17, 72:23,
73:2, 73:5, 73:6,
73:9, 73:11,
73:12, 73:17,
75:11, 77:19,
77:22, 77:25,
86:2, 131:13,
141:4, 141:9,
174:23, 184:1,
184:4, 184:10,
185:12, 188:16,
225:9, 226:8,
226:10, 226:13,
226:15, 228:8,
228:12
**websites**  71:22,
72:5, 84:19
**wednesday**  4:2
**week**  35:14, 38:21,
44:4, 256:13
**weekly**  17:17, 26:22
**weeks**  256:13
**weight**  136:25, 285:8
**weird**  133:10
**welcome**  188:21
**well**  6:17, 9:25,
10:5, 10:7, 11:1,
11:23, 15:5,
15:14, 16:9,
16:11, 17:22,
19:15, 19:20,
19:22, 20:14,
20:16, 22:7,
22:18, 24:6,
24:13, 26:3,
28:13, 29:21,
30:3, 30:19,
31:12, 31:13,
32:22, 34:10,
35:3, 35:7, 35:9,
35:12, 39:20,
40:8, 41:2, 41:10,
43:16, 47:11,
47:20, 48:5,
48:15, 48:21,

48:23, 49:15,
50:3, 50:7, 50:12,
50:21, 53:15,
54:21, 55:14,
56:4, 58:5, 58:22,
59:19, 59:24,
60:7, 60:9, 60:22,
61:22, 62:6, 65:1,
66:9, 67:10, 68:8,
68:23, 69:11,
71:25, 72:24,
73:13, 74:6, 74:9,
76:6, 77:21, 78:8,
78:15, 78:21,
79:14, 80:23,
82:15, 83:25,
84:11, 84:25,
85:22, 86:2, 87:2,
89:9, 93:6, 94:4,
94:16, 95:1, 95:4,
96:14, 97:19,
98:11, 100:14,
104:24, 106:4,
107:19, 109:6,
111:8, 111:25,
112:13, 112:18,
113:6, 117:25,
121:20, 122:1,
122:4, 123:5,
123:25, 124:11,
124:18, 125:1,
125:7, 126:21,
126:22, 127:20,
128:3, 130:18,
131:18, 136:15,
136:19, 137:5,
137:10, 138:19,
140:12, 140:18,
141:15, 142:3,
142:7, 142:24,
144:12, 145:3,
149:21, 150:8,
151:24, 153:14,
157:16, 157:19,
158:6, 161:16,
161:21, 162:18,
162:24, 163:2,
164:19, 165:7,
166:21, 167:8,
167:16, 168:14,
170:17, 170:22,

172:8, 173:25,
174:25, 176:7,
177:16, 177:23,
178:4, 178:18,
178:20, 178:21,
179:14, 179:23,
180:5, 181:16,
182:10, 182:24,
184:15, 184:23,
190:4, 191:7,
191:18, 192:25,
194:7, 194:19,
195:21, 196:13,
196:15, 197:9,
197:13, 199:9,
200:24, 201:17,
207:2, 207:11,
207:13, 210:3,
212:16, 213:1,
214:2, 217:21,
220:3, 220:10,
220:15, 220:20,
223:12, 224:4,
226:20, 228:4,
229:9, 229:20,
231:3, 232:18,
234:17, 236:12,
243:4, 243:12,
244:16, 246:24,
252:11, 252:17,
256:24, 261:20,
261:25, 263:11,
265:2, 265:20,
266:4, 269:11,
270:20, 274:24,
276:16, 276:24,
277:17, 279:1,
279:8, 282:11,
284:6, 286:19,
287:11, 287:25,
288:1, 289:6,
290:11, 291:21,
292:11

**went** 15:24, 31:24,
46:22, 49:1, 49:4,
98:15, 106:20,
149:1, 158:10,
163:25, 192:6,
255:5, 255:5,
281:13, 282:11

**western** 216:25

**whataburger** 54:17,
54:22

**whatever** 26:22,
29:9, 68:22,
114:4, 116:14,
143:15, 147:1,
147:1, 164:11,
176:24, 209:5,
219:25, 236:1,
249:16, 264:21,
280:8, 284:22

