# Deposition Transcript

Case Number: 9:25-cv-81197-DMM

Date: April 28, 2026

In the matter of:

# DEFENSE DISTRIBUTED, et al. v JOHN ELIK, et al.

# JASON MATHIEU TYRA, ESQ.

CERTIFIED COPY

Reported by:
HELEN MENDLOWICH



Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

------------------------------------------X

DEFENSE DISTRIBUTED, a Texas Corporation;
DD FOUNDATION, LLC, a Texas limited
liability company; and DEFCAD, INC., a
Texas corporation,

                Plaintiffs,

                        Case No. 9:25-cv-81197-DMM
      -against-

JOHN ELIK, individually; MATTHEW LAROSIERE,
individually; ALEXANDER HOLLADAY,
individually; PETER CELENTANO, individually;
and JOHN LETTMAN, individually,

                Defendants.

------------------------------------------X


Videotaped Deposition of Jason Mathieu Tyra, Esq.

Tuesday, April 28, 2026

via Zoom


REPORTED BY:  Helen Mendlowich, CSR

April 28, 2026
11:00 a.m.

        Videotaped deposition of Jason Mathieu Tyra, Esq., taken by Defendants via Zoom video conferencing, pursuant to Notice, before Helen Mendlowich, a Certified Shorthand Reporter and Notary Public within and for the State of New York.

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

A P P E A R A N C E S:


FOSTER, P.C.
Attorneys for Plaintiffs
        155 North Wacker Drive, Suite 4250
        Chicago, Illinois 60606
        Telephone:  (312) 726-1600

BY:     HOWARD FOSTER, ESQ.


MATTHEW MICHAEL LAROSIERE, ESQ.
Attorneys for Defendants, John Elik and John Lettman
        6964 Houlton Circle
        Lake Worth, Florida 33467
        Telephone:  (561) 452-7575


LAW OFFICES OF GARY DE PURY, P.A.
Attorneys for Defendants, Alexander Holladay
        21035 Leonard Road
        Lutz, Florida 33558
        Telephone:  (813) 917-4279

BY:     GARY CHARLES DE PURY, ESQ.


ZERMAY LAW, P.A.
Attorneys for Defendants, Alexander Holladay, John
Elik, John Lettman, Matthew Larosiere
        3000 Coral Way, Suite 1115
        Miami, Florida 33145
        Telephone:  (310) 752-9728

BY:     ZACHARY Z. ZERMAY, ESQ.



ALSO PRESENT:

        JOHN LETTMAN, Defendant

        ISAAC PETH, Videographer

        CODY RUTLEDGE WILSON

JASON MATHIEU TYRA, ESQ.                                JOB NO. 2667670
APRIL 28, 2026

TYRA

THE VIDEOGRAPHER:  Good morning.

We are on the record at 11:06 a.m. Eastern Time, April 28th, 2026, to begin the deposition of Jason Mathieu Tyra in the matter of Defense Distributed, et al. versus John Elik, et al.

The venue of this case is Federal U.S. District Courts, Florida Southern District Court.  The case number is 9:25-cv-81197.

This deposition is taking place via Zoom. The legal videographer is Isaac Peth, here on behalf of Steno, whose business address is 315 West Ninth Street, Suite 807, Los Angeles, California 90015.

Would counsel please identify yourselves and state whom you represent.

MR. FOSTER:  Howard Foster for the plaintiffs.

MR. ZERMAY:  Hello.  Zachary Zermay for defendant, Matthew Larosiere.

MR. LAROSIERE:  Matthew Larosiere for defendants, Elik, Stroke, Lettman and Clark.

MR. DE PURY:  Gary De Pury on behalf of defendant, Alexander Holladay, H-O-L-L-A-D-A-Y.

TYRA

Thank you.

THE VIDEOGRAPHER:  Thank you, counsel.

Will the court reporter please identify yourself and swear in the witness.

J A S O N   M A T H I E U T Y R A, Esq., stating his address as 6301 Preston Road, Suite 700, Plano, Texas 75025, after having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

DIRECT EXAMINATION BY MR. LAROSIERE:

Q.   Thank you, Mr. Tyra for being with us.

So that address you just gave, that's your business address, right?

A.   That is correct.

Q.   What's your residence address?

MR. FOSTER:  I don't think you are entitled to that, Matthew.  I object.

Q.   Go ahead and answer.

A.   4436 Avonshire Lane, Plano, Texas 75093.

Q.   And how long have you lived there?

A.   Since April of 2018.

Q.   2018?  Do you remember where you lived before that?

TYRA

MR. FOSTER:  I object to this line of questions.  He is not here as an individual deponent.  You can't ask questions about him individually.

Q.   Go ahead and answer.

MR. FOSTER:  No, I instruct you not to answer that.

MR. LAROSIERE:  I am getting somewhere with this, Mr. Foster.  Do you want to start this way?

MR. FOSTER:  Sure, I do.

MR. LAROSIERE:  Okay.  Are you saying you want to start with instructing him not to answer a simple question?

MR. FOSTER:  Right, about his prior residences.  I will move for a protective order about this.

BY MR. LAROSIERE:

Q.   Mr. Tyra, have you ever lived at 4305 Neta Drive in Killeen, Texas?

MR. FOSTER:  Objection.

Q.   It's yes or no.  Go ahead and answer.

MR. FOSTER:  You can answer.

A.   I am going to not answer -- okay.  Yes, I

TYRA

have.

Q.   You said "yes" and then you said you weren't going to answer.  Why was that?

A.   I don't know what I'm -- like, am I instructed not to answer, Mr. Foster, or not?

MR. FOSTER:  Okay, you can answer that answer.  I am not instructing you not to answer.  You can answer that.

A.   I have resided at 4305 Neta Drive, yes.

Q.   Okay.  That's fine.

So you're a CPA, right?

A.   Yes.

Q.   Okay.  It took you a second to answer.  Was that a hard question?

A.   No, I answered immediately.  There may be delay here.

I am a certified public accountant licensed in Texas and New York.

Q.   Okay, now I hear the delay.  Sorry about that.

You are familiar with the report you wrote on February 16, 2026, right?

A.   Yes.

Q.   Okay.  Did you review that in preparation

JASON MATHIEU TYRA, ESQ.                                      JOB NO. 2667670
APRIL 28, 2026

TYRA

for your deposition today?

A.    Yes, I did.

Q.    Okay, thank you for that.

And that report contains all the opinions you intend to offer in this case; is that correct?

A.    Yes.

Q.    Okay.  So you're not holding back any regression models that weren't mentioned in this report?

A.    I did not prepare any regression models, so I am not holding anything back.

Q.    No, that's fine.  And to be clear, I'm not accusing you of anything; I'm just trying to have the facts straight.  So don't think I am trying to say you are holding anything back.  It's just a question.

You are not holding back any customer surveys that you were relying on; is that correct?

A.    That is correct.

Q.    You are not holding on any web analytics that you relied on; is that correct?

A.    That's correct.

Q.    You are not holding back any trim analysis or loss/profits calculations that were not disclosed

TYRA

in your report or workbooks; is that correct?

A.   I believe the report does describe loss/profits, so that analysis is included, but no trim analysis, no.

Q.   Okay.  Whatever I was saying specifically, loss/profits calculations not disclosed in the report, you are not holding those back?

A.   I am not holding any back, that is correct.

Q.   Okay.  And you have not issued a supplemental report changing your opinion in your February 16, 2026 report; is that correct?

A.   Yes.

Q.   Okay.

So how long have you been a CPA?

A.   Since July of 2013.

Q.   And were you an attorney before that or --

A.   I'm sorry, I don't understand the question.  Was I a trainee?

Q.   An attorney.  You're also an attorney, right?

A.   No, I was licensed afterward.  I've been -- yes, no.

Q.   How long have you been an attorney?

TYRA

A.   Since December of 2020.

Q.   Okay.  Would you say your practice is currently focused on the accounting side or more on legal practice?

A.   I would say it's a multidisciplinary practice that draws equally in both areas.  I don't primarily handle litigation, but the clients that I handle do appreciate being able to talk about both things.

Q.   So it's kind of a value-add to your consultancy service, basically, is that, you know, you can competently give them legal advice when they might need it on top of the money management advice you are otherwise giving?

A.   Yes.

Q.   Okay, that makes sense.

You are not a marketing expert, right?

A.   I am not a marketing expert, that's correct, yes.

Q.   Okay.  Have you ever published anything about online marketing?

A.   I have not.

Q.   Have you ever done any research or publications on -- I will pull that back.  I don't

                        TYRA

want to ask you a compound question.

          Have you ever made any publications about
consumer behavior?

     A.   I have not.

     Q.   Have you ever taken any formal classes
about consumer behavior?

     A.   Yes.

     Q.   Okay.  What was it?

     A.   I hold a master's of business
administration degree from the University of Texas
at Dallas.  That's a required portion of the
curriculum of I think any MBA.

     Q.   Okay, so what was that class?

     A.   Marketing.

     Q.   Marketing?  I asked if you had --

     A.   I believe the class was entitled -- sorry.
Go ahead.

     Q.   No, I asked if you had taken any courses
on consumer behavior.

     A.   Marketing is a class that describes
consumer behavior and it's what marketing concerns
itself with.

     Q.   Understood.

          Do you have any -- do you have a marketing

JASON MATHIEU TYRA, ESQ.                                                JOB NO. 2667670
APRIL 28, 2026

TYRA

certificate as part of your MBA or no?

A.    No.

Q.    Did you have a focus in your MBA?

A.    Yes.

Q.    What was that focus?

A.    Accounting.

Q.    Accounting?  Did you take any courses on social media marketing?

A.    No.

Q.    Okay.

In this case, not talking about your college anymore, you have not conducted any consumer surveys; is that correct?

A.    That is correct.

Q.    And you haven't conducted any efficacy studies in this case; is that correct?

A.    Efficacy study?  Um, yes, that's correct.

Q.    Okay.  Have you done any Google trends analyses?

A.    I haven't.

Q.    So in the report you say that you assumed the meme first appeared around May of 2023.  Did that assumption come from the complaint or somewhere else?

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

A.   I don't recall, but I don't know where else I could have gotten that information, so yeah, I don't know.

Q.   So you say it was either the complaint or the plaintiffs telling you?  Would that be fair to say?

A.   That seems reasonable, yes, yeah.

Q.   So you didn't independently determine who created it, who posted it or how many people saw it; is that right?

A.   I'm sorry, you broke up there.  What did you say, again?

Q.   So you didn't independently determine who created the meme, who first posted it or how many people saw it; is that fair to say?

A.   Yes.

Q.   So if the May of 2023 date were wrong, the before and after analysis changes; is that right?

A.   Well, no.  The sales data are what they are, regardless of when the meme appeared, so I don't think that analysis changes, no.

Q.   But the causation analysis would change?

A.   Potentially.  The data clearly show a downward trend in sales, so for the sake of

                          TYRA

discussion, if it appeared in July, that would move

it slightly to the right, but I don't think the

conclusion would have changed.

     Q.   Okay.  We will talk about that because I

have some questions.  Are you an economist?

     A.   I am not.

     Q.   Okay, because I saw in one of your reports

you did -- you had a section that included an

R-squared value; do you remember that?

     A.   Unless I was citing something, I would not

have included an R-square value in my report.  Can

you tell me where that was?

     Q.   Yes, so it was in one of the -- so

plaintiffs in this case, and, you know, I am not

wanting to testify but they were required to provide

the materials relied upon and I see in the --

actually, hold on.  Let's just do this.

          MR. FOSTER:  I object to this to the

     extent that you are trying to reference an

     exhibit without marking it.

          MR. LAROSIERE:  Howard, knock it off.

          MR. FOSTER:  You are required to mark your

     exhibits.

          MR. LAROSIERE:  Howard, stop.  Howard,

                          TYRA

stop talking.  You can say "objection to form,"

you can say -- put your objections on the

record.  Okay?  Stop talking.  You don't get to

just monologue.  I am trying to present it

right now.

        MR. FOSTER:  Well, do it correctly.

        MR. LAROSIERE:  Howard, stop.

        (Technical difficulties sorted.)

        (Defendants' Exhibit 1, report, was marked

for identification as of this date.)

BY MR. LAROSIERE:

    Q.   Can you see that?

    A.   Yes.

    Q.   Is it legible?

    A.   Yes.

    Q.   I can fix it, if it's not?

    A.   No, I can see it.

    Q.   Is this your report?

    A.   It appears to be, yes.

    Q.   What do you mean "it appears to be"?

    A.   Well, I only see one page and it looks

like what I turned in but, I mean -- I'm not trying

to obfuscate.  Yeah, it looks like my report, yes.

    Q.   Okay.  I am just going to scroll through.

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

So this is what I was driving at, this annex.  Did you prepare that draft?

A.  Yes, I did.

Q.  Okay.  So what I was talking about there is the materials that contain this draft was three sheets of a workbook?  I can put that up, if you want.  I am just asking if you remembered a sheet having a FAR score analysis with this?

A.  Okay, I was not provided that.  So what you see is what I received.  There is a slight difference between what I was provided in that I broke the columns up.

The data that I have in the report here is all that I received from my client, so -- with the exception of I modified it to fit the page. Otherwise, I did not perform a FAR score analysis, I did not receive one, I did not rely on one.

Q.  Okay.  So you say you see a definite downward trend here; is that correct?

A.  Yes.

Q.  Describe where that trend starts.

A.  The month the meme was released.

Q.  Which is what month?

A.  I believe the report says May of 2023.

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

                                   TYRA

          Q.    May of 2023?

          A.    Yeah, whatever the report says.

          Q.    That would be 5 of 23?

          A.    Yes.

          Q.    Okay.  So that's -- that represents -- can
you see my mouse?

          A.    Yes.

          Q.    That represents this peak right here?

          A.    It looks like it.

          Q.    Yup.  I think this graph looks pretty
flat.

          A.    Is that a question?

                MR. FOSTER:  Objection, that's not a
          question.

          Q.    That's not a question.

                How do you find a definite downward trend
from this graph?

          A.    I didn't use that graph to it.  I did not
perform a graphical analysis; I performed a
numerical analysis.

          Q.    How did you perform that?

          A.    If you scroll back, there is a section in
the report that describes the methodology.

          Q.    This is a deposition.  I am poking at

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

what's in your brain.  I am not poking at the report.  I have the report.  I am asking how you determined a downward trend.

A.   Okay, got it.  So what I did is I look at the peer-agreed prior to the release of the meme, I dropped the highest and lowest grossing months from each year as outliers, and then I derived an average monthly sales for the period up to I believe April of 2023.

So that was considered the before period, May was dropped because I didn't have a precise day that it came out, so I wasn't sure whether that fit into the before or the after, and then I did the same thing for the after period.  I dropped the lowest and highest grossing months, and then took an average by month and compared it to.

Q.   Okay.  So May was a pretty high-grossing month, wasn't it?

A.   I'm sorry, you broke up.  What was that question?

Q.   May was a pretty high-grossing month, wasn't it?  In fact May of 2023 was unusually high; would you say that's fair to say?

A.   Yes.

TYRA

Q.    And so -- and you excluded that month from your calculation, right?

A.    Yes.

Q.    Could that not have had a significant impact on the before and after?  I mean, I understand you're saying because you don't know the exact date, that you took it out, but don't you think that could have had an, for example, if sales increased significantly after that point, couldn't that have had a material impact?

A.    The fact, yes, which is why I omitted it. I also omitted the highest and lowest grossing months in the before or after periods, as well, for the same reason, by the way.

Q.    For each year or just in each period?

A.    I believe I did this by year, so each period would be by year, but...

Q.    Let's go up.

So here you say highest-grossing month during that period was November of 2023, which you say is related to the Black Friday sale, and the lowest-grossing month was September of 2025.  So you didn't separate out the highest and lowest months by year, did you?

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

A.   It just says "this period."  I mean, I don't know what "this period" is in this context.

Q.   For the period of June 2023 through October of 2025.

A.   Okay, yes, I did not break it up by year.

Q.   Okay.

A.   This is a little over two-year period.

Q.   All right.  And your comparison period was November of 2021 through April of 2023?

A.   Yes.

Q.   Okay.  Well, here it says -- so for November of '21 through '23, if you excluded the highest-grossing month and the lowest-grossing month, is that fair to say, you excluded two items?

A.   That appears to be what it says, yes.

Q.   I am asking if that's what you did.

A.   What does it say?

Q.   When you are doing your calculation, when you did that -- it says that.  I am just asking if that's what you did.

We lost you for a second.  Did you hear me?

A.   Please repeat.  I think I heard you, but please repeat.

JASON MATHIEU TYRA, ESQ.                                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

Q.   Yeah, I see what it says in the report.

A.   Your question is -- go ahead.

Q.   I am asking if that's what you did, you excluded April of 2022 and September of 2022?

A.   I did precisely what is described in the report.

Q.   Okay.  So then -- would you call that the control period, that's the period before the meme?

A.   The control period?

Q.   I am trying to call it -- I am just trying to have a name for the before and the after.

A.   It's not what I would call it, but if you want to call it, you can call it "the control."

Q.   What would you call it then?

A.   "The before period," the period prior to the meme.

Q.   So let's call it "the before period."  You excluded two months in the before period; is that correct?

A.   Sure, uh-huh, yes.

Q.   So then from the after period, you excluded the highest-grossing month and the lowest-grossing month, and then also the month of the meme; is that correct?

TYRA

A.   The month of the meme was not included in either period, so yes, that's correct.

Q.   Right, because it's the period that's for the month.  Okay.

Just while we're here, in your conclusion you say that the meme will certainly drive customers away and that it will continue to do so as long as it's up.  Is that fair to say?

A.   Yes.

Q.   Okay.  Is that still your testimony?  The meme being online is going to keep driving customers away from DEFCAD?

A.   Yes, that is still my testimony.

Q.   Okay.  In your report you acknowledge that the meme was published on your client's own website.  Are you aware of that?

A.   Am I -- no, I'm not aware of that.  Where are you saying it says that?

Q.   Are you aware that your clients posted the meme on their own website?

A.   I'm not aware of that.

Q.   Okay.  Would that impact your calculations?

A.   No.

TYRA

Q.   How?

A.   Because the analysis was performed on the meme existing and being publicly available.  I didn't perform any analysis with respect to where exactly it's available.

Q.   Okay.  But to the extent you're trying to calculate damages caused by defendants' purported posting of the meme, would you say that creates a problem?

A.   I don't believe I have rendered any conclusions at all with respect to defendants' conduct.  I analyzed the existence of a publicly-accessible meme that contains a call to action asking people not use the DEFCAD platform.  I didn't perform any analysis with respect to where it's available.

Q.   Okay.  So your analysis doesn't indicate, for example, how much business was lost by the actions of any particular defendant; that's fair to say?  It's just about the meme?

A.   I don't have any evidence on hand at all that suggests that the defendants anything to do with the meme.  I didn't analyze that.  That's not what I was engaged to do.

TYRA

Q.   Okay.  You were engaged solely to determine the market impact of this meme's existence?

A.   That's correct, and my report does not contain and my testimony will not contain any factual allegations related to the conduct by any particular defendant.

Q.   Okay.  I want to highlight this, and I think this goes along with what you're saying, "The meme itself may also have generated a pop in sales to customers who first became aware of DEFCAD in carrying the meme on social media."  You wrote that, right?

A.   I did write that.

Q.   Okay.  It says "It is worth noting that May of 2023 sales were reported as $53,926, which is higher than the average over the previous 18 months."  You wrote that, right?

A.   I did write that.

Q.   Okay.  "This likely corresponds with the expiration of the amnesty period for registration of pistols with stabilizing braces as short-barreled rifles under the National Firearms Act."

You wrote that?

JASON MATHIEU TYRA, ESQ.                                              JOB NO. 2667670
APRIL 28, 2026

TYRA

A.   Yes.

Q.   Does DEFCAD or Defense Distributed, do they sell stabilizing braces?

A.   I don't know.

Q.   You don't know?

A.   I am not familiar with the entire product catalogue of the plaintiffs' businesses.

Q.   Okay, but how would you say that likely impacted it?

A.   Because this industry, in my experience, tends to react in a variety of ways to efforts to regulate, so, you know, and I think the report does talk about this later on, discussion of regulations, election of, you know, politicians perceived to be hostile to gun rights, anytime there is a terrorist attack or a school shooting or something like that, that tends to drive sales of firearms and firearms accessories.  So this comment refers to that effect in general, that when it looks like regulation is going to change in a material way, people tend to want to buy guns and ammo.

Q.   Okay.  So basically you are saying rising tide lifts all boats, more or less?

A.   I think that's fair, yes.

TYRA

Q.   But you didn't -- that was basically just kind of your gut instinct from knowing the firearms industry?

A.   Yes.

Q.   Okay.  So that wasn't based on any analytics, of course, you didn't disclose with me?

A.   Okay, well, this is a statement of fact that the month that this occurred, this other thing also occurred.  I think the causation is implied by the correlation, but I don't -- you know, if you are asking if I have any proof that A led to B, I have no proof, if that's your question.

Q.   Okay, that's fine.

So I am wondering how you can reconcile that the meme itself may have generated a pop in sales with the -- with your conclusion that the meme's existence is going to drive customers away.

A.   Because the data show clearly a downward trend with respect to the sales, I think it is possible that there is a subset of consumers that first became aware of DEFCAD because they came across the meme somewhere, on Reddit or wherever it is that they encountered it, and looked at the website and then decided to buy something, but that

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

impact is not borne out by the data in the long run. I think that it's something like $5,000 a month on average in sales which are lost, that are not really accounted for by any other known social or micro economic factor.

Q.   So you're saying those must have been caused by the meme?

A.   Yes, I think that is the conclusion of the report, yes.

Q.   Okay.  But in your report you mentioned that there was a democratic administration previously, correct?

A.   Previous to what?

Q.   Well, previous to 2024/5, right?

A.   Are you -- so yeah, I mean, the person in office was in fact a Democrat, if that's your question.

And you did mention that that has an impact on the gun industry overall, I believe, in your report.  I believe there's a comment that says something to the effect of Democrat administrations tend to drive gun control and thus also tend to drive sales in the gun market and sales of weapons, ammunition and accessories, so you would expect

TYRA

under those conditions to see an upward trend as people start to get worried about regulation, which, by the way, the Biden administration was intent upon pushing, but we don't see that effect; we see the opposite.

Q.   But you do seem, actually, the single highest revenue being when the Biden administration was pushing the Ghost Gunner regulation that's mentioned in your report, right?

A.   Right.  I think that is correct, yes.

Q.   And then by late 2024 we knew that there would be a republican administration in 2025.  Is that not a factor that might reduce sales since people, you know, perhaps, I think you say "perhaps unfairly" believing that there's going to be some significant change?

A.   Do I believe that a Republican administration would cause sales of their products to fall?  Is that your question?  I'm not sure I understand what you are asking.

Q.   I believe that's what you wrote, as compared to a democratic administration.

A.   Yeah, I think that's correct, as a comment on general trends, yes.

TYRA

Q.   But you didn't apply any math to account for that in the downward trend; is that correct?

A.   That is correct.

Q.   Okay.

So before I go on, I want to -- you said this data that you refer to here in the annex D and whatever it is, this was provided to you by your client?

A.   Yes.

Q.   So you didn't actually -- how did they provide it to you?  Just in a spreadsheet?

A.   Sorry, you broke up there.

How did they give it to me?  How was it provided to me?

Q.   Yes.  Was it just a spreadsheet?

A.   Yes, in substantially similar form to the way that it is displayed here.

Q.   So did you verify that these were the actual amounts attributed to these business segments?

A.   I did not.

Q.   You did not.

Tell me something -- I have some more questions.  This is just groundwork stuff, so you

TYRA

don't have to go into the weeds.

You didn't identify a single customer that saw the meme and chose not to subscribe to DEFCAD; is that correct?

A.    That is correct.

Q.    You didn't identify a single purchaser of the Ghost Gunner who canceled or voided a purchase because of the meme; is that correct?

A.    To be clear, I didn't attempt to.  So yes, that is correct, but that was not within the scope of the project.

Q.    Okay, no, I'm just asking the questions. You don't have to be defensive.  I understand; I just want it for the record.

So let me go back a little bit.  Stop presenting.

I'm going to show you Exhibit 2.

(Defendants' Exhibit 2, report, was marked for identification as of this date.)

Is this your report?

A.    It appears to be the same document you just showed me, yes.

Q.    The last document I showed you was 20 pages and this one is 23 pages.

TYRA

Did you black out these numbers?

A.   No.  No, I did not.

Q.   Have you ever seen this before?

A.   No.  Do you mean like I -- the one with the blacked-out numbers?  No, I have not seen this.

Q.   Okay.  Well, this one has some different material that wasn't in the first one and also this one has your signature block.

A.   Okay.

Q.   I'd like to also point out the previous one didn't include Ghost Gunner sales and this one did.  Do you see that?

A.   Yes.

Q.   Would you agree that there are material differences in these two reports?

A.   Would I?  Yes.

Q.   Do you see the data on this report?

A.   I'm sorry, you broke up.  Say again.

Q.   Do you see the date on this report, the date?

A.   The date, February 16, 2026.

Q.   Okay.

So this version of the report excludes your discussion that the meme may have made a pop in

JASON MATHIEU TYRA, ESQ.                                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

sales.

A.    Okay, to be clear, I did not -- this is not the document I prepared.  I didn't black anything out, I didn't remove anything.  So what you are showing me now is not the product that I returned to my client, at least with respect to those items.

Q.    Okay.  So the product you returned --

A.    I am not really in the position to tell you how it differs.

Q.    But this one bears your signature; is that correct?  Is that your signature on page 14?

A.    That is my signature, yes.

Q.    So why does this one exclude the discussion that the meme may have caused a pop?

A.    I mean, I -- if this is my signature, the one with -- look, I can't account for any version control, you know, discrepancies here.  The one with my signature appears or should be the final version.

If the other one has my signature and someone else modified it, I can't tell you, but I am not really sure what we are doing here.  You showed me a document that you asked was one mine, and I believe it was.  Now you are showing me --

TYRA

Q.   Then you and I are kind of in the same position.  This is the only version that we got with your signature and it has everything blacked out, so.

I'm going to show you another document.

(Defendants' Exhibit 3, report, was marked for identification as of this date.)

This is Exhibit 3.  Do you see the document?

A.   Yes.

Q.   Is this your report?

A.   I don't know that I can answer that because I turned in a report and if these are, you know, labeled as discrete exhibits, you are showing me different versions of what purports to be my work product.  I would suggest to you that the one that I signed was my work product.

Q.   But you remember we just talked about the pop discussion, right?  You remember that, right?

MR. FOSTER:  Excuse me, Matthew, can you turn your camera on?

MR. LAROSIERE:  No, Mr. Foster.

MR. FOSTER:  You won't turn it on?

MR. LAROSIERE:  Howard, stop.

TYRA

MR. FOSTER:  I am asking you if you will turn your camera on.

MR. LAROSIERE:  Howard, stop talking.

THE WITNESS:  You see the --

MR. FOSTER:  One second.  I think you are required to have your camera on, if you are taking a deposition.

MR. LAROSIERE:  Mr. Foster, look up the rules.  If it's there, send it to me and I'll do it.

Right now, I am doing something -- it's none of your business, I have a medical problem and I am dealing with changing my infusion set. So if you would please stop with your senseless interruptions and harassments, I would like to continue with this deposition.

Would you like to see me changing my infusion sets?

MR. FOSTER:  No.  I have not never seen another --

MR. LAROSIERE:  Howard, stop.

MR. FOSTER:  I just want to make this is on the record because I think it will end up before the judge.  I have never seen a lawyer

TYRA

taking a deposition with a camera off.  It raises the question as to what you're -- if are you listening to someone else, if you have an ear pod on or something like that.

MR. LAROSIERE:  I do not.  I am handling my medical situation right now.

Can we please stop?  I will turn it on when I am done.

MR. FOSTER:  Okay, that's fair enough.

MR. LAROSIERE:  Sorry about that, Mr. Tyra.

(The pending question was read back.)

THE WITNESS:  Yes, I remember.

BY MR. LAROSIERE:

Q.   You remember that being in the report, right?

A.   Yes.

Q.   So you don't know why it was excluded --

A.   No, I do not.

Q.   -- from this document?

A.   No, I do not.

Q.   Okay.  So if I'm -- again, I am not accusing you of anything.  I am trying to find out -- I am trying to get to the bottom of what happened

TYRA

here because I'm going to tell you right now because there's four different versions of your report and each of them are different, that we received.  Okay.  And so -- there's a reason I am showing you each one, because each of them comes with different conclusions.

This one includes the pop discussion but it also changes whether it's DEFCAD revenue or LEGIO revenue.  Do you ever remember there being confusion as to what was LEGIO or DEFCAD revenue?

A.   Yes, so that's actually a question that I asked my client.

It's the same thing.  LEGIO is DEFCAD's credit card processor.  I probably will not do a good job of explaining this but there is inherently some kind of strategic process that is required to realize, so LEGIO is just the name of the processor.

Q.   I just got one more and then we'll try to get to the bottom of, you know, where the money comes from because I'm sure you are well aware of that as their CPA.  I'm sorry, you are their CPA, right?

A.   I would describe myself as their tax preparer.  They use another practitioner to actually

TYRA

prepare their books.

Q.   Okay.

(Defendants' Exhibit 4, report, was marked for identification as of this date.)

I'm going to show you Exhibit 4.  I know you are not going to like this question, but is this your report?

A.   It appears to be substantially similar to my report.

Q.   Right.

I notice here under DEFCAD revenue and Defense Distributed revenue, they are formatted differently from your earlier reports.  Do you see that?

A.   They are formatted differently?

Q.   Like it's a different shade of blue and a different font in the heading?

A.   Are you asking me if it's different or are you asking me if I see the formatting.

Q.   I'll ask if you see the formatting right here.  Does the heading where it says DEFCAD revenue --

A.   Yes, yes, I do see that.

Q.   Do you agree they're different?

TYRA

A.   Like, these two that you are showing me on the page, are they different from one another?

Q.   Yes.

A.   Or are you asking me if it's different from the document that you showed me before?

Q.   I am asking you if they are different from one another here.

A.   Yes, they are different from one another as depicted on this page, yes.

Q.   And it's different from all of your other headings, right?  They tend to be dark blue with white text?

Do you see what I'm pointing at there?

A.   Yes, so -- I mean, Microsoft Word, it's like a -- it's meant to be like a subheading when it's a different color.  That's the reason it's a different color.

Q.   Okay.

So this one includes revenue from sales of the Ghost Gunner?

MR. FOSTER:  Objection, there is no question there.

Q.   Is that correct?

A.   Yes.

TYRA

Q.   But the earlier report we were talking about didn't include that at all.  Do you remember that?

A.   No, because -- the report that I turned in did include that data, so if the other report had it, it wasn't obvious to me that it was missing.

Q.   It didn't include this appendix, but you still discussed it, though.  That's okay.

Can you tell me which of these reports is your report?

A.   Off the cuff, no.

Q.   Why is that?

A.   Because they -- I know what I turned in. I know -- I'm not, again, I'm not in a position to tell you which of these documents that you are showing me is what I turned in.  It appears that you are showing me different versions.  I don't have any answer for that.

Q.   Okay.  So how did you turn your report in to your client?

A.   I provided it to Mr. Foster by e-mail.

Q.   And that was one document?

A.   What are you asking me?  Like --

Q.   You provided Mr. Foster one document; is

TYRA

that correct?

A.   Yes.

Q.   So you didn't hand him four different documents?

A.   I did not hand him four different final reports, if that's what you're asking me.

Q.   Okay.

Hold on one second.  I'm going to give a footnote 20 -- sorry about the dogs.

You said you don't remember the meme being on your client's website, right?

A.   I -- no -- I -- if I said that in the report -- I mean, I'm not aware if that was ever said.  If it says that, then it's a typo or I misspoke in the report.

Q.   All right, so you don't believe that that was the case.

A.   I am not aware of this meme being posted on my client's website, that is correct, yes.

Q.   Okay.  So let's read page 10.  Do you see footnote 29?  Can you read that highlighted section for me?

A.   "Plaintiffs believe the FEDCAD meme first appeared on social media."

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

Q.   Those are your words, right?

A.   Yes.

Q.   Okay.  Can you read the first part for me. This is the first part but there is going to be two parts.

A.   "Plaintiffs cited Facebook, X (formerly Twitter), Reddit and other social media platforms. As of the date of this report, a Google image search revealed the FEDCAD meme remained visible online in at least six separate places, including X, Reddit and DEFCAD's own website.  In at least one case, the website hosting the meme expanded on FEDCAD's attack by incorporating other online" --

Q.   That's fine.  These are your words, right?

A.   Yes.

Q.   Okay.  So how can you reconcile all that?

MR. FOSTER:  Objection to the form of the question.

Q.   Go ahead and answer.

A.   How can I reconcile what?

Q.   The fact that those are your words where you said you found it on plaintiff's own website versus you saying it must have been a typo.

MR. FOSTER:  That wasn't his testimony.

TYRA

Objection.

MR. LAROSIERE:  Okay.

