# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

DEFENSE DISTRIBUTED, a        )
Texas corporation; DD         )
FOUNDATION, LLC, a Texas      )
limited liability company;    )
and DEFCAD, INC., a Texas     )
corporation,                  )
                              )
        Plaintiffs,           )
                              )
   v.                         ) No. 9:25-cv-81197
                              ) Middlebrooks/
JOHN ELIK, individually;      ) Matthewman
MATTHEW LAROSIERE,            )
individually; ALEXANDER       )
HOLLADAY, individually;       )
PETER CELENTANO,              )
individually; JOSH KIEL       )
STROKE, individually; and     )
JOHN LETTMAN, individually;   )
and ZACKARY CLARK,            )
individually,                 )
                              )
        Defendants.           )

DISCOVERY DEPOSITION OF

JOHN ELIK

April 21, 2026

Volume I

Stenographically Reported by:
ANDREW R. PITTS, CSR, RPR

Page 2

April 21, 2026

9:05 a.m. Central Time

The discovery deposition of JOHN ELIK, pursuant to Notice, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of remote videoconference depositions before Andrew R. Pitts, Certified Shorthand Reporter, Registered Professional Reporter.

Page 3

A P P E A R A N C E S:

ATTORNEY FOR PLAINTIFFS:

FOSTER PC
HOWARD FOSTER, Esquire
155 North Wacker Drive
Suite 4250
Chicago, Illinois  60606
312-726-1600
hfoster@fosterpc.com

ATTORNEY FOR DEFENDANTS:

ZERMAY LAW GROUP
MATTHEW MICHAEL LAROSIERE, Esquire
ZACHARY ZERMAY, Esquire
6964 Houlton Circle
Lake Worth, Florida  33467-8744
561-452-7575
larosieremm@gmail.com

ALSO PRESENT:

BAILEY FINNESTAD, concierge and exhibit sharing;

JOHN P. LETTMAN, Defendant.

Page 4

INDEX

JOHN ELIK                                    EXAMINATION

        BY MR. FOSTER                              5

        BY MR. LAROSIERE                         315


                    E X H I B I T S

FOSTER              DESCRIPTION                      PAGE

Exhibit 1    Litigation hold letter                   70

Exhibit 2    Response packet                         141

Exhibit 3    Navi of Boomhandia message             142

Exhibit 4    5/15/23 message                         167

Exhibit 5    1/14/23 message                         172

Exhibit 6    5/15/23 message at 8:34 a.m.            185

Exhibit 7    5/8/24 message                          196

Exhibit 8    2/28/24 message                         209

Exhibit 9    2/22/24 message                         213

Exhibit 10   August 2022 messages from Ivan         227

Exhibit 11   FEDCAD meme                             254

Exhibit 12   Meet The Team meme                      280

Exhibit 13   5/15/23 messages at 8:01 a.m.          291

Exhibit 14   Plastikov advertisement               299

Page 5

(Whereupon, the following proceedings were held via videoconference.)

(Whereupon, the witness was administered an oath.)

JOHN ELIK, called as a witness herein, having been first administered an oath, was examined and testified remotely via videoconference as follows:

EXAMINATION

BY MR. FOSTER:

Q.   Okay.  So we are on the record.  It is 9:05 a.m. Central time, and this is the deposition of John Elik.

Do you pronounce it "Elik" or "Eelik"?

A.   "Elik," that's correct, you got it. That's rare.

Q.   John "Elik," under the Rules of the Federal Civil Procedure.  Mr. Elik is driving in his car, but he's got a --

A.   I think I'm driving.  Oh, hands free.

Q.   Hands-free driving, oh.

A.   I'm not driving.

Q.   All right.  Okay.  So let's begin.

Mr. Elik, what is your date of birth,

Page 14

Q.    Okay.  So going back to this, at the time you were employed by Boeing, did Mr. Larosiere offer you a job?

A.    I don't know that a job is how I would describe it.  I mean, you could characterize it as some form of employment, sure, I think that's fair, but job, I don't know.  I don't know if there's like a legal implication with what job means.  I know in some states it may even vary.

Q.    All right.  Well, what is it that he offered you?  Let's look at it that way.

A.    It was more or less an agreement where he had ideas for guns and knew that I was good at coming up with ideas or ways to actualize these ideas.  And so it was more or less an agreement where he would direct me to make things or design things or -- you know, in general, it was like one of these -- you could call it like a work for hire design contract.

Q.    Okay.

A.    So he had an employment agreement that we signed up, you know, him being a lawyer and everything is formal, right?  So it's part of this -- it's a good and a bad thing maybe having a lawyer for your best friend where, you know,

Q.   Is this part of your -- I'll call it the employment agreement with Matthew pursuant to that?

A.   Version 4 specifically was.  I don't believe that the previous versions were.

Q.   Well, I think --

A.   I think the previous versions were --

Q.   -- we are looking at version 4 here. That's what it says at the top.

A.   The previous versions were completely differently anyhow.  Like, version 4 was a clean slate restart that Matt had said, "You should make this gun not look ugly," which was slightly offensive at the time, but he was right.  The first versions were unattractive.

Q.   Okay.  So explain to me again.  What is your role?  Did you make these for Mr. Larosiere?

A.   I'm just getting hung up on what you mean by "this."  Like, by "this," do you mean, like, the website links?  No, I didn't make those.  That's a --

Q.   Not the website links.

A.   No.  I'm getting -- I hate to be particular, but I want to make sure I know what

Page 302

you mean by "this."

Q.   The gun design.

A.   There is a gun design known as Plastikov version 4 that I did make for Matt.

Q.   Okay.  That's what I'm trying to establish here.

And, now, as I understand it, so then does Matt sell kit parts for the design through his business?

A.   I guess I'm not sure.  You'd have to ask him.

Q.   Let's assume that it does, his company MAF is selling parts or accessories for this model, okay?  Would you be getting any, like, fees or royalties from those sales?

A.   No.

Q.   Why not?

A.   I mean, when you're not, you're not, right?

Q.   Did he pay you initially for the design?

A.   Like, your clients already have this, and I think it was -- of course, I don't know if it was marked confidential, so you may or may not be able to see it.