# EXHIBIT 4

Page 1

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:25-CV-81197-Middlebrooks/Matthewman

DEFENSE DISTRIBUTED, a Texas       )
corporation; DD FOUNDATION,LLC,    )
a Texas limited liability          )
company; and DEFCAD, INC., a       )
Texas corporation,                 )
                Plaintiffs,        )
        vs.                        )
JOHN ELIK, individually;           )
MATTHEW LAROSIERE, individually;   )
ALEXANDER HOLLADAY, individually;  )
PETER CELENTANO, individually,     )
JOSH KIEL STROKE, individually;    )
JOHN LETTMAN, individually;        )
and ZACKARY CLARK, individually,   )
                Defendants.        )

DEPOSITION OF JOHN P. LETTMAN
APPEARING REMOTELY

April 24, 2026
9:36 a.m. CDT

REPORTED BY:  WENDY A. KILLEN, CSR
LICENSE NO.:  084-003772
CONCIERGE-TECH:  BAILEY FINNESTAD
APPEARING REMOTELY

Page 2

REMOTE APPEARANCES

FOSTER, P.C.
BY:  HOWARD FOSTER, ESQ.
155 North Wacker Dr, Suite 4250
Chicago, Illinois  60606
(312) 726-1600
hfoster@fosterpc.com
    On behalf of the Plaintiffs;

ZERMAY LAW
BY:  ZACHARY ZERMAY, ESQ.
800 West First Street
Los Angeles, California  90012
zachary@zermaylaw.com
    On behalf of Matthew Larosiere;

MATTHEW LAROSIERE, ESQ.
6824 Hanging Moss Road
Orlando, Florida  32807
larosieremm@gmail.com
    On behalf of John Lettman;

ALSO PRESENT:
GARY DE PURY, ESQ.
CODY WILSON
JOHN ELIK

---

Page 3

INDEX TO EXAMINATION

WITNESS:  JOHN P. LETTMAN

PAGE

EXAMINATION BY MR. FOSTER                4
EXAMINATION BY MR. LAROSIERE            179
FURTHER EXAMINATION BY MR. FOSTER        190

INDEX TO EXHIBITS

MARKED                  PAGE
    Exhibit 1            42
    Exhibit 2            70
    Exhibit 3            77
    Exhibit 4            98
    Exhibit 5           115
    Exhibit 6           121
    Exhibit 7           133
    Exhibit 8           148
    Exhibit 9           155
    Exhibit 10          165

* * * * *

---

Page 4

(Witness sworn)

JOHN P. LETTMAN, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. FOSTER:

Q.   Mr. Lettman, as you know, I'm Howard Foster.  I represent the Plaintiffs in this case.  We are going to take your deposition today under the Federal Rules of Civil Procedure.

Have you ever been deposed before?

A.   I don't think I have.

Q.   Okay.  So I'm sure you know what the format is.  I ask questions; you answer them.  Your lawyer, Matthew Larosiere, has a right to object, but, generally, you have to answer them over his objection.

A.   Yes.

Q.   And if at any time you feel like you want to take a break, just ask me and we'll try and accommodate you.

If you don't understand my question, let me know right away obviously, and

---

Page 5

I'll try and rephrase it.  And we have to try very hard not to talk over each other.  Sometimes that gets to be a problem.

A.   Absolutely.

Q.   So the court reporter can take it all down, when I talk, you don't talk; when you talk, I don't talk.  And you have to answer everything verbally, no like uh-huh or yeah.  Yes, no, generally speaking.

All right.  Could you please give me your current address?

A.   It is 29 Bon Air, B-o-n A-i-r, Avenue in Bradford, Pennsylvania 16701.

Q.   How long have you lived at that address?

A.   I believe three years.

Q.   Okay.  Please tell me about your education starting with high school.

A.   I went to Avon Grove High School, and then I went to Technical College High School Pennock's Bridge in Oxford -- I think -- Pennsylvania, and then I went to the University of Pittsburgh at Bradford.

Q.   Hang on.  Did you get a degree from

---

2 (Pages 2 - 5)

Page 6

this first college?

A. Yes.

Q. What degree did you earn?

A. I think it's called a vocational certificate. So it's not a university degree.

Q. Again, which institution is that?

A. Technical College High School in Pennock's Bridge.

Q. Pennsylvania?

A. Correct.

Q. Okay.

A. So it's a campus name, not the town name, the Pennock's Bridge.

Q. What year did you get your certificate?

A. Oh, boy, 2013, I believe.

Q. Okay. And what year were you born?

A. 1995.

Q. Okay. Got it.

Then did you go to school after getting the certificate in 2013?

A. Correct. I went to the University of Pittsburgh at Bradford.

Q. Okay. Did you learn a degree there?

Page 7

A. Oh, no. I dropped out.

Q. You dropped out.

What year did you drop out?

