UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JENNIFER VANDERSTOK, et al., | § § § § | |
| Plaintiffs, | § § | |
| BLACKHAWK MANUFACTURING GROUP INC. d/b/a 80 Percent Arms, | § § § § | |
| Intervenor-Plaintiff, | § § | |
| DEFENSE DISTRIBUTED, and THE SECOND AMENDMENT FOUNDATION, INC. | § § § § | Civil Action No. 4:22-cv-00691-O |
| Intervenors-Plaintiffs, | § § § | |
| v. | § § | |
| MERRICK GARLAND, in his Official Capacity as Attorney General of the United States, et al., | § § § § | |
| Defendants. | § | |

**DEFENSE DISTRIBUTED AND THE
SECOND AMENDMENT FOUNDATION, INC.'S
COMPLAINT**

1

1.      Defense Distributed and the Second Amendment Foundation, Inc. challenge the federal government's new regulatory definition of "firearm," *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (Exhibit A) (hereinafter the new Final Rule), which illegally expands that keystone term of criminal law far beyond both its statutory and constitutional borders.  The new regulatory definition of "firearm" is unprecedented. It uses supposedly delegated power to deem illegal for the first time ever vast swaths of traditional Second Amendment conduct that Congress itself did not and could not choose to make illegal.

2.      The new Final Rule contradicts the statute it is supposed to be administering. Congress in the Gun Control Act defined "firearm" to include a weapon's actually finished "frame or receiver."  Yet the new Final Rule expands the definition to criminalize (1) *unfinished* frames and receivers—*i.e.*, non-frame and non-receiver articles that *may become* a frame or receiver *if* additional processes sufficiently alter their material constitution, and (2) frame and receiver "part kits"—*i.e.*, kits of non-frame and non-receiver articles that *may become* a frame or receiver *if* additional processes sufficiently alter its material constitution.  Both expansions contradict the Gun Control Act's "firearm" definition, which plainly understands that an unfinished frame or receiver is not an actual frame or receiver and that a part kit to make a frame or receiver is also not an actual frame or receiver.  Such obvious statutory overreaches violate the Administrative Procedure Act.

3.      The new Final Rule also violates the Administrative Procedure Act by failing to perform the inquiries mandated by *New York State Rifle & Pistol Ass'n, v. Bruen*, 142 S.Ct. 2111 (2022).  To comply with the Second Amendment, the promulgating agencies needed to jettison balancing tests and consider only whether their regulation is "consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 2126-32.  Yet because that did not happen—itself a key APA violation—it is no surprise that the new Final Rule tramples true historical traditions.

4.     More fundamentally, the new Final Rule is an exercise of Legislative power that Congress did not in fact and could not have constitutionally delegated to the agencies at issue. Because the task of defining the Gun Control Act's "firearm" term has vast economic and political significance, a valid delegation of that power would have to have been (1) articulated *clearly*, and (2) accompanied by *intelligible principles* for its exercise.  But because Congress did not *clearly* articulate a delegation of the power to define the Gun Control Act's "firearm" term, no such delegation occurred in fact.  The major questions doctrine establishes this.  *See, e.g.*, *West Virginia v. EPA*, 142 S. Ct. 2587 (2022).  And because Congress did not accompany any such delegation with *intelligible principles* for its exercise, the separation of powers would not permit it.  The nondelegation doctrine establishes this.  *See, e.g.*, *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022).

5.     For these and other reasons, the federal government's new regulatory definition of "firearm" should be held unlawful and set aside.  Relief is especially critical for the instant plaintiffs, Defense Distributed and the Second Amendment Foundation, Inc., who but for the new Final Rule would be exercising their Second Amendment rights by engaging in the conduct that these Agencies have illegally criminalized.  The resulting harms are concrete, particularized, and in many respects irreparable.

6.     For years, Defense Distributed's entire business model has depended on its ability to deal in items that are *not* "firearms" under Gun Control Act itself and *not* "firearms" under prior regulations, but that *are* defined for the first time ever as "firearms" by the new Final Rule.  The new Final Rule cuts a foundation of Defense Distributed's business model out from under it, sweeping away critical revenues, saddling it with massive new compliance costs, causing service provider disruptions, and damaging Defense Distributed's reputation and goodwill in the business community.  These harms are largely irreparable and very probably existential.

7.     The Second Amendment Foundation's members are suffering massive irreparable harms as well.  Despite having a well-established constitutional right to manufacture their own firearm for self-defense at home, the new Final Rule stops SAF members from acquiring from firms like Defense Distributed the "unfinished" frames and receivers and/or frame and receiver "parts kits" that SAF members reasonably need to exercise their Second Amendment rights.

