**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION**

| | |
|---|---|
| COAST RUNNER, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 7:24-cv-326 |
| KICKSTARTER, PBC; INDIEGOGO, INC.; LAUNCHBOOM, INC.; JOHN DOES #1 AND #2, | **<u>JURY TRIAL DEMANDED</u>** |
| Defendants. | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

1.      Turning an idea into a commercial success is a challenge. At some point, every entrepreneur must make difficult choices about how to raise money to grow his business. Some turn to crowdfunding: the use of social media to raise money from many smaller investments or donations rather than a handful of large ones. For many commercial ventures, the crowdfunding industry is a functional duopoly: Kickstarter and Indiegogo, the two largest crowdfunding platforms, compete with one another but control virtually the entire crowdfunding market for industrial-grade machines, with other market participants unable to reach even a small fraction of potentially interested consumers that the duopoly can. Other businesses, such as Launchboom, have grown up around this duopoly to help new entrepreneurs navigate their relationships with Kickstarter and Indiegogo.

2.      An entrepreneur with a new product obtains crowdfunding by preparing an elaborate, labor-intensive application for a platform's approval—almost always Kickstarter or Indiegogo. Such a proposal, when approved, is referred to as the product's "campaign," and

interested purchasers, often called "backers," pledge money in advance of a product's development or release in exchange for some benefit—usually a copy of the finished product along with other "perks," which are usually upgrades, expansions, or other improvements to the base product. In exchange, the platform takes a percentage of the money pledged. When this arrangement works, everyone wins: the entrepreneur raises capital without parting with equity or taking on debt; the backers are the first to enjoy cutting-edge products; the platform takes a commission in proportion to the entrepreneur's success.

3.      Coast Runner spent six months—and hundreds of thousands of dollars—working closely with Kickstarter and Launchboom on a Kickstarter campaign for its innovative new product, the CR-1. Put simply, the CR-1 brings extremely precise metal machining and engineering technology to a space fit for an ordinary desktop—the device is accurate to within one thousandth of an inch, or approximately 25 microns. The CR-1's industrial applications alone are vast: small and large firms alike can fabricate parts made of materials as durable as titanium on the fly at a fraction of the cost of using large-scale industrial equipment. As part of securing Kickstarter's approval for the campaign, and in order to maximize marketing and fundraising effectiveness, Coast Runner divulged to Kickstarter and Launchboom virtually everything about the CR-1, its origins, its development, its capabilities, and Coast Runner's business plans for the CR-1 after the campaign.

4.      Kickstarter and Launchboom repeatedly affirmed their excitement at the CR-1's promise as the campaign's expected launch date, February 27, 2024, approached. Indiegogo, Kickstarter's rival and only substantial competitor, saw so much promise in the CR-1 that it tried to persuade Coast Runner to abandon its plans to use the Kickstarter platform in favor of crowdfunding on Indiegogo. Mere days before launch, Kickstarter expressed its strong confidence

in the CR-1 campaign, and Launchboom projected hundreds of thousands of dollars of investment for the CR-1. The campaign successfully launched as expected on February 27, and the public's initial reaction bore out Kickstarter's and Launchboom's optimism, as the CR-1 accumulated over $500,000 in backing mere hours after the campaign began. Based on this initial reaction, Launchboom projected funding revenue in the millions of dollars.

5. And then it stopped. A fraction of the first day into a planned 30-day campaign, Kickstarter first removed advertising perks it had promised the CR-1, then hid the CR-1's campaign, and then, through a form e-mail with no further explanation, informed Coast Runner than it was terminating the CR-1 campaign in 48 hours. Kickstarter ignored Coast Runner's puzzled inquiries. What could have changed Kickstarter's mind so abruptly that it began and ended a campaign six months in the making in the same day?

6. Kickstarter was willing to speak to Launchboom. Launchboom's representative assured Coast Runner that he could serve as an intermediary and could resolve whatever problem had arisen. Coast Runner believed him. Launchboom's representative pursued Coast Runner's inquiries up to the top of the Kickstarter hierarchy, culminating in a Kickstarter/Launchboom CEO-to-CEO conversation. But after that conversation, Launchboom suddenly stopped replying to Coast Runner's inquiries altogether, refusing to provide Coast Runner an explanation as to either Kickstarter's decision or its own. Launchboom went so far in spontaneously disassociating from Coast Runner that it issued the firm an unprompted refund.

7. In an attempt to salvage hundreds of thousands in expenses, months of work, and millions in projected sales, Coast Runner turned to Indiegogo, the rival platform that attempted to snatch the CR-1 from Kickstarter's platform in the first place, to stand up an emergency replacement campaign. Indiegogo agreed, reiterating its excitement for the CR-1, and in a whole-

of-company effort, Indiegogo managed to kick off a campaign for the CR-1 on February 29. The CR-1 once again received an incredible market response, accruing another $250,000 in backer pledges in the first few hours of this new campaign.

8. Yet Indiegogo shut down the CR-1 campaign the next day, March 1, with the same total lack of explanation as Kickstarter and Launchboom before it. Indeed, Indiegogo did not even notify Coast Runner that it had terminated the CR-1 crowdfunding campaign, instead leaving Coast Runner to discover the termination on its own.

9. Multiple crowdfunding-sector insiders, including employees from Launchboom and Indiegogo, confirmed that which had become plainly obvious to Coast Runner: in response to outside pressure to drop Coast Runner because of its founders' political views, Kickstarter had demanded, and both Launchboom and Indiegogo agreed to, an illegal conspiracy through which all three firms would refuse to promote the CR-1.

10. Some illegal conspiracies escape detection and punishment because their victims cannot identify the details surrounding the illegal conspiracy. Not this one. Between February 28 and March 1, 2024, Kickstarter's CEO, Everette Taylor, conspired with and induced Launchboom's CEO, Mark Pecota, and Indiegogo's CEO, Becky Center, to terminate business relationships with Coast Runner and to refuse to deal with Coast Runner or the CR-1. They did so in order to appease political pressure from John Doe #1 and John Doe #2, an individual and organization who induced Kickstarter to start the conspiracy in the first place, and to ensure that the CR-1 could not effectively obtain crowdfunding capital under any conditions. This illegal conspiracy replaced competition between Kickstarter and Indiegogo in the market for crowdfunding for industrial-grade machines with *per se* illegal collusion. Coast Runner brings this

suit to expose this illegal conspiracy and to seek all available redress under both federal and Texas antitrust laws, each of which all three firms have brazenly violated.

## PARTIES

11.     Plaintiff Coast Runner, Inc. is a Texas corporation with its principal place of business in Austin, Texas.

12.     Defendant Kickstarter, PBC is a New York public benefit corporation with its principal place of business in New York City, New York.

13.     Defendant Indiegogo, Inc. is a California corporation with its principal place of business in San Francisco, California.

14.     Launchboom, Inc. is a California corporation with its principal place of business in San Diego, California.

15.     John Doe #1 is an unknown individual. His state of residence is currently unknown.

16.     John Doe #2 is an unknown entity. Its state of residence and its principal place of business are currently unknown.

## JURISDICTION & VENUE

17.     This Court has exclusive subject-matter jurisdiction over this case, as Coast Runner claims that Defendants violated the Sherman Antitrust Act. 28 U.S.C. § 1331; 15 U.S.C. § 4; *Miller v. Granados*, 529 F.2d 393, 395 (5th Cir. 1976). This Court likewise possesses supplemental subject-matter jurisdiction over Coast Runner's remaining state-law claims, as they form part of the same "case or controversy" as Coast Runner's federal antitrust claims. 28 U.S.C. § 1367(a).

