**NOT FOR PUBLICATION**

# In the
# United States Court of Appeals
# For the Eleventh Circuit

————————————

No. 24-10449

————————————

FLORIDA VIRTUAL SCHOOL,

*Plaintiff-Counter Defendant-Appellant,*

*versus*

K12, INC.,

K12 FLORIDA, LLC,

*Defendants-Counter Claimants-Appellees,*

RUMBERGER, KIRK & CALDWELL, PA,

*Respondent.*

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:20-cv-02354-GAP-EJK

————————————

Before JILL PRYOR, GRANT, and TJOFLAT, Circuit Judges.

GRANT, Circuit Judge:

Florida Virtual School and K12, Inc. are competitors in the online education business.  Florida Virtual entered the industry first and registered trademarks for "Florida Virtual School" and "FLVS."  When K12 came onto the scene, it operated programs under similar names: "Florida Virtual Academy" and "Florida Virtual Program."  Florida Virtual School thought these names were too similar, so it sued K12 for trademark infringement.  The parties eventually settled, and K12 renamed its programs "Florida Cyber Charter Academy."  But the conflict reignited when K12 launched a new program, "Florida Online School."  Once again, Florida Virtual sued for trademark infringement, this time adding unfair competition, false advertising, and breach of contract claims as well.

After discovery, the parties cross-moved for summary judgment.  The district court denied both parties' motions on the trademark infringement claim, but granted summary judgment to K12 on the false advertising, unfair competition, and breach of contract claims.  The court also excluded the opinions of both Florida Virtual experts and denied Florida Virtual's jury demand because it had "no proof of actual damages."  The parties proceeded to a bench trial on the trademark infringement claim, where the court found that there was no likelihood of confusion, and thus no infringement.  Dissatisfied with these rulings, Florida Virtual now appeals.  It says the court erred at summary judgment, at trial, and in between.  We disagree, and affirm.

24-10449                 Opinion of the Court                 3

## I.

The Florida legislature created Florida Virtual School to provide online education for students in the state. Fla. Stat. § 1002.37(1)(a)–(b) (2025). By January 2002, it was using two marks, "FLORIDA VIRTUALSCHOOL" and "FLVS," and it registered both with the United States Patent and Trademark Office in 2010.[1] K12 entered the industry in 2003, offering for-profit online instruction programs called Florida Virtual Academy (FLVA) and Florida Virtual Program (FLVP).

To Florida Virtual School, these names were too close to its marks. So in 2011, shortly after registering its trademarks, Florida Virtual sued K12 for trademark infringement. That dispute ended in a settlement, with both parties making concessions. K12 agreed to (1) pay Florida Virtual $600,000; (2) stop using the Florida Virtual Academy (FLVA) and Florida Virtual Program (FLVP) names and acronyms; (3) not use additional "Prohibited Marks," including Florida Online Academy and Florida Online Charter Academy; and (4) transfer domain names containing the prohibited marks to Florida Virtual. But K12 could still use the domains as redirect links to its new websites through 2016. For its part, Florida Virtual promised to release K12 from any actions relating to its use of Florida Virtual Academy or Florida Virtual Program. While the settlement agreement included a list of "Approved Marks"

---

[1] It registered the mark "FLORIDA VIRTUAL SCHOOL" with the USPTO in 2017.

4                        Opinion of the Court                      24-10449

available to K12, the parties agreed that there would "be no presumption against K12's choice of a mark" not on that list.

After the settlement, K12 operated its programs under one of the approved marks, Florida Cyber Charter Academy. Until 2019, that is—when K12 contracted with the Hendry County School District to launch a new program named Florida Online School (FLOS). Although the name was not prohibited by the settlement agreement, Florida Virtual was not pleased. In a series of August 2020 demand letters, it challenged K12's use of Florida Online School. It also raised concerns with K12's continued use of FLVA.com as a redirect to its other websites. In response, K12 transferred the FLVA.com domain to Florida Virtual and began the process of renaming its Hendry County program "Digital Academy of Florida."

But that was not enough to stop Florida Virtual from suing K12 for the "considerable market confusion" its actions had caused, and advancing claims for trademark infringement, unfair competition, false advertising, and breach of the settlement agreement. In addition to compensatory damages, Florida Virtual sought injunctive relief and disgorgement of K12's profits. K12 asserted a counterclaim for cancellation of Florida Virtual's marks on the basis of fraud against the USPTO. After discovery, both parties moved for summary judgment and K12 moved to exclude the testimony of Florida Virtual's experts, Jeffery Stec and Daniel Gallogly.

