UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE №: 9:25-cv-81197

DEFENSE DISTRIBUTED, et. Al.,

          *Plaintiffs,*

v.

JOHN ELIK, et. Al.,

          *Defendants.*

_____/

**DEFENDANTS ELIK, LAROSIERE, HOLLADAY, STROKE, AND
LETTMAN'S CONSOLIDATED RULE 11 MOTION FOR SANCTIONS
<u>AGAINST PLAINTIFFS AND THEIR COUNSEL</u>**

Plaintiffs are the wholly owned corporate alter egos of Cody Rutledge Wilson. (*See* Doc. 62 at 2). At the root of this controversy is *Larosiere v. Wilson*, No. 6:24-cv-01629 (Doc. 29) (M.D. Fla ____) (hereinafter "*Larosiere v. Wilson*").

Beginning in 2022, Wilson and his entities began selling copyrighted works authored by Elik, Larosiere, and others, without authorization. When individuals asked Wilson to stop, Wilson wrote a manifesto titled "Black Flag White Paper," detailing his contempt for copyright, and admitting to deleting copyright notices from Defendants' works. Wilson, Cody R. Black Flag White Paper, 2024; (Ex. A at 1). In the manifesto, Wilson identifies a website he created, "Fedcad.com" (Ex. A at 2), a mock version of the USCO's public records website (Ex. A at 3), which acknowledges the works Wilson reproduced were copyrighted. (Ex. A at 4-6). Upon the release of his manifesto, speaking of Defendants, Wilson wrote: "The reason you don't sue is because you got the law wrong on copyright. That and because you're a huge pussy. Anyway, I wrote a paper to commemorate the great pirates who lit our way. They pillaged so we could plunder." (Ex. A at 7).

Larosiere sued Plaintiffs in the Middle District of Florida for copyright infringement. *Larosiere v. Wilson* (Doc. 1). In response, Plaintiffs filed a series of shotgun countercomplaints, looping in a host of out-of-state Counterdefendants with a 109-page RICO counterclaim, alleging everything from wire fraud to obstruction of justice. *Larosiere v. Wilson* (Doc. 29). Defendants in the instant action include the same Counterdefendants in Plaintiff's original strike suit counterclaim, plus other acquaintances and personal friends of Elik and Larosiere across the country.

After riding their baseless RICO claims for a year, to moot a motion to compel them to provide discovery responses to requests that sought the factual basis of their counterclaims, and to shop for a more favorable judge, Plaintiffs voluntarily dismissed their materially identical counterclaims in the Middle District of Florida on September 5, 2025. Then, on September 25, 2025, they re-filed those same theories in this Court. The SAC reprises the same defective RICO theories centered on the "FEDCAD" meme, but fails to identify who said what, when, to whom, or how any statement was false—failing Rule 9(b). The things the SAC alleges were said in the meme, do not even appear in it. *Compare* (SAC at ¶ 55(a)-(e)) *with* (Ex. A at 81).

The complaint's theory is that the meme caused others to cease business with Plaintiffs and caused "diminished customer goodwill, lost sales and profit, and substantial reputational and financial harm in an amount exceeding $1 million." (SAC ¶69). Most critically, the complaint fails to engage with the fact that Plaintiffs themselves have published the purportedly illegal meme since at least May of 2024, without any commentary or refutation.[1] Plaintiffs and their counsel know they are publishing this themselves. (Doc. 25).

Worse, Plaintiffs try to transmute a reputational dispute into wire-fraud-based RICO, an approach this Court has consistently rejected. *Freites v. Medina* squarely

---

[1] Anonymous, "FEDCAD meme," Defcad.com, May 22, 2024, https://defcad.com/library/fedcad-meme/. Defendants also note that Plaintiffs' publication of the meme is the first Google result for "fedcad meme" (Ex. A at 82), and that Plaintiffs' website also hosts the "FEDCAD-19," (Ex. A at 9) which bears prominent inscriptions including "FUCK DEFCAD," "CODY WILSON IS A CHILD SEX PREDATOR," and "ALL MY HOMIES USE ODYSEE." (Ex. A at 10-12) https://defcad.com/library/fedcad-19/.

holds that "a scheme to defame… does not qualify as mail or wire fraud," and applies Florida's Single Action Rule to bar end-runs where the gravamen is defamation. No. 25-CV-20465, 2025 WL 1425491 (S.D. Fla. May 16, 2025), appeal dismissed *sub nom*. *Freites C. v. Medina*, No. 25-12067-E, 2025 WL 2638566 (11th Cir. Aug. 27, 2025). Likewise, this Honorable Court's Order on Sanctions in *Trump v. Clinton*, condemns shotgun pleadings and the misuse of RICO actions for these purposes. 653 F.Supp.3d 1198 (M.D. Fla. 2023). Plaintiffs' SAC ignores those warnings.

