**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

CASE №: 9:25-cv-81197

DEFENSE DISTRIBUTED, et al.,

*Plaintiffs*,

v.

JOHN ELIK, et al.,

*Defendants*.

______________________________________/

**DEFENDANTS' MOTION FOR A DETERMINATION OF ENTITLEMENT TO ATTORNEYS' FEES UNDER 15 U.S.C. § 1117(a)**

Defendants Zackary Clark, John Elik, Alexander Holladay, Matthew Larosiere, John Lettman, and Josh Kiel Stroke move for a determination that this is an exceptional case under 15 U.S.C. § 1117(a). Final judgment was entered for Defendants on every claim. DE 180.

## INTRODUCTION

This case "stands out" in the §1117(a) context. Plaintiffs—who undisputedly published the allegedly ruinous meme themselves—repeatedly promised they had proof "confirm[ing]" lost sales specifically because of the FEDCAD meme and Defendants' conduct. DE 49 ¶ 67. Such materials were markedly absent from the summary judgment record, because they never existed to begin with. DE 147-15–19.

Every source Plaintiffs identified cut against them: Of the two purported lost partners, Plaintiffs offered only speculation of one and admitted of the other that there was "no commercial relationship" to lose; the surveys named no Defendant or statement; and their sole expert Tyra conceded, "if you are asking if I have any proof that A led to B, I have no proof." DE 147-5 at 145–48, 206–08; DE 147-7 at 27; DE 179 at 2, 7–8. Their own data showed sales declining long before the meme. DE 147-9 at 1–2. Yet Plaintiffs demanded approximately $2 million on the speculation that some unidentified portion had "likely" reached Defendants through nonparty businesses. DE 162 at 2, 11–13.

Plaintiffs' counsel litigated this matter in an objectively unreasonable manner. Aside from repeatedly citing the preamble of a decision as if it were black letter law after notice, Plaintiffs violated this Court's orders with abandon, posting discovery material online and coaching a deponent, having to be repeatedly sanctioned.

Plaintiffs imposed the cost of nationwide, seven-figure litigation on ordinary individuals of limited means by repeatedly assuring the Court that causal proof existed when the completed record contained none, while publicly branding the litigation a "rough ride" in fundraising solicitations. It was not done in good faith.

## GOVERNING STANDARD

§ 1117(a) permits fees when a case "stands out" because of the relative weakness of a litigating position or "the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). The Court weighs the totality including frivolousness, motivation, objective unreasonableness, and the need for compensation and deterrence. Defendants need prove exceptionality only by a preponderance. *Id*. at 554 n.6, 557–58. Neither bad faith nor independently sanctionable conduct is required. *Tobinick v. Novella*, 884 F.3d 1110, 1117–19 (11th Cir. 2018); *American S. Homes Holdings, LLC v. Erickson*, No. 24-10287, slip op. at 11 15 (11th Cir. Apr. 9, 2025). Indeed, *Tobinick* affirmed fees although the district court was "unwilling to find" conduct "tantamount to bad faith" under § 1927. 884 F.3d at 1115–19.

## ARGUMENT

### I. PLAINTIFFS' CLAIMS WERE SUBSTANTIVELY WEAK.

#### A. Plaintiffs pled causation as an established fact when no proof existed.

A false-advertising plaintiff "ordinarily must show" that injury "flows directly from the deception wrought by the defendant's advertising[.]" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133–34 (2014). At summary judgment, that means evidence connecting a Defendant's statement to a consumer's decision.

*TocMail, Inc. v. Microsoft Corp.*, 67 F.4th 1255, 1263, 1266 (11th Cir. 2023); DE 179 at 7–9. Plaintiffs continued litigating this case knowing they had none.

Plaintiffs represented, from the beginning, that they had that evidence. The operative pleading alleged that "[i]nterviews with former customers" had "confirmed" that "multiple customers specifically stopped doing business" because of the meme and related misinformation. DE 49 ¶ 67. It alleged losses exceeding $1 million. *Id.* ¶¶ 68–69. On May 14, 2026, Plaintiffs again vaguely gestured towards Collier, Goldhaber, the exit surveys, and Tyra whenever pressed for any evidence underlying the claim. DE 147-15–19. They affirmed that all their supporting documents had been produced. *Id.* The completed production—these four repeatedly invoked sources and some 30,000 pages of inapposite nonsense[1]—contained no proof of the propositions for which Plaintiffs offered them.

