UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:25-cv-81197

DEFENSE DISTRIBUTED, et al.,
Plaintiffs,

JOHN ELIK, et al.,
Defendants. ____________________________________/

DECLARATION OF JOHN LETTMAN

I, John Lettman, declare as follows:

1. I am over eighteen years of age and have personal knowledge of the matters stated in this declaration.

2. I submit this declaration in support of Defendants' motion for an award of attorneys' fees under 15 U.S.C. § 1117(a).

3. I reside in Pennsylvania. I am employed as a Senior Software Engineer. My employment has been in Pennsylvania, New York, and Washington. I have conducted no business in Florida.

4. I am not a large business or institutional defendant. My approximate annual household income is $200,000. I have significant financial obligations.

5. I have no insurance or other third-party source paying the attorneys' fees incurred in this action.

6. I have never been an employee of any party to this case. I have never been employed by or paid by MAF Corporation, Defense Distributed, DD Foundation, DEFCAD, or any other Plaintiff or Defendant.

7. I do not sell subscriptions to a digital-file repository, paid access to firearm-design files, or any service competing with DEFCAD. I did not stand to profit if a person stopped subscribing to DEFCAD.

8. I posted the FEDCAD meme and made other online comments concerning DEFCAD as an individual expressing my personal views.

9. The meme did not identify MAF Corporation, The Gatalog, CtrlPew, Defense Distributed, DD Foundation, DEFCAD, or a product or service sold by me. It did not direct readers to a commercial site or ask them to purchase anything from me.

10. I received no financial benefit from posting the meme or making the statements challenged in this case.

11. I did not coordinate my posts with the other Defendants as part of a plan to obtain Plaintiffs' customers. I did not have a list of DEFCAD subscribers and did not know the identities of the customers Plaintiffs claimed to have lost.

12. Plaintiffs nevertheless accused me of participating in a racketeering enterprise and violating the Lanham Act. Those allegations placed my reputation, employment, finances, and future at risk even though the challenged speech was personal commentary and Plaintiffs could not identify a commercial transaction caused by it.

13. I was required to retain counsel, answer written discovery, search for and preserve records, produce online material, sit for a deposition, and assist with motions addressing claims that continued for approximately two years.

14. I personally spent thousands of hours responding to this litigation. I lost at least 100 workdays and incurred approximately $32,000 in out-of-pocket expenses.

    a. I spent approximately $2,000 on PACER fees to obtain copies of docket entries and maintain awareness of the lawsuit.

    b. Following the filing of these accusations against me, my employer at the time selected me for a headcount reduction on November 21, 2025. According to former co-workers, the selection was based on risk of client perspectives of those accusations while I worked with high-security projects. As a result, I spent $30,000 on emergency funds during an unusually lengthened unemployment of six months resulting from the negative perspective of prospective employers.

    c. I suspect the expenses are far worse, but I have elected to keep my estimate conservative and limited to those items that are clearly documented.

15. Because of the filing and the burdens of this lawsuit, I lost time used to otherwise care for my ailing and dying father, Gary F. Lettman, a veteran of the Vietnam War who was exposed to Agent Orange.

    a. My father's health deteriorated through 2024 and 2025.

    b. As his health worsened, I found myself unable to visit him at his home as often due to the pressing requirements of this lawsuit.

    c. During the several times he was transported to Cole Memorial Hospital in Coudersport, Pennsylvania for emergencies, I found myself unable to visit him there due to the pressing requirements of this lawsuit.

d. As my father's health became worse, and he was transferred to UPMC Hamot in Erie, Pennsylvania, I found myself unable to visit him as frequently as I would have liked due to the pressing requirements of this lawsuit.

e. On August 21, 2025, I was contacted by family members who told me the nurses did not think my father would make it though the night. At the time, I had been discussing the claims against me in this case with my counsel and the fishing expedition that was the Requests for Production.

f. On the same day, my father passed.[1]

g. Most of my family was there for my father's untimely passing while I was still on Interstate 86 in New York.

h. There is nothing in this material world that could reimburse the suffering, depression, and anxiety I suffered due to my father's loss while I toiled to defend against a Bitcoin multimillionaire's retaliation for using my speech to discuss his despicable act of paying a minor child for sexual relations and his unusual business practices.

i. I personally hold Howard Foster, Brandon Everman, and Gregory Weiss directly accountable for misleading this Honorable Court regarding *Hartman* to further this vexatious and retaliatory case.