**whatsoever** 39:17,
138:10, 168:24

**whenever** 6:10

**wherever** 23:25

**whether** 43:13, 45:1,
60:6, 60:10,
60:12, 80:20,
89:23, 91:6,
124:1, 128:17,
159:14, 170:7,
188:23, 189:23,
267:10

**whichever** 219:12

**white** 15:21

**whoever** 228:7

**whole** 6:3, 36:4,
80:10, 145:19,
148:9, 149:3,
174:3, 222:21,
261:8, 267:25,
282:18

**whose** 18:12

**wide** 162:25, 163:8,
165:13

**wife** 84:4

**wikipedia** 87:8

**wild** 210:18, 210:18,
211:2, 211:2

**wilderness** 267:16,
267:17

**willing** 158:21,
231:10

**wilson** 4:4, 4:11,
5:9, 5:11, 5:24,
6:13, 6:16, 54:4,
74:23, 182:19,
242:5, 254:7,
264:7, 282:15

**wilson's** 280:7

**win** 213:21, 214:17,

214:17, 215:13,
215:14, 215:17,
215:18, 215:21,
215:24, 216:20,
217:3, 218:10,
218:25, 219:1,
219:2, 219:4,
220:4, 220:14,
221:5, 221:9,
221:12, 221:13,
221:13
**wind**  60:14
**wins**  215:16, 215:17,
219:7, 219:21,
220:3, 220:21,
220:24, 221:6,
221:14
**wish**  16:8, 62:11,
177:23
**withdrawn**  93:10,
93:14, 93:17,
93:19, 96:1
**within**  24:18, 24:18,
41:10, 42:25,
169:25, 286:17
**without**  19:3, 57:22,
69:19, 87:5,
100:16, 100:21,
101:14, 104:10,
104:11, 104:17,
104:20, 150:14,
151:13, 185:9,
242:21, 242:23
**witness**  5:5, 16:16,
40:9, 40:11,
43:20, 43:22,
52:17, 52:23,
63:14, 84:13,
114:18, 115:7,
118:4, 157:24,
157:24, 256:25,
291:25, 292:1,
292:2
**witnessing**  264:12
**woman**  227:14,
248:25, 253:23
**wonder**  273:21
**wondering**  209:19
**word**  47:5, 48:21,
54:6, 71:24,
123:8, 125:2,

142:11, 154:17,
155:20, 186:24,
189:4, 189:10,
190:8, 192:22,
192:23, 192:23,
212:7, 213:8,
267:13, 274:19,
274:23, 275:17
**words**  15:4, 53:20,
60:18, 118:1,
184:24, 212:7,
215:3, 267:3
**work**  14:6, 14:24,
21:18, 35:5,
40:13, 57:16,
62:16, 76:22,
87:4, 102:12,
117:16, 129:10,
129:14, 129:16,
129:19, 184:22,
188:1, 188:2,
250:6, 250:8,
263:13, 270:4,
278:9, 289:18,
289:19, 289:21
**worked**  37:20, 148:17
**workers**  144:11
**working**  36:25, 37:1,
145:5, 185:2
**works**  87:6, 101:25,
103:7, 169:10,
200:22, 203:5,
271:1, 276:1,
284:11
**world**  12:14, 12:15,
27:8, 49:18, 93:7,
117:18, 121:25,
165:19, 166:3
**worried**  11:6, 89:19,
89:24, 89:25
**worry**  29:7, 71:4,
225:22, 266:9,
266:10, 266:14
**worse**  92:25, 179:2
**would**  7:8, 9:5,
13:17, 13:18,
13:21, 15:16,
15:17, 15:19,
15:23, 17:14,
19:13, 19:16,
19:17, 22:19,

22:23, 23:6,
23:23, 28:2,
28:23, 29:2, 30:1,
30:6, 32:14,
32:21, 35:1, 35:7,
36:20, 39:2, 39:5,
39:23, 39:24,
40:25, 41:2, 41:5,
41:6, 42:16,
46:24, 47:3, 47:4,
47:20, 48:3,
58:10, 58:12,
60:1, 62:11, 64:3,
64:13, 64:22,
66:4, 66:9, 66:12,
66:13, 68:6,
68:21, 71:1,
71:23, 77:10,
77:25, 78:19,
80:17, 80:22,
81:3, 81:5, 81:6,
81:10, 81:18,
83:10, 85:11,
85:25, 86:3,
86:19, 86:20,
87:18, 90:8,
90:10, 91:13,
91:19, 93:2,
96:17, 99:3,
102:14, 106:11,
107:4, 107:7,
108:11, 109:5,
110:15, 110:23,
111:1, 116:22,
117:24, 117:25,
118:1, 119:12,
122:2, 124:17,
126:2, 128:7,
135:5, 137:5,
138:2, 142:10,
142:24, 142:24,
144:3, 145:7,
146:9, 147:23,
153:16, 153:18,
155:17, 155:17,
155:18, 161:10,
161:16, 161:22,
164:4, 164:6,
164:8, 164:9,
164:19, 168:9,
168:16, 170:4,