Madam Court Reporter, can you scroll back up and read back where he said, if he did say, that would have been a typo?

(The record was read back.)

BY MR. LAROSIERE:

Q.   Okay, that's still your testimony, that it would have been a typo?

A.   No, and if I wrote that, it must have been my perception, at least at the time that I wrote it.

Q.   Okay.

Would you say that most of DEFCAD's customers visit DEFCAD's website?

A.   Yes.

Q.   So if it's posted here, do you think it's possible that that would have an acute impact to the extent it has any impact on the customers?

A.   It depends on the context.

Q.   Okay.  What do you mean?

A.   I mean, this is a footnote to the report, so I don't recall precisely under what conditions -- I ran a Google image search and wrote down the places where I say it appeared.  It could have been

TYRA

on an page that, you know, was attempting to respond to the meme to inoculate DEFCAD against the meme's effects.  I don't know.

This is merely a claim of fact as to where I saw that it appeared within the context of a discussion about how it was lingering online.

Q.   Okay.  No, that's fine, but I'm asking you, hypothetically, you know, I'm not asking you what was actually on their website.  I am not asking you to figure that out.  I am asking, hypothetically, if it were hosted plainly, with no commentary or refutation, do you think that that would have an acute impact on DEFCAD's customers?

A.   I am trying to think whether I care to speculate on what the meaning of "acute" is.  So if -- I want to make sure I understand your question.

So if DEFCAD hosted a meme that included a call to action saying don't buy stuff from DEFCAD on DEFCAD's own website, without any further comments or discussion, would that have an acute impact on a customer's decision to buy?  Is that your question?

Q.   No, so -- and I understand the question was not great.  Let me try again.

So, you know, your theory is that the

TYRA

presence of the meme online is what caused the damage to DEFCAD; is that correct?

A.   Yes.

Q.   So I'm asking -- so it's DEFCAD's customers seeing the meme that would cause them to shy away, right?

A.   Yes.

Q.   So I'm asking, if it was posted on that website, and again, we're presupposing that there is no commentary refutation, it's just posted all by itself --

A.   Okay, uh-huh.

Q.   -- do you think that would have a significant impact as it's calculated here?

MR. FOSTER:   Objection, calls for speculation.

Q.   You can go ahead.

A.   So, yes, I do.  And the reason is the meme claims that DEFCAD was hacked.  I think your average user would assume, if they saw harmful material on DEFCAD's website, that was, you know, claiming that DEFCAD had been hacked, they would assume that that's an example of DEFCAD being hacked.  So yes, I believe that would have an acute effect on the

JASON MATHIEU TYRA, ESQ.                                            JOB NO. 2667670
APRIL 28, 2026

TYRA

customer's decision to buy.

Q.   Okay.  That's fair.

(Defendants' Exhibit 5, meme, was marked
for identification as of this date.)

I'm going to show you Exhibit 5.  Can you
see the exhibit?

A.   Yes.

Q.   I'm just trying to make it easier to read.
That's the meme, correct?

A.   Looks like it, yes.

Q.   And this looks like your client's website,
right?

A.   Looks like it, yes.

Q.   So here is the text underneath it.  Do you
see any refutations or commentary on it?

A.   I do not see any anything on the screen
any refutations or commentary.

Q.   What about here?

A.   No, none there either.

Q.   What about right here?

A.   No.

Q.   Okay.  I'm not asking you to speculate.
You know, you prepared a report about the impact of
this meme, so if this was hosted on DEFCAD's website

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

exactly in this situation, exactly as you see it here, do you think this would have a significant impact on DEFCAD's consumers?

A.    I think the existence -- the report addresses the existence and accessibility of the meme.  This appears to be hosted on DEFCAD's website as a component of it looks like another suit, Gatalog v Wilson, et al.  I'm not a web developer, so I don't know what this format is that it's showing, but if the meme didn't exist, it wouldn't be available to post anywhere.

Q.    Well, you didn't quite answer the question.

A.    I'm sorry.  Please -- yeah.

Q.    I understand you're saying the meme's existence is the purported problem and we talked before and agreed that DEFCAD's customers and potential customers seeing the meme is the -- under your report, would be the nexus, the connection between the lost revenue and the meme, right?

A.    Yes, we did discuss that, yes.

Q.    Yes.  So I'm asking you -- you know, I'm just asking you if seeing this, if you think that would have a significant impact on DEFCAD's

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

customers.  And again, I know you don't know exactly how it's on the website but let's presume it's on the website exactly like any other file is on the website.

A.   Well, this isn't like any other file on the website.

MR. FOSTER:  Objection, there is no question there.

Q.   You're right.  I think you already said that the meme being on the website without commentary or refutation would have an acute impact, so I don't think we need to keep going around in circles on this.  I will go ahead and -- also, do you see the metrics section on here, views and downloads?

A.   Yes.

Q.   How many does it say?

I'm sorry, I didn't hear you?

A.   It says "views, 2.7K" and "downloads, 554."

Q.   Okay.  I will remove this exhibit.

So, I want to pull back.  I remember --

THE WITNESS:  Can we take a 5-minute break while you are transitioning?  Is that going to

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

disrupt?

MR. LAROSIERE:  No, go ahead.

MR. FOSTER:  Can we make it 10 minutes?

MR. LAROSIERE:  Yeah, let's back come back at 15 after the hour.

Does that work for you, Jason?

THE WITNESS:  Yes.

THE VIDEOGRAPHER:  Hearing no objections from other counsel, we will go ahead and go off the record.

We are now off the record.  The time is 12:07 p.m. Eastern Time.

(A break was taken.)

THE VIDEOGRAPHER:  We are now on the record.  The time is 12:17 p.m. Eastern Time.

BY MR. LAROSIERE:

Q.   I'm going to kind of shift gears now.

Do you have any personal or financial ties with Cody Wilson?

A.   He's a client.  That would be a financial tie.

Q.   Is that it?

A.   Yes.

Q.   Okay.  So you have no other -- you're not

TYRA

connected to him aside from, you know, you

performing services for him and his businesses?

A.   That is -- no, I am not.  That is correct.

Q.   Okay.  So which of Mr. Wilson's companies

do you handle taxes for?

A.   Geez.  Defense Distributed, for sure.  I

handle his personal returns and there are several

others that I have handled in the past or have

handled off and on, like skipped a year, kind of

thing.

I don't have a complete list close at

hand, but there's probably four or five.  Most of

them are consolidated under Defense Distributed,

yeah, I am.

Q.   Is DD Foundations one of those that you

deal with?

A.   That's one that we discussed before.  I

don't know that we have actually filed that return.

Q.   Okay.  So you're not the CPA for any these

companies; is that correct?

A.   Well, you say the CPA.  I mean, there's a

specific legal relationship it implies.  I prepare

the taxes on their behalf and --

Q.   But you don't do --

TYRA

A.   I provide consulting support.

No, I do not.  That's a different arrangement.

Q.   For any of them?

A.   Yeah, I don't do for them the accounting, for any of them.

Q.   Do you manage their crypto currency stuff?

A.   No.

Q.   No?  So do you know anything about their crypto?

A.   Only to the extent it appears in a tax return.  So if there is a capital gain from disposal or it would be on the balance sheet, but other than that, no.

Q.   Is that the only time?  Like for example, are you aware that they accept crypto currency as payment for their products and services?

A.   Yes.

Q.   Okay.  How does that get -- how does that get factored into your report?

A.   I don't know that it was or wasn't.  So if the data in the appendixes is all they received for sales, I don't know if that's included or not.

Q.   Okay.  So you know if that -- you know,

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

because you prepared their tax returns, right?

A.   Yes.

Q.   So would crypto currencies that they were paid for services that they rendered that year, would that show up on the tax return or not?

A.   Just gross revenue, so yeah, that would be included in gross revenue.

Q.   Even if they hadn't had a realization of that?  Like, if they didn't change it for currency?

A.   Sorry, you broke -- you're breaking up.

Q.   Would that be in --

A.   You are breaking up.  Please, can you repeat?

Q.   Yes, I wasn't talking yet.

Would that be included even if they didn't convert the crypto currency to U.S. dollars?

A.   Okay, if you're asking me, like, broadly, does U.S. law require that, yes.  If you are asking me did that occur in Defense Distributed's case, I don't know because I don't keep their books, but generally speaking, yes, that's required to be included.

Q.   Okay.  But you don't know because you don't keep their books?

JASON MATHIEU TYRA, ESQ.                                   JOB NO. 2667670
APRIL 28, 2026

TYRA

A.   That's correct.

Q.   So how familiar are you with the business entity plaintiffs in this case?

A.   I wouldn't say intimately familiar but, you know, fairly familiar.

Q.   Mm-hm.

You're aware that one of the claims in the case is that they all share income generated by DEFCAD; are you aware of that?

A.   Yes.

Q.   Okay.  So how does DD Foundation make money or do you not know?

A.   I don't know that I can competently testify about how DD Foundation makes money, yes.

Q.   Okay.

A.   If that is -- I mean, off the cuff, I don't even know if that's the one that consolidated under Defense Distributed.  I would have to look.

Q.   You don't know?

A.   Not off the cuff.  I mean, I have thousands of clients.

Q.   Yeah, no, I understand.  Give me one second.

A.   Sure.

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

Q.  I'm sorry about that.

So you're not sure if any money made by DD Foundation was or was not included in your report?

A.  No, I'm not sure.

Q.  Okay.  What about DEFCAD, Inc.; how does it make money?

A.  My understanding is that that company derives revenue from the sale of subscriptions to its platform.  And my only caveat beneath my answer is that it's hard for me to testify under oath about how any of these companies make money.  I don't work there, I don't operate those companies, so any answer I give you would be potentially speculative on my part or based on an incomplete understanding.

Q.  Okay, but you prepared a report which suggested that DEFCAD was losing about $5,000 a month, right?

A.  Based on the data I had on hand, which was provided to me by DEFCAD, yes.

Q.  Okay, which you didn't verify.

A.  I did not verify that data, that is correct.

Q.  Okay.  One second.  I am going to show you something.

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

(Defendants' Exhibit 6, Defense
Distributed 2024 tax return, was marked for
identification as of this date.)

Q.   Do you recognize this document?

A.   Yes.

Q.   You prepared this, right?

A.   It says I did.

Q.   So I'm going to go all the way down to the bottom.

What is this?  What is this schedule?

A.   So the Texas comptroller requires -- takes a very expansive view of the term "unitary business interest."  "Unitary" would include the companies that have both, subsidiaries and companies that are owned by the same owners, so reporting is required for the same person as is reporting own's other companies, and that's what this affiliated schedule breaks out.

Q.   And so what do you report on this affiliated schedule?  Do you report the gross receipts of those companies?

A.   It depends.  Generally, yes, if there are gross receipts.  Not all gross receipts are taxable in Texas, so typically that would be handled in a

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

TYRA

proportionate factor.  I think that's what it shows in number 8 versus number --

Q.  Yes, so some would be subjected to Texas tax and some would not, right?

A.  That's correct, yes.

Q.  So you showed both of those numbers on this, right, to the extent that they exist?

A.  Yes.

Q.  Okay.  What entity is right here, in this second part of the franchise tax affiliate schedule?

A.  DEFCAD, Inc.

Q.  And you prepared this, right?

A.  This appears to be one that I prepared, yes.

Q.  Okay.  What are the gross receipts for DEFCAD, Inc. for 2024, or 2025, sorry?

A.  According to this franchise tax affiliate schedule, zero dollars.

Q.  And that's both in-state and out-of-state, right?

A.  According to this, what you are showing me, yes.

Q.  Okay.  So walk me through how DEFCAD could be making the revenue you identify in the report

JASON MATHIEU TYRA, ESQ.                                         JOB NO. 2667670
APRIL 28, 2026

TYRA

while also reporting zero gross receipts.

A.   I'm sorry, you broke up there.  Say again?

Q.   I'm sorry.  Can you walk me through how DEFCAD could be making the revenue that you attribute to them in your report while also making zero gross receipts?

A.   Yeah, so I think I heard your question.  Okay, so can you scroll back up to, what are you on, page 6 or 7, whatever the first page of form 1120-S is.

Q.   Can you tell me when to stop?

A.   It's going to be way up in the booklet.  It's going to be page, like, 7 or 8, 6 or something, within the entire packet.

Down.  Down, keep going.  Actually, you can stop here.  The first page of the summary.

Q.   So up --

A.   Okay, yes.  Where it says -- yes.

So you see how these are all zeros?  I believe what we did for this tax year is we filed an effective tax return page.  Yes, you see how it says revenue, everything is zero for 2024?

Q.   Yes.

A.   I would not consider this to be a final

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

tax return, so...

Q.   Okay.   Just one second.

So we'll look up the 2023 one because it has the same -- it shows the same thing.   It's uploading.

(Defendants' Exhibit 7, Defense Distributed 2023 tax return, was marked for identification as of this date.)

So this, you would say, is the final return, right, 2023?

A.   Sure, yes, appears to be.

Q.   Let's go down to the Texas franchise tax affiliate schedule, and it looks like DEFCAD tax isn't included.

A.   Okay.

Q.   So help me understand how DEFCAD is making money, right, because we have the -- in fact, Defense Distributed matches the total gross receipts.   So is DEFCAD making money separately from Defense Distributed at all?

A.   So are you asking based on this affiliated schedule?   I wouldn't consider this authoritative with respect to, you know, it depends.   So, you know, the client potentially didn't decide do take

TYRA

the position that that entity should be consolidated

for the year.

There is another federal affiliate -- I'm

not sure if these are even Texas companies, off the

cuff.  Maybe I just don't understand what you're

asking me, so.

Q.   I am trying to understand -- so here's the

problem I have, and this might -- you know, this

might help you understand:  Previously DEFCAD was

ordered to provide their tax returns and they

provided none, and they -- and Mr. Wilson testified

that DEFCAD does not even have a bank account.  He

also testified that DEFCAD is no longer in

existence.  So I am trying to understand how DEFCAD

is making money when it doesn't have its own tax

returns, when it doesn't show any income on the, you

know, on the consolidated or any of these schedules

and when it's forfeited its existence in the state

of Texas and it doesn't exist.  That's what I am

trying to understand and it sounds like you might

not understand it either.

Do you think -- there's a lot there so

that's --

A.   So yeah, I mean --

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

TYRA

Q.    Help me understand -- the narrow question is, can you help me understand how DEFCAD is making money and where we can see that money to confirm it?

A.    No, I cannot help you understand that.  I think those would be questions for Mr. Wilson.

Q.    Okay.  And so do you understand that?

A.    I'm not required to understand as a condition of my employment.

Q.    No, I'm not asking that.  I am just asking if you understand it or not.

A.    I mean, my understanding is limited to what I said before, that DEFCAD derives revenue. Now, in terms of how that is structured legally or financially, no.  I mean, that's not information that I would routinely collect, aside from the preparation of the tax returns, and again, I would not consider them authoritative.  I do make mistakes.  Sometimes information is incorrect or incomplete.

But do I consider the assertion that a company has forfeited its in Texas to be evidence at to its existence or non-existence?  No.  Companies forfeit all the time for lots of reasons.  Sometimes they get reinstated; sometimes they don't.  Maybe

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

that company doesn't exist in Texas at all.  Maybe it never did.  I don't know.

Q.   Okay.  So I guess just to be 100 percent clear so I don't have to keep circling, you don't actually know where the numbers they gave you for the Ghost Gunner and DEFCAD sales came from; is that correct?

A.   They came to me from my client.  As to where they were derived, I don't know.  Yes, I don't know where they came from.

Q.   Okay.  Hold on one second.  And I think I know what the answers to some of these are going to be but just bear with me.

I am bringing up the meme again.

A.   Sure.

Q.   Just the meme itself.  Don't worry about it being on the website.  I just want to talk about the meme itself.

So based on your statements in the report, it seems this meme is what caused the plaintiffs their damages and there's no other reasonable explanation for -- sorry, not damages.  You don't talk about damages, right?  Do we agree there?

Scratch the last question.  You are not

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

talking about damages.  You are just talking about lost sales.

A.    Your question I heard was, do I believe the meme caused them to lose sales.  Yes.

Q.    Okay.  And you don't believe there is any other reasonable explanation for those lost sales?

A.    I am not aware of any other explanation.

Q.    Okay.  Did you review any materials concerning the factual voracity of the claims made in the meme?

A.    I did not.

Q.    None of them?  Just confirm.

A.    No, none of them.

Q.    Okay.  Have you read the meme?

A.    Yes, I have.

Q.    Okay.  Can you tell me where in the meme you see a reference to any other website?

A.    Any other website?  What do you mean?  No, I don't see any reference, other than to DEFCAD.

Q.    Okay.  Where in the meme do you see reference to any company aside from DEFCAD?

A.    Nowhere.

Q.    Okay.  Where in the meme do you see any advertisement for any product or service?

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

A.   Nowhere.

Q.   Where in the meme do you see the words "the Gatalog"?

A.   Nowhere.  I don't see that term within the meme.

Q.   Okay.  Where in the meme do you see reference to Ghost Gunner?

A.   I don't see a reference to Ghost Gunner in the meme.

Q.   Where in the meme do you see a reference to GAD?

A.   I don't know what GAD is, but I don't see it in there, no.

Q.   Where in the meme do you see a reference to Defense Distributed?

A.   Nowhere.

Q.   Where in the meme do you see a reference to DD Foundation?

A.   I don't see any reference to DD Foundation.

Q.   Okay.

Where in the meme do you see a reference to Polymer80?

A.   Nowhere in there.

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

Q.   I'm going to pull your report back up.  I am pulling back to Exhibit 1.

Can you reed that highlighted section?

A.   I don't see where you have it highlighted.

Okay, yeah.

"Defendant's conduct inflicted economic harm on plaintiffs by causing exactly the consumer behavior encouraged by the FEDCAD meme, that is, by driving consumers away from plaintiff's website to defendant's website."

Q.   Okay, how is that encouraged in the meme?

A.   I believe the meme encourages it by saying "do not use" -- "friends don't let friends use FEDCAD."

Q.   How does it drive it to defendant's website?

A.   Because defendants operate a competing website.  So a person who is looking for the services provided by DEFCAD wouldn't be turned off from wanting that service in the first place; they would just find it somewhere else.

Q.   You said defendant's operated a competing website.  What website is that?

A.   I'm sorry, say again.

TYRA

Q.   You say defendant's operate a competing website.  I am asking you what website that is.

A.   I think it's listed in footnote 16, the Gatalog.

Q.   That doesn't mention a website.  So where did you get the conclusion --

A.   I'm sorry, you broke up.  Say it again.

Q.   Where did you get the conclusion that the defendants were operating a competing website?

A.   Where did I get the conclusion?  You know what?  I don't know think that's really an integral part of the report and to the extent that I opine that defendant's conduct and have made a factual claim as to what defendants did, I intended for my conclusions to really center on what the meme did.

I am aware that the plaintiff alleges that defendants created the meme.  I don't think I make any statement of opinion or fact about -- except to the extent that it's necessary to advance the narrative of the report.  So, you know, I know damages are supposed to be tied to the meme, not to defendant's specific conduct.  Defendants didn't create the meme, but I guess defendants are now responsible for the harm, but that's not really

TYRA

within the scope of the report that I prepared.

Q.   But the conclusion is right here, where you say "Defendant's comment inflicted economic harm on plaintiffs by causing exactly the consumer behavior encouraged by the FEDCAD meme, that is, by driving consumers away from plaintiff's website to defendant's website."

You wrote that, right?

A.   Yes, and that's what I --

Q.   Hold on, that's not -- excuse me, go ahead.

You wrote that --

A.   Yes.

Q.   -- and now we just reviewed the meme and we couldn't find any reference -- we reviewed it together and we couldn't find any reference to any other website, could we?

A.   No.

Q.   So I am asking you where you got this conclusion.  Was it from the complaint?

A.   Okay, so I don't -- I don't believe this conclusion is an integral part of what I was hired to do.  Okay?  I was hired to estimate the economic damages associated with the meme.  I was not hired

TYRA

to assess the economic impact derived by defendants

with respect to the meme, so to the extent we -- I

don't think this really is an integral part.

So if you are asking, like, where did I

come to the conclusion?  I guess that was an

assumption that I made that a person who would

create a meme attempting to harm another person's

business who was in a similar business, would do so

for the purposes of direct economic gain.

I have no evidence of economic gain, and I

don't think the report weighs in on it, other than

the broad general statement that a consumer who was

driven away from DEFCAD who still wanted what DEFCAD

provides would get it from a competing provider.

Q.   Okay.  You are saying a lot but it didn't

answer my question.  I am asking you, because you --

what does the section header say?

A.   "The FEDCAD meme harmed plaintiffs."

Q.   Okay.  And this is a definitive statement

you made in your report.  We are talking about your

report now, right?  I mean you understand that, we

are talking about your report.  Do you understand

that?

A.   Yes.

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

                               TYRA

        Q.    Okay.

        A.    Yes.

        Q.    Do you see that you made this claim in your report:  You claim "Defendants conduct inflicted economic harm on plaintiffs."  Is that correct?

        A.    Yes.

        Q.    I am asking you what materials you reviewed to come to that conclusion.

        A.    None.  I did not review any material regarding that particular statement.

        Q.    You made it up?

        A.    It is my opinion, so yeah, I made it up.

        Q.    You made it up.

              You acknowledge and you write this in the report, that regulations, litigation and other market factors can affect your client's sales?  Is that correct?  You agree with that?

        A.    Yes.

        Q.    But when you came to your conclusion, you know, asserting the amount of total damages, you didn't calculate the dollar impact of any of those factors on revenue, did you?

        A.    No.

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

Q.   You just attributed 100 percent of the purported lost sales to the meme, didn't you?

A.   Yes.

Q.   Is that consistent with general practices and -- I don't even know what field you are purporting to be calculating this under.

A.   I'm sorry, you wrote broke up in the middle.  Is that consistent with general -- go ahead.  I'm sorry.

Q.   So you're asserting -- I mean, first you were saying that you're not asserting damages but your report says you're asserting damages.  Can you see that your report says that?

A.   Yes, it certainly does assert that the meme caused my client economic harm, the damages.

Q.   Right.  And yet you've excluded any other factor from your damage calculation, didn't you?

A.   I did consider other factors and there is some narrative discussion of that, but in terms of did I attempt to dollarize the impact of any other factor, I did not.

Q.   How come?

A.   I don't think to a great extent those can be dollarized.  So, you asked about regulations,

TYRA

what is the economic impact of regulation, the other thing that I would say here is that, you know, the plaintiff's business was consistent over, you know, a pretty lengthy period of time and we see a clear difference in the before time versus the after time. All this other stuff was always occurring.  Okay? So regulation isn't something that wasn't there before and now it is there.  Litigation is not something that wasn't there before and now it is there.  What we have is a difference in social media, you know, presence of a harmful meme.  Right? So that's what I looked at.

     To the extent that the business is affected by these other things, that they're a constant and not something that changed drastically at one period of time or at one date in time.

     Q.   Okay.

     Do you remember what the total damages you assert were caused by the meme in your report?

     A.   Off the cuff I believe it was something like $2.4 million through the end date of the analysis, which I think was October of '25.

     Q.   And most of that was from Ghost Gunner, right?

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

TYRA

A.    Depressed sales of the Ghost Gunner, yes.

Q.    Okay.  But Ghost Gunner is not mentioned anywhere in the meme; is that right?

A.    That is correct, yes.

Q.    So how did that happen?

A.    How did what happen?

Q.    How did the meme cause 100 percent of your purported lost revenue for Ghost Gunner in the amount of $2.6 million when the meme doesn't mention anything about Ghost Gunner.

A.    Okay, so I think there is some discussion about that in the report.  A DEFCAD platform is a companion to the Ghost Gunner, drives sales.  There is a symbiotic relationship between the two.  A person who would purchase the Ghost Gunner would need something -- you know, would need the electronic files to print things and vice versa.

So I think declining sales or declining traffic for DEFCAD would result in a decline in demand for the Ghost Gunner product.

Q.    Mm-hm.  You say that they are linked together, in your report; is that right?

A.    I believe they are, yes.

Q.    Where do you see -- where do you see that?

TYRA

On what material do you base that?

A.    Personal knowledge of the business, that those are affiliates of one another and they are companion pieces to each other.

Q.    Didn't you say in the report that the Ghost Gunner's files don't need to be paid for?

A.    The Ghost -- like that you could use it without paying for files?  Are you asking for my opinion or a statement of fact, because I don't know what you're asking.

Q.    I am asking you what's in the report and we have a problem because we have four different reports that say different things, so I am having to trust your memory of what you wrote because we don't know which one of these you actually sent.

A.    Geez.  Okay, um, I have my copy of my report, not that it matters.  But yeah, I think it is technically possible to use the Ghost Gunner without purchasing something from DEFCAD, if that's your question, yes.

Q.    Okay.  Could you send me that copy?

A.    Mr. Foster?

THE VIDEOGRAPHER:  Do we need to go off record for a minute so we can assist him with

JASON MATHIEU TYRA, ESQ.                    JOB NO. 2667670
APRIL 28, 2026

                          TYRA

that?

     MR. LAROSIERE:  You can go off record for

a second.

     THE VIDEOGRAPHER:  Okay, sounds good.

Hearing no objections by other counsel, we will

go off.

     We are now off the record.  The time is

12:54 p.m. Eastern Time.

     (A break was taken.)

     THE VIDEOGRAPHER:  We are now on the

record.  The time is 1:03 p.m. Eastern Time.

     MR. LAROSIERE:  I believe there was a

question pending.  Madam Court Reporter, can

you read it back.

     (Record reviewed.)

     MR. FOSTER:  If you want, Mr. Tyra, to,

I'm saying, if it would help, feel free to

e-mail a copy of your report to us now.

Hopefully we can resolve any issue about two

different versions.

     THE WITNESS:  Yes, I'm happy to do that,

and I am going to do that right now.

     One comment, I notice, as I'm looking at

it, that the -- I think the signature date is

TYRA

the 20th and then the header says the 16th.

The reason for that is when I initially turned

it in, I didn't know that it would need to be

signed and Mr. Foster directed me to sign it,

so I did.  That's the reason those dates are

different.

MR. LAROSIERE:  That's fine.

THE WITNESS:  Okay, I'm responding to the

e-mail where you gave me the link for the

deposition this morning.

MR. LAROSIERE:  Thank you.

MR. FOSTER:  Okay.  May I ask you a

question, Matthew, before you resume.

MR. LAROSIERE:  No.  Mr. Foster, if you

want to go off record, we can do that.

MR. FOSTER:  We can go off the record,

please.  I am trying to help.

MR. LAROSIERE:  Okay.

THE VIDEOGRAPHER:  Hearing no objections

from other counsel, we will go off the record.

We are now off the record.  The time is

1:04 p.m. Eastern Time.

(Discussion held off the record.)

THE VIDEOGRAPHER:  We are now on the

TYRA

record.  The time is 1:06 p.m. Eastern Time.

BY MR. LAROSIERE:

Q.   Sorry, I am just taking a look at this.

(Defendants' Exhibit 8, report, was marked for identification as of this date.)

Okay, this is Exhibit 8.  This is the report we just got back from you.

Does that look right to you, Mr. Tyra?

A.   It looks same as the other ones, yeah.  It looks right.

If you represent to me that that's what I just sent to you, yes.

Q.   Okay.  So there's a couple of things, though, I want to ask about here.  Can you go to the top of -- well, I'll go to the top of page 10.  It says "Reviewed income tax filings of Defense Distributed for tax years 2020 through 2023 and sales data for the Ghost Gunner from May of '22 through October of '25."  Is that correct?

A.   Let's see.  For tax years 2020 through 2023.  I didn't see "October."

And sales data, yes.  Okay, that's what it says, yeah.

Q.   And then gross sales and subscription

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

counts for DEFCAD each rose from November of '21 through October of '25?

A.   Yes.

Q.   So why was there that big gap?  Why did we not have data for the earlier years?  Is it because your clients didn't provide it to you?

A.   I did not review any data that was not provided by my client, so yeah, that's true.

Q.   Did you ask for that earlier data?

A.   I did not.

Q.   But you said it wasn't available, in your report.

A.   It wasn't available to me.

Q.   And so you didn't attempt to get it?

A.   No.

Q.   Okay.  I've got another thing to look at.

(Defendants' Exhibit 9, custom report, was marked for identification as of this date.)

This is Exhibit 9.  Do you see it?

A.   Yes.

Q.   Do you recognize this document?

A.   Do I recognize it?  Is that what you are asking me?

Q.   Yes.

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

A.   No, I do not.

Q.   Okay.  Are these not the monthly figures for the Ghost Gunner?

A.   Off the cuff, I don't know.  That may be true.

Q.   Okay.  Let's go back to your report.

Can you try to take a good look at this data and keep it in your mind when we go back to your report?

A.   Sure.

Q.   Okay.  This is your report.  Do you see this appendix E?

A.   Yeah.  I believe there is an appendix here that has Ghost Gunner data in it.

Q.   Mm-hm.  Reported by defendants?

A.   Yes.  This looks substantially similar.

If you are asking me to weigh in as in if that document were identical, I don't know.  But what you are showing me now is what I based my report on.

Q.   Okay.  So the reason I am asking is this is what we were provided of what you based your report on and I think those are the same numbers here.  Would you agree?  You did reformat them and

                            TYRA

change a couple of things.  Not change the numbers,

but you made it fit on the page the nicer.

          A.   I would agree they appear to be the same,

yes.

          Q.   So on the next page we see this graph.  Do

you remember seeing this graph?

          A.   No.

          Q.   You don't?  Okay.

          A.   I don't remember seeing the graph, no.

          Q.   Okay.  Would you say that this graph

represents a fair and accurate or at least a

reasonable representation of the data that's in this

part of the sheet?

          A.   It appears to be, yes.

          Q.   Okay.  So would you say that this reflects

an upward trend or a downward trend?

          A.   I'm sorry.  Either my connection is bad or

yours is.  You're waiting me for me to answer.  I

didn't hear any of the question.

          Q.   Would you say this graph represents an

upward trend or a downward trend?

          A.   Downward trend.

          Q.   Downward trend, beginning when?

          A.   I mean -- I don't know.  It's over time.

TYRA

It looks to be -- if we look at May of 2022, which appears to be the left-most, versus 2026, February, other than some peaks in here, it looks like downward over the entire period depicted within the entire graph.

Q.   The entire period --

A.   Yeah, but this also shows some annual variances.  So 2023, there's that spike in May of 2023, February of '24, but overall, yes, this appears to depict a downward trend.

Q.   Can you still hear me?

A.   I can now, yes.

Q.   Okay, sorry.  Steno is saying my connection is unstable.  If it's okay with you, I am going to turn off my video to make it better.

Howard, do you object?

MR. FOSTER:  How is turning off your video going to make the connection better?  I am just concerned.

THE VIDEOGRAPHER:  It does actually improve the connection, if I may interject.

MR. FOSTER:  If that is technically advisable, then I don't object.

MR. DE PURY:  It's a simple bandwidth

TYRA

issue.

THE VIDEOGRAPHER:  Yes, bandwidth, and that would be my recommendation as well.

MR. FOSTER:  Let's see if that helps.

BY MR. LAROSIERE:

Q.   Do you see a spike in around February of 2024?

A.   Yes.

Q.   That's after the meme was posted, right?

A.   Yes.

Q.   And that spike continues for a couple of months, right?

A.   I wouldn't say "a couple."  I would say maybe one, and then it starts to trend downward.

Q.   Okay.  But we agree that there's an overall downward trend in this graph, right?

A.   Yes.

Q.   But earlier you said that 100 percent of the downward trend attributed to the Ghost Gunner would be because of the meme, didn't you?

A.   I did say that, yes.

Q.   Okay.  Is that still your belief?

A.   In the context of the analysis in the report, yes.

JASON MATHIEU TYRA, ESQ.                                        JOB NO. 2667670
APRIL 28, 2026

TYRA

Q.   What I am asking you right now, looking at this data, do you still believe that 100 percent of the downward trend from 2023 onward is because of the meme?

A.   I don't -- yes, I do.  And I note that I didn't use any graphs.  You know, I did not perform a graphable analysis, so I don't think this is a very good equation to depict the data, but yes, I still believe that.

Q.   Okay.

MR. FOSTER:  Question, Matthew:  Do you think we can take a lunch break?

MR. LAROSIERE:  Mr. Tyra, do you want to take a lunch break?

THE WITNESS:  I mean, I don't want to say "no," but it's only 10 a.m. here.  I would prefer to push through.

Are we going to go for 8 hours?

MR. LAROSIERE:  No, I don't think we are going to go for that long but I would prefer to push through as well.

MR. FOSTER:  Do you think we can do it on the hour, 45 minutes?

MR. LAROSIERE:  I don't know, Mr. Foster,

TYRA

but we will try to cover as much ground as we can.

MR. FOSTER:  Okay, okay.  I'm just asking.

BY MR. LAROSIERE:

Q.   I'm just trying to understand how it can simultaneously be the case that revenue was going down steadily, since we can see at least 2022, but that 100 percent of any downward trend would be attributable to the meme.  Can you explain that to me?

A.   That's the only singular outside factor that I identified that contained a call to action directing people not to use DEFCAD or its affiliates.