A. 2016, I think.

Q. Okay. Have you had any education after that?

A. No.

Q. And what is your occupation?

A. Currently, I work for a start-up. I am an embedded software engineer.

Q. You're a software engineer?

A. That's correct, but with like firmware.

Q. What's the name of your current employer, this start-up?

A. They're called Thoron, T-h-o-r-o-n.

Q. What is your job with Thoron?

A. I develop firmware for unmanned aerial vehicles.

Q. Where is this company or this business located?

A. Seattle, Washington.

Q. Okay. So a full-time job with them?

A. I would say part-time. It's a very

Page 8

flexible environment.

Q. Okay. When did you start with Thoron?

A. Early 2026.

Q. Okay. And where did you work prior to that?

A. It's called Clear Object.

Q. What did you do at Clear Object?

A. I was titled a senior back-end engineer.

Q. Okay. And how long were you with that company?

A. Approximately a year. It was a short stint.

Q. Okay. All right. So at some point, you became acquainted with Matthew Larosiere, is that correct?

A. I would say that's fair.

Q. When did you first meet him?

A. This would have to be an estimate. Perhaps 2022.

Q. Okay. How did you meet him?

A. Online.

Q. Okay. In any particular site or chat room or...?

Page 9

A. Well, I first seen him on YouTube. He would create videos talking about guns, which I have limited familiarity with as far as the history. And then he would also describe things about firearms law, which I want to be on top of ATF rule changes, things like that. So there's a few people I look at.

And then as far as personally meeting as a back-and-forth conversation, I think it would be on Twitter, which is now called X.

Q. Right.

When was that?

A. When was that? In 2022.

Q. Okay. Did you become regular -- communicate with each other regularly thereafter?

A. I would say a little bit after. I think initially it was kind of informal. With anybody who is a YouTube person, they are quite busy. Everybody wants to talk to them. So I think I had one or a few messages back and forth initially, and then it became a little more frequent perhaps in 2023-ish.

Q. Okay. And at some point, did you do some work for his business, MAF Corp?

3 (Pages 6 - 9)

Page 46

A.   Well, anything that's happening with firearms advocacy that could imperil people's rights, so if somebody is doing something illegal to subvert California law, I don't think that's the right way of going about it.

Q.   So you see yourself as sort of a spokesman or guardian for the gun-owning community, is that correct?

A.   No.  I'm just a guy with opinions.

Q.   It seems like you're more than just a guy.  You're very focused, as you just said, on looking out for the rights of gun owners?

A.   As a guy who has opinions, I care about people's right to self-defense.  That's it.

Q.   Right.  I don't understand that.  So maybe you can make this connection for me clearer.

As a guy who is interested in people's self-defense, why were you focused on Cody Wilson?

A.   Because he was doing something illegal in this instance.  I would focus on anybody if they were doing something illegal that would imperil people's rights to have firearms.  I talk

Page 47

about politicians all the time.

Q.   So how was -- explain to me, please, how would what you accused him of doing imperil people from owning firearms?

A.   Because by subverting that law, it's going to make California react and try to make stringent, more strong regulations to try to prevent that subversion from happening again, right?  So if you do something to subvert a law, they will make the law stronger, don't you think?

Q.   I don't know.  I'm a lawyer.  Sometimes that happens.  Sometimes nothing happens.

A.   Yeah.  Well, sometimes it does.

Q.   There are a lot of reasons why laws are passed.

But what he was doing actually was trying -- would have made ghost gun ownership easier in California, right?

MR. LAROSIERE:  Objection, you're calling for speculation.

MR. FOSTER:  No, I'm not.

BY MR. FOSTER:

Q.   Isn't that what he was trying to do?

Page 48

A.   It would have been illegal.

Q.   But it would have made it easier for people to have these ghost guns, right?

MR. LAROSIERE:  Objection, argumentative.

THE WITNESS:  Are you advocating for people to break the law?

BY MR. FOSTER:

Q.   No.  But isn't that what he was actually doing, right, trying to get his -- you said he was trying to get his guns available to people in California?

MR. LAROSIERE:  Objection, argumentative and speculation combined.

BY MR. FOSTER:

Q.   Okay.  Answer the question.

A.   Okay.  He would have been breaking the law and that would put people in jail if they had that machine.

Q.   Okay.  The State of California has now sued Matthew Larosiere and Alexander Holladay for alleged illegal activities in their business.

Are you aware of that?

A.   I've heard about it.

Page 49

Q.   Have you ever posted information about that lawsuit?

A.   Yeah, I have.

Q.   When?

A.   Recently.  I call it dumb because it was a -- they were criticizing, I think, Holladay for talking about firearms.  So their law doesn't even talk about it.  I think they were jumping to a speculation.

Q.   Okay.  So you posted information or your opinions about that lawsuit, right?

A.   Yes.

Q.   On which platform?

A.   X.

Q.   Okay.  Scroll down here on this post or Tweet.

Do they still call them Tweets?

A.   I think they call them Xeets or something now.

Q.   It's no longer Twitter.  All right.

You put the FEDCAD meme on this Tweet, right?

A.   I sure did.

Q.   So you were familiar with them at that

13 (Pages 46 - 49)