## I.     Parties

### A.     Defense Distributed

8.     Plaintiff Defense Distributed is a private business corporation with headquarters and a principal place of business in Austin, Texas.  Cody Wilson founded Defense Distributed and serves as Defense Distributed's Director.

9.     Defense Distributed is the first private defense contractor in service of the general public. Since 2012's Wiki Weapon project, Defense Distributed has defined the state of the art in small scale, digital, personal gunsmithing technology.

10.     Defense Distributed does business nationwide and in this district. Defense Distributed is a SAF member and a member of the Firearms Policy Coalition, Inc.

### B.     Second Amendment Foundation, Inc.

11.     Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of the State of Washington.  SAF's principal place of business is in Bellevue, Washington.  It is governed by a board of directors and has members nationwide and in this district.

12.     SAF promotes the right to keep and bear arms by supporting education, research, publications, and legal efforts about the Constitution's right to privately own and possess firearms and the consequences of gun control.

4

13.     SAF brings this action on behalf of itself.  SAF also brings this action on behalf of its members because at least one of its members would have standing to sue in his own right, the interests the suit seeks to vindicate are germane to SAF's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

### C.     Defendants

14.     Defendant Merrick Garland is the Attorney General of the United States and the head of the United States Department of Justice.

15.     Defendant United States Department of Justice (DOJ) is an agency of the United States that administers and enforces the principal federal gun control statutes and, in particular, the National Firearms Act of 1934 and the Gun Control Act of 1968.

16.     Defendant Steven Dettelbach is the Chief Law Enforcement Officer and Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

17.     Defendant Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) is an agency of the United States that administers and enforces the principal federal gun control statutes, including the National Firearms Act of 1934 and Gun Control Act of 1968.

18.     This complaint refers to the Defendants collectively as "the Agencies."

## II.    Jurisdiction

19.     28 U.S.C. § 1331 supplies the Court with original federal question jurisdiction over this action because it arises under the Constitution and laws of the United States.  The action so arises because it seeks declaratory, injunctive, and other relief pursuant to the Constitution of the United States of America, the Administrative Procedure Act, 5 U.S.C §§ 701-706, the All Writs Act, 28 U.S.C. § 1651(a), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

20. An active, justiciable controversy exists amongst the parties about whether the Justice Department's promulgation of the "Frame or Receiver" Rule, *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (herein the new Final Rule), complied with the Administrative Procedure Act's rulemaking requirements, 5 U.S.C. §§ 551-559, and the United States Constitution's Second and Fifth Amendments. Declaratory relief would resolve this controversy and eliminate the burden imposed on Plaintiff stemming therefrom.

## III. Venue

21. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(e)(1)(B) and (C). A substantial part of the events giving rise to these claims occurred in this district. A substantial part of the property that is the subject of the action is situated in this district. Defense Distributed has engaged in several business transactions in this district and SAF members reside in this district.

## IV. Facts

### A. The Agencies illegally expanded "firearm" statutes to cover non-firearms.

22. "Firearm" is one of American criminal law's most impactful statutory keystones. By exercising it "legislative Powers," U.S. Const. art. I, § 1, Congress used the term "firearm" to create a litany of criminal and civil proscriptions that impact millions of Americans every day. *See, e.g.*, 18 U.S.C. ch. 44 ("Firearms"). It is a crime for many Americans to possess a "firearm." 18 U.S.C. § 922(g). It is a crime for many Americans to transport or receive a "firearm." 18 U.S.C. § 923(a)(1)(A); 18 U.S.C. § 923(a)(3). It is a crime for many Americans to manufacture a "firearm" at all, 18 U.S.C. § 923(a)(1)(A), and a crime for many other Americans to manufacture a "firearm" without a serial number, 18 U.S.C. § 923(i).

23.     Congress gave "firearm" its keystone definition in the Gun Control Act of 1968. The statute defines "firearm" to mean "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."   18 U.S.C. §921(a)(2). Congress never defined the "firearm" term's constituent phrase "frame or receiver."

24.     To administer and enforce the Gun Control Act (and other statutes), Congress created within the Department of Justice (DOJ) a Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF).  26 U.S.C. § 599A(a)(1).  Congress headed ATF with a Director that answers to the Attorney General.  26 U.S.C. § 599A(a)(1).  DOJ, ATF, and those two administrative officials are this action's Defendants and collectively referred to herein as the "Agencies."

25.     Without Congressional action, the Agencies redefined the statutory term "firearm" on several key occasions, using a variety of administrative procedures.  The two most important redefinitions occurred via Agency administrative regulations promulgated in 1978 and 2022.