18.     This Court likewise has specific personal jurisdiction over all Defendants. At various times, each repeatedly initiated contact with officers or employees of Coast Runner, a Texas corporation, while those employees were working at Coast Runner's Texas headquarters.

5

Each solicited the business of Coast Runner knowing that Coast Runner was in Texas. Each entered into a contract executed in Texas related to the production and promotion of the Coast Runner milling machine to be manufactured in Texas. Each collusively participated in an illegal agreement to breach those contracts and to refuse to deal with Coast Runner regarding its milling machine; in furtherance of that illegal agreement, each communicated statements directed to Coast Runner and its officers or employees while those individuals were located in Texas, and each knew that their statements and actions would cause harms both inside and beyond Texas to a Texas corporation and individuals residing in Texas.

19.     Venue is proper in this district for the same reasons that this Court possesses personal jurisdiction, as the acts described above constitute "a substantial part of the events or omissions giving rise" to Coast Runner's claims. 28 U.S.C. § 1391(b)(2). Substantially all of the events that support personal jurisdiction occurred within the Western District of Texas.

<strong>GENERAL ALLEGATIONS</strong>

20.     This case turns on the development of Coast Runner's CR-1 milling machine; the plans that Coast Runner made with Kickstarter, Indiegogo, and Launchboom to bring that machine to market; the precipitous end to each of those relationships; and the subsequent discovery that those relationships ended because of an illegal conspiracy among those three businesses to jointly refuse to deal with Coast Runner and its CR-1 machine.

**I.      Desktop milling machines enable broad, creative, and highly precise use of a variety of materials in manufacturing.**

21.     Complex manufacturing processes in the United States rely on a series of high-end industrial machines designed for each firm's particular purposes. One such machine is a milling machine. A milling machine removes material from inserted blanks to transform those blanks into precision-engineered parts for personal, commercial, and industrial uses; milling machines take

plastic, wood, metals, and other materials and cut them into specific shapes. The best of these machines can handle materials as hard as titanium. The most highly regulated can cut to within a micron of error, while most successful, multi-purpose devices are precise to within one thousandth of an inch. When these machines make cuts pursuant to code controlled by an attached computer, they are referred to as CNC (or computer number control) milling machines.

22.     Broad-application CNC milling machines are essential in a variety of sectors, ranging from aerospace engineering to energy production to heavy manufacturing. These machines are in common use across the American economy; they can cost tens or hundreds of thousands of dollars to purchase and even more to configure and use across a variety of applications.

23.     Manufacturers of large industrial and commercial equipment and parts often use CNC milling machines in tandem with other industrial machines to fabricate replacement parts for damaged, broken, or worn-out machines. These uses can prove profitable, especially when a company expects the market will require a large number of a given item, or when the item to be manufactured is large and will command a high price from buyers. But configuring these large machines for smaller items, obscure items, or short production runs can prove costly—often too costly to make such manufacturing uses economically viable.

## II.     Cody Wilson and Garret Walliman develop a highly advanced, general purpose, desktop CNC machine.

24.     Cody Wilson and Garret Walliman, CEO and CTO of Coast Runner, respectively, invent, develop, refine, and market computer-controlled small-scale machines that enable individuals and businesses to manufacture machine parts for personal or industrial use at a fraction of the cost of larger-scale industrial fabrication machines.

25.     Through one of his other endeavors, Defense Distributed, Wilson pioneered the use of computer-controlled compact machinery to enable individuals to, consistent with their Second

Amendment rights and all applicable state and federal laws, manufacture parts for making, repairing, or modifying firearms. Wilson and Defense Distributed have been harassed by anti-gun groups from New Jersey to California, and Wilson is frequently required to defend himself and his ventures against litigation brought by both private and state entities that seek to constrain private individuals' Second Amendment rights. *See, e.g.*, *Defense Distributed v. Bonta*, No. 2:22-CV-6200-GW-AGR (C.D. Cal., filed Aug. 31, 2022). Wilson has, in turn, spent considerable time and resources on litigation defending, and public advocacy supporting, the individual right to keep and bear arms that the Second Amendment enshrines. *See, e.g.*, CODY WILSON, COME AND TAKE IT: THE GUN PRINTER'S GUIDE TO THINKING FREE (2016).

26. Drawing on their combined hardware and software design experience and their prior ventures that developed CNC milling machines directed at specific applications, Wilson and Walliman decided to develop an all-purpose computer-controlled desktop milling machine to enable individuals and businesses to fabricate complex and precise parts out of even the hardest materials at a fraction of the cost of available industrial options. Whatever one may think of Defense Distributed, Wilson, Walliman, or any of their previous ventures, they set out to design an all-purpose industrial CNC milling machine for the general market, not specifically for firearms manufacturing or similar uses.

27. Wilson and Walliman worked with others during 2022 to develop a prototype machine that could meet this market need. The prototype they developed, the CR-1, vastly improved on the special-purpose milling machine sold by Defense Distributed. Compared to the Ghost Gunner—the Defense Distributed product most similar to the CR-1—the CR-1 uses an upgraded power supply, different circuit boards, additional dampeners in the hardware, a total

redesign of the fixturing, an entirely redesigned software platform, and other additional improvements that set the CR-1 apart from any other at-home milling product.

28.     As a consequence, the CR-1 has capabilities far beyond the Ghost Gunner machine: for example, the CR-1 can mill extremely durable materials, like titanium, and the CR-1's software contains a "manual mode" that enables the end user to operate the machine manually while maintaining the CR-1's exceptional precision.

29.     To recognize the creation of this all-purpose prototype, Wilson and Walliman incorporated Coast Runner as a separate business in February 2023. Walliman served as Coast Runner's first CEO; Wilson has taken over as CEO as of October 2024, while Walliman continues to lead Coast Runner as its CTO.

30.     Consistent with their intent that the CR-1 serve as an all-purpose CNC milling machine and *not* as an arms-related product, Coast Runner sought a commodity control classification from the Biden Administration's Department of Commerce in July 2023. A manufacturer typically seeks such a classification when it contemplates exporting its goods overseas; the classification process can notify a manufacturer whether their goods are or will be subject to federal export regulations or restrictions. For example, nearly all exports and reexports to Iran are prohibited by law. 31 C.F.R. § 560.204.

31.     In the commodity control classification process, the Department of Commerce analyzes a product's nature, components, technical parameters, and potential uses to assign a five-digit alphanumeric designation—an Export Control Classification Number—for import/export purposes. This designation assigns a given product a place in the Department of Commerce's taxonomy of all goods exported from the United States. The first character identifies the general product category of a proposed export: for example, chemicals begin with a 1, electronics with a

3, and marine products begin with an 8. *See, e.g.*, "Export Control Classification Number (ECCN)," Bureau of Industry and Security, U.S. Department of Commerce, https://www.bis.doc.gov/index.php/licensing/commerce-control-list-classification/export-control-classification-number-eccn (last visited Dec. 3, 2024). The second character identifies the type of product: end items or equipment are an A, testing and inspection equipment are a B, and so on. *Id.* The final three characters represent a specific subcategory within the structure established by the first two characters. *Id.* Items *not* subject to the Department of Commerce's export control list are generally marked EAR99. *Id*.

32. Firearms and firearms manufacturing products are subject to extensive federal export control laws and regulations. In particular, products related to the design and production of firearms are typically designated 0B501, 0B505, or 0B602.

33. Coast Runner therefore considered it important to ensure that an objective regulator viewed the CR-1 as a general-application industrial milling machine and not as an arms-manufacturing machine. Not only would this step distinguish the CR-1 from Wilson's previous ventures, but the distinction would control whether and to what extent Coast Runner could safely and legally export the CR-1 to markets overseas. Fortunately for Coast Runner, the Department of Commerce agreed that the CR-1 was a general purpose industrial machine and not an arms-manufacturing device subject to arms control laws. Like the vast majority of commodities, the CR-1 was designated EAR99.