24-10449                Opinion of the Court                5

The district court denied both parties' motions for summary judgment on the trademark infringement claim, but disposed of the others. First, the court granted summary judgment to K12 on the false advertising claim. That claim was based on a checklist on K12's website, through which K12 encouraged customers to "weigh [their] options" when "comparing K12 to other online learning solutions." The checklist showed two columns, each listing several features of an online education program. The left column, titled "K12-Powered Schools," had a *checked* box next to each feature while the right column, titled "Other Online Learning Solutions," had an *unchecked* box next to each.

# K12 vs. Other Online Learning Solutions

When comparing K12 to other online learning solutions like Connections Academy, FLVS, and Time4Learning, use this checklist to weigh your options.

**K12** | Comparison Checklist

| K12-Powered Schools | Other Online Learning Solutions |
|---|---|
| **CURRICULUM** | **CURRICULUM** |
| ☑ Grades K–12 are offered | ☐ Grades K–12 are offered |
| ☑ AP® and honors courses | ☐ AP® and honors courses |
| ☑ Career readiness education | ☐ Career readiness education |
| ☑ Tuition-free online summer school and bootcamps | ☐ Tuition-free online summer school and bootcamps |
| ☑ Incorporation of STEM education in coursework | ☐ Incorporation of STEM education in coursework |
| **ACCREDITATION AND DEGREE** | **ACCREDITATION AND DEGREE** |
| ☑ Cognia Accreditation | ☐ Cognia Accreditation |
| ☑ State-issued diploma recognized by colleges and universities worldwide | ☐ State-issued diploma recognized by colleges and universities worldwide |
| **TEACHERS** | **TEACHERS** |
| ☑ State-certified teachers leading live class instruction | ☐ State-certified teachers leading live class instruction |
| **EXTRACURRICULAR ACTIVITIES** | **EXTRACURRICULAR ACTIVITIES** |
| ☑ Clubs, contests, showcases, and workshops available for students | ☐ Clubs, contests, showcases, and workshops available for students |
| **SUPPORT AND RESOURCES** | **SUPPORT AND RESOURCES** |
| ☑ Special education programs, tutoring, and wraparound support | ☐ Special education programs, tutoring, and wraparound support |
| ☑ Resources to help parents succeed as Learning Coaches | ☐ Resources to help parents succeed as Learning Coaches |
| **PROVEN SUCCESS** | **PROVEN SUCCESS** |
| ☑ Stories from parents and students of all grade levels | ☐ Stories from parents and students of all grade levels |
| ☑ High quality and satisfaction ratings | ☐ High quality and satisfaction ratings |

Florida Virtual retained Jeffery Stec to "survey consumer perceptions" of the checklist.  He concluded that the checklist misled around 18 percent of consumers into believing that Florida Virtual offered services that its competitors did not.  But the court excluded his testimony—finding that the survey portrayed the checklist "out of context"—and granted summary judgment on the false advertising claim because there was no other evidence of consumer deception.  The court saw the checklist as a "marketing tool inviting the reader to compare the features of [K12's] program with competing online educational programs."  And because the survey did not allow respondents to "evaluate the programs that *other* online learning solutions" offered, it was "flawed."

Next, the district court excluded the lost-profits testimony of Florida Virtual's damages expert, Daniel Gallogly.  Gallogly calculated the profits Florida Virtual would have lost for each student that diverted to Florida Online School—but he did not calculate how many students were diverted.  Instead, he assumed that every Florida Online School student would have enrolled in Florida Virtual School absent the alleged infringement.  The district court rejected this methodology.  It found that Gallogly was qualified, but that his lost-profits opinion failed "to meet even basic standards of reliability and helpfulness" because it rested on an improbable assumption.  With Gallogly's lost-profits testimony excluded, the court declared that Florida Virtual had "*zero* evidence of actual damages, and there [was] nothing for a jury to consider regarding this issue."

In a subsequent order, the district court limited Gallogly's disgorgement testimony.  Florida Virtual sought disgorgement of not only K12's profits related to Florida Online School, but also the profits from its other programs.  The other programs were relevant, Florida Virtual argued, because the continued use of FLVA.com as a redirect to these programs' websites was an independent act of trademark infringement.  The district court disagreed.  In its view, Florida Virtual had "combined and conflated" its trademark infringement allegations with its breach of contract allegations.  The court struck Gallogly's disgorgement testimony that was unrelated to K12's revenue from Florida Online School.