The record also evidences an improper purpose under Rule 11(b)(1). After voluntarily dismissing in the Middle District, Plaintiffs re-filed across districts, failed to properly identify the related action in their Local Rule 3.8 notice, and their principal, Cody Wilson, posted a blog entry days later boasting of a "rifle pleading"[2] while threatening Defendant John Elik—a contemporaneous admission that this lawsuit is a weapon, not a petition for redress. The complaint is thus an abusive re-hash, factually ungrounded, and legally foreclosed.

The Court should impose sanctions tailored to deter repetition, including (1) striking or dismissing the Second Amended complaint, (2) awarding fees and costs incurred because of the violation, jointly and severally against Plaintiffs and their counsel, and (3) any other non-monetary directives the Court deems just.

---

[2] Defendants believe Wilson referred to this complaint as a "rifle pleading" because each of his three previous countercomplaints, culminating in a 49-count counterclaim, were identified as shotgun complaints. Wilson feels, it seems, his removal of *even more* specificity from the Instant complaint somehow makes it less of a shotgun complaint, but rather a "rifle complaint." Defendants feel Wilson misses the mark with this analogy. (Ex. A at 13).

## ARGUMENT

### I. PLAINTIFF'S CLAIMS ARE FRIVOLOUS AND WARRANT SANCTIONS

As the Eleventh Circuit has observed, "particularly with regard to civil RICO claims, plaintiffs must stop and think before filing them." *Pelletier v. Zweifel*, 921 F.2d 1465, 1522 (11th Cir. 1991). Plaintiffs did not stop, and they did not think. They just filed (and re-filed) (and then, re-filed a third time).

#### A. The "Civil RICO" Claims

Count I alleges a civil RICO conspiracy under 18 U.S.C. § 1962(d), predicated on alleged violations of § 1962(c). To do so, Plaintiffs must allege that Defendants conducted or participated in the conduct of an enterprise's affairs through a pattern of racketeering activity that caused injury to business or property. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Predicate acts of racketeering must be specifically alleged, and where the predicate is wire fraud, Rule 9(b) requires particularity as to the "who, what, when, where, and how." *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316–17 (11th Cir. 2007).

Plaintiffs' pleading does none of this. Instead, it simply declares that "[e]ach use of the [I]nternet to spread damaging disinformation violates the federal wire fraud statute" (SAC ¶34), and that Defendants' meme-posting therefore constitutes a "pattern of racketeering activity" somehow carried out through non-party MAF Corp. (SAC ¶¶37–48). This is not remotely a good-faith attempt to plead racketeering.

First, no predicate act is plausibly alleged. Online memes and allegedly disparaging posts are not "schemes to defraud" under 18 U.S.C. § 1343. There is no

4

allegation that any Defendant made a misrepresentation for the purpose of obtaining property, nor are there particulars as to time, place, content, or speaker. Plaintiffs instead rely on group labels and *ipse dixit* allegations of wire fraud.

Second, the enterprise allegations are facially defective. Merely pointing to "MAF" and alleging that the other Defendants "followed Larosiere's direction" (SAC ¶45) does not establish an "enterprise" under § 1961(4). Conclusory invocations of an "enterprise" cannot substitute for facts showing a distinct legal entity or association-in-fact. *Pelletier*, 921 F.2d 1518–22.

Third, there is no "pattern of racketeering activity." Plaintiffs rely on episodic Internet posts beginning in 2023. (SAC ¶¶23–35). That does not satisfy either closed-ended continuity (no substantial duration) or open-ended continuity (no threat of future racketeering). *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1357–59 (11th Cir. 2018). Allegations that Defendants mocked Plaintiffs online—even if repeated—do not transform criticism into organized crime.