**Collier:** Despite his repeated invocation, Plaintiffs produced nothing whatsoever of Collier. Wilson was only "tempted to say" Collier left because of the meme, having no idea which statement caused Collier to leave—"[i]f we can even determine that it was a statement." DE 147-5 at 144:14–146:7. When a message in their own possession referred to "other major reasons" for Collier's departure; Wilson could only "venture a guess." *Id.* at 206:1  207:19. *Cf.* DE 13 at 6, 10-11; 24 at 7; 37 at 10; 47 at 5; 70 at 10; 73 at 10; 109-1 at 2 (repeatedly alleging Collier terminated a business relationship because of Defendants).

[1] Of note, some 14,200 pages of the produced documents, all marked confidential, all of which Defendants had to trudge through, consisted of engineering textbooks, open-source treatises with no relationship to any claim, and German-language technical documentation on a tank transmission.

**Goldhaber:** Plaintiffs repeatedly alleged that Goldhaber terminated a revenue-generating relationship because of Defendants. *See* DE 13 at 6, 10–11; DE 24 at 7; DE 37 at 10; DE 47 at 5; DE 49 at 6, 12–13; DE 70 at 10; DE 73 at 10; DE 109-1 at 3. They contended at summary judgment that Goldhaber "confirmed that Defendants' smear campaign caused him to stop uploading[,]" causing a "direct link" to lost business. DE 162 at 3, 7, 14. This, despite their own admissions no such things occurred. *See* DE 147-5 at 147:17–148:24 (admitting that no commercial relationship with Goldhaber existed, that Goldhaber's works continued to be uploaded to DEFCAD, and that the hoped-for relationship was "not attained").

**The surveys:** Plaintiffs alleged that customer interviews had "confirmed" lost business "because of the FEDCAD meme and related misinformation propagated by Defendants," then told the Court that "numerous customer exit surveys" proved it. DE 49 ¶ 67; DE 162 at 2, 7. But the surveys identified no statement by any Defendant, and no respondent's exposure to any Defendant's conduct. DE 179 at 2, 7. Nor were the supposed "FEDCAD" references organic customer accounts. Sixteen of the seventeen references were selections of Plaintiffs' prewritten option—"I don't want to support FEDCAD"—which Wilson admitted was a company-generated fixed response; the lone remaining reference merely said the customer "didn't have enough time to use fedcad." DE 147-5 at 98:1  14, 100:22  101:2; DE 147-6 at 22.

**Tyra:** Plaintiffs promised that Jason Tyra would quantify losses attributable to each Defendant. He did nothing of the kind. Tyra merely averaged sales before and after May 2023 and assigned 100% of the asserted decline to the meme, despite acknowledging that the data showed a downward trend beginning at least a year

earlier. DE 147-7 at 19:1–18, 69:1–7, 79:1–80:25. He admitted that neither his report nor his testimony would contain any factual allegation about any particular Defendant. Id. at 25:1–7. A version of his report even acknowledged that the meme "may . . . have generated a pop in sales"; after Tyra confirmed that under oath, Plaintiffs invoked a clawback and insisted that Defendants could use only the version omitting it. Id. at 25:8–27:15, 188:15–190:8. The Court accordingly found that Tyra identified no affected customer, determined nothing about causation by any Defendant, and attributed the losses only to the meme's "general online presence." DE 179 at 2–3, 8–9.

Even as Plaintiffs assigned 100% of the post-May 2023 sales decline to Defendants here, Defense Distributed was pursuing overlapping lost-revenue theories in other litigation, telling another federal court that ATF enforcement was causing lost Ghost Gunner revenue, and a threat of business dissolution during the same period. DE 147-7 at 69:1–20; DE 166-2 ¶ 14; DE 166-4 at 19–20; DE 166-6 at 3.