16. Because of the filing and the burdens of this lawsuit, I lost time used to otherwise maintain my marriage, care for my partner's ailing mental health, and care for her specific medical needs.

a. At the time of this and the previous related action, I was married.

b. My partner suffered from anxiety, depression, and a rare condition called empty nose syndrome.

c. Her empty nose syndrome condition required lengthy travel to the few specialist ENT doctors and surgeons that could help her.

d. As a result of the demands of this lawsuit, there were numerous instances where appointments were rescheduled and plans were altered. In combination with the distance and limited availability of these specialists, care could be postponed for several months if a single day was unavailable to me because of discovery demands and lawsuit requirements.

---

[1] *https://www.findagrave.com/memorial/287033763/gary_franklin-lettman*

e. Her anxiety and depression were made worse by the presence of law enforcement officers visiting my home repeatedly to deliver subpoenas and other service related to the action.

f. As a lawful firearms hobbyist, I am an outspoken supporter of the Second Amendment.

g. Unfortunately, law enforcement officers are justifiably fearful of interactions with those who possess firearms.

h. On one occasion, the Constable of McKean County flashed his emergency lights rather than knocking to gain my attention to deliver service for this lawsuit.

i. My wife became concerned about a police raid due to Mr. Wilson misrepresenting to law enforcement officers that I was violent, dangerous, or unlawful and in possession of firearms. She feared this would induce officers to approach in a more violent fashion or otherwise raid our home in search of any unlawful firearms despite my full compliance with regulations.

j. I later learned that Mr. Wilson unnecessarily included documents containing screenshots of Second Amendment advocacy and critique of police actions in his service to Mr. Phil Royster. I believe this completely justified my wife's fear that Mr. Wilson attempted to induce violent police action in response to his critics.

k. As my attention focused on the requirements of this lawsuit, I became unavailable to other activities in my life, as discussed above.

l. My wife's mental health deteriorated further and her physical condition worsened. I became unable to dedicate the necessary time to maintain my relationship with her, and ultimately, as a significant result of this lawsuit and Plaintiffs actions, my marriage terminated.

17. Because of the filing or public existence of this lawsuit, a prospective employer rescinded an employment offer that would have paid approximately $160,000 per year.

a. On January 25, 2026, Brandon Mannella, the CEO of Teraswitch Inc, a telecommunications company, reached out to me and offered me a position due to my proximity to Pittsburgh and experience with Kubernetes, global public DNS, Grafana, and Prometheus.

b. Mr. Mannella demonstrated a high degree of enthusiasm and, on the same night, connected me with the Infrastructure Engineering Lead at Teraswitch Inc, Robert Shermer.

c. Mr. Shermer scheduled a discussion for January 30, 2026. The conversation extended one hour beyond the allotted time as our discussion turned to numerous future development directions for the Teraswitch infrastructure and the potential projects I could take on.

d. Following the discussion with Mr. Shermer, Mr. Mannella encouraged me to speak with the Lead Full Stack Engineer at Teraswitch Inc, Lucio Santella, because I would be working with the software engineers present in his team. The meeting with Mr. Santella occurred on February 5, 2026.

e. Mr. Santella wrote, regarding the discussion, "I really enjoyed the conversation. Thanks for taking the time to walk through some of your background. I think there's some interesting overlap in experience that would benefit where our software work is headed."