170:8, 178:11, 178:11, 178:20, 180:24, 183:11, 183:12, 183:17, 184:24, 184:25, 186:21, 187:1, 187:2, 189:16, 190:3, 193:23, 195:12, 202:14, 205:5, 205:17, 208:22, 209:2, 209:6, 209:20, 210:21, 210:22, 210:23, 210:25, 211:15, 213:9, 215:12, 215:24, 216:21, 219:21, 220:16, 220:20, 220:20, 220:20, 224:6, 224:13, 229:23, 229:25, 229:25, 230:9, 231:5, 231:8, 231:20, 232:21, 233:22, 233:22, 235:15, 237:16, 238:20, 238:23, 242:21, 244:24, 245:1, 246:11, 253:24, 254:15, 255:23, 257:2, 260:19, 263:9, 263:11, 264:6, 265:2, 265:6, 266:13, 268:9, 270:5, 271:12, 271:13, 272:23, 274:12, 276:17, 283:18, 284:10, 285:20, 286:6

**would-be**  197:18

**wow**  128:3, 133:2, 189:21

**wrap**  241:5, 288:11

**wretchedly**  222:23, 222:24

**write**  38:18, 40:16, 212:14, 233:24

**writing**  9:2, 146:3

**written**  7:22, 40:14

**wrong**  64:23, 198:6,

200:12, 220:24, 220:25, 221:2

**wrote**  181:9, 223:8, 235:9, 235:12

---

### Y

**ye**  250:10

**yeah**  5:15, 6:20, 7:4, 7:4, 10:24, 13:3, 13:9, 19:7, 19:22, 21:12, 25:14, 25:24, 27:15, 30:15, 32:8, 33:13, 34:20, 35:12, 36:4, 38:11, 39:15, 42:2, 43:12, 47:5, 48:3, 48:7, 48:7, 48:24, 49:22, 51:15, 52:5, 53:21, 54:23, 56:6, 57:15, 58:2, 60:17, 60:20, 62:17, 66:15, 66:16, 66:19, 72:18, 75:1, 75:13, 75:20, 76:18, 78:14, 79:2, 79:6, 79:20, 80:5, 80:17, 80:24, 81:2, 81:11, 82:17, 85:10, 86:7, 86:14, 88:7, 88:15, 88:24, 91:9, 95:12, 97:2, 97:3, 97:11, 97:18, 97:24, 98:2, 98:16, 99:21, 100:9, 100:22, 100:25, 101:7, 101:16, 102:17, 102:18, 103:5, 103:12, 103:14, 103:15, 103:23, 104:11, 107:8, 108:13, 108:15, 109:12, 110:22, 111:10,

114:13, 115:6, 116:2, 117:13, 117:15, 117:15, 117:16, 117:22, 120:2, 120:15, 121:24, 122:5, 127:6, 127:13, 128:20, 130:3, 130:8, 131:16, 132:9, 133:22, 139:19, 139:21, 140:22, 141:24, 142:1, 142:3, 142:6, 144:15, 144:21, 144:25, 145:16, 149:13, 150:16, 154:13, 157:13, 158:4, 158:6, 158:16, 158:21, 158:24, 158:24, 161:18, 161:22, 165:15, 165:16, 165:18, 166:15, 167:19, 167:19, 168:3, 168:24, 170:14, 170:18, 171:21, 172:2, 173:9, 173:14, 173:14, 175:17, 176:10, 176:23, 177:1, 177:7, 177:10, 177:20, 178:12, 178:23, 179:18, 179:22, 180:1, 180:20, 180:25, 181:8, 181:19, 182:12, 183:10, 183:20, 183:21, 184:16, 188:19, 189:23, 191:11, 191:11, 192:21, 193:13, 195:6, 195:20, 197:11, 199:2, 199:6, 200:11, 200:15, 200:18, 201:9, 202:17, 204:4, 204:6, 204:9, 204:11, 204:20, 205:4, 206:8,