Q.   And so that causes you to just forget about all the previous downward trends?  That cancels out everything else?

A.   To the extent of damages being attributable to an individual actor, yes, I would say so.  Now, factor economically, I didn't --

Q.   You didn't actually consider other potential causes, right?  You only focused on the meme in your report?

A.   I did consider the causes that are

TYRA

identified in the report, but, you know, I did not -- I didn't consider any factors not committed in the report.

Q.   But the factors that you did document in the report, you attributed basically zero dollars of causal connection to.

A.   I'm sorry, I would what?

Q.   Those factors that you did identify in your report, you've attributed zero dollars of causal connection to?

A.   I don't know if that is a broad, general statement.  I try to adjust for similar things and at least comment on them, but, you know, is your question, like, what was the biggest month depicted in this graph?  The month the meme was produced. Every month after that is lower.

I don't think that's a bad conclusion in the context of even the graph that you showed me.

Q.   Okay.  I am asking if you did any calculations to, you know, discount any other factors or perhaps account for, you know, the plaintiffs' posting of the meme on their own website.

A.   I did not perform any such calculations,

JASON MATHIEU TYRA, ESQ.                                            JOB NO. 2667670
APRIL 28, 2026

TYRA

no.

Q.   Okay.  Why not?

A.   I didn't think it was necessary.

Q.   Okay.

A.   Or, alternatively, for some things I don't think they can be properly dollarized.  Like, I don't know if there's a -- what would be the adjustment factors for a Democrat in the office, yes or no.

Q.   It seems you identified an overall downward trend in the firearm's market of about 5 percent year over year in your report; did you not?

A.   I only caught half of that.  Only about 5 percent per year?

Q.   It seems to me that you identified an overall downward trend in the firearm's market of about 5 percent per year; is that right?

A.   That sounds right, yes.

Q.   But you didn't subtract that from your damages calculation, did you?

A.   No, I did not.

Q.   Okay.  So you said there's a lot of things that are hard to dollarize.  Give me examples of some of those things that are hard to dollarize.

TYRA

A.   The year uncertainty and doubt.  So, for example, I think it's pretty clear that the pandemic, Covid-19 in '19, '20, and maybe '21, resulted in a strong upward trend in sales in the firearm industry.  How would you -- I don't know, even speaking professionally, I don't know how to adjust for pandemic.  That's such a random event.  You know, there are things -- I talk about some of the things in the report.  For example, regulation has been chaotic.  Even the pistol brace thing.  That seems to be pushed pretty hard by the Biden administration, and where we are you now is a combination of either unenforceable at all or the Trump administration --

Q.   I don't need you to -- I'm sorry if I cut you off?

A.   Sure.

Q.   I don't need to you talk about the pistol brace meme.  But you're saying it's hard to dollarize fear, uncertainty and doubt, right?

A.   Yes.

Q.   And I agree.

So we're going to go back to your report.  On page 14, Exhibit 6, can you read this highlighted

TYRA

section, please?

A.   "I conclude that FEDCAD had the effect intended by the persons who created it, to drive customers away from DEFCAD and Defense Distributed by systematically sowing fear, uncertainty and doubt.  The effects are clearly identifiable in sales data and continue to the present at an average rate of $90,234 per month."

Q.   Okay.  So how would you dollarize that here in reduced sales?

A.   The meme contains and explicit call to action.  It says, "Friends don't let friends use FEDCAD," and then it corrects itself to ensure that the viewer knows that they're explicitly referring to DEFCAD.

Maybe I misspoke by using "fear, uncertainty and doubt" in that off-the-cuff answer as an example of something that's difficult to dollarize, but I don't -- you know, I will use a better example if you ask me the question again. You know, I think it's pretty clear that there are factors that have macroeconomic impacts that are difficult to put into specific economic terms.  That was the point I was trying to make.  Bad example.

JASON MATHIEU TYRA, ESQ.                                JOB NO. 2667670
APRIL 28, 2026

TYRA

I agree.

Q.   No, I think it was a fair example.  And you're saying it's hard to quantify fear, uncertainty and doubt, you know, in a pandemic, but somehow it's easy for you to quantify fear uncertainty and doubt with this meme.  So let me ask you this question:  To arrive at this conclusion, you just allocated 100 percent of any downward trend that you found to the meme; is that correct?

A.   That is correct.

MR. FOSTER:  Objection.  That's been asked and answered.

Q.   So let me ask you, are there -- is there any standard methods for determining this causation that you applied?

A.   No.  I would say that this is a pretty niche-use case.  This firearm is not something that comes up very much or ever.

Q.   So there is not a specific formula that you used to come to the conclusion that $90,000-plus per month is attributable to the meme?

A.   There is a specific formula.  It's the one I described in my report.  As far as whether that is a standard formula, average sales before versus

TYRA

average sales after, by month, I think it's

described pretty clearly and it's not that

complicated.  But your question was is there any

standard like an industry standard?  No, not that

I'm aware of, just The methodology that I used in

the report.

Q.   So then your allocation of 100 percent of

this loss is based on just your gut?

MR. FOSTER:  Objection to the form of

the--

A.   At least based on my professional --

Q.   Go ahead.

A.   Based on my professional judgement, it is

my professional opinion that this meme caused the

plaintiffs economic harm.

Q.   Okay.  And that is based on no other

documents or formulations, other than those

explicitly included in this report; that's correct?

A.   I think I said also professional

judgement.  I don't know how to document that other

than I'm the one who wrote it but, you know.

Q.   Okay.

A.   Yeah, that would be correct to that

extent.

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

Q.   Okay.  So I'm just going to ask you these specific things.  We talked about this earlier so I understand maybe if these answers might be "no," but I just want to nail them down, right, because earlier we talked about related to other factors.

In a portion of this downward trend in sales did you factor in Mr. Wilson's having allegedly had sexual intercourse with a child in 2018?

MR. FOSTER:  Object, relevance.

Q.   That's --

MR. FOSTER:  And I object to the form of the question.

Q.   Go ahead and answer, Mr. Tyra.

A.   I did not factor in.  That -- I did not take that into consideration, no.

Q.   Okay.  Did you factor in public sentiment about copyright infringement?

A.   I only got part of that.  I think the answer is no, I did not.  Okay, go ahead.

Q.   I was asking if you factored in public sentiment about your client's potential copyright infringement.

A.   No, I did not.

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

TYRA

Q.   Did you factor in financial hardship that might cause customers to cancel their memberships?

A.   No.

Q.   Did you factor in requiring individuals to have a federal firearm's license to use the site in some states?

A.   No.

Q.   Did you factor in that your clients may have double-charged some individuals?

A.   No.

Q.   Did you factor in perhaps accidental subscriptions being canceled?

A.   Please repeat the question.

Q.   Did you factor in perhaps accidental subscriptions being canceled?

A.   No.

Q.   Did you factor in decreased interest, generally, with the concept of 3D-printed firearms?

A.   No.

Q.   Did you factor in privacy concerns, especially requiring the uploading of a driver's license in order to use the website?

A.   No.

Q.   Did you factor in misleading or confusing

JASON MATHIEU TYRA, ESQ.                                         JOB NO. 2667670
APRIL 28, 2026

TYRA

expectations of the service on behalf of customers?

A.   No.

Q.   Did you factor in technical issues with the website?

A.   No.

Q.   Did you factor in the services being available for free elsewhere?

A.   No.

Q.   Did you factor in upgrades or downgrades of the subscription plans?

A.   No.

Q.   Okay.  As for the Ghost Gunner, right, because that's the bulk of the purported loss, right?  We do agree the Ghost Gunners build are the bulk of the purported loss?

A.   Yes.

Q.   When was the -- do you know what the current version of the Ghost Gunner is?

A.   I do not.

Q.   You don't know if it's the Ghost Gunner 3?

A.   Not off the cuff, no.

Q.   Do you know when that product was last updated?

A.   No, I do not.

TYRA

Q.   Okay.  Would it surprise you if I said it was in 2020?

A.   Would I be surprised?  I mean -- I don't know that product, I don't -- no, like, I wouldn't be surprised or not surprised.  That seems, you know, interesting, I guess.  I don't know.

Q.   So if the product hasn't changed in six years, do you think it's normal to see a decline in sales after its release?

A.   It this context I don't know because it's -- the Ghost Gunner is a CNC mill.  I don't know how it would change.  I don't think that technology is known for continuous constant development.  I guess I change my answer to your last question, would it surprise me?  No, because it's just a mill.

Q.   Okay.  I'm going to go back to your report.

You say in your report -- can you read that section, please?

A.   "The group's flagship product is a computer numerically controlled mill known as the Ghost Gunner that allows an individual user to machine components out of partially finished block of raw metal, usually steel, that may be assembled

TYRA

into a fully-functional firearm.

Q.   Okay.  What products can the Ghost Gunner
machine from steel?

A.   Again, I'm not an expert as to the
functioning of that particular product, but I
believe it can -- you can manufacture like a frame
for a firearm out of those.  I know there are other
parts that cannot be -- I'm sorry, ma'am.  I didn't
hear you.  Do you want me to repeat my answer?

Yes, so it is my impression that you can
create most of a firearm, but not everything, that
there are things like a firing pin that cannot be
made by this.  But that may not be correct.  This
wasn't really part of the analysis.

Q.   Okay, so you just made that up?

A.   No, I didn't make it that up.  I didn't
make any technical claims about how the functioning
of this...

Q.   Okay.

A.   I believe this is a correct statement.  It
allows an individual to machine components.  That's
what the product does.

Q.   Okay.  But where did you get that
material?  Like, how did you form that belief that

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

                              TYRA

it can machine from steel?

        A.    Based on my personal understanding of how
I believe the product works.

        Q.    Okay.  So it's just from your mind?

        A.    Yes.

        Q.    Okay.  Can you read this next part here?

        A.    "While DEFCAD platform supports sales of
the Ghost Gunner."

        Q.    How does it do that?

        A.    Ghost Gunner operates using computer files
that are provided by DEFCAD.

        Q.    Okay.  How does it support the sales of
the Ghost Gunner, is what I asked you.

        A.    If you can just buy a Ghost Gunner and put
it on a countertop, it doesn't do anything.  You
need to hook a computer up to it, and in order to
cause it to function, files with designs for
components need to be fed into it by software.  My
understanding is that those files are provided by
the DEFCAD platform.

        Q.    Okay, how do you know that?

        A.    Because my client told me that.

        Q.    Okay.  Doesn't the Ghost Gunner ship with
the files for it on a USB drive?

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

A.   I don't know.

Q.   Okay.

We'll go to down to page 7, Exhibit 8. Can you read that, please?

A.   "A person who wishes to legally purchase a firearm from a federally-licensed dealer in the United States is required by federal law to provide identification to the seller."

Q.   Doesn't DEFCAD require customers to provide the same information?

A.   I don't know.

Q.   Okay.

Did you write all of this report yourself?

A.   Yes, I did.

Q.   Okay.  And all the sources you cited, how did you read them?

A.   How did what?

Q.   How did you read these sources?

A.   I don't understand.  How did I read them? Like -- what with my comprehension of the English language.  I am not trying to be flippant.  I just don't understand the question.

Q.   Okay.

I am asking did you read them

JASON MATHIEU TYRA, ESQ.                                JOB NO. 2667670
APRIL 28, 2026

TYRA

electronically, did you read them in print?

A.   Oh.   Electronically.

Q.   Okay.   Do you remember this article here?

A.   I believe this is part of a section of the report that isn't really cited anywhere else.   It just describes a survey of literature.

Q.   Mm-hm.   But you remember reading this, right?

A.   Not in particular, no.   There's, like, 20 things on that list.

Q.   Okay.   This cites to volume 5, number 3 of this journal?

A.   True.

Q.   Okay.

I read all your sources.   This will be Exhibit 10.   This is the journal listing for that paper.

(Defendants' Exhibit 10, volume 5 of journal listing, was marked for identification as of this date.)

Do you see that?

A.   Yes.

Q.   Let's go to volume 5, number 3.   Do you see any paper that you cited there?

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

A.   Those don't appear to be numbered, so the third bullet point does not -- is that what you're asking me?

Q.   This was the contents of volume 5, number 3 of the journal of the Journal of Digital and Social Media Marketing, and I don't see that article in there.  Do you?

A.   I do not.

Q.   Okay.  So where did you read it?

A.   The citation that I provided is the citation that was listed on the article that I found online.

Q.   So you didn't read this --

A.   If I botched the citation, then okay, but that doesn't -- if I botched the citation, then that doesn't mean the article doesn't exist.  I'm sure if you Google that article, it will come up exactly in the form that I read it.  I mean, I said I read it electronically.

Q.   So I did do that and I couldn't find this article.

MR. FOSTER:  There's no question, Jason.

Q.   Did you use generative artificial intelligence to help you draft this report?

TYRA

A.   No, I did not.

Q.   Okay.  Can you find that article right now?  And that being "The Power of Memes:  A New Dynamic in Marketing, Journal of Digital and Social Media Marketing."

A.   Just a second.

Yes, first thing that comes up when I Google "The Power of Memes" and "A New Dynamic in Marketing, Journal of Digital and Social Media Marketing, volume" --

Q.   Can you put a link to that in the chat?

A.   Sure.

Q.   Is that on inspirajournals.com?

A.   Yes, that looks to be the same one.

Q.   Okay.  Let's look at it together.

A.   This looks like an article that cites to it.

Q.   Yeah, I think so.

Is the title of the article that you just found, "Memes as Marketing:  Exploring Their Role in Digital Brand Strategy And Consumer Engagement," by Neeraj Kumar?

A.   Yes, it is.

Q.   Okay.  And Neeraj Kumar is not Consala M.,

TYRA

is it?

A.   No.

Q.   Okay.  So this isn't that article you relied on, is it?

A.   Okay.  If I say "relied on," I would like to read the heading of appendix B, what we are talking about here.  It says "Examples of recent published works that address the impact of memes in consumer marketing and their conclusions in brief," and then it provides the source, Neeraj Kumar, and then did it goes and provides the examples that are cited in the article.  So I don't claim that I relied upon these; I described them as examples of works that address the impact of memes.

I think these contexts are taken out of question here.  You are framing that them as if I -- if it were an integral part of the report.  They are as described.  They are examples of recent published works.

Q.   And you didn't read them, right?

A.   Cited to the source.  Did I read them?  I looked at their conclusions.  I didn't read every one of these; I didn't claim to read them.

Q.   Okay.  I don't think the last two cites

TYRA

there exist and I want to know why you included them.

A.   They are included by the source that I provided.  It says "source, Neeraj Kumar and Professor Manvinder Singh Pahwa," so if you'd like to discuss with Dr. Singh Pahwa, why he included these articles, you know, in his own work, you would have to ask him.

Q.   Hold on.

Madam Court Reporter, didn't Mr. Tyra earlier say he read this.  Can you read that back?

(Testimony was read back.)

I've got another document.  You might be happy to know, I am wrapping up.

If your client had provided you the reasons customers gave for leaving the website, would that have impacted your conclusion?

A.   Potentially.

Q.   Potentially?  Can you describe how you would have taken that into effect or taken that into account?

A.   Okay, so you're implying that my client would have had extensive, detailed knowledge as to the motivations behind the people that he literally

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

TYRA

wasn't doing business with.

Q.   No, no, no.  Hold on.  No, no, that's not the question I am asking.

I am asking if there were exit surveys from DEFCAD that stated the reasons for discontinuing the account, how would you have taken that into account?

A.   I would have to see the surveys to answer. That's why I say "potentially."  There could be lots of reasons why people would no longer purchase the service.

Q.   Okay.  What would you look for, if you had such data?

A.   So first of all, people who have the opportunity to complete an exit survey, by definition would have represented annual recurring revenue, so I would want to know what percentage of sales in general is annual recurring revenue.

Those surveys only apply to that portion. So if it's a material portion of sales, I would probably want to try and adjust for those, yes.

Q.   Mm-hm.

I'm going to show you something.  This is going to be Exhibit 11.

TYRA

(Defendants' Exhibit 11, exit surveys, were marked for identification as of this date.)

So these are the exit surveys that were provided by your client leaving DEFCAD.  Do you see this?  This is just the first page.

A.   Yes, I see it.

Q.   Okay.  How many of these would you attribute to the FEDCAD meme?

A.   Let's see.  "I don't want to support FEDCAD," "Concerned about personal privacy/security," "I don't want to support FEDCAD," "Concerned about personal privacy/security."  So four, for sure, and maybe half of these have no reason cited.

Q.   Mm-hm.  So would you have included those as an impact of the meme?

A.   Certainly.  The meme appears to be the source of the term "FEDCAD."  Those would definitely be included.

Q.   I'm sorry.  I understand what you are saying about the ones that specifically selected "I don't want to support FEDCAD," and I understand your argument about personal security.  I am talking

TYRA

about the blank ones.

A.   Okay, so the way I would have used that is, this looks like a 21-page document, I don't know what quantity of them are blank but if it's a substantial portion, that would have an impact as to whether I consider this to be material or not.

Q.   Okay.  What about the ones that say "cost too much"?

A.   Again, I mean -- so what I would do.  I don't know what the question was.

Q.   Would you say that the individuals who canceled their membership --

A.   Please repeat the question.

Q.   I'm sorry, what?

(Technical difficulty.  Court reporter clarification.)

Yes, for the reason "could not access files," were because of the FEDCAD meme?

A.   Again.

MR. FOSTER:  Objection, that calls for speculation.

Q.   Go ahead and answer.

A.   Yeah, so I just -- I don't know enough about this.  Is there literally just one question

TYRA

and that's --

Q.   Okay, so -- and this is because --

A.   Is there one question so you get one opportunity to answer?

Q.   So because this is an Excel sheet that is kind of a mess like this, so there's three questions.  There's basically, the one that you're seeing here is from a drop-down, then there's, if they select other, they can put more information, and there's another row where they can say "please provide more detail."

A.   Okay, I wouldn't -- I just don't know. This is kind of my speculation is not great because I don't portray myself to be a survey expert.

Q.   To be clear, I am asking you, if you were provided these, would this have changed or impacted your conclusion that 100 percent of the lost sales were because of the meme?

MR. FOSTER:  Objection.  Object to the form of the question.

Q.   Go ahead and answer.

A.   Same answer as before.  Potentially.  I am not prepared to say "yes" or "no" just based on the document that I have in front of me.

TYRA

Q.   Okay.  I want to look at the document some more with you then.  One second.  I'm going to try to make this easier to read because I know this is a mess.

(Defendants' Exhibit 12, summary output, was marked for identification as of this date.)

I'm going to show you Exhibit 12.  Do you recognize this document?

A.   No.

Q.   So you have never seen this before?

A.   I have not.

Q.   Okay.  I'm going to show you Exhibit 13.

(Defendants' Exhibit 13, survey comments, was marked for identification as of this date.)

Is this clear?

A.   I guess, yeah.  I mean...

Q.   Okay.  So I'm asking which of these would you attribute to the FEDCAD meme?

A.   On this particular page?  The one that says "I don't support FEDCAD," for one.

Q.   Okay.

What about here?

A.   "Concerned about personal security/privacy."

JASON MATHIEU TYRA, ESQ.                                           JOB NO. 2667670
APRIL 28, 2026

                              TYRA

          I'm reading these now.  Just that one.

     Q.   Do you see where they say "give more

detail"?

     A.   Yes.

     Q.   Can you read that?

     A.   "ID verification is crazy, especially only

allowing 21-plus.  This is the fucking Internet.

Please like Odysee, CNTRLPew, the Gatalog and

FossCAD outperform you and I hope they run you guys

into the fucking ground.  The fact that you guys try

to have more control and reach than a government

body is insane, and using a paywall to hide access

and then only after you get your money, you make it

known you have to ID and be over 21.  You guys are

scum and scammers.  I hope you all sincerely go fuck

yourselves."

     Q.   So where in there is the meme mentioned?

     A.   There is no mention of the meme in that

statement.

     Q.   But you would still attribute that to the

meme.

     A.   That's not what you asked me.

     Q.   I asked which of these individuals you

would attribute the loss of their subscription to

TYRA

the meme and you said the ones that say "concerned

about personal security and privacy."

A.   I don't think that people, you know, this

is not the proper -- this is my problem with this

line of reasoning generally.  I don't think this is

able to completely capture everything the person has

seen and everything going on in their mind.

This guy says he is concerned about

personal security and privacy and he specifically

cites competitors of DEFCAD.  He is obviously very,

very upset about it.  You know, did he see the meme

or not?  I don't know, but if I found out that he

did, I would be very unsurprised, based on these

comments.

Q.   Right, but you didn't bother to find out

whether anybody actually did see the meme or not,

right?

A.   I don't understand.  Did I attempt to

ascertain whether any individual ever saw the meme?

No, I actually didn't perform procedures for that

purpose.

Q.   Okay.

You'd say there's a lot of individuals on

this report, right?  A lot of surveys?

TYRA

A.   I don't have any basis to assume anything at all about this.  This could have been one guy that, you know -- this could have been a bot, this could have been anything.

Q.   All of this could have been one person?

A.   I believe I said I have no basis at all to either support or not support the statement that you made, which is there are a lot of people here.

Q.   Okay.

A.   This is just on it, as far as I'm concerned.

Q.   And again, assuming that these are the exit surveys for DEFCAD --

A.   Well, why would I assume that?

Q.   I'm -- for the purposes of the question.

MR. FOSTER:  There's no question there.

A.   Okay, well, I think that's important.

Q.   I'm about to ask you a question and I want you to assume for the purposes of the question that these are the exit surveys for DEFCAD.  Can I proceed with this question?

Can we do that?  With this limited universe of this question, I want you to presume that these are that, okay?

TYRA

A.   Sure.

MR. FOSTER:   I'm sorry, is there a question, there?

MR. LAROSIERE:   Howard, stop.

Q.   Would this data support your conclusion that 100 percent of lost sales were due to the meme or would it not support it?

MR. FOSTER:   Object to the form of the question.  Calls for speculation.

You may answer.

A.   And I just have a problem with that because, you know, looking at this globally, I can consider the meme and I think the plaintiffs assert this to be part of a coordinated campaign against my client online.  Okay?  So I'm not convinced that this is reliable data.

This is the first time I have seen it.  I don't know where it came from.  I don't know how it was collected, just based on what you told me.  So, you know, just based on what you have shown me, no, I don't think I can change my conclusion.  You know? I would not be surprised to discover that somebody, you know, maliciously entered data into this form. You know, that would go along with the plaintiffs'

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

                              TYRA

assertion that they were attacked online.

          I just don't know what I would do with

this.  And you have asserted that these are all

individual customers who actually canceled their

subscriptions, and even in that context, I don't

think this does a good job of holistically capturing

everything that was going on in their mind.  So a

guy that says "costs too much," what does that mean?

It costs too much for what?  It costs too much for

the amount of effort involved?  It costs too much in

the context of the data breaches?  Maybe that guy

would have done it for $10 a year, not whatever it

is they charge.  I just don't know.

     Q.   So, again, assuming it's real -- I know

that you don't know that -- this would be more data

than you reviewed in arriving at your conclusion

that 100 percent of the lost sales were because of

the meme; is that fair to say?

     A.   Yes.

     Q.   Okay.

          I want to ask you a quick question just

about bias, okay?

     A.   Sure.

     Q.   Are you close personal friends with Mr.

TYRA

Wilson?

A.   I am not.

Q.   You're not?

A.   No, I'm not.

Q.   How did you meet him?

A.   He contacted my firm I think in 2019, 2018, some years ago.  His tax preparer that he had been working with was a company called Saville Dodgen in Dallas, Texas dropped him, and he was looking for a new preparer, and he came in through our website.

Q.   Okay.  You guys are both very interested in crypto currency; is that correct?

A.   I am interested in it professionally, yes. I don't really do anything with it personally, so I don't know that I would say "very interested."

Q.   I think you have appeared on new interviews talking about crypto currency, haven't you?

A.   True.  It's an area of professional practice for me.

Q.   You have an Bitcoin Connect account?

A.   Say again.

Q.   You have a Bitcoin Connect account, right?

TYRA

A.   A Bitcoin Connect account?  That's not something I'm actively using.  I don't know that I have ever had an account on that site, assuming that it's an activity.

(Court reporter clarification.)

Okay, let me qualify that.  I have been in the crypto space for, like, 13 years and there a tremendous volume of websites and publications and so forth that have come and gone.  It has always been an are of professional practice.  I never personally invested crypto currency, traded crypto actively or done anything like that.  I think that answers your question.

Q.   Yes.  So I see -- you focused a lot on security and privacy when we were talking about reasons, potentially, for people leaving; is that fair to say?

A.   Yes, yes.

Q.   Why did you focus on that?

A.   Well, because I think that that meme really strikes -- that that's the heart of what it's trying to get to with the people that it was directed at.  The meme alleges that the site has been hacked, that the company shares data with the

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

TYRA

federal government.  It contains a call to act.  It contains threats.  You know, don't use FEDCAD unless you want your data shared with the ATF.  That was my take on what was presented.

And so, based on my professional practice, that is an area of great concern to people likely to purchase this product.  And I think that was known to the people who created this.  They -- again, it contains an explicit call to action.  "Friends don't let their friends use FEDCAD."

Q.   Okay.

I have put up Exhibit 5.  You told me that the meme suggests that their information will be shared with the federal government.  Can you tell me where in the meme it says that?

A.   Let's see.

"DEFCAD's database has been hacked and dumped on multiple occasions.  They never disclosed the data breaches."  Yeah, I guess it doesn't say that.

Q.   Then why did you say that?  It said in your report, too.

A.   Because that's an area of concern for people within this community.

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

Q.   But the meme doesn't say that, right?

A.   It does use the term "FEDCAD."  Fed what?  Federal agents?  What else does that mean?  What was it meant to mean?  I would want to ask the person who made it, What does "FEDCAD" mean?  Why is that on point for "DEFCAD."

And the meme even says -- it corrects itself on the very first line -- "Friends don't let friends us DEFCAD."  So there can be no question as to whether "FEDCAD" refers to "DEFCAD."

Q.   Okay.  Are you --

A.   Why is "FEDCAD" on point --

Q.   Hold on, please.

Are you aware that FEDCAD is a website, FEDCAD.com?

A.   No.

Q.   Would it surprise you if I told you that your client owned that website?

A.   I would neither be surprised nor unsurprised.  I am not aware of any such website listing.

Q.   Okay.  So I mean you kind of wandered off -- I think you agreed earlier that it doesn't say the information would be provided to the federal

TYRA

government, so were you just kind of speculating as to the entire meaning of the meme there?

MR. FOSTER:  I object to the form of the question.  You misstated his testimony.

Q.  Go ahead.

A.  My interpretation of the term "FEDCAD" was that it was meant to draw a line or draw a connection between the federal government and the DEFCAD platform.

Q.  Okay.  And what did you base that on?

A.  What I considered to be the clear meaning of that term.

Q.  Did you check to see if the website FEDCAD existed at all?

A.  I did not.

Q.  Okay.  But when you said in your report and earlier, just now, that the meme threatens that the information will be handed over to the federal government, you just made that up, didn't you?

MR. FOSTER:  Object.  You are misstating his testimony.  You may answer.

A.  So yes, so it was my interpretation of this meme, that that's what it was suggesting.  If you say I made that up, yes, and to the extent that

TYRA

I don't have a source for that information other than my interpretation, yes, I made it up.

Q.   Okay.  You seem to be getting a little upset when we talk about the subject of data breaches.  Have you ever been personally or professionally affected by a data breach?

MR. FOSTER:  Objection to the form of the question.

A.   Yes.

Q.   You have?

A.   Yes.

Q.   What was that?

A.   I'm a professional officer of the United States Army.

MR. FOSTER:  This deposition cannot go into your personal matters.

MR. LAROSIERE:  Mr. Foster, it goes -- this is an impeachment question and he is answering.

MR. FOSTER:  I didn't make my objection on the record, Matthew, and you are not going to talk over me.

MR. DE PURY:  You can't make speaking objections, Mr. Foster.

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

MR. LAROSIERE:  All you can say is "objection to the form of the question."

MR. FOSTER:  I didn't state the grounds. You can't engage in a personal deposition of an expert, only about his professional matters.

BY MR. LAROSIERE:

Q.  Go ahead and answer.  You started saying that --

A.  I hold a security clearance as a commissioned officer of the United States Army.  In 2015 the entire OPM database was hacked, presumably by a foreign party, and that information made available on the dark web.  This means that everything, including my fingerprints, where I have ever lived, who my spouse is, everyone I associate with is available publicly as at some level.

I have also repeatedly had my credit card information stolen, I have been wrapped up in the other mass data breaches that affected the banking industry or other consumer databases, so I think probably almost every American has been wrapped in some way or form in a data breach.

Q.  Okay.  Well, first of all, thank you for your service, Mr. Tyra, and I am very sorry that

TYRA

happened to you.

Q.   Would you say that had a significant impact on you?

A.   It happened to everybody.

Say again.

Q.   Sorry.  Would you say that had a significant impact on your personal and professional life?

A.   Not yet, but it does have some very significant Second and Third World effects.  For example, if that information is now held in the hands of China and we go to war with China, there's no way that I can claim to be anyone other than who I am because my fingerprints, DNA, entire personal history are literally in the hands of a foreign adversary.  So yeah, I'd say that it's a pretty significant effect on me.

Q.   That's horrible.  I -- that's terrible, and I am very sorry.

A.   Thanks.

Q.   Now, do you know if your information was leaked as part of the Ashley Madison hack?

MR. FOSTER:  Object to the form of the question.  Object to the relevance.  I am

TYRA

instructing you not to answer that.

MR. LAROSIERE:  This is directly as to --
this is directly as to bias?

MR. FOSTER:  The Ashley Madison hack?
Like, whether people used that website?  Are
you kidding?

I am moving for a protective order.

MR. DE PURY:  It goes to credibility,
which has a direct --

MR. FOSTER:  I am moving for a protective
order.

MR. DE PURY:  Since you are putting a
speaking objection on the record, I am going to
address it.  It goes to his credibility.  He
was just directly asked if he's ever been
hacked and ever been a victim of a hack and he
only went to the OPM database and not to the
reported Ashley Madison database.

Whether or not the judge grants you a
protective order, it now goes to his entire
credibility.  And that's basically it, Mr.
Foster.  So since you want to put your speaking
objection on the record, I am going to put my
position on this on the record.  Thank you.

TYRA

MR. FOSTER:  Okay.  That's fine, Gary, you did.

I am instructing you not to answer that. And I will go to the judge, if necessary, for a protective order as to that question.

MR. LAROSIERE:  Okay.  So just so everybody knows, we will litigate this and you will have to be dragged out to be deposed again, if Mr. Foster is not successful.

It's up to you if you want to answer the question "yes" or "no."  I can tell you I am not going to ask follow-up questions.  I don't want to know whether you used the website.  I don't want to know anything like that.  I am just asking yes or no, whether your information came out in the Ashley Madison leak.  I promise I will not ask anything following that about that.

MR. FOSTER:  You are asking if his data came out then but you're saying you're not going to ask him if he used the site?  How can it be on there if he didn't use the site?

MR. LAROSIERE:  Mr. Foster, I don't want to ask him about what happened in his personal

TYRA

life.

MR. FOSTER:  You are.

MR. LAROSIERE:  Mr. Tyra, it's up to you.

MR. FOSTER:  Don't answer the question, Mr. Tyra.

MR. DE PURY:  File the motion, Howard, and we will litigate it in open court.

MR. FOSTER:  All right, okay.

MR. LAROSIERE:  All right.  Mr. Howard, are you terminating this deposition?

MR. FOSTER:  No, I am not terminating it.

MR. DE PURY:  I have not gone yet.

MR. FOSTER:  Let's keep going.

MR. LAROSIERE:  Okay.

BY MR. LAROSIERE:

Q.   Was your information leaked in the Ashley Madison hack?

MR. FOSTER:  No, don't answer any question -- don't answer that question.

MR. LAROSIERE:  That's the only question I have left and you can answer it "yes" or "no," and I promise I won't ask you anything about it after that.

MR. FOSTER:  You're saying -- you are

TYRA

representing to me, or us, Matthew, this is your last question in the deposition.

MR. LAROSIERE:  No.  I promise I won't not ask anything about what was in it, what happened in his life or anything like that.

MR. FOSTER:  And I don't think that he should answer that.  It is -- I am moving for a protective order on that question.  He should not have to answer that question.

MR. LAROSIERE:  I only have one more question after that, which simply goes to bias.

Like I said, I don't -- I feel for the guy.  I am not going to ask him about his marriage.  I am not going to ask him anything. I am not going to ask him about whether he was married.

MR. FOSTER:  You are asking him a question that goes to his marriage.

MR. LAROSIERE:  No, I don't know when he got married.

MR. FOSTER:  I am done with this.  Move on.

BY MR. LAROSIERE:

Q.   Mr. Tyra, it's up to you.  You can say

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

"yes" or "no."  If you won't answer, we are going to wind up back here again, so it's up to you.

MR. FOSTER:  We are not going to wind up here back again.  Just move on.  Don't answer it.