### 1.     1978 Rule.

26.     In 1978, the Agencies promulgated a rule that redefined the Gun Control Act's "firearm" term by redefining the constituent phrase "frame or receiver." *Title and Definition Changes*, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978) (formerly codified at 27 C.F.R. § 478.11 (2020)) (hereinafter the 1978 Rule).  The 1978 Rule defined "frame or receiver" to mean "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." *Id.*

27.     Under the 1978 Rule, the Agencies took the position that "items such as receiver blanks, 'castings' or 'machined bodies' in which the fire-control cavity area is completely solid and un-machined have not reached the 'stage of manufacture' which would result in the

classification of a firearm according to the GCA." The Agencies announced this position in an ATF publication titled "Are "80%" or "unfinished" receivers illegal?" that was last reviewed by the Agencies on April 6, 2020 and appeared online at https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal until at least December 23, 2022. A true and correct copy of this publication is attached to the complaint as Exhibit B.

28. Under the 1978 Rule, the Agencies also took the position that the Gun Control Act "does not impose restrictions on receiver blanks that do not meet the definition of a 'firearm." The Agencies announced this position in an ATF publication titled "Are there restrictions on who can purchase receiver blanks?" that was last reviewed by the Agencies on June 24, 2020 and appeared online at https://www.atf.gov/firearms/qa/are-there-restrictions-who-can-purchase-receiver-blanks until at least November 1, 2022. A true and correct copy of this ATF publication is attached to the complaint as Exhibit C.

### 2. The new Final Rule

29. In August 2022, the Agencies issued a new regulation that redefined the Gun Control Act's "firearm" term by redefining the constituent phrase "frame or receiver." *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, and 479). This is referred to as the new Final Rule. The new Final Rule redefines "frame or receiver" in several material ways.

30. The new Final Rule deletes the 1978 regulation's general definition of "frame or receiver" and replaces it with new and separate definitions of "frame" and "receiver." 27 C.F.R. § 478.12(a) (codifying 87 Fed. Reg. at 24,735). The "frame" and "receiver" definitions operate generally, subject to exceptional provisions appearing later in the regulation. *Id.* ("Except as

otherwise provided in this section, the term "frame or receiver" means the following….).  These redefinitions are codified in 27 C.F.R. § 478.12 at subsections (a)(1) and (a)(2).

31.     The new Final Rule also supplies a four-part set of specifying provisions about a "partially complete, disassembled, or nonfunctional frame or receiver."  These specifications are codified in 27 C.F.R. § 478.12 at subsection (c).

### a.     27 C.F.R. § 478.12(a)(1) "Frame" redefinition

32.     The new Final Rule generally defines "frame" to mean "the part of a handgun, or variants thereof, that provides housing or a structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component prior to initiation of the firing sequence (i.e., sear or equivalent), even if pins or other attachments are required to connect such component to the housing or structure."  87 Fed. Reg. at 24,735.

33.     The new general "frame" definition is codified as 27 C.F.R. § 478.12(a):

§ 478.12 Definition of Frame or Receiver.

(a)     Except as otherwise provided in this section, the term "frame or receiver" means the following—

  (1)     The term "frame" means the part of a handgun, or variants thereof, that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component (i.e., sear or equivalent) to the housing or structure.

27 C.F.R. § 478.12(a)(1).

### b.     27 C.F.R. § 478.12(a)(2) "Receiver" redefinition

34.     The new Final Rule generally defines "receiver" to mean "the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are

required to connect such component to the housing or structure."  87 Fed. Reg. at 24,735.  The

new general "receiver" definition is codified at 27 C.F.R. § 478.12(a)(2):

§ 478.12 Definition of Frame or Receiver.

(a)    Except as otherwise provided in this section, the term "frame or receiver" means the following—

. . .

(2)    The term "receiver" means the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure.

27 C.F.R. § 478.12(a)(2).

### c.    27 C.F.R. § 478.12(c) "Partially complete, disassembled, or nonfunctional frame or receiver" specifications

35.    After giving general "frame" and "receiver" definitions, the new Final Rule gives

definitional specifications about a "partially complete, disassembled, or nonfunctional frame or

receiver."  87 Fed. Reg. at 24,739.  Specifically, the rule delivers three definitional specifications:

(1) inclusions and exclusions, (2) a consideration authority, and (3) nonexclusive examples.

### i.    The definitional inclusion and inclusion.

36.    The first definitional specifications for a "partially complete, disassembled, or

nonfunctional frame or receiver" are inclusions and exclusions.  87 Fed. Reg. at 24,739.  This part

of the specification says that the terms "frame" and "receiver" "shall include a partially complete,

disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is

designed to or may readily be completed, assembled, restored, or otherwise converted to function

as a frame or receiver, i.e., to house or provide a structure for the primary energized component of

a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or

internal sound reduction component of a firearm muffler or firearm silencer, as the case may be,"

10

and that those same terms "shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." 87 Fed. Reg. at 24,739. The definitional inclusions and exclusions are codified at 27 C.F.R. § 478.12(c):

§ 478.12 Definition of Frame or Receiver.