34. Satisfied that the prototype CR-1 represented a significant advance in general industrial CNC milling technology, Wilson and Walliman faced a familiar question for any business owner: how to raise the money to mass produce the CR-1 and bring it to market.

35.     Wilson and Walliman initially had several fruitful conversations with private investors who expressed interest in the CR-1 and its industrial applications. During the course of those conversations, however, Wilson and Walliman concluded that they could best launch a novel, high-tech product like the CR-1 through a crowdfunding campaign. Crowdfunding is a unique and, for many creators and inventors, a highly advantageous method of raising capital. Wilson and Walliman had the opportunity to receive a substantial cash infusion, prove a market for their product, retain their equity, and avoid debt. No other funding mechanism carries those benefits. Indeed, every other way a burgeoning company might raise capital requires either a dilution of equity or indebtedness of some form, and none can simultaneously serve as a proving ground for a new product.

### III.     Crowdfunding is a big-dollar industry, but with few key players.

36.     At its most basic, a crowdfunding campaign raises money by using social media—in particular, a crowdfunding website and social-media links back to that website—to generate large-scale public interest in a person or project. The crowdfunding website describes the individual's or project's needs and the goal they are pursuing through crowdfunding, and the crowdfunding site asks individuals who visit the page to pledge to donate money to or purchase a product from an individual or business. Those who do so are typically referred to as "backers" of that project or campaign. Such campaigns vary in duration and can last for weeks or even months for the highest-dollar and most sophisticated campaigns. The crowdfunding site in turn takes its fee from the money donated or revenue earned through the crowdfunding campaign.

37.     Kickstarter and Indiegogo are the two largest and most popular crowdfunding websites for new businesses to develop for-profit projects across a variety of lines of business. For example, Kickstarter's front page organizes its projects under subheadings ranging from "Art" to

"Design" to "Games" to "Technology" and "Theater."[1] Indiegogo's campaigns are no less varied, including brand new video-game systems, an all-terrain electric bike, a compact table laser welder, and an AI-powered chessboard.[2] By Kickstarter's figures, it has funded over 267,000 projects to the tune of nearly $8.4 billion.[3] Indiegogo boasts that it has supported over 800,000 projects and has raised more than $3 billion across these campaigns.[4] There are also other crowdfunding platforms that serve other purposes—for example, GoFundMe primarily hosts charitable campaigns for individuals and causes, while DonorsChoose focuses specifically on campaigns by teachers to raise money for their classrooms. But so far as for-profit projects for industrial-grade machines are concerned, Kickstarter and Indiegogo possess virtually the entire market, and in any event over 90% of this relevant market share. Kickstarter and Indiegogo are direct competitors;[5] they initially competed for Coast Runner's business specifically.

38. A successful crowdfunding campaign through Kickstarter or Indiegogo offers entrepreneurs several advantages in bringing a new industrial-grade machine to market when compared to alternative funding sources. First, a successful crowdfunding campaign signals legitimacy to future investors and purchasers by confirming both that a new business is capable of fulfilling product orders in a timely manner and that a new product lives up to its advertised capabilities. Kickstarter itself describes these effects as "market validation," through which a successful crowdfunding campaign "demonstrates to investors and partners that there is demand for [a] concept."[6] Second, a successful campaign significantly increases brand recognition for a

---

[1] https://www.kickstarter.com/
[2] https://www.indiegogo.com/
[3] https://www.kickstarter.com/help/stats?ref=hello
[4] https://www.indiegogo.com/about/our-story
[5] https://entrepreneur.indiegogo.com/how-it-works/indiegogo-vs-kickstarter/
[6] https://www.indiegogo.com/about/our-story

new business and a new product through the media coverage of both business and product during the crowdfunding campaign. Finally, a successful crowdfunding campaign provides entrepreneurs with a substantial capital infusion without obligating a new business to sell equity or take on potentially costly debt. Crowdfunding therefore presents unique advantages for funding industrial-grade projects such as the CR-1; other funding alternatives are not close substitutes.

39.     Both Kickstarter and Indiegogo require a thorough application process in order to initiate a crowdfunding campaign via their respective sites. These applications go into varying levels of detail depending on the sophistication of the project and the amount of money an entrepreneur seeks, and both Kickstarter and Indiegogo often engage in an iterative process with potential crowdfunders, where the respective sites can review the nature of the project, the claims the project's creators make about their product, the perks the project's creators are offering to potential backers, the multimedia and content that the project's backers wish to use on their proposed project pages, and so on. Kickstarter has a more robust review process, while Indiegogo touts its more flexible approach.[7]

40.     This application process can be costly in terms of both money and manpower. Putting aside the typical costs of taking an invention from paper to fully functional prototype, an entrepreneur seeking crowdfunding can spend hundreds or thousands of man-hours in developing advertising copy, selecting the right perks and partners to work with to maximize a project's exposure, generating images and videos that will encourage potential backers to support the project, and related activities. These materials are submitted along with the project application; they can take weeks or months to develop.

---

[7] https://blog.thecrowdfundingformula.com/indiegogo-vs-kickstarter/

41.     Kickstarter and Indiegogo review materials associated with a proposed project carefully. While some relatively simpler projects can be approved quickly, both Kickstarter and Indiegogo advertise that most projects are approved only after a multi-day internal review by their respective "Trust and Safety" teams.[8] These reviews often prompt questions or requests for additional information. For more complicated projects going through an iterative, back-and-forth approval process, approval can take weeks—additional time that, again, comes at the end of an often weeks- or months-long preparatory effort.

42.     Indeed, a substantial industry of Kickstarter and Indiegogo "experts" has emerged to assist prospective crowdfunders with the complexity of a crowdfunding campaign, from application to marketing to execution and beyond. Both Kickstarter and Indiegogo certify "expert" companies to, in Kickstarter's words, "help support your campaign from start to finish."[9]

43.     Kickstarter and Indiegogo-adjacent businesses are certified as "experts" in part because of their especially robust relationships with the two industry leaders and their employee bases. Businesses advertising their expertise regarding one or both platforms—especially when certified by those platforms as an expert—typically have access to highly placed employees at both Kickstarter and Indiegogo. These experts leverage their longstanding relationships in a variety of ways to ensure their clients' projects succeed, such as by acting as an intermediary between the site and prospective crowdfunder in the case of a dispute, by seeking preferential listing or advertising for a client's projects, or by using their longstanding experience and advanced metrics to generate sophisticated estimates of a project's total revenues from the campaign.

---

[8] https://www.kickstarter.com/trust?ref=global-footer; https://learn.indiegogo.com/trust/
[9] https://www.kickstarter.com/experts

44. Launchboom is one such business. Launchboom advertises that it is a certified expert by both Kickstarter and Indiegogo. Launchboom advertises its "proven track record as a top **Kickstarter company**," stating it "help[s] clients navigate the nuances of **Kickstarter promotion** and offer[s] the best strategies for **Kickstarter marketing**."[10] Launchboom assures clients of its "expert insights" into Kickstarter, and promises it is "committed to being your trusted partner throughout the entire crowdfunding journey."[11] Launchboom makes similar assurances regarding Indiegogo to its potential and actual customers.