Florida Virtual fought the damages and disgorgement rulings.  It filed a new motion, asking the court to (1) allow the requested jury trial and (2) reconsider its disgorgement limitations. The district court did not acquiesce.  It granted summary judgment to K12 on Florida Virtual's claim for actual damages stemming from trademark infringement, reiterating that Florida Virtual had "no proof of actual damages."  It then concluded that Florida Virtual was not entitled to a jury trial because its remaining remedies—disgorgement of K12's profits and injunctive relief— were "equitable in nature."  The court did not alter its disgorgement ruling, either.  It granted summary judgment for K12 on the FLVA.com claim for two reasons: (1) Florida Virtual had not "based its trademark infringement arguments on [K12's] use of the FLVA.com domain," and (2) the claim was released by the settlement agreement.

In October 2023, the court held a bifurcated bench trial on the remaining claims. In the first phase, the district court ruled in Florida Virtual's favor on K12's counterclaim that Florida Virtual's marks should be canceled because it made material misrepresentations to the USPTO. In the second phase, the court considered Florida Virtual's infringement claim. The only relief still available was to enjoin K12's use of "Florida Online School" and "FLOS" and disgorge its profits from using those names. The district court granted judgment for K12, determining that Florida Virtual's trademarks were "inherently weak" and that it "produced no credible evidence of actual confusion." Florida Virtual now appeals.

**II.**

We review the district court's grants of summary judgment de novo, viewing the evidence in the light most favorable to Florida Virtual and drawing all inferences in its favor. *Nehme v. Fla. Int'l Univ. Bd. of Trs.*, 121 F.4th 1379, 1383 (11th Cir. 2024). Denials of a jury demand are also reviewed de novo. *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1352 (11th Cir. 2019). We review the exclusion of expert testimony for abuse of discretion. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014). After a bench trial, the district court's conclusions of law are reviewed de novo and factual findings are reviewed for clear error. *Hard Candy*, 921 F.3d at 1360.

10                    Opinion of the Court                    24-10449

**III.**

Florida Virtual raises several issues on appeal: (1) whether the district court erred in granting summary judgment on Florida Virtual's actual damages claim and denying it a jury trial; (2) whether the district court erred in denying the false advertising claim; and (3) whether the district court clearly erred at the bench trial in finding no trademark infringement.[2]  We address each in turn.

**A.**

Florida Virtual first challenges the district court's denial of its jury trial demand and award of summary judgment on its damages claim.  These two objections go hand in hand because Florida Virtual had a right to a jury trial only for that claim.  *See id.* at 1359.  The other remedies it sought—disgorgement of profits and injunctive relief—are equitable remedies that do not carry a right to a jury trial.  *Id.* at 1356, 1359.  The relevant question, then, is whether the district court erred in granting summary judgment on Florida Virtual's claim for actual damages.  It did not.

To recover money damages for trademark infringement, Florida Virtual needed to show that it suffered "actual damages." *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1182 (11th Cir.

_____

[2] Florida Virtual raises two more issues.  *First*, that the district court's "disgorgement limitation" should be reversed if its rulings on the false advertising claim or any of the trademark infringement claims are reversed.  And *second*, that the case should be reassigned on remand.  Because we affirm across the board, we need not address these secondary points.

24-10449                Opinion of the Court                11

1994); *see Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1252 (11th Cir. 2007).  "The primary limiting principle" is that such damages cannot be "speculative"—Florida Virtual was required to "demonstrate the basis for [its] recovery with specificity," showing that injury "actually occurred."  *Hard Candy*, 921 F.3d at 1353 (quotation omitted); *St. Charles Mfg. Co. v. Mercer*, 737 F.2d 891, 893 (11th Cir. 1983) (quotation omitted).  None of the evidence brought forward by Florida Virtual met this standard.

*First*, Florida Virtual introduced the statement of a confused parent, Casey Kalajian.  She testified that she wanted to enroll her daughter in Florida Virtual School in 2020, but accidentally enrolled her in Florida Online School instead.  Kalajian, however, realized her mistake and withdrew her daughter before she attended any classes.  She then attempted to enroll her daughter with Florida Virtual but "decided to go back to brick-and-mortar at the end of the day."