Fourth, the claim is an improper attempt to repackage reputational and business grievances as RICO. In *Freites*, the Court dismissed nearly identical RICO allegations where defamation and disparagement were labeled as mail and wire fraud. 2025 WL 1425491, at *7. The same defect is present here: Plaintiffs allege reputational injury and customer loss from public statements, not property loss caused by criminal fraud. *Accord, e.g.*, *Méndez Internet Management Services, Inc. v. Banco Santander de Puerto Rico*, 621 F.3d 10, 16–18 (1st Cir. 2010); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791–93 (1st Cir. 1990).

Finally, the conspiracy claim under § 1962(d) fails because there is no substantive violation or agreement to commit a substantive violation alleged. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1296 (11th Cir. 2010).

The Eleventh Circuit has affirmed Rule 11 sanctions where RICO was asserted without factual or legal basis. *Byrne v. Nezhat*, 261 F.3d 1075, 1129 32 (11th Cir. 2001); *Pelletier*, 921 F.2d at 1518–22. And this Court has likewise condemned misuse of RICO as a litigation weapon, imposing sanctions in *Trump v. Clinton*.

B. <u>The "Lanham Act" Claim</u>

Count II alleges false advertising under § 43(a)(1)(B) of the Lanham Act. To do so, Plaintiffs must allege that Defendants made false or misleading statements of fact in "commercial advertising or promotion," that such statements actually deceived or had the tendency to deceive consumers in a material way, and that the deception caused injury. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002).

The Complaint falls far short. Plaintiffs allege that Defendants branded DEFCAD as "FEDCAD," accused it of being "hacked and dumped," hosted in Iran, and claimed it "doxxes" customers and colludes with authorities, disseminating these accusations in the form of memes and social media posts. (Compl. ¶¶49–55) *but see* (Ex. A at 81) (the meme saying few of these things). Setting aside the minor detail that Plaintiffs themselves (1) created and own "Fedcad.com,"[3] and (2) are the most

---

[3] Plaintiffs use "Fedcad.com" to list some of the works which they are copying that have copyright notices affixed. (Ex. A at 3-6).

6

prolific spreaders of the "FEDCAD meme," (Ex. A at 8, 82) the complaint—after two previous Rule 11 notices—still fails to engage with these defects.

First, the challenged speech is not "commercial advertising or promotion." A meme posted online is not a commercial advertising campaign. *See Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 950–53 (11th Cir. 2017) (criticism or commentary about a business does not become commercial speech merely because it may affect the business); *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012) (11th Circuit's formulation of "commercial advertising or promotion."). Plaintiffs' reliance on Internet banter does not satisfy this standard.

Second, the alleged statements are criticism, not false statements of fact. Labeling DEFCAD as "FEDCAD" is not a verifiable factual assertion. The Lanham Act does not provide a cause of action for defamation disguised as false advertising. See *Boule v. Hutton*, 328 F.3d 84, 90–91 (2d Cir. 2003) (Lanham Act does not cover reputational harm caused by noncommercial commentary).

Third, the Complaint alleges no facts showing deception or materiality. Unburdened by evidentiary support, Plaintiffs recite that consumers "shun publicity" and that certain partners ceased working with them (SAC. ¶¶32–34), but they allege no facts establishing that consumers were deceived.

C. The Florida Tortious Interference Claim

Under Florida law, a claim for tortious interference requires: (1) the existence of a business relationship under which the plaintiff has legal rights; (2) the defendant's knowledge of that relationship; (3) the defendant's intentional and

unjustified interference with it; and (4) damages. The relationship must be concrete and protectable; mere hopes of future business do not suffice.

Plaintiffs' allegations in ¶¶61–69 fail every element. They identify no legally protectable business relationship, only vague "customers and potential customers" and two non-party individuals, Collier and Goldhaber, without any allegation of contractual rights or obligations (SAC ¶¶33, 63, 68-69). Plaintiffs then assert in conclusory fashion that "the Florida Defendants" interfered by making "false statements" (SAC ¶66). But the Complaint pleads no act of any Floridian tied to any particular customer, contract, or transaction. Plaintiffs' reliance on group labels and speculation cannot substitute for concrete allegations that a Floridian interfered with an identifiable relationship.

## II. PLAINTIFFS FILED THIS CASE FOR AN IMPROPER PURPOSE AFTER VOLUNTARILY DISMISSING THE SAME THEORIES ACROSS THE DISTRICT LINE.