Here, like in *Pro Video*, the court gave the plaintiff an opportunity to develop its case, but "it never did"; instead, "the weakness of Plaintiff's position grew more apparent at the summary judgment stage." *Pro Video Instruments, LLC v. Thor Fiber, Inc.*, 2021 WL 487020, at *3 (M.D. Fla. Feb. 10, 2021). Plaintiffs have a "continuing obligation to assess the strength of its claims," "but [they] never did." *Id.* at *5. So too in *Florida International University Board of Trustees v. Florida National University, Inc.*, where "nothing in the record" showed that a reasonable litigant could expect success and the plaintiff's own witnesses showed it "failed to re-evaluate the strength of its case as discovery continued." 2017 WL 3610583, at *6–7 (S.D. Fla. Aug. 11,

2017). The earlier denial of dismissal here is "of no import" for the same reason. *FIU*, 2017 WL 3610583, at *7. This was not a case in which competent evidence addressed simply failed to persuade. Cf. *FCOA, LLC v. Foremost Title & Escrow Services, LLC*, 2019 WL 7790856, at *3–5 (S.D. Fla. Oct. 17, 2019) (denying fees where the plaintiff supported each factor with record evidence, case law, and surveys). Plaintiffs' sources did not answer the causal question at all, and after this was made obvious, Plaintiffs chose to misrepresent the evidence rather than re-evaluate.

**B. Plaintiffs' own publication and sales evidence further contradicted their causal theory.**

Plaintiffs themselves hosted the meme and promoted the download to their customer list. DE 147-13 ¶¶ 15–18. Tyra nevertheless attributed the claimed losses to the meme's public existence without considering who published it  including Plaintiffs. DE 147-7 at 23–24. The Court held that Plaintiffs' republication "breaks the link between Defendants' alleged conduct and the claimed harm." DE 179 at 10. Because Tyra's source-blind model was Plaintiffs' only Lanham Act damages proof, their effort to impose its entire loss on Defendants was objectively unreasonable.

The timing pointed the wrong way too. Tyra admitted that the data showed an overall decline beginning in May 2022—a year before the meme's alleged publication. DE 147-7 at 79:1  11. A source-blind model cannot make a seven-figure Lanham Act claim reasonable. *See Pro Video*, 2021 WL 487020, at *3–5 (unresponsive expert material supported both substantive weakness and unreasonable litigation conduct).

**C. Discovery made the theory more conjectural.**

By summary judgment, the categorical allegation that Defendants diverted Plaintiffs' sales had morphed into an assertion that "[a]t least a portion" of roughly

$2 million had "likely" reached Holladay or Larosiere through nonparty businesses. DE 162 at 2, 11–13. The same guesswork expanded the defendant pool, adding Clark—who posted the meme on twitter after finding it on Plaintiffs' website—because he "may have joined" the conspiracy, and they "understand" he worked for MAF (he did not). DE 49 ¶¶ 36–39; DE 71-1 ¶¶ 2 10. Lettman likewise went from no alleged act in the first two complaints to liability for different statements—including an Iran assertion Plaintiffs conceded "is not explicitly mentioned in the FEDCAD meme." DE 1; DE 13; DE 49 ¶ 29; DE 147-17 at 2.

Instead of narrowing the case when discovery exposed those gaps, Plaintiffs added Clark, substituted later conduct for the missing individualized theory against Lettman, and pursued an unallocated $2 million theory against individuals across the country. That resembles the party-and-claim expansion *Tobinick* found compelling. 884 F.3d at 1118–19. It also fits the "sparse and largely irrelevant" proof and weak, undeveloped claims held exceptional in *Most Worshipful National Grand Lodge v. United Grand Lodge GA*, 813 F. App'x 455, 459–61 (11th Cir. 2020).

## II. PLAINTIFFS LITIGATED THE CASE IN A MANNER THAT INDEPENDENTLY STANDS OUT, VIOLATING COURT ORDERS.

While both sides certainly could have been more gentlemanly, Plaintiffs were repeatedly sanctioned in this case, and disobeyed Court orders. In a "wholly frivolous" manner, Plaintiffs forced Defendants to compel the deposition of the source of their one and only damages evidence. DE 98 at 2. DE 120. Later, the Court struck Plaintiffs' first summary-judgment response because it "fail[ed] to provide specific, pinpoint citations to the record." DE 163. Plaintiffs ignored this, and in their amended response, still used whole-exhibit citations for material propositions, as Defendants

documented at DE 170 at 1 and ¶¶ 10, 25–26, 57–58, 66. The rules require pinpoint citations. Plaintiffs, having nothing to cite, ignored this.