f. Mr. Manella, over a telephone conversation offered me a position, starting at $130,000 per year and elevating to $160,000 per year after a three-month probationary period.

g. Mr. Manella wrote, following his decision to hire me on February 11, 2026, "Update - paperwork is being worked on, should have something to you shortly."

h. Mr. Sherma wrote on February 17, 2026, "Welcome aboard! Glad to hear you'll be joining the team - I really enjoyed our conversation and excited to have your expertise as we embark on our ambitious infrastructure / product efforts this year!" He would finish is email after discussing logistics, "Again, welcome to Teraswitch engineering - excited to work together!"

i. On February 18, 2026, Mr. Manella sent a Docusign link two documents.

j. The first Docusign document was "Re: Employment Terms." The document offered an "initial base salary" to be "paid at a rate of $130,000 per year, less payroll deductions, withholdings, paid on the Company's normal payroll schedule."

k. The second Docusign document was "EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS ASSIGNMENT AGREEMENT." The document appeared to be a typical confidentiality and intellectual property assignment agreement.

l. On February 19, 2026, the two documents were executed and signed by Mr. Manella and me.

m. On February 19, 2026, Mr. Manella reached out, concerned that my LinkedIn did not list Teraswitch, but instead listed an ambiguous "Stealth Startup" with no information.

n. In my reply, I explained that this was due to my concerns that Plaintiffs here use my LinkedIn information to identify employers and their clients to place pressure on them using public information by this litigation. I felt my concerns were validated by Mr. Wilson's persistent contact with journalists to publicly list my name with this litigation.[2]

o. Mr. Manella replied, "Yep that all sounds reasonable to me."

p. On February 26, 2026, Patrick Gilboy, the Controller (HR) at Teraswitch, reached out with the following documents to be filled and signed:

  i. Charles Schwab – Company Retirement Account Participant Application

  ii. ADP – Employee Information Form

  iii. ADP Employee Direct Deposit Banking Authorization Form

  iv. Emergency Contact Form

  v. Receipt & Return of Company Property

  vi. USCIS Form I-9

  vii. IRS Form W-4

  viii. Commonwealth of Pennsylvania Local Earned Income Tax Withholding

  ix. Acknowledgement and Authorization Regarding Background Check

  x. A Summary of Your Rights Under the Fair Credit Reporting Act

q. On the same day, I signed and returned all documents to Mr. Gilboy.

---

[2] Mr. Wilson contacted Dan Christensen of Florida Bulldog to spread his perspective of the litigation. Florida Bulldog proceeded to directly reference my name in the tags, reinforcing it in search results for my name.
*https://www.floridabulldog.org/tag/john-lettman/*

r. On the same day, Teraswitch Inc sent a Background Screening request from AccurateNow for a background check. On the same day, I filled in the requested information. I requested the results from Mr. Gilboy.

s. On the same day, Mr. Gilboy provided the background check results. They reported:

   i. County: Allegheny, PA – Felony and Misdemeanor: No Records Found

   ii. County: McKean, PA – Felony and Misdemeanor: No Records Found

   iii. Global Sanctions: No Records Found

   iv. National Criminal / Sex Offender Search: No Records Found

   v. Social Security Trace: Lettman, John Paul

t. I interpreted my background check results as demonstrating no criminal activity of any kind.

u. After phone calls with Mr. Manella discussing a visit to the offices, I wrote on March 2, 2026, indicating that it would not be feasible to do it within the week timeframe he requested. I explained this ongoing action and the numerous pressing demands for discovery and depositions that would soon occur.

v. At the time, my discovery responses were required on March 9, 2026. I anticipated arguments, motion practice, or confusion from opposing counsel given the items they sought to justify their wild conspiracy claims simply did not exist.

w. Later, the same day, feeling this would put my employment at risk, I considered accommodation such as bringing a computer with me and wrote that I could accommodate the time frame.

x. After considerable silence, on March 17, 2026, Mr. Shermer wrote, "Sorry for the delay here! Unfortunately it does appear we will need to rescind this offer. I very much enjoyed our conversations and hope we can stay connected on LinkedIn."