206:24, 208:18, 209:18, 210:19, 211:10, 211:12, 212:2, 212:22, 213:11, 213:25, 215:15, 216:5, 218:9, 219:19, 224:25, 225:6, 225:13, 225:14, 226:16, 226:25, 229:1, 229:2, 229:18, 229:23, 230:18, 230:19, 231:13, 232:4, 232:14, 233:13, 233:13, 234:17, 234:22, 235:3, 235:21, 235:22, 235:25, 236:2, 237:1, 237:14, 237:18, 237:25, 238:14, 239:4, 239:11, 240:20, 241:3, 241:8, 241:19, 241:20, 242:7, 243:10, 243:25, 244:16, 244:16, 246:24, 247:9, 248:13, 248:20, 250:10, 250:10, 253:3, 253:5, 253:10, 253:18, 254:6, 255:20, 258:25, 260:7, 260:9, 260:14, 260:16, 262:25, 263:4, 263:10, 264:2, 264:2, 264:2, 264:23, 265:1, 266:3, 266:17, 266:19, 266:19, 267:6, 267:6, 268:5, 268:8, 269:19, 269:20, 269:21, 270:7, 271:7, 271:23, 271:25, 273:24, 274:23, 275:25, 276:20, 276:21, 278:18, 278:20,

279:2, 279:6, 279:16, 280:7, 280:17, 280:20, 280:22, 282:19, 283:10, 285:5, 286:13, 286:16, 286:24, 287:1, 287:10, 287:14, 287:19, 288:10, 288:22, 289:12, 289:19, 290:9, 290:25, 291:23, 292:9

**year** 27:6, 27:6, 37:5, 98:11, 214:12, 214:14, 266:16, 277:10, 277:11

**year-to-year** 27:3

**years** 9:20, 11:19, 14:21, 27:11, 30:8, 31:5, 35:4, 37:7, 37:7, 37:8, 38:17, 66:3, 66:18, 68:2, 98:8, 117:4, 125:20, 125:21, 129:6, 148:16, 148:17, 176:20, 176:20, 182:8, 193:8, 209:23, 229:21, 266:16, 277:14, 280:1

**yell** 80:2

**yelling** 145:11

**yep** 5:8, 137:24, 195:18, 247:3, 247:22, 291:16, 292:14

**yes** 4:15, 4:18, 4:25, 5:1, 5:2, 5:4, 5:16, 5:20, 5:21, 6:24, 7:21, 7:25, 8:17, 8:24, 8:24, 9:6, 10:24, 11:21, 13:18, 13:23, 16:12, 16:14, 18:2, 22:10, 22:14, 23:5, 24:1, 24:1, 26:18, 26:20,

27:19, 28:16, 30:11, 34:18, 34:18, 37:1, 37:15, 37:15, 38:10, 38:17, 39:13, 40:24, 43:9, 45:10, 45:24, 46:23, 48:5, 48:9, 51:23, 57:17, 57:21, 58:7, 58:9, 59:1, 64:5, 65:11, 72:22, 73:4, 84:21, 85:20, 86:10, 87:22, 89:20, 91:3, 102:21, 116:3, 127:24, 128:12, 133:15, 143:4, 144:20, 146:22, 152:8, 159:24, 160:1, 163:20, 164:7, 164:8, 166:17, 169:2, 171:11, 175:21, 176:20, 182:22, 183:9, 184:9, 187:11, 190:7, 190:15, 193:24, 196:9, 199:18, 201:4, 202:13, 204:22, 214:4, 217:17, 223:5, 223:5, 224:1, 224:15, 226:6, 228:17, 228:17, 228:21, 229:20, 232:14, 234:21, 242:6, 242:9, 242:23, 245:2, 245:6, 251:19, 252:22, 252:24, 253:24, 256:11, 259:5, 259:25, 260:4, 262:8, 263:3, 263:5, 270:15, 274:1, 274:15, 274:16, 275:19, 277:8, 283:6, 289:25, 291:16, 292:1

**yeses** 5:3
**yet** 6:8, 38:22, 61:3, 110:20, 141:16, 149:12, 167:21, 213:21, 214:3, 220:14, 221:5, 221:9
**york** 90:11, 90:14, 90:16, 131:1, 163:10, 284:17, 284:18
**young** 54:13, 54:16, 54:25, 226:7, 226:9, 226:18, 238:5, 241:16, 242:8, 248:22, 264:17, 268:3

## Z

**zach** 79:11
**zero** 67:20

EXHIBIT A
Defendant's Exhibit





1



2

EXHIBIT B
Defendant's Exhibit