MR. DE PURY:  Actually, Mr. Foster, Mr. Tyra is an expert witness and not your client. So you are out of line by instructing him not to answer.

MR. FOSTER:  No, I'm not.  I'm allowed to make --

MR. DE PURY:  I'm going to go double-check -- every time you interrupt me, I'm just going to slow my patter down.

I am going to go double-check the rules on that and we will address it in your motion in court.  Thank you.

MR. FOSTER:  Okay, sir.

BY MR. LAROSIERE:

Q.   It's up to you, Mr. Tyra.  Are you electing not to answer?

A.   The answer is I don't know anyway.  I'm not -- I am not familiar with the contents of that data breach.

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

Q.   Okay.  Well, because of that, I would have to ask -- and again, I am not interested in whether or not you were married -- were you on that website?

MR. FOSTER:  I instruct you not to answer the question.  It's up to you whether or not to take that.

MR. LAROSIERE:  I --

MR. FOSTER:  You have to let me make my objection.  That's what the local rule says, Matthew.  Stop talking.

I object to the question.  It's irrelevant, it's harassing, and I instruct you not to answer it so I can move for protective order.

MR. LAROSIERE:  Is Mr. Tyra your client?

MR. FOSTER:  No, but I am allowed to do that.

MR. LAROSIERE:  Okay.

BY MR. LAROSIERE:

Q.   Mr. Tyra, you can choose to answer or not.

A.   Yeah, I choose not to answer.

Q.   Okay.  Yeah, no, I have to ask you that. It comes down to your credibility and your focus on the data leaks.  I am very sorry that we couldn't

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

TYRA

get it done just quickly and easily, but I'm going to have to -- we're going to have to go to the Court and we're going to have to re-depose you.

MR. FOSTER:  You are not going to redepose --

MR. LAROSIERE:  Stop it, Mr. Foster.  You are so outrageously out of line.  You are refusing -- this is my last line of questioning, simply as to credibility.  You are refusing to let me pursue an obvious threat, so I have to -- as I understand, you are terminating my portion of the deposition. You're not allowing me to continue.

MR. FOSTER:  No, I'm not.

MR. LAROSIERE:  I am -- Howard, this is going to be litigated, so I am going to cede the floor to Mr. De Pury, who may have questions for his client, to the extent that he does?

MR. FOSTER:  Okay.  Can we go off the record for a minute?

MR. LAROSIERE:  No.

MR. FOSTER:  Okay, so we won't go off the record.

TYRA

MR. DE PURY:  All right.  Am I up?

MR. FOSTER:  Yup.

MR. DE PURY:  Thank you.

DIRECT EXAMINATION BY MR. DE PURY:

Q.  Mr. Tyra, I am Gary De Pury.  I am the attorney for one of the co-defendants, Mr. Holladay.

Thank you for being here today, not that you have a choice.

I have read through your report and I have read through -- and obviously, I have been here all day today.  Some of these questions may seem like they are basically repetitive for what was addressed earlier but I want to begin with, just a few moments ago you testified -- actually, you know, what?  I will skip that.  I will come back to it.

At 11:32, pretty much when we first began, you testified that your report does not place any blame on the defendants and that you would not be testifying as to any blame on defendants; is that correct?

A.  I think that --

MR. FOSTER:  It was asked and answered.
You can answer.

A.  I think that mischaracterizes what I said.

JASON MATHIEU TYRA, ESQ.                                           JOB NO. 2667670
APRIL 28, 2026

                              TYRA

I was not asked to opine on liability of the

plaintiffs -- excuse me, of the defendants.  I was

asked to weigh in on the economic impact of the

meme.

          Q.   Okay, and you've done that quite well

today.  But your report -- your testimony, if I

recall, maybe Madam Reporter can pull it up, it was

at 11:32 a.m. where you stated that your report does

not put any blame nor does your -- nor will be

testifying today that there's any blame.

               Madam Reporter, are you going to pull that

up?

               MR. FOSTER:  There is no question.

               MR. DE PURY:  There is going to be a

     question as soon as she reads that back.

               MR. FOSTER:  Okay.

               MR. DE PURY:  That's how it works.

               (The record was read back.)

BY MR. DE PURY:

          Q.   Thank you.  That was what I was speaking

to.

               Sir, is that still your testimony?

          A.   I am not an expert as to whether, you

know, the defendants created or propagated this

TYRA

meme.  At the time that was not what I was engaged

to do, so yes, that is still my testimony.

MR. DE PURY:  So at the bottom of page

8 -- Matt, can you pull up your screen?  Can

you share page 8 of his report?

MR. LAROSIERE:  One moment.

MR. DE PURY:  Thank you.  Right to the

bottom of page 8.

BY MR. DE PURY:

Q.   Sir, can you read that last paragraph?

A.   Sorry, it's kind of lagging a little bit.

"By creating, propagating and promoting

the FEDCAD meme, defendants intended to influence

users of DEFCAD's website and purchasers of its

products and those of its affiliates, creating fear,

uncertainty and doubt.  The attack starts with the

heading "FEDCAD," implying that DEFCAD is in league

with or somehow infiltrated by agents of the federal

government.  The meme uses technical jargon and

language unlikely" --

Q.   And Matt, can you scroll to the top of the

next page?  And sir, if you would read the very top

paragraph, which is the continuation.

A.   -- "to be understood by lay persons or

TYRA

those outside the GunCAD community, "unsalted data,"
"M82," and "low poly videogame model."

By alleging that DEFCAD's database has
been hacked and dumped, and that they do not attempt
to encrypt their data, defendants invoke a fear
either of public exposure or exposure to government
scrutiny or both."

Q.   So is it still your testimony that you
don't attempt to place any blame on the defendants
in your report?

A.   That's not what my report opines on.  I
think it's necessary in the context of, you know,
describing the alleged conduct.  But if you put me
on the stand and ask me if I think the defendants
did this thing, I can't answer that question.  I
think that's -- I don't understand where you're
going with this.  I want to give factual --

Q.   Well, your entire report is an attempt to
make a factual understanding of what happened in
this situation; does it not?

MR. FOSTER:  Objection, you are misstating
the report.

Also, Gary, why don't you open your video,
so we can see you.

TYRA

MR. DE PURY:  Well, Howard, it's not in

the rules.  Since you brought it up with Matt--

MR. FOSTER:  I think you should do that --

MR. DE PURY:  Howard, I don't have a

camera on this system.  I'm not going to go

change computers.  It's not in the rules and

it's -- so it doesn't require.  And by the way,

it doesn't really matter.  The rules lay it out

that only the witness needs to be on there.

Now, I could have pointed out that at 1:29 you

were clearly texting somebody, and I wrote it

down.  I could have asked you who you were

texting but I --

MR. FOSTER:  What rule, Gary, says only

the witness has to be on the camera?

MR. DE PURY:  Howard, do you want me to

change computers?

MR. FOSTER:  What rule says that?

MR. DE PURY:  Howard, what rule says that

I have to be on the computer.  Now, we will

move on, sir.

BY MR. DE PURY:

Q.   My question was or, actually, you were

trying to answer that you were not placing blame but

TYRA

you're clearly -- the words clearly placed blame.

        MR. FOSTER:  No.  Objection, you are misstating his testimony and you are misstating your report.

        MR. DE PURY:  Howard --

        MR. FOSTER:  You can answer the question.

        MR. DE PURY:  Howard, what I'll just do is just forward your e-mail back to me where you threaten me at 8:32 on the morning on the I believe the 3rd, so I suggest you stop.

BY MR. DE PURY:

    Q.   Sir, I'm going to move on to the next question.  Would you now change your -- this report, now that you're aware that FEDCAD is an actual website owned by your client, by Mr. Wilson?

        MR. FOSTER:  Objection, misstating the testimony.

    Q.   Sir, are you now aware that FEDCAD is a website owned by Mr. Wilson?

    A.   Yes, I am.

        MR. FOSTER:  Objection.  Wait.  Objection, you are misstating his testimony.

        MR. DE PURY:  His testimony is right now.

BY MR. DE PURY:

TYRA

Q.   Sir, are you aware that that is a -- I think you just answered "yes," so now we are basing it off of that testimony, his direct answer "yes."

Howard, this will be your last chance to stop.

MR. FOSTER:  Wait a second --

MR. DE PURY:  I asked a direct question. Howard, stop.

MR. FOSTER:  Gary --

MR. DE PURY:  You are so far out of line, this is ridiculous.

MR. FOSTER:  We have not established that his client owns the website.  That is not established.

MR. DE PURY:  Then your objection would be "not in the record."

MR. FOSTER:  It's not in the record.  It's not in the report and it's not in the record.

MR. DE PURY:  Howard, stop.  Howard, stop.

BY MR. DE PURY:

Q.   Mr. Tyra, are you aware that your client owns a website called FEDCAD?

MR. FOSTER:  Objection, misstates the evidence and the testimony and the report.

JASON MATHIEU TYRA, ESQ.                                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

Q.   You can go ahead and answer.

MR. FOSTER:  You can answer.  You can answer.

A.   I don't have any personal knowledge of that.  I am aware that he asserted to me that that's true.

Q.   Okay.

If it were true -- and we are stating for the record, if it were true, to overrule all of Howard's pending objections -- would that have changed your analysis in this?

A.   No.

Q.   Why not?

MR. FOSTER:  Objection, calls for speculation.

Q.   Go ahead and answer.

A.   Okay.  The reason is because the heart of the meme is an explicit call to action, so I think that adding information that the plaintiff owns FEDCAD -- it explicitly says "Friends don't let friends use FEDCAD," so it actually makes the effect even more -- even worse, even more significant.

Now, with regard to my conclusion that FEDCAD is an allusion to the ATF or the federal

TYRA

government, generally, that might not work anymore. But as the meme says, "Friends don't let friends use FEDCAD," so I came to the same conclusion.

Q.   So you speculated to that portion, no, that you assume that FEDCAD was somehow an illusory or illusionary play on words to insert "FED," correct?

MR. FOSTER:   Objection to the form of the question.

Q.   You can answer.

A.   I thought I already did answer, sorry.

Q.   No -- well, you may have been answering when Howard was speaking over us.

So my question was effectively that your testimony a few minutes ago was that you effectively guessed that the word "FEDCAD" was just a play on words, correct?

MR. FOSTER:   You are misstating his testimony.   Object to the form of the question.

Q.   I am paraphrasing your testimony.   If we need to be here until 10:00 tonight because of Mr. Foster's improper objections, we will be.

The issue that you testified to just a few minutes ago, and again, I am paraphrasing, was that

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

you made the assumption that "FED" in "FEDCAD" was a literary device -- whatever you want to call it that would satisfy Mr. Foster -- that was to point or make people assume that they were tied to the Fed; is that correct?

A.   The federal government, not like the federal reserve, but yes.

Q.   Okay, thank you.   And you now believe that to be -- well, you can't believe that to be wrong but you now know that may not be the reason, correct?

A.   Well, I mean as a -- I mean, I don't know that is correct.   As a lay person, as someone who was initially just exposed based on seeing the meme, that's what I thought it meant, so it's reasonable to assume that another person who didn't have that other piece of information would assume the same thing.

Q.   Now, so on page 26 the report -- I'm not going to have Matt pull it up because it's not exactly -- it doesn't matter.   Oh, it is already up, so you can go to it.

You state "The plaintiffs allege the defendants created and propagated the meme."

TYRA

Correct?  In other words, you used the word "alleged"?

A.   Yes.

Q.   And the word "alleged" was used intentionally, correct?

A.   Yes.

Q.   And that means that you were not independently able to verify who created the meme, correct?

A.   That is correct, yes.

Q.   But then on page 8 you state "By creating, propagating and promoting the FEDCAD meme, the defendants intended to," and then it goes on, the part I just had you read into the record, right?

A.   Yes.

Q.   All right.  In that statement you no longer use the word "alleged," do you?

A.   I do not.

Q.   Instead, are you assuming the defendants created it?

A.   I am.

Q.   All right.  So your opinion, in large part, relies on the assumption or --

A.   I have been offering testimony as to

TYRA

defendant.

Q.   Well, you have testified all day as to defendants created this.

MR. FOSTER:  Objection.  He didn't testify to that.  You are misstating it.

Q.   All right.  So your opinion -- because I also didn't say your testimony relies on it -- your opinion relies on an assumption that the defendants are the actors, correct?

A.   No.  The conclusion as to economic damages does not depend on who caused them.

Q.   Okay.  Now, let's talk about the causation.  You conclude -- you don't opine, you conclude that the meme caused a decline in revenue; isn't that correct?

A.   Yes.

Q.   But are you able to identify a single customer who --

MR. FOSTER:  Objection.  I'm sorry, I take that back.  Finish your question.  I'm sorry.

Q.   Are you able to identify a single customer who stopped purchasing because of the meme?

MR. FOSTER:  Objection.  That was already asked and answered by him by Matthew, the exact

TYRA

same question.

MR. DE PURY:  Okay.  I'm a different attorney for a different client.

MR. FOSTER:  I know.

MR. DE PURY:  All right.  Howard, we can get through this so quick.  It's already asked and answered, and his answer was "no," that we're just going to move on.  So we will go back to the record later, when we address this and the other issue in court.

Madam Reporter, would you certify the question, please?

MR. FOSTER:  I didn't tell him not to answer the question.  What are you doing, Gary?

MR. DE PURY:  We are going to litigate this.  You are objecting to it, asked and answered.  We are already litigating these -- we're already going to be litigating for another reason that you're well aware of.

MR. FOSTER:  He can answer.  Wait.  He can answer the question.

MR. LAROSIERE:  We need the earlier question certified as well.

MR. FOSTER:  He can answer the question.

TYRA

I didn't tell him not to answer the question. I just pointed out that it was asked and answered.

MR. DE PURY:  All right.

MR. LAROSIERE:  Hold on.

Madam Reporter, can you make sure you certify that he didn't actually answer the question?

(Court reporter clarification.)

BY MR. DE PURY:

Q.   Sir, we're going to take a break from my direct line right now and we're going to go back to the other questions.

Was there ever a data breach that you did not speak of?  You spoke to the OPM data breach. Was there ever another data breach which affected you personally?

MR. FOSTER:  I object to that question.

MR. DE PURY:  Madam Reporter, please certify the question.

MR. FOSTER:  Hold on.  I'm not done.

MR. DE PURY:  You are done.

MR. FOSTER:  I think you are asking him about his personal life.

TYRA

MR. DE PURY:  We are only certifying the questions that you have gone well -- I am certifying the questions, Howard.

MR. FOSTER:  If you -- I don't have a problem or indication for Mr. Tyra.  You can answer that question.  I just wanted to note my objection on the record.

MR. DE PURY:  Do you want me to repeat the question again or no?

MR. FOSTER:  Sure.

MR. DE PURY:  Okay.

THE WITNESS:  Yes, please.

BY MR. DE PURY:

Q.   Previously you were asked about data breaches and if they've affected you.  You testified that the OPM data breach -- and for the record, OPM is Office and Personnel Management -- that the OPM data breach personally affected you.

Have you ever been affected by any other data breach?

MR. FOSTER:  I object to the form of the question but you can answer.

A.   Okay.  What I think I heard, did any other data breach affect me personally.

TYRA

Q.   Yes.

A.   Is that right?

Q.   Yes, other than the OPM data breach, which you have already spoken to.

A.   Okay, can you hear me.  It looks like everybody got kicked out and is coming back in.

Did any other data breach affect me personally; is that your question?

Q.   Yes, that was the question but I want to make sure that we are all here.

A.   Okay, I don't know.  I mean, like, if you're implying -- if the question is, like, did I have an intense emotional reaction to any other data breach, even the OPM thing, that affected like millions of people, so I mean, I don't think I have ever lost anything per se, you know, not directly. I can get my credit card replaced or whatever.  But in terms of intense personal effect, no.

Q.   Okay.  Now we go to the one that we really need to certify so the Court can review it:  Were you affected by the Ashley Madison data breach?

MR. FOSTER:  Okay.  Before you answer that, wait.  I am going to instruct you not to answer.

TYRA

MR. DE PURY:  Please certify the question.
Madam Reporter, please certify the question.

We don't need your explanation, Howard, because at this point it's coaching and I am going to instruct you as a fellow member of the bar to stop coaching this witness, and if you do it again --

MR. FOSTER:  Gary, you're always threatening me --

MR. DE PURY:  No, Howard, you're the one that threatens everyone when we get into a discussion constantly.

MR. FOSTER:  Gary.  Gary, calm down.
Doesn't his prior answer effectively answer your Ashley Madison --

MR. DE PURY:  No, it does not because we are trying to get to what you -- sir, I am going to continue this line of questioning.

Madam Reporter, were you able to get that question?  Thank you.

Sir, the next question, and this will be the last question I ask on this, unless Howard causes more, were you on the -- were you a subscriber to the Ashley Madison website?

TYRA

MR. FOSTER:  Absolutely I object and instruct you not to answer the question.

MR. DE PURY:  And again, Howard, he is your client.  He is the witness.

MR. FOSTER:  I know, and I instructing him to not answer it.  Even though he is not my client, that's the instruction.

MR. DE PURY:  All right.

Madam Reporter, would you please certify the question.

Howard, you went to a law school, a different law school, but I know on day one, effectively, don't ask questions you don't know the answer to, so...

BY MR. DE PURY:

Q.   All right, I am going to return back to the causation opinions, sir.

Now, you cannot -- we already asked this and I think we have kind of gone around some of this but you didn't personally survey any customers of this, correct?

MR. FOSTER:  Objection, asked and answered.

A.   That is correct.

TYRA

Q.   You didn't conduct any market testing; is that correct?

A.   That is correct.

Q.   And did you -- you didn't do anything to isolate the meme as a sole variable in the controlled analysis, correct?

By "control," I mean the before and after.

A.   That is not correct.  The report addresses several other.

Q.   Okay.

A.   Um, I do -- I'm not trying to be cagey here.  I am just trying to answer the question in the way that you asked.  So did I do anything -- did I isolate any other factor?  Is that your question?

Q.   Yes.  And to be fair, I know you have already testified to a lot of this but I am representing Mr. Holladay and my questions are going in a slightly different question.  So I am not trying to beat you down in any way, shape or form.  In fact, I apologize as a fellow soldier for what we just went through in the past few minutes.  I don't want to ask you those questions, but your -- Mr. Foster made it where we had to.

So that's my personal apology to you, sir.

TYRA

A.   No, I did not isolate any other factor.

Q.   All right.  So let's go to a different factor.

Your analysis brings us to the downturn of revenue based on the month the meme came out, correct?

MR. FOSTER:  Objection, asked and answered.

Q.   Please answer the question.

A.   A downturn of --

Q.   The reduction of revenue?

A.   Downturn of revenue.

Q.   Yes, the reduction of revenue, it's basically you're attributing it to the month or the meme, and it starts the month the meme came out, correct?

A.   Yes.

Q.   All right.

In your, for lack of a better term, damages, but again, that's just the encompassing term for lack of revenue or the reduction of revenue, your damages period begins around mid-2023, correct?

A.   Yes.

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

MR. FOSTER:  Gary, excuse me one second. Can we take a break?

MR. DE PURY:  No.

BY MR. DE PURY:

Q.   You would agree that reputation can impact consumer behavior, correct?

A.   Yes.

Q.   Now, are you aware of Mr. Wilson's 2018 charge for sexual assault of a minor?

MR. FOSTER:  Objection, asked and answered.

Q.   You can answer it.

A.   I am aware of, yes.

Q.   All right, and you're aware that he finished his probation and that all ended prior to this issue, correct?

A.   I don't -- I don't have any personal knowledge of that, like, you know.

I am aware that he was arrested.  I don't know what happened after that.

Q.   Okay.  Were you aware that Mr. Wilson participated in a fairly popular documentary?

A.   In a popular -- no, I was not.

Q.   All right.  So would it be shocking to you

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

TYRA

to find out that Mr. Wilson was a participant in a documentary and that documentary was published in March 2023?

A.   It's a funny way to ask.  I mean, would I be shocked?  No.

Q.   Well, would you think that a documentary about Mr. Wilson and his trials and tribulations, his arrest for sexual assault of a minor, would -- if that was published, would that play into your analysis?

It was published at the exact same time as the downturn occurred.  Would that play into your analysis?

A.   Potentially, yes.

Q.   Potentially?

A.   Meaning the meme does identify Cody Wilson as a person with a criminal record.  It says that in the meme, so I mean, I don't know --

Q.   We have already gone over that -- go ahead.

A.   With this -- you're asking me, something I worked for weeks on, would something you just told me about affect it?  I don't know.  Perhaps.  How could I say "no."

TYRA

Q.   Well, I mean, but you didn't check, did you?

A.   Check on what?  To see if there was a documentary about Cody Wilson available?

Q.   To see anything.  In fact, your testimony today has been effectively that you didn't check anything, correct?

A.   I didn't testify that I checked nothing. I said -- I think my answer has been pretty clear as to what I checked.

Q.   Well, your answers have been very clear that you attributed 100 percent of the economic or the revenue downturn to the meme, correct?

A.   Yes.

Q.   Okay.

And so the movie "Death Athletic," you've never heard of that?

A.   I have not.

Q.   Now, we have already established the fact that Mr. Wilson, and not just in your deposition today but in every deposition that Mr. Wilson continues to publish this meme on his own website, you're saying you were not aware of that, correct?

MR. FOSTER:  Objection.

JASON MATHIEU TYRA, ESQ.                                        JOB NO. 2667670
APRIL 28, 2026

TYRA

Q.   You can go ahead and answer.

A.   So I said two things.  I did cite in my report that that appears on a Google image search and I forgot that I wrote that and it came up.  And after Mr. Larosiere refreshed my memory, that is correct.  I did testify that, as a matter of fact, as of the date that I checked, it would appear on his own website.

Q.   Okay.  But you don't attribute that he is publishing the meme that he thinks is so damaging in your report, do you?

A.   I don't understand the question.  Do I -- do I cite -- do I attribute any of the damages -- okay, go ahead.

Q.   Let me withdraw it.

You've been doing Mr. Wilson's taxes for quite some time, correct?  A few years?

A.   Yes, for a few years, yes.

Q.   So you're intimately knowledgeable of his expenses?

A.   No.

Q.   You're not knowledgeable of his expenses?

A.   I am knowledgeable of the information that I apply to the tax return, which is taken from the

TYRA

P&L statements that were prepared by another party.

Q.   Does Mr. Wilson have a store front?

A.   I don't know.

Q.   I mean, it's largely just an Internet business, correct?

A.   I don't have any personal -- I mean, I assume so.  I don't know.

Q.   Okay.  So is it fair to assume that by publishing this meme on effectively the front door of his storefront, which is the website, that he's not that worried about this meme?

MR. FOSTER:  Objection to the form of the question.

Q.   Go ahead and answer.

A.   I don't think that's fair because -- I would like to know the context.  I think that I -- go ahead.

Q.   Let me give you an analogy.  You're an attorney and an accountant, correct?

A.   Yes.

Q.   Would you have one of the local artists come over and paint "I failed math" on the front of your store, in front of your office?

MR. FOSTER:  Objection, calls for

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

speculation.

Q.   It doesn't call for speculation.  Is it a business decision what you would make that you would have somebody do that.  I didn't ask to speculate at to whether that would be good for the business.  So please answer the question.

A.   Well, if I were using it as some form of an advertising gimmick, yeah, I might write that.  But if I said "I failed math, so I can't properly calculate" -- like if I was an ambulance chaser and I said "I failed math, so maximum claim of damages in a lawsuit go back to the client," yeah, I might write something like that.

Q.   Okay.  So in your hypothetical, if you put "I failed math," and therefore I'm not going to bill you and you'll greatly benefit from my fantastic work, and we can add to the hypothetical.

Sir, the question was, if you put the words "I failed math" on your office door, do you think that would -- is that something you would do, with nothing else, just "I failed math"?

MR. FOSTER:  Object to that.  I object to the form of the question.  Okay?  I will leave it at that.

TYRA

MR. DE PURY:  All right.  Your objection is noted.

Q.  Please answer the question.

A.  I think that would be confusing to a potential client.

Q.  Okay.

A.  I think that's all it is.  Do I think that would cost me sales?  No, I don't.

Q.  Okay.  So, by the same token, Mr. Wilson is actively participating in his own demise, according to him, by placing this meme on his front door.  And again, by "front door," the analogue is, this is an Internet business and it's on its landing page, is it not?

MR. FOSTER:  Objection to the form of the question.

MR. DE PURY:  Thank you.  Your objection is noted.

Q.  Please answer.

A.  I don't believe that is what Mr. Larosiere showed me.  I don't think that is the landing page for the website.  I think that that is something maybe having to do with the way it was built, but there was a link to a lawsuit filed there.  What I

TYRA

think that is part of something that addresses the meme.

Q.   Okay.  But you would agree he is still publishing it, correct?

A.   It appeared to be available on that website as of the date that I checked, yes.

Q.   All right.  Now, Mr. Wilson owns multiple businesses, correct?

MR. FOSTER:  Object to the form of the question.

A.   Yes.

Q.   Okay.  I'm sorry, the answer was?

A.   To my knowledge, yes.

Q.   Okay.  Did you do any cross-link analysis to -- let me back that up.  I'm sorry.  I'm going to start again.

You testified earlier that you are his tax preparer but not his bookkeeper, correct?

A.   That is correct.

Q.   And you also testified to the fact that the information you generated or you used to generate your report was what was provided by Mr. Wilson, correct?

A.   It was provided by Mr. Wilson, yes.

TYRA

Q.   Did you at any time interview any of his bookkeepers?

A.   No.

Q.   Okay.  Why not?

A.   I wasn't engaged to attest as to the accuracy and completeness of the data.  I was engaged to weigh in on the economic impact of the meme within the context of that data.

Q.   But your signature is on it, right?

A.   Yes.

Q.   And as an expert witness, doesn't that mean that you are guaranteeing at least some credibility of your report?

MR. FOSTER:  Objection to the form of the question.

MR. DE PURY:  Your objection is noted.

Q.   Please answer the question, sir.

A.   I think that question probably means something different to me than it does to you because, as a certified public accountant, I can be engaged to attest as to, you know, the quality or accuracy or completeness of data.

This wasn't that kind of engagement.  I think I said in the introductory paragraph the

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

TYRA

standards under which I wrote my report.

And I also state in the report that the data were provided by the client.  So I don't attempt to weigh in on the accuracy or completeness.  I'm not -- yes, my signature is on it.  I am not attesting to anything about the data itself.

Q.   But you're going to come into court and testify as to the data, correct?

A.   I'm going to testify that -- I will testify that my client provided me with that data, yes.

Q.   Okay.  And you're going to now have to testify that you did nothing to verify the accuracy of that data, correct?

A.   Yes, and I'm comfortable doing that.

Q.   Okay.  Now I'm going to ask the other question.

So to your understanding, Mr. Wilson, for the southern term, he has his hands in a bunch of different pots, right?  So he owns several businesses, correct?

A.   To my knowledge, that is correct.

Q.   All right.  And did you do anything, any cost data analysis to see if revenue in one area had

TYRA

an uptick at the same time the revenue in another area had a downtick?

A.   I did not.

Q.   All right.  So you have no way of being able to testify as to whether or not Mr. Wilson was running two sets of books; is that a fair statement?

A.   Yes, that is a fair statement.

Q.   All right.  You're being paid for your time in this matter, right?

A.   I hope so.

Q.   What does that mean, you hope so?

A.   I'm sorry, yes, I am being paid.

Q.   Okay.  And the compensation is based on hours worked?

A.   Yes.

Q.   Is it in any way attributed to outcome?

A.   No.

Q.   Now, you relied on information provided by your client; you testified to that.  You didn't independently verify the information; you've also testified to that.  Am I misstating anything?

A.   No.  That's correct.

Q.   So your conclusions depend on the accuracy of what you were provided but not by anything -- any

TYRA

actual independent reports; is that correct?

A.   That is correct.

Q.   And so if the underlying information is inaccurate or, worst case, falsified, your conclusions would also be affected, correct?

A.   I would need to see -- I mean, in this scenario, I would need to see the correct data, so potentially, yes.

Q.   Right, but isn't that something you should have tried to do before testifying today?

A.   No.

MR. FOSTER:  Objection to the form of the question.

Q.   I'm sorry, was your answer "no"?

A.   My answer was no, yes.

Q.   Okay.

Now, looking at your CV, I think you said that you haven't testified in multiple -- in several years in this, as part of the report.

When is the last time you were an expert witness?

A.   In a litigation matter that made it all the way to a deposition, never.

Q.   Okay.

TYRA

Now, would you consider that your credibility is -- well, I mean, your credibility is on the line any time you testify; is that a fair statement?

MR. FOSTER:  Object to the form of the question.

Q.  I will rephrase the question.

A.  Go ahead.

Q.  Would you consider that any witness, the judge or the trier of facts is going to rely on the credibility?

MR. FOSTER:  Objection to the form of the question.

MR. DE PURY:  What's your objection to the form of the question, Howard.  I want to know this one.

Usually I don't want speaking objections but I want to understand why you think that credibility is not a factor in a court of law.

MR. FOSTER:  Calls for speculation.

MR. DE PURY:  Okay.

BY MR. DE PURY:

Q.  Sir, when is the last time you testified in anything?

JASON MATHIEU TYRA, ESQ.                                JOB NO. 2667670
APRIL 28, 2026

                             TYRA

    A.   Testified in anything?

    Q.   Yes.

         MR. FOSTER:  I object to that question.

    Q.   Just give me a year, a day, a week.  Have

you ever had a traffic accident, a traffic ticket?

    A.   Yes.

         MR. FOSTER:  Wait, how is that --

    Q.   You had a traffic ticket.  So you,

testified, correct?

         MR. FOSTER:  You're asking a traffic

    ticket.

         MR. DE PURY:  Howard, since you're

    objecting to everything, I am trying to boil

    this down to a second-grade level so you'll

    stop objecting.

BY MR. DE PURY:

    Q.   So Mr. Tyra, have you ever given sworn --

         MR. FOSTER:  No --

         MR. DE PURY:  Howard --

         MR. FOSTER:  I'm not going to let you

    speak over me, Gary.  You're going to have to

    stop.

         You can't ask him personal questions that

    have not --

TYRA

MR. DE PURY:  It's not a personal question, Howard.  I am trying to get to an analogue.

MR. FOSTER:  Has he had a parking ticket? A parking ticket is totally unrelated to this.

MR. DE PURY:  Howard, if you would let me finish --

(Recurring cross-talk.  A break was taken at court reporter's request.)

THE VIDEOGRAPHER:  We are now off the record.  The time is 3:04 p.m. Eastern Time.

(A break was taken.)

THE VIDEOGRAPHER:  We are now on the record.  The time is 3:14 p.m. Eastern Time.

BY MR. DE PURY:

Q.   Thank you very much.

So what I was getting at with those earlier questions, which, I will try and simplify that a little bit, what I am getting at is, have you ever been placed under oath and testified under oath before?

A.   Yes.

Q.   All right.  And it doesn't matter what.  I don't want to know about lawsuits or anything else.

                            TYRA

That's all I was getting at.

          So you would agree that credibility is
important, correct?

     A.   Yes.

     Q.   I think you would also agree that you're a
little bit of a hybrid because you are
multi-licensed between the -- your an Army officer
with a TS, you have a law degree or you're a
practicing attorney and a practicing accountant.  So
it's -- your credibility would be scrutinized less
than some other folks; would that be a fair
assumption, without speculating?

     A.   To be clear, I have a secret clearance,
not a TS clearance.

     Q.   Oh, I'm sorry.  Okay.  I don't want to get
into your military career.  Maybe we will talk about
that offline sometimes -- someday, have a beer or
five, and Howard will buy us martinis.

          MR. FOSTER:  I will buy you guys martinis.

     Q.   So when you use things like the word
"alleged" in a document, that's reflecting your
limitation of the knowledge of background or that's
just -- you're putting "alleged" in there as kind of
a stop-gap, correct?  Is that clear?  Is my question

TYRA

clear?

A.   Yes.

Q.   Okay.  Is that the yes to my question is clear or yes to the actual question?

A.   Yes to both.  It's clear and --

Q.   Okay, thank you.

All right, and so when you later omitted that qualifier, doesn't that suggest a higher level of certainty?

A.   In the cause -- do you mean, like -- to the extent that that report speculates as to who created the meme, that wasn't what I was engaged to do.  So, you know, I don't consider myself to be qualified to make any factual statements or factual claims as to who created it or who propagated.  I think I wrote it that way because it was necessary to make it make sense.  Perhaps I should have written "The person who created the meme," but, you know, I was not -- it was not my intent to claim factually that your clients did this thing.

Q.   Okay.  And in fact, my client -- the defendants didn't create this meme -- well, I think -- well, I don't know, but I know that my client didn't create this meme.

JASON MATHIEU TYRA, ESQ.                                JOB NO. 2667670
APRIL 28, 2026

TYRA

So now, let's go to this:  When you wrote this report, you based it totally on the information provided by Mr. Wilson.  Is that -- am I getting your earlier testimony correct?

A.   Yes.

MR. FOSTER:  It's been asked and answered like eight times, but okay.

MR. DE PURY:  It's a precursor to a follow-up question.