(a)    Except as otherwise provided in this section, the term "frame or receiver" means the following—
. . .

(c)    Partially complete, disassembled, or nonfunctional frame or receiver.

The terms "frame" and "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, i.e., to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material).

27 C.F.R. § 478.12(c).

37.    The new Final Rule defines "readily" as "[a] process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state," and says that, "[w]ith respect to the classification of firearms, factors relevant in making this determination include the following: (1) Time, i.e., how long it takes to finish the process; (2) Ease, i.e., how difficult it is to do so; (3) Expertise, i.e., what knowledge and skills are required; (4) Equipment, i.e., what tools are required; (5) Parts availability, i.e., whether additional parts are required, and how easily they can be obtained; (6)

11

Expense, i.e., how much it costs; (7) Scope, i.e., the extent to which the subject of the process must be changed to finish it; and (8) Feasibility, i.e., whether the process would damage or destroy the subject of the process, or cause it to malfunction." 27 C.F.R. § 478.11.

### ii.     The consideration authority.

38.     The second definitional specification for a "partially complete, disassembled, or nonfunctional frame or receiver" is the consideration authority. 87 Fed. Reg. at 24,739. This part of the specification says that, "[w]hen issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit." 87 Fed. Reg. at 24,739. The consideration authority is codified at 27 C.F.R. § 478.12(c):

§ 478.12 Definition of Frame or Receiver.

(a)     Except as otherwise provided in this section, the term "frame or receiver" means the following—
          . . .
(c)     Partially complete, disassembled, or nonfunctional frame or receiver.

          . . . When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit..

27 C.F.R. § 478.12(c).

### iii.     The nonexclusive examples.

39.     The third definitional specification for a "partially complete, disassembled, or nonfunctional frame or receiver" gives five nonexclusive examples of what is and is not a "frame" or "receiver." 87 Fed. Reg. at 24,739. It is codified at 27 C.F.R. § 478.12(c).

40.     Example 1 says that a "frame or receiver parts kit containing a partially complete or disassembled billet or blank of a frame or receiver that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver, as a person with online instructions and common hand tools may readily complete or assemble the frame or receiver parts to function as a frame or receiver." 87 Fed. Reg. at 24,739.  It is codified at 27 C.F.R. § 478.12(c).

41.     Example 2 says that a "partially complete billet or blank of a frame or receiver with one or more template holes drilled or indexed in the correct location is a frame or receiver, as a person with common hand tools may readily complete the billet or blank to function as a frame or receiver."  87 Fed. Reg. at 24,739.  It is codified at 27 C.F.R. § 478.12(c).

42.     Example 3 says that a "complete frame or receiver of a weapon that has been disassembled, damaged, split, or cut into pieces, but not destroyed in accordance with paragraph (e), is a frame or receiver." 87 Fed. Reg. at 24,739.  It is codified at 27 C.F.R. § 478.12(c).

43.     Example 4 says that a "billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver." 87 Fed. Reg. at 24,739.  It is codified at 27 C.F.R. § 478.12(c).

44.     Example 5 says that a "flat blank of an AK variant receiver without laser cuts or indexing that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools is not a receiver, as a person cannot readily fold the flat to provide housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence."87 Fed. Reg. at 24,739.  It is codified at 27 C.F.R. § 478.12(c).

**B.      The new Final Rule harms Defense Distributed.**

45.     The new Final Rule harms Defense Distributed directly, substantially, and irreparably.  Until the Agencies promulgated the new Final Rule, Defense Distributed did business

13

by substantially dealing in (manufacturing, selling, delivering, shipping, transporting, and receiving) articles that (1) are *not* "firearms" within the ordinary meaning of the Gun Control Act, (2) are *not* "firearms" as the 1978 Rule defines that term, but (3) *are* defined for the first time ever as "firearms" by the new Final Rule.  Solely because of the Agencies' new Final Rule, Defense Distributed ceased the business of dealing in (manufacturing, selling, delivering, shipping, transporting, and receiving) articles that (1) are *not* "firearms" within the ordinary meaning of the Gun Control Act, (2) are *not* "firearms" as the 1978 Rule defines that term, but (3) *are* defined for the first time ever as "firearms" by the new Final Rule.