45. Jellop is another. Jellop bills itself as the "ad tech power behind the best Kickstarters."[12] Jellop has a narrower focus than Launchboom—Jellop "run[s] ad campaigns, mainly on Facebook and on Google, to promote Kickstarter projects," while Launchboom offers beginning-to-end Kickstarter support and also works with Indiegogo campaigners.[13] But like Launchboom, Jellop advertises its history and relationships with Kickstarter, promising it will "put the experience we've gained promoting thousands of Kickstarter projects at creators' disposal."[14]

46. Launchboom and Jellop frequently work together. As Launchboom states on its Frequently Asked Questions page in response to the question "Can you work with other agencies like Jellop?", Launchboom says it "ha[s] worked on many campaigns with Jellop."[15] Considered together, Launchboom and Jellop have worked on thousands of crowdfunding campaigns that have collectively raised over a billion dollars.[16]

---

[10] https://www.launchboom.com/kickstarter-3/ (bold in original).
[11] *Id.*
[12] https://jellop.com/
[13] https://jellop.com/faqs/; https://www.launchboom.com/how-launchboom-works/
[14] https://jellop.com/
[15] https://www.launchboom.com/faq/
[16] https://www.launchboom.com/success-stories/; https://jellop.com/faqs/

## IV.     Coast Runner decides to pursue crowdfunding.

47.     By summer 2023, Coast Runner had focused its efforts on pursuing a crowdfunding campaign on Kickstarter. Several Coast Runner employees worked on developing the CR-1 and the Kickstarter application full-time, and others spent a substantial fraction of their time developing materials, including audiovisual materials, for the application.

48.     During this process, Coast Runner learned about Launchboom and the services it provided. Coast Runner employees met with representatives from Launchboom, including Launchboom's CEO, where Launchboom vetted Coast Runner, its personnel, and its plans for the CR-1. After that meeting, Launchboom agreed to work with Coast Runner, and accepted payment of $8,000 to get the ball rolling.

49.     As part of agreeing to assist with Coast Runner's Kickstarter application and campaign, Launchboom promised to work on the campaign from prior to the submission of the Kickstarter application through and after the final funding of the campaign. Launchboom described to Coast Runner how it could leverage relationships within Kickstarter to ensure Coast Runner's application was accepted, to secure front-page advertisement of the CR-1 on Kickstarter's page, to include the CR-1 in Kickstarter's newsletter, and to advance Coast Runner's campaign on Kickstarter through perks and advantages beyond what a Kickstarter campaign might receive without Launchboom's influence. Wilson, Walliman, and others working for Coast Runner met with Launchboom's representative many times over the coming months, participated in Launchboom's coursework, had weekly check-ins with Launchboom, and allowed Launchboom to shape Coast Runner's advertising and to direct advertising spending. At Launchboom's direction, Coast Runner spent over $20,000 on advertising between October 2023 and February 2024. Coast Runner also engaged Jellop to leverage that company's advertising technology for the CR-1 Kickstarter campaign.

16

50.     Coast Runner and the CR-1 sparked enough immediate interest that Kickstarter's largest rival platform, Indiegogo, approached Wilson and Walliman to persuade them to crowdfund through Indiegogo instead. Wilson and Walliman took this as a sign of significant interest in the CR-1: as Launchboom informed them, Kickstarter and Indiegogo were by far the two most significant crowdfunding platforms for high-tech industrial projects, comprising nearly the entire crowdfunding market in that sector. Indeed, Indiegogo's website has a page dedicated to promoting the three key advantages it claims over Kickstarter: "partnerships and support, cutting-edge tools, and flexibility and worldwide reach."[17] Indiegogo does not give any other crowdfunding platform that kind of direct treatment, demonstrating that the two are each other's primary competitor—the "Indiegogo vs. Kickstarter" page is even featured in the footer of Indiegogo's website.

51.     Indiegogo and Kickstarter compete on a variety of factors and features, including, as mentioned above, the nature of the application and review process, the campaign "page" builder and its features, video hosting capabilities, customization of campaign rewards, campaign analytics and data reporting, and platform fees.[18] Kickstarter offers 15 top-level categories of projects, with 155 subcategories to choose from—its top categories in terms of funding are games, design, and technology. Kickstarter is particularly effective in launching games. Indiegogo, on the other hand, has fewer categories and subcategories for projects, and does not have a particular specialization, but it is becoming known for its work in lodging, glamping, and hotels, as well as the e-bike niche. Indiegogo also allows charity drives, while Kickstarter does not. Another key difference is in the platforms' respective funding models; unlike Kickstarter, Indiegogo offers a "flexible" model that allows project creators to keep the funds they raise, even if they do not meet

---

[17] https://entrepreneur.indiegogo.com/how-it-works/indiegogo-vs-kickstarter/
[18] https://blog.thecrowdfundingformula.com/indiegogo-vs-kickstarter/

their stated goal. Kickstarter's model is all or nothing. The platforms also compete on global reach, with Indiegogo operating in 33 countries, to Kickstarter's 25.

52. Promotional opportunities also differ between the platforms, with Indiegogo offering more transparent and straightforward opportunities for homepage placement and inclusion in its newsletter. Kickstarter promotions, such as "project we love" status, are harder to obtain, but can be extremely effective. Indiegogo also permits "secret perks" for certain backers; for example, a creator could offer a secret perk to those who sign up for an email list or follow a social media page. But Kickstarter permits quantity- and time-limited perks, while Indiegogo permits only quantity limits on perks. Finally, Indiegogo allows creators to gather information such as backers' shipping addresses and other relevant data, such as, for example, shoe or shirt size if the campaign is for shoes or shirts. Kickstarter requires that creators gather this information from backers after the campaign has ended, but Kickstarter's partnership with Easyship offers significant tools and perks to creators. Which platform is best for a given project ultimately comes down to the priorities and preferences of the project creator.

53. Wilson and Walliman agreed to meet with an Indiegogo representative with an open mind. After a lengthy discussion, Brian Letzter, an Indiegogo senior account executive, agreed that relying on Kickstarter made sense for Coast Runner's goals, but Letzter suggested that Indiegogo would be glad to host the CR-1 as an "InDemand" project. As Indiegogo explains it, Indiegogo's InDemand program is intended as "the next step in [the] entrepreneurial journey" after a successful crowdfunding campaign, serving as "a post-campaign funding solution that bridges the gap between crowdfunding and commerce."[19] Wilson and Walliman indicated that Coast Runner would be interested in pursuing the InDemand program after the Kickstarter campaign concluded.

---

[19] https://entrepreneur.indiegogo.com/how-it-works/indemand/

54. Having decided to deploy their campaign on the Kickstarter crowdfunding platform, Coast Runner and Launchboom initially agreed to target early October 2023 as the campaign's launch date. Coast Runner submitted its application to Kickstarter in late September and included detailed information about the CR-1, its capabilities, video materials to serve as advertisements for the CR-1, language for its crowdfunding webpage, and more. Kickstarter reviewed these materials thoroughly and responded on October 1 to ask Coast Runner to make several changes to its proposed materials. These changes were minor and amounted to requests that Coast Runner rephrase a handful of statements across its proposed campaign materials. Coast Runner made the requested changes, and in days Kickstarter approved Coast Runner's proposed campaign.

55. Launchboom, however, believed that Coast Runner needed to delay the start of its campaign. As Launchboom developed its marketing strategy for the CR-1, it continued to revise upwards the number of pre-launch backers it expected to secure. Naturally, Coast Runner regarded this as a positive development, as additional backers translate directly into greater financial success for a crowdfunding campaign. As its expectations for the CR-1's success continued to grow, Launchboom suggested several delays of the target start date for Coast Runner's campaign: first to November, and then to December and January. On Launchboom's advice, Coast Runner agreed to each of these delays.