For that testimony to serve as evidence of actual damages, a jury would have to determine that Kalajian's daughter would have enrolled at Florida Virtual if not for the confusion created by Florida Online's mark.  The flaw in this argument is that Kalajian did not enroll her daughter at Florida Virtual even after she withdrew from Florida Online.  To be sure, she started to.  But her daughter's enrollment at Florida Virtual was "delayed" when Kalajian attempted to sign her up.  And once the wait extended past Labor Day, Kalajian opted to put her back in the now reopened brick-and-mortar elementary school she had attended before the

12                    Opinion of the Court                  24-10449

Covid-19 pandemic shut it down in early 2020.  Given this sequence of events, Florida Virtual did not show that it suffered actual damages from Kalajian's mistaken enrollment.[3]

*Second*, Florida Virtual presented examples of confusion among students, parents, and school officials.  It says this evidence demonstrated "real damage."  But there is a difference between general confusion and actual damages, and Florida Virtual did not bridge that gap.  Consider several of its examples:

- A social worker contacted Florida Virtual for a Florida Online School student's enrollment records after the student's father said he had "been enrolled in FLOS (Florida Online School) which is a part of FLVS."

- A sixth grade Florida Online School student told his teacher in an email that he was "just starting Florida Virtual School."

- A parent emailed her son's Florida Online School teacher to withdraw him "from Florida virtual school."

- In an email to a Florida Online School teacher, a parent said, "I am new to the Florida virtual school."

---

[3] Even assuming Kalajian would have enrolled her daughter at Florida Virtual if not for the confusion with the Florida Online mark, we would still affirm as there is not enough evidence of actual damages stemming from her confusion to get to a jury.  Gallogly's expert report provided the only actual damages figure associated with Kalajian, and, as stated below, the district court did not abuse its discretion when it excluded the report.

- A parent contacted both Florida Virtual and Florida Online School employees to ask about the status of her daughter's enrollment in Florida Online School.

When viewed in the light most favorable to Florida Virtual, these examples demonstrate confusion—but that's all. They do not show that the confusion diverted students from Florida Virtual to K12, or otherwise injured Florida Virtual.

*Third*, and finally, Florida Virtual relied on Gallogly's damages calculation. Gallogly created a model for calculating the profits Florida Virtual lost for each student that diverted to Florida Online School and the total revenue K12 received. The court found that he was qualified. But it also concluded that his opinion failed "to meet even basic standards of reliability and helpfulness" because it assumed that Florida Virtual would have obtained *all* of K12's registrations absent the allegedly unlawful conduct. That conclusion was not an abuse of discretion.

The district court plays an important "gatekeeping" function to ensure that proposed expert testimony "rests on a reliable foundation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). When "determining whether particular expert testimony is reliable," the court has "considerable leeway." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Buland v. NCL (Bahamas) Ltd.*, 992 F.3d 1143, 1151 (11th Cir. 2021) (alteration adopted and quotation omitted).

14                     Opinion of the Court                24-10449

Gallogly calculated the profits Florida Virtual would have lost for each student that diverted to Florida Online School. But to reach his total damage calculation, Gallogly assumed that *every* student who attended Florida Online School would have attended Florida Virtual School absent the confusion. This assumption, as the district court noted, was "entirely speculative because there [was] absolutely *no* evidentiary support for it." Because Gallogly's damage calculation rested on an untenable assumption, his report was unreliable, and therefore inadmissible. *See id.*

On top of that, calculating the lost profits this way did not require any "scientific, technical, or other specialized knowledge"—only, as the district court said, "simple math." Fed. R. Evid. 702(a). All Gallogly had to do to reach his damage calculation was multiply Florida Virtual's profits per student by the number of students that registered at Florida Online School. The district court did not abuse its discretion in excluding his testimony.

In sum, Florida Virtual presented no evidence of actual damages. And without a viable damages claim, it was not entitled to a jury trial.[4] *See Hard Candy*, 921 F.3d at 1359.

---

[4] In the same order in which the district court denied Florida Virtual's request for a jury trial, it also granted summary judgment on Florida Virtual's trademark infringement claim arising from K12's use of FLVA.com. That was not error. As the court correctly recognized, the FLVA.com allegations were relevant only to the breach of contract claim, and Florida Virtual does not challenge the district court's disposition of that claim on appeal.

24-10449                Opinion of the Court                15

**B.**

Florida Virtual next argues that the district court erred in granting summary judgment on its false advertising claim. That claim was based on a two-column checklist on K12's website. Both columns listed features of an online education program—"Grades K–12 are offered," "AP® and honors courses," and the like. But there was a *checked* box next to each feature in the "K12-Powered Schools" column and an *unchecked* box next to each feature in the "Other Online Learning Solutions" column. The webpage containing the link to the checklist invited prospective customers to "use this checklist to weigh [their] options" when "comparing K12 to other online learning solutions."