The improper purpose animating this action is plain. It is an effort to silence critics and give force to personal vendettas by inflicting litigation costs.

Plaintiffs repeatedly equate online commentary with wire fraud and racketeering (SAC ¶¶23–35, 34, 37–48). They then bootstrap the same allegations into false advertising and tortious interference counts, never identifying specific facts as to defendants, but instead relying on group accusations.

This Court has seen this tactic before. In *Trump v. Clinton*, the Court sanctioned counsel who filed a sprawling RICO and conspiracy complaint to flaunt a political grievance. 653 F.Supp.3d 1198. The same is true here: Plaintiffs' counsel

8

filed this action to harass what their client perceives to be his detractors. *See Pelletier*, 921 F.2d at 1518–22 (Upholding sanctions in similar circumstances).

The very public boasting by Plaintiffs' principal—calling this new pleading a "rifle pleading" and threatening Illinois-based Defendant John Elik (Ex. A at 13)—is direct evidence of an ulterior objective. Rule 11(b)(1) forbids using the courts to intimidate, punish, or exact reputational revenge. *Cf. Trump v. Clinton*, 653 F.Supp.3d at 1207 (sanctions where the lawsuit's "inadequacy as a legal claim was evident from the start" and it was filed to "harass and punish").

On September 29, 2025, the principal of Plaintiffs (Wilson), linked directly to the complaint filed in this lawsuit on his personal blog. In this blog post, Wilson speaks of Defendant Elik, who goes by "Ivan" online and lives in Alton, Illinois. Elik often creates hours-long video essays about Italian hunting shotguns, which Wilson brings up to threaten Elik. (Ex. A at 13). Wilson didn't stop there, threatening Elik's death twice in addition to a "rough ride." *Id.*

This is not the first time that Plaintiff's principal has threatened Elik's death. As discovery revealed in the Middle District case "[Elik] received a mailed death threat originating from an address known to be associated with Cody Wilson. Shortly thereafter, Mr. Wilson facilitated the public dissemination of [Elik's] name and home address in what [Elik] reasonably perceived as a coordinated smear and intimidation campaign." (*Larosiere v. Wilson*, Doc. 136-3 at 43). Plaintiff's principal admits on his blog that *he* is the guiding hand behind the Instant complaint, which makes it redundantly clear that Plaintiff's goal here is to further harass Defendant Elik. *Id.*

("I have been scapegoated because I mentioned FOSSCAD in a federal lawsuit" in reference to this case.) (emphasis added). Rule 11 exists to deter this conduct.

This Court has condemned the weaponization of pleadings, labeling shotgun and narrative-driven complaints "abusive litigation tactics" that obstruct justice by forcing defendants and courts to sift sprawling, immaterial allegations. See *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313 (11th Cir. 2015).

### III.   THIS ACTION IS BARRED BY §770, FLA. STAT, AND IS OUTSIDE THE STATUTE OF LIMITATIONS WITH REGARD TO THE "FEDCAD" MEME.

Very analogous to *Freites*, all four of Plaintiffs' claims are premised on the idea that the "Fedcad meme" was false. As articulated above, Plaintiffs admit Defendants are authors and thus eligible for §770 protection. (Ex. A at 13) ("Young Author").

Florida's Legislature has long recognized the need to cabin defamation-style litigation. § 770 imposes clear statutory prerequisites and limitations on such suits: (1) § 770.01 requires pre-suit notice to the defendant at least five days before filing; (2) § 770.05 bars multiple suits arising from the same publication and limits to a single venue; and (3) § 770.07 provides that the cause of action accrues upon first publication.

#### A.  Plaintiffs Failed to Provide §770.01 Notice

At the threshold, Plaintiffs have not alleged, and cannot show, compliance with § 770.01's notice requirement. It was never provided when these claims were advanced in the Middle District, and is now fatal to this claim ever being brought outside of the Middle District.