After being ordered not to "post or discuss[]" discovery material online, (DE 115) Plaintiffs repeatedly publicized materials from this case. Ex. A (Plaintiffs' publication of Celentano's deposition transcript, which they titled "Celentano-buddy-fucking.pdf"). *Id.* at 16. Not even 24 hours after the Court ordered that "no attorney shall coach any witness" during a deposition Plaintiffs' counsel interrupted his client's deposition, stated on the record he would be talking about the subject of the deposition, and proceeded to audibly instruct his client how to answer questions just outside the door. DE 147-5 at 52:12-23.

The same persistence appeared in Plaintiffs' misuse of *Hartman*. Plaintiffs' counsel threatened Rule 11, asserting that *Hartman* affirmed "just such a RICO judgment." DE 24-1 at 9. Plaintiffs, though, were citing "an overview of the alleged scheme to provide necessary context for the arguments on appeal" as if it were black letter law. *Hartman v. Does 1-2*, No. 23-13473, 2025 WL 398846, at *1 (11th Cir. Feb. 4, 2025). This would have been obvious had Plaintiffs' counsel bothered to read the opinion. Defendants immediately supplied the opinion's express limitation, that *Hartman* "express[ed] and impl[ied] no opinion" on whether the alleged conduct established predicate acts. Plaintiffs nevertheless repeated the mischaracterization to the Court, ultimately inducing this Court to have to revise a ruling which relied on the misrepresentation. DE 73 at 4–5; DE 179 at 4–5. Although that issue concerned RICO, this misrepresentation is what kept the case going far beyond the motion to

dismiss. Just as in *Tobinick*, the plaintiff's addition of claims and parties, sanctions motions, and accusations across the case are relevant. 884 F.3d at 1118–19.

## III. PLAINTIFFS' MOTIVATION, AND THE NEED FOR COMPENSATION AND DETERRENCE CONFIRM EXCEPTIONALITY.

Four days after filing, Plaintiffs publicly showcased the complaint, calling it a "rifle pleading" and a "ticket to a rough ride" while alluding to Elik's death, and invited readers to financially support their legal actions. DE 181-1 at 13; Ex. B. Plaintiffs repeatedly used this litigation in fundraising. While this case remained pending, Plaintiffs published deposition transcripts in a hostile narrative, again closing with "To support our legal actions, please join LEGIO." Ex. A.

Plaintiffs' motivation was hardly obscure. They first asserted these theories as counterclaims after one Defendant sued them for copyright infringement; after dismissing those counterclaims, Plaintiffs brought "substantially similar claims as a new case" here. DE 147-4 at 92:7–94:6. Wilson went so far as to testify that the copyright action itself was part of the alleged "RICO activity." *Id*. at 96:1–6, 97:5–22.

Why? Because Plaintiffs benefitted from the publicity. Plaintiffs' corporate representative testified that LEGIO became "more defined after the lawsuits," and that the paid-membership model was a "natural progression from the multi-state litigation[.]" DE 147-5 at 9–13. He also testified that news surrounding his litigation "has driven sales," and that he had "benefited from it." DE 147-4 at 129, 132 33.

That evidence, combined with the objective record, supports a finding of exceptionality under §1117(a). In *Warren Technology, Inc. v. UL LLC*, the Eleventh Circuit affirmed exceptionality because the case "had many weaknesses," the plaintiff used "sharp litigation tactics," and a public industry letter—"taken together with the

other facts”—supported the totality even though there was insufficient evidence of bad faith or improper purpose. No. 21-11168, slip op. at 4–7 (11th Cir. Oct. 22, 2021). Here the “rough ride” rhetoric, systematic litigation fundraising, and admitted deterrent objective reinforce an inference already grounded in the dearth of factual support and the Court's prior findings of litigation misconduct.

As *Octane Fitness* directs the Court to weigh, the need for compensation and deterrence are concrete. 572 U.S. at 554 n.6. Three affiliated companies sought seven-figure relief, paired with treble-damages RICO exposure, against six individuals scattered across the country. Defendants had no institutional litigation budget or insurance, and their declarations document obligations approaching or exceeding annual income, along with disruption to their work, businesses, health, and families. Exs. C-H. A defense victory that leaves those burdens entirely where Plaintiffs placed them would not provide meaningful compensation, and it would not deter Plaintiffs’ use of exceptionally weak Lanham Act claims as leverage.