18. Beyond Teraswitch, another company, Audinate, withdrew their interest immediately after discovering this action, several weeks after numerous interviews and week-long demonstration projects.

19. The reputational impact of this action upon myself has been extraordinary.

20. As a Software Engineer, my role depends on a significant amount of trust with sensitive information, proprietary data, confidential data, personally identifiable information, and security-related information.

21. The accusations by Plaintiffs of specific misdeeds related to computer systems attack my reputation in that regard.

22. Furthermore, by viewing them, I saw that Plaintiffs hosted many of the filings related to this action on their websites.

23. The activity was not limited to the Plaintiffs. I observed that their counsel, Howard Foster, hosted filings related to this action in his website with the caption "3D Gunmaker Wins RICO Decision Against Rival Company" and a link to an order containing my name.

24. I feel the wording "3D Gunmaker Wins RICO Decision" was designed to mislead the public into believing Mr. Wilson won the entire lawsuit based on the merits of his vexatious RICO claims. I understand this is not an unusual tactic of Mr. Foster as he has misled this Honorable Court *numerous* times.

25. As a result of the publicity from the hosted filings, public records, and articles induced by Mr. Wilson, my name has been permanently associated with the untrue claims in this lawsuit.

26. Since the filing of this and the prior related lawsuit, my ability to seek employment, build connections, and otherwise network in my industry has been destroyed.

27. After my lay-off resulting from this lawsuit, at least 95 applications to different positions were either withdrawn or declined, an unusual circumstance in my career. I believe this occurred in substantial part because searching my name resulted in the hosted filings, public records, and articles induced by Mr. Wilson being returned.

28. Employers, co-workers, and industry professionals would often find this lawsuit, the prior related lawsuit, articles directly induced by Mr. Wilson to include my name, and other derived information. Often, this would lead to negative outcomes, such as concern, mistrust, questioning, lay-offs, and termination.

29. The possibility of an adverse judgment for a large amount was not abstract to me. A judgment of that nature would have threatened my home, savings, investments, retirement accounts, ability to support my mother, and businesses I relied on when I was unemployed because of this lawsuit.

30. Mr. Wilson's ulterior purpose for this lawsuit is blindingly clear from the first complaint. Plaintiffs failed to mention any specific act I committed.

31. Realizing their mistake, Plaintiffs invented the "Iran" claims, unrelated to the FEDCAD meme in any way, to paper over the mishap and continue their retaliatory action against me.

32. Realizing *that* mistake, Howard Foster would misrepresent to this Honorable Court numerous times that the FEDCAD meme *did* mention "Iran" despite the text containing no such mention.

33. I retained The Law Offices of Matthew Larosiere to defend me at an hourly rate of $450. I authorized counsel to perform the work reasonably necessary to defend me, and I remain responsible for the resulting obligations under my fee agreement.

34. The fees are substantial in relation to my income and assets. Paying those fees without an award would be financially ruinous. The fact that I ultimately prevailed does not eliminate those financial consequences.

35. On July 1, 2026, the Court entered summary judgment against Plaintiffs. The Court concluded that Plaintiffs had not supplied customer-level evidence connecting the challenged conduct to a lost subscription.

36. That conclusion is consistent with my experience throughout discovery. Plaintiffs never identified a customer I knew, a transaction I interfered with, a competing subscription I sold, or money I received because of the speech at issue.

37. Absent any consequences for their egregious behavior, I **know** Plaintiffs will continue their vendetta against critics and file further vexatious lawsuits.

38. I respectfully request that the Court award Defendants their reasonable attorneys' fees so that the cost of defeating these claims does not remain with the individuals who had to defend themselves.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 31 July, 2026, in Bradford, Pennsylvania.

JOHN LETTMAN