MR. FOSTER:  All right, all right.

BY MR. DE PURY:

Q.   Now you have been provided additional information that -- well, does it change your thought process to now find out that there is other information that Dr. Wilson did not provide you?

A.   No.

Q.   Okay.  So the fact he didn't tell you that he helped and started a documentary, that didn't change your thought process?

I'm not asking if it changes your analysis, your overall analysis.  I am asking if it changes your thought process.  And what I mean by that --  I will clarify this and then I will go back to the question.

TYRA

What I mean by that is, had you been aware of these additional facts, would you then have gone back to Mr. Wilson and said, Hey, I want more information.  That's what I mean by "thought process."

So the question would be, the fact that you're now aware that he was in a documentary, does that change your thought process?

A.   With respect to the documentary specifically?  You're asking me about stuff I didn't know about and have never --

MR. FOSTER:  That calls for speculation. I just want to get it, Gary.  I think it calls for speculation.  You can answer, all right?

A.   I think my broad, general answer is yes, I am willing to consider other things.  As to whether any of those individual other things would have changed the conclusion, I can't tell you just off the cuff, but yeah, it's possible it could have.

Q.   Okay.  So the -- here I'm going to applaud with the military term -- I don't want blow wind up your skirt, right?  I'm not doing that, but you're highly-educated.  You said you have an MBA, correct, plus your law degree, plus your accounting degree,

TYRA

plus you're a lieutenant colonel in the Army; is that correct?

A.   Yes.

Q.   So that would at least lead people to believe that you're very thorough in all of your endeavors, correct?

A.   Very thorough.  I think it's reasonable that people would conclude that, yes.

Q.   Okay.  So is it reasonable to conclude, then, that had you been aware of these other factors which you've become aware of today, that you would have gone back to Mr. Wilson and said, Hey, tell me more about this so I can put it in the report?

A.   Yeah, I mean -- yes.

Q.   Okay.  Thank you.

Now, you've been doing Mr. Wilson's taxes for -- I asked this question a few minutes ago.  I just want to clarify that.  You said you've been doing his taxes for several years, correct?

A.   Yes.

Q.   And you attribute that if there is a sudden drop and increase about the time of the DEFCAD meme -- and whether we say -- this was clarified in other depositions:  When we say the

JASON MATHIEU TYRA, ESQ.                                         JOB NO. 2667670
APRIL 28, 2026

TYRA

word "meme" or we say the words "DEFCAD meme," we are only speaking to that one meme that was pointed out to you today.

So you are attributing in your report the loss of revenue to about the time of the DEFCAD meme; is that correct?

A.   Yes.

Q.   All right.  Now, in the taxes, I believe in and it's here in the report, you state that it dropped from 6.8 million.  Do you recall what you put in your report?

A.   Not off the cuff, no.

Q.   All right.  Matt, is that what you're trying to pull up now?

Okay, here we go.  Can you read what Matt has highlighted?

A.   "I noted a dramatic decrease in sales from 2022, gross sales of $6,482,548, to 2023, gross sales of $3,851,463, based on the tax filings of Defense Distributed.  These figures include the Ghost Gunner and related ancillaries, DEFCAD subscription revenue and other income recorded by Defense Distributed group of companies."

Q.   Okay.  Now, we've already -- you've

TYRA

already testified to the fact that you didn't do a

cross-analysis to see if there was any shifting

between companies.  That was your testimony just

about 30 minutes ago, correct?

          MR. FOSTER:  Objection, you are misstating

     his testimony.

     Q.   Wait, he said he didn't do a cost analysis

to see if revenue went up in one, if there was an

uptick in one and a downtick in another?

     A.   That is correct.

     Q.   Okay.  Now also, this, in your report, and

you have stated you stand by this report, that there

is a dramatic decrease in sales from 2022, gross

sales of $6,482,548 to a downturn of $3,851,463

based on the tax filings, but did you list any other

tax returns where there was -- were there ever a tax

return of $6 million, give or take, in filings

before?

     A.   I don't know that I can give the answer.

Certainly I can't answer with respect to any returns

I didn't prepare.  I only looked at the ones that I

prepared because those would be the ones that I had

on hand and limited that to the years at issue.

     Q.   Okay.  So would you have been --

TYRA

A.   I don't know 2019.  I don't know whether I did that one or not but I don't discuss that year, so I wouldn't have looked at that year.

Q.   Wouldn't it be important for the analysis to be able to tell the Court, my client's doing $6 million, $5,790,000, $6 million, $6,390,000 -- wouldn't it be important for you to be able to tell -- your credibility is on the line, to go in and testify to the Court, here is his track record and here is where it took a downturn?

A.   No.  I am happy with what I did.

Q.   Okay.  So you -- so it's not important to the Court to be able to show actual, real numbers?

MR. FOSTER:  Object to the form of the question.

MR. DE PURY:  Your objection is noted.

Q.   Please answer.

A.   I did use real numbers.  I used actual sales data of DEFCAD's single product over I think it's about an 18-month period before to about 18-month period afterward.

Now, you can disagree with the scope and the methodology and certainly we can have that conversation, but do I believe that that methodology

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

is flawed in comparison with another methodology

given the data allowed me?  No, I am satisfied with

what I did.

Q.   Okay.  But you're not the trier of fact,

right?

A.   No, I'm not.

Q.   All right.  So ultimately it's whether or

not the Court is satisfied?

A.   True, and I don't have any control over

that.

(Defendants' Exhibit 14, Defense

Distributed 2021 tax return, was marked for

identification as of this date.)

Q.   Well, you do, though, because you could

have provided prior years.  So we are looking at it

now, prior year, gross receipts just over 5 million

and just over 4 million in 2021 and 2020.

A.   Okay.

Q.   So how do you account for this sudden --

what did you say -- rapid or dramatic decrease,

that's your term, dramatic decrease in revenue?

A.   Well, this company had a lot going on.

You said how do I account for the sudden rapid

decrease in revenue?  Is that your question?

TYRA

Q.   No, I'm sorry, that was a bad question, bad form of a question.

If the 2020 numbers are $4,370,000 and some change, and 2021, $4,923,000 and some change, then you're stating that the 2022 is $6 million and then back to 2023 is back to 3 and some change, isn't -- aren't we going to then say that 2023 is an outlier, just like you said certain months were outliers earlier?

A.   No.

Q.   Okay.  And why are you saying "no"?

A.   An outlier in the context of what? Because, okay, so I dropped 2 months over an 18-month period before and after, so that's 2 out of 18.  You are talking about 1 out of 5.

Is 1 out of 5 an outlier?  I don't know that that's statistically proper to make that conclusion out of a sample size of the file.

Q.   Okay.  But you're pointing out that that is the pattern when it's clearly an outlier.  It's the highest out of -- you are literally comparing the highest to the lowest in the entire track record?

A.   True.

JASON MATHIEU TYRA, ESQ.                                        JOB NO. 2667670
APRIL 28, 2026

TYRA

Q.   Okay, thank you.

A.   But are you also breaking out --

Q.   And we already discussed that -- I am going to re-ask the question in a little bit different way, Howard will object, I'm sure, but it's a precursor.

If expenses were shifted between entities -- you already testified that you don't know if they were or not.  If expenses were shifted between entities, that could affect the reported trends; is that a fair statement?

MR. FOSTER:  Asked and answered, but answer.

A.   No, I don't think that's fair because your question if expenses were shifted --

Q.   No.  Oh, I'm sorry, you're right.  I meant to say if revenue was shifted.

A.   If -- okay.  So the -- I don't know, because like the data were provided, it was represented to me that the data provided to me represented sales of DEFCAD's subscriptions.

Q.   So you have no reason to --

A.   So if, you know, it wasn't DEFCAD's -- only from one of the family of companies.

TYRA

Q.   Okay.  You have no reason to distrust Mr. Wilson, right?

A.   That is correct.  I have no reason to distrust him.

Q.   Yet you provided one copy of the report and four were sent over to us; is that correct?

A.   So you say.  I don't have any personal knowledge of that.

Q.   Right.  But, I mean, if it were true, if we had four -- well, you saw three other ones than the one you provided today, right?

MR. FOSTER:  Objection, misstating the testimony.

A.   You showed me four different versions of a document and I think I testified previously that I did not modify that document and at least one version contained modifications, so -- and I also provided you with the document that I prepared.  So as far as I'm concerned, there is a single version.

MR. FOSTER:  It is now 3:30.  Everybody, we said we were going to stop.

MR. DE PURY:  We said at 3:45.

MR. FOSTER:  I'm sorry, all right.  Keep going.

TYRA

BY MR. DE PURY:

Q.   So that was my question, though.  We are all in agreement now, we are all working off of the one 23-page document, but the question was -- the initial question was, you have no reason to distrust Mr. Wilson and you said that's correct.  So the follow-up question to that was you provided one copy of a report and then three additional copies were somehow transmitted, and you don't know who did that; is that correct?

A.   That is correct.

Q.   All right.  So if nothing else, something -- there's been some shenanigan somewhere.  Would that be -- I mean, they're not -- you didn't provide four different copies of your singular report, right?

A.   I did not provide four different copies, that's correct.

Q.   All right.  But that doesn't give you any reason to distrust Mr. Wilson?

A.   No, and I'll tell you why -- you want me to follow it up?

Q.   All right.  And I'll wrap it up here really quickly.

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

There was a -- well, you're well aware it was quite difficult to get you to the deposition. The very last part of that had to do with Gunsite and your military service, but prior to that there was quite a bit of difficulty. Did you take any part of that?

MR. FOSTER:  Objection to the form of the question.

A.   No.

Q.   All right.  So are there any e-mails between you and Mr. Foster which indicate that you don't want to testify?

MR. FOSTER:  Object.  All e-mails between him and me are privileged as work product.

MR. DE PURY:  Right.

MR. FOSTER:  You can't answer.

MR. DE PURY:  Madam Reporter, please certify that question.

MR. FOSTER:  Unless -- the rule is unless it's about his assumptions that go to his report, his fee or data that we provided for his report.

BY MR. DE PURY:

Q.   So I'm going to ask one follow-up question

JASON MATHIEU TYRA, ESQ.                                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

and you will give the same objection, I am aware of that, are there any text messages -- I'll just ask: Are there any e-mails, text messages or any other written communications between you and Mr. Foster with regard to you not wanting to testify or be deposed?

MR. FOSTER:  Same objection.  Don't answer.

MR. DE PURY:  Madam Reporter, please certify that question.

MR. FOSTER:  Okay.

MR. DE PURY:  All right.  There's a bunch more which are redundant which you already answered.  I think that pretty much wraps it up for me.

It's 3:32.  Does anybody object to going on a break now and having Mr. Zermay come in?

MR. FOSTER:  Let's do that.

MR. LAROSIERE:  Let's find thought if Zermay wants to do it at all.

MR. DE PURY:  Yes, that might be valid. Zach, are you listening still?

MR. ZERMAY:  Yes.  No, I don't have any questions.  We will go for hour when we come

TYRA

back.

MR. FOSTER:  Mercifully.  Thank you,
Zachary.

All right.  Can we resume at 4:00, okay?

MR. LAROSIERE:  Sure.

MR. FOSTER:  And I won't be long.

MR. DE PURY:  That works for me.

THE VIDEOGRAPHER:  We are now off the
record and the time is 3:33 p.m. Eastern Time.

(A break was taken.)

THE VIDEOGRAPHER:  We are now on the
record.  The time is 4:02 p.m. Eastern Time.

MR. DE PURY:  All right, thank you very
much.

BY MR. DE PURY:

Q.   All right, Mr. Tyra, thank you.  You do
recall that you are still under oath; is that
correct?

A.   Yes.

Q.   All right.  Sir, we were originally or
previously having a discussion and some questions
and a lot of objections, and so I'm going to try and
ask those questions in substantially the same form.

You were asked previously by Mr. Larosiere

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

whether or not you have ever been affected by a data

breach.  Do you recall that question?

A.    Yes.

Q.    And your response at that time was "yes,

by an OPM" -- or again, for the record, Office of

Personnel Management -- "data breach," and you

didn't elaborate into any other data breaches; is

that correct?

A.    Yes.

Q.    And then subsequent to that, there was a

follow-up question about an Ashley Madison data

breach and you were asked if you were affected by

that data breach; is that correct?

A.    I believe that was the question, yes.

Q.    Okay.  And your answer was substantially

that you don't know because you don't have access to

the records from that data breach; is that correct?

A.    No.  I believe I said I have never

attempted to ascertain whether I was part of the

records.  This is something that occurred 11 years

ago, so...

Q.    Okay.

A.    The question is, did it affect me?  No, it

did not.

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

TYRA

Q.   Okay.  So then the follow-up questions,
then, were were you a subscriber to Ashley Madison?

A.   I don't recall.  Again, this would have
been -- this is quite a long time ago.

Q.   All right.  Is intrepidpro1@gmail.com your
e-mail address or a prior e-mail address?

MR. FOSTER:  Well, I object to that.  He
is not required to answer that question.

Q.   So is the e-mail intrepidpro1@gmail.com a
current or former e-mail address of your?

MR. FOSTER:  Objection.

MR. DE PURY:  Your objection is noted.

Q.   Please answer.

A.   No.  My e-mail address is the same one I
just used, jason.m.tyra@gmail.com.

Q.   Okay.  Is that the e-mail address you used
on Ashley Madison?

MR. FOSTER:  Wait a minute.  He didn't say
that he was on Ashley Madison.

MR. DE PURY:  Are you answering the
question for him, Mr. Foster?

MR. FOSTER:  I am objection.  He didn't
say he was -- did you ask him if he was on
Ashley Madison?

TYRA

MR. DE PURY:  I am asking him if the e-mail intrepidpro1@gmail.com is his e-mail or was his e-mail.  He said, no, my current e-mail is this, so I am asking -- I am responding to his response.

BY MR. DE PURY:

Q.   So Mr. Tyra, I will ask again, is the e-mail address intrepidpro1@gmail.com a current or former e-mail address of yours?

MR. FOSTER:  He answered it.  Asked and answered.

Q.   I didn't hear the answer.  Would you repeat it, Mr. Tyra?

Is someone texting you right now?

A.   Yes, yes, no.

Q.   You said yes or no?  Is someone texting you right now?

A.   I'm sorry, I didn't catch your question.

Is someone texting me?  Is that your question?

Q.   Yes.

A.   No, no one is texting me.

Q.   Okay.

No one is communicating to you via e-mail?

TYRA

No one is feeding answers to you right now?

A.   No.

Q.   So I will ask this again:  Is the e-mail intrepidpro1@gmail.com a current or former e-mail address?

A.   I don't recall that having been an e-mail address that I have ever used.  I have used the same e-mail address since, like, 2008.

Q.   And you formerly testified that you did live at 4305 Neta, N-E-T-A, Drive, Killeen, Texas?

MR. FOSTER:  I object to that question. We want to make that answer confidential so it cannot be filed in court or anywhere else.  We are allowed to do that.

A.   That is a property that I own and I lived there -- that was my permanent address in 2007 -- 2007 to 2009, I believe.

Q.   So about the same time as the 11-year-ago incident?

Did you understand my question?

A.   I'm sorry, I didn't even hear your question.  Did you say about the same time as what?

Q.   The 11-year-ago incident, the Ashley Madison breach?

TYRA

A.   No.  So 2008 and 2015 were not close to each other.  Those were not about the same time.

Q.   Okay.  If it's been 11 years since the data leak and you're not aware of the impact on you, is it possible that you do not know if DEFCAD customers experienced the same thing?  In other words --

A.   I don't even understand what you are asking.  Is it possible -- go ahead.

Q.   Is it possible that DEFCAD customers would not be aware of a data leak with DEFCAD?

A.   Yes, that is possible.

Q.   Okay.

A.   I mean, how can I say "no" to that.  Of course it's possible that your data would get leaked and you wouldn't know.

Q.   Well, is it likely, based on your own experience?

A.   Yes, I would say that's likely, yes.

Q.   Okay.  Did you discuss this with Mr. Foster during the break, this line of questioning?

A.   Yes, I did.

Q.   Okay.

A.   Yes.

TYRA

Q.   But it's your testimony that you do not recall if you were a subscriber to Ashley Madison?

MR. FOSTER:  Objection, asked and answered.

MR. DE PURY:  I am just following up. We've got a couple of different answers.

MR. FOSTER:  He's already answered.

A.   Yes, that is my testimony, that I don't recall whether I was a subscriber at that website. That's quite a while.  I can't recall every website I ever subscribed to.

Q.   That's a pretty important website, correct?

A.   I guess it would depend on who you ask. It obviously wasn't very important to me.

MR. FOSTER:  That's your answer.  Gary, are you done with this line of questioning?

MR. DE PURY:  No.  You said we can ask the questions, so now I am delving into it a little bit.

BY MR. DE PURY:

Q.   Would it help if I give you your account number for back then?

MR. FOSTER:  Sounds like you're accusing

TYRA

him.

Q.   A user ID number, would that help?

A.   I don't know.  Would I -- I can't even tell you my bank account number, I don't know.

Q.   I don't want you to tell me your bank account number.

A.   Well, I mean, you know, again, at a minimum you are asking me about activity that occurred over 10 years ago and I think your initial question was did it affect me, and no, it did not affect me in any meaningful way.  It did not have any impact on my personal life or anything else, the presence or absence in that data leak.

Q.   Okay.  During the break Mr. Foster said that you guys did speak about this.  Did you discuss with him how to answer these questions?

MR. FOSTER:  I didn't say anything, Gary.

MR. DE PURY:  You certainly did.  You came right back and said --

MR. FOSTER:  Yes, you're right, you're right.  We did speak about this and I said that.

MR. DE PURY:  Okay.

BY MR. DE PURY:

TYRA

Q.   So my question is -- Mr. Foster indicated that you guys did speak about this.  Did he instruct you how to answer or did you discuss with him how to answer these questions?

A.   No.  And I said Mr. Foster didn't say that.  I said that.  You asked me if I spoke about this with Mr. Foster during the break and I said yes.  He did not instruct me to answer in any particular way.

MR. DE PURY:  Well, for the record, when we came back, before we went on the record, Mr. Foster stated "I have good news for you, Gary and Matt.  I have good news.  During the break I spoke to Mr. Tyra and he is willing to answer the questions about Ashley Madison."

So again, that was not on the record so I am now basically putting it on the record.

Howard, do you disagree that that is what occurred?

MR. FOSTER:  That is correct.  He agreed to answer questions about Ashley Madison.

MR. DE PURY:  Okay.  All right.  That's all I have.

MR. FOSTER:  Okay, very good.

TYRA

Now I'd like to go on the record and say this:  I am going to ask the witness a few questions.

CROSS-EXAMINATION BY MR. FOSTER:

Q.   Mr. Tyra, did you prepare more than one version of your expert report?

A.   I had multiple working copies.  I believe the version that was final, that I signed, is version 3.

Q.   Okay.  Is it possible that you sent prior versions to Cody Wilson?

A.   It's possible.  Cody Wilson is my client with respect to this engagement.

Q.   Okay.  If you did, were they signed by you?

A.   No.  I didn't even -- no.  And the reason -- I only signed one.  I didn't even know that I needed to sign it until you asked me to, after I submitted the final version.

MR. FOSTER:  Okay.  I will represent to opposing counsel here that apparently this is -- what Mr. Tyra testified to occurred.  There were prior -- a couple of prior versions of his report were sent to Cody Wilson and/or to me,

TYRA

and they inadvertently were disclosed to you, and my co-counsel, Brandon Heffernan, has requested in writing that you all return them pursuant to federal rules, which require you to do so.  The only version that you are to use is the one that was signed.

MR. DE PURY:  Howard, my understanding of the rules is that goes if there were drafts that you inadvertently sent over, however, we have testimony from the witness today, which has now changed after your discussion during the break, that there possibly were other iterations of this sent over to Mr. Wilson.

So that's greatly concerning to me because you had a break.  We already know that you discussed the other issue, so now this is certainly suspect, and we also know that some of these things were edited, and the witness testified earlier that he's only ever seen the one.  He didn't point these things out.  He never said he'd never edited those, he never did this, so somebody has edited his work, which brings up my question of --

MR. FOSTER:  No, no.  Gary, you can ask

JASON MATHIEU TYRA, ESQ.                                          JOB NO. 2667670
APRIL 28, 2026

TYRA

him questions about that.  Nobody edited his
work after.

MR. DE PURY:  I have asked him the
questionless earlier.

MR. FOSTER:  Everybody can go on and you
can ask him this.  My understanding is -- I'm
speaking now and you're going to let me finish.

MR. DE PURY:  You were interrupting me,
but okay.

MR. FOSTER:  He has revised his work, as
people do in different versions, but only one
version was signed.

That's what my understanding is.  You are
free to ask him questions about that all you
want.

MR. LAROSIERE:  Are you done with your set
of questions?

MR. FOSTER:  Yes, I am.

MR. LAROSIERE:  I am just going to ask one
follow-up.  Actually, there is going to be more
than one, I'm sorry.

REDIRECT EXAMINATION BY MR. LAROSIERE:

Q.   Mr. Tyra, are you aware of the date your
report was due on the scheduling order?

TYRA

A.    I am not.

Q.    Okay, that's fine.

This is the version of the report you are now saying is the sole, final controlling one; is that correct?  Exhibit 8?

A.    Is it signed?

Q.    I'm scrolling.

It has your signature?

A.    Yes.

Q.    What is the date?  What is the date of this document?

A.     It says February 20th, 2020 -- it says February 20th of 2026.

Q.    Okay.  And is this an Adobe signed signature here?

A.    Yes.

Q.    And what is the date of this Adobe signed signature?

A.     It's a facsimile of my actual signature. February 20, 2026.

Q.    Okay.

Do you recall your testimony earlier where we discussed that in your report you had included that the meme may have caused a pop in sales?

TYRA

A.   Sorry, you cut out.  Say again.

Q.   Do you recall your testimony earlier, which was hours ago, that your report included a discussion that the meme may have caused a pop in sales?

A.   Yes.

Q.   Okay.  And we agreed that you had that in your report, right?

You're taking a while to answer.

A.   It was in a version of the report, yes.

Q.   Okay.  I don't see it in this one that you have e-mailed to me.

A.   Is that a question?

Q.   It's not.

A.   Or what?

Q.   Did Mr. Wilson tell you to remove that statement?

A.   No, he did not.

Q.   Okay.  Yeah, I understand you are changing your testimony after your conversation with Mr. Howard Foster.

MR. FOSTER:  No, no, no.  He is not changing his testimony.

MR. LAROSIERE:  Howard, you are not being

TYRA

deposed.  We are probably going to have you in the future --

MR. FOSTER:  And if you try and use the earlier versions after our clawback letter, you'll face the judge.

MR. LAROSIERE:  Are you now threatening me that despite the testimony that there's only one version --

MR. FOSTER:  There's only one version that you can use.

MR. LAROSIERE:  So you're now threatening. Despite all of the earlier testimony --

MR. FOSTER:  Okay.  Did you receive our e-mail from Brandon.

MR. LAROSIERE:  I did not.

MR. FOSTER:  You didn't receive it?

MR. LAROSIERE:  Yes, and you're trying to pollute the record with this?  We have hours of testimony from Mr. Tyra.

MR. FOSTER:  Okay.  Did you receive Brandon's e-mail.

MR. DE PURY:  I received it and responded to it that your client -- I mean, I'm sorry, that the witness has testified earlier that he

TYRA

only ever provided one copy.

Now the problem that you're having, Howard, is the witness is on the record for a couple of hours, looking at the exhibits and saying, I did not redact anything on any of these I sent.  So the question we're going to have before the Court is, which one of you guys or your client redacted something that was then sent to us.  Since the expert didn't do it and he has testified he didn't do it, therefore, it can't possibly be the draft, therefore the rule would not apply, what we are going to have to get into it.

MR. LAROSIERE:  The only document we have is signed the day after it was due.

MR. FOSTER:  He has already addressed that issue.  He addressed the issue why it was the day after.  He has testified to that.

MR. LAROSIERE:  This doesn't work the way you think it does, Mr. Foster, and I think we're going to have motion practice about this.

MR. FOSTER:  All right, we'll have motion practice.  Okay.

MR. DE PURY:  My issue is that someone has

TYRA

falsified the expert witness -- the expert

document, not the witness, I'm sorry.

Is it Tyra or Tyra?

THE WITNESS:  It's Tyra.

MR. DE PURY:  It bugs me when I say it

wrong.

Tyra?  I've been saying it properly, all

right.

So the issue, Mr. Foster, that I am having

and maybe it's not appropriate to discuss now,

maybe we should have a meet and confer, but

someone has clearly edited this because the

witness said he did not send over anything

redacted, then you had a conversation with him

and now he is testifying differently.

MR. FOSTER:  I believe the reason was, he

revised his own report -- there were three

versions.  I have already told you, though,

that we filed a redacted version to remove

confidential data.  We, plaintiffs' counsel,

made some redactions when we had to file it.

MR. DE PURY:  When did you tell us that?

MR. FOSTER:  It's on the record.  Ask the

court reporter.

TYRA

MR. DE PURY:  Do you want to be sworn, Mr. Foster?

MR. FOSTER:  Ask Helen --

MR. LAROSIERE:  I think -- I don't think -- we have evidence from the testifying deponent.  What you are saying is in evidence, so I think we have it in evidence.

MR. FOSTER:  Okay.  Let's just -- I think we are done with this deposition because I have no more questions and, as I understand it, neither one of you have anymore questions.

MR. LAROSIERE:  Mr. Tyra, I assure you it doesn't usually go like this, so -- but thank you so much for your time and please enjoy Gunsite.

MR. FOSTER:  We're done.

THE VIDEOGRAPHER:  All right.  Before I go off, we just have to go over a couple of things.

Of course, Mr. Larosiere, you will be receiving the standard video edit as part of the videographer service.  Would you like to purchase any additional video products, such as the synced video for this proceeding?

JASON MATHIEU TYRA, ESQ.                                              JOB NO. 2667670
APRIL 28, 2026

TYRA

MR. LAROSIERE:  No, just the standard video is fine, and yes, I would like a transcript if.

THE VIDEOGRAPHER:  Transcript, sounds good.

And would any other counsel like to purchase any video products for this proceeding?

MR. FOSTER:  No, but I'd like the transcript.

MR. DE PURY:  You're going to want this, Howard.

THE VIDEOGRAPHER:  So a transcript for Mr. Foster and Mr. De Pury, as well.

I am going to go ahead and read us off now.

This concludes the deposition of Jason Mathieu Tyra for Defense Distributed, et al. versus John Elik, et al.

MR. DE PURY:  I just was saying to Howard, he is going to want this.  I didn't order.

THE VIDEOGRAPHER:  Of course, no problem.

We are now off the record.  The time is 4:23 p.m. Eastern Time. (Time noted:  4:23 p.m.)

ACKNOWLEDGEMENT

STATE OF NEW YORK )
                SS:)
COUNTY OF ROCKLAND)

I, Jason Mathieu Tyra, Esq., hereby certify, I have read the transcript of my testimony taken under oath in my deposition of April 28, 2026; that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

JASON MATHEIU TYRA, ESQ.

Subscribed and sworn to
before me this        day
of            2026.

Notary Public

                             I N D E X

EXAMINATION BY                                    PAGE

MR. LAROSIERE - direct                           5

MR. DE PURY - direct                             125

MR. FOSTER - cross                               184

MR. LAROSIERE - redirect                         186


                        E X H I B I T S
                  (Retained by court reporter)


NO.      DESCRIPTION                              PAGE

1        report                                  15

2        report                                  30

3        report                                  33

4        report                                  37

5        meme                                    45

6        Defense Distributed 2024 tax

         return                                  54

7        Defense Distributed 23 tax

         return                                  57

8        report                                  74

9        custom report                           75

10       volume 5 of journal listing             95

11       exit surveys                            101

12       summary output                          104

13       survey comments                         104

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

E X H I B I T S  (continued)

14      Defense Distributed 2021 tax
        return                                    168


                    R U L I N G S

Page 140, Line 21

     Q.   Were you affected by the Ashley Madison
data breach?


Page 141, Line 24

     Q.   Were you a subscriber to the Ashley
Madison website?

JASON MATHIEU TYRA, ESQ.                                    JOB NO. 2667670
APRIL 28, 2026

                          C E R T I F I C A T E


 STATE OF NEW YORK)
                SS:)
 COUNTY OF KINGS  )


    I, Helen Mendlowich, a Notary Public within and

 for the State of New York, do hereby certify:

    THAT Jason Mathieu Tyra, Esq., the witness whose

 deposition is hereinbefore set forth, was duly sworn

 by me and that such deposition is a true record of

 the testimony given by such witness.

    I further certify that I am not related to any of

 the parties to this action by blood or marriage; and

 that I am in no way interested in the outcome of

 this matter.

     Further, that if the foregoing pertains to the

 original transcript of a deposition in a Federal Case,

 before completion of the proceedings, review of the

 transcript [ ] was [ ] was not requested.

    IN WITNESS WHEREOF, I have hereunto set my hand on

 this 28th day of April 2026.