### 1.    Unfinished frames and receivers

46.    An "unfinished" frame is not a frame.  An "unfinished" receiver is not a receiver. By definition, an "unfinished" frame is a non-frame article that *may become* a frame *if and only if* additional processes sufficiently alter its material constitution; and by definition, an "unfinished" receiver is a non-receiver article that *may become* a receiver *if and only if* additional processes sufficiently alter its material constitution.   These definitions of "unfinished" frame and "unfinished" receiver accord with American common usage in the twenty and twenty-first centuries.  Unfinished frames and receivers are also known colloquially as "80%" frames and receivers, frame and receiver "blanks," and frame and receiver "castings."

47.    Until the Agencies promulgated the new Final Rule, Defense Distributed regularly engaged in substantial amounts of all of following activities without complying with the federal laws that apply to Gun Control Act "firearms":

      a.  Dealing in unfinished receivers

      b.  Selling unfinished receivers

      c.  Delivering, shipping, transporting, and receiving unfinished receivers

14

48.     The new Final Rule harms Defense Distributed directly, substantially, and irreparably by redefining the statute's "firearm" term to include, for the first time ever, unfinished receivers and unfinished frames.  It does so with the definitional specifications for a "partially complete, disassembled, or nonfunctional frame or receiver" at 27 C.F.R. § 478.12(c).  There lie several clauses that operate both independently and conjunctively to make the statutory term "firearm" cover unfinished frames:

    a.  *"Partially complete"*: The regulation defines unfinished receivers as "firearms" by providing that the "terms 'frame' and 'receiver' shall include a partially complete. . . frame or receiver . . . that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver. . . ."  27 C.F.R. § 478.12(c).

    b.  *"Disassembled"*:  The regulation defines unfinished receivers as "firearms" by providing that the "terms 'frame' and 'receiver' shall include a . . . disassembled . . . frame or receiver . . . that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver. . . ."  27 C.F.R. § 478.12(c).

    c.  *"Nonfunctional"*: The regulation defines unfinished receivers as "firearms" by providing that the "terms 'frame' and 'receiver' shall include a . . . .nonfunctional frame or receiver . . . that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver . . . ."  27 C.F.R. § 478.12(c).

49.     Solely because the Agencies promulgated the new Final Rule, Defense Distributed ceased engaged in the following conduct:

   a.   Dealing in unfinished receivers

   b.   Selling unfinished receivers

   c.   Delivering, shipping, transporting, and receiving unfinished receivers

50.    In this respect, the Agencies' promulgation of the new Final Rule thereby harmed Defense Distributed in the following ways:

   a.   *Lost profits*: The new Final Rule harmed Defense Distributed by causing a complete cessation of certain lines of business that deprived Defense Distributed of over one hundred thousand dollars in revenues to date.

   b.   *Service discontinuation*.  The new Final Rule harmed Defense Distributed by causing a substantial business interruption—service providers ceased doing business with Defense Distributed—that cost Defense Distributed tens of thousands of dollars to remedy.

   c.   *Attorney's Fees*.  The new Final Rule harmed Defense Distributed by forcing Defense Distributed to pay for legal services necessary to ensure compliance with the changed "firearm" definition.

### 2.    Part kits

51.    A frame "part kit" is not a frame. A receiver "part kit" is not a receiver.  By definition, a frame "part kit" is a kit of non-frame articles that *may become* a frame *if and only if* additional processes sufficiently alter its material constitution; and by definition, a receiver "part kit" is a kit of non-receiver articles that *may become* a receiver *if and only if* additional processes sufficiently alter its material constitution.  These definitions of frame "part kit" and receiver "part kit" accord with American common usage in the twenty and twenty-first centuries.  Frame and receiver "part kits" are another variety of "unfinished" frames and receivers

52.     Until the Agencies promulgated the new Final Rule, Defense Distributed regularly engaged in substantial amounts of all of following activities without complying with the federal laws that apply to Gun Control Act "firearms":

    a.  Dealing in frame and receiver parts kits

    b.  Manufacturing frame and receiver parts kits

    c.  Selling frame and receiver parts kits

    d.  Delivering, shipping, transporting, and receiving frame and receiver parts kits

53.     The new Final Rule harms Defense Distributed directly, substantially, and irreparably by redefining the statute's "firearm" term to include, for the first time ever, firearm parts kits.  It does so in the definitional specifications for a "partially complete, disassembled, or nonfunctional frame or receiver" at 27 C.F.R. § 478.12(c).  There the regulation defines frame and receiver parts kits as "firearms" by providing that a "a frame or receiver parts kit" can constitute "a partially complete, disassembled, or nonfunctional frame or receiver," which the regulation already says the "terms 'frame' and 'receiver' shall include."  27 C.F.R. § 478.12(c).