56. Coast Runner and Launchboom took advantage of the additional time prior to launch to further cultivate a relationship between Coast Runner and Kickstarter, as well as to raise media and market awareness of the Coast Runner brand and the CR-1. To those ends, Launchboom planned and hosted a dinner at the January 2024 Consumer Electronics Show ("CES") for individuals from Launchboom, Kickstarter, and the firms running campaigns in which

Launchboom had taken a particular interest. As Spencer Knowlton, a high-ranking employee at Launchboom, put it to Coast Runner, such a personal introduction to Kickstarter was uncommon and a service that Launchboom and other crowdfunding experts reserved for a small subset of their clients. That exclusive service would further include, according to Knowlton, a personal "hand-off" to Kickstarter at the formal start of the campaign.

57. At the CES dinner, Knowlton candidly shared Launchboom's excitement regarding the upcoming Coast Runner campaign. Knowlton divulged to Wilson and Walliman that while Launchboom initially estimated that Coast Runner would raise $500,000 in its campaign, pre-launch reservations had significantly outstripped expectations, with nearly 1,000 reservations for the CR-1 compared to Launchboom's initial expectation of 400. Those reservations sailed past 1,000 following the CES dinner. As Knowlton described it, Launchboom expected that Coast Runner could make well over $700,000 on its initial Kickstarter campaign alone, not including other sales driven by the campaign, pursuing additional sales through Indiegogo's InDemand program, and other possible revenue sources.

58. Kickstarter likewise confirmed its excitement for the Coast Runner campaign. As Nathan Nalevanko, a Senior Outreach Lead on Kickstarter's Design & Technology Team, told Wilson and Walliman, Kickstarter viewed the CR-1 as "exactly what we [Kickstarter] want to promote," Kickstarter was "very excited" about the project, and Kickstarter believed that "not only will you [Coast Runner] make lots of money [from the campaign], but we [Kickstarter] support you and your project."

59. But the Consumer Electronics Show also brought Coast Runner some troubling news: a potential rival was developing a competing CNC milling product, and rumor had it that this rival intended to launch a similar crowdfunding campaign in spring of 2024. Coast Runner,

Wilson, and Walliman had incurred over $250,000 in costs to date in developing the CR-1 and preparing to launch the crowdfunding campaign; Wilson and Walliman therefore informed Launchboom that the CR-1 campaign had to officially begin in February. Launchboom agreed, and all settled on February 27 as the finalized, official launch date for the CR-1 Kickstarter campaign.

60. A week prior to the February 27 launch, Kickstarter continued to express its excitement for the CR-1 campaign. Nalevanko promised the Coast Runner team that the CR-1 would appear as a "Product We Love" campaign on Kickstarter page, which would denote the CR-1 campaign with a special Kickstarter badge and keep the CR-1 visible on Kickstarter's front page. Nalevanko told Coast Runner that campaigns promoted with the "Products We Love" perks typically earned approximately 20% more than they otherwise would have without those benefits.

61. Launchboom approached the upcoming campaign launch with equal enthusiasm. Spencer Knowlton, who had originally assumed that Coast Runner would raise around $500,000 from its Kickstarter campaign, informed Coast Runner that he had revised his projections upwards to approximately $1,000,000 across the thirty-day Kickstarter campaign, with additional revenue coming from InDemand and other sources after such a successful campaign.

62. As the campaign drew closer to launch, some of Wilson and Walliman's critics attempted to discourage broad commercial interest in the CR-1 either by mischaracterizing it as an unimproved copy of the Ghost Gunner or by labeling it a product for manufacturing firearms. Though both assertions were false, Launchboom, through Knowlton, inquired about these claims with Coast Runner. Wilson and Walliman explained the significant differences between the Ghost Gunner and the CR-1, and Knowlton expressed his satisfaction with Wilson and Walliman's explanation.

21

63.     Neither Nalevanko nor Kickstarter inquired with Wilson, Walliman, or anyone at Coast Runner regarding these rumors. Wilson and Walliman did not consider this lack of an inquiry troubling, as the thorough application process and numerous exchanges with Kickstarter regarding the CR-1 gave Kickstarter more than enough information to know that claims describing the CR-1 as the equivalent of Defense Distributed's Ghost Gunner product, or otherwise pigeonholing the CR-1 as a firearms-manufacturing machine, were plainly false.

64.     With immense positive feedback from Kickstarter and Launchboom merely days before launch, and with neither firm expressing any concern to Wilson or Walliman about either the CR-1's provenance or capabilities, Wilson, Walliman, and the entire Coast Runner team felt optimistic about the campaign's imminent launch.

**V.      Coast Runner's Kickstarter campaign is short lived.**

65.     February 27 arrived. Kickstarter launched the Coast Runner campaign early in the morning central time, and Wilson and Walliman were relieved to see initial confirmation of Kickstarter's and Launchboom's excited predictions. Kickstarter designated the CR-1 as a product it loved, the campaign began on Kickstarter's highly desired front page, and reservations started coming in quickly.

66.     Something changed within the first few hours of the CR-1 campaign. Even though reservations were mounting at a growing pace, Wilson and Walliman noticed that Kickstarter removed the "Products We Love" badge only an hour or two after launch; within several more hours, Kickstarter had deliberately hidden the CR-1 campaign such that a potential backer could only discover it on Kickstarter's website by searching for it specifically.

67.     By this point, the Coast Runner team was certain that someone within Kickstarter overruled months of meticulous planning and had decided to abort the CR-1's launch. Yet even with this negative development, the first part of the first day's launch proved incredibly successful

22

for the CR-1, which rapidly accrued more than half a million dollars of support despite the new impediments Kickstarter imposed. While dissatisfied with Kickstarter's lack of communication regarding why it had turned against the CR-1, the Coast Runner team chose to approach Kickstarter cautiously to maximize the chances the CR-1 could still realize significant financial support.

68. Kickstarter reached out to the Coast Runner team for the first time at approximately 4 pm central time on February 27. That communication conveyed that, in Kickstarter's view, Coast Runner had failed to disclose that the CR-1 project contained an artificial intelligence ("AI") component. Kickstarter did not prohibit potential crowdfunders from seeking support for products either created using or including AI, but Kickstarter's application materials included a box that applicants were supposed to check to indicate that a proposed campaign supported a product that used AI.

69. Wilson and Walliman regarded this note with confusion. On the one hand, the CR-1 was neither developed using AI nor did it require AI to fully operate. But on the other, Coast Runner had long planned to offer as a unique crowdfunding "perk"—that is, an added bonus that a project's creator offered to initial backers, backers who offered more than the requested minimum for the project, or other preferred backers—a license for an AI tool created by CloudNC that, if properly used, could write code for the CR-1. If Kickstarter meant to communicate that Coast Runner erred by failing to disclose the use of AI in the CR-1 itself, Coast Runner reasoned, it was mistaken; but if it meant the perk, then Kickstarter, and specifically Nathan Nalevanko, had known about the "use of AI" for months. Neither possibility made sense.

70. Recalling that Launchboom had previously assured Coast Runner of its expertise in navigating disputes with Kickstarter, Wilson and Walliman communicated their concerns and Kickstarter's confusing email to Knowlton and the Launchboom team. Knowlton reacted with

surprise and reassured Wilson and Walliman that there must have been a misunderstanding with Kickstarter; Knowlton expressed confidence that the campaign would be back on track within the next 24 hours.

71. Knowlton's first reaction proved too optimistic. On the evening of February 27, Kickstarter sent Coast Runner an e-mail indicating Kickstarter's Trust & Safety Team planned to terminate the CR-1 campaign in 48 hours. Wilson and Walliman first turned to Nalevanko, their immediate contact at Kickstarter, seeking an explanation. Nalevanko responded dismissively, suggesting that Wilson and Walliman had to inquire further with the Trust & Safety Team for answers. Taken in context, and given Nalevanko's history with the Coast Runner team, Wilson and Walliman interpreted Nalevanko's response as meaning that Nalevanko would neither answer Coast Runner's questions nor assist with the CR-1 campaign further.