The first element of a false advertising claim requires the plaintiff to show that the opposing party's advertisements were "false or misleading." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). If an advertisement is "literally false, the movant need not present evidence of consumer deception." *Id.* But if an ad is true but misleading, the plaintiff "must present evidence of deception in the form of consumer surveys, market research, expert testimony, or other evidence." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir. 2004) (quotation omitted).

The false advertising claim fails for two reasons. *First*, the checklist was not literally false. An "advertisement cannot be literally false" if it is "susceptible to more than one reasonable interpretation." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1309

16                    Opinion of the Court                    24-10449

(11th Cir. 2010) (quoting parenthetical omitted).   Although one reasonable reading of the checklist is that K12 provided "the checked services while other schools [did] not," it is not the only one.   Another is that K12 was inviting consumers to do their own research and fill out the checklist—not stating that it possessed features the other providers definitely did not.

And *second*, Florida Virtual did not show that the checklist was misleading.   To be sure, the expert report showed that reviewing the checklist led 18.3 percent of consumers to believe that K12 offered features that its competitors did not.   And this was false concerning Florida Virtual, which did offer all of the features listed on the checklist.

But the expert's survey did not allow respondents to review the websites of K12's competitors and assess whether they provided the same services as K12.   In the district court's view, this rendered the report unreliable because the checklist was a "marketing tool inviting the reader to compare the features of [K12's] program with competing online educational programs." The district court did not abuse its discretion in making this determination.   After all, the stated purpose of the checklist was to allow users to "weigh [their] options" when comparing K12 to other providers.

Because Florida Virtual failed to satisfy the first element of a false advertising claim, the district court did not err in granting summary judgment to K12.

24-10449                Opinion of the Court                17

## C.

Finally, Florida Virtual contests the district court's ruling on its trademark infringement claim. To succeed on that claim, Florida Virtual needed to prove (1) that it owned valid marks with priority and (2) that K12 was "likely to cause consumer confusion" with its marks. *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 946 (11th Cir. 2023). After a bench trial, the district court determined that Florida Virtual made the first showing but not the second.

Seven factors are relevant in assessing likelihood of consumer confusion:

> (1) the strength of the allegedly infringed mark; (2) the similarity of the infringed and infringing marks; (3) the similarity of the goods and services the marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016). We have also recognized "consumer sophistication" as a relevant consideration. *FCOA*, 57 F.4th at 947. "In drawing the ultimate inference about likelihood of confusion," the strength of the mark and actual confusion are the "two most important" factors. *Id.*

18                    Opinion of the Court                 24-10449

Florida Virtual argues that the district court misevaluated "nearly every factor," leading to an erroneous conclusion that there was no likelihood of consumer confusion. We address this argument in two parts. *First*, we review the district court's evaluation of the seven likelihood-of-confusion factors for clear error. *See Fla. Int'l*, 830 F.3d at 1255. *Second*, we review—again for clear error—its conclusion that there was no likelihood of consumer confusion. *See id.* We will reverse only if our review of the record leaves us "with the definite and firm conviction that a mistake has been committed about the district court's basic finding that there was no likelihood of confusion." *Hard Candy*, 921 F.3d at 1363 (quotation omitted).

### 1.

**Strength of the marks.** Starting with the first factor, Florida Virtual argues that the court erred by finding its marks "weak." We are unpersuaded.

There are "two steps in assessing the strength of a mark: conceptual strength and commercial strength." *FCOA*, 57 F.4th at 948. Conceptual strength places "a mark on the sliding scale of trademark strength, from weakest to strongest: (1) generic, (2) descriptive, (3) suggestive, and (4) fanciful or arbitrary." *Id.* at 949. "Descriptive marks describe a characteristic or quality of an article or service (e.g., 'vision center' denoting a place where glasses are sold)." *Id.* (quotation omitted). Florida Virtual concedes that its marks are descriptive.

24-10449                Opinion of the Court                19

Although descriptive marks are generally "so weak that they are not valid trademarks," they can become valid by acquiring "secondary meaning." *Id.* (quotation omitted). A "mark has secondary meaning when consumers view the mark as synonymous with the mark holder's goods or services." *Id.* American Airlines, for example, "could theoretically refer to any airline based in North or South America. But with the mark holder's time and effort, American Airlines now calls to mind a specific airline through its secondary meaning." *Id.* (citation omitted). Incontestable descriptive marks (those that have been registered with the PTO for at least five years, among other requirements) are presumed to not only "have some degree of secondary meaning" but to be "relatively strong." *Id.* (quotation omitted); *see also id.* at 949 n.13.