10

B. <u>The Single Action Rule Bars These Claims</u>

All of Plaintiffs' claims are predicated on allegedly false statements published online. (SAC ¶¶42–69). These are defamation-style allegations, regardless of how Plaintiffs label them. As the *Frietes* court explained in a similar situation:

> In Florida, a single publication gives rise to a single cause of action. This is what is known as the Single Publication/Single Action Rule, and it precludes a plaintiff from asserting multiple causes of action when they arise from the same publication [or publications] upon which plaintiff's defamation claim is based. The rule is designed to prevent plaintiffs from circumventing a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm. Moreover, the underpinnings of the single-action rule make clear that <u>it does not matter whether the defamation claim fails, succeeds, or is not brought at all</u>. **If the underlying facts are premised on false and defamatory publications, the plaintiff is bound by the single action rule and cannot avoid the limitation by engaging in semantic exercises or strategic gamesmanship by asserting various additional claims**.

*Freites*, 2025 WL 1425491, at *5 (cleaned up, emphasis added).

Setting aside the fact that Plaintiffs have not bothered to plausibly allege any falsity, in November of 2024, Plaintiff Defense Distributed filed a claim under the Lanham Act, DMCA, for Florida Tortious Interference, for Florida Trade Libel, and the FDUTPA, all relating to the same publications. *Larosiere v. Wilson*, (Doc. 29).

§ 770.05, Fla. Stat. provides:

> Limitation of choice of venue.—No person shall have more than one choice of venue for damages for…any…tort founded upon any single publication…or…any one presentation to an audience[.]

This section has been understood to reflect an intention by the Florida Legislature to limit defamation-style cases "to only **one** suit in **one** chosen venue to avoid multiple suits upon the one cause of action." *Perdue v. Miami Herald Pub. Co.* 291 So.2d 604, 606 (Fla.1974) (emphasis added). In other words, to prevent exactly what Plaintiffs attempt here.

What's more, the single action rule forbids Plaintiff's slipshod attempts to contort their defamation claim into four separate counts, each "explicitly speak[ing] about…'false accusations,' and damaging reputations.'" *Frietes* at *5. *Frietes* concerned postings to Twitter and YouTube, like here. All causes of action refer to the same publications, and thus cannot be brought consistent with the Single Action rule.

C.  The Claims Are Outside The Statute of Limitations Under §770.07

§ 770.07's accrual rule means that any claim sounding in libel, slander, or defamation, has the statute of limitations run from the date of first publication. Plaintiff allege the meme was published as early as 2023. (SAC ¶¶24). May 15, 2023, was 2 years, 4 months, and 10 days before the date of filing. This is beyond the two years afforded by § 95.11, Fla. Stat. Under §770.07, all causes of action stemming from the publication accrued at first publication; it cannot be revived by repetition.

Additionally, Plaintiffs, Texas companies, necessarily allege damages in Texas by bringing RICO claims. § 95.10, Fla. Stat. provides that "[w]hen the cause of action arose in another state or territory of the United States, or in a foreign country, and its laws forbid the maintenance of the action because of lapse of time, no action shall be maintained in this state." Texas' statute of limitations for libel is one year.

No reasonable attorney could plead these state-law claims and their federal derivatives without addressing 770's clear mandates. The failure to do so confirms no count was "warranted by existing law" under Rule 11(b)(2) and reflect, instead, an improper purpose of harassment through duplicative, defective litigation.

12

## IV. PLAINTIFFS' FACTUAL CONTENTIONS LACK EVIDENTIARY SUPPORT AND IGNORE CONTRARY MATERIALS—INCLUDING THEIR OWN.

Rule 11(b)(3) requires a reasonable pre-filing inquiry. Plaintiffs' Instant complaint is predicated on narratives that are unsupported or contradictory:

### A. The "Plaintiffs Share Income" Contention

The complaint, supposedly as a hook for the inclusion of the three plaintiffs, contends that they "share the income produced by DEFCAD's legal file sharing business[.]" (SAC ¶15). But Plaintiffs dispute this themselves. (Ex. A at 86).

### B. The "Iran Hosting" Contention

The complaint does not credibly allege that any party ever asserted that Defcad itself "hosts in Iran," nor is such an allegation even in the meme. The record reflects a website configured to present as DEFCAD on an Iranian server. Plaintiffs' own security vendor (Mandiant) confirms the site's existence. (Ex. A at 14-21). Plaintiffs' failure to correct or remove the site does not transform truthful statements of concern into defamatory falsehoods—and certainly not into wire fraud.