**CONCLUSION**

The objective of this lawsuit was not to win, but to burden Defendants. In this way, Plaintiffs achieved their goal. For the foregoing reasons, Defendants respectfully request that the Court determine that this is an exceptional case, and find Defendants entitled to reasonable attorneys' fees under 15 U.S.C. § 1117(a).

Respectfully submitted,

DATED: August 31, 2026

*/s/ Gary C. De Pury*
Gary C. De Pury
Florida Bar No: 126588
Law Offices of Gary De Pury, P.A.
21035 Leonard Road
Lutz, Florida 33558
Tel: (813) 607-6404
Email: Gary@DePury.com
*Lead Counsel for Alex Holladay.*

*/s/Matthew Larosiere*___
Matthew Larosiere, Esq.
Fla. Bar. No. 1005581
The Law Offices of Matthew Larosiere
6964 Houlton Circle
Lake Worth, FL 33467
Email: Larosieremm@gmail.com
Tel: (561) 452-7575
*Lead Counsel for Elik, Stroke, Lettman, and Clark.*

*/s/ Zachary Z. Zermay*____
Zachary Z. Zermay, Esq.
Fla. Bar № 1002905
*Zermay Law, P.A.*
1200 Fourth Street, #1102
Key West, FL 33040
Email: zach@zermaylaw.com
Tel: (305) 767-3529
*Lead Counsel for Matthew Larosiere.*

## **REQUEST FOR HEARING**

Defendants request oral argument under Local Rule 7.1(b). A hearing would assist the Court because of the variety of issues raised in the motion. Defendants estimate that a hearing would require approximately 90 minutes total, with 45 minutes per side.

**VERIFICATION**

Pursuant to L.R. 7.3(a)(7), the undersigned verify, under penalty of perjury, that the motion's factual representation are true and correct to the undersigned's knowledge and belief.

*/s/ Gary C. De Pury*
Gary C. De Pury
Florida Bar No: 126588
Law Offices of Gary De Pury, P.A.
21035 Leonard Road
Lutz, Florida 33558
Tel: (813) 607-6404
Email: Gary@DePury.com
*Lead Counsel for Alex Holladay.*

*/s/Matthew Larosiere*
Matthew Larosiere, Esq.
Fla. Bar. No. 1005581
The Law Offices of Matthew Larosiere
6964 Houlton Circle
Lake Worth, FL 33467
Email: Larosieremm@gmail.com
Tel: (561) 452-7575
*Lead Counsel for Elik, Stroke, Lettman, and Clark.*

*/s/ Zachary Z. Zermay*
Zachary Z. Zermay, Esq.
Fla. Bar № 1002905
*Zermay Law, P.A.*
1200 Fourth Street, #1102
Key West, FL 33040
Email: zach@zermaylaw.com
Tel: (305) 767-3529
*Lead Counsel for Matthew Larosiere.*

**LOCAL RULE 7.3 CERTIFICATION**

Pursuant to Local Rule 7.3(a)(8), undersigned counsel certifies that Defendants served Plaintiffs with their draft fee motion and supporting materials on July 31, 2026, and requested Plaintiffs' written positions, separately as to entitlement and amount, and their availability to confer. On August 15, Plaintiffs' counsel initially agreed to confer. On August 16, however, after Defendants requested a time for the conference, Plaintiffs' counsel stated that, because Plaintiffs disputed entitlement, "there is no basis for further conferral under LR 7.3(b)," and directed Defendants to proceed with the motion. Defendants renewed their request, but Plaintiffs declined further conferral concerning entitlement. The parties later conferred only regarding bifurcation and agreed that entitlement should be determined first, resulting in the Court's bifurcation order. DE 195. Accordingly, entitlement remains fully disputed and was not resolved by agreement. The amount of any award is not presently before the Court and is reserved for separate conferral and briefing if entitlement is established.

*/s/ Matthew Larosiere*____
Matthew Larosiere, Esq.
Fla. Bar № 1005581

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 31, 2026, I electronically filed the foregoing with the Clerk of Court using CM/ECF, which served all counsel of record.

*/s/ Matthew Larosiere*____
Matthew Larosiere, Esq.
Fla. Bar № 1005581