                         _____

                         HELEN MENDLOWICH, CSR

```
ERRATA SHEET
CHANGES IN TESTIMONY
DEFENSE DISTRIBUTED, et al. v JOHN ELIK, et al.
JASON MATHIEU TYRA, ESQ.
April 28, 2026

Page  Line   From                     To

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

SIGNATURE:_____DATE:_____

         JASON MATHIEU TYRA, ESQ.
```

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

## Exhibits

**Exhibit 1** 15:10 63:3 195:11

**Exhibit 2** 30:18,19 195:12

**Exhibit 3** 33:7,9 195:13

**Exhibit 4** 37:4,6 195:14

**Exhibit 5** 45:4,6 112:13 195:15

**Exhibit 6** 54:2 84:25 195:16

**Exhibit 7** 57:7 195:18

**Exhibit 8** 74:5,7 94:4 187:6 195:20

**Exhibit 9** 75:18,20 195:21

**Exhibit 10** 95:17,19 195:22

**Exhibit 11** 100:25 101:2 195:23

**Exhibit 12** 104:6,8 195:24

**Exhibit 13** 104:13,14 195:25

**Exhibit 14** 168:12 196:3

## $

**$10** 109:13

**$2.4** 69:22

**$2.6** 70:10

**$3,851,463** 165:20 166:15

**$4,370,000** 169:4

**$4,923,000** 169:5

**$5,000** 27:3 53:17

**$5,790,000** 167:7

**$53,926** 24:17

**$6** 166:18 167:6,7 169:6

**$6,390,000** 167:7

**$6,482,548** 165:19 166:15

**$90,000-plus** 86:21

**$90,234** 85:9

## 1

**1** 15:10 63:3 169:16,17

**10** 40:21 48:4 74:16 80:17 95:17,19 182:10

**100** 60:4 68:2 70:8 79:19 80:3 81:9 86:9 87:8 103:18 108:7 109:18 147:13

**10:00** 133:22

**11** 100:25 101:2 176:21 180:4

**11-year-ago** 179:19,24

**1120-S** 56:10

**11:06** 4:4

**11:32** 125:17 126:9

**12** 104:6,8

**12:07** 48:13

**12:17** 48:16

**12:54** 72:9

**13** 104:13,14 111:8

**14** 32:13 84:25 168:12

**15** 48:6

**16** 7:23 9:13 31:22 64:4

**16th** 73:2

**18** 24:18 169:16

**18-month** 167:21,22 169:15

**19** 84:4

**1:03** 72:12

**1:04** 73:23

**1:06** 74:2

**1:29** 129:11

## 2

**2** 30:18,19 169:14,15

**2.7K** 47:20

**20** 30:24 40:10 84:4 95:10 187:21

**2007** 179:17,18

**2008** 179:9 180:2

**2009** 179:18

**2013** 9:17

**2015** 116:12 180:2

**2018** 5:23,24 88:10 110:8 145:9

**2019** 110:7 167:2

**2020** 10:2 74:18,21 91:3 168:18 169:4 187:13

**2021** 20:10 168:13,18 169:5

**2022** 21:5 78:2 81:8 165:19 166:14 169:6

**2023** 12:23 13:18 16:25 17:2 18:10,23 19:21 20:4,10 24:17 57:4,8,11 74:18,22 78:9,10 80:4 146:4 165:19 169:7,8

**2024** 28:12 54:3 55:17 56:23 79:8

**2024/5** 27:15

**2025** 19:23 20:5 28:13 55:17

**2026** 4:5 7:23 9:13 31:22 78:3 187:14,21

**20th** 73:2 187:13,14

**21** 20:13 75:2 84:4 105:15

**21-page** 102:4

**21-plus** 105:8

**22** 74:19

**23** 17:4 20:13 30:25

**23-page** 172:5

**24** 78:10

**25** 69:23 74:20 75:3

**26** 134:20

**28th** 4:5

**29** 40:22

## 3

**3** 33:7,9 90:21 95:12,24 96:6 169:7 184:10

**30** 166:5

**315** 4:13

**3:04** 159:12

**3:14** 159:15

**3:30** 171:21

**3:32** 174:17

**3:33** 175:10

**3:45** 171:23

**3d-printed** 89:19

**3rd** 130:11

## 4

**4** 37:4,6 168:18

**4305** 6:20 7:10 179:11

**4436** 5:21

**45** 80:24

**4:00** 175:5

**4:02** 175:13

**4:23** 193:25

## 5

**5** 17:4 45:4,6 83:12,14, 18 95:12,19,24 96:5 112:13 168:17 169:16,

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

17

**5-minute** 47:24

**554** 47:21

**6**

**6** 54:2 56:10,14 84:25

**6.8** 165:11

**6301** 5:7

**7**

**7** 56:10,14 57:7 94:4

**700** 5:8

**75025** 5:8

**75093** 5:21

**8**

**8** 55:3 56:14 74:5,7 80:19 94:4 127:5,6,9 135:12 187:6

**807** 4:14

**8:32** 130:10

**9**

**9** 75:18,20

**90015** 4:15

**9:25-cv-81197** 4:10

**A**

**a.m.** 4:4 80:17 126:9

**absence** 182:14

**Absolutely** 142:2

**accept** 50:17

**access** 102:18 105:13 176:17

**accessibility** 46:6

**accessories** 25:19 27:25

**accident** 158:6

**accidental** 89:12,15

**account** 29:2 32:18 58:13 82:22 99:22 100:7,8 110:23,25 111:2,4 168:20,24 181:23 182:5,7

**accountant** 7:18 149:20 153:21 160:10

**accounted** 27:5

**accounting** 10:4 12:7,8 50:6 163:25

**accuracy** 153:7,23 154:5,14 155:24

**accurate** 77:12

**accusing** 8:14 35:24 181:25

**acknowledge** 22:15 67:16

**act** 24:24 112:2

**action** 23:15 43:19 81:13 85:13 112:10 132:19

**actions** 23:20

**actively** 111:3,13 151:11

**activity** 111:5 182:9

**actor** 81:20

**actors** 136:10

**actual** 29:20 130:15 156:2 161:5 167:14,19 187:20

**acute** 42:18 43:14,16, 21 44:25 47:12

**add** 150:18

**adding** 132:20

**additional** 162:13 163:3 172:9 192:24

**address** 4:13 5:7,14, 15,17 98:9,15 118:15 122:17 137:10 177:7, 11,15,17 178:9,10

179:6,8,9,17

**addressed** 125:13 190:17,18

**addresses** 46:6 143:9 152:2

**adjust** 82:13 84:8 100:22

**adjustment** 83:9

**administration** 11:11 27:12 28:4,8,13, 19,23 84:13,15

**administrations** 27:22

**Adobe** 187:15,18

**advance** 64:20

**adversary** 117:17

**advertisement** 61:25

**advertising** 150:9

**advice** 10:13,14

**advisable** 78:24

**affect** 67:18 139:25 140:8 146:24 170:11 176:24 182:11,12

**affected** 69:15 115:7 116:20 138:17 139:16, 19,20 140:15,22 156:6 176:2,13

**affiliate** 55:11,18 57:14 58:4

**affiliated** 54:18,21 57:22

**affiliates** 71:4 81:15 127:16

**afterward** 9:23 167:22

**agents** 113:4 127:19

**agree** 31:15 37:25 60:24 67:19 76:25 77:4 79:16 84:23 86:2 90:15 145:6 152:4 160:3,6

**agreed** 46:18 113:24 183:21 188:8

**agreement** 172:4

**ahead** 5:20 6:6,23 11:18 21:3 41:20 44:18 47:14 48:3,10 65:12 68:10 87:13 88:15,21 102:23 103:22 114:6 116:8 132:2,17 146:21 148:2,15 149:15,18 157:9 180:10 193:16

**Alexander** 4:25

**allegations** 24:7

**allege** 134:24

**alleged** 128:14 135:3, 5,18 160:22,24

**allegedly** 88:9

**alleges** 64:17 111:24

**alleging** 128:4

**allocated** 86:9

**allocation** 87:8

**allowed** 122:11 123:17 168:3 179:15

**allowing** 105:8 124:14

**allusion** 132:25

**alternatively** 83:6

**ambulance** 150:11

**American** 116:22

**ammo** 25:22

**ammunition** 27:25

**amnesty** 24:22

**amount** 67:22 70:10 109:11

**amounts** 29:20

**analogue** 151:13 159:4

**analogy** 149:19

**analyses** 12:20

**analysis** 8:24 9:4,5 13:19,22,23 16:9,17 17:20,21 23:3,5,16,18 69:23 79:24 80:8 92:15 132:12 143:7 144:5 146:11,14 152:15

154:25 162:22 166:8 167:5

**analytics**  8:21 26:7

**analyze**  23:24

**analyzed**  23:13

**ancillaries**  165:22

**and/or**  184:25

**Angeles**  4:14

**annex**  16:3 29:7

**annual**  78:8 100:17, 19

**answering**  115:20 133:13 177:21

**answers**  60:13 88:4 111:14 147:12 179:2 181:7

**anymore**  12:13 133:2 192:12

**anytime**  25:16

**apologize**  143:21

**apology**  143:25

**apparently**  184:22

**appeared**  12:23 13:21 14:2 40:25 42:25 43:6 110:18 152:6

**appears**  15:20,21 20:16 30:22 32:20 37:9 39:17 46:7 50:12 55:14 57:12 77:15 78:3,11 101:19 148:4

**appendix**  39:8 76:13,14 98:7

**appendixes**  50:23

**applaud**  163:21

**applied**  86:16

**apply**  29:2 100:20 148:25 190:13

**April**  4:5 5:23 18:9 20:10 21:5

**area**  110:21 112:7,24 154:25 155:3

**areas**  10:7

**argument**  101:25

**Army**  115:15 116:11 160:8 164:2

**arrangement**  50:4

**arrest**  146:9

**arrested**  145:20

**arrive**  86:8

**arriving**  109:17

**article**  95:4 96:7,12, 17,18,22 97:3,17,20 98:4,13

**articles**  99:8

**artificial**  96:24

**artists**  149:22

**ascertain**  106:20 176:20

**Ashley**  117:23 118:5, 19 119:17 120:17 140:22 141:16,25 176:12 177:3,18,20,25 179:24 181:3 183:16,22

**assault**  145:10 146:9

**assembled**  91:25

**assert**  68:15 69:20 108:14

**asserted**  109:4 132:6

**asserting**  67:22 68:11,12,13

**assertion**  59:21 109:2

**assess**  66:2

**assist**  71:25

**associate**  116:16

**assume**  44:21,23 107:2,15,20 133:6 134:5,17,18 149:8,9

**assumed**  12:22

**assuming**  107:13 109:15 111:4 135:20

**assumption**  12:24 66:7 134:2 135:24 136:9 160:13

**assumptions**  173:21

**assure**  192:13

**ATF**  112:4 132:25

**Athletic**  147:17

**attack**  25:17 41:13 127:17

**attacked**  109:2

**attempt**  30:10 68:21 75:15 106:19 128:5,10, 19 154:5

**attempted**  176:20

**attempting**  43:2 66:8

**attest**  153:6,22

**attesting**  154:7

**attorney**  9:18,21,25 125:7 137:4 149:20 160:10

**attributable**  81:10, 20 86:22

**attribute**  56:6 101:10 104:19 105:21,25 148:10,14 164:22

**attributed**  29:20 68:2 79:20 82:6,10 147:13 155:17

**attributing**  144:15 165:5

**authoritative**  57:23 59:18

**average**  18:8,17 24:18 27:4 44:20 85:8 86:25 87:2

**Avonshire**  5:21

**aware**  22:17,18,20,22 24:12 26:22 36:21 40:14,19 50:17 52:8,10 61:8 64:17 87:6 113:15, 21 130:15,19 131:2,22 132:6 137:20 145:9,14, 15,20,22 147:24 163:2, 8 164:11,12 173:2 174:2 180:5,12 186:24

## B

**back**  8:8,12,16,18,24 9:8,9 10:25 17:23 30:16 35:13 42:4,5,7 47:23 48:5 56:9 63:2,3 72:15 74:8 76:7,9 84:24 91:17 99:12,13 122:3,5 125:16 126:16,19 130:9 136:21 137:10 138:13 140:7 142:17 150:13 152:16 162:24 163:4 164:13 169:7 175:2 181:24 182:20 183:12

**background**  160:23

**bad**  77:18 82:18 85:25 169:2,3

**balance**  50:14

**bandwidth**  78:25 79:3

**bank**  58:13 182:5,6

**banking**  116:20

**bar**  141:7

**base**  71:2 114:11

**based**  26:6 53:15,19 57:22 60:20 76:20,23 87:9,12,14,17 93:3 103:24 106:14 108:20, 21 112:6 134:15 144:6 155:14 162:3 165:20 166:16 180:18

**basically**  10:12 25:23 26:2 82:6 103:8 118:22 125:13 144:15 183:18

**basing**  131:3

**basis**  107:2,7

**bear**  60:14

**bears**  32:12

**beat**  143:20

**beer**  160:18

**began**  125:17

**begin**  4:5 125:14

**beginning**  77:24

**begins** 144:23

**behalf** 4:13,24 49:24 90:2

**behavior** 11:4,7,20, 22 63:9 65:6 145:7

**belief** 79:23 92:25

**believing** 28:16

**beneath** 53:10

**benefit** 150:17

**bias** 109:23 118:4 121:12

**Biden** 28:4,8 84:12

**big** 75:5

**biggest** 82:15

**bill** 150:16

**bit** 30:16 127:12 159:20 160:7 170:5 173:6 181:21

**Bitcoin** 110:23,25 111:2

**black** 19:22 31:2 32:4

**blacked** 33:4

**blacked-out** 31:6

**blame** 125:19,20 126:10,11 128:10 129:25 130:2

**blank** 102:2,5

**block** 31:9 91:24

**blow** 163:22

**blue** 37:17 38:12

**boats** 25:24

**body** 105:13

**boil** 158:14

**bookkeeper** 152:19

**bookkeepers** 153:3

**booklet** 56:13

**books** 37:2 51:21,25 155:7

**borne** 27:2

**bot** 107:4

**botched** 96:15,16

**bother** 106:16

**bottom** 35:25 36:20 54:10 127:4,9

**brace** 84:11,20

**braces** 24:23 25:4

**brain** 18:2

**Brand** 97:22

**Brandon** 185:3 189:15

**Brandon's** 189:22

**breach** 115:7 116:23 122:25 138:15,16,17 139:17,19,21,25 140:4, 8,15,22 176:3,7,13,14, 18 179:25

**breaches** 109:12 112:20 115:6 116:20 139:16 176:8

**break** 20:6 47:24 48:14 72:10 80:13,15 138:12 145:3 159:9,13 174:18 175:11 180:22 182:15 183:8,14 185:13,16

**breaking** 51:11,13 170:3

**breaks** 54:19

**bringing** 60:15

**brings** 144:5 185:24

**broad** 66:13 82:12 163:16

**broadly** 51:18

**broke** 13:12 16:13 18:20 29:13 31:19 51:11 56:3 64:8 68:8

**brought** 129:3

**bugs** 191:6

**build** 90:15

**built** 151:24

**bulk** 90:14,16

**bullet** 96:3

**bunch** 154:20 174:13

**business** 4:13 5:15 11:10 23:19 29:20 34:13 52:3 54:13 66:9 69:4,14 71:3 100:2 149:6 150:4,6 151:14

**businesses** 25:8 49:3 152:9 154:22

**buy** 25:22 26:25 43:19, 22 45:2 93:15 160:19, 20

---

**C**

**cagey** 143:12

**calculate** 23:8 67:23 150:11

**calculated** 44:15

**calculating** 68:7

**calculation** 19:3 20:19 68:18 83:21

**calculations** 8:25 9:7 22:24 82:21,25

**California** 4:15

**call** 21:8,11,13,14,15, 18 23:14 43:19 81:13 85:12 112:2,10 132:19 134:3 150:3

**called** 110:9 131:23

**calls** 44:16 102:21 108:10 132:15 149:25 157:21 163:13,14

**calm** 141:14

**camera** 33:22 34:3,7 35:2 129:6,16

**campaign** 108:15

**cancel** 89:3

**canceled** 30:8 89:13, 16 102:13 109:5

**cancels** 81:18

**capital** 50:13

**capture** 106:7

**capturing** 109:7

**card** 36:15 116:18 140:18

**care** 43:15

**career** 160:17

**carrying** 24:13

**case** 4:8,10 8:6 12:12, 17 14:15 40:18 41:12 51:20 52:4,9 81:7 86:18 156:5

**catalogue** 25:8

**catch** 178:19

**caught** 83:14

**causal** 82:7,11

**causation** 13:23 26:10 86:15 136:14 142:18

**caused** 23:8 27:8 32:16 44:2 60:21 61:5 68:16 69:20 87:15 136:12,15 187:25 188:5

**causing** 63:8 65:5

**caveat** 53:10

**cede** 124:17

**center** 64:16

**certainty** 161:10

**certificate** 12:2

**certified** 7:18 137:24 153:21

**certify** 137:12 138:8, 21 140:21 141:2,3 142:10 173:19 174:11

**certifying** 139:2,4

**chance** 131:5

**change** 13:23 25:21 28:17 51:10 77:2 91:13, 15 108:22 129:7,18 130:14 162:14,20 163:9 169:5,7

**changed** 14:4 69:16 91:8 103:17 132:12 163:19 185:12

**changing** 9:12

34:14,18 188:20,24

**chaotic** 84:11

**charge** 109:14 145:10

**chaser** 150:11

**chat** 97:12

**check** 114:14 147:2,4, 7

**checked** 147:9,11 148:8 152:7

**child** 88:9

**China** 117:13

**choice** 125:9

**choose** 123:21,22

**chose** 30:4

**circles** 47:14

**circling** 60:5

**citation** 96:11,12,15, 16

**cite** 148:3,14

**cited** 41:7 94:16 95:6, 25 98:13,22 101:16

**cites** 95:12 97:17 98:25 106:11

**citing** 14:11

**claim** 43:5 64:15 67:4, 5 98:13,24 117:14 150:12 161:20

**claiming** 44:22

**claims** 44:20 52:8 61:10 92:18 161:16

**clarification** 102:17 111:6 138:10

**clarified** 164:25

**clarify** 162:24 164:19

**Clark** 4:23

**class** 11:14,17,21

**classes** 11:6

**clawback** 189:5

**clear** 8:13 30:10 32:3 60:5 69:5 84:3 85:22

103:16 104:16 114:12 147:10,12 160:14,25 161:2,5,6

**clearance** 116:10 160:14,15

**client** 16:15 29:9 32:7 36:13 39:21 48:21 57:25 60:9 68:16 75:9 93:23 99:16,23 101:6 108:16 113:19 122:8 123:16 124:19 130:16 131:14,22 137:4 142:5, 8 150:13 151:6 154:4, 11 155:20 161:22,24 184:13 189:24 190:9

**client's** 22:16 40:12, 20 45:12 67:18 88:23 167:6

**clients** 10:8 22:20 52:22 75:7 89:9 161:21

**close** 49:12 109:25 180:2

**CNC** 91:12

**CNTRLPEW** 105:9

**co-counsel** 185:3

**co-defendants** 125:7

**coaching** 141:5,7

**Cody** 48:20 146:17 147:5 184:12,13,25

**collect** 59:16

**collected** 108:20

**college** 12:13

**colonel** 164:2

**color** 38:17,18

**columns** 16:13

**combination** 84:14

**comfortable** 154:16

**comment** 25:19 27:21 28:24 65:4 72:24 82:14

**commentary** 43:13 44:11 45:16,18 47:12

**comments** 43:20

104:14 106:15

**commissioned** 116:11

**committed** 82:3

**communicating** 178:25

**communications** 174:5

**community** 112:25 128:2

**companies** 49:5,21 53:12,13 54:14,15,18, 22 58:5 59:23 165:24 166:4 170:25

**companion** 70:14 71:5

**company** 53:8 59:22 60:2 61:22 110:9 111:25 168:23

**compared** 18:17 28:23

**comparing** 169:22

**comparison** 20:9 168:2

**compensation** 155:14

**competently** 10:13 52:14

**competing** 63:18,23 64:2,10 66:15

**competitors** 106:11

**complaint** 12:24 13:5 65:21

**complete** 49:12 100:16

**completely** 106:7

**completeness** 153:7,23 154:5

**complicated** 87:4

**component** 46:8

**components** 91:24 92:22 93:19

**compound** 11:2

**comprehension** 94:21

**comptroller** 54:12

**computer** 91:22 93:11,17 129:21

**computers** 129:7,18

**concept** 89:19

**concern** 112:7,24

**concerned** 78:20 101:12,14 104:24 106:2,9 107:12 171:20

**concerns** 11:22 89:21

**conclude** 85:3 136:14,15 164:9,10

**concludes** 193:18

**conclusion** 14:4 22:6 26:17 27:9 64:7,9, 11 65:3,21,23 66:6 67:10,21 82:18 86:8,21 99:18 103:18 108:6,22 109:17 132:24 133:4 136:11 163:19 169:19

**conclusions** 23:12 36:7 64:16 98:10,23 155:24 156:6

**condition** 59:9

**conditions** 28:2 42:23

**conduct** 23:13 24:7 63:7 64:14,23 67:5 128:14 143:2

**conducted** 12:13,16

**confer** 191:12

**confidential** 179:13 191:21

**confirm** 59:4 61:13

**confusing** 89:25 151:5

**confusion** 36:10

**Connect** 110:23,25 111:2

**connected** 49:2

**connection** 46:20 77:18 78:15,19,22 82:7, 11 114:9

**Consala** 97:25

**consideration** 88:17

**considered** 18:11 114:12

**consistent** 68:5,9 69:4

**consolidated** 49:14 52:18 58:2,18

**constant** 69:16 91:14

**constantly** 141:13

**consultancy** 10:12

**consulting** 50:2

**consumer** 11:4,7, 20,22 12:13 63:8 65:5 66:13 97:22 98:10 116:21 145:7

**consumers** 26:21 46:4 63:10 65:7

**contacted** 110:7

**contained** 81:13 171:18

**contents** 96:5 122:24

**context** 20:3 42:20 43:6 79:24 82:19 91:11 109:6,12 128:13 149:17 153:9 169:13

**contexts** 98:16

**continuation** 127:24

**continue** 22:8 34:17 85:8 124:14 141:19

**continues** 79:12 147:23

**continuous** 91:14

**control** 21:9,10,14 27:23 32:19 105:12 143:8 168:10

**controlled** 91:22

143:7

**controlling** 187:5

**conversation** 167:25 188:21 191:15

**convert** 51:17

**convinced** 108:16

**coordinated** 108:15

**copies** 172:9,16,18 184:8

**copy** 71:17,22 72:19 171:6 172:8 190:2

**copyright** 88:19,23

**correct** 5:16 8:6,19, 20,22,23 9:2,10,13 10:20 12:14,15,17,18 16:20 21:20,25 22:3 24:5 27:13 28:11,24 29:3,4 30:5,6,9,11 32:13 38:24 40:2,20 44:3 45:10 49:4,21 52:2 53:23 55:6 60:8 67:7,19 70:5 74:20 86:10,11 87:19,24 92:14,21 110:14 125:21 133:8,18 134:6,12,14 135:2,6,10, 11 136:10,16 142:22,25 143:3,4,7,9 144:7,17,24 145:7,17 147:8,14,24 148:7,18 149:6,20 152:5,9,19,20,24 154:9, 15,22,23 155:23 156:2, 3,6,8 158:10 160:4,25 162:5 163:24 164:3,7, 20 165:7 166:5,11 171:4,7 172:7,11,12,19 175:19 176:9,14,18 181:14 183:21 187:6

**correctly** 15:7

**corrects** 85:14 113:8

**correlation** 26:11

**corresponds** 24:21

**cost** 102:8 151:9 154:25 166:8

**costs** 109:9,10,11

**counsel** 4:16 5:3 48:10 72:6 73:21 184:22 191:21 193:7

**countertop** 93:16

**counts** 75:2

**couple** 74:14 77:2 79:12,14 181:7 184:24 190:5 192:19

**courses** 11:19 12:8

**court** 4:10 5:4 42:4 72:14 99:11 102:16 111:6 120:8 122:18 124:3 137:11 138:10 140:21 154:8 157:20 159:10 167:6,10,14 168:9 179:14 190:8 191:25

**Courts** 4:9

**cover** 81:2

**Covid-19** 84:4

**CPA** 7:12 9:16 36:22 49:20,22

**crazy** 105:7

**create** 64:24 66:8 92:12 161:23,25

**created** 13:10,15 64:18 85:4 112:9 126:25 134:25 135:9,21 136:4 161:13,16,19

**creates** 23:9

**creating** 127:13,16 135:12

**credibility** 118:9,15, 22 123:24 124:10 153:14 157:3,12,20 160:3,11 167:9

**credit** 36:15 116:18 140:18

**criminal** 146:18

**cross-analysis** 166:3

**CROSS-EXAMINATION** 184:5

**cross-link** 152:15

**cross-talk** 159:9

**crypto** 50:8,11,17 51:4,17 110:14,19

111:8,12

**cuff** 39:12 52:17,21 58:6 69:21 76:5 90:22 163:20 165:13

**currencies** 51:4

**currency** 50:8,17 51:10,17 110:14,19 111:12

**current** 90:19 177:11 178:4,9 179:5

**curriculum** 11:13

**custom** 75:18

**customer** 8:18 30:3 136:19,22

**customer's** 43:22 45:2

**customers** 22:7,12 24:12 26:18 42:15,19 43:14 44:6 46:18,19 47:2 85:5 89:3 90:2 94:10 99:17 109:5 142:21 180:7,11

**cut** 84:16 188:2

**CV** 156:18

---

### D

**Dallas** 11:12 110:10

**damage** 44:3 68:18

**damages** 23:8 60:22,23,24 61:2 64:22 65:25 67:22 68:12,13, 16 69:19 81:19 83:21 136:11 144:21,23 148:14 150:12

**damaging** 148:11

**dark** 38:12 116:14

**data** 13:20,24 16:14 26:19 27:2 29:7 31:18 39:6 50:23 53:19,22 74:19,23 75:6,8,10 76:9,15 77:13 80:3,9 85:8 100:14 108:6,17, 24 109:12,16 111:25 112:4,20 115:5,7 116:20,23 119:20

122:25 123:25 128:2,6 138:15,16,17 139:15, 17,19,21,25 140:4,8,14, 22 153:7,9,23 154:4,7, 9,11,15,25 156:8 167:20 168:3 170:20,21 173:22 176:2,7,8,12,14, 18 180:5,12,16 182:14 191:21

**database** 112:18 116:12 118:18,19 128:4

**databases** 116:21

**date** 13:18 15:11 19:8 30:20 31:20,21,22 33:8 37:5 41:9 45:5 54:4 57:9 69:17,22 72:25 74:6 75:19 95:21 101:4 104:7,15 148:8 152:7 168:14 186:24 187:11, 18

**dates** 73:6

**day** 18:12 125:12 136:3 142:13 158:5 190:16,19

**DD** 49:16 52:12,15 53:3 62:19,20

**De** 4:24 78:25 115:24 118:9,13 120:7,13 122:7,13 124:18 125:2, 4,5,6 126:15,18,20 127:4,8,10 129:2,5,17, 20,23 130:6,8,12,24,25 131:8,11,16,20,21 137:3,6,16 138:5,11,20, 23 139:2,9,12,14 141:2, 11,17 142:4,9,16 145:4, 5 151:2,18 153:17 157:15,22,23 158:13, 17,20 159:2,7,16 162:9, 12 167:17 171:23 172:2 173:16,18,24 174:10, 13,22 175:8,14,16 177:13,21 178:2,7 181:6,19,22 182:19,24, 25 183:11,23 185:8 186:4,9 189:23 190:25 191:6,23 192:2 193:12, 15,21

**deal** 49:17

**dealer** 94:7

**dealing** 34:14

**Death** 147:17

**December** 10:2

**decide** 57:25

**decided** 26:25

**decision** 43:22 45:2 150:4

**decline** 70:20 91:9 136:15

**declining** 70:19

**decrease** 165:18 166:14 168:21,22,25

**decreased** 89:18

**DEFCAD** 22:13 23:15 24:12 25:3 26:22 30:4 36:9,11 37:12,22 43:3,18,19 44:3,20,23, 24 52:10 53:6,17,20 55:12,17,24 56:5 57:14, 17,20 58:10,13,14,15 59:3,13 60:7 61:20,22 63:20 66:14 70:13,20 71:20 75:2 81:14 85:5, 16 93:8,12,21 94:10 100:6 101:6 106:11 107:14,21 113:7,10,11 114:10 127:18 164:24 165:2,6,22 180:6,11,12

**DEFCAD's** 36:14 41:12 42:14,15 43:14, 20 44:5,22 45:25 46:4, 7,18,25 112:18 127:15 128:4 167:20 170:22,24

**defendant** 4:21,25 23:20 24:8 136:2

**defendant's** 63:7, 11,16,23 64:2,14,23 65:4,8

**defendants** 4:23 23:23 63:18 64:10,15, 18,23,24 66:2 67:5 76:16 125:19,20 126:3, 25 127:14 128:6,10,15 134:25 135:14,20 136:4,9 161:23

**defendants'** 15:10 23:8,12 30:19 33:7 37:4 45:4 54:2 57:7 74:5

75:18 95:19 101:2 104:6,14 168:12

**Defense** 4:6 25:3 37:13 49:7,14 51:20 52:19 54:2 57:7,19,21 62:16 74:17 85:5 165:21,24 168:12 193:19

**defensive** 30:14

**definite** 16:19 17:17

**definition** 100:17

**definitive** 66:20

**degree** 11:11 160:9 163:25

**delay** 7:17,20

**delving** 181:20

**demand** 70:21

**demise** 151:11

**Democrat** 27:17,22 83:9

**democratic** 27:12 28:23

**depend** 136:12 155:24 181:15

**depends** 42:20 54:23 57:24

**depict** 78:11 80:9

**depicted** 38:10 78:5 82:15

**deponent** 6:4 192:7

**deposed** 119:9 174:7 189:2

**deposition** 4:5,11 8:2 17:25 34:8,17 35:2 73:11 115:16 116:5 120:11 121:3 124:13 147:21,22 156:24 173:3 192:10 193:18

**depositions** 164:25

**Depressed** 70:2

**derived** 18:8 60:10 66:2

**derives** 53:9 59:13

**describe** 9:3 16:22 36:24 99:20

**describes** 11:21 17:24 95:7

**describing** 128:14

**designs** 93:18

**detail** 103:12 105:4

**detailed** 99:24

**determine** 13:9,14 24:3

**determined** 18:4

**determining** 86:15

**developer** 46:9

**development** 91:14

**device** 134:3

**difference** 16:12 69:6,11

**differences** 31:16

**differently** 37:14,16 191:16

**differs** 32:11

**difficult** 85:19,24 173:3

**difficulties** 15:9

**difficulty** 102:16 173:6

**Digital** 96:6 97:5,10, 22

**direct** 5:12 66:10 118:10 125:5 131:4,8 138:13

**directed** 73:5 111:24

**directing** 81:14

**directly** 118:3,4,16 140:17

**disagree** 167:23 183:19

**disclose** 26:7

**disclosed** 8:25 9:7 112:19 185:2

**discontinuing** 100:7

**discount** 82:21

**discover** 108:23

**discrepancies** 32:19

**discrete** 33:15

**discuss** 46:22 99:7 167:3 180:21 182:16 183:4 191:11

**discussed** 39:9 49:18 170:4 185:17 187:24

**discussion** 14:2 25:14 31:25 32:16 33:20 36:8 43:7,21 68:20 70:12 73:24 141:13 175:22 185:12 188:5

**displayed** 29:18

**disposal** 50:13

**disrupt** 48:2

**Distributed** 4:7 25:3 37:13 49:7,14 52:19 54:3 57:8,19,21 62:16 74:18 85:5 165:21,24 168:13 193:19

**Distributed's** 51:20

**District** 4:9

**distrust** 171:2,5 172:6,21

**DNA** 117:15

**document** 30:22,24 32:4,24 33:6,10 35:21 38:6 39:23,25 54:5 75:22 76:19 82:5 87:21 99:14 102:4 103:25 104:2,9 160:22 171:16, 17,19 172:5 187:12 190:15 191:3

**documentary** 145:23 146:3,7 147:5 162:19 163:8,10

**documents** 39:16 40:5 87:18

**Dodgen** 110:10

**dogs** 40:10

**dollar** 67:23

**dollarize** 68:21 83:24,25 84:21 85:10, 20

**dollarized** 68:25 83:7

**dollars** 51:17 55:19 82:6,10

**door** 149:10 150:20 151:13

**double-charged** 89:10

**double-check** 122:13,16

**doubt** 84:2,21 85:7,18 86:5,7 127:17

**downgrades** 90:10

**downloads** 47:16, 20

**downtick** 155:3 166:10

**downturn** 144:5,11, 13 146:13 147:14 166:15 167:11

**downward** 13:25 16:20 17:17 18:4 26:19 29:3 77:17,22,23,24 78:5,11 79:15,17,20 80:4 81:9,17 83:12,17 86:9 88:7

**draft** 16:3,6 96:25 190:12

**drafts** 185:9

**dragged** 119:9

**dramatic** 165:18 166:14 168:21,22

**drastically** 69:16

**draw** 114:8

**draws** 10:7

**drive** 6:21 7:10 22:7 25:18 26:18 27:23,24 63:16 85:4 93:25 179:11

**driven** 66:14

**driver's** 89:22

**drives** 70:14

**driving** 16:2 22:12 63:10 65:7

**drop** 164:23

**drop-down** 103:9

**dropped** 18:7,12,15 110:10 165:11 169:14

**due** 108:7 186:25 190:16

**duly** 5:9

**dumped** 112:19 128:5

**Dynamic** 97:5,9

---

**E**

**e-mail** 39:22 72:19 73:10 130:9 177:7,10, 11,15,17 178:3,4,9,10, 25 179:4,5,7,9 189:15, 22

**e-mailed** 188:13

**e-mails** 173:11,14 174:4

**ear** 35:5

**earlier** 37:14 39:2 75:6,10 79:19 88:3,6 99:12 113:24 114:18 125:14 137:23 152:18 159:19 162:5 169:10 185:20 186:5 187:23 188:3 189:5,13,25

**easier** 45:9 104:4

**easily** 124:2

**Eastern** 4:4 48:13,16 72:9,12 73:23 74:2 159:12,15 175:10,13 193:25

**easy** 86:6

**economic** 27:6 63:7 65:4,24 66:2,10,11 67:6 68:16 69:2 85:24 87:16 126:4 136:11 147:13 153:8

**economically** 81:21

**economist** 14:6

**edit** 192:22

**edited** 185:19,22,23 186:2 191:13

**effect** 25:19 27:22 28:5 44:25 85:3 99:21 117:18 132:22 140:19

**effective** 56:22

**effectively** 133:15, 16 141:15 142:14 147:7 149:10

**effects** 43:4 85:7 117:11

**efficacy** 12:16,18

**effort** 109:11

**efforts** 25:12

**elaborate** 176:8

**electing** 122:22

**election** 25:15

**electronic** 70:18

**electronically** 95:2, 3 96:20

**Elik** 4:7,23 193:20

**emotional** 140:14

**employment** 59:9

**encompassing** 144:21

**encountered** 26:24

**encouraged** 63:9, 12 65:6

**encourages** 63:13

**encrypt** 128:6

**end** 34:24 69:22

**endeavors** 164:7

**ended** 145:16

**engage** 116:5

**engaged** 23:25 24:2 127:2 153:6,8,22 161:13

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

**engagement** 97:22 153:24 184:14

**English** 94:21

**enjoy** 192:15

**ensure** 85:14

**entered** 108:24

**entire** 25:7 56:15 78:5,6,7 114:3 116:12 117:15 118:21 128:19 169:23

**entities** 170:8,11

**entitled** 5:19 11:17

**entity** 52:4 55:10 58:2

**equally** 10:7

**equation** 80:9

**Esq** 5:6

**established** 131:13, 15 147:20

**estimate** 65:24

**et al** 4:7 46:9 193:19, 20

**event** 84:8

**evidence** 23:22 59:22 66:11 131:25 192:6,7,8

**exact** 19:8 136:25 146:12

**EXAMINATION** 5:12 125:5 186:23

**examined** 5:10

**examples** 83:24 98:8,12,14,19

**Excel** 103:6

**exception** 16:16

**exclude** 32:15

**excluded** 19:2 20:13,15 21:5,19,23 35:19 68:17

**excludes** 31:24

**excuse** 33:21 65:11 126:3 145:2

**exhibit** 14:21 15:10 30:18,19 33:7,9 37:4,6 45:4,6,7 47:22 54:2 57:7 63:3 74:5,7 75:18, 20 84:25 94:4 95:17,19 100:25 101:2 104:6,8, 13,14 112:13 168:12 187:6