54.     Solely because the Agencies promulgated the new Final Rule, Defense Distributed ceased engaged in the following conduct:

    a.  Dealing in frame and receiver parts kits

    b.  Manufacturing frame and receiver parts kits

    c.  Selling frame and receiver parts kits

    d.  Delivering, shipping, transporting, and receiving frame and receiver parts kits

55.     In this respect, the Agencies' promulgation of the new Final Rule thereby harmed Defense Distributed in the following ways:

    a. *Lost profits*: The new Final Rule harmed Defense Distributed by causing a complete cessation of certain lines of business that deprived Defense Distributed of over one hundred thousand dollars in revenues to date.

    b. *Service discontinuation*.  The new Final Rule harmed Defense Distributed by causing a substantial business interruption—service providers ceased doing business with Defense Distributed—that cost Defense Distributed tens of thousands of dollars to remedy.

    c. *Attorney's Fees*.  The new Final Rule harmed Defense Distributed by forcing Defense Distributed to pay for legal services necessary to ensure compliance with the changed "firearm" definition.

### 3.     Irreparable harm

56.     The new Final Rule irreparably harms Defense Distributed by causing the financial injuries listed about in amounts that are very, very substantial.

87     The new Final Rule irreparably harms Defense Distributed by damaging Defense Distributed's reputation and goodwill in its business community.  Amongst Defense Distributed's customer base, the new Final Rule causes both substantial confusion about product identities and an erroneous fear of criminal liability—both of which result in losses of income, as well as good will and reputation, that can never be fully recovered.

57.     The new Final Rule irreparably harms Defense Distributed by infringing Defense Distributed's constitutional rights, including the Second Amendment right to keep and bear Arms and the Fifth Amendment Due Process right to be free from unconstitutionally vague criminal proscriptions.

58.     The new Final Rule irreparably harms Defense Distributed by forcing Defense Distributed to incur compliance costs that will never be recovered.

59.     The new Final Rule irreparably harms Defense Distributed by inflicting so much monetary harm as to threaten Defense Distributed's existence. If not stopped, the Agencies' promulgation of the new Final Rule will likely cause an income deprivation so severe that Defense Distributed discontinues the business of dealing in non-firearm frame and receiver items.  Even if a federal firearms license were maintained, Defense Distributed cannot avoid the existential risks because most of its business involves the interstate shipment of articles directly to purchasers, which if considered "firearms" are not allowed even with an FFL.  *See* 18 U.S.C. § 922(a)(2).

60.     Effective vindication of Defense Distributed's rights requires that the Agencies be enjoined from enforcing the new Final Rule against both Defense Distributed itself *and* Defense Distributed's customers, whose concern over civil and criminal penalties must be alleviated to provide Defense Distributed the relief it is due.

### C.      The new Final Rule harms SAF's members.

61.     The new Final Rule directly, substantially, and irreparably harms SAF members that (a) legally own at least one firearm purchased from a federal firearms licensee, (b) reasonably desire to manufacture their own firearm for lawful self-defense at home by, *inter alia*, acquiring from firms like Defense Distributed articles defined for the first time ever as "firearms" by the new Final Rule, and (c) would do so imminently if not for the new Final Rule's promulgation.

62.     Because of the new Final Rule, SAF members can no longer commercially purchase, possess, or otherwise acquire from firms like Defense Distributed the articles defined for the first time ever as "firearms" by the new Final Rule—e.g.,, "unfinished" frames and receivers and frame and receiver "parts kits"—that SAF members would use to manufacture their own firearms for self-defense at home.  Furthermore, the New Final Rule's vagueness exerts a

chilling effect on SAF members, who cannot reasonably determine what the law deems punishable and cannot reasonably determine how it will be administered.

63.     It is no answer to say that SAF members might pay slightly more to acquire the articles in question from federal firearms licensees in compliance with the new Final Rule.  Such a requirement is legally unconstitutional, since under *Bruen* there is no historical tradition of imposing such licensing schemes.  And such a requirement is factually impracticable, since the new Final Rule's onerous regime makes it uneconomical for a sufficient number of licensees to deal in "unfinished" frames and receivers and/or frame and receiver "parts kits."  Furthermore, the costs of complying with these unjustifiable extra acquisition steps (e.g., FFL transfer fees) are themselves harms that the law deems irreparable.

## V.     Causes of Action

### A.     Count One: APA § 706(2)(A), (C)—Statutory Contradiction

64.     Defense Distributed & SAF incorporate the preceding paragraphs.

65.     The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A),  as well as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right,"  5 U.S.C. § 706(2)(C).