72. Wilson and Walliman again contacted their partners at Launchboom. And Knowlton reaffirmed that Launchboom intended to discover the reason underlying Kickstarter's sudden reversal regarding Coast Runner, rectify that reversal, and prevent the CR-1 campaign's cancellation.

73. Over the months they worked together, Wilson and Walliman had come to view Knowlton as both an honest broker and as a person sincerely invested in the CR-1's success. That meant a great deal to Wilson, Walliman, and the Coast Runner team, and Coast Runner hoped that Knowlton and Launchboom could salvage the CR-1's Kickstarter campaign.

74. But between Kickstarter's baffling (and then abandoned) AI explanation and Nalevenko's sudden and inexplicable hostility, Wilson and Walliman suspected they knew the cause of their sudden misfortunes. The two had faced determined harassment in their past ventures by individuals and organizations who opposed the lawful production or possession of firearms.

24

They surmised that if Kickstarter precipitously turned on Coast Runner after months of consistent support for the CR-1, the most likely reason was that an individual (John Doe #1) acting on behalf of an organization opposed to gun rights (John Doe #2) urged Kickstarter's CEO, Everette Taylor, and Kickstarter's senior leadership to rescind the CR-1 campaign.

75.     Wilson and Walliman were familiar with such tactics. In their experience, organizations that oppose fundamental freedoms such as the right to bear arms would often target the economic and commercial relationships of whomever they sought to weaken. By deliberately interfering with a lucrative contract belonging to Wilson and Walliman's non-ideological commercial business, John Does #1 and #2 reasoned, they could deprive Wilson and Walliman of the resources necessary to defend their separate Second-Amendment-related ventures both in and out of court.

## VI.     Amid the chaos, Indiegogo emerged as a potential lifeline for Wilson and Walliman.

76.     By the morning of February 28th, Wilson and Walliman had arrived at two conclusions. First, they realized that months of planning and media cultivation had brought them to this moment: if Coast Runner did not capitalize on a crowdfunding campaign soon, thousands of hours of effort, hundreds of thousands of dollars of costs, and millions of dollars of pledges would be lost. Second, they accepted that the CR-1's Kickstarter campaign was very likely to fail, notwithstanding the pair's belief that Knowlton was working diligently to repair Coast Runner's relationship with Kickstarter.

77.     The pair therefore turned to Kickstarter's chief rival in the crowdfunding market for industrial-grade machines, Indiegogo. Recalling Indiegogo's strong previous interest in Coast Runner and the CR-1, Wilson and Walliman reached out to Brian Letzter, the Indiegogo representative who had spoken to them months prior, to inquire whether Indiegogo would host a crowdfunding campaign for the CR-1 on an extremely accelerated schedule.

25

78. Letzter immediately sought direction from Indiegogo's senior leadership, including CEO Becky Center. Indiegogo confirmed to Wilson and Walliman that it both could stand up a replacement crowdfunding campaign for the CR-1 and that it was interested in doing so.

79. Wilson and Walliman knew that Kickstarter and Indiegogo comprised nearly 100% of the crowdfunding market for industrial-grade machines like the CR-1. They intended to leave no ambiguity with this second campaign. In a series of candid conversations with Letzter and the Indiegogo senior leadership team, Wilson and Walliman went to pains to disclose their previous firearms-related ventures, to identify the improvements and upgrades that distinguished the CR-1 from the Ghost Gunner, to provide the CR-1's Department of Commerce commodity classification, and to answer any and all questions that Indiegogo had of them. Their goal was simple: they sought to ensure that it would be impossible for a third party to disrupt an Indiegogo crowdfunding campaign with derogatory claims about Wilson or Walliman, Coast Runner, or the CR-1, even if false.

80. Wilson and Walliman even shared their concerns with Indiegogo. Indiegogo swiftly reassured the two that they knew about the pressure campaign against Wilson and Walliman, that they understood the CR-1, its general commercial applications, that it was not a firearms-related product, and that they would not succumb to pressure to terminate the CR-1's campaign should such pressure arise.

81. Out of an abundance of caution, and cognizant that Kickstarter's Trust & Safety Team was responsible for terminating the CR-1's Kickstarter campaign, Walliman specifically asked for Indiegogo's Trust & Safety Team to review the campaign and to confirm that Coast Runner's proposed campaign for the CR-1 complied fully with Indiegogo's trust and safety requirements. Indiegogo agreed to provide an advance review to allay Coast Runner's concerns.

After their review, Indiegogo's Trust & Safety Team confirmed that Coast Runner's proposed campaign for the CR-1 complied with Indiegogo's trust and safety requirements and issued Coast Runner a letter to "confirm that you may launch your campaign on Indiegogo."

82. Indiegogo immediately expended tremendous effort to prepare a CR-1 campaign to launch the following day, February 29. Letzter underscored Indiegogo's complete institutional support of Coast Runner and the CR-1: in Letzter's words, "the whole company [was] spending the day [Wednesday] on making this campaign happen for you guys [Coast Runner]." As Letzter explained, Indiegogo employees up and down the Indiegogo hierarchy set aside other projects and made the accelerated preparation of the CR-1 their priority.

83. But as Wilson and Walliman made progress with Indiegogo, Spencer Knowlton continued to escalate his inquiries with individuals at Kickstarter upwards through Kickstarter's chain of command. Communications between Wilson, Walliman, and Knowlton remained productive, if frank; at one point, Walliman told Knowlton that Coast Runner knew that Kickstarter ended the CR-1 campaign because of John Doe #1 and John Doe #2's lobbying of Kickstarter to end its relationship with Wilson, Walliman, and Coast Runner. Knowlton acknowledged as much, he but stood by his belief that Coast Runner and Kickstarter would arrive at a mutually acceptable path forward for the CR-1.

84. By that evening, Knowlton informed Wilson and Walliman that Launchboom's CEO, Mark Pecota, had spoken with Kickstarter's CEO directly regarding Kickstarter's decision to terminate the CR-1 campaign. Knowlton did not directly relay the contents of that meeting. Nevertheless, Knowlton assisted Wilson and Walliman in getting the Indiegogo campaign prepared for its planned launch the next day.

**VII.  Kickstarter officially—and prematurely—terminates the campaign; Indiegogo launches its campaign and terminates it as well.**

85.     February 29 heralded the collapse of what remained of the Kickstarter CR-1 campaign. Though Kickstarter indicated in its February 27 letter that it would terminate the CR-1 campaign in 48 hours, Kickstarter waited only 44 hours before removing the CR-1 campaign entirely. Wilson and Walliman sought an explanation or justification from Kickstarter for its ultimate decision. Kickstarter provided none.

86.     In an abrupt change, Launchboom also precipitously ended communications with Wilson, Walliman, and Coast Runner. In the prior six months, Launchboom generally and Knowlton specifically provided Wilson and Walliman with regular, timely updates and guidance related to the CR-1 Kickstarter campaign. Wilson and Walliman attempted several times to get in touch with Knowlton or anyone at Launchboom regarding the contents of the Launchboom/Kickstarter CEO meeting or whether Kickstarter divulged why it terminated the CR-1 campaign without explanation. Launchboom universally ignored those communication attempts.

87.     Coast Runner's final contact with Launchboom regarding the CR-1 campaign came in the form of an unexplained refund. While Coast Runner never requested a refund of the fees it paid Launchboom for its assistance, Launchboom nonetheless sent Coast Runner a full refund by credit card. Launchboom never explained why it refunded Coast Runner's money, why the Kickstarter campaign failed, or why it suddenly and completely ended communication with Coast Runner.