The presumption of strength, however, can be rebutted with a showing of commercial weakness. *Id.* at 949–50. "Commercial strength refers to the real-world consumer recognition of a mark, most often created by the efforts and work of the mark holder." *Id.* at 950. "Commonly used evidence of commercial strength includes third party use; advertising and promotion; sales and number and types of customers; recognition by trade, media, and customers; and survey of likely customers." *Id.*

The district court presumed—as it was required to—that the incontestable marks, Florida Virtual School and FLVS, were "relatively strong." But it determined that K12 rebutted this

20                    Opinion of the Court                24-10449

presumption through evidence of commercial weakness.  That was
not clear error.

    To start, there was evidence that Florida Virtual's brand
recognition was not strong.  Florida Virtual's director of marketing
testified that it had changed its logo six times since 1997 and
acknowledged that changing a logo "can dilute a brand."  And its
senior director of marketing and communications "discussed a
nearly $5 million effort to *rebrand* [Florida Virtual's] global
operations as recently as 2020."  *Fla. Virtual Sch. v. K12, Inc.*, 710 F.
Supp. 3d 1143, 1154–55 (M.D. Fla. 2024) (emphasis added).

    Survey evidence also suggested that Florida Virtual's brand
recognition was not as strong as it claimed.  Take two examples.  In
a 2018 survey, only 30 percent of parents with school-aged children
recognized Florida Virtual's brand—even when prompted.  And in
a 2020 survey, just 1 percent of respondents named Florida Virtual
as an online education provider without prompting.  To be fair to
Florida Virtual, other survey evidence demonstrated better brand
recognition.  In April 2021, for example, 50 percent of respondents
recognized Florida Virtual School when prompted.  But even that
was less than ten percentage points better than K12's brand
recognition during the same period.  The district court recognized
as much, finding Florida Virtual's brand recognition only
"marginal[ly]" superior.

    There was also evidence of third-party use.  The "extent of
third-party use of a mark is an essential factor in determining" its
strength—a "strong trademark is one that is rarely used by parties

24-10449                    Opinion of the Court                    21

other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *Fla. Int'l*, 830 F.3d at 1257 (quotation omitted).

In finding that the presumption of relative strength was rebutted, the district court considered various Florida school districts' use of "Virtual School" for their online education programs (examples include Orange County Virtual School and Broward Virtual School). Florida Virtual says this too was clear error. The names of these programs are "not confusingly similar" to Florida Virtual School, it argues, because the geographic designation distinguishes them. But the court could reasonably take a different view: that the similarity of the names weakened Florida Virtual's marks.

**Similarity of the Marks.** Moving to the next factor, Florida Virtual says the district court erred "by holding that the similarity of marks factor was 'neutral' because the parties' design marks were distinguishable." In other words, it argues that the court needed to consider the word marks separate from the design marks. The problem? That is exactly what the court did. It recognized that the word marks, Florida Virtual School (FLVS) and Florida Online School (FLOS), were nearly identical. But it also recognized that Florida Virtual "operates in a crowded field of similar marks on similar goods or services," where "slight differences in names may be meaningful." *Id.* at 1260 (quotation omitted). Separately, it found that the design marks looked

22                    Opinion of the Court                  24-10449

"nothing alike." The district court did not err in finding that this factor was neutral.

**Similarity of Services.** Florida Virtual does not challenge the district court's finding that the parties offered similar services. This factor weighs in its favor.

**Similarity of Trade Channels and Customers.** This factor "takes into consideration where, how, and to whom the parties' products are sold." *Id.* at 1261. "The primary focus in this inquiry is on the overlap of the customer bases, because the greater the overlap, the greater the likelihood that consumers will be exposed to both marks and become confused." *FCOA*, 57 F.4th at 954.

The court said this factor weighed in neither party's favor because Florida Online School's only customer was Hendry County School District, not "individual parents and students." Florida Virtual says this was error because it "also partners with school districts," so its customers are similar either way. And it adds that Florida Online School still "catered to the same general kinds of individuals," which is "all the similarity of customer factor requires."