### C. "Hacking" Contentions

Plaintiffs' own records corroborate that they were hacked. In 2021, Plaintiffs compensated an individual whom they knew as "JG" after "JG" discovered a vulnerability that did in fact enable access to sensitive user data. (Ex. A at 25-40). "JG" found an exploit on Django (the apparent software framework of DEFCAD) and NGINX (a software for serving web pages) that allowed them to obtain the private source code of DEFCAD. Given DEFCAD likely uses Django, many settings and configuration options are in a standard location: typically, a private source code file.

13

When the NGINX web server is configured correctly, private source code files are not served to the user. However, when incorrectly configured, certain resource paths may incidentally provide the private source code files to the user. In this case, the latter was the case for DEFCAD. The address, username, and password of their database were exposed via the Django configuration file. From there, "JG" simply needed to connect to the database and access its contents. "JG" told others that the database was accessed and shared. Plaintiffs and Defendants also produced in discovery web security reports indicating the site was likely compromised. (Ex. A at 14-21, 42-47). "JG" also engaged with Plaintiffs to establish a bounty program to crowdsource security fixes for additional security flaws on Plaintiff's websites. (Ex. A at 48-60). Against that backdrop, statements that DEFCAD had been hacked and data was dumped from their database were supported by a reasonable basis (indeed by Plaintiffs' own disclosures), and Plaintiffs are acutely aware of their veracity. At minimum, the Instant complaint cannot honestly allege falsity.

D. "Doxxing" Contentions

Plaintiff claims that Defendants together conspired to make statements that included that "DEFCAD's customer names are public ("doxxing")." They later claim Defendants "claim[] that DEFCAD "doxxes" its customers by providing personal information to federal authorities and anti-gun activists." However, they never offer evidence of either of these claims. Instead, they provide only the "FEDCAD" meme,

which makes only one reference to "doxxing."[4] As DEFCAD is well aware, DEFCAD in fact turned over non-public information about gun designers to an anti-gun organization in a lawsuit where DEFCAD was sued for willfully infringing the anti-gun organization's trademarks and DEFCAD refused to cease the infringement.

Additionally, Plaintiff's own behavior (and that of their common principal, Cody Wilson) has included doxxing besides that which took place in the lawsuit. In *Larosiere v. Wilson*, Wilson disclosed that he had paid multiple private investigators to gather information on John Elik (Ex. A at 61-65), Matthew Larosiere (Ex. A at 61-62, 66), Alexander Holladay (Ex A. at 61-65, 67), and Peter Celantano (Ex. A at 68-71). Wilson also provided text messages during discovery in that case where he indicated plans to doxx Peter Celantano (Ex. A at 72-76). Wilson also publicly posted John Elik's private banking information on Wilson's blog. (Ex. A at 83-85). Cody Wilson's willful copyright infringement, which is the subject of the *Larosiere v. Wilson*, has resulted in several more unrelated individual's private information being posted publicly. A great wake of doxxing and de-anonymizing follows Wilson, and through him, the Plaintiffs in this case.

## V. THE INSTANT COMPLAINT IS A SHOTGUN PLEADING

The Instant complaint incorporates all preceding paragraphs into subsequent counts, asserts multiple claims against multiple defendants without specifying who did what, and is replete with conclusory, immaterial, and vague allegations untethered to the elements of any claim or defense. These are the *Weiland* archetypes

---

[4] "Doxxing" refers generally to the sharing or posting of personal information that was otherwise kept private.

15

of shotgun pleading. See *Weiland*, 792 F.3d at 1321–23; *Barmapov v. Amuial*, 986 F.3d 1321 (11th Cir. 2021).

Compounding that, the pleading relies on group labels and collective conduct across platforms and time, while the counts themselves rarely identify which defendant engaged in which act supporting which claim. *Compare* Count II (Lanham Act, ¶¶54–60)—lodged against all defendants on the same undifferentiated facts—with Count III, which is nominally "against solely the Florida Defendants" but still depends on the same group-pled narrative.

## VI. PLAINTIFFS' VENUE AND PERSONAL-JURISDICTION CONTENTIONS ARE FRIVOLOUS AS TO OUT-OF-STATE DEFENDANTS, AND REMAIN UNSUPPORTED BY FACTS.

Plaintiffs' Instant complaint advances sweeping assertions of Florida jurisdiction and venue untethered to any Florida-directed conduct by several out-of-state defendants. Defendants submitted sworn affidavits in the Middle District that they were never paid by MAF and had no Florida-targeting relevant to Plaintiffs' theories; Plaintiffs offered no contrary evidence in discovery. Re-filing the same airy jurisdictional and venue claims here, without new facts, compounds the violation.