**exhibits** 14:24 33:15 190:5

**exist** 46:11 55:8 58:20 60:2 96:17 99:2

**existed** 114:15

**existence** 23:13 24:4 26:18 46:5,6,17 58:15,19 59:23

**existing** 23:4

**exit** 100:5,16 101:2,5 107:14,21

**expanded** 41:13

**expansive** 54:13

**expect** 27:25

**expectations** 90:2

**expenses** 148:21,23 170:8,10,16

**experience** 25:11 180:19

**experienced** 180:7

**expert** 10:18,19 92:5 103:15 116:6 122:8 126:24 153:12 156:21 184:7 190:10 191:2

**expiration** 24:22

**explain** 81:10

**explaining** 36:16

**explanation** 60:23 61:7,8 141:4

**explicit** 85:12 112:10 132:19

**explicitly** 85:15 87:19 132:21

**Exploring** 97:21

**exposed** 134:15

**exposure** 128:7

**extensive** 99:24

**extent** 14:20 23:7 42:19 50:12 55:8 64:13, 20 66:3 68:24 69:14 81:19 87:25 114:25 124:19 161:12

---

**F**

---

**face** 189:6

**Facebook** 41:7

**facsimile** 187:20

**fact** 18:23 19:12 26:8 27:17 41:22 43:5 57:18 64:19 71:10 105:11 143:21 147:6,20 148:7 152:21 161:22 162:18 163:7 166:2 168:5

**factor** 27:6 28:14 55:2 68:18,22 81:12,21 88:8, 16,18 89:2,5,9,12,15, 18,21,25 90:4,7,10 143:15 144:2,4 157:20

**factored** 50:21 88:22

**factors** 67:18,24 68:19 82:3,5,9,22 83:9 85:23 88:6 164:11

**facts** 8:15 157:11 163:3

**factual** 24:7 61:10 64:14 128:18,20 161:15

**factually** 161:21

**failed** 149:23 150:10, 12,16,20,22

**fair** 13:6,16 18:24 20:15 22:9 23:20 25:25 35:10 45:3 77:12 86:3 109:19 111:18 143:16 149:9,16 155:7,8 157:4 160:12 170:12,15

**fairly** 52:6 145:23

**fall** 28:20

**falsified** 156:5 191:2

**familiar** 7:22 25:7 52:3,5,6 122:24

**family** 170:25

**fantastic** 150:17

**fear** 84:21 85:6,17 86:4,6 127:16 128:6

**February** 7:23 9:13 31:22 78:3,10 79:7 187:13,14,21

**fed** 93:19 113:3 133:7 134:2,5

**FEDCAD** 40:24 41:10 63:9,15 65:6 66:19 85:3,14 101:10, 12,13,20,24 102:19 104:19,21 112:3,11 113:3,6,11,13,15 114:7, 14 127:14,18 130:15,19 131:23 132:21,22,25 133:4,6,17 134:2 135:13

**FEDCAD's** 41:13

**FEDCAD.COM** 113:16

**federal** 4:8 58:4 89:6 94:8 112:2,15 113:4,25 114:9,19 127:19 132:25 134:7,8 185:5

**federally-licensed** 94:7

**fee** 173:22

**feeding** 179:2

**feel** 72:18 121:13

**fellow** 141:6 143:21

**field** 68:6

**figure** 43:11

**figures** 76:3 165:21

**file** 47:4,6 120:7 169:19 191:22

**filed** 49:19 56:21 151:25 179:14 191:20

**files** 70:18 71:7,9 93:11,18,20,25 102:19

**filings** 74:17 165:20 166:16,18

**final** 32:20 40:6 56:25 57:10 184:9,20 187:5

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

**financial** 48:19,21 89:2

**financially** 59:15

**find** 17:17 35:24 63:22 65:16,17 96:21 97:3 106:16 146:2 162:15 174:20

**fine** 7:11 8:13 26:14 41:15 43:8 73:8 119:2 187:3 193:3

**fingerprints** 116:15 117:15

**finish** 136:21 159:8 186:8

**finished** 91:24 145:16

**firearm** 84:6 86:18 92:2,8,12 94:7

**firearm's** 83:12,17 89:6

**firearms** 24:24 25:18 26:3 89:19

**firing** 92:13

**firm** 110:7

**fit** 16:16 18:13 77:3

**fix** 15:17

**flagship** 91:21

**flat** 17:12

**flawed** 168:2

**flippant** 94:22

**floor** 124:18

**Florida** 4:9

**focus** 12:4,6 111:20 123:24

**focused** 10:4 81:23 111:15

**folks** 160:12

**follow** 172:23

**follow-up** 119:13 162:10 172:8 173:25 176:12 177:2 186:21

**font** 37:18

**footnote** 40:10,22 42:22 64:4

**foreign** 116:13 117:16

**forfeit** 59:24

**forfeited** 58:19 59:22

**forget** 81:16

**forgot** 148:5

**form** 15:2 29:17 41:18 56:10 87:10 88:13 92:25 96:19 103:21 108:9,24 114:4 115:8 116:3,23 117:24 133:9, 20 139:22 143:20 149:13 150:8,24 151:16 152:10 153:15 156:13 157:6,13,16 167:15 169:3 173:8 175:24

**formal** 11:6

**format** 46:10

**formatted** 37:13,16

**formatting** 37:20,21

**formula** 86:20,23,25

**formulations** 87:18

**forward** 130:9

**Fosscad** 105:10

**Foster** 4:18 5:18 6:2, 7,10,12,16,22,24 7:6,7 14:19,23 15:7 17:14 33:21,23,24 34:2,6,9, 20,23 35:10 38:22 39:22,25 41:18,25 44:16 47:8 48:4 71:23 72:17 73:5,13,15,17 78:18,23 79:5 80:12,23, 25 81:4 86:12 87:10 88:11,13 96:23 102:21 103:20 107:17 108:3,9 114:4,21 115:8,16,18, 21,25 116:4 117:24 118:5,11,23 119:2,10, 20,24 120:3,5,9,12,14, 19,25 121:7,18,22 122:4,7,11,19 123:5,9, 17 124:5,7,15,21,24 125:3,23 126:14,17 128:22 129:4,15,19 130:3,7,17,22 131:7,10,

13,18,24 132:3,15 133:9,19 134:4 136:5, 20,24 137:5,14,21,25 138:19,22,24 139:5,11, 22 140:23 141:9,14 142:2,6,23 143:24 144:8 145:2,11 147:25 149:13,25 150:23 151:16 152:10 153:15 156:13 157:6,13,21 158:4,8,11,19,21 159:5 160:20 162:7,11 163:13 166:6 167:15 170:13 171:13,21,24 173:8,12, 14,17,20 174:5,8,12,19 175:3,7 177:8,12,19,22, 23 178:11 179:12 180:22 181:4,8,17,25 182:15,18,21 183:2,6,8, 13,21,25 184:5,21 185:25 186:6,11,19 188:22,23 189:4,10,14, 17,21 190:17,21,23 191:10,17,24 192:3,4,9, 17 193:10,15

**Foster's** 133:23

**found** 41:23 86:10 96:12 97:21 106:13

**Foundation** 52:12, 15 53:4 62:19,21

**Foundations** 49:16

**frame** 92:7

**framing** 98:17

**franchise** 55:11,18 57:13

**free** 72:18 90:8 186:15

**Friday** 19:22

**friends** 63:14 85:13 109:25 112:10,11 113:9,10 132:21,22 133:3

**front** 103:25 149:3,10, 23,24 151:12,13

**fuck** 105:16

**fucking** 105:8,11

**fully-functional** 92:2

**function** 93:18

**functioning** 92:6,18

**funny** 146:5

**future** 189:3

---

**G**

---

**GAD** 62:12,13

**gain** 50:13 66:10,11

**gap** 75:5

**Gary** 4:24 119:2 125:6 128:24 129:15 131:10 137:15 141:9,14 145:2 158:22 163:14 181:17 182:18 183:13 185:25

**Gatalog** 46:9 62:4 64:5 105:9

**gave** 5:14 60:6 73:10 99:17

**gears** 48:18

**Geez** 49:7 71:17

**general** 25:20 28:25 66:13 68:5,9 82:12 100:19 163:16

**generally** 51:22 54:23 89:19 106:6 133:2

**generate** 152:23

**generated** 24:11 26:16 52:9 152:22

**generative** 96:24

**Ghost** 28:9 30:8 31:12 38:21 60:7 62:8,9 69:24 70:2,3,9,11,14, 16,21 71:7,8,19 74:19 76:4,15 79:20 90:13,15, 19,21 91:12,23 92:3 93:9,11,14,15,24 165:22

**gimmick** 150:9

**give** 10:13 29:14 40:9 52:23 53:14 83:24 105:3 128:18 149:19 158:5 166:18,20 172:20 174:2 181:23

**giving** 10:15

**globally** 108:13

**good** 4:3 36:16 72:5 76:8 80:9 109:7 150:6 183:13,14,25 193:6

**Google** 12:19 41:9 42:24 96:18 97:9 148:4

**government** 105:12 112:2,15 114:2,9,20 127:20 128:7 133:2 134:7

**grants** 118:20

**graph** 17:11,18,19 77:6,7,10,11,21 78:6 79:17 82:16,19

**graphable** 80:8

**graphical** 17:20

**graphs** 80:7

**great** 43:24 68:24 103:14 112:7

**greatly** 150:17 185:15

**gross** 51:7,8 54:21,24 55:16 56:2,7 57:19 74:25 165:19 166:14 168:17

**grossing** 18:7,16 19:13

**ground** 81:2 105:11

**grounds** 116:4

**groundwork** 29:25

**group** 165:24

**group's** 91:21

**guaranteeing** 153:13

**guess** 60:4 64:24 66:6 91:7,14 104:17 112:20 181:15

**guessed** 133:17

**gun** 25:16 27:20,23,24

**Guncad** 128:2

**Gunner** 28:9 30:8 31:12 38:21 60:7 62:8,9

69:24 70:2,3,9,11,14, 16,21 71:19 74:19 76:4, 15 79:20 90:13,19,21 91:12,23 92:3 93:9,11, 14,15,24 165:22

**Gunner's** 71:7

**Gunners** 90:15

**guns** 25:22

**Gunsite** 173:4 192:16

**gut** 26:3 87:9

**guy** 106:9 107:3 109:9, 12 121:14

**guys** 105:10,11,15 110:13 160:20 182:16 183:3 190:8

---

## H

**H-O-L-L-A-D-A-Y** 4:25

**hack** 117:23 118:5,17 120:18

**hacked** 44:20,23,24 111:25 112:18 116:12 118:17 128:5

**half** 83:14 101:15

**hand** 23:22 40:4,6 49:13 53:19 166:24

**handed** 114:19

**handle** 10:8,9 49:6,8

**handled** 49:9,10 54:25

**handling** 35:6

**hands** 117:13,16 154:20

**happen** 70:6,7

**happened** 35:25 117:2,5 119:25 121:6 128:20 145:21

**happy** 72:22 99:15 167:12

**harassing** 123:13

**harassments** 34:16

**hard** 7:15 53:11 83:24, 25 84:12,20 86:4

**hardship** 89:2

**harm** 63:8 64:25 65:4 66:8 67:6 68:16 87:16

**harmed** 66:19

**harmful** 44:21 69:12

**header** 66:18 73:2

**heading** 37:18,22 98:7 127:18

**headings** 38:12

**hear** 7:20 20:22 47:19 77:20 78:12 92:10 140:6 178:13 179:22

**heard** 20:24 56:8 61:4 139:24 147:18

**Hearing** 48:9 72:6 73:20

**heart** 111:22 132:18

**Heffernan** 185:3

**held** 73:24 117:12

**Helen** 192:4

**helped** 162:19

**helps** 79:5

**Hey** 163:4 164:13

**hide** 105:13

**high** 18:23

**high-grossing** 18:18,22

**higher** 24:18 161:9

**highest** 18:7,16 19:13,24 28:8 169:22, 23

**highest-grossing** 19:20 20:14 21:23

**highlight** 24:9

**highlighted** 40:22 63:4,5 84:25 165:17

**highly-educated** 163:24

**hired** 65:23,24,25

**history** 117:16

**hold** 11:10 14:18 40:9 60:12 65:11 99:10 100:3 113:14 116:10 138:6,22

**holding** 8:8,12,16,18, 21,24 9:8,9

**holistically** 109:7

**Holladay** 4:25 125:7 143:18

**hook** 93:17

**hope** 105:10,16 155:11,12

**horrible** 117:19

**hosted** 43:12,18 45:25 46:7

**hostile** 25:16

**hosting** 41:13

**hour** 48:6 80:24 174:25

**hours** 80:19 155:15 188:4 189:19 190:5

**Howard** 4:18 14:22, 25 15:8 33:25 34:4,22 78:17 108:5 120:7,10 124:16 129:2,5,17,20 130:6,8 131:5,9,20 133:14 137:6 139:4 141:4,11,23 142:4,12 157:16 158:13,20 159:3,7 160:19 170:6 183:19 185:8 188:22,25 190:4 193:13,21

**Howard's** 132:11

**hybrid** 160:7

**hypothetical** 150:15,18

**hypothetically** 43:9,12

---

## I

**ID** 105:7,15 182:3

identical 76:19

identifiable 85:7

identification 15:11 30:20 33:8 37:5 45:5 54:4 57:9 74:6 75:19 94:9 95:20 101:3 104:7,15 168:14

identified 81:13 82:2 83:11,16

identify 4:16 5:4 30:3,7 55:25 82:9 136:18,22 146:17

illusionary 133:7

illusory 133:6

image 41:9 42:24 148:4

immediately 7:16

impact 19:6,11 22:23 24:3 27:2,20 42:18,19 43:14,21 44:15 45:24 46:4,25 47:12 66:2 67:23 68:21 69:2 98:9, 15 101:18 102:6 117:4, 8 126:4 145:6 153:8 180:5 182:13

impacted 25:10 99:18 103:17

impacts 85:23

impeachment 115:19

implied 26:10

implies 49:23

implying 99:23 127:18 140:13

important 107:18 160:4 167:5,8,13 181:13,16

impression 92:11

improper 133:23

improve 78:22

in-state 55:20

inaccurate 156:5

inadvertently 185:2,10

incident 179:20,24

include 31:12 39:3,6, 8 54:14 165:21

included 9:4 14:9,12 22:2 43:18 50:24 51:8, 16,23 53:4 57:15 87:19 99:2,4,7 101:17,21 187:24 188:4

includes 36:8 38:20

including 41:11 116:15

income 52:9 58:17 74:17 165:23

incomplete 53:15 59:20

incorporating 41:14

incorrect 59:19

increase 164:23

increased 19:10

independent 156:2

independently 13:9,14 135:9 155:21

indication 139:6

individual 6:3 81:20 91:23 92:22 106:20 109:5 163:18

individually 6:5

individuals 89:5,10 102:12 105:24 106:24

industry 25:11 26:4 27:20 84:6 87:5 116:21

infiltrated 127:19

inflicted 63:7 65:4 67:6

influence 127:14

information 13:3 59:15,19 94:11 103:10 112:14 113:25 114:19 115:2 116:13,19 117:12,22 119:16 120:17 132:20 134:18 148:24 152:22 155:19, 21 156:4 162:3,14,16 163:5

infringement 88:19,24

infusion 34:14,19

inherently 36:16

initial 172:6 182:10

initially 73:3 134:15

inoculate 43:3

insane 105:13

insert 133:7

inspirajournals. com 97:14

instinct 26:3

instruct 6:7 123:5,13 140:24 141:6 142:3 183:3,9

instructed 7:6

instructing 6:14 7:8 118:2 119:4 122:9 142:6

instruction 142:8

integral 64:12 65:23 66:4 98:18

intelligence 96:25

intend 8:6

intended 64:15 85:4 127:14 135:14

intense 140:14,19

intent 28:4 161:20

intentionally 135:6

intercourse 88:9

interest 54:14 89:18

interested 110:13, 15,17 123:3

interesting 91:7

interject 78:22

Internet 105:8 149:5 151:14

interpretation 114:7,23 115:3

interrupt 122:14

interrupting 186:9

interruptions 34:16

interview 153:2

interviews 110:19

intimately 52:5 148:20

intrepidpro1@ gmail.com 177:6,10 178:3,9 179:5

introductory 153:25

invested 111:12

invoke 128:6

involved 109:11

irrelevant 123:13

Isaac 4:12

isolate 143:6,15 144:2

issue 72:20 79:2 133:24 137:11 145:17 166:24 185:17 190:18, 25 191:10

issued 9:11

issues 90:4

items 20:15 32:8

iterations 185:14

### J

jargon 127:20

Jason 4:6 48:7 96:23 193:18

jason.m.tyra@ gmail.com. 177:16

job 36:16 109:7

John 4:7 193:20

journal 95:13,17,20 96:6 97:5,10

judge 34:25 118:20 119:5 157:11 189:6

judgement 87:14,21

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

**July** 9:17 14:2

**June** 20:4

**K**

**kicked** 140:7

**kidding** 118:7

**Killeen** 6:21 179:11

**kind** 10:11 26:3 33:2 36:17 48:18 49:10 103:7,14 113:23 114:2 127:12 142:20 153:24 160:24

**knew** 28:12

**knock** 14:22

**knowing** 26:3

**knowledge** 71:3 99:24 132:5 145:19 152:14 154:23 160:23 171:9

**knowledgeable** 148:20,23,24

**Kumar** 97:23,25 98:11 99:5

**L**

**labeled** 33:15

**lack** 144:20,22

**lagging** 127:12

**landing** 151:14,22

**Lane** 5:21

**language** 94:22 127:21

**large** 135:23

**largely** 149:5

**Larosiere** 4:21,22 5:12 6:9,13,19 14:22,25 15:8,12 33:23,25 34:4, 9,22 35:6,11,15 42:3,8 48:3,5,17 72:3,13 73:8, 12,15,19 74:3 79:6 80:14,20,25 81:5 108:5 115:18 116:2,7 118:3

119:7,24 120:4,10,15, 16,21 121:4,11,20,24 122:20 123:8,16,19,20 124:7,16,23 127:7 137:23 138:6 148:6 151:21 174:20 175:6,25 186:17,20,23 188:25 189:7,12,16,18 190:15, 20 192:5,13,21 193:2

**late** 28:12

**law** 51:19 94:8 142:12, 13 157:20 160:9 163:25

**lawsuit** 150:13 151:25

**lawsuits** 159:25

**lawyer** 34:25

**lay** 127:25 129:9 134:14

**lead** 164:5

**league** 127:18

**leak** 119:17 180:5,12 182:14

**leaked** 117:23 120:17 180:16

**leaks** 123:25

**leave** 150:24

**leaving** 99:17 101:6 111:17

**led** 26:12

**left** 120:22

**left-most** 78:3

**legal** 4:12 10:5,13 49:23

**legally** 59:14 94:6

**legible** 15:15

**LEGIO** 36:9,11,14,18

**lengthy** 69:5

**letter** 189:5

**Lettman** 4:23

**level** 116:17 158:15 161:9

**liability** 126:2

**license** 89:6,23

**licensed** 7:19 9:23

**lieutenant** 164:2

**life** 117:9 120:2 121:6 138:25 182:13

**lifts** 25:24

**limitation** 160:23

**limited** 59:12 107:23 166:24

**lingering** 43:7

**link** 73:10 97:12 151:25

**linked** 70:22

**list** 49:12 95:11 166:16

**listed** 64:4 96:12

**listening** 35:4 174:23

**listing** 95:17,20 113:22

**literally** 99:25 102:25 117:16 169:22

**literary** 134:3

**literature** 95:7

**litigate** 119:8 120:8 137:16

**litigated** 124:17

**litigating** 137:18,19

**litigation** 10:8 67:17 69:9 156:23

**live** 179:11

**lived** 5:22,24 6:20 116:16 179:16

**local** 123:10 149:22

**long** 5:22 9:16,25 22:8 27:2 80:21 175:7 177:5

**longer** 58:14 100:11 135:18

**looked** 26:24 69:13 98:23 166:22 167:4

**Los** 4:14

**lose** 61:5

**losing** 53:17

**loss** 87:9 90:14,16 105:25 165:6

**loss/profits** 8:25 9:4,7

**lost** 20:22 23:19 27:4 46:21 61:3,7 68:3 70:9 103:18 108:7 109:18 140:17

**lot** 58:23 66:16 83:23 106:24,25 107:9 111:15 143:17 168:23 175:23

**lots** 59:24 100:10

**low** 128:3

**lower** 82:17

**lowest** 18:7,16 19:13, 24 169:23

**lowest-grossing** 19:23 20:14 21:24

**lunch** 80:13,15

**M**

**M82** 128:3

**machine** 91:24 92:4, 22 93:2

**macroeconomic** 85:23

**Madam** 42:4 72:14 99:11 126:8,12 137:12 138:7,20 141:3,20 142:10 173:18 174:10

**made** 11:3 31:25 53:3 61:10 64:14 66:7,21 67:4,13,14,15 77:3 92:14,16 107:9 113:6 114:20,25 115:3 116:13 134:2 143:24 156:23 191:22

**Madison** 117:23 118:5,19 119:17 120:18 140:22 141:16,25 176:12 177:3,18,20,25 179:25 181:3 183:16,22

**make** 34:23 43:17 45:9 48:4 52:12 53:7,12

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026
JOB NO. 2667670

59:18 64:18 78:16,19 85:25 92:17,18 104:4 105:14 115:21,24 122:12 123:9 128:20 134:5 138:7 140:11 150:4 161:15,18 169:18 179:13

**makes** 10:17 52:15 132:22

**making** 55:25 56:5,6 57:17,20 58:16 59:3

**maliciously** 108:24

**manage** 50:8

**management** 10:14 139:18 176:7

**manufacture** 92:7

**Manvinder** 99:6

**March** 146:4

**mark** 14:23

**marked** 15:10 30:19 33:7 37:4 45:4 54:3 57:8 74:5 75:19 95:20 101:3 104:7,15 168:13

**market** 24:3 27:24 67:18 83:12,17 143:2

**marketing** 10:18,19, 22 11:15,16,21,22,25 12:9 96:7 97:5,6,10,11, 21 98:10

**marking** 14:21

**marriage** 121:15,19

**married** 121:17,21 123:4

**martinis** 160:19,20

**mass** 116:20

**master's** 11:10

**matches** 57:19

**material** 19:11 25:21 31:8,15 44:21 67:11 71:2 92:25 100:21 102:7

**materials** 14:17 16:6 61:9 67:9

**math** 29:2 149:23

150:10,12,16,20,22

**Mathieu** 4:6 193:19

**Matt** 127:5,22 134:21 165:14,16 183:14

**Matt--** 129:3

**matter** 4:6 129:9 134:22 148:7 155:10 156:23 159:24

**matters** 71:18 115:17 116:6

**Matthew** 4:21,22 5:19 33:21 73:14 80:12 115:22 121:2 123:11 136:25

**maximum** 150:12

**MBA** 11:13 12:2,4 163:24

**meaning** 43:16 114:3,12 146:17

**meaningful** 182:12

**means** 116:14 135:8 153:19

**meant** 38:16 113:5 114:8 134:16 170:17

**media** 12:9 24:13 40:25 41:8 69:12 96:7 97:6,10

**medical** 34:13 35:7

**meet** 110:6 191:12

**member** 141:6

**membership** 102:13

**memberships** 89:3

**meme** 12:23 13:15,21 16:23 18:6 21:9,17,25 22:2,7,12,16,21 23:4,9, 14,21,24 24:11,13 26:16,23 27:8 30:4,9 31:25 32:16 40:11,19, 24 41:10,13 43:3,18 44:2,6,19 45:4,10,25 46:7,11,19,21 47:11 60:15,17,19,21 61:5,11, 15,17,21,24 62:3,6,7, 10,11,15,18,23 63:9,12, 13 64:16,18,22,24 65:6,

15,25 66:3,8,19 68:3,16 69:12,20 70:4,8,10 79:10,21 80:5 81:10,24 82:16,23 84:20 85:12 86:7,10,22 87:15 101:10,18,19 102:19 103:19 104:19 105:18, 19,22 106:2,12,17,20 108:7,14 109:19 111:21,24 112:14,16 113:2,8 114:3,18,24 126:5 127:2,14,20 132:19 133:3 134:15,25 135:9,13 136:15,23 143:6 144:6,16 146:17, 19 147:14,23 148:11 149:10,12 151:12 152:3 153:9 161:13,19,23,25 164:24 165:2,3,7 187:25 188:5

**meme's** 24:3 26:18 43:3 46:16

**memes** 97:4,9,21 98:9,15

**memory** 71:15 148:6

**mention** 27:19 64:6 70:10 105:19

**mentioned** 8:9 27:11 28:10 70:3 105:18

**Mercifully** 175:3

**mess** 103:7 104:5

**messages** 174:3,4

**metal** 91:25

**methodology** 17:24 87:6 167:24,25 168:2

**methods** 86:15

**metrics** 47:15

**micro** 27:5

**Microsoft** 38:15

**mid-2023** 144:23

**middle** 68:9

**military** 160:17 163:22 173:5

**mill** 91:12,16,22

**million** 69:22 70:10 165:11 166:18 167:7 168:17,18 169:6

**millions** 140:16

**mind** 76:9 93:5 106:8 109:8

**mine** 32:24

**minimum** 182:9

**minor** 145:10 146:9

**minute** 71:25 124:22 177:19

**minutes** 48:4 80:24 133:16,25 143:22 164:18 166:5

**mischaracterizes** 125:25

**misleading** 89:25

**missing** 39:7

**misspoke** 40:16 85:17

**misstated** 114:5

**misstates** 131:24

**misstating** 114:21 128:22 130:4,17,23 133:19 136:6 155:22 166:6 171:13

**mistakes** 59:19

**Mm-hm** 52:7 70:22 76:16 95:8 100:23 101:17

**model** 128:3

**models** 8:9,11

**modifications** 171:18

**modified** 16:16 32:22

**modify** 171:17

**moment** 127:7

**moments** 125:14

**money** 10:14 36:20 52:13,15 53:3,7,12 57:18,20 58:16 59:4 105:14

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

monologue 15:5

month 16:23,24 18:17,19,22 19:2,20,23 20:14,15 21:23,24 22:2, 5 26:9 27:3 53:18 82:15,16,17 85:9 86:22 87:2 144:6,15,16

monthly 18:9 76:3

months 18:7,16 19:14,24 21:19 24:19 79:13 169:9,14

morning 4:3 73:11 130:10

motion 120:7 122:17 190:22,23

motivations 99:25

mouse 17:7

move 6:17 14:2 121:22 122:5 123:14 129:22 130:13 137:9

movie 147:17

moving 118:8,11 121:8

multi-licensed 160:8

multidisciplinary 10:6

multiple 112:19 152:8 156:19 184:8

**N**

N-E-T-A 179:11

nail 88:5

narrative 64:21 68:20

narrow 59:2

National 24:24

needed 184:19

Neeraj 97:23,25 98:11 99:5

Neta 6:20 7:10 179:11

news 183:13,14

nexus 46:20

nicer 77:3

niche-use 86:18

Ninth 4:14

non-existence 59:23

normal 91:9

Notary 5:9

note 80:6 139:7

noted 151:3,19 153:17 165:18 167:17 177:13 193:25

notice 37:12 72:24

noting 24:16

November 19:21 20:10,13 75:2

number 4:10 55:3 95:12,24 96:5 181:24 182:3,5,7

numbered 96:2

numbers 31:2,6 55:7 60:6 76:24 77:2 167:14, 19 169:4

numerical 17:21

numerically 91:22

**O**

oath 53:11 159:21 175:18

obfuscate 15:24

object 5:19 6:2 14:19 78:17,24 88:11,13 103:20 108:9 114:4,21 117:24,25 123:12 133:20 138:19 139:22 142:2 150:23 152:10 157:6 158:4 167:15 170:6 173:14 174:17 177:8 179:12

objecting 137:17 158:14,16

objection 6:22 15:2 17:14 38:22 41:18 42:2

44:16 47:8 86:12 87:10 102:21 103:20 115:8,21 116:3 118:14,24 123:10 128:22 130:3,17,22 131:16,24 132:15 133:9 136:5,20,24 139:8 142:23 144:8 145:11 147:25 149:13,25 151:2,16,18 153:15,17 156:13 157:13,15 166:6 167:17 171:13 173:8 174:2,8 177:12,13,23 181:4

objections 15:3 48:9 72:6 73:20 115:25 132:11 133:23 157:18 175:23

obvious 39:7 124:11

occasions 112:19

occur 51:20

occurred 26:9,10 146:13 176:21 182:10 183:20 184:23

occurring 69:7

October 20:5 69:23 74:20,22 75:3

Odysee 105:9

off-the-cuff 85:18

offer 8:6

offering 135:25

office 27:17 83:9 139:18 149:24 150:20 176:6

officer 115:14 116:11 160:8

offline 160:18

omitted 19:12,13 161:8

online 10:22 22:12 41:10,14 43:7 44:2 96:13 108:16 109:2

onward 80:4

open 120:8 128:24

operate 53:13 63:18 64:2

operated 63:23

operates 93:11

operating 64:10

opine 64:13 126:2 136:14

opines 128:12

opinion 9:12 64:19 67:14 71:10 87:15 135:23 136:7,9

opinions 8:5 142:18

OPM 116:12 118:18 138:16 139:17,18 140:4,15 176:6

opportunity 100:16 103:5

opposing 184:22

opposite 28:6

order 6:17 89:23 93:17 118:8,12,21 119:6 121:9 123:15 186:25 193:22

ordered 58:11

originally 175:21

out-of-state 55:20

outcome 155:17

outlier 169:9,13,17,21

outliers 18:8 169:10

outperform 105:10

output 104:6

outrageously 124:8

overrule 132:10

own's 54:17

owned 54:16 113:19 130:16,20

owners 54:16

owns 131:14,23 132:20 152:8 154:21

## P

P&I 149:2

p.m. 48:13,16 72:9,12 73:23 74:2 159:12,15 175:10,13 193:25

packet 56:15

pages 30:25

Pahwa 99:6,7

paid 51:5 71:7 155:9, 13

paint 149:23

pandemic 84:4,8 86:5

paper 95:18,25

paragraph 127:11, 24 153:25

paraphrasing 133:21,25

parking 159:5,6

part 12:2 41:4,5 53:15 55:11 64:13 65:23 66:4 77:14 88:20 92:15 93:7 95:5 98:18 108:15 117:23 135:15,24 152:2 156:20 173:4,7 176:20 192:22

partially 91:24

participant 146:2

participated 145:23

participating 151:11

parts 41:6 92:9

party 116:13 149:2

past 49:9 143:22

patter 122:15

pattern 169:21

paying 71:9

payment 50:18

paywall 105:13

peak 17:9

peaks 78:4

peer-agreed 18:6

pending 35:13 72:14 132:11

people 13:10,16 23:15 25:21 28:3,15 81:14 99:25 100:11,15 106:4 107:9 111:17,23 112:7,9,25 118:6 134:5 140:16 164:5,9 186:12

perceived 25:15

percent 60:4 68:2 70:8 79:19 80:3 81:9 83:13,15,18 86:9 87:8 103:18 108:7 109:18 147:13

percentage 100:18

perception 42:12

perform 16:17 17:20, 22 23:5,16 80:7 82:25 106:21

performed 17:20 23:3

performing 49:3

period 18:9,11,15 19:16,18,21 20:2,3,4,8, 9 21:9,10,16,18,19,22 22:3,4 24:22 69:5,17 78:5,7 144:23 167:21, 22 169:15

periods 19:14

permanent 179:17

person 27:16 54:17 63:19 66:7 70:16 94:6 106:7 107:6 113:5 134:14,17 146:18 161:19

person's 66:8

personal 48:19 49:8 71:3 93:3 101:12,14,25 104:24 106:3,10 109:25 115:17 116:5 117:8,15 119:25 132:5 138:25 140:19 143:25 145:18 149:7 158:24 159:2 171:8 182:13

personally 110:16 111:12 115:6 138:18 139:19,25 140:9 142:21

Personnel 139:18 176:7

persons 85:4 127:25

Peth 4:12

piece 134:18

pieces 71:5

pin 92:13

pistol 84:11,19

pistols 24:23

place 4:11 63:21 125:18 128:10

places 41:11 42:25

placing 129:25 151:12

plainly 43:12

plaintiff 64:17 132:20

plaintiff's 41:23 63:10 65:7 69:4

plaintiffs 4:19 13:6 14:15 40:24 41:7 52:4 60:21 63:8 65:5 66:19 67:6 87:16 108:14 126:3 134:24

plaintiffs' 25:8 82:23 108:25 191:21

Plano 5:8,21

plans 90:11

platform 23:15 53:10 70:13 93:8,21 114:10

platforms 41:8

play 133:7,17 146:10, 13

pod 35:5

point 19:10 31:11 85:25 96:3 113:7,13 134:4 141:5 185:21

pointed 129:11 138:3 165:3

pointing 38:14 169:20

poking 17:25 18:2

politicians 25:15

pollute 189:19

poly 128:3

Polymer80 62:24

pop 24:11 26:16 31:25 32:16 33:20 36:8 187:25 188:5

popular 145:23,24

portion 11:12 88:7 100:20,21 102:6 124:13 133:5

portray 103:15

position 32:10 33:3 39:15 58:2 118:25

possibly 185:13 190:12

post 46:12

posted 13:10,15 22:20 40:19 42:17 44:9, 11 79:10

posting 23:9 82:23

potential 46:19 81:23 88:23 151:6

potentially 13:24 53:14 57:25 99:19,20 100:10 103:23 111:17 146:15,16 156:9

pots 154:21

Power 97:4,9

practice 10:3,5,7 110:22 111:11 112:6 190:22,24

practices 68:5

practicing 160:10

practitioner 36:25

precise 18:12

precisely 21:6 42:23

precursor 162:9 170:7

prefer 80:18,21

preparation 7:25

59:17

**prepare** 8:11 16:3 37:2 49:23 166:22 184:6

**prepared** 32:4 45:24 51:2 53:16 54:7 55:13, 14 65:2 103:24 149:2 166:23 171:19

**preparer** 36:25 110:8,11 152:19

**presence** 44:2 69:12 182:14

**present** 15:5 85:8

**presented** 112:5

**presenting** 30:17

**Preston** 5:7

**presume** 47:3 107:24

**presupposing** 44:10

**pretty** 17:11 18:18,22 69:5 84:3,12 85:22 86:17 87:3 117:17 125:17 147:10 174:15 181:13

**previous** 24:18 27:14,15 31:11 81:17

**previously** 27:13 58:10 139:15 171:16 175:22,25

**primarily** 10:8

**print** 70:18 95:2

**prior** 6:16 18:6 21:16 141:15 145:16 168:16, 17 173:5 177:7 184:11, 24

**privacy** 89:21 106:3, 10 111:16

**privacy/security** 101:13,14

**privileged** 173:15

**probation** 145:16

**problem** 23:10 34:13 46:17 58:9 71:13 106:5 108:12 139:6 190:3

193:23

**procedures** 106:21

**proceed** 107:22

**proceeding** 192:25 193:9

**process** 36:17 162:15,20,23 163:6,9

**processor** 36:15,18

**produced** 82:16

**product** 25:7 32:6,9 33:17,18 61:25 70:21 90:23 91:5,8,21 92:6,23 93:4 112:8 167:20 173:15

**products** 28:19 50:18 92:3 127:16 192:24 193:8

**professional** 87:12, 14,15,20 110:21 111:11 112:6 115:14 116:6 117:8

**professionally** 84:7 110:15 115:7

**Professor** 99:6

**project** 30:12

**promise** 119:17 120:23 121:4

**promoting** 127:13 135:13

**proof** 26:12,13

**propagated** 126:25 134:25 161:16

**propagating** 127:13 135:13

**proper** 106:5 169:18

**properly** 83:7 150:10 191:8

**property** 179:16

**proportionate** 55:2

**protective** 6:17 118:8,11,21 119:6 121:9 123:14

**provide** 14:16 29:12 50:2 58:11 75:7 94:8,11

103:12 162:16 172:15, 18

**provided** 16:10,12 29:8,15 39:22,25 53:20 58:12 63:20 75:9 76:23 93:12,20 96:11 99:5,16 101:6 103:17 113:25 152:23,25 154:4,11 155:19,25 162:4,13 168:16 170:20,21 171:6,12,19 172:8 173:22 190:2