66.     By promulgating the new Final Rule, the Agencies committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A), as well as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," § 706(2)(C), because the new regulatory "firearm" definition is inconsistent with the statute at issue.  Instead of further *defining* "firearm" in accordance with the Gun Control Act,

the New Rule *redefines* "firearm" in contradiction of the Gun Control Act.  It does so in at least two respects:

    a.  First, in 27 C.F.R. § 478.12(c), the new Final Rule exceeds the statute by defining the terms "frame" and "receiver" to include a "partially complete, disassembled, or nonfunctional frame or receiver."  That exceeds the statute because the Gun Control Act defines "frame" and "receiver" to mean an *actual* "frame" and "receiver"; it does not let "frame" be defined to mean an unfinished non-frame article that *may become* a frame *if and only if* additional processes sufficiently alter its material constitution; and it does not let "receiver" be defined to mean an "unfinished" non-receiver article that *may become* a receiver *if and only if* additional processes sufficiently alter its material constitution.  Nor does it let the statute cover what *used to be* an actual "frame" or "receiver" *but is no more* due to disassembly.

    b.  Second, in 27 C.F.R. § 478.11, the new Final Rule exceeds the statute by defining the terms "frame" and "receiver" to include a "weapon parts kit." That too exceeds the statute because the Gun Control Act defines "frame" and "receiver" to mean an *actual* "frame" and "receiver"; it does not let "frame" be defined as a kit of non-frame articles that *may become* a frame *if and only if* additional processes sufficiently alter its material constitution; and it does not let a "receiver" be defined as a kit of non-receiver articles that *may become* a receiver *if and only if* additional processes sufficiently alter its material constitution.

**B.      Count Two: APA § 706(2)(A)—Failure to consider**

67.      Defense Distributed & SAF incorporate the preceding paragraphs.

68.      The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

69.      By promulgating the new Final Rule, the Agencies committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A), because the Agencies failed to consider all of the relevant factors and data.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("the agency must examine" "relevant factors" and "relevant data").  In particular, the Agencies promulgated this rule without considering the Second Amendment factors and data made relevant by *New York State Rifle & Pistol Ass'n, v. Bruen*, 142 S.Ct. 2111 (2022).  Under *Bruen*, the Agencies had to strictly (without means-ends scrutiny) consider whether "the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 2126-32.  Yet no such legally-correct inquiry occurred.  The Agencies did not consider whether the new Final Rule "addresses a general societal problem that has persisted since the 18th century," and if so only whether there is a "lack of a distinctly similar historical regulation addressing that problem."  *Id.* Nor did the Agencies consider whether "earlier generations addressed the societal problem," and if so only whether they "did so through materially different means."  *Id.*  The Agencies instead infected their Second Amendment analysis with the presumptions of legality and means-ends scrutiny that *Bruen* invalidates.  *Compare* 87 Fed. Reg. 24,676-24,677 (relying on "compelling governmental interests" and "presumptively lawful regulatory measures"), *with Bruen*, 142 S. Ct. at 2126 ("*Heller* and *McDonald* do not support applying means-end scrutiny in the Second

22

Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.").

### C.      Count Three: APA § 706(2)(A), (C)—Delegation

70.      Defense Distributed & SAF incorporate the preceding paragraphs.

71.      The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A),  as well as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right,"  5 U.S.C. § 706(2)(C).

72.      *No delegation in fact*: By promulgating the new Final Rule, the Agencies committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A), as well as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," § 706(2)(C), because the "major questions" doctrine shows that Congress did not in fact delegate to these Agencies the task of further defining the Gun Control Act's "firearm" term. *See West Virginia v. EPA*, 142 S. Ct. 2587 (2022).  Congress must "speak clearly if it wishes to assign to an agency decisions of 'vast economic and political significance.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324, (2014).  The task of defining the Gun Control Act's "firearm" term is a decision of vast economic and political significance.  Yet no statute *clearly* delegates it.  The supposed delegation therefore did not occur in fact.

73.      *Unconstitutional delegation*: By promulgating the new Final Rule, the Agencies committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A), as well as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," § 706(2)(C), because the nondelegation doctrine stopped Congress from delegating the task of further defining the Gun Control Act's "firearm" term to the

Agencies.  *See Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) ("The two questions we must address, then, are (1) whether Congress has delegated power to the agency that would be legislative power but-for an intelligible principle to guide its use and, if it has, (2) whether it has provided an intelligible principle such that the agency exercises only executive power.").  The power at issue— the power to define the Gun Control Act's keystone "firearm" term"— would be legislative power but-for an intelligible principle to guide its use.  Yet Congress did not, in Gun Control Act's "firearm" definition or anywhere else, supply the Agencies with an "intelligible principle" to guide that definitional power's use.  As such, Congress's supposed delegation to the Agencies' of a power to further define the Gun Control Act's "firearm" term is unconstitutional.