88.     Indiegogo met the February 29 launch date that it agreed to with Coast Runner, bringing its CR-1 crowdfunding campaign online that evening. As with the Kickstarter campaign, initial market response proved enthusiastic: within the first several hours, the CR-1 secured over $250,000 in backing.

28

89.     As with Kickstarter, that backing—and Indiegogo's CR-1 campaign—proved illusory. Unlike Kickstarter, Indiegogo never notified Coast Runner that it intended to terminate its CR-1 crowdfunding campaign; instead, Coast Runner discovered the termination had already taken place when one of its employees attempted to find the campaign on Indiegogo's site and found in its place an icon and message indicating that Indiegogo had suspended the campaign. Like Kickstarter before it, Indiegogo neither provided an explanation for its decision nor responded to Wilson's and Walliman's attempts to resolve any ostensible problem with the campaign.

## VIII.   Coast Runner learns of the illegal collusion against it.

90.     Months passed before Wilson, Walliman, or Coast Runner discovered further information explaining how and why the CR-1's crowdfunding campaigns failed. The first clue came in May, when Jellop sought payment from Coast Runner for an approximately $10,000 invoice despite the failure of the Kickstarter campaign. Gil Shterzer, a representative from Jellop, repeatedly contacted Wilson regarding payment; exasperated, Wilson outlined the events of both campaigns to Shterzer and offered to pay Jellop's invoice if and only if Shterzer could resolve what happened with the CR-1's two campaigns once and for all. Shterzer agreed to Wilson's proposal and said he would be in touch.

91.     Shterzer reached out to his contacts at Kickstarter, Indiegogo, and Launchboom. As Shterzer relayed it to Wilson, one highly placed Kickstarter employee expressed the belief that Kickstarter had terminated Coast Runner's campaign wrongfully but defended Kickstarter's actions by adding—as Shterzer put it—that "Indiegogo agreed to do the same thing [to Coast Runner]." Shterzer also acknowledged to Wilson that Kickstarter, Indiegogo, and Launchboom agreed to box out Coast Runner, and he indicated that he knew who had that conversation and how the decision came to pass.

29

92.     Wilson believed Shterzer's two stories: first because of how Indiegogo's unexplained termination of the CR-1's campaign closely tracked Kickstarter's similar actions mere days prior, and second because Wilson knew that as an economic matter, Launchboom needed its business relationship with Kickstarter too much to imperil it by refusing to join in an illegal agreement to refuse to deal with Coast Runner. Wilson and Shterzer disagreed as to whether Shterzer had given Wilson enough concrete information to satisfy their deal regarding Jellop's invoice, however; when Wilson told Shterzer he expected more information before he paid Jellop's $10,000 bill, Shterzer replied indignantly that he "guess[ed] Kickstarter and Indiegogo were right, you guys [Coast Runner] are a scam," further solidifying Wilson's understanding that Shterzer and Jellop had been in communication with Kickstarter and Indiegogo about their plan to blacklist Coast Runner.

93.     In July 2024, Wilson raised his suspicions about an illegal agreement among Kickstarter, Indiegogo, and Launchboom to refuse to deal with Coast Runner to Nick Cesare, a former Launchboom employee, experienced manager of Kickstarter and Indiegogo campaigns, and personal friend of Brian Letzter. Cesare indicated to Wilson that Letzler had been quietly pushed out of Indiegogo in May because of his advocacy in favor of the CR-1 project. Per Cesare, Kickstarter had indeed reached out to Indiegogo and emphatically asked them to cut ties with Coast Runner; after Indiegogo agreed to do so, it viewed its substantial investment of time and resources into the CR-1 campaign as an unjustifiable loss. Indiegogo ultimately blamed Letzter for that loss, and, as Cesare heard, Indiegogo's senior management informed Letzter that he would have to leave the organization.

94.     Wilson realized that Letzter likely had firsthand information about the illegal agreement among Kickstarter, Indiegogo, and Launchboom. So, in mid-July, Wilson called Letzter

and, to Wilson's surprise, Letzter promptly returned his call. Wilson and Letzter led off comparing notes about how the CR-1's failed crowdfunding campaigns had left them both worse for the wear; after Wilson perceived that Letzter was comfortable discussing the subject, Wilson asked Letzter outright about what caused Indiegogo's sudden reversal regarding the CR-1 campaign.

95. Letzter confirmed that Indiegogo canceled the CR-1 campaign in response to Kickstarter soliciting Indiegogo to do so. On Friday, February 29, just following Indiegogo's launch of its CR-1 campaign, Kickstarter's CEO and senior-most leadership reached out to their counterparts at their chief rival, Indiegogo, to communicate their disapproval of Coast Runner, the CR-1, and Indiegogo's unexpected CR-1 campaign launch just days after Kickstarter cancelled its CR-1 campaign. Letzter confirmed that Kickstarter and Indiegogo agreed to jointly refuse to provide crowdfunding campaign services to Coast Runner regarding the CR-1. Almost immediately following the companies' agreement, Indiegogo instructed its personnel not to discuss the CR-1 campaign with anyone, especially Wilson, Walliman, or Coast Runner. Within hours of illegally agreeing with its rival Kickstarter to refuse to support the CR-1, Indiegogo canceled its CR-1 campaign. So, what started as competition—Indiegogo winning Coast Runner's business when Kickstarter turned out to be the wrong platform for the CR-1—became an anticompetitive agreement against Coast Runner's right to participate in a competitive marketplace.

## IX. Coast Runner was severely harmed by the Defendants' collusive agreement.

96. As described above, Knowles had consistently projected that Coast Runner could easily generate hundreds of thousands of dollars from its Kickstarter campaign. Indeed, by the time the campaign launched, Knowles estimated that the campaign would generate $1,000,000, given the number of pre-backers, the marketing campaign that had already been underway, the Kickstarter perks, and the unique, innovative product. As the campaign rapidly gathered steam in

the early hours, Knowles thought the revenue could ultimately exceed $2,500,000. Coast Runner saw none of that return.

97.     Even after it moved to Indiegogo, Coast Runner was projected to generate well over a million dollars. As described above, the project generated large interest and a high conversion rate from the Kickstarter campaign in the first day. Again, because of the Defendants' illegal actions, Coast Runner received nary a dime.

98.     More concretely, just in the short time Coast Runner's campaigns were live, they earned over $500,000 and $250,000 on Kickstarter and Indiegogo, respectively. Defendants supposedly returned those funds to the backers when the campaigns were terminated.

99.     Not only did Defendants deprive Coast Runner of revenue, but they collected thousands of dollars in fees for the services rendered in standing up and hosting the two failed crowdfunding campaigns. And the lost relationship with Indiegogo meant that Coast Runner lost a reliable source of continued funding post-campaign: Indiegogo's InDemand program.

100.    Coast Runner expended over $250,000 developing the CR-1, preparing for the crowdfunding campaigns, marketing their product and the campaigns, and developing physical and digital assets in furtherance of its marketing and crowdfunding campaigns. Nevertheless, Coast Runner has been hindered in bringing the CR-1 to market, and its best avenue to do so, the crowdfunding industry, has been closed because of Defendant's illegal group boycott. Therefore, Coast Runner has missed out on the opportunity to, and has been severely delayed in, participating in the general marketplace for industrial-grade machines.

101.    The competitor's product that prompted the original February 27 launch date for the Kickstarter campaign itself launched on Kickstarter on April 9, 2024. The product was called "Carvera Air," and it was manufactured by Makera, a Chinese manufacturing concern

masquerading as an independent American business. That campaign raised $3,400,000, demonstrating the market demand for tabletop CNC machines, and reflecting an amount Coast Runner could have easily obtained with their superior product and genuinely independent, Texas-based company.