These are two good arguments. And were we reviewing de novo, we might agree that this factor weighs in Florida Virtual's favor. But we are not—and it was not clear error for the court to determine that this factor was neutral. That's because K12 presented evidence at trial that the Hendry County School District was the only one purchasing services from Florida Online School.

24-10449                Opinion of the Court                23

And if that was the case, there was no "overlap of the customer bases." *See id.*

We also note that even if the court had clearly erred in its evaluation of this factor, that alone "would not compel reversal." *See Hard Candy*, 921 F.3d at 1363. The court's "error in its analysis of one of the subsidiary factors" is "not enough to allow us to overturn" its decision. *Id.* (quotation omitted).

**Similarity of Advertising Media.** The court decided that this factor was neutral, too. According to the court, both parties "use[d] digital media to reach their customers and facilitate services," but they targeted different audiences: K12 "primarily market[ed] to school districts," while Florida Virtual advertised directly to students and parents. Florida Virtual does not contest this. Instead, it says the court erred because this factor "focuses on the medium the parties advertised through."

Not so. "The key question in assessing similarity of advertising media is whether the parties' ads are likely to reach the same *audience*." *Fla. Int'l*, 830 F.3d at 1263 (emphasis added). Although the evidence showed that Florida Virtual and K12 used the same "*types* of advertising methods," the overlap in the audience of the advertisements was minimized since K12 advertised primarily to school districts, not parents and students. *Id.*

**Intent to Infringe.** The district court determined that this factor weighed strongly in K12's favor, and we again disagree with Florida Virtual's contention that this decision was clear error.

24                    Opinion of the Court                    24-10449

While there was some evidence—like K12's continued use of FLVA.com—that could suggest intent to infringe, other evidence supported the court's finding.  We highlight just two examples. After the parties settled the first lawsuit, K12 chose a name (Florida Online School) that was *not* prohibited by the settlement agreement.  And it began the process of changing this name to Digital Academy of Florida when Florida Virtual voiced concerns.

**Actual confusion.**  For the final factor, Florida Virtual contests the district court's determination that it failed to present "credible evidence of actual confusion."  "Evidence of actual confusion is the best evidence of a likelihood of confusion." *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 137 (11th Cir. 2022) (alteration adopted and quotation omitted).  But not all confusion evidence is created equal.  "Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight, while confusion of actual customers of a business is worthy of substantial weight." *Fla. Int'l*, 830 F.3d at 1264 (alteration adopted and quotation omitted).

*First*, Florida Virtual asserts that the district court clearly erred by failing to find that the testimony of two parents who mistakenly enrolled their children in Florida Online School, Casey Kalajian and Lisa Kornheisl, showed actual confusion.  But reasonable minds can disagree about whether K12's marks were the cause of their mix-up.  And where "there are two permissible views of the evidence, the factfinder's choice between them cannot

be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

Start with Kalajian. She enrolled her daughter in Florida Online School even though her "intention was to enroll her in [Florida Virtual School]." And she testified that she believed the two programs to be "one in [sic] the same." But she also said that the reason for the mistaken enrollment was that she "thought there was only one" online education provider in Florida. And because she believed Florida Virtual was the sole provider, she "didn't feel the need to research" her options "in depth."

Given this testimony, it was reasonable for the court to conclude that the source of her confusion was her mistaken belief that there was only one provider, not the similarity of K12's marks. After all, if Kalajian was convinced there was only one online provider, it would not make a difference to her whether the program she signed up for was called Florida Virtual School, Florida Online School, or something completely different, like Digital Academy of Florida.

Take an example. Suppose a skier wants to fly out west during winter break. She believes that only one airline, Delta Air Lines, offers a flight from Atlanta to Salt Lake City. Unbeknownst to her, American Airlines offers the same flight. She searches for an Atlanta-to-Salt Lake City flight—intending to purchase one from Delta—and books the first flight that comes up, which happens to be on American. Did she book with American instead

26                    Opinion of the Court                    24-10449

of Delta because their names were too similar?  Of course not—it's because she thought there was only one option.

So too with Kornheisl.  One "permissible view[]" of her testimony is that she was confused about the nature of Florida Online School's program, not its name.  *See Anderson*, 470 U.S. at 574.  Florida Virtual argues that the "only plausible reading" of Kornheisl's testimony is "that her confusion over the parties' marks caused her to mistakenly enroll her son" in Florida Online School.  We disagree.  Yes, Kornheisl initially signed her son up for Florida Online School, withdrew him, and enrolled him at Florida Virtual School instead.  But that is not the whole story.