## VII. PLAINTIFFS' IGNORANCE OF CONTRARY EVIDENCE IS SANCTIONABLE CHERRY-PICKING.

Lawyers cannot cite public reports or filings for snippets that appear supportive while omitting the same documents' contradictory or limiting context. *Trump v. Clinton* 653 F.Supp.3d at 1215. Plaintiffs cite virtually nothing, while ignoring the materials referenced *supra*, plus: (1) their own Mandiant report confirming an instance of Defcad on an Iranian server (*Larosiere v. Wilson*, Doc. 138-1, A-375-398); (2) their admissions that they never attempted to correct any

statements alleged to be false; (*Larosiere v. Wilson*, Doc. 138-2, B-32); (3) their own production which revealed that Wilson has engaged in substantial efforts to dox and de-anonymize individuals including Defendants (*Larosiere v. Wilson*, Doc. 138-2, B-94); (4) the absolute lack of any basis to claim any Defendant claimed Defcad was hosted in Iran (*Larosiere v. Wilson*, Doc. 138-2, B-10-15 (Refusing to answer interrogatories as to false statements, pointing generally at responses to requests for production); Doc. 138-1, A-373-478 (responses to request for production, where no evidence of this exists)); (5) the fact that Larosiere has never once made any of the claims at the basis of this claim (Same as previous); (6) the fact that—after a year of discovery—Plaintiffs could not produce a scintilla of evidence that MAF had paid anyone but Larosiere and Holladay (*Larosiere v. Wilson*, Doc. 138-1, A-2-179) (Purporting to be a response to a request for documents supporting the existence of a RICO enterprise, but in actuality 177 pages of inapposite nonsense, without a shred of evidence that MAF paid anyone); (7) their own bounty payment and post-incident program consistent with a compromised web presence (*Larosiere v. Wilson*, Doc. 138-2, B101-102); (8) the fact that *nobody but Plaintiffs* make a business out of selling digital gun files, undermining the competition theory; and (8) their previously produced reports indicating compromise (*Larosiere v. Wilson*, Doc. 138-1, A-375-398).

Rule 11(b)(3) demands an honest engagement with the factual record. Plaintiffs' pleading fails that basic duty.

## VIII.   THE MANIFEST FRIVOLITY OF THIS CASE DEMONSTRATES THAT COUNSEL EITHER FAILED TO UNDERTAKE A REASONABLE PRE-FILING INQUIRY, OR WERE ASLEEP AT THE WHEEL.

Rule 11 requires attorneys to really "stop and think" before bringing a RICO claim, especially when it involves dragging individuals from across the nation to a faraway forum. That's why it's shocking where counsel for Plaintiffs roped John Lettman into this case, where the sole mention of him in the entire complaint is a vague statement referring to instances where Lettman has posted evidence of a server based in Iran providing DEFCAD's content (Ex. A at 22-24). This sort of conclusory statement is not a sufficient factual allegation to support forcing Lettman to litigate an unarticulated "conspiracy to violate RICO" lawsuit based on Internet memes–especially when Plaintiff's own security vendor identified the Iranian servers (Ex. A at 14-21). No reasonable attorney would have filed this case.

Counsel may argue that they have clean hands, pointing at one another to avoid the repercussions of filing this obviously defective suit. However, that doesn't prevent sanctions. "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, **or party** that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1) (emphasis added). And where the client has made a "knowing factual misrepresentation" or is the "mastermind" behind the frivolous case, sanctions against a client are appropriate. *Byrne v. Nezhat*, 261 F.3d 1075, 1118 (11th Cir. 2001) (quotation marks omitted), abrogated on other grounds as recognized by *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1357 n.10 (11th Cir.

18

2018). Rule 11 sanctions must be calibrated to deter repetition. Rule 11(c)(4). Given Plaintiffs' voluntary dismissal and immediate re-filing across districts, death threats directed at Defendants, the shotgun pleading, and the ludicrous RICO theory, little room for doubt can exist regarding the client's role in bringing this suit.

On top of this, the complaint fails to engage with several critical facts: most importantly, that *Defendants themselves* have posted the "FEDCAD" meme (Ex. A at 8, 80-81), advertised files which contain the "FEDCAD" meme[5], and provided their customers a copy of the "FEDCAD" meme[6]. Defendants have shared the meme on their website for nearly two years without any commentary, denial, or refutation[7]. Defendants sent out an email blast to their entire customer list–some 150,000 customers (Ex. A at 79)–advertising the availability of the "The Regular 1022", which directs users to a page where they can download a "zip" file (Ex. A at 80) which contains the "FEDCAD" meme (Ex. A at 81) (again with no commentary, denial, or refutation). Additionally, the owner of the Plaintiffs, Cody Wilson, had to register as a sex offender due to a crime involving a minor,[8] fled the United States to try to avoid

---

[5] https://defcad.com/blog/mk18-g80/ , directing recipients of this blog post and email blast to the download page for the "Regular 1022", screenshots at (Ex. A at 77-81).

[6] https://defcad.com/library/the-regular-1022/ , where the "Download Docs" button causes a zip file to be downloaded which contains the "FEDCAD" meme. Defendants themselves created this zip file, put it on their website, and directed their customers to it.

[7] Via the link in Footnote 6, the listed date that Defendants published the "FEDCAD" meme themselves is May 22, 2024. (Ex. A at 8).

[8] https://www.texastribune.org/2019/09/12/3d-printed-gun-designer-cody-wilson-sentenced-sexual-assault-girl/

19

responsibility for sex crimes,[9] and has engaged in a pattern of flagrant copyright infringement.[10] Each of these events, and the public's general awareness of and disgust with them, are indisputable reasons that Plaintiffs may be suffering "diminished customer goodwill, lost sales and profit, and substantial reputational and financial harm," yet the complaint never attempts to address these facts, instead it pins all of Plaintiffs' self-inflicted woes on the posting of a meme that has received *thousands of views* and *hundreds of downloads (*Ex. A at 8 and 80-81) from Plaintiff's own publication of that very same meme.

## CONCLUSION

Courts in this Circuit—including this Court—have imposed fees and struck pleadings where plaintiffs persisted in defective RICO and reputational-tort repackaging after being put on notice. *See, e.g.*, *Pelletier*; *Byrne*; *Jackson*; *Trump v. Clinton*; and *Freites*. Plaintiffs have been on notice for over a year, and have done nothing to correct these defects. Substantial corrective sanctions are necessary to deter repetition.

Respectfully submitted,

DATED:  March 10, 2026

---

9      https://www.npr.org/2018/09/24/651214331/3d-gun-designer-arrested-for-sexual-assault-of-a-minor-freed-on-bail

10 As detailed in *Larosiere v. Wilson* Doc. 43.

20

| | | |
|---|---|---|
| */s/ Gary C. De Pury* | */s/Matthew Larosiere* | */s/ Zachary Z. Zermay* |
| Gary C. De Pury | Matthew Larosiere, Esq. | Zachary Z. Zermay, Esq. |
| Florida Bar No: 126588 | Fla. Bar. No. 1005581 | Fla. Bar № 1002905 |
| Law Offices of Gary De Pury, P.A. | The Law Offices of Matthew Larosiere | *Zermay Law, P.A.* |
| 21035 Leonard Road | 6964 Houlton Circle | 1200 Fourth Street, #1102 |
| Lutz, Florida 33558 | Lake Worth, FL 33467 | Key West, FL 33040 |
| Tel: (813) 607-6404 | Email: Larosieremm@gmail.com | Email: zach@zermaylaw.com |
| Email: Gary@DePury.com | Tel: (561) 452-7575 | Tel: (305) 767-3529 |
| *Lead Counsel for Alex Holladay.* | *Lead Counsel for Elik, Stroke, Lettman, and Clark.* | *Lead Counsel for Matthew Larosiere.* |

21

## **CERTIFICATE OF SAFE HARBOR SERVICE**

I HEREBY CERTIFY on this 10th day of March, 2026, I emailed a copy of the foregoing to opposing counsel. I will not file this motion unless the deficient filing is withdawn or corrected within 21 days.

*/s/ Matthew Larosiere*
Matthew Larosiere, Esq.
Fla. Bar № 1005581

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 1st day of July, 2026, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Matthew Larosiere*
Matthew Larosiere, Esq.
Fla. Bar № 1005581