**provider** 66:15

**public** 5:9 7:18 88:18, 22 128:7 153:21

**publications** 10:25 11:3 111:9

**publicly** 23:4 116:17

**publicly-accessible** 23:14

**publish** 147:23

**published** 10:21 22:16 98:9,19 146:3,10, 12

**publishing** 148:11 149:10 152:5

**pull** 10:25 47:23 63:2 126:8,12 127:5 134:21 165:15

**pulling** 63:3

**purchase** 30:8 70:16 94:6 100:11 112:8 192:24 193:8

**purchaser** 30:7

**purchasers** 127:15

**purchasing** 71:20 136:23

**purported** 23:8 46:17 68:3 70:9 90:14, 16

**purporting** 68:7

**purports** 33:16

**purpose** 106:22

**purposes** 66:10 107:16,20

**pursuant** 185:5

**pursue** 124:11

**Pury** 4:24 78:25 115:24 118:9,13 120:7, 13 122:7,13 124:18 125:2,4,5,6 126:15,18, 20 127:4,8,10 129:2,5, 17,20,23 130:6,8,12,24, 25 131:8,11,16,20,21 137:3,6,16 138:5,11,20, 23 139:2,9,12,14 141:2, 11,17 142:4,9,16 145:4, 5 151:2,18 153:17 157:15,22,23 158:13, 17,20 159:2,7,16 162:9, 12 167:17 171:23 172:2 173:16,18,24 174:10, 13,22 175:8,14,16 177:13,21 178:2,7 181:6,19,22 182:19,24, 25 183:11,23 185:8 186:4,9 189:23 190:25 191:6,23 192:2 193:12, 15,21

**push** 80:18,22

**pushed** 84:12

**pushing** 28:5,9

**put** 15:3 16:7 85:24 93:15 97:12 103:10 112:13 118:23,24 126:10 128:14 150:15, 19 164:14 165:12

**putting** 118:13 160:24 183:18

---

**Q**

---

**qualified** 161:15

**qualifier** 161:9

**qualify** 111:7

**quality** 153:22

**quantify** 86:4,6

**quantity** 102:5

**question** 6:15 7:15 8:17 9:20 11:2 17:13, 15,16 18:21 21:3 26:13 27:18 28:20 35:3,13 36:12 37:7 38:23 41:19

43:17,22,23 46:14 47:9 56:8 59:2 60:25 61:4 66:17 71:21 72:14 73:14 77:20 80:12 82:15 85:21 86:8 87:4 88:14 89:14 91:15 94:23 96:23 98:17 100:4 102:11,14,25 103:4,21 107:16,17,19, 20,22,24 108:4,10 109:22 111:14 113:10 114:5 115:9,19 116:3 117:25 119:6,12 120:5, 19,20,21 121:3,9,10,12, 18 123:6,12 126:14,16 128:16 129:24 130:7,14 131:8 133:10,15,20 136:21 137:2,13,15,22, 24,25 138:2,9,19,21 139:7,10,23 140:9,10, 13 141:2,3,21,22,23 142:3,11 143:13,15,19 144:10 148:13 149:14 150:7,19,24 151:4,17 152:11 153:16,18,19 154:18 156:14 157:7,8, 14,16 158:4 159:3 160:25 161:4,5 162:10, 25 163:7 164:18 167:16 168:25 169:2,3 170:5, 16 172:3,5,6,8 173:9, 19,25 174:11 176:3,12, 15,24 177:9,22 178:19, 21 179:12,21,23 182:11 183:2 185:24 188:14 190:7

**questioning** 124:10 141:19 180:22 181:18

**questionless** 186:5

**questions** 6:3,4 14:6 29:25 30:13 59:6 103:8 119:13 124:19 125:12 138:14 139:3,4 142:14 143:18,23 158:24 159:19 174:25 175:22, 24 177:2 181:20 182:17 183:5,16,22 184:4 186:2,15,18 192:11,12

**quick** 109:22 137:7

**quickly** 124:2 172:25

## R

**R-SQUARE** 14:12
**R-SQUARED** 14:10

**raises** 35:3

**ran** 42:24

**random** 84:8

**rapid** 168:21,24

**rate** 85:9

**raw** 91:25

**re-ask** 170:5

**re-depose** 124:4

**reach** 105:12

**react** 25:12

**reaction** 140:14

**read** 35:13 40:21,22 41:4 42:5,7 45:9 61:15 72:15 84:25 91:19 93:7 94:5,17,19,20,25 95:2, 16 96:10,14,19 98:7,21, 22,23,24 99:12,13 104:4 105:6 125:10,11 126:19 127:11,23 135:15 165:16 193:16

**reading** 95:8 105:2

**reads** 126:16

**real** 109:15 167:14,19

**realization** 51:9

**realize** 36:18

**reason** 19:15 36:5 38:17 44:19 73:3,6 76:22 101:16 102:18 132:18 134:11 137:20 170:23 171:2,4 172:6, 21 184:17 191:17

**reasonable** 13:8 60:22 61:7 77:13 134:16 164:8,10

**reasoning** 106:6

**reasons** 59:24 99:17 100:6,11 111:17

**recall** 13:2 42:23 126:8 165:11 175:18 176:3 177:4 179:7 181:3,10,11 187:23 188:3

**receipts** 54:22,24 55:16 56:2,7 57:20 168:17

**receive** 16:18 189:14, 17,21

**received** 16:11,15 36:4 50:23 189:23

**receiving** 192:22

**recent** 98:8,19

**recognize** 54:5 75:22,23 104:9

**recommendation** 79:4

**reconcile** 26:15 41:17,21

**record** 4:4 15:4 30:15 34:24 42:7 48:11,12,16 71:25 72:3,8,12,16 73:16,17,21,22,24 74:2 115:22 118:14,24,25 124:22,25 126:19 131:17,18,19 132:10 135:15 137:10 139:8,17 146:18 159:12,15 167:10 169:24 175:10, 13 176:6 183:11,12,17, 18 184:2 189:19 190:4 191:24 193:24

**recorded** 165:23

**records** 176:18,21

**recurring** 100:17,19 159:9

**redact** 190:6

**redacted** 190:9 191:15,20

**redactions** 191:22

**Reddit** 26:23 41:8,11

**redepose** 124:5

**REDIRECT** 186:23

**reduce** 28:14

**reduced** 85:11

**reduction** 144:12, 14,22

**redundant** 174:14

**reed** 63:4

**refer** 29:7

**reference** 14:20 61:18,20,22 62:8,9,11, 15,18,20,23 65:16,17

**referring** 85:15

**refers** 25:19 113:11

**reflecting** 160:22

**reflects** 77:16

**reformat** 76:25

**refreshed** 148:6

**refusing** 124:9,11

**refutation** 43:13 44:11 47:12

**refutations** 45:16, 18

**regard** 132:24 174:6

**registration** 24:22

**regression** 8:9,11

**regulate** 25:13

**regulation** 25:20 28:3,9 69:2,8 84:10

**regulations** 25:14 67:17 68:25

**reinstated** 59:25

**related** 19:22 24:7 88:6 165:22

**relationship** 49:23 70:15

**release** 18:6 91:10

**released** 16:23

**relevance** 88:11 117:25

**reliable** 108:17

**relied** 8:22 14:17 98:5,6,14 155:19

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

**relies** 135:24 136:8,9

**rely** 16:18 157:11

**relying** 8:19

**remained** 41:10

**remember** 5:24
14:10 33:19,20 35:14,
16 36:10 39:3 40:11
47:23 69:19 77:7,10
95:4,8

**remembered** 16:8

**remove** 32:5 47:22
188:17 191:20

**rendered** 23:11 51:5

**repeat** 20:24,25 51:14
89:14 92:10 102:14
139:9 178:14

**repeatedly** 116:18

**repetitive** 125:13

**rephrase** 157:8

**replaced** 140:18

**report** 7:22 8:5,10
9:2,3,8,12,13 12:22
14:12 15:10,19,24
16:14,25 17:3,24 18:3
21:2,7 22:15 24:5 25:13
27:10,11,21 28:10
30:19,21 31:18,20,24
33:7,12,14 35:16 36:3
37:4,8,10 39:2,5,6,11,
20 40:14,16 41:9 42:22
45:24 46:5,20 50:21
53:4,16 54:20,21 55:25
56:6 60:20 63:2 64:13,
21 65:2 66:12,21,22,23
67:5,17 68:13,14 69:20
70:13,23 71:6,12,18
72:19 74:5,8 75:13,18
76:7,10,12,21,24 79:25
81:24 82:2,4,6,10 83:13
84:10,24 86:24 87:7,19
91:18,19 94:14 95:6
96:25 98:18 106:25
112:23 114:17 125:10,
18 126:7,9 127:6
128:11,12,19,23 130:5,
14 131:19,25 134:20
143:9 148:4,12 152:23
153:14 154:2,3 156:20
161:12 162:3 164:14

165:5,10,12 166:12,13
171:6 172:9,16 173:22,
23 184:7,25 186:25
187:4,24 188:4,9,11
191:18

**reported** 24:17 76:16
118:19 170:11

**reporter** 5:4 42:4
72:14 99:11 102:16
111:6 126:8,12 137:12
138:7,10,20 141:3,20
142:10 173:18 174:10
191:25

**reporter's** 159:10

**reporting** 54:16,17
56:2

**reports** 14:8 31:16
37:14 39:10 40:7 71:14
156:2

**represent** 4:17
74:12 184:21

**representation**
77:13

**represented** 100:17
170:21,22

**representing** 121:2
143:18

**represents** 17:6,9
77:12,21

**republican** 28:13,18

**reputation** 145:6

**request** 159:10

**requested** 185:4

**require** 51:19 94:10
129:8 185:5

**required** 11:12
14:16,23 34:7 36:17
51:22 54:16 59:8 94:8
177:9

**requires** 54:12

**requiring** 89:5,22

**research** 10:24

**reserve** 134:8

**resided** 7:10

**residence** 5:17

**residences** 6:17

**resolve** 72:20

**respect** 23:5,12,16
26:20 32:7 57:24 66:3
163:10 166:21 184:14

**respond** 43:2

**responded** 189:23

**responding** 73:9
178:5

**response** 176:5
178:6

**responsible** 64:25

**result** 70:20

**resulted** 84:5

**resume** 73:14 175:5

**return** 49:19 50:13
51:6 54:3 56:22 57:2,8,
11 142:17 148:25
166:18 168:13 185:4

**returned** 32:7,9

**returns** 49:8 51:2
58:11,17 59:17 166:17,
21

**revealed** 41:10

**revenue** 28:8 36:9,
10,11 37:12,13,23
38:20 46:21 51:7,8 53:9
55:25 56:5,23 59:13
67:24 70:9 81:7 100:18,
19 136:15 144:6,12,13,
14,22,23 147:14 154:25
155:2 165:6,23 166:9
168:22,25 170:18

**review** 7:25 61:9
67:11 75:8 140:21

**reviewed** 65:15,16
67:10 72:16 74:17
109:17

**revised** 186:11
191:18

**ridiculous** 131:12

**rifles** 24:24

**rights** 25:16

**rising** 25:23

**Road** 5:7

**Role** 97:21

**rose** 75:2

**routinely** 59:16

**row** 103:11

**rule** 123:10 129:15,19,
20 173:20 190:12

**rules** 34:10 122:16
129:3,7,9 185:5,9

**run** 27:2 105:10

**running** 155:7

---

**S**

---

**sake** 13:25

**sale** 19:22 53:9

**sales** 13:20,25 18:9
19:9 24:11,17 25:18
26:17,20 27:4,24 28:14,
19 31:12 32:2 38:20
50:24 60:7 61:3,5,7
67:18 68:3 70:2,14,19
74:19,23,25 84:5 85:8,
11 86:25 87:2 88:8
91:10 93:8,13 100:19,
21 103:18 108:7 109:18
151:9 165:18,19,20
166:14,15 167:20
170:22 187:25 188:6

**sample** 169:19

**satisfied** 168:3,9

**satisfy** 134:4

**Saville** 110:9

**scammers** 105:16

**scenario** 156:8

**schedule** 54:11,18,
21 55:11,19 57:14,23

**schedules** 58:18

**scheduling** 186:25

**school** 25:17 142:12,
13

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

**scope** 30:11 65:2 167:23

**score** 16:9,17

**Scratch** 60:25

**screen** 45:17 127:5

**scroll** 15:25 17:23 42:4 56:9 127:22

**scrolling** 187:8

**scrutinized** 160:11

**scrutiny** 128:8

**scum** 105:16

**search** 41:9 42:24 148:4

**second-grade** 158:15

**secret** 160:14

**section** 14:9 17:23 40:22 47:15 63:4 66:18 85:2 91:20 95:5

**security** 101:25 106:3,10 111:16 116:10

**security/privacy** 104:25

**segments** 29:21

**select** 103:10

**selected** 101:23

**sell** 25:4

**seller** 94:9

**send** 34:10 71:22 191:14

**sense** 10:17 161:18

**senseless** 34:15

**sentiment** 88:18,23

**separate** 19:24 41:11

**separately** 57:20

**September** 19:23 21:5

**service** 10:12 61:25 63:21 90:2 100:12 116:25 173:5 192:23

**services** 49:3 50:18 51:5 63:20 90:7

**set** 34:14 186:17

**sets** 34:19 155:7

**sexual** 88:9 145:10 146:9

**shade** 37:17

**shape** 143:20

**share** 52:9 127:6

**shared** 112:4,15

**shares** 111:25

**sheet** 16:8 50:14 77:14 103:6

**sheets** 16:7

**shenanigan** 172:14

**shift** 48:18

**shifted** 170:8,10,16, 18

**shifting** 166:3

**ship** 93:24

**shocked** 146:6

**shocking** 145:25

**shooting** 25:17

**short-barreled** 24:23

**show** 13:24 26:19 30:18 33:6 37:6 45:6 51:6 53:24 58:17 100:24 104:8,13 167:14

**showed** 30:23,24 32:23 38:6 55:7 82:19 151:22 171:15

**showing** 32:6,25 33:15 36:5 38:2 39:17, 18 46:11 55:22 76:20

**shown** 108:21

**shows** 55:2 57:5 78:8

**shy** 44:7

**side** 10:4

**sign** 73:5 184:19

**signature** 31:9

32:12,13,14,17,20,21 33:4 72:25 153:10 154:6 187:9,16,19,20

**signed** 33:18 73:5 184:9,15,18 185:7 186:13 187:7,15,18 190:16

**significant** 19:5 28:17 44:15 46:3,25 117:3,8,11,18 132:23

**significantly** 19:10

**similar** 29:17 37:9 66:9 76:17 82:13

**simple** 6:15 78:25

**simplify** 159:19

**simply** 121:12 124:10

**simultaneously** 81:7

**sincerely** 105:16

**Singh** 99:6,7

**single** 28:7 30:3,7 136:18,22 167:20 171:20

**singular** 81:12 172:16

**sir** 122:19 126:23 127:11,23 129:22 130:13,19 131:2 138:12 141:18,22 142:18 143:25 150:19 153:18 157:24 175:21

**site** 89:6 111:4,24 119:22,23

**situation** 35:7 46:2 128:21

**size** 169:19

**skip** 125:16

**skipped** 49:10

**skirt** 163:23

**slight** 16:11

**slightly** 14:3 143:19

**slow** 122:15

**social** 12:9 24:13 27:5 40:25 41:8 69:11 96:7

97:5,10

**software** 93:19

**soldier** 143:21

**sole** 143:6 187:5

**solely** 24:2

**someday** 160:18

**sorted** 15:9

**sounds** 58:21 72:5 83:19 181:25 193:5

**source** 98:11,22 99:4,5 101:20 115:2

**sources** 94:16,19 95:16

**southern** 4:9 154:20

**sowing** 85:6

**space** 111:8

**speak** 138:16 158:22 182:16,22 183:3

**speaking** 51:22 84:7 115:24 118:14,23 126:21 133:14 157:18 165:3 186:8

**specific** 49:23 64:23 85:24 86:20,23 88:3

**specifically** 9:6 101:23 106:10 163:11

**speculate** 43:16 45:23 150:5

**speculated** 133:5

**speculates** 161:12

**speculating** 114:2 160:13

**speculation** 44:17 102:22 103:14 108:10 132:16 150:2,3 157:21 163:13,15

**speculative** 53:14

**spike** 78:9 79:7,12

**spoke** 138:16 183:7, 15

**spoken** 140:5

**spouse** 116:16

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

**spreadsheet** 29:12, 16

**stabilizing** 24:23 25:4

**stand** 128:15 166:13

**standard** 86:15,25 87:5 192:22 193:2

**standards** 154:2

**start** 6:10,14 28:3 152:17

**started** 116:8 162:19

**starts** 16:22 79:15 127:17 144:16

**state** 4:17 5:9 58:19 116:4 134:24 135:12 154:3 165:10

**stated** 100:6 126:9 166:13 183:13

**statement** 26:8 64:19 66:13,20 67:12 71:10 82:13 92:21 105:20 107:8 135:17 155:7,8 157:5 170:12 188:18

**statements** 60:20 149:2 161:15

**states** 89:7 94:8 115:15 116:11

**stating** 5:7 132:9 169:6

**statistically** 169:18

**steadily** 81:8

**steel** 91:25 92:4 93:2

**Steno** 4:13 78:14

**stolen** 116:19

**stop** 14:25 15:2,4,8 30:16 33:25 34:4,15,22 35:8 56:12,17 108:5 123:11 124:7 130:11 131:6,9,20 141:7 158:16,23 171:22

**stop-gap** 160:25

**stopped** 136:23

**store** 149:3,24

**storefront** 149:11

**straight** 8:15

**strategic** 36:17

**Strategy** 97:22

**Street** 4:14

**strikes** 111:22

**Stroke** 4:23

**strong** 84:5

**structured** 59:14

**studies** 12:17

**study** 12:18

**stuff** 29:25 43:19 50:8 69:7 163:11

**subheading** 38:16

**subject** 115:5

**subjected** 55:4

**submitted** 184:20

**subscribe** 30:4

**subscribed** 181:12

**subscriber** 141:25 177:3 181:3,10

**subscription** 74:25 90:11 105:25 165:23

**subscriptions** 53:9 89:13,16 109:6 170:22

**subsequent** 176:11

**subset** 26:21

**subsidiaries** 54:15

**substantial** 102:6

**substantially** 29:17 37:9 76:17 175:24 176:16

**subtract** 83:20

**successful** 119:10

**sudden** 164:23 168:20,24

**suggest** 33:17 130:11 161:9

**suggested** 53:17

**suggesting** 114:24

**suggests** 23:23 112:14

**suit** 46:8

**Suite** 4:14 5:7

**summary** 56:17 104:6

**supplemental** 9:12

**support** 50:2 93:13 101:11,13,24 104:21 107:8 108:6,8

**supports** 93:8

**supposed** 64:22

**surprise** 91:2,16 113:18

**surprised** 91:4,6 108:23 113:20

**survey** 95:7 100:16 103:15 104:14 142:21

**surveys** 8:19 12:14 100:5,9,20 101:2,5 106:25 107:14,21

**suspect** 185:18

**swear** 5:5

**sworn** 5:9 158:18 192:2

**symbiotic** 70:15

**synced** 192:25

**system** 129:6

**systematically** 85:6

---

**T**

---

**takes** 54:12

**taking** 4:11 34:8 35:2 74:4 188:10

**talk** 10:9 14:5 25:14 60:18,24 84:9,19 115:5, 23 136:13 160:17

**talked** 33:19 46:17 88:3,6

**talking** 12:12 15:2,4 16:5 34:4 39:2 51:15 61:2 66:21,23 98:8 101:25 110:19 111:16 123:11 169:16

**tax** 36:24 50:12 51:2,6 54:3 55:5,11,18 56:21, 22 57:2,8,13,14 58:11, 16 59:17 74:17,18,21 110:8 148:25 152:18 165:20 166:16,17 168:13

**taxable** 54:24

**taxes** 49:6,24 148:17 164:17,20 165:9

**technical** 15:9 90:4 92:18 102:16 127:20

**technically** 71:19 78:23

**technology** 91:13

**telling** 13:6

**tend** 25:21 27:23 38:12

**term** 54:13 62:5 101:20 113:3 114:7,13 144:20,22 154:20 163:22 168:22

**terminating** 120:11, 12 124:13

**terms** 59:14 68:20 85:24 140:19

**terrible** 117:19

**terrorist** 25:16

**testified** 5:10 58:12, 14 125:15,18 133:24 136:3 139:16 143:17 152:18,21 155:20,22 156:19 157:24 158:2,10 159:21 166:2 170:9 171:16 179:10 184:23 185:20 189:25 190:11, 19

**testify** 14:16 52:15 53:11 136:5 147:9 148:7 154:9,10,11,14 155:6 157:4 167:10 173:13 174:6

JASON MATHIEU TYRA, ESQ.
APRIL 28, 2026

JOB NO. 2667670

**testifying** 125:20 126:11 156:11 191:16 192:6

**testimony** 22:11,14 24:6 41:25 42:9 99:13 114:5,22 126:7,23 127:3 128:9 130:4,18, 23,24 131:4,25 133:16, 20,21 135:25 136:8 147:6 162:5 166:4,7 171:14 181:2,9 185:11 187:23 188:3,21,24 189:8,13,20

**testing** 143:2

**Texas** 5:8,21 6:21 7:19 11:11 54:12,25 55:4 57:13 58:5,20 59:22 60:2 110:10 179:11

**text** 38:13 45:15 174:3, 4

**texting** 129:12,14 178:15,17,20,23

**the--** 87:11

**theory** 43:25

**thing** 18:15 26:9 36:14 49:11 57:5 69:3 75:17 84:11 97:8 128:16 134:19 140:15 161:21 180:7

**things** 10:10 69:15 70:18 71:14 74:14 77:2 82:13 83:6,23,25 84:9, 10 88:3 92:13 95:11 148:3 160:21 163:17,18 185:19,21 192:20

**thinks** 148:11

**thought** 133:12 134:16 162:15,20,23 163:5,9 174:20

**thousands** 52:22

**threat** 124:11

**threaten** 130:10

**threatening** 141:10 189:7,12

**threatens** 114:18 141:12

**threats** 112:3

**ticket** 158:6,9,12 159:5,6

**tide** 25:24

**tie** 48:22

**tied** 64:22 134:5

**ties** 48:19

**time** 4:5 42:12 48:12, 13,16 50:16 59:24 69:5, 6,17 72:8,9,12 73:22,23 74:2 77:25 108:18 122:14 127:2 146:12 148:18 153:2 155:2,10 156:21 157:4,24 159:12,15 164:23 165:6 175:10,13 176:5 177:5 179:19,23 180:3 192:15 193:24,25

**times** 162:8

**title** 97:20

**today** 8:2 125:8,12 126:7,11 147:7,22 156:11 164:12 165:4 171:12 185:11

**token** 151:10

**told** 93:23 108:20 112:13 113:18 146:23 191:19

**tonight** 133:22

**top** 10:14 74:16 127:22,23

**total** 57:19 67:22 69:19

**totally** 159:6 162:3

**track** 167:10 169:23

**traded** 111:12

**traffic** 70:20 158:6,9, 11

**trainee** 9:20

**transcript** 193:4,5, 11,14

**transitioning** 47:25

**transmitted** 172:10

**tremendous** 111:9

**trend** 13:25 16:20,22 17:17 18:4 26:20 28:2 29:3 77:17,22,23,24 78:11 79:15,17,20 80:4 81:9 83:12,17 84:5 86:9 88:7

**trends** 12:19 28:25 81:17 170:11

**trials** 146:8

**tribulations** 146:8

**trier** 157:11 168:5

**trim** 8:24 9:5

**true** 75:9 76:6 95:14 110:21 132:7,9,10 168:10 169:25 171:10

**Trump** 84:15

**trust** 71:15

**TS** 160:9,15

**turn** 33:22,24 34:3 35:8 39:20 78:16

**turned** 15:23 33:14 39:5,14,17 63:20 73:3

**turning** 78:18

**Twitter** 41:8

**two-year** 20:8

**typically** 54:25

**typo** 40:15 41:24 42:6, 10

**Tyra** 4:1,6 5:1,13 6:1, 20 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1,12 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,17 73:1 74:1,9

75:1 76:1 77:1 78:1 79:1 80:1,14 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1,15 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1,11 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1,25 117:1 118:1 119:1 120:1,4,6 121:1,25 122:1,8,21 123:1,16,21 124:1 125:1,6 126:1 127:1 128:1 129:1 130:1 131:1,22 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1,6 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1,18 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1,17 176:1 177:1 178:1,8,14 179:1 180:1 181:1 182:1 183:1,15 184:1,6,23 185:1 186:1, 24 187:1 188:1 189:1, 20 190:1 191:1,4,5,8 192:1,13 193:1,19

**U**

**U.S.** 4:8 51:17,19

**uh-huh** 21:21 44:13

**ultimately** 168:8

**uncertainty** 84:2,21 85:6,18 86:5,7 127:17

**underlying** 156:4

**underneath** 45:15

**understand** 9:19 19:7 28:21 30:14 43:17, 23 46:16 52:23 57:17

58:6,8,10,15,21,22 59:2,3,5,7,8,11 66:22, 23 81:6 88:4 94:20,23 101:22,24 106:19 124:12 128:17 148:13 157:19 179:21 180:9 188:20 192:11

**understanding** 53:8,15 59:12 93:3,20 128:20 154:19 185:8 186:7,14

**understood** 11:24 127:25

**unenforceable** 84:14

**unfairly** 28:16

**unitary** 54:13,14

**United** 94:8 115:14 116:11

**universe** 107:24

**University** 11:11

**unrelated** 159:6

**unsalted** 128:2

**unstable** 78:15

**unsurprised** 106:14 113:21

**unusually** 18:23

**updated** 90:24

**upgrades** 90:10

**uploading** 57:6 89:22

**upset** 106:12 115:5

**uptick** 155:2 166:10

**upward** 28:2 77:17, 22 84:5

**USB** 93:25

**user** 44:21 91:23 182:3

**users** 127:15

### V

**valid** 174:22

**value-add** 10:11

**variable** 143:6

**variances** 78:9

**variety** 25:12

**venue** 4:8

**verification** 105:7

**verify** 29:19 53:21,22 135:9 154:14 155:21

**versa** 70:18

**version** 31:24 32:18, 20 33:3 90:19 171:18, 20 184:7,9,10,20 185:6 186:13 187:4 188:11 189:9,10 191:20

**versions** 33:16 36:3 39:18 72:21 171:15 184:12,24 186:12 189:5 191:19

**versus** 4:7 41:24 55:3 69:6 78:3 86:25 193:20

**vice** 70:18

**victim** 118:17

**video** 78:16,18 128:24 192:22,24,25 193:3,8

**videogame** 128:3

**view** 54:13

**viewer** 85:15

**views** 47:15,20

**visible** 41:10

**visit** 42:15

**voided** 30:8

**volume** 95:12,19,24 96:5 97:11 111:9

**voracity** 61:10

### W

**wait** 130:22 131:7 137:21 140:24 158:8 166:8 177:19

**waiting** 77:19

**walk** 55:24 56:4

**wandered** 113:23

**wanted** 66:14 139:7

**wanting** 14:16 63:21 174:6

**war** 117:13

**ways** 25:12

**weapons** 27:24

**web** 8:21 46:9 116:14

**website** 22:16,21 26:25 40:12,20 41:12, 13,23 42:15 43:10,20 44:10,22 45:12,25 46:7 47:3,4,5,7,11 60:18 61:18,19 63:10,11,17, 19,24 64:3,6,10 65:7,8, 18 82:24 89:23 90:5 99:17 110:12 113:15, 19,21 114:14 118:6 119:14 123:4 127:15 130:16,20 131:14,23 141:25 147:23 148:9 149:11 151:23 152:7 181:10,11,13

**websites** 111:9

**weeds** 30:2

**week** 158:5

**weeks** 146:23

**weigh** 76:18 126:4 153:8 154:5

**weighs** 66:12

**West** 4:14

**white** 38:13

**Wilson** 46:9 48:20 58:12 59:6 110:2 130:16,20 145:22 146:2,8,17 147:5,21,22 149:3 151:10 152:8,24, 25 154:19 155:6 162:4, 16 163:4 164:13 171:3 172:7,21 184:12,13,25 185:14 188:17

**Wilson's** 49:5 88:8 145:9 148:17 164:17

**wind** 122:3,4 163:22

**wishes** 94:6

**withdraw** 148:16

**wondering** 26:15

**word** 38:15 133:17 135:2,5,18 160:21 165:2

**words** 41:2,15,22 62:3 130:2 133:7,18 135:2 150:20 165:2 180:8

**work** 33:16,18 48:7 53:12 99:8 133:2 150:18 173:15 185:23 186:3,11 190:20

**workbook** 16:7

**workbooks** 9:2

**worked** 146:23 155:15

**working** 110:9 172:4 184:8

**works** 93:4 98:9,15, 20 126:18 175:8

**World** 117:11

**worried** 28:3 149:12

**worry** 60:17

**worse** 132:23

**worst** 156:5

**worth** 24:16

**wrap** 172:24

**wrapped** 116:19,22

**wrapping** 99:15

**wraps** 174:15

**write** 24:15,20 67:16 94:14 150:9,14

**writing** 185:4

**written** 161:19 174:5

**wrong** 13:18 134:11 191:7

**wrote** 7:22 24:13,19, 25 28:22 42:11,12,24 65:9,13 68:8 71:15 87:22 129:12 148:5 154:2 161:17 162:2

## Y

**year**  18:8 19:16,17,18,
  25 20:6 49:10 51:5
  56:21 58:3 83:13,15,18
  84:2 109:13 158:5
  167:3,4 168:17

**years**  74:18,21 75:6
  91:9 110:8 111:8
  148:18,19 156:20
  164:20 166:24 168:16
  176:21 180:4 182:10

**York**  5:10 7:19

**Yup**  17:11 125:3

## Z

**Zach**  174:23

**Zachary**  4:20 175:4

**Zermay**  4:20 174:18,
  21,24

**zeros**  56:20

**Zoom**  4:11