### D.       Count Four: APA § 706(2)(A), (C)—Change of position

74.       Defense Distributed & SAF incorporate the preceding paragraphs.

75.       The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A),  as well as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right,"  5 U.S.C. § 706(2)(C).

76.       *Unexplained change of position*:  By promulgating the new Final Rule, the Agencies committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A), as well as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," § 706(2)(C), because the New Rule commits major changes without adequate explanation.  *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("Unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."  In particular, even though the New Rule expressly repudiates the Agencies' prior position taken in

multiple determinations, *see* 87 Fed. Reg. at 24,741 ("Prior determinations by the Director that a partially complete, disassembled, or nonfunctional frame or receiver, including a parts kit, was not, or did not include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to April 26, 2022, shall not continue to be valid or authoritative after that date.), no adequate explanation for that major change exists.

### E.      Count Five: APA § 706(2)(B)—Right to Keep and Bear Arms

77.      Defense Distributed & SAF incorporate the preceding paragraphs.

78.      The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

79.      The Second Amendment of the Constitution of the United States forbids laws abridging the individual right to keep and bear Arms.

80.      By promulgating the 2022 "Frame and Receiver" Rule and thereby redefining the Gun Control Act's keystone "firearm" term, the Agencies subjected Defense Distributed & SAF to an unconstitutional abridgement of Second Amendment rights.  The Agencies' new Final Rule infringes the individual right to make and acquire Arms, which is part and parcel of the right to keep and bear Arms, and is inconsistent with this Nation's historical tradition of firearm regulation. As such, it is an unconstitutional abridgement of Second Amendment rights.  *See N.Y. State Rifle & Pistol Ass'n, v. Bruen*, 142 S.Ct. 2111 (2022).

### F.      Count Six: APA § 706(2)(B)—Due Process Clause

81.      Defense Distributed & SAF incorporate the preceding paragraphs.

82.     The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

83.     The Fifth Amendment of the Constitution of the United States forbids  deprivations of life, liberty, or property without due process of law.  The Clause's vagueness doctrine is violated by criminal laws that either deny defendants fair notice of what is punishable or invite arbitrary enforcement by lack of standards.  The 2022 "Frame and Receiver" Rule does both

84.     The new Final Rule violates the vagueness prohibition by defining "frame" and "receiver" to include a "partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c).  Those inherently amorphous terms—especially "readily," even as defined by 27 C.F.R. § 478.11—present an unconstitutional level of vagueness that denies citizens fair notice of what is punishable.

85.     The new Final Rule also violates the vagueness prohibition by defining "frame" and "receiver" to sometimes include "a forging, casting, printing, extrusion, unmachined body, or similar article," depending on whether or not it has "reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." 27 C.F.R. § 478.12(c).  Those inherently amorphous terms—especially "clearly identifiable"—present an unconstitutional level of vagueness that denies citizens fair notice of what is punishable.

86.     The new Final Rule also violates the vagueness prohibition by providing that, "[w]hen issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or

26

possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit." 27 C.F.R. § 478.12(c).  Those inherently sweeping and standardless terms violate the vagueness doctrine by inviting arbitrary enforcement.

## VI.    Requests for Relief

87.    Defense Distributed and SAF request a judgment in their favor as to all claims against the Agencies awarding them all relief they are entitled to.

88.    Defense Distributed and SAF request a judgment holding *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022), unlawful.

89.    Defense Distributed and SAF request a judgment setting aside *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022).

90.    Defense Distributed and SAF request a judgment permanently enjoining the Agencies' enforcement of *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022).

91.    Defense Distributed requests a preliminary injunctions enjoining the Agencies' enforcement of *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022), against Defense Distributed.

92.    SAF requests preliminary injunction enjoining Agencies' enforcement of *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022), against SAF's members.

93.    Defense Distributed & SAF request a judgment against the Agencies that awards Defense Distributed & SAF their costs, including reasonable attorney fees.

Respectfully submitted,

BECK REDDEN LLP

By /s/ *Chad Flores*
Chad Flores
cflores@beckredden.com
Texas Bar No. 24059759
Nicholas M. Bruno
nbruno@beckredden.com
Texas Bar No. 24097432
Zachary T. Nelson
znelson@beckredden.com
Texas Bar No. 24127240
1221 McKinney St., Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

Counsel for Defense Distributed and
The Second Amendment Foundation, Inc.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this submission was served on all counsel of record by the Court's CM/ECF system in accordance with the Federal Rules of Civil Procedure on December 23, 2022.

*/s/ Chad Flores*
Chad Flores