102.    Finally, Coast Runner has lost brand legitimacy and both present and potential goodwill as a result of Defendants' actions. Coast Runner has been labeled a scam or a front, and it has struggled to obtain non-crowdsourced funds and to bring the CR-1 machine to market. Defendants have telegraphed and outright said that Coast Runner cannot be trusted as a company and that the CR-1 is nothing more than a repackaged firearms mill. Those statements and the reasonable inferences a person not knowing the full truth might draw from Defendants' illegal, tortious, and very public conduct have had significant, lasting economic impact.

## FIRST CAUSE OF ACTION

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

### (against all named Defendants and against John Does #1 and 2)

103.    All the foregoing paragraphs are incorporated herein.

104.    "To establish liability under § 1 of the Sherman Act, 15 U.S.C. § 1, a plaintiff must show that the defendants (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *MM Steel, L.P. v. JSW Steel (USA)*, 806 F.3d 835, 843 (5th Cir. 2015) (citation and quotation marks omitted).

105.    Defendants conspired together to refuse to deal with Coast Runner. Whether by consent or by coercion, Kickstarter, at the behest of John Does #1 and #2, formed an illegal combination with the other Defendants to ditch the CR-1 campaign and blackball Coast Runner from the crowdfunding market for industrial-grade machines. By communicating through its most

33

senior leadership, on or about February 29, 2024, to both Indiegogo's and Launchboom's most senior leadership, Kickstarter successfully caused tremendous economic damage to Coast Runner and deprived it of the benefits of participating in the competitive marketplace in unreasonable restraint of trade.

106. Rivalry and competition in the crowdfunding sector promote market-based pricing, innovation in features and functionalities of the hosting sites, and creativity in promotion of projects; moreover, competition incentivizes crowdfunding platforms to work for the success of market participants such as Coast Runner. Here, in the absence of competition, the Defendants deprived Coast Runner of these benefits.

107. The illegal conspiracy impacted interstate trade in that it reached across state borders and into Texas to harm Coast Runner. Furthermore, Defendants abused instrumentalities of interstate commerce to achieve their restraint on trade by using phone lines, email, and the internet to communicate with one another regarding the objective of their illegal combination. Moreover, at the time each respective crowdfunding campaign was terminated, Coast Runner had backers from numerous states and would have shipped the CR-1 to each of those states.

108. Defendants' group boycott is a per se unreasonable restraint on trade that caused severe economic and reputational harm to Coast Runner.

**SECOND CAUSE OF ACTION**

**Violation of the Texas Free Enterprise and Antitrust Act, TEX. BUS. & COMM. CODE § 15.05**

**(against all named Defendants and against John Does #1 and 2)**

109. All the foregoing paragraphs are incorporated herein.

110. A claim under section 15.05(a) "requires proof of 1) a contract, combination, or conspiracy, 2) which is unreasonable, and 3) has an adverse effect on competition in the relevant

market." *W. Mktg., Inc. v. AEG Petroleum, LLC*, 616 S.W.3d 903, 915 (Tex. App. Amarillo, 2021), *opinion modified on reh'g,* 621 S.W.3d 88 (2021).

111. For the same reasons set forth in paragraphs 105-108, above, Defendants' actions violate the Texas Free Enterprise and Antitrust Act of 1983. Defendants formed a conspiratorial combination in unreasonable restraint of trade. Defendants engaged in their antitrust conspiracy knowingly and willfully, and in a flagrant manner.

**THIRD CAUSE OF ACTION**

**Tortious Interference with Contract**

**(against John Does #1 and #2)**

112. All the foregoing paragraphs are incorporated herein.

113. "To establish a claim for tortious interference with a contract, a plaintiff must establish: (1) the existence of a valid contract subject to interference; (2) that the defendant willfully and intentionally interfered with the contract; (3) that the interference proximately caused the plaintiff's injury; and (4) that the plaintiff incurred actual damage or loss." *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017).

114. Coast Runner had a valid and enforceable contract with Kickstarter to host its crowdfunding campaign. John Does #1 and #2, on or about February 27, 2024, intentionally induced Kickstarter to breach that contract. That interference directly and proximately caused Coast Runner to lose the revenue it would have obtained through its Kickstarter campaign.

**FOURTH CAUSE OF ACTION**

**Business Disparagement**

**(against John Does #1 and #2)**

115. All the foregoing paragraphs are incorporated herein.

116. "To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff." *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003).

117. Defendants John Doe #1 and John Doe #2 published false statements of fact regarding Coast Runner's economic interests by communicating, to Kickstarter and possibly to others, that Coast Runner had violated Kickstarter's terms of service, that Coast Runner was producing a machine for the production of firearms, that Coast Runner was a scam, and that Coast Runner was a front. Each of those statements was false. The Defendants made those statements knowing that they were false, with ill will toward Coast Runner, and with the specific intent to interfere with Coast Runner's economic interests. These false statements, starting from John Does #1 and #2, publicized to Kickstarter, and then to Indiegogo, and, in the process, to the public, inflicted easily foreseeable and cascading harms to Coast Runner. First Kickstarter and then Indiegogo and Launchboom refused to deal with Coast Runner, costing Coast Runner millions of dollars and rendering hundreds of thousands of dollars of investment a waste. Now, as a direct result of Defendants' actions, Coast Runner's reputation has been tarnished, and others have refused to and will continue to refuse to deal with Coast Runner.

### FIFTH CAUSE OF ACTION

### Civil Conspiracy

### (against all named Defendants and John Does #1 and #2)

118. All the foregoing paragraphs are incorporated herein.

119. "[T]he elements of civil conspiracy a[re]: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more

unlawful, overt acts; and (5) damages as the proximate result." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019).

120.   The Defendants joined together in an illegal conspiracy for the purpose of denying Coast Runner access to the marketplace and to free trade by undertaking a monopolistic, disparaging, tortious course of action. They agreed on that purpose, as reflected in their coordinated actions to that end and by their conspiratorial communications with each other. Each took an affirmative action toward the commission of antitrust violations, tortious interference with Coast Runner's economic relationships, and disparagement. All of the damages alleged herein are the result of the Defendant's combination and their illegal acts taken in concert with one another.

121.   Under Texas law, each Defendant is jointly and severally liable with each other Defendant for all relief demanded herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor and the following relief:

1. Actual and economic damages in an amount to be proved at trial, but no less than $10,000,000;

2. Treble damages under federal law in an amount to be proved at trial, but no less than $20,000,000;

3. Other exemplary damages as available under federal and Texas law;

4. Plaintiff's costs and attorneys' fees to litigate this action as allowed under both Texas and Federal law;

5. Treble attorneys' fees as allowed by Texas law;

6. Pre- and post-judgment interest as provided by law; and

7. For all such other and further relief allowed by law and equity as is just and proper.

Respectfully submitted,

*/s/ Judd E. Stone II*
Judd E. Stone II
Texas Bar No. 24076720
Christopher D. Hilton
Texas Bar No. 24087727
Ari Cuenin
Texas Bar No. 24078385
Cody C. Coll
Texas Bar No. 24116214
STONE HILTON PLLC
600 Congress Ave., Suite 2350
Austin, TX 78701
Telephone: (737) 465-3897
judd@stonehilton.com
chris@stonehilton.com
ari@stonehilton.com
cody@stonehilton.com

Joshua D. Wright*
California Bar No. 223156
DC Bar 997694
LODESTAR LAW AND ECONOMICS, PLLC
1115 Theresa Ann Street
McLean, VA  22101
Telephone: (703) 300-0928
jwright@lodestarle.com

*Counsel for Plaintiff*

* *pro hac vice forthcoming*