Kornheisl explained that she knew that Florida Virtual and K12 were different companies because she had previously enrolled her daughter in a K12 program.  And she testified that she did not care which program her son went to, so long as it had a flexible schedule.  She added that the reason she unenrolled her son from Florida Online School was because it did not offer a flexible schedule like she thought it did: "And so I put him into, originally, [Florida Online School], not realizing the schedule, and then immediately realized that wasn't the right thing for us as a family and put him into" Florida Virtual's flex program.  When asked directly why she enrolled in Florida Online, she doubled down:

> **Q.** . . . What was the reason for your confusion in that first enrolling with FLOS instead of FLVS?
> **A.** Again, I wanted to make sure that [my son] was in a flexible schedule.  That was my main focus—that is my main focus.

It was not until Florida Virtual's counsel again asked her "reason for enrolling" at Florida Online School instead of Florida Virtual School that she cited the similarity in the programs' names. The district court's view of this testimony was permissible. *See id.*

*Second,* Florida Virtual argues that it was error for the court to discount evidence demonstrating actual confusion "as unreliable and possible hearsay." During the trial, Florida Virtual sought to introduce twenty-one emails from employees, parents, students, and others as evidence of actual confusion. The court expressed hearsay concerns with the emails, but it did not exclude them on that basis. Instead, it determined that the emails were not "reliable evidence of confusion."

Relying on out-of-circuit authority, Florida Virtual argues that it was error to admit the confusion evidence only to dismiss it as "unreliable." *See Lyons P'ship v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001), *abrogated in part on other grounds by Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 676 n.12 (2014). But it misreads *Lyons*. There, the district court's final opinion dismissed actual confusion evidence as "unreliable hearsay." *Id.* (quotation omitted). On appeal, the Fourth Circuit determined that because the evidence was not hearsay, the district court erred if it "disregarded [the] evidence *because* it was hearsay." *Id.* (emphasis added).

Here, none of that is true: the district court did not disregard the emails because they were hearsay; it evaluated them and concluded that they did not demonstrate actual confusion. "[T]he

28                    Opinion of the Court                    24-10449

Court finds that, even if admitted, [the emails] would not constitute reliable evidence of confusion. Instead, if anything, they support the fact that online educational service providers exist in a muddled marketplace replete with generically and descriptively named participants." As the finder of fact, the district court was entitled to determine that this evidence was "worthy of little weight." *See Fla. Int'l*, 830 F.3d at 1264 (quotation omitted).

*Third*, Florida Virtual contends that the court clearly erred by weighing the lack of survey evidence of consumer confusion against Florida Virtual. It's true, "[l]ack of survey evidence does not weigh against the plaintiff when determining likelihood of confusion." *See PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1169 (11th Cir. 2019). But the court understood this point. It recognized that survey evidence was "not a necessary requirement," noting only that without it there was "no way to filter out latent marketplace confusion that the parties agree exists in the online education market." The lack of survey evidence was not independently weighted against Florida Virtual—it was the court's determination that Florida Virtual failed to "present any credible evidence of actual confusion" that caused it to weigh the actual confusion factor heavily in K12's favor.

**Consumer sophistication.** Although it is not one of the seven factors, "we are also mindful that sophisticated consumers of complex goods or services are less likely to be confused than casual purchasers of small items." *Fla. Int'l*, 830 F.3d at 1256 (alterations adopted and quotation omitted). The district court determined

24-10449                Opinion of the Court                29

that Florida Virtual's customers were sophisticated given "the nature and importance of a parent's choice of where to educate their child."

We have said that students looking for a college to attend are "relatively sophisticated consumers" because of "the nature, importance, and size of the investment in a college education." *Id.* at 1256, 1265. And although choosing a college is on a different scale than choosing a grade school, it was not clear error to apply that logic—especially because parents, not students, are the ones making that decision. Plus, the evidence showed that some of Florida Virtual's customers were school districts and administrators, and we would expect them to have a developed understanding of their online education options.

**2.**

"Having found the district court's assessment of each of the seven likelihood-of-confusion factors to be reasonable, it should come as no surprise that we find no clear error in its ultimate conclusion that" Florida Virtual "failed to establish a likelihood of confusion." *Id.* at 1265. Put otherwise, our review of the record does not leave us with the definite and firm conviction that a mistake has been committed about the district court's basic finding that there was no likelihood of confusion. *See id.* at 1255.

★     ★     ★

We **AFFIRM** the